

U.S. Department of Justice

United States Attorney
Eastern District of New York

DCP:JRS/GK/DAS
F. #2021R00900

271 Cadman Plaza East
Brooklyn, New York 11201

February 23, 2023

By ECF and E-Mail

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Carlos Watson and Ozy Media, Inc.
                Criminal Docket No. 23-82 (MKB)

Dear Judge Pollak:

      The government respectfully submits this letter in support of its motion that the Court impose appropriate conditions of release to reasonably assure the defendant Carlos Watson's appearance in court as required and the safety of other persons and the community.

      As set forth in the indictment, from approximately 2018 to 2021, Watson — the CEO and founder of Ozy Media, Inc. ("Ozy") — directed a scheme to defraud investors in and lenders to Ozy of tens of millions of dollars. Although Watson knew that Ozy was frequently drowning in debt and on the verge of insolvency, Watson falsely presented Ozy to investors and lenders as a successful business with minimal debt. He lied about Ozy's revenue, frequently inflating the true figures by multiples. He lied about Ozy's profits and losses, claiming that Ozy broke even or made millions of dollars in profits in years when it in fact suffered millions in losses. He lied about who was investing in Ozy, claiming that celebrities and high-profile companies were leading investment rounds when those individuals and entities were not investing at all. He lied about acquisition offers for Ozy, claiming to at least one investor that a technology company had offered to buy Ozy for $600 million, when in fact the company had never discussed purchasing Ozy at any price. He lied about the existence and terms of Ozy's business contracts, directing others to alter real contracts or forge fake contracts to provide to potential sources of financing.

      In September 2021, an article in the New York Times revealed one part of the scheme: an attempt by Watson and co-conspirator Samir Rao to defraud a potential investor by impersonating an executive from a purported business partner of Ozy during a due diligence call. Although Watson was in fact present on the call as it occurred and was texting Rao directions of what to say, Watson has falsely denied participation in that incident to investors and in the media. In fact, he has gone so far as to cynically claim that the impersonation was a result of

Rao experiencing a mental health episode — a lie that Watson and Rao concocted as an excuse once suspicions about the call emerged.

Since the investigation into Watson's scheme began, Watson and Ozy — which Watson has always controlled and continues to control — have attempted to stymie the investigation. Watson and Ozy have withheld key incriminating documents from the government and the Securities and Exchange Commission (the "SEC"). Watson and Ozy have also attempted to retaliate against witnesses perceived to be cooperating with the government's investigation, including by cutting off funding for their legal defense.

Based on Watson's serious and years-long deceptions, the severe penalties he faces upon conviction, the overwhelming evidence of his guilt and his efforts to undermine the investigation into his fraudulent scheme, the government respectfully submits that Watson should be released only upon the imposition and satisfaction of appropriate conditions to ensure that he does not flee, further attempt to obstruct the investigation or commit any additional crimes.

I. <u>Background</u>

On February 22, 2023, a grand jury in this District issued an indictment charging Watson with securities fraud conspiracy, in violation of 18 U.S.C. § 371 (Count One); wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count Two); and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Three). <u>See</u> ECF Dkt. No. 1 (the "Indictment"). Ozy was charged in Counts One and Two of the same Indictment. <u>See id.</u> Watson's co-conspirator Samir Rao pleaded guilty to an information charging him with securities fraud conspiracy, wire fraud conspiracy, and aggravated identity theft on February 21, 2023. <u>See</u> Case No. 23-CR-47 (EK). Watson's co-conspirator Suzee Han pleaded guilty to an information charging her with securities fraud conspiracy and wire fraud conspiracy on February 14, 2023. <u>See</u> Case No. 23-CR-48 (EK).

A. <u>The Fraudulent Scheme</u>

As alleged in the Indictment, Ozy is a media and entertainment company whose businesses include digital newsletters, television production, podcasts, and live events, the most prominent of which is a live festival known as "Ozy Fest." Watson founded Ozy in 2012 and has served as the company's Chief Executive Officer since its inception.

Between approximately 2018 and 2021, Watson and his co-conspirators, including Rao and Han, orchestrated a scheme to defraud investors in and lenders to Ozy of tens of millions of dollars through fraudulent misrepresentations and omissions about key aspects of Ozy's business, including Ozy's financial results, debts and audience size. In addition, Watson and his co-conspirators lied to prospective investors about who else might be investing in Ozy, the existence and size of acquisition offers received by Ozy, the existence and timing of "Series C" and "Series D" financing rounds by Ozy, and the existence and terms of Ozy's business contracts — going so far as to direct Ozy employees to create fake contracts with forged signatures to provide in due diligence. On multiple occasions, when faced with questions from lenders or potential investors, Watson and his co-conspirators assumed the identities of and

impersonated actual media company executives to cover up their prior fraudulent misrepresentations.

**Forged Cable Television Contract and Impersonation of Media Executive**

In December 2019, Watson and his co-conspirators attempted to induce a bank to lend Ozy money based on misrepresentations and omissions about Ozy's business. Watson and his co-conspirators sought to secure the loan with anticipated revenues from a second season of an Ozy television show; however, the contract between Ozy and the show's cable network for the second season of the show was still under negotiation. To induce the bank to make the loan sooner, Watson directed Ozy's then-Chief Financial Officer (CFO) to send the bank a fake signed contract between Ozy and the cable network purporting to be for the second season. When the then-CFO refused, Rao, with Watson's approval, sent the fake contract — which contained terms favorable to Ozy and a forged signature — to the bank, copying the then-CFO. Later that day, the then-CFO emailed Watson and Rao to say that she was resigning effective immediately. She explained, "this . . . is illegal. This is fraud. This is forging someone's signature with the intent of getting an advance from a publicly traded bank." She continued, "To be crystal clear, what you see as a measured risk — I see as a felony."

In subsequent months, Watson and his co-conspirators continued to attempt to induce the bank to lend Ozy several million dollars based on misrepresentations and omissions, including regarding the expected revenue from the second season of the Ozy television show. During these discussions, the bank requested to speak to a representative of the cable network. To conceal the lies about Ozy's relationship with the cable network and the status and terms of their agreement, Rao, with Watson's approval, created a fake email address in the name of an actual executive of the cable network, which Rao used to impersonate the executive and communicate with the bank about the potential loan.

**Attempted Fraudulent Investment and Impersonation of Another Media Executive**

From approximately November 2020 through February 2021, Watson and his co-conspirators attempted to induce a financial institution to invest up to $45 million in Ozy by means of material misrepresentations and omissions regarding Ozy's historical and projected financial results, debts, and business relationships. Had the full $45 million investment occurred as intended, $6 million of the $45 million would have been paid to Watson personally.

As part of its due diligence process, the financial institution asked Watson and Rao to arrange a meeting with someone from a well-known online video service that Watson and his co-conspirators had claimed had paid Ozy nearly $6 million in licensing revenue for "The Carlos Watson Show." This was another misrepresentation — Ozy was never paid by this online video service for Ozy content. Because Ozy did not in fact have any business relationship with the online video service, Watson and Rao agreed that Rao would impersonate a media executive at the online video service in communications with the financial institution. On or about January 28, 2021, Rao, with Watson's agreement, created a fake email address in the name of the media executive, which he used to correspond with representatives of the financial institution.

On or about February 2, 2021, Rao had a call with employees of the financial institution during which he impersonated a media executive from the online video service using a

3

voice alteration application that he downloaded onto his cellular telephone to mask his voice during the call. During the call, Watson was in the same room as Rao, and texted Rao instructions about what to say and what not to say on the call. Shortly after the call, one of the employees of the financial institution contacted the actual media executive of the online video service, who confirmed that he had not been on the call and that the online video service had no role in the production of The Carlos Watson Show. When members of the financial institution later spoke with Watson, he falsely claimed that Rao had acted alone and as a result of a mental breakdown.

> B. <u>Watson's Efforts at Obstruction and Witness Retaliation</u>

After the publication of the <u>New York Times</u> article and the opening of the government's investigations, Watson attempted to conceal the scheme and his role in it. After receiving grand jury subpoenas, Watson and Ozy produced some responsive materials but withheld plainly responsive documents that incriminated Watson. For example, Watson and Ozy withheld documents showing that Watson received regular email updates on Ozy's true financial performance—which drastically contradicted the information Watson provided to investors—establishing his knowledge that statements he made to investors about Ozy's financial performance were lies. Watson and Ozy additionally withheld a resignation email that Ozy's then-CFO sent to Watson and Rao after Rao sent a falsified contract to a potential lender — which Watson had previously instructed the then-CFO to do and which she had refused to do. In the email, the then-CFO described Watson's and Rao's conduct as "illegal," a "fraud," and a "felony."

In addition, Watson produced to the government certain text message conversations in which the portion of the conversation incriminating Watson had been deleted. For example, as alleged in paragraph 99(n) of the Indictment, on July 15, 2020, Watson, Rao and Han texted each other about what fake numbers had been sent to an investor in the past and what fake numbers should be provided to that investor going forward. The full version of this conversation was produced by both Rao and Han. In the version Watson produced, however, Rao's and Han's texts remained, but Watson's own texts were all missing.

Watson's obstruction extended to attempts to retaliate against individuals he believed were cooperating with the government's investigation. Soon after the publication of the <u>New York Times</u> article, in September 2021, Watson agreed on behalf of Ozy that Ozy would pay Rao's and Han's legal bills. For a time, Ozy did in fact pay Rao's and Han's bills. In late December 2021, however, then-counsel for Ozy spoke separately with counsel for Rao and counsel for Han and told them that Ozy would no longer pay their legal bills because it believed they were cooperating with the government's investigation. At the time of these decisions, Watson was the only executive at Ozy and the only person at Ozy with authority to make such a decision.

In January 2022, after counsel for Rao challenged the legality of Ozy's actions, then-counsel for Ozy wrote to counsel for Rao and stated that Ozy would be willing to pay Rao's legal bills only if Rao signed an affirmation stating that Rao had had no reasonable cause to believe his conduct at Ozy was unlawful — <u>i.e.</u>, a statement denying knowledge of the fraudulent scheme, which was patently false. Later that month, counsel for Rao spoke with then-counsel for

4

Watson, who reiterated that Ozy would not pay Rao's legal bills because of the belief that Rao was cooperating with the government.[1]

II.    Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) [which are inapplicable here] or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character"; and (4) the nature and seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

---

[1]    Rao subsequently sued Ozy in Delaware Chancery Court seeking advancement of his legal fees. The Delaware Court ordered Ozy to advance the fees, as required under Delaware law. The government understands that Ozy has nevertheless continued to refuse to advance Rao's or Han's legal fees and recently has been held to be in contempt of court.

5

III.    Argument

    A.    Watson Presents a Risks of Flight and Obstruction

The facts and circumstances of this case demonstrate that that Watson presents a serious risk of both flight and of obstruction.

    1.    Risk of Flight

First, "[t]he prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022). Here, if Watson is convicted at trial, he faces a mandatory-minimum sentence of two years' and a maximum sentence of 37 years' imprisonment. The government currently estimates that for purposes of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the advisory Guidelines range of imprisonment would be 286 to 351 months' (approximately 24 to 29 years') imprisonment.[2] Courts have recognized that even a significantly shorter potential sentence can warrant a risk-of-flight finding. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee").

Second, where, as here, the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." Zhang, 55 F.4th at 151; United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). The evidence of Watson's guilt is overwhelming. The

---

[2]    The government's initial estimate of the Guidelines is premised on a base offense level of 7 pursuant to U.S.S.G § 2B1.1(a)(1), a 24-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M) (loss of more than $65 million), a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) (more than 10 victims); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A) (more than $1 million from a financial institution); a two-point enhancement pursuant to U.S.S.G. § 3C1.1(c) (organizer or leader); and a two-point enhancement pursuant to U.S.S.G. § 3C1.1 (obstruction of justice), for a total offense level of 39. Assuming a criminal history category of I, this would yield an initial Guidelines range of 262 to 327 months' imprisonment for Counts One and Two. Pursuant to 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6, an additional 24 months' consecutive sentence is then added for Count Three, for a total of 286 to 351 months' imprisonment.

allegations in the Indictment — which make up just a portion of the government's proof — are largely drawn from documents uncovered over the course of the ongoing investigation. The documentary proof irrefutably shows that investors and lenders were consistently provided materially false information by Watson and his co-conspirators. Watson's own emails and texts show that Watson knew the information he and co-conspirators was providing was false. Watson provided demonstrably false financial results and projections that contradicted internal reports Watson received from Ozy employees and often contradicted his own statements to other investors. Watson also falsely claimed that well-known celebrities or large companies were leading investment rounds in Ozy or had offered to purchase Ozy, which he knew was untrue. Watson's own emails and text further demonstrate that Watson was the driving force behind the scheme, directing co-conspirators on what to say and approving emails and documents with fraudulent information before they were sent. The government anticipates that witness testimony from victims (many of whom will say Watson lied to them directly in meetings and on calls) and others will further elaborate the extent of the scheme and Watson's central role in it.

Third, Watson has the means to flee if he chooses to do so. See Sabhnani, 493 F.3d at 76 ("a second factor strengthens the case for detention: defendants' ample means to finance flight"). Based on the investigation, the government understands that Watson has substantial assets. He was previously a managing director at a large financial institution and also sold a prior company that he founded for several million dollars. In addition, Watson controls Ozy, which obtained tens of millions of dollars from victims — the full disposition of which the government is still investigating.

Fourth, the dishonesty shown by Watson in his conduct in this case, as well as his efforts to obstruct the investigation, discussed above, demonstrate that he cannot be trusted to return to court as required without appropriate conditions. See United States v. Nouri, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (Chin, D.J.) (finding defendant presented "substantial risk of flight" based, in part, on "dishonest and obstructive conduct," including "commit[ing] fraud on his investors"). Watson lied for years, including to people who believed they were his friends. There is no reason to believe that any promise to return to court should be accepted unless it is based on substantially more than Watson's word.

Accordingly, the government submits that the Court should find by a preponderance of the evidence that Watson poses a serious risk of flight.

### 2. Risk of Obstruction

The Court may find a risk of obstruction based on a "risk that [a defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Here, Watson has already attempted to obstruct justice and retaliate against witnesses. See 18 U.S.C. § 1513(e) (criminalizing "knowingly, with the intent to retaliate, tak[ing] any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense); 18 U.S.C. § 1519 (criminalizing "knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede,

7

obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States").

Although the government does not currently argue that detention is necessary to mitigate the risk of further obstruction or retaliation by Watson, the government respectfully submits that Watson's past conduct warrants imposition of appropriate conditions to ensure that he does not continue such obstructive conduct. See United States v. Campos, No. 19-CR-575 (FB), 2019 WL 7049953, at *1 (E.D.N.Y. Dec. 23, 2019) (imposing "conditions sufficient to reasonably mitigate" risk of further obstruction where government had proffered evidence of past obstruction).

      B.      Appropriate Conditions Are Required

Here, each of the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of setting appropriate conditions to ensure that Watson does not flee or further obstruct justice or attempt to retaliate against witnesses.

First, as set forth above, the offense is serious, the conduct involves extraordinary dishonesty, and Watson faces severe penalties if convicted at trial.

Second, as set forth above, the weight of the evidence against Watson is extremely strong.

Third, Watson's history and characteristics weigh in favor of imposing conditions of release. Watson's commission of a years-long fraudulent scheme suggests that he does not have a truthful or reliable character. In addition, his sole employment for the last decade has been at a company he operated by means of the charged fraudulent scheme and which has been charged alongside him. The government acknowledges that Watson has no known criminal history and no known substantial ties to foreign countries.

Fourth, Watson poses a continuing danger to the community. As set forth above, there is a risk that Watson may continue to attempt to obstruct the prosecution or retaliate against witnesses if appropriate conditions are not imposed. Further, there is a risk of continued fraudulent conduct by Watson. According to public reporting, Watson has been attempting to raise new money for Ozy from advertisers and investors as recently as this month. See Max Tani, Media company Ozy is attempting a comeback, Semafor (Feb. 9, 2023), https://www.semafor.com/article/02/08/2023/media-company-ozy-is-attempting-a-comeback ("In a 30-minute-long presentation to potential advertisers and investors at the MAGNA Equity Upfronts in Manhattan on Wednesday, Ozy founder Carlos Watson and his team implored brands to invest in the digital media company 'if you want the opportunity to spread love.'").

In light of the above, the government submits that the Court should release Watson only if he satisfies appropriate conditions, including:

      1)      A substantial secured bond of a value constituting a significant portion of Watson's assets, signed by at least two sureties with net worths of sufficient unencumbered value to pay the amount of the bond, with appropriate moral suasion over Watson, see Sabhnani, 493 F.3d at 77

8

    ("[T]he deterrent effect of a bond is necessarily a function of the totality of a defendant's assets."); United States v. Batista, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("In addition to the requirement of financial responsibility, a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial."); see also 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that any surety "have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond");

2) Travel restrictions limiting Watson's travel to the Northern District of California and, as required for court appearances, New York City, see 18 U.S.C. § 3142(c)(1)(B)(iv);

3) A condition forbidding Watson from contact with his co-defendant, Ozy Media, Inc., including any current or former officers, employees or directors of Ozy, except in the presence of Watson's counsel, and from any contact at all with investors in or lenders to Ozy, including their officers and employees; individuals or entities whom Watson or Ozy solicited for investments in or loans to Ozy, including their officers and employees; and any other co-conspirators, victims or witnesses (with case-by-case exclusions for family members and close friends who were not involved in the fraudulent scheme, if consented to by the government and pre-trial), see 18 U.S.C. § 3142(c)(1)(B)(v);

4) A condition forbidding Watson from attempting to obtain investments or loans for Ozy or any other business; and

5) A condition forbidding Watson from attempting to obstruct the prosecution or retaliating against witnesses, or causing Ozy or anyone else to do so on his behalf.

IV.    Conclusion

    For the reasons set forth above, the government respectfully submits that the Court should impose appropriate conditions, as forth above, to mitigate the risk that Watson will

9

flee, obstruct justice, retaliate against witnesses, or engage in further criminal activity harmful to the community.

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney

                        By:    /s/
                                        Jonathan Siegel
                                        Gillian Kassner
                                        Dylan A. Stern
                                        Assistant U.S. Attorneys
                                        (718) 254-6293/6224/6213

cc:     Clerk of the Court (EK) (by ECF)
        Counsel of Record (by ECF)