UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     *     Case No. 23-CR-00082(EK)
    *
    *     Brooklyn, New York
    *     March 10, 2023
    v.     *
    *
CARLOS WATSON,     *
    *
    Defendant.     *
    *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      GILLIAN KASSNER, ESQ.
     DYLAN STERN, ESQ.
     Asst. United States Attorney
     United States Attorney's Office
     271 Cadman Plaza
     Brooklyn, NY 11201


For the Defendant:      NOAM BIALE, ESQ.
     JUSTINE HARRIS, ESQ.
     Sher Tremonte LLP
     80 Broad Street
     Suite 1301
     New York, NY 10004




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
4 Research Drive, Suite 402
Shelton, Connecticut 06484 (203)929-9992

1          (Proceedings commenced at 4:13 p.m.)

2          (Defendant present via telephone.)

3          THE CLERK:  Criminal cause for a status conference,

4     United States of America versus Carlos Watson, Docket No. 23-

5     CR-82.

6          Before I ask you to state your appearances, I just

7     would like to note that these proceedings are public.  The

8     recording and/or rebroadcasting of them are not allowed.

9          Would you now please state your appearances for the

10    record, starting with the government.

11         MS. KASSNER:  Good afternoon, Your Honor.  Gillian

12    Kassner and Dylan Stern for the Government.

13         THE COURT:  Good afternoon.

14         MR. BIALE:  Good afternoon, Your Honor.  Noam Biale

15    and Justine Harris for Mr. Watson, who is present with us by

16    phone line.

17         THE COURT:  Good afternoon to you both.

18         And Mr. Watson, I think it's afternoon in

19    California.  Good afternoon to you as well.  Can you hear me?

20         THE DEFENDANT:  I can.  Good afternoon.

21         THE COURT:  Okay.  Again, as I indicated last time,

22    if there's anything you don't hear, let us know and we'll

23    repeat it.  And if you need to speak to your lawyers or if

24    your lawyers need to speak to you, you all should speak up

25    and let us know that and we will do our best to facilitate.

1        Okay.  So we've got on my agenda the bail

2   modification question, and I suppose whatever remains of the

3   Government's request to Judge Scanlon to appointment counsel

4   for the company.  The parties may have additional agenda

5   items, but let's kick it off with the bail modification

6   question.

7        I had asked. or at least foreshadowed to the

8   defense. that I would be interested in understanding with as

9   much specificity as possible what it is Mr. Watson needs to

10  do, in his view, to effectuate the wind down of the company,

11  who he needs to talk about what and with what frequency.

12        Just to start out by perhaps stating the obvious, a

13  lot of features of the current situation make this a

14  potential recipe for chaos.  Right?

15        We've got allegations from the indictment that Mr.

16  Watson participated in the extended and fraudulent course of

17  conduct.

18        Of course, those are just allegations, but the

19  allegations speak to the commission of that fraud, not by one

20  person alone, but by multiple employees of this company, and

21  with many perhaps investors as perhaps potential victims.

22        And so the extent Mr. Watson is saying I need to be

23  able to manage the company through an orderly wind down, one

24  can't help but hear in that statement the contention that Mr.

25  Watson needs to be in regular contact with potential

1   witnesses and victims of the alleged offense conduct and to

2   do so outside the presence of counsel.

3          That's compounded obviously by the fact that the

4   company has apparently no lawyer of its own, either in-house

5   lawyer or outside counsel.

6          And so we're dealing with a situation where, you

7   know, as we lawyers all know, there's a substantial

8   divergence of interest between Mr. Watson's interests and the

9   company's interests, at least potentially. That's why company

10  counsel represent the company and not any individual.

11         You know, the law is clear, as we've seen in the

12  papers back and forth, that avoiding or minimizing what would

13  otherwise be an intolerable risk of obstruction is a valid

14  basis on which to contemplate certain contact restrictions on

15  someone's release.

16         Even the most recent letter I got from the defense

17  says, look, there's a person who the Government alleges Mr.

18  Watson was trying to obstruct justice through or trying to

19  influence or what -- I forget exactly what they say.

20         The defense response; actually Mr. Watson's on very

21  happy terms with that person.  He wrote her a letter of

22  recommendation to graduate school and she's calling to thank

23  him.

24         Query whether that complicates things more than it

25  clarifies them, right?

1        MR. BIALE:  Sorry to interrupt, Your Honor, but

2    that's not the same person that the Government has alleged

3    the obstruction is happening with.  That's employee --  yeah.

4        THE COURT:  Let me read exactly what I'm talking

5    about.  So this is your March 9th letter.

6        Whether we call it obstruction or not, the

7    Government apparently contends that Mr. Watson made threats

8    to this person to ruin her life, including by calling the

9    dean of a prestigious business school.

10       Maybe I misspoke when I suggested that that perhaps

11   might exist under the umbrella of obstruction, but you could

12   see why I would make that mistake if that's the case.

13       And then the defense letter indicates that, in

14   fact, this person is calling Mr. Watson to thank him for

15   providing letters of recommendation that assisted her

16   admission to Stanford Business School.

17       I'm not getting into the merits of this at all

18   except to say every one of these negotiations that you're

19   saying Mr. Watson needs to be engaged in on his own and

20   without any legal supervision from the company or otherwise

21   is a potential future allegation, rightly or wrongly, of

22   obstruction, right?

23       If he needs to be talking to employees about what

24   they're going to be paid for sticking around through the

25   wind-down period, I don't even need to finish the sentence,

1       right?

2               You see the potential issue there that the

3       Government is going to be here, you know, six weeks or two

4       months from now saying he's not only paying these people fair

5       market value for their services to stick around and wind down

6       the company, he's paying them in excess of that in

7       circumstances that raise questions about potentially

8       influencing testimony.

9               And that's as much a risk to him obviously as it is

10      to the integrity of these proceedings and the safety of the

11      community.

12              And so with all of that by way of preliminaries, it

13      seems to me, again, that the devil's in the details here and

14      that the more specificity we can have about who Mr. Watson's

15      going to be meeting with, who he needs to be talking to, on

16      what subjects, is there a human resources professional at

17      this company in whom, you know, the Government has some faith

18      who might be a party or a witness to any of these

19      conversations, or what -- how does the defense propose to

20      mitigate or eliminate the risks that I'm hypothesizing here?

21              MR. BIALE:  Sure, Your Honor.  So let me start with

22      a few preliminaries.

23              One is we're not seeking to have Mr. Watson be in

24      contact with investors without the presence of counsel.  So

25      that's a separate issue from the employees.  Okay.  So I just

1    wanted to make that clear.

2              Secondly, Your Honor has asked about the status of

3    the company.  And I can give a little bit of an update on

4    that.

5              The company is working with experienced insolvency

6    counsel whose name is Rafael Zahralddin, at Lewis Brisbois.

7    I never know how to pronounce that firm's name, but it's a

8    well-known large firm.

9              THE COURT:  You say working with, meaning that

10   person has been engaged?

11             MR. BIALE:  That person -- that person is

12   representing the company and advising on how this wind down

13   should occur.  Okay.

14             THE COURT:  Okay.  But there's no bankruptcy filing

15   that's been -- is there a bankruptcy filing?

16             MR. BIALE:  There's not, no, Your Honor.

17             So where we are now is the company is going to be

18   dissolved pursuant to Delaware law in something called a

19   dissolution.  I think it's not a bankruptcy.  You're probably

20   more familiar with it than I am.

21             But that my understanding is a fairly straight

22   forward process and it's in motion already, but will take a

23   little of time.  And the company has -- and it also requires

24   some resources.

25             So the company through, acting through counsel, has

1    identified a secured creditor who is willing to fund the

2    dissolution and any potential claims that would maximize

3    recovery for any interested parties.

4          So that's what's happened since we last appeared

5    before Your Honor.  There is a process in place.  It's being

6    guided by experienced counsel.

7          And our colleague, who Your Honor knows, Bob Knuts,

8    who has more expertise in this area than I or Ms. Harris do,

9    has been in communication with the company's lawyer to

10   understand what's going on.  And both are obviously making

11   sure that all the decisions are in the best interests of the

12   minority shareholders and the creditors.  So that's what's

13   going on with the company.

14         Now, for that wind down to occur, Mr. Watson does

15   need to be in contact with certain members of his finance

16   team to find out what the company owes people, what is owed

17   to the company --

18         THE COURT:  Why?  Why can't the liquidator have

19   that contact instead of your client having that contact?

20         MR. BIALE:  Well, so, I'm just giving an example of

21   -- I mean, there isn't someone in place yet, right?  Our

22   client --

23         THE COURT:  But you said there was somebody in

24   place.

25         MR. BIALE:  Oh, I'm sorry, you mean the counsel.

1          THE COURT:  Yeah.  Sorry, when I say liquidator, I

2     mean --

3          MR. BIALE:  Okay.

4          THE COURT:  -- resolution counsel or whatever you

5     want to call this person.

6          MR. BIALE:  If I can have a moment?

7          THE COURT:  Yeah.

8     (Pause.)

9          MS. HARRIS:  Your Honor, may we have a minute to

10    consult with our client privately?

11         THE COURT:  Yes.

12         MS. HARRIS:  No.  No.  That's what we're here for.

13    You'd be doing that if he was here in person.

14         Mr. Watson, your lawyers are going to figure out a

15    way to call you.

16         MS. HARRIS:  Yeah.  We'll just step out into the

17    hall, Your Honor, if that's okay.

18         THE COURT:  Please.

19         MS. HARRIS:  Okay.  Thank you very much.

20    (Pause.)

21         MR. BIALE:  Okay.  Mr. Watson, are you on the line

22    with us here in court?

23         THE DEFENDANT:  I am.

24         MR. BIALE:  Okay.  So, Your Honor, thank you for

25    that time.

1    So, look, we take Your Honor's point.  I think that

2    when we came and saw you on Monday there were lots of issues

3    involving HR matters, health insurance, things like that,

4    that we -- that we outlined in our letter, many of which Mr.

5    Watson's sister has been trying to deal with.  She has a role

6    at the company.  And obviously because of the bail

7    restrictions, she had stepped into convey some of that

8    information to the employees.

9         I think we are fine with --

10        THE COURT:  Tell me again -- tell me again what her

11   role at the company is?

12        MR. BIALE:  I'm not sure what her exact title is,

13   Your Honor.  I apologize.

14        But I think that what probably makes sense going

15   forward is to have those communications be with dissolution

16   counsel involved.  That's Mr. Zahlraddin.

17        We are not really in a position to be on all those

18   communications, but he is.

19        THE COURT:  Right.

20        MR. BIALE:  So I think that if that's a solution

21   that Your Honor would be comfortable with, I think we'd be

22   comfortable with that going forward.

23        So essentially we're withdrawing the request to

24   have him communicate with employees without counsel present.

25   We would just ask that that counsel be Mr. Zahlraddin.

1          And then, you know, with respect to other issues, I

2     think we can revisit them later.  You know, we wanted to

3     bring this to Your Honor's attention because it was an

4     immediate, pressing need at the beginning of the week.

5     Obviously things are happening quickly.  But I think that Mr.

6     Zahlraddin is in a position to play that role if that would

7     give the Court comfort.

8          MS. KASSNER:  Your Honor, if the Government may

9     respond?

10         I think there is an issue here.  It's actually not

11    necessarily distinct from the issue you outlined earlier.

12         You know, the insolvency counsel, we're at least

13    aware that on this past Friday Mr. Watson unilaterally fired

14    a person who we believed to be the only independent director

15    of the company and copied that counsel.

16         So, in other words, as proposed --

17         THE COURT:  Is it a Delaware corporation?

18         MS. KASSNER:  Yes, Your Honor.

19         THE COURT:  An independent director means not also

20    an employee of the company, right, just a director, right?

21         MS. KASSNER:  Yes, Your Honor.

22         THE COURT:  How does one person unilaterally

23    terminate a director?

24         MS. KASSNER:  By email.  He sent an email.  I'm not

25    sure.

1          THE COURT:  Yeah.

2          MS. KASSNER:  In terms of the bylaws, Your Honor, I

3    actually not sure that they're complying with the bylaws of

4    the company right now.

5          The issue really is we keep requesting information

6    and not getting it.  The information should be easy to

7    provide.  How many employees does this company have?  Is it

8    11?  Is it 10?  Is it 15?  The number has changed every time

9    we've asked the question, and including as recently as

10   between February 3rd, 2023 and today, it seems that more

11   employees are with the company than there had been.  It

12   doesn't make sense.

13         Who are the directors?  Who are the executives?

14   Who is this finance person who we hope exists?  I think at

15   this point we have virtually no information about the --

16         THE COURT:  Let me sure I understand the gap

17   between your position and the defense position.

18         The existing -- I left the copy of the bond on my

19   desk, but somebody's bringing it up now. I think the existing

20   condition is no contact outside the presence of counsel.  And

21   we just heard an offer essentially to live within the

22   confines of that existing -- essentially a withdrawal of the

23   request to modify the bond.

24         MS. KASSNER:  That's right.  Your Honor, the

25   Government is seeking in its letter to Your Honor dated March

1    9th, 2023, and I apologize this is in a footnote, but

2    footnote 4 -- and I actually think it might be another

3    footnote.  Hold on, Your Honor.

4            We actually, and I'm trying to see if there's

5    another place in the filing, we actually are seeking

6    clarification of the bond that counsel, or first counsel in

7    this matter, because right now the concern that we have is

8    that the defendant may use -- copying another attorney, who

9    by the way might be hired by him, and might only be speaking

10    with him, about how to dissolve the company.

11            And, therefore, by -- oh, my colleagues have

12    helpfully pointed out it's actually footnote 7 on the last

13    page of our filing, that we actually weren't aware that this

14    concern would occur until we heard about the firing of the

15    independent director with an attorney copied.

16            But if that attorney is accountable only to Mr.

17    Watson then, unfortunately, I don't believe that solves the

18    ongoing concern, especially if that attorney is dealing with

19    the dissolution of the company.

20            THE COURT:  I was taking from Mr. Biale's comments

21    that the attorney-client relationship ran from --

22            Say the name of the lawyer again.

23            MR. BIALE:  Sure.  It's Rafael Zalradeen, Z-A-L-R-

24    A-D-E-E-N [sic].  He's a partner at Lewis Brisbois which is

25    spelled B-R-I-S-B-O-I-S.

1    THE COURT:  I have taken Mr. Biale to be indicating

2    that the attorney-client relationship ran from Mr. Zahlraddin

3    to the company.

4            MR. BIALE:  That's correct.

5            THE COURT:  Not to Mr. Watson personally.  And that

6    comes with all the attorney's duties of loyalty and

7    confidence that it comes with.

8            And, you know, presumably to the extent that a

9    lawyer might be thought to be acting for the benefit of a

10   particular individual and potentially to the detriment of his

11   actual client, I think that would be a very serious thing and

12   not something we should presume to be likely, right?

13           MS. KASSNER:  Well, Your Honor, I wouldn't -- we

14   wouldn't have initially presumed it until we saw this email.

15           I'll note that the email firing the director wasn't

16   brought to our attention by Mr. Watson or by the company.  We

17   found out about it independently.

18           And I'll also note that the real issue here is that

19   attorney is not accountable to Your Honor.  And so, if there

20   is an issue, there's no way for us to mitigate against a

21   potential risk, especially in dissolution proceedings, to

22   ensure that he's answerable to the company.  He doesn't have

23   a duty of loyalty to the investors.  He has his own ethical

24   and professional obligations, but --

25           THE COURT:  But the company has fiduciary duties to

its investors and he's a lawyer representing the company.

I mean, look, there's a risk of obstruction in every case, right? And the bail conditions can't, you know, blanket the world to prevent that, you know, spark from getting any oxygen.

If I were, you know, defense counsel, which I'm not, and far be it for me to tell anybody how to represent their clients, but I already mentioned, you know, there are obviously extremely strong incentives for Mr. Watson to be scrupulous and careful in any dealings he has with employees, directors, et cetera, especially to the extent they involve the potential exchange of money or letters of recommendation or anything else of value for all the obvious reasons that everybody who practices in the area of corporate internal investigations is eminently familiar with and doesn't need me to tell them about.

But what are you -- what are you asking for?

You're asking if there's a resolution -- if there's a partner at a Wilmington law firm experienced in, you know, bankruptcy and resolution matters who's going to be coordinating the wind down, he has to be able to -- Mr. Watson has to be able to talk to that lawyer, right?

The lawyer can't make business decisions about who's important to keep around for the resolution process and who's less important on his or her own. There needs, you

1    know, there needs to be input from a business person, and the

2    highest ranking person at this firm is Mr. Watson.

3            To the extent this can be run as a kind of hub and

4    spokes communication process where the lawyer sits in the

5    middle and, you know, talks to Mr. Watson when he needs to

6    and then talks to other employees when he needs to without

7    the spokes of Mr. Watson and other employees talking to each

8    other, even in the presence of counsel, then maybe that's

9    advantageous from everybody's perspective.

10           But it's not -- that would go beyond the existing

11   bail conditions and I didn't understand us really to be

12   contemplating that today.

13           MS. KASSNER:  Well, Your Honor, I think the

14   Government's request in that case is just that if the

15   individual who is appointed as insolvency counsel at some

16   point changes, we would just ask to be updated about the

17   identity of insolvency counsel.  But otherwise, I think

18   that's fine.

19           THE COURT:  Meaning that this issue has now been

20   resolved to everybody's satisfaction and there's nothing for

21   me to decide?

22           Is that the defense view?

23           MR. BIALE:  It sounds that way, Your Honor.

24           THE COURT:  Okay.  And the Government concurs?

25           MS. KASSNER:  Yes, Your Honor.

1          THE COURT:  I'm getting some begrudging nods from

2     the Government's table.  Okay.

3          MR. BIALE:  Your Honor, I do just want to say one

4     thing for the record on this.

5          I think we've covered the ground pretty throughly

6     here, but something that came up in the Government's letter

7     and has again come up today is the Government's questioning

8     of the propriety of conduct by lawyers at well regarded,

9     reputable law firms.

10          The lawyers who did the productions in this case,

11     which include Deckert, Ford O'Brien.  And then after they

12     were no longer counsel to Mr. Watson, Covington & Burling.

13     And Steptoe & Johnson came in, were in negotiations with the

14     Government to look at and supplement any of those productions

15     and thought they were engaged in a fruitful dialog on that

16     and then the Government in a total surprise to them just

17     arrested Mr. Watson and indicted the company.

18          These are firms and they work with vendors that

19     know what they're doing.  This is not -- these are not fly by

20     night operations.  And so the suggestion that they are being

21     used to obstruct the Government's investigation I think is a

22     very serious allegation and not something to just be thrown

23     into a letter with no proof.

24          Let me also say, Your Honor, with respect to the

25     allegations about obstruction regarding the advancement of

1    fees to Mr. Rau (ph), we covered this in our letter.  The

2    undertaking that he was asked to sign which simply confirms

3    that he acted in good faith and in the best interests of the

4    company is consistent with the company's bylaws.

5         It's commonplace in any undertaking in an insurance

6    situation that the Government is making that into an

7    obstructive act where Mr. Watson was trying to get him to

8    sign a false affidavit is just -- I mean, you can hear in my

9    voice that it's -- I can't believe they're saying that.

10        And when we wrote our letter, Your Honor, we did

11   not have the oral decision of the Delaware Chancery Court.

12   We asked the Government to provide it to us.

13        The Government suggests in footnote 5 of their

14   letter that the Court found, and this is a quote, "Found in

15   holding Ozy to have wrongfully withheld advancement and Ozy

16   had no legal right to require Rau to sign such an

17   affirmation."

18        Well, I have now read the Chancery Court's

19   decision, Judge.  I would like to give it to you.  There's

20   nothing like that in here.  They are making that up out of

21   whole cloth.

22        What the Chancery Court said was that the company

23   had to continue to advance fees because Rau had not

24   repudiated the undertaking that he had signed.

25        So the Chancery Court found actually that that

1    undertaking was completely appropriate and effective and

2    that's why the Court ordered the advancement to be paid.

3            So I'm raising all this -- I realize there's

4    nothing for the Court to decide, I don't want to try your

5    patience -- but I'm bothered by the fact that ordinary

6    actions taken in the context of corporate investigations are

7    being painted as obstructive acts in ways that just do not

8    make sense.

9            And so I'd like to -- this transcript is under

10    seal, Your Honor.  I can submit it to the Court just by

11    handing it to your deputy.

12            But, you know, I would just like the facts on this

13    to be --

14            THE COURT:  Under seal in Chancery you're talking

15    about?

16            MR. BIALE:  Under seal in the Chancery Court, which

17    is why we weren't able to get it until the Government sent it

18    to us.

19            THE COURT:  You're sure that I'm allowed to review

20    it as per the seal order of the Chancery Court?  Not that I'm

21    allowed to review, but that you're allowed to share it with

22    me?

23            MR. BIALE:  I don't know if the Government has a

24    view on that.

25            MS. HARRIS:  It was cited -- it was cited in the

1    Government's letter, Your Honor.

2          THE COURT:  Okay.  I'm not sure that any of this

3    matters right now to any live decision that I'm being asked

4    to make.

5          But once again we're in a pretty unusual posture

6    here in that you've got an individual chief executive who's

7    been indicted for fraud who is continuing apparently in that

8    role at the company at which the fraud allegedly occurred and

9    the company has no in-house lawyers, as far as I know, and is

10    unrepresented at least in this action.

11          And the company has failed to appear, right?

12          So the company has an obligation, it's been

13    summoned to appear in this case.  And unless somebody wants

14    to advise me otherwise, it has defaulted on that obligation

15    or has fallen down on that obligation.

16          And so I don't know where that leaves everybody

17    except that it's a potential free for all here.

18          I'm not going to get ahead of myself and start

19    raising issues that other people aren't raising to me, but

20    there's been some back and forth about, I think, the idea

21    that the Government has pending document requests into the

22    company and is at a loss to understand with whom it's dealing

23    in that respect.

24          Again, I could see reasons why even from Mr.

25    Watson's perspective he wouldn't want to be the person

1    coordinating the company's response, but I'm not telling

2    anybody what to do in that regard.

3            When there's an issue that needs to be decided,

4    somebody will call it to my attention and we'll decide it.

5            Is there an issue that needs to be decided with

6    respect to the Government's request to appoint counsel for

7    the company?

8            MR. SIEGEL:  Your Honor, I think if the company is

9    at this point still not represented, the only way for this

10   case to move forward against the company at a minimum is for

11   the Court to appoint counsel.

12           THE COURT:  Why?  Why doesn't the case move forward

13   against this corporate defendant in absentia?  And,

14   relatedly, what makes you confident that it's appropriate to

15   expend CJA funds to represent a corporation?

16           MR. SIEGEL:  Well, Your Honor, there's no

17   suggestion that CJA funds should be used.

18           THE COURT:  How else are we going to pay the

19   lawyers?

20           MR. SIEGEL:  So the way courts have done this in

21   the past where this has come up is they've appointed the

22   counsel at the company's expense.

23           THE COURT:  Can you point me to the citations?

24           MR. SIEGEL:  Sure.  So this is in our March 8th

25   letter.

1          THE COURT:  March 8th letter to Judge --

2          MR. SIEGEL:  To Your Honor and to Judge Scanlon.

3          THE COURT:  Okay.  For some reason, I don't have

4     that in front of right now.

5          MS. HARRIS:  Your Honor, I can hand one up to you.

6          THE COURT:  Yeah.  Would you please.

7          MR. SIEGEL:  And, Your Honor, I'll give you a

8     chance to read it, but the legal discussion starts on the

9     second page, into the third page, where we discuss the cases

10    that have addressed -- the courts that have found themselves

11    in this situation, how they're addressed it.

12         (Pause.)

13         THE COURT:  It would be idle to provide for

14    somebody in the corporation if the Court after doing so could

15    not render judgment against it, the Court must, therefore, to

16    appoint one of its attorneys and officers to appear for the

17    corporation.  So says the Western District of Michigan 2016.

18    I'm sorry.  That's *Crosby*, Southern District 1959.

19         It's unclear to me, and I haven't looked at these

20    cases, whether that's the Court appointing outside counsel.

21    Like, am I picking the lawyer?  Is the company picking the

22    lawyer?

23         MR. SIEGEL:  Yes, Your Honor.

24         In *Crosby*, the Court picked the lawyer.  And that's

25    what's happened in other cases as well.

1        THE COURT:  Picked the lawyer, how?

2        MR. SIEGEL:  So the situation that makes it

3    simplest, which is not -- well, which may be the situation we

4    have here, if there is other counsel representing the company

5    in other matters.

6        In *Crosby*, I think there was company representing

7    the -- there was counsel representing the corporation in an

8    SEC matter and the Court said you now represent the company

9    in the criminal matter as well.

10       In other courts, I think the Court can look to the

11   bar of the Court and determine someone who would be

12   appropriate and appoint them.

13       THE COURT:  Have you seen that happening in any of

14   these cases?

15       MR. SIEGEL:  Your Honor, I can --

16       THE COURT:  You're asking me just to like go

17   through a list of lawyers with corporate fraud experience in

18   New York and cold call someone, essentially?

19       MR. SIEGEL:  Your Honor, what we are submitting is

20   that you have the authority to do that, and that absent that,

21   the corporation can effectively stymy the prosecution by just

22   refusing to appear.

23       THE COURT:  How does that stymy the prosecution

24   though?  They're just -- why is it any different from a

25   fugitive defendant who gets tried in absentia and convicted,

1    and whatever is left of the corporation's assets I guess

2    would be subject to the Court's jurisdiction at sentencing?

3         MR. SIEGEL:  Well, I think the fugitive defendant's

4    a good example.  A fugitive defendant doesn't get tried in

5    absentia.  We have to wait until we find them, then we can

6    arrest them, we can put them in jail, and then we would have

7    a trial with them here in person.

8         THE COURT:  Is that always true?  What if the

9    defendant leaves in the middle of trial?

10        I think there are circumstances in which criminal

11   defendants are tried in absentia, but that may be perhaps

12   beyond the scope of this discussion.

13        All right.  Let me think about this issue.

14        MR. SIEGEL:  And, Your Honor --

15        THE COURT:  What other avenues does the Government

16   have at its disposal to solve this issue?

17        I don't know if there's a parallel SEC

18   investigation here, and you don't necessarily need to reveal

19   that now, but I would have thought that the SEC, and maybe

20   even the U.S. Attorney's Office, have procedural avenues

21   through which you could pursue receivership.  Who knows?

22        MS. KASSNER:  Your Honor?

23        THE COURT:  Rather than having me, you know step in

24   and appoint someone?

25        MR. SIEGEL:  So, Your Honor, there is -- the SEC

1    has brought a case.  As far as I understand no one has

2    appeared for the company in the SEC's case.  I can't speak to

3    whether the SEC will take any of its remedies.  Obviously,

4    the SEC, in SEC cases, can do things like appoint a receiver,

5    but that's --

6              THE COURT:  The SEC brought an administrative case

7    or a case in federal court?

8              MR. SIEGEL:  They brought a case in federal court.

9              THE COURT:  In this district?

10             MR. SIEGEL:  Yes, Your Honor.

11             THE COURT:  Is that pending before a given judge?

12             MR. SIEGEL:  Your Honor --

13             THE COURT:  And is that judge me?

14             MR. SIEGEL:  I don't exactly know how it works on

15   the civil side.  I've looked it up on the docket.  There's no

16   judge assigned I think because at this point no one has

17   appeared or answered.

18             THE COURT:  That would explain, yeah, why this is

19   news to me.

20             MR. SIEGEL:  But there is -- there is a pending SEC

21   action.  I think the SEC has its own process that they'll

22   have to consider.

23             If the Court doesn't appoint counsel, and the

24   question is what we can do on our own, that's an issue that

25   we are -- that we are currently researching.  And I think

1    we'll have to see what happens, and there may be things we

2    can do, but as an initial -- our initial research has not

3    found cases of, for example, a receiver being appointed in a

4    criminal case.

5         What the normal course that we have seen is what

6    we've proposed, of a court appointing counsel.

7         Now, of course, this all become moot if the company

8    does what it is supposed to do and retains counsel and

9    appears, but short of that, what we have generally seen in

10   the case law is the Court appointing counsel.

11        THE COURT:  So the company -- the company can't

12   obviously be represented pro se because there's no such

13   thing, but an agent of the company could appear as a party,

14   right, could have come in presumably indicating that they are

15   an employee of the corporation and, for example, just entered

16   a plea of not guilty at the first appearance.

17        Is there any reason why that couldn't have happened

18   even absent company counsel having been engaged?

19        MR. SIEGEL:  Your Honor, as I understand the Court

20   rules, is that generally when a corporation is a party to a

21   litigation in a court, they can't -- an officer who's not a

22   lawyer can't appear because -- while a person can be pro se,

23   a company, as you said, can't be pro se.  So anyone

24   representing the company has to be a member of the bar of the

25   Court.

1          That said --

2          THE COURT:  They can't obviously submit briefs on

3     the company's behalf or do things that are typically within

4     the sphere of lawyering, but I would have thought that an

5     agent could have simply entered a plea, for example.

6          MS. KASSNER:  Your Honor?

7          MR. SIEGEL:  Under the rules, and what happened on

8     Wednesday, is if the company doesn't appear, a not guilty

9     plea is automatically entered.

10          THE COURT:  No.  I understand that.  But --

11          MR. SIEGEL:  But, look, if there were someone at

12     the company who could speak for the company who is not a

13     lawyer, that would at least allow us to talk about discovery,

14     talk about a way forward.  Unfortunately, as it appears, the

15     only person at the company is Carlos Watson.

16          THE COURT:  The only person at the company --

17          MR. SIEGEL:  The only officer or director at the

18     company that we are aware of is Carlos Watson.

19          THE COURT:  So this independent director who was

20     ostensibly terminated was the last --

21          MR. SIEGEL:  Yes.

22          THE COURT:  -- director, apart from Mr. Watson?

23          MR. SIEGEL:  Yes.

24          THE COURT:  Interesting.

25          MR. SIEGEL:  I mean, that's exactly the concern we

1    had.  When we filed this letter, our hope was that someone

2    could be appointed, they could be told the company is your

3    counsel.  At the time, we believed there was a director who

4    was not Mr. Watson who they could talk to.  Mr. Watson made

5    that no longer the case.

6         There is a board of one, as far as we understand

7    it, and we can be corrected if that's wrong.  There is an

8    officer of one, which, you know, that comes to what may be a

9    step ahead. If we get counsel, there's going to be a very

10   complicated conflict issue because the only person they can

11   talk to about the interests of the company is Carlos Watson,

12   who may have very different interests than the interests of

13   the company.

14        THE COURT:  Why is that a conflict for the lawyer?

15        MR. SIEGEL:  Well, the issue -- in the normal

16   course of things, when you have a conflict by the CEO, you

17   would have the lawyer answering to the general counsel, who's

18   reporting directly to the Board, or the lawyer reporting

19   directly to the Board.

20        Here, if the lawyer's client is Carlos Watson, just

21   to put a hypothetical, if the lawyer's advice -- if the

22   lawyer's disinterested advice to the company is Ozy Media is

23   in your interest to throw Carlos Watson overboard.

24        THE COURT:  Of course.  So Mr. Watson has a

25   conflict in speaking to the lawyer on behalf of the company.

1       I'm not disputing that.  I thought you were suggesting that

2       the lawyer would have a conflict of interest and that is not

3       apparent to me.

4                   MR. SIEGEL:  If the lawyer's only client at the

5       company is Carlos Watson, how can the lawyer --

6                   THE COURT:  Yeah.  It's a limitation on the

7       lawyer's ability to do their job effectively, but it's not a

8       conflict of interest on the part of the attorney, I don't

9       think.  This may be more metaphysical than we need to be

10      right now.

11                  This is -- yeah.

12                  MS. HARRIS:  Your Honor, I just -- I guess I want

13      to -- perhaps a little note of reassurance to the assembled

14      parties.

15                  The folks at our side of the table are very mindful

16      of all of these issues.  And obviously the Government,

17      despite obviously treating Mr. Watson as an agent of the

18      company for purposes of serving the summons, has raised at

19      every point along the way this potential conflict of whether,

20      you know, that obviously there's two different entities, two

21      different parties, so there's potential conflicts of

22      interests.  And we're very mindful of that.

23                  But I find it somewhat puzzling, honestly, that,

24      you know, they were dealing with counsel for the company,

25      Steptoe, and there was potential *Curcio* issues being raised

up until the day before the arrest.  And then they arrested
and indicted not just Mr. Watson, but the company.  That
obviously throws any entity, whether it was a small, you
know, rebuilding company after a time of stress and
difficulty or a very large corporation, it throws any company
into some state of upheaval, right?

And so we were the ones to advise the Court, by
letter to Your Honor, before the date of the summons, as a
courtesy to the Court, that there was not yet -- because we
obviously are privy to some of the things going on at the
company, that there was not yet counsel in place for the
company, but that the rules -- and we asked for time, that
there's efforts being made.

But, again, mindful of the Government's concern,
though I think it's ultimately unfounded, because as Mr.
Biale represented, these decisions are being made highly-
counseled at every step of the way, mindful of his
obligations as a fiduciary -- you know, that he has two
different roles here -- he's a fiduciary to the company and
he's an individual charged -- and he's being counseled at
every step of the way -- that until this dissolution process,
which is being done under Delaware State Law, with effective
and able counsel at its side, until there are appropriate,
all the appropriate things in place, the consents from the
relevant stakeholders, to have counsel come in at this point

1  would necessarily trigger a litany of these exact conflict of

2  interest *Curcio* issues, who's appointing, who's the counsel?

3          And so we ask simply, you know, not on behalf of

4  Ozy, because we don't represent Ozy, but our client is the

5  acting CEO of the company, he's the majority, common --

6  majority shareholder of the common stock.

7          He is -- does have authority under the bylaws to

8  act on behalf of the company, that we be given -- that by

9  April 3rd, we expect there to be counsel for the company in

10  place and that these questions and the issues being raised,

11  while important, and I understand why the issues are being

12  flagged, but that trying to find a solution for it is

13  premature.

14          So both the company and Mr. Watson are presumed

15  innocent in this situation, and we ask simply for time to get

16  all the ducks in a row in a way that is mindful of the

17  concerns raised by all the parties and insurers like an

18  orderly disposition of this matter in this courtroom.

19          THE COURT:  Yeah.

20          MS. KASSNER:  Your Honor, if the Government may

21  briefly respond?

22          I think that's fine given that April 3rd is not too

23  far from now.  And so if it turns out that Ozy is able to

24  retain counsel by then, then I think that's fine.

25          The concern we have is more of just we're preparing

1    for a scenario where that may not happen, and I think we

2    wanted to alert your court both that we are very concerned

3    about this conflict, what we perceive to be a conflict of

4    interest, and we wanted the Court to be mindful of that,

5    especially because Mr. Watson's lawyers were filing a motion

6    on behalf of Ozy Media, which struck us as a true conflict,

7    raising true conflict concerns.

8         But I think by April 3rd, you know, if counsel is

9    retained, then we don't have an issue and we can address any

10   conflicts of interest as in the ordinary course.

11        I also just want to point one thing out without

12   belaboring it, but there's been a lot of discussion about our

13   conversations with prior lawyers, both for the company and

14   for Mr. Watson.

15        Current counsel wasn't a member of those

16   conversations and I just want to be careful --

17        THE COURT:  It's all -- it's all a bit of a side

18   show, from my perspective, in that I understand there may be

19   norms, alleged norms, about how communications are supposed

20   to work between the U.S. Attorney's Office and corporate

21   counsel in the context of an investigation and potential

22   indictment.  There may not be such norms.  But either way,

23   it's not for me to say anything about it one way or the

24   other.

25        This is a highly unusual set of circumstances, at

1    least in my experience.  And unusual circumstances do

2    sometimes call for extraordinary measures.

3         And if it looks in the lead up to April 3rd like

4    the company has still not retained counsel for -- to

5    represent it in this case, I will seriously consider whether

6    to -- whether I have the power to appoint counsel, whether I

7    have the power to move forward with this case vis-a-vis the

8    company absent such appointment of counsel, and I'd like to

9    be prepared to do that on April 3rd rather than thereafter.

10        MS. HARRIS:  We'd be happy to advise the Court

11   within a week of April 3rd if we anticipate any failure to

12   deliver on my assurances, Your Honor.

13        THE COURT:  That's what I was going to ask.  Is if

14   counsel -- if counsel enters an appearance for the company a

15   week or more before April 3rd, then I think we're all set.

16        If that hasn't happened a week before April 3rd, I

17   would be interested in the company's ability to pay a lawyer.

18        And I don't know through what procedural device I

19   would compel a financial affidavit from a company that's

20   otherwise not appearing, but I would be inclined to think

21   broadly about that subject and about whether to appoint

22   counsel thereafter.

23        But let's not get ahead of ourselves.  Let's see

24   where we are a week before April 3rd.

25        MS. HARRIS:  Thank you, Judge.

1          THE COURT:  Anything else today on the Government's

2    agenda?

3          MS. KASSNER:  Yes, Your Honor.  Very quickly.

4          We understand that there have been additional

5    motions as of -- I believe it was 1:00 in the morning last

6    night filed.

7          THE COURT:  Yes.

8          MS. KASSNER:  We haven't had a chance to run down

9    some of the relevant facts and law relevant to our response.

10   We would ask for two weeks to respond to -- I think it's a

11   motion about statements contained in our office's press

12   release.

13         And then separately, there's a motion having to do

14   with the return of devices under Rule 41(g).

15         THE COURT:  I think two weeks for responses to

16   those items is imminently reasonable.

17         Anything else from the defense perspective today?

18         MR. BIALE:  No, Your Honor.  That sounds fine.

19         I think -- so two weeks from today is the 24th.

20   You know, we may just want to address any reply orally on the

21   3rd.

22         THE COURT:  If you want to put in a letter, you

23   know, three business days after you get the Government's

24   letter, I'd welcome it.

25         MR. BIALE:  Okay.  Sure, Your Honor.  Thanks.

1  We'll do that.  All right.  Or we'll do it if necessary.

2          THE COURT:  All right.  Have a great weekend

3  everybody.

4          ALL COUNSEL:  Thank you, Your Honor.

5          THE COURT:  We're adjourned.

6      (Proceedings concluded at 5:07 p.m.)

7      I, CHRISTINE FIORE, Certified Electronic Court Reporter

8  and Transcriber, certify that the foregoing is a correct

9  transcript from the official electronic sound recording of

10  the proceedings in the above-entitled matter.

11

12  *Christine Fiore*

13  _____          March 14, 2023

14     Christine Fiore, CERT

15         Transcriber

16

17

18

19

20

21

22

23

24

25