## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                                    Case No. 23-Crim.-82 (EK)

CARLOS WATSON, ET AL.,                    **ORAL ARGUMENT REQUESTED**

                 Defendants.

**DEFENDANT CARLOS WATSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT**

**RONALD SULLIVAN LAW PLLC**

Ronald S. Sullivan Jr., Esq.
1300 I Street NW
Suite 400 E
Washington, D.C. 20005
Telephone: 202-313-8313
Email: rsullivan@ronaldsullivanlaw.com

Admitted Pro Hac Vice
Counsel for Defendant Carlos Watson

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 3

   I.    What Ozy Media was ..................................................................................... 4

   II.   Fundraising for Early Stage Investors ........................................................ 5

   III.  Collapse of venture funding for digital media companies .......................... 6

       A.   BuzzFeed ................................................................................................. 6

       B.   Vice Media ............................................................................................. 10

   IV.  The Indictment ............................................................................................ 14

ARGUMENT ............................................................................................................... 15

   I.    Standard of Review ...................................................................................... 15

   II.   Counts One, Two, and Three of the Indictment should each be dismissed for failure
to state an offense. ................................................................................................... 16

       A.   Count Three of the Indictment must be dismissed because the facts alleged do not
constitute a crime. ................................................................................................. 16

       B.   Counts One and Two should be dismissed because they fail to allege material
misstatements. ....................................................................................................... 22

       C.   The Indictment should be dismissed for selective prosecution. .................... 26

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, (1988) ............................................................ 22, 25

*Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) ...................................................................... 27

*Dowling v. United States*, 473 U.S. 207, 213 (1985) ................................................................ 15

*In re Vice Group Holdings Inc.*, Petition No. 23-10738, US Bankruptcy Court for the Southern
    District of New York, filed May 15, 2023 ........................................................................... 14

*Long v. Abbott Mortg. Corp.*, 459 F.Supp. 108, 116-17 (D. Conn. 1978) ................................ 25

*Michaels v. Michaels*, 767 F.2d 1185, 1197 (7th Cir. 1985) ..................................................... 25

*Neder v. United States*, 527 U.S. 1, 25 (1999) .......................................................................... 22

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445, (1976) ................................................. 25

*United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) ...................................................... 26

*United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ................................................ 15

*United States v. Armstrong*, 517 U.S. 456, 464 (1996) .............................................................. 26

*United States v. Bass*, 536 U.S. 862, 863 (2002) ...................................................................... 29

*United States v. Chem. Found., Inc.*, 272 U.S. 1, 14 (1926) ...................................................... 26

*United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) ................................................ 22

*United States v. Covington*, 395 U.S. 57, 60–61 (1969) ............................................................ 15

*United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000) .............................................. 15

*United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992) ............................................................ 26

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ................................................................ 24

*United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) ..................................................... 28

*United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ............................................................. 22

*United States v. Weimart*, 819 F.3d 351 (7th Cir. 2016) ........................................................... 23

*Wayte v. United States*, 470 U.S. 598, 607 (1985) .................................................................... 26

*Williams v. Affinion Group, LLC*, 889 F.3d 116, 124 (2d Cir. 2018) ......................................... 22

## STATUTES

18 U.S.C.  §1028A .................................................................................................................... 17

## RULES

Federal Rule of Criminal Procedure 12(b) ................................................................................ 15

## INTRODUCTION

"The art of bargaining, as most of us eventually learn, is in large part the art of sending misleading messages . . . "[1] This reality may sometimes offend our intuitive moral sense, but for better or worse, it essential to the functioning of the market, a reality that is even more stark in the world of tech and media startups seeking venture capital funding. The well-known and well-documented practices of puffing and bluffing venture funding, some of which we document below, may not be archetypes of ideal moral behavior—but they are a critical part of an economic system that has created the incredible innovations of the last decades from Apple and Google to Tesla and Airbnb. The Indictment in this case threatens to criminalize these practices, and in an effort to make an example of someone it places the full force of the purported moral failings of this system squarely—and unfairly—on the shoulders of one man.

Stretching the law beyond recognition in an attempt to criminalize what is at worst commonplace puffery, the Indictment is fatally flawed and should be dismissed. Indeed, it would not be puffery, but in fact our duty to alert the entrepreneurial, innovative, ever-evolving, game-changing, tremendously beneficial ecosystem we have come to know, embrace and, in some instances, almost deify as "Silicon Valley" to the potentially disastrous reality we will encounter if the mechanisms by which Carlos Watson endeavored to raise the money required to finance his start-up enterprise, Ozy, are effectively criminalized.

Even taken as true, the government's allegations fail to adequately assert that Carlos Watson has committed a crime. Take, for instance, claims that Mr. Watson or his colleagues lied about the identities of potential lead investors when soliciting investments from sophisticated

---

[1] R.H. Frank, PASSIONS WITHIN REASON (1988), at 165.

counterparties in early private funding rounds, or that he and other Ozy employees provided pro forma financial information that turned out to be inaccurate in hindsight. It is not criminal to hedge one's bargaining position or to provide optimistic projections about the future that, with the benefit of hindsight, turn out not to materialize. To argue otherwise is to ignore the realities of the freewheeling venture capital market that has produced much innovation.

And that refusal to take into context the realities of this particular market is even more pronounced when the Indictment is read in the unique landscape of early stage venture funding. Early stage venture capital investors take big risks on new, unproven ideas knowing full well that most of these bets will not pay off but in the hope that a few of those gambles will yield massive returns. For this reason, the reasonable early stage venture investor has a significantly different sense of what is material than other types of investors. When read in the correct context—the world of venture funders—the alleged discrepancies in pro forma accounting and puffery are immaterial as a matter of law and therefore are an insufficient basis for alleging a crime.

Beyond the allegations of financial accounting misrepresentations, the Indictment further alleges two occasions in which Mr. Watson was aware that another employee of the company was pretending to be someone else during a reference interview. These allegations are, frankly, shocking. But not all that is shocking is illegal. The government argues that these ham-fisted impersonation attempts on confirmatory reference calls amount to aggravated identity theft—a crime which adds a mandatory two-year prison sentence. That sentence sounds disproportionate because it is: as argued below, the facts alleged in the Indictment demonstrate that the government has stretched the statutory definition of aggravated identity theft beyond recognition in an effort to criminalize behavior that is not, as a matter of law, criminal.

Though the government chooses to be willfully blind to the economic context in which the alleged activities took place, we cannot ignore the context in which they have chosen to prosecute Mr. Watson. The news is rife with examples in which similarly situated entrepreneurs have engaged in the same behavior as Mr. Watson, but these entrepreneurs—these White entrepreneurs—have not faced the same scrutiny as he has.

Accordingly, Mr. Watson moves that the Indictment be dismissed in its entirety for selective prosecution. In the alterative, he asks that the Court order discovery so that it can be more fully appraised of how Mr. Watson is not receiving equal treatment under the law on account of his race. Additionally, each of the Counts should be individually dismissed because the Indictment fails to set out facts that constitute a crime. In the alternative, portions of the Indictment that set out conduct that is non-criminal should be stricken.

## FACTS

Carlos Watson created and, with the help of a cast of experienced investors, directors, and advisors, ran a company called Ozy Media. All new business endeavors are inherently risky and difficult, but a new internet media company was especially so. Yet Mr. Watson believed both in the possibility of success and in the importance of creating a Black-owned media outlet that would provide a new and different perspective. In order to build the company from the ground up, Mr. Watson sought and received several rounds of funding from the high-risk, high-reward system of venture capital firms and angel investors. These sophisticated investors, who have their own legal and business due diligence processes, would bet on Ozy because of the strength of Mr. Watson's vision and eventually the company's demonstrated ability to create unique and high-quality television shows, podcasts, newsletters, and festivals that engaged high-quality audiences and partners.

## I.      What Ozy Media was

The world of early-stage (and in some cases, growth-stage) venture capital may be particularly vulnerable to fraud: initial investors are betting on things to come and relying on projected sales of products or services that fail to achieve widespread market acceptance, or worse, never come to fruition. But that story—the Theranos scandal being the prime example—is not the story of Ozy. What started as a company that produced a series of premium online newsletters expanded to world class music and ideas festivals, Apple top-ten ranked podcasts, and Emmy award-winning television shows for Hulu, Amazon and others.

Ozy was real: real enough to earn the investments of leading venture capitalists, media companies and major banking institutions. If you read Ozy's cutting edge newsletters, if you attended Ozy Fest in Central Park, if you listened to one of their acclaimed podcasts on the BBC or Spotify or watched one of their shows on PBS or A&E, you would understand why. Ozy was real and vibrant and valuable. And it was guided by a skilled and experienced board of directors, who collectively had more than a century of investing experience and did more than 1,000 deals. Ozy spent more than $500,000 to retain sophisticated counsel (including King & Spaulding, Wilson Sonsini, and others), which vetted all materials and guided all fundraising, including Series C, Series D, and TV deals.  And Ozy was winning the race to capture an exciting and advertiser-coveted audience of diverse, curious consumers who wanted something different. This was not Theranos. Through dent of hard work and enormous sacrifice, this was a very real company with a remarkable catalogue of creative content and a wide audience. As with any start up or early stage company, an investment in Ozy was a bit of a gamble to be sure—but it was a bet that smart investors would take because of the unique position Ozy had in the market, and the unique vision

and skill set of its founder, who had previously founded a company that attracted significant venture capital and angel investors.

## II.      Fundraising for Early Stage Investors

Turning the idea for a new kind of media company into the reality of five premium newsletters, fourteen television shows, ten podcasts, four world class festivals, five award programs, an Emmy, and more than thirty Fortune 500 advertisers took a lot of work and a lot of capital. Funding such an endeavor, especially before it began earning revenue and signing large scale advertising and content licensing deals, would be a gamble. But there are investors who make their living on just these types of bets: early stage investors ("ESIs"). These investors come from large banks, venture capital firms, media companies, investment banks, and family offices that specialize in funding companies that are new and have very limited historical financial data upon which their projections are based. They pursue this high-risk strategy by setting a valuation through negotiations with the company that seeks to balance the desired reward with the relative risk.

When investing in these companies, early stage investors are acutely aware that they cannot rely on the same kind of financial data that a different kind of investor might look at if it were investing in a more mature company. Instead, early stage investors look at other factors—like the vision and experience of the founder, whether founders believe in the company enough to invest their own money, and how the company might be able to scale—to make an informed but risky decision.

In fact, a Harvard Business School study has shown the extent to which early-stage investors are focused on the identity of founders and the business model rather than any real financial information. In the hierarchy of decision-making in this particular economic context, the most frequently cited important factor in decisions to pursue deals are the founders themselves.

26% of venture capital firms do not even cite the business model as an important factor in their funding decisions. The Harvard study shows that a company's valuation is only the fifth most-cited factor in decisions about which deals to pursue. And, critically, VCs show a "disregard for traditional financial evaluation." Early stage investors, in short, are more interested in what a company can become than in what its cash-flow looks like. In fact, 9% of these investors admit to using no financial metrics whatsoever, and an even higher percentage admit that they make "gut investment decisions."[2]

### III.    Collapse of venture funding for digital media companies

During the time of Ozy's development, ESIs had a wide variety of digital media companies to choose from, including, but not limited to, BuzzFeed and Vice Media. While these companies were and are household names, they have either completely collapsed or are financially struggling, as are similarly situated digital media firms. Their founders reportedly — and in some cases, admittedly — engaged in conduct that differs from the conduct charged in Mr. Watson's Indictment in only one way: their conduct was, by orders of magnitude, far more egregious. And yet they have not been indicted.

#### A.  BuzzFeed

The experience of BuzzFeed is illustrative. As early as the Spring of 2008, BuzzFeed founder Jonah Peretti prepared and presented a slide show "investor deck" to ESIs with "business projections [that] proved wrong — way wrong," according to reporting by Ad Age.[3] Peretti's pitch

---

[2] Gompers, Paul A., William Gornall, Steven N. Kaplan, and Ilya A. Strebulaev. *How Do Venture Capitalists Make Decisions?* NBER Working Paper Series, No. 22587, September 2016.

[3] Jason Del Rey, "BuzzFeed's 2008 Investor Pitch: See Jonah Peretti's Predictions, Right and Wrong," *AdAge*, April 12, 2013, *available at* https://adage.com/article/media/buzzfeed-s-2008-investor-pitch-jonah-peretti-s-predictions/240861; BuzzFeed 2008 Slide Deck *available at* https://www.scribd.com/embeds/135575039/content?start_page=1&view_mode=scroll&access_key=key-4ru5a8bm288jkt2bd33 [BuzzFeed 2008 Slide Deck].

deck asserted — incorrectly, it turned out — that BuzzFeed: would "[d]ramatically grow traffic without hiring editors" (in fact, BuzzFeed employed 90 editors by 2013)[4]; would "prove revenue model within [the] year" (in fact, revenue reached only $4 million by the end of 2012, and BuzzFeed repeatedly missed its revenue projections)[5]; and would sell standard "ad units" (in fact, BuzzFeed almost immediately changed its advertising strategy to pursue "sponsored posts" and expensive-to-produce "native advertising").[6] Peretti later explained that he framed his pitch to what his audience of ESIs wanted to hear,[7] in keeping with his view that raising capital was merely a "game."[8] Sophisticated ESIs invested in BuzzFeed's early stage capital raises, including SoftBank Capital, Hearst Ventures, RRE Ventures, SV Angel, Founder Collective, GC Capital, Ron Conway (who also invested in Ozy's January 2017 $10 million capital raise), and Chris Dixon, but their representatives on BuzzFeed's board were reportedly lax in their supervision of the

---

[4] *Compare* BuzzFeed 2008 Slide Deck at slide 3 ("Where We're Headed," second bullet) *with* Jason Del Rey, "BuzzFeed's 2008 Investor Pitch: See Jonah Peretti's Predictions, Right and Wrong," *AdAge*, Apr. 12, 2013 (90 editors).

[5] *Compare* BuzzFeed 2008 Slide Deck at slide 3 ("Where We're Headed," third bullet) *with* Ben Smith, *Traffic* at 167 ($4 million revenue in 2012), *and with* Sam Thielman and Mark Sweney, "BuzzFeed cuts projected revenue by half after missing 2015 financial target," The Guardian, Apr. 12, 2016 ("the company has been forced to cut its 2016 revenue target from $500m to $250m after missing its 2015 target by more than $80m. The company reportedly projected revenues of $250m in 2015 but generated less than $170m."); *and with* Jill Abramson, *Merchants of Truth* at 343 ("BuzzFeed slid into tight financial straits. After missing their 2016 revenue targets, they missed them again in 2017 — this time by around 20 percent — and announced they would be laying off 100 U.S. employees.")

[6] *Compare* BuzzFeed 2008 Slide Deck at slide 17 ("Trend Targeting," third bullet) *with* Jason Del Rey, "BuzzFeed's 2008 Investor Pitch: See Jonah Peretti's Predictions, Right and Wrong," *AdAge*, Apr. 12, 2013 ("BuzzFeed, of course, eschews standard ad units on its site and instead relies on sponsored posts") *and with* Lukas I. Alpert, "BuzzFeed Plans Job Cuts, Business Reorganization After Revenue Miss," *Wall St. J.,* Nov. 29, 2017, *https://www.wsj.com/articles/buzzfeed-plans-job-cuts-business-reorganization-after-revenue-miss-1511972228* (describing "native advertising" as "a high-cost, labor-intensive marketing format in which advertising is custom-made for brands to resemble editorial content").

[7] Jason Del Rey, "BuzzFeed's 2008 Investor Pitch: See Jonah Peretti's Predictions, Right and Wrong," AdAge, Apr. 12, 2013 (quoting Peretti: "the VCs I was meeting had a strong anti-editorial bias which is still mostly true today").

[8] Ben Smith, *Traffic* at 116 ("Jonah [Peretti]. . . had gotten interested in this new game of raising money. He liked figuring out new rules and new systems, playing new roles. And he liked winning, even if it sometimes gave off a disconcerting sense that he viewed the whole thing as a game, not really recognizing the stakes.").

company.[9] It was later reported that Peretti had engaged in techniques to inflate traffic metrics[10] and that BuzzFeed relied on stolen content.[11]

In June 2014, Peretti and his colleague, Ben Smith, went to Silicon Valley to solicit BuzzFeed's largest investment to date, led by prominent venture capital firm Andreesen Horowitz. Smith, BuzzFeed News' Editor-in-Chief, later described the pitch meeting:

> "Jonah had prepped us on the strategy: We needed to come in confident, smart, a little intellectual, ready to argue. None of the usual humility. Andreesen was known for harshly challenging founders, but this was a different situation: BuzzFeed was hot, and he knew we were meeting with others on Sand Hill Road [where many venture capital firms were based], that we'd have other offers. . . . Jonah explained to Andreesen across the long table at his office on Sand Hill Road why the company would be worth far more than the $450 million Disney had offered [with acquisition offer, in the fall of 2013, Peretti rejected]. BuzzFeed, he said, was learning to . . . quantify human emotion on social media and feed it back to an audience with a combination of art and science, then capture the nearly infinite scale and perpetual motion the new media offered."[12]

Andreesen Horowitz invested in the $50 million round, which valued BuzzFeed at $850 million.  On August 10, 2014, Chris Dixon, Andreesen Horowitz' appointee on the BuzzFeed board, boasted in a blog post that "[a]s a small, early investor in BuzzFeed, I got to observe firsthand how effectively Jonah and the team executed in recent years. The results speak for

---

[9] Ben Smith, *Traffic* at 152 (reporting "And the board meetings were pretty weird too. Kenny [Lerer], Will Porteous, and Hearst Ventures executive Scott English would sit around the table on Spring Street and Jonah would talk for a while, and then Kenny would say, 'I have no idea what you're doing,' and they'd all leave cheerfully.").

[10] Ben Smith, *Traffic* at 80-81 (disclosing that "Jonah [Peretti] made the discovery" and employed the "pac-manning" technique at *The Huffington Post*, which involved "linking to as many other high-performing, freshly updated news sites as you could, particularly the links that were already rated on top of Google. And when you ate the links, you'd swallow their Google juice. Then you keep adding links, and Google would see the new one each time it crawled the page. Essentially, the process faked freshness, and the machine fell for it. . . . Pac-manning gave *The Huffington Post* huge surges in traffic.").

[11] Ben Smith, *Traffic* at 168 ("There were other things the team [at BuzzFeed] didn't like to talk about, like our early reliance on a pseudonymous blogger who basically stole posts from other websites.")

[12] Ben Smith, *Traffic* at 207-08.

themselves: BuzzFeed . . . <u>is consistently profitable</u> . . . ."[13] It is not clear what data, if any, Peretti and Smith provided to Dixon as a basis for this claim — nor, from Smith's own reporting, does it seem that these ESIs actually cared about BuzzFeed's profitability.[14] In fact, BuzzFeed would not eke out a profit until 2020.[15]

In December 2021, when BuzzFeed went public via a merger with a special purpose acquisition company, the transaction turned out to be, in Ben Smith's words, "an iconic disaster of the late tech bubble, [BuzzFeed's] shares falling to below $1 in early 2023 from $10 a year earlier. That left BuzzFeed with a market capitalization of less than 20 percent of what Disney would have paid for it" — a reference to the Disney deal that Peretti had turned down and used as negotiating leverage when soliciting venture capital firm Andreesen Horowitz.[16] More than 80 BuzzFeed employees filed arbitration claims accusing BuzzFeed of "bungling its stock market debut and denying the workers the chance to sell their shares at a higher price."[17] More bluntly, former New York Times Executive Editor Jill Abramson questioned:

> "Is it because we are all charmed by Peretti, that the scandalous swindle that was his long-awaited IPO hasn't been truly investigated? Key questions: How much dough did he make on the deal? How much did Ben Smith make on his stock? One

---

[13] https://web.archive.org/web/20140811110734/https://cdixon.org/2014/08/10/buzzfeed/ (emphases added).

[14] Ben Smith, *Traffic* at 208 ("Behind the scenes, though, these investors told Jonah to stop worrying about profits. The name of the game was growth, and he should expand as fast as he could, in every direction available, while he still had momentum."); *accord* Clare Malone, "Jonah Peretti Has Regrets About BuzzFeed News, *The New Yorker*, May 4, 2023 ("Marc Andreessen told Peretti and Smith not to worry about revenue but instead to focus on growth.").

[15] BuzzFeed Inc., Form S-4 Registration Statement, filed July 30, 2021, at F-43 ("While the Company [BuzzFeed] became profitable in 2020, the Company has a history of net losses") and at 21 (net income of $11.2 million on revenue of $321.3 million,), *available at* https://www.sec.gov/Archives/edgar/data/1828972/000110465921098380/tm2122219-1_s4.htm

[16] Ben Smith, *Traffic* at 302-03.

[17] Katie Robertson, "Dozens of BuzzFeed Employees Claim They Were Illegally Shortchanged in I.P.O.," *N.Y. Times*, Mar. 15, 2022, *available at* https://www.nytimes.com/2022/03/15/business/media/buzzfeed-ipo-arbitration.html

viral Nike chain of emails many years ago has turned into an epic mess. Was Peretti's 'genius' a complete chimera all along?"[18]

As recently as July 23, 2023, On The Media, an award-winning radio program produced by New York City's public radio station WNYC, devoted an entire episode to the collapse of the digital media industry — including the decline of BuzzFeed and the bankruptcy of Vice Media — and featured an interview with Peretti's former colleague Ben Smith, who admitted in hindsight:

> "I don't think news is a good business for venture capitalists to invest in. There was a pressure on us to grow really fast, to grow explosively, to build a business that could return many, many times its investment very fast. . . . It's not something where venture capitalists should be looking to throw in millions of dollars and see it multiply by 100 over a period of a couple of years."[19]

As of this writing, neither Peretti (a former EDNY resident[20]) nor Smith (a current EDNY resident[21]) has been charged with any crime.

## B. Vice Media

As Vice grew to command the highest valuation of any of the new media companies,[22] the company's three co-founders, Shane Smith, Gavin McInnes, and Suroosh Alvi, admitted at various times to engaging in a wide-range of misconduct. They used funds earmarked for welfare beneficiaries as seed capital to start their magazine in Montreal in the mid-1990s.[23] They lied about

---

[18] Joe Pompeo, "'I Was Pretty Utopian': With BuzzFeed News in the Grave, Ben Smith Reflects on Digital Media's Convulsions," *Vanity Fair*, May 1, 2023 *available* at https://www.vanityfair.com/news/2023/04/ben-smith-buzzfeed-news-traffic.

[19] Episode transcript available at https://www.wnycstudios.org/podcasts/otm/episodes/on-the-media-staying-alive

[20] http://www.sbny.vc/jonah-peretti

[21] Ben Smith, *Traffic* at 344 (author's note stating that Smith "lives in Brooklyn" with his family)

[22] Alex Sherman, Gerry Smith, and Paul T. Sweeney, "Deal of the Week: How on Earth is Vice Worth $5.7 Billion?," Bloomberg Deal of the Week, June 28, 2017.

[23] Carey Toane, "We Aim To Offend: How Three Hustling Guys From Montreal Hit The Streets With A Rude, Smart-Ass Magazine Called Vice, And Built It Into A Stick-It-To-The-Man Brand -- A Post-Modern Marketing Concept Tailor-Made For Kids Looking To Buy Rebellion," *National Post*, May 1, 2001 (reporting that Alvi used funds from a Montreal welfare program to launch Vice's initial publication); Reeves Wiedeman, "Vice Media Was

the geographic distribution of their magazine.[24] They impersonated an executive from MTV.[25] They lied about who Vice's investors were.[26] They published fake content.[27] They employed

---

Built on a Bluff. What Happens When It Gets Called?," *New York*, June 10, 2018 (Smith and McInnes "faked their way onto the Canadian welfare rolls").

[24] Jill Abramson, *Merchants of Truth* at 44 (Smith "was good at selling the space in the magazine to advertisers, often by using the tactics of a scam artist. He told one potential advertiser that their publication was distributed across North America and then mailed a few hundred copies to a skate shop in Miami and another batch to a clothing store in San Francisco.").

[25] Jason Tanz, "The Snarky Vice Squad Is Ready to Be Taken Seriously. Seriously," *Wired*, Oct. 10, 2007, *available at* https://www.wired.com/2007/10/ff-vice/ (Vice's co-founders "repeatedly lied to the press . . . staging a made-up meeting with MTV"); Reeves Wiedeman, "Vice Media Was Built on a Bluff. What Happens When It Gets Called?," *New York*, June 10, 2018 (reporting that in 1999 "When a Canadian reporter came [to Vice's New York City office] to do a profile, the company paid a friend to pretend he was an MTV executive interested in a Vice-branded show").

[26] Alexandra Molotkow, "Giving Offence," The Walrus, Sept. 12, 2011, *available at* https://thewalrus.ca/giving-offence/ ("In 1998, playing a game of 'bullshit the press,' Smith told a Montreal Gazette reporter that Richard Szalwinski, of the new media company Behaviour (which had recently acquired Shift magazine), wanted to invest in Vice. Szalwinski had never even heard of Vice"); Jill Abramson, *Merchants of Truth* at 44 (at one point, Vice's founders falsely claimed they were courting pornographer Larry Flynt as a potential investor).

[27] Jill Abramson, *Merchants of Truth* at 43 (McInnes admitting that "he wrote 80 percent of the copy and made up fake bylines so it looked like they had a real staff. 'You need more blacks, you need more women writing . . . . In order to meet those demands, I eventually decided to become those blacks and women.'"); Carey Toane, "We Aim To Offend: How Three Hustling Guys From Montreal Hit The Streets With A Rude, Smart-Ass Magazine Called Vice, And Built It Into A Stick-It-To-The-Man Brand -- A Post-Modern Marketing Concept Tailor-Made For Kids Looking To Buy Rebellion," *National Post*, May 1, 2001 (noting that Vice's co-founders "also published fake interviews with car thieves and hooligans who set homeless people on fire, and later ran a gag announcement that they had discovered Osama bin Laden in China's Pamir Mountains").

manipulative "traffic-padding" techniques to inflate Vice's audience numbers.[28] They outfitted a

fake headquarters office space[29] to induce Intel to enter into an eight-figure advertising deal.[30]

Even so, sophisticated institutional investors and media companies flocked to Vice, which,

having relocated to the Eastern District of New York, went on to land more than $1 billion from

investors, including: $500 million from A&E and Crossover Ventures (2014),[31] followed by $100

million from Canadian media company Rogers Communications (2015),[32] and a $400 million

---

[28] Reeves Wiedeman, "Vice Media Was Built on a Bluff. What Happens When It Gets Called?," *New York*, June 10, 2018 ("Vice's digital audience was smaller than that of some digital-media companies like BuzzFeed and Vox Media, despite having used audience-building strategies that, while not unheard of, weren't especially transparent. Brad Fredricks, the company's director of marketing from 2007 to 2008, said that he was given a mandate to boost traffic and did so by purchasing ads on torrent sites and other high-traffic corners of the web, often featuring 'photos of some hot chick with big boobs bouncing up and down.' Fredricks says the strategy boosted Vice's traffic from a few hundred thousand visitors per month to several million, while obfuscating who the audience actually was. 'Advertisers are assuming these are the tastemakers, not some horny guy who clicked on a dark-web link,' Fredricks says."); Andrew Wallenstein, "Vice Media Traffic Plummets, Underscoring Risky Web Strategy," Variety, Mar. 21, 2016, *available at* https://variety.com/2016/digital/news/vice-media-traffic-plummets-underscoring-risky-web-strategy-1201733673/ (reporting that Vice used "traffic-padding" techniques, including "clickbait factories" and "aggressive" use of "traffic assignment letters," to inflate its audience numbers).

[29] In the Spring of 2010, while Vice courted Intel as a prospective ad customer, Smith "arranged to annex the offices of an architecture firm next door [to Vice's real office] ahead of the first client meeting. . . . Smith wanted to exude the vibe of a smart tech start-up, not a rough pizza-box-strewn frat party." Jill Abramson, *Merchants of Truth* at 162.

 "Vice's 50 employees then worked around the clock for several days setting up the new space to look like it had been Vice's all along. Vice constructed a glass-enclosed conference room to host the Intel meeting," going so far as to hire a plumber "to install a fancy Japanese toilet. On the morning of the Intel meeting, Vice employees were instructed to get to the office early, to bring friends with laptops to circulate in and out of the new space, and to 'be yourselves, but 40 percent less yourselves,' which meant looking like the hip 20-somethings they were but in a way that wouldn't scare off a marketing executive. A few employees put on a photo shoot in a ground-floor studio as the Intel executives walked by. 'Shane's strategy was, "I'm not gonna tell them we own the studio, but I'm not gonna tell them we don't,"' one former employee says." Reeves Wiedeman, "Vice Media Was Built on a Bluff. What Happens When It Gets Called?," New York, June 10, 2018, *available at* https://nymag.com/intelligencer/2018/06/inside-vice-media-shane-smith.html.

[30] Ashley Rodriguez, "How a Single Deal with a Decidedly Unhip Tech Company Built the Vice Media Behemoth," Quartz, Sept. 8, 2016, *available at* "https://qz.com/776628/shane-smith-how-a-single-native-advertising-deal-with-intel-intc-built-the-vice-media-behemoth (estimating Vice-Intel contract value at $40 million); Reeves Wiedeman, "Vice Media Was Built on a Bluff. What Happens When It Gets Called?," New York, June 10, 2018, *available at* https://nymag.com/intelligencer/2018/06/inside-vice-media-shane-smith.html (estimating contract value at $25 million).

[31] Max Tani, "Shane Smith Made More Than $100 Million From Vice," Semafor, Mar. 20, 2023, *available at* https://www.semafor.com/article/03/19/2023/shane-smith-made-more-than-100-million-from-vice.

[32] Jill Abramson, *Merchants of Truth* at 358.

investment from Disney (December 2015).[33] The Disney deal implied a valuation of more than $4 billion. In August 2016, Shane Smith told the Wall Street Journal that he believed Vice would be worth $50 billion in three or four years.[34] In June 2017, Vice secured a $450 million investment from private equity firm TPG at a valuation of $5.7 billion — approximately double that of the New York Times,[35] and triple that of BuzzFeed's value.[36] Whatever projections Vice provided to investors to support these valuation levels, it is clear that the company struggled to meet its benchmarks: Vice "fell far short of its revenue target" in 2017, at least $100 million short of its projected $805 million goal, according to the Wall Street Journal.[37]

During this time period, it later emerged, Shane Smith extracted at least $100 million from Vice to support a lavish lifestyle, which included purchases of, among other things, a vintage Rolls Royce, a mountain in Costa Rica, a $300,000 dinner in Las Vegas, and a $23 million mansion in Santa Monica.[38]

---

[33] Reeves Wiedeman, "Vice Media Was Built on a Bluff. What Happens When It Gets Called?," New York, June 10, 2018, *available at* https://nymag.com/intelligencer/2018/06/inside-vice-media-shane-smith.html

[34] Keach Hagey, "Disney and Vice, a Storybook Romance," Wall St. J., Aug. 23, 2016, *available at* https://www.wsj.com/articles/disney-and-vice-a-storybook-romance-1471963909

[35] Alex Sherman, Gerry Smith, and Paul T. Sweeney, "Deal of the Week: How on Earth is Vice Worth $5.7 Billion?," Bloomberg Deal of the Week, June 28, 2017.

[36] Jill Abramson, *Merchants of Truth* at 349

[37] Keach Hagey, "Vice Just Had a Big Revenue Miss, and Investors are Getting Antsy," Wall St. J., Feb. 8, 2018, *available at* https://www.wsj.com/articles/vice-media-confronts-tv-woes-amid-leadership-troubles-1518003121

[38] Max Tani, "Shane Smith Made More Than $100 Million From Vice," Semafor, Mar. 20, 2023, *available at* https://www.semafor.com/article/03/19/2023/shane-smith-made-more-than-100-million-from-vice; "Former Vice CEO Shane Smith Pocketed $100 Million From the Media Company," TheWrap.com, Mar. 20, 2023, *available at* https://www.thewrap.com/vice-media-ex-ceo-shane-smith-100-million-report/; Mark David, "Shane Smith Spends Big for Henry Jaglom's Villa Ruchello," *Variety*, Aug. 4, 2015 (reporting that Shane Smith "shelled out an eye-popping $23 million" for the California property).

On May 15, 2023, Vice filed for Chapter 11 bankruptcy protection in Manhattan.[39]

As of this writing, neither Smith (a former EDNY resident) nor Vice (headquartered in the EDNY[40]) has been charged with any crime.

## IV.    The Indictment

The stories of these Ozy competitors are useful for understanding the context of Ozy's rise and prosecutor-driven fall. They each grew up in the same high-risk, high-reward funding landscape. Some of them very publicly—and even proudly—touted how they misled the public and investors about their audience, revenue, and who else was investing in them. Yet not one of these similarly situated companies has been indicted. Not one of these similarly situated founders been indicted.

The fact that Carlos Watson and his company have been indicted is not the only difference between them and their peer founders and companies. The others are white and white-owned. Carlos Watson is a Black man and Ozy Media was majority-owned by people of color.

This fact stands unremarkable in the context of the three prosecutors on this case. Using data from the Bureau of Prisons, we have demonstrated that they have a grossly disparate charging record with regard to racial minorities. Indeed, the three prosecutors in charge of Mr. Watson's case, from the Eastern District of New York ("EDNY"), have a grossly disparate charging record as regards racial minorities charged with crimes. US Census data for the five counties that make up the EDNY (Kings, Nassau, Queens, Richmond, and Suffolk Counties), information compiled on inmates by the US Bureau of Prisons, and data contained in court dockets about defendants'

---

[39] *In re Vice Group Holdings Inc.*, Petition No. 23-10738, US Bankruptcy Court for the Southern District of New York, filed May 15, 2023.

[40] The address listed for Vice in its bankruptcy case is 49 South 2nd Street, Brooklyn, NY 11249.

demographic characteristics reveal a stark picture of racial inequality in charging decisions by the prosecutors who are pursuing Mr. Watson. White people make up 45% of the EDNY's population, but only 6% of the 193 people who have been charged as defendants by these prosecutors since 2019. Blacks, by contrast, comprise 17% of the population of the EDNY at large, but a whopping 51% of the defendants charged with crimes by these EDNY prosecutors. Indeed, 90% of the people they have charged are people of color.[41] This cannot be right.

## ARGUMENT

### I.      Standard of Review

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the issue." Fed. R. Crim. P. 12(b); see also *United States v. Covington*, 395 U.S. 57, 60–61 (1969) (holding that where determinative questions of law were decided in his favor, defendant was entitled to dismissal of indictment). Because federal crimes are "solely creatures of statute," *Dowling v. United States*, 473 U.S. 207, 213 (1985) (cleaned up), "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012). "[A] claim that an indictment does not charge an offense may be raised at any time, and may be considered by a court sua sponte." *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000).

A defendant may move to dismiss an Indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). A charge in an indictment is insufficient and must be dismissed when the government's theory of prosecution, as established

---

[41] As described, the underlying data is available on PACER and through the BOP and can be easily retrieved. The data is not easily reproducible in pdf format, but can be provided upon request to the government or the Court.

by the language of the indictment, fails to describe conduct that is actually prohibited by statute. *See Russell v. United States*, 369 U.S. 749, 764-65 (1962); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (dismissing count of indictment for insufficiently alleging an element of the offense.  In ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true.  *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

## II.     Counts One, Two, and Three of the Indictment should each be dismissed for failure to state an offense.

Where, as here, the government has set out detailed allegations in the Indictment, the Court must dismiss the Indictment if those allegations, even if true, do not establish criminal liability. *See*, *e.g.*, *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (dismissing indictment where facts alleged did not constitute the crime of perjury). To be clear, none of the arguments below concern the sufficiency of the government's evidence. Rather, we demonstrate that the theories of criminality presented in the Indictment are wrong as a matter of law.

### A.  Count Three of the Indictment must be dismissed because the facts alleged do not constitute a crime.

The Indictment sets out detailed allegations of what the government claims to be a case of Aggravated Identity Theft. Specifically, it describes two incidents of alleged identity theft and even goes so far as to label individuals as "Identity Theft Victim 1" and "Identity Theft Victim 2". The government alleges that Mr. Watson knew that another Ozy employee submitted a forged contract as evidence of Ozy's financial strength, created fake emails, and impersonated these individuals in the context of reference calls — the purpose of which, the government admits was, in the first instance, to ascertain "the status of the relationship between OZY and Cable Network 1" (Indictment at ¶47) and, in the second instance, "to discuss 'OZY's relationship with Video Service 1'" (Id. at ¶66).

16

Such behavior is, of course, misguided. But it is simply incorrect to identify this behavior as aggravated identity theft. Indeed, referring to the persons who were impersonated as "victims" already misleadingly overstates the situation: each of the interactions described in the Indictment is a confirmatory reference call of a potential lender or investor who sought color on the status of the relationships between Ozy and the alleged identity theft victim's employer before these prospective counterparties committed to investing or offering Ozy loans. To identify the impersonated individuals as "victims" suggests that—as in the common understanding of what constitutes identity theft—these individuals were harmed. They were not.

Both a plain reading of the Aggravated Identity Theft statute and consideration of the Supreme Court's recent ruling in Dubin make it clear that even when taking these allegations as true the government has not alleged that Mr. Watson has engaged in the kind of conduct covered by the statute. *See Dubin v. United States*, 143 S. Ct. 1557, 1573–74 (2023). Accordingly, Count Three of the Indictment must be dismissed.

> **1. Per the Supreme Court's recent ruling in Dubin, the conduct alleged in the indictment does not constitute Aggravated Identity Theft.**

The government has a history of overcharging defendants with violations of 18 U.S.C. §1028A for conduct that goes "well beyond ordinary understandings of identity theft." *Dubin v. United States*, 143 S. Ct. 1557, 1564 (Sotomayor, J.) (collecting cases, including a defendant who made a counterfeit handgun permit for another person, using that person's real name, unlicensed doctors who issued prescriptions that their actual patients would then fill at pharmacies, an ambulance service inflating its reimbursement rates by saying that patients had required stretchers when they had not, and a defendant who provided massage services to patients to treat their pain but improperly billed Medicare (internal citations and alterations omitted)); *see also id*. at 1564

17

(Gorsuch, J. concurring) ("[T]he United States came to this Court with a view of 18 U.S.C. § 1028A(a)(1) that would affix that unfortunate label on almost every adult American. Every bill splitter who has overcharged a friend using a mobile-payment service like Venmo. Every contractor who has rounded up his billed time by even a few minutes. Every college hopeful who has overstated his involvement in the high school glee club. All of those individuals, the United States says, engage in conduct that can invite a mandatory 2-year stint in federal prison. The Court today rightly rejects that unserious position."). In fact, it was this rampant overcharging of conduct that no reasonable person would consider aggravated identity theft that led to the circuit split which *Dubin* resolved.

David Dubin was convicted of healthcare fraud under the aggravated identity theft statute after he overbilled Medicaid for psychological testing by falsely claiming that the person performing the testing was a licensed psychologist when they were in fact lesser-qualified licensed psychological "associates." The government's reading of the statute would have allowed Mr. Dubin to be convicted of aggravated identity theft simply because his fraud incidentally involved the use of the patients' names.

To correct this obviously overbroad reading of the statute, the Supreme Court held that under § 1028A(a)(1), a defendant "uses" another person's means of identification "in relation to" a predicate offense when the use is "at the crux of what makes the conduct criminal." *Dubin*, 143 S. Ct. at 1564–65. In Mr. Dubin's case, the Court found that "the crux of petitioner's overbilling was inflating the value of actual services provided, while the patient's means of identification was an ancillary part of the Medicaid billing process." *Id.* at 1563.

The alleged predicate offense here is the wire fraud count, and the alleged impersonation is in no way "at the crux" of what would make that allegation illegal in this case. The central

18

concern of the alleged wire fraud in the Indictment is that Mr. Watson and his codefendants used interstate wire communications to misrepresent Ozy's business relationships. The personal information of the so-called "Identity Theft Victims" was completely incidental to the alleged wire fraud. (It bears repeating that neither Bank Lender 1 nor Financial Institution 1 — the employers of the respective Identity Theft Victims — actually entered into a transaction with Ozy based on the reference calls in question. Indictment at ¶47 ("Bank Lender 1 ultimately did not lend OZY any money") and ¶71 ("Financial Institution 1 ended its due diligence and did not ultimately invest in OZY")). To borrow the language of Dubin, the "crux of" the wire and securities fraud even taken as alleged was boasting about the status of Ozy's business relationships—whereas the use of fake email addresses for the Identity Theft Victims was merely ancillary.

That identity theft was not at the crux of the alleged misconduct explains why this case simply does not read like a classic identity theft case. Unlike the classic case, where a victim's specific identity is used so that the identity thief can take money from the victim's accounts or make use of the victim's credit score to the victim's detriment, here the use of a specific name was merely to benefit from their ministerial capacities at their respective employers to provide color to sophisticated financial counterparties regarding their general "relationships" with Ozy. To put this in simpler terms, the alleged criminal activity could have been achieved just as easily by inventing a non-existent executive. The point is not that there is a smarter way of committing the crime; rather, the point is that the use of someone else's name in this activity was so incidental that it would not make common sense to categorize it as aggravated identity theft.

And that commonsense notion of identity theft was relevant to the Supreme Court's own articulation of the admittedly difficult to define line between use of a name that is incidental and

use of a name that is "at the crux" of what makes the allegation illegal. But consider this example from the Court's opinion:

> The crux of [Mr. Dubin's] fraud was "how" services were rendered; the patients' names were part of the billing process, but ancillary to what made the conduct fraudulent. In contrast, take the pharmacist who swipes information from the pharmacy's files and uses it to open a bank account in a patient's name. That "misuse of th[e] means of identification" would be "integral to" what made the conduct fraudulent, because misrepresentation about who was involved was at the crux of the fraud.

*Id*. at 1565. This case is clearly more like Mr. Dubin's than the pilfering pharmacist. Unlike for the pharmacist, for whom a misrepresentation about "who was involved" is at the crux, the alleged misrepresentation here is about a "what"—the status of an amorphous and fluid relationship between video networks and a content provider. The "what" is the topic of concern for the potential investors and lenders, not the "who" of the specific signatory or corporate representative.

The Supreme Court in Dubin made it clear that incidental use of a person's name that is not at the crux of the alleged misconduct does not violate 18 U.S.C. §1028A. Count Three of the Indictment should therefore be dismissed.

### 2.   Even were Dubin not controlling, the alleged conduct does not constitute Aggravated Identity Theft.

If this case is not identity theft, then it certainly is not aggravated identity theft. As the Supreme Court wrote:

> Typically, an aggravated offense is one made worse or more serious by circumstances such as violence, the presence of a deadly weapon, or the intent to commit another crime. This suggests that Congress had in mind a particularly serious form of identity theft. Yet the Government's reading would apply an aggravated label to all manner of everyday overbilling offenses.
> *Id*. at 1568–69 (2023) (citations omitted)

The severity of the penalty points to how Congress intended the statute to target particularly serious acts of identity theft, since it imposes a mandatory 2-year prison sentence "onto underlying offenses that do not impose a mandatory prison sentence of any kind." *Id*. at 1571.

The alleged misconduct certainly does not rise to the level that would justify such an extraordinary imposition on the sentencing court. Far from being "aggravated" the alleged "identity theft" did not create any actual harm for the so-called "victims." Compare this to the facts of Dubin, where in fact the petitioner's fraud would have had the effect of "directly harm[ing] the patient by depriving him of his annual eligibility for otherwise-compensable psychological services." *Id*. at 1576 (J. Gorsuch, concurring). Even accepting the allegations as true, there was no direct harm of the alleged "victims" here—to consider this a case of "aggravated" identity theft flies in the face of good sense.

In articulating what aggravated identity theft is and what it is not, the Supreme Court also looked at the title and legislative history of the law. Both confirm that the conduct described in the Indictment was not the kind of conduct Congress was trying to proscribe when it passed §1028A. The inclusion of the modifier "aggravated" "suggests that Congress had in mind a particularly serious form of identity theft". The language of the statute under which the government seeks to prosecute Mr. Watson ("us[ing], without lawful authority") was made into law in 1998 as the Identity Theft and Assumption Deterrence Act of 1998, Pub. L. No. 105-318, 112 Stat. 3007 (1998) with a very specific purpose: to prevent the devastating financial effects of identity theft, which had become a serious problem because of newly widespread availability of the internet. Consider this statement made by President Clinton when he signed the law:

> Tens of thousands of Americans have been victims of identity theft. Imposters often run up huge debts, file for bankruptcy, and commit serious crimes. It can take years for victims of identity theft to restore their credit ratings and their reputations. This

legislation will enable . . . law enforcement agencies to combat this type of crime . . .”

Statement of President William Clinton Upon Signing H.R. 4151, 1998 WL 971795 (Oct. 30, 1998).

President Clinton's statement echoes the Congressional record, which shows that the law was enacted specifically to prevent and deter classic identity theft, that is, "theft of personal identification information that results in harm to the person whose identification is stolen . . . " This is simply not the kind of conduct alleged in the Indictment.

### B. Counts One and Two should be dismissed because they fail to allege material misstatements.

To prove securities fraud in a civil action under Section 10(b) of the Securities Exchange Act of 1934, the government must prove that, "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." Similarly, "materiality of falsehood is an element of the federal . . . wire fraud statutes." *Neder v. United States*, 527 U.S. 1, 25 (1999); *see also Williams v. Affinion Group, LLC*, 889 F.3d 116, 124 (2d Cir. 2018). "In order to impose criminal liability, the government must also prove that the defendant willfully violated the law." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (internal quotations and citations omitted).

A misstatement in a securities transaction is material so long as there is "a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." *Id*. at 89; *see United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012). A misrepresentation is important if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, (1988).

But the idea of the "total mix" must necessarily have limits, since investors are not free to walk away from concluded deals any time they find any piece of information they wish they had known before entering into the transaction. Though we expect and require, especially in the context of securities sales, certain minimum standards of disclosure with respect to material information, the key term is material. And the question of materiality is focused primarily on the value of the good or service for sale, not the bargaining position of the seller. To argue otherwise would criminalize every day behaviors that, though we may not agree with, are certainly not criminal: the used car salesman who falsely describes the sedan as having been owned by a little old lady who only drove it to church and the real estate broker who indicates that the market is hot and there are other offers coming in may lose our moral judgment, but they do not commit a crime.

The Seventh Circuit expressed this principle most strongly in *United States v. Weimart*, 819 F.3d 351 (7th Cir. 2016), which required the court to decide whether negotiations that included misrepresentations constituted fraud when the buyer got exactly what they bargained for, notwithstanding the misrepresentation. The Seventh Circuit held unequivocally that where the investor gets what it bargains for, any misrepresentations offered during the negotiation is irrelevant.

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. Such deceptions are not criminal. The better answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions about reserve prices and other terms and their relative importance should not be considered material for purposes of mail and wire fraud statutes . . . .

*Weimert* at 358. And this principle makes sense: puffery is not a crime. Were the court to criminalize such a vast swath of quotidian negotiating tactics, commerce would grind to a halt. This position is naturally consistent with case law. As the court in Weimert stated, they could find

23

"no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes."

The Second Circuit addressed a similar—but by no means identical—issue in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015). That case involved the sale of Residential Mortgage Backed Securities (RMBS), which had a robust secondary market in which brokers and highly sophisticated institutional investors participated. While negotiating with counterparties, Litvak misrepresented the cost his firm had paid to acquire the securities, the price at which the firm had negotiated to sell certain them, and his role in the transaction (suggesting that he was a third-party, when in fact his firm owned the RMBS and no third-party seller existed). During two appeals, Mr. Litvak argued that since his misrepresentations did not affect the value of the actual item sold that his misrepresentations were not material as a matter of law. *Id*. The Second Circuit rejected this argument.

This case, however, is distinguishable from Litvak. Two important kinds of allegations in the Indictment concern the bargaining positions of the parties. The first—and most clearly non-criminal—are allegations that Mr. Watson and other Ozy executives misrepresented that other sophisticated firms were interested in or had committed to investing in the company. This alleged misrepresentation is not like the misrepresentations in *Litvak*. There, the court found that the statements were not immaterial as a matter of law because the trial court had heard testimony from certain investors that they may have made different investment choices had they known that the broker (who was actually just the seller) had paid less for the RMBS than they had represented. It makes sense that this information would have been material in the context of "over the counter" securities purchases, because an indication that the seller had acquired the RMBS at a cheaper price would indicate to the potential buyer that there were cheaper products of the same quality on

the market. That is not the case in a situation, such as here, where what is being sold is not something that could be acquired "over the counter" but is a specific investment in a specific company. There was no "market" for Ozy, the illiquid securities of which were never publicly traded. Rather, investors were making independent decisions about the likelihood that the company would succeed and then, at a much later time, go public or be acquired so that the early investors could "exit" Ozy, recouping multiples of their initial investment. Accordingly, allegations that Mr. Watson or his associates misrepresented the identity of "lead investors" do not constitute criminal or fraudulent acts. At minimum these portions of the Indictment should be stricken.

The court's opinion in *Litvak* is also important in this case because it established that the "reasonable investor" standard must be read in the context of the markets where the particular buyers and sellers were trading. The *Litvak* court reasoned that the standard of a reasonable investor, "like the negligence standard of a 'reasonable man,' is an objective one." *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445, (1976); *Long v. Abbott Mortg. Corp.*, 459 F.Supp. 108, 116-17 (D. Conn. 1978)). Accordingly, the "standard may vary . . . with the nature of the traders involved in the particular market." *Id.* at 64-65 (citing *Basic*, 485 U.S. at 236, 108 S.Ct. 978; *Michaels v. Michaels*, 767 F.2d 1185, 1197 (7th Cir. 1985)).

The "nature of the traders involved in the particular market" here is that of highly sophisticated and decidedly risk-tolerant early stage investors. Those investors are definitionally not interested in what the market value of a company is—because at the early stage where they are investing, there is no market for the nascent company's securities, in the traditional sense. Rather than focusing on financial data—which they routinely ignore completely—these investors are interested in whether the company, once it raises sufficient capital, will be able to scale its business,

achieve cash flow breakeven or profitability, and ultimately create a windfall that can be realized through an acquisition or other liquidity event. Again, this case is distinguishable from *Litvak* because rather than testimony from purchasers who affirm that they would make different choices in a market with different information about how much sellers paid for the underlying product, the relevant question for buyers here was how much risk they were willing to tolerate at what valuation and what level of investment. And as the Harvard study shows, ESIs make that determination not based on financial data but based on other factors. Accordingly, the government's argument that financial information—which Ozy produced almost always on a projected, pro forma, or unaudited basis—is immaterial as a matter of law within this market.

### C.  The Indictment should be dismissed for selective prosecution.

On a more fundamental level, however, the Indictment is fatally flawed because it violates the principal that the government should not arbitrarily and selectively choose defendants. Admittedly, the burden for a defendant challenging an indictment on the grounds of selective prosecution is a high one. Federal prosecutors do have "broad discretion" to enforce laws. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). As a result, the government is granted a general "presumption of regularity" and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *Id.* (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14 (1926)); *see also*, *e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Armstrong requires that the defendant show "clear evidence" that the prosecutorial decision not only "had a discriminatory effect" but was also "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

26

To show discriminatory effect a defendant must establish that "'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant'" and that the defendant has been "'singled out.'" *Fares*, 978 F.2d at 59; *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).

With respect to the second requirement, discriminatory purpose, a defendant must establish that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59 (cleaned up). This means more than that the Government acted with an "awareness of consequences." *Wayte*, 470 U.S. at 610 (internal quotation marks omitted). Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id*. (internal quotation marks omitted). Where a defendant "has not shown that the Government prosecuted him because of" his protected status or conduct, his claim fails. *Id*. (emphasis in the original).

Here, there is evidence of both discriminatory purpose and effect. Applying *Fares*, the government has not proceeded against others similarly situated (new media companies and their founders and executives, namely: BuzzFeed's Jonah Peretti and Ben Smith, and Vice's Shane Smith, Gavin McInnes, and Suroosh Alvi) even though they have engaged in conduct of the type forming the basis of the charge against Mr. Watson, and even though they, being current or former Brooklynites or having a corporation based in Brooklyn, have much stronger ties to EDNY than does Mr. Watson.

With respect to BuzzFeed, Jonah Peretti and Ben Smith, this conduct includes conspiracy to commit securities fraud and conspiracy to commit wire fraud in that, in connection with the purchase and sale of investment in BuzzFeed and by the use of interstate wire communication,

27

BuzzFeed, BuzzFeed's founder, and/or Smith provided incorrect financial information to prospective investors, employed techniques to inflate actual traffic metrics, relied on stolen content, enabled an investor's false claim that BuzzFeed was profitable six years before it actually was, and overstated the valuation of BuzzFeed to induce an investment from Andreesen Horowitz.

With respect to Vice, Shane Smith, Gavin McInnes, and Suroosh Alvi, this conduct includes conspiracy to commit securities fraud and conspiracy to commit wire fraud in that, in connection with the purchase and sale of investment in Vice and by the use of interstate wire communication, one or more of Vice's co-founders reportedly or admitted to lying about the identities of the company's investors, publishing fake content, employing manipulative traffic-padding techniques to inflate traffic metrics, and creating a Potemkin Village office in an effort to lure Intel into entering into a lucrative contract. This conduct also includes, under the government's wrongly expansive application of 18 U.S.C. § 1028A, aggravated identity theft, in that Vice's co-founders, together with others, during and in relation to the conspiracy to commit wire fraud, impersonated an MTV executive.

As to the prong of Fares requiring a showing that the government has "singled out" this defendant, Mr. Watson has unearthed evidence supporting a strong inference that the prosecutors in the instant case have treated him disparately based on their record of targeting defendants who, like Mr. Watson and his co-defendants, are non-White.

To obtain discovery on a motion to dismiss for selective prosecution, Mr. Watson must present "some evidence tending to show the existence of the essential elements of the defense." *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)), "and that the documents in the government's possession would indeed be probative of these elements." *Berrios*, 501 F.2d at 1211 12. "Mere assertions and

generalized proffers on information and belief are insufficient" to meet this burden. *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see also Fares*, 978 F.2d at 59 (same).

Mr. Watson has collected sufficient evidence to be entitled to discovery. A search of PACER for all criminal prosecutions in the U.S. District Court for the Eastern District of New York in which Assistant United States Attorneys Gillian Kassner, Jonathan Siegel, or Dylan Stern appeared on behalf of the United States from January 1, 2019 to April 24, 2023 returned 193 defendants. In order to determine each defendant's race, as a starting point, U.S. Bureau of Prisons (BOP) Inmate Locator database was consulted because it records an inmate's race as American Indian, Asian, Black, or White. Notably, the BOP database does not designate whether an individual defendant is Hispanic, and not all charged defendants — even those convicted and sentenced to a term of imprisonment — appear in the BOP Inmate Locator. Also examined were the docket sheet and filings from each case, such as pre-sentencing reports, arraignment transcripts, etc. in order to identify defendants who are of Hispanic or Latinx descent and to determine race for individuals for whom the BOP database did not return an entry. For those defendants whose race was not indicated in official court records, public records and social media profiles bearing a photograph of the defendant or other indicator of race were also reviewed. The breakdown of the charged defendants by race was found to be:

| | |
|---|---|
| Black: | 51% |
| Hispanic: | 25% |
| Asian: | 13% |
| White: | 6% |
| Undetermined[42]: | 4% |

---

[42] The "Undetermined" category includes (1) individuals whose identities have not been publicly disclosed ("John Doe" and "Jane Doe" defendants) or whose cases are still under seal and (2) defendants whose identity could not be determined through the steps outlined above.

29

These numbers grossly deviate from the racial breakdown of the population within the Eastern District of New York, based on an analysis of US Census data for the five counties that make up the EDNY (Kings, Nassau, Queens, Richmond, and Suffolk Counties).[43] White people make up 45% of the EDNY's population, but only 6% of the 193 people who have been charged as defendants by these prosecutors since 2019. Black people, by contrast, comprise 17% of the population of the EDNY, but a staggering 51% of the defendants charged with crimes by these three EDNY prosecutors. This disproportionate charging data is particularly troubling in light of the well-known fact that White people commit white-collar crimes with a greater frequency than Black people. See LaBrie, Rachel, *White-Collar Crime: Diversity and Discrimination in Sentencing* (2022).

Because Mr. Watson has assembled evidence to support the inference of racially impermissible selective prosecution, the Court should grant discovery on this point.

## CONCLUSION

For the reasons stated above, we respectfully request that the Court dismiss the Indictment, or, in the alternative, dismiss each of the Counts in the Indictment  because they fail to set forth facts that constitute a crime, or strike those portions of the Indictment that allege non-criminal conduct, or order discovery so that it can be more fully appraised of how Mr. Watson is not receiving equal treatment under the law on account of his race.

---

[43] US Census Bureau, American Community Survey, 2021 1-Year Supplemental Estimates, *available at* https://data.census.gov/table?q=race+richmond+county+NY&g=050XX00US36047,36059,36081,36103&tid=ACS SE2021.K200201

Dated: August 1, 2023                    Respectfully submitted,

                                         **RONALD SULLIVAN LAW, PLLC**


                                         /s/ Ronald S. Sullivan Jr.
                                         Ronald S. Sullivan Jr.
                                         (admitted pro hac vice)
                                         1300 I Street, N.W., Suite 400 E
                                         Washington, D.C. 20005

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing using the CM/ECF system, which sent a notification of such filing to all required parties.

**RONALD SULLIVAN LAW, PLLC**

<u>/s/ Ronald S. Sullivan Jr.</u>
Ronald S. Sullivan Jr.
(admitted pro hac vice)
1300 I Street, N.W., Suite 400 E
Washington, D.C. 20005