## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

CARLOS WATSON, ET AL.,

                    Defendants.

Case No. 23-Crim.-82 (EK)

---

## DEFENDANT CARLOS WATSON'S REPLY MOTION TO GOVERNMENT'S OPPOSITION TO WATSON'S MOTION TO DISMISS

### INTRODUCTION

It is deeply disappointing that in 2023 the United States Department of Justice ("DOJ") responds to an allegation of racially discriminatory charging decisions by arguing, in part, that Black people commit more crimes than whites. Dkt. 91 at 23 (blatantly touting and supporting what they allege is the "well-documented fact that crime rates vary among racial groups"). But DOJ has done so, and we are forced to respond.

It is this very form of ignorant and bigoted logic that itself causes the over-representation of African Americans in the criminal legal system.  Black and brown people in the United States are over-policed, over-prosecuted, and over-sentenced at alarming rates.   All responsible scholarship points to these documented systemic factors as what causes the crime rate disparity between Blacks and whites, not the flat-footed government assertion that some races simply commit more crimes than others. *See, e.g.*, Angela J. Davis, *Racial Fairness in the Criminal Justice System: The Role of the Prosecutor*, 39 COLUM. HUM. RTS. L. REV. 202 (2008) (identifying numerous systemic factors); Paul Butler, *One Hundred Years of Race and Crime,* 100 J. CRIM. L. & CRIMINOLOGY 1043 (2010) (including among the systemic factors racialized exercise of

discretion, selective enforcement by police departments, selective prosecution, selective sentencing by judges, social and environmental conditions, poverty, etc.).

Of course, *conviction* rates differ among races.  The only relevant and responsible question is why.  If certain groups are disproportionately subject to surveillance, interrogation, investigation, arrest, charging, indictment, longer sentences, more disciplinary reports while incarcerated, and fewer compassionate releases, commutations, pardons, and grants of parole then it should come as no surprise that their crime rates and correlating factors are higher.  That prosecutors from the Department of Justice—a federal agency all of our tax dollars fund—attempt to conceal the undeniable record of these three prosecutors' racially discriminatory charging decisions by claiming that Black people just commit more crimes is itself additional persuasive evidence in support of the selective prosecution claim.

The government's assertion that the prosecutors in the instant case focus on "violent crimes or violent criminal enterprises," Dkt. 91 at 18, while exclusively listing Black or brown criminal enterprises, is also telling.  The clear indication being that Black and brown people engage in violence at higher rates than their white counterparts.  Interestingly, there is not a single mention of the Proud Boys, Oath Keepers, Patriot Front or any other domestic violent extremist group rooted in white supremacy on their list of cases.[1]  When Attorney General Merrick Garland testified about the January 6th riot at the U.S. Capitol during a Senate Appropriations Committee hearing on May 12, 2021, he unequivocally stated that white supremacy is "the most dangerous threat to our democracy."  Yet not a single white supremacist group is mentioned on the violent criminal enterprises list voluntarily provided by these three prosecutors.

---

[1] Interestingly, DOJ deliberately chose not to use the word "gang" when describing any domestic violent extremist group rooted in white supremacy. Instead, white supremacists get the privilege of being in a group.

The prosecutors attempt to cast blame on the FBI and other federal law enforcement partners for the troubling racial disparities found in the cases they prosecuted since 2019. They claim that the FBI and other law enforcement agencies initiate cases. This is misleading for several reasons. First, prosecutors routinely speak to their law enforcement partners about matters they want to pursue or have investigated. Second, each of the instant prosecutors accepted cases from their law enforcement partners and initiated prosecution. They could have declined. Finally, regarding the cases they assumed, Rule 3.8 of the American Bar Association's Model Rules of Professional Conduct requires that prosecutors in a criminal case shall "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause." Accordingly, even older cases these prosecutors inherited or assumed from others still require their individual review and analysis. Nowhere in the government's opposition do these prosecutors refute the disturbingly high and disproportionate percentage of defendants they have prosecuted that are Black.

The government's racialized argument in this case is at odds with DOJ's public rhetoric. As recently as September 20, 2023 when Attorney General Merrick Garland testified before the House Judiciary Committee, stating "[t]he Justice Department was founded in the wake of the Civil War and in the midst of Reconstruction, with the first principal task of bringing to justice white supremacists and others who terrorized Black Americans to prevent them from exercising their civil rights. The Justice Department's job was then and it is now to fulfill that promise that is at the foundation of our democracy: that the law will treat all of us alike." *Available at* https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-opening-statement-house-judiciary-committee. That promise is not being fulfilled for Mr. Watson.

### AGGRAVATED IDENTITY THEFT

As part of its attempt to basically avoid responding to the arguments of the Motion to Dismiss, the government relies on *Wedd* to argue that the Court should ignore that the Supreme Court's recent holding in *Dubin*, which precludes their aggravated identity theft charge. This case is readily distinguishable from *Wedd* in ways fatal to the government's argument.

In *Wedd*, the defendant "schemed to employ consumers' phone numbers and, through [an] auto-subscribing program, to cause them to pay for text message services without their knowledge or consent." *United States v. Wedd*, 993 F.3d 104, 123 (2d Cir. 2021). The Second Circuit found in *Wedd* that the indictment did not "detail the specific facts of the underlying schemes or precisely *how* Wedd and his co-defendants 'use[d]' consumers' telephone numbers." *Id.* at 121 (emphasis in the original).

That is not the case here.  The Indictment does not merely lay out the statutory language and then allege that its requirements are met. Rather, the government took the time to draft a speaking indictment that properly gives Mr. Watson a clear picture of the conduct the government alleges to be criminal. Indeed, "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *Id.*  The indictment alleges a count of aggravated identity theft and describes two instances in which another person's identity is allegedly invoked as part of the defendant's business activities.

That the two instances of alleged impersonation are precisely what the government claims to be aggravated identity theft is further supported by the closest thing they provide to a substantive response to the argument put forth in the Motion to Dismiss: a single footnote.  Dkt. 91 at 7 n. 5. There, the government provides *Dubin*'s definition of aggravated identity theft, and asserts that they will prove "that is exactly what the defendant and his co-conspirators did, at least twice, as

part of their fraudulent scheme." *Id*. By "at least twice" the government can *only* mean the two instances described in the indictment, referenced in their own press releases, and discussed in the Motion to Dismiss.

To pretend that those two instances are not precisely what the government means when it alleges that Mr. Watson has committed aggravated identity theft would require an unbelievable act of willful ignorance. And if the government really means to say that the conduct alleged is *not* what they are talking about when they accuse him of aggravated identity theft then surely they are violating Mr. Watson's Sixth Amendment right to be informed of the nature and cause of accusations made against him.

The government claims that Mr. Watson has "moved to dismiss for insufficient facts." Dkt. 91 at 1. That is a tellingly misleading characterization. The problem with the government's indictment is not that they need more facts. The problem is that the facts they allege—over a remarkably detailed 42 pages—do not constitute crimes.

## SELECTIVE PROSECUTION

As this court well knows, "racial bias, implicit and explicit, continues to exist in our country despite decades of well-meaning efforts to eradicate it, and . . . the judiciary is not immune." Nomination of Eric Ross Komitee, Questions for the Record, Aug. 7, 2018, at 8 (responding to Sen. Corey Booker).[2] The decision to indict Mr. Watson reeks of implicit and explicit racial bias.

The government purports to disagree with the defendant's analysis of the data regarding the race of criminal defendants in the Eastern District of New York.[3] Of course, unlike Mr. Watson,

---

[2] https://www.judiciary.senate.gov/imo/media/doc/Komitee%20Responses%20to%20QFRs.pdf

[3] In the absence of discovery, defendant worked with due diligence to compile a dataset from publicly available data available through PACER, Bureau of Prisons data, court filings, and other sources. The methodology, Dkt. 84 at 32 resulted in a dataset comprising all criminal prosecutions in the U.S. District Court for the Eastern District of New York in which Assistant United States Attorneys Gillian Kassner, Jonathan Siegel, or Dylan Stern appeared on behalf of the United States from January 1, 2019 to April 24, 2023. Data source: PACER. Search criteria by field: Party Last

the US Attorney's Office presumably has access to the complete dataset on the demographics of defendants who are prosecuted in this district.

Yet the US Attorney's Office chose not to tap into its own data to affirmatively refute defendant's data with contrary data. For example, Mr. Watson determined that 90% of the defendants in the prosecutions in which these AUSAs have entered an appearance are non-White and explained the basis for that determination. The government's brief failed to provide any data to the contrary. If the defendant's claim of 90% is not accurate, what is the correct number? If Mr. Watson had been off by 5% or 15%, even, then surely the government would trumpet that error.[4] This court should interpret the government's failure to refute defendant's numbers as an admission that his numbers are correct.

The prosecutors' myopic objections to Mr. Watson's analysis reveal a failure to engage with the data in a meaningful way. For example, the government points to the inclusion of a case from 1985—the first entry in the list of hundreds of cases shared with the government—as a supposed "significant flaw []" in the defendant's analysis. Dkt. 91 at 17.[5] Had the government

---

Name = [Siegel / Kassner / Stern]; Party First Name = [Jonathan / Gillian / Dylan]; Party Role = aty; Court Type = Criminal; Region = New York Eastern; Date Filed Start = 01/01/2019. Total cases = 193.

Defendant's research protocol is readily distinguishable from the one found lacking in *United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003). In that case, a defendant facing an immigration violation in the Southern District of New York sought discovery for selective prosecution, claiming that the government targeted him based on his Arab ethnicity. The *Alameh* defendant used a commercial database to assemble a list of individuals charged in the Southern *and* Eastern Districts of New York, then classified those persons based on the subjective criterion of whether they had an "Arab or Muslim sounding surname." *Id.* at 172. Here, by contrast, the defendant eschewed commercial sources in building his list of other accuseds; kept the focused on the charging district (EDNY); manually assembled the underlying data directly from the judiciary (via PACER); then researched each case individually in search of a more reliable indicator of the accused's race than the "sound[]" of his or her surname.

[4] Suppose, *arguendo*, that the defendant had miscalculated gravely (he did not), and the percentage of non-White defendants has been "only" 85% or 75% — then non-White people would still be the targets of prosecutions at a rate far disproportionate to their representation in the Eastern District of New York.

[5] Likewise, the government somehow faults the defendant for not including in his dataset "investigations that have not yet been charged or made public." Brief at 17, n.10. But defendant acknowledged this as one of the limitations of his methodology precisely because his data was assembled from public sources, which by definition exclude sealed cases

actually analyzed defendant's data, it would have found that this case, a parole violation matter in which AUSA Jonathan Siegel appeared in January 2020, proves that the defendant's rigorous research protocol worked to produce accurate racial identifications.[6] While Mr. Watson deploys a sound research protocol and data in support of his contentions, the government waives around its own press releases as "evidence."

Rather than identifying a single case in which Mr. Watson misidentified another defendant's race, the government spent a half-page of its brief pointing at cases where non-Black, non-similarly situated defendants have been charged with crimes *by other prosecutors*. Dkt. 91 at 14 n.8. But what other prosecutors do is irrelevant to a selective prosecution analysis, which must focus on "the record of the decisionmakers in respondent's case," *United States v. Bass*, 536 U.S. 862, 864 (2002). Here, those decisionmakers are AUSAs Siegel, Kassner, and Stern.

Another way that these AUSAs try to avoid responsibility for their racially troubling track record is to blame others in the federal law enforcement apparatus—the FBI and their own bosses. The claim that the FBI and other law enforcement agencies initiate cases is misleading because prosecutors routinely speak to their law enforcement partners about matters they want to pursue or have investigated.   The related effort to cast themselves as mere "line AUSAs"—passively "assigned" to prosecutions and unable to act without authorization from a constellation of supervisors—abdicates their individual discretion.[7] Each of the instant prosecutors accepted cases

---

or cases that the government has not opened a public criminal proceeding. In any event, the number of charged persons whose race defendant could not determine was a small portion of the dataset (4%).

[6] *United States v. Jose Valesquez*, Docket No. 85-cr-00691. Date Filed: 1/31/2020. AUSA: Jonathan Siegel. The BOP Inmate Locator indicated that this defendant was "White." Instead of relying on this identification, defendant excavated the case docket, finding a Department of Justice document, which AUSA Siegel himself filed, identifying the defendant as "Hispanic." Parole Commission Warrant Application, filed as Exhibit B to Letter of AUSA, Dkt. 3.

[7] Dkt. 91 at 1 (bearing initials of two supervisors and all three AUSAs), 16, 17.

from their law enforcement partners and initiated prosecution.  They could have declined.[8]  Finally, regarding the cases they assumed, Rule 3.8 of the New York Rules of Professional Conduct requires that prosecutors "shall not institute, cause to be instituted or maintain a criminal charge when the prosecutor . . . knows or it is obvious that the charge is not supported by probable cause." Accordingly, even older cases these prosecutors inherited or assumed from others still require their individual review and analysis.  The claim by AUSAs Siegel, Kassner, and Stern—that they are cogs in a prosecutorial machine that produces racially disparate outcomes—is another reason to grant discovery.

The final red herring is the use of U.S. Sentencing Commission statistical data, which the AUSAs use to buttress their outrageous claim that non-White people are more prone to criminality. Dkt. 91 at 18. What this data actually reveal is the extent to which these AUSAs, with their 90% non-White prosecution rate, are extreme outliers. Nationwide, 23% of defendants are white, but only 6% in Siegel, Kassner, and Stern's cases are white. In federal courtrooms nationwide, 25% of defendants are Black, but in the courtrooms that Siegel, Kassner, and Stern walk into, 51% of the defendants are Black and 90% are people of color.[9]

The government's claimed ignorance of securities fraud conspiracies that were concocted and carried out in EDNY's own backyard by Mr. Watson's competitors (Brooklyn-residents at the

---

[8] Line prosecutors "*must* resist pressures from their superiors that interfere with the exercise of discretion that logically should belong to them" (emphasis added). Bruce A. Green & Fred C. Zacharias, *The U.S. Attorneys Scandal and the Allocation of Prosecutorial Power*, 69 Ohio St. L.J. 187, 192.

Their apparent abdication of individual discretion cannot be squared with Justice Department policy and ethical obligations. DOJ Justice Manual §§ 9-27.110 (Manual's purpose is "to promote the reasoned exercise of prosecutorial discretion") and 9-2.101 (recommending AUSAs familiarize themselves with ABA Criminal Justice Standards); ABA Criminal Justice Standard 3.1-6(a) ("The prosecutor should not manifest or exercise, by words or conduct, bias or prejudice based upon race . . . . A prosecutor should strive to eliminate implicit biases, and act to mitigate any improper bias or prejudice when credibly informed that it exists . . . .").

[9] 2022 Annual Report and Sourcebook of Federal Sentencing Statistics at 48, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf.

relevant times, then or now) is not credible. Nor is it credible to claim that Mr. Watson's conduct was more egregious than the conduct of Vice's Shane Smith or BuzzFeed's Jonah Peretti and Ben Smith (about which the government admitted in its brief as to knowing nothing). Mr. Watson honestly raised $100 million from investors; the government claims, incorrectly, that he conspired to fraudulently raise some portion of that. If the government applied the same standards to these white CEOs that they applied to Mr. Watson, one would be charged with conspiring to fraudulently raise $6 billion from investors and aggravated identity theft—not to mention embezzlement to fund a lavish lifestyle, a conspiracy to cover up sexual assaults that occurred in Brooklyn, and other crimes. Dkt. 84 at 10-14. Others would be charged with conspiracy to fraudulently raise $2 billion from investors and stock option fraud. Dkt. 84 at 6-10. This alleged misconduct is more egregious—literally by many orders of magnitude—than anything Mr. Watson has been wrongly accused of doing.

## CONCLUSION

What is absent from the government's submission is any affirmative representation about their record of prosecution. Mr. Watson has shown, with unassailable data overwhelmingly collected from the government itself, these three white prosecutors, since 2019, have prosecuted minority populations at a 90% clip.  Glaringly absent is any counter-representation. The government criticizes Mr. Watson's rigorous methodology; the government oddly cites to press releases as if they constitute data; and, they argue procedure and make flailing attempts to undermine Mr. Watson's data – public data from the Department of Corrections. *But, the government **never** denies the discriminatory prosecutorial record of the three prosecutors attempting to jail Mr. Watson.*

9

What is glaringly obvious is that if Mr. Watson's data were incorrect or misleading, the United States would have responded with what they take to be the accurate racial breakdown of the trio's prosecutions. They did not, because they cannot. The government's silence speaks volumes.  The case should be dismissed.

**RONALD SULLIVAN LAW PLLC**

Ronald S. Sullivan Jr., Esq.
1300 I Street NW
Suite 400 E
Washington, D.C. 20005
Telephone: 202-313-8313
Email: rsullivan@ronaldsullivanlaw.com

Admitted Pro Hac Vice
*Counsel for Defendant Carlos Watson*

10