UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

                                          **MEMORANDUM & ORDER**
                  -against-                    23-CR-82(EK)

 CARLOS WATSON and OZY MEDIA, INC.,

                  Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Before the Court are two of Watson's pretrial motions.

Watson moves to suppress any evidence obtained from a laptop and

two cell phones (the "Devices") seized at the time of his

arrest.  He also moves for an order directing the U.S. Attorney

to remove from its website a press release that, he asserts,

impermissibly comments on his character, reputation, and guilt.

For the reasons set forth below, the motion to suppress is

denied.  The Court reserves decision on Watson's request for the

removal or modification of the press release.

             **I.   Motion to Suppress and Return Property**

**A.   Factual and Procedural Background**

          The following recitation is primarily drawn from the

affidavits submitted by the parties in connection with this

motion.  The government submitted two affidavits sworn by FBI

Special Agent John Williams: one made in support of the

application for a warrant to search the three Devices (two Apple

iPhones and a MacBook Pro), *see* Williams Aff. ¶ 7, ECF No. 79-1, and the second made in support of the application for GPS data for Watson's phone with a number ending in -7723 (the "7723 Number").  *See* Williams GPS Aff. ("GPS Aff."), ECF No. 79-2. Watson did not initially file any affidavit in support of his motion, but did so after the Court invited him to substantiate any factual assertions made in his papers.  Watson Aff., ECF No. 86; *see, e.g.*, *United States v. Shaw*, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003) (an "affidavit of someone with personal knowledge of the underlying facts" must support factual assertions made in a suppression motion); *United States v. Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967) (attorney's statement did not raise factual issue absent allegation of personal knowledge).[1]

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search [or seizure] are in question.*" United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005).  Watson has not requested an evidentiary hearing.  Based on the parties'

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

submissions, which raise no contested issues of material fact, the Court concludes that a hearing is unnecessary. *See, e.g.*, *United States v. Zimmerman*, 480 F. Supp. 3d 446, 452 (E.D.N.Y. 2020) (declining to hold hearing where the "material facts relevant to" the motion were "uncontroverted").

    1.   <u>Watson's Arrest and the Seizure of the Devices</u>

Watson is the founder and CEO of Ozy Media ("Ozy"), which is also a defendant in this case.  Indictment ¶ 1, ECF No. 1.  Ozy was a media and entertainment company that produced digital newsletters, podcasts, video content, and live events. *Id.* ¶ 2.

On February 22, 2023, a grand jury sitting in this District returned an indictment charging Watson with securities fraud conspiracy, wire fraud conspiracy, and aggravated identity theft.  On the same day, the government obtained two warrants. The first ordered Watson's arrest.  *See* ECF No. 2.  The second authorized law enforcement to obtain GPS location data for the 7723 Number for a period of thirty days.  Special Agent Williams attested to his belief that the 7723 Number belonged to Watson, given that certain witnesses, purported victims, and Watson's counsel had identified that number as having belonged to him during the period of the charged conspiracy.  Subscriber records also indicated that Watson had used, and was still using, that number.  *See* GPS Aff. ¶¶ 1, 8.

The following morning, on February 23, FBI agents located Watson at a hotel in midtown Manhattan, relying on GPS data for the 7723 Number and physical surveillance to do so. *See* Williams Aff. ¶ 8.  After informing the hotel's staff of the arrest warrant, the FBI agents — among them, Agent Williams — received a key to Watson's room.  *See id.* ¶ 9.[2]

After obtaining the key, the FBI went to Watson's hotel room door.  Standing outside, they called the 7723 Number multiple times.  Williams Aff. ¶ 9.  Although agents could hear a phone buzzing from where they stood outside the hotel room door, no one answered.  *Id.* ¶ 9.[3]  Agent Williams also attested that the agents repeatedly knocked on the hotel room door and

---

[2] Special Agent Williams's search warrant affidavit refers to the arresting agents generally as the "FBI" and "FBI agents."  *See id.* ¶¶ 8-10. In a supplemental affidavit filed in connection with this motion, Agent Williams attested that he was present during Watson's arrest.  *See* Williams Suppl. Aff. ¶ 3, ECF No. 87-1.  The government also represents that FBI records produced to Watson in discovery identify Agent Williams as the seizing agent for each of the Devices.  *See* Gov't Mem. of Law in Response to Mot. to Suppress ("Gov't Opp'n") 8 n.4, ECF No. 79.

[3] In his motion papers, Watson indicated that he had a "white noise app playing on his phone" (such that the agents could not have heard any buzzing).  Def. Mot. to Suppress ("Def. Mot.") 3, 14, ECF No. 73.  Because Watson's declaration in support of his motion makes no mention of this, *see generally* Watson Aff., the Court disregards this factual allegation.  *See Gillette*, 383 F.2d at 848-49; *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) ("[S]tatements on the matter submitted by [defendant's] attorney in his papers before the district court cannot by themselves create a factual issue.").

In any case, even if credited, this allegation does not raise any issue of material fact.  The agents had more than adequate cause to believe Watson was inside, given that they had tracked him to the hotel based on the 7723 Number and then identified his room with the assistance of hotel staff.

announced themselves as the FBI.  *See* Williams Aff. ¶ 9.  When (again) no one answered, the agents used the hotel room key to access the room.  *See id.*

Upon entering, FBI agents saw Watson sitting at the hotel desk, in front of the laptop at issue, on what appeared to be a video conference call.  *See id.* ¶ 10; Watson Aff. ¶ 3.[4] Agent Williams attested that Watson was holding one cell phone, while another cell phone was located on the bed behind him, "within reaching distance."  *See* Williams Aff. ¶ 10.  The FBI then placed Watson under arrest and seized the Devices.  *Id.* ¶ 11.  Watson similarly averred that when the agents handcuffed him, one phone was "on the desk" and the other was "on the bed." Watson Aff. ¶ 4.  Neither the Williams Affidavit nor Watson's papers suggest that anyone else was with Watson in the hotel room prior to his arrest.

2.   Post-Arrest Procedure

On February 28, five days after Watson's arrest, the U.S. Attorney's Office submitted a draft application of a search warrant for the Devices to the Department of Justice's Criminal Division.  *See* Williams Aff. ¶ 21 n.1; Gov't Opp'n 21, ECF No.

---

[4] Watson's motion asserts that he "was not sitting at the desk," Def. Mot. 14, but his affidavit indicates exactly otherwise.  *See* Watson Aff. ¶ 3 ("I was sitting at my desk in my New York hotel room doing a video conference on my computer . . . .").

79, Gov't Suppl. Ltr. 5, ECF No. 87.  As the government has since confirmed, this review process is dictated by DOJ policy on obtaining information or records from members of the news media.  *See* Gov't Suppl. Ltr. 5 (citing 28 C.F.R. § 50.10); *see also* Williams Aff. ¶ 21 n.1.  While that review was ongoing, Watson moved for the return of the Devices pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure.  Mar. 6, 2023 Conf. Tr. 22:6-23:10, ECF No. 29; *see* Def. Mar. 10, 2023 Letter, ECF No. 33.  The DOJ approved the warrant application on March 13.  Gov't Opp'n 21.  The government then submitted that application to a magistrate judge on March 14,[5] and a warrant authorizing the search of the Devices issued later that day.

At the April 21 status conference, the Court directed the parties to litigate all issues relating to the seizure and search of the Devices, on a full record, as a motion to suppress (rather than as a Rule 41(g) motion for return of property).  Apr. 21, 2023 Conf. Tr. 15:15-21, ECF No. 57.  Watson filed the instant suppression motion on June 20, and at the Court's invitation, his supporting affidavit on August 9.  As of July 18 (the date of the government's opposition), the search of the Devices pursuant to the warrant remained ongoing.  *See* Gov't

---

[5] The Williams Affidavit includes this relevant procedural history, explicitly noting that Watson had moved under Rule 41(g) for the return of the devices.  *See* Williams Aff. ¶ 21 n.1.

Opp'n 3.  In an October 25, 2023 status report letter to the Court, the government indicated that it had produced, among other things, data from Watson's two seized phones.  ECF No. 95.

## B.  Discussion

Watson first asserts that the initial seizure of the Devices was not supported by probable cause.  In doing so, he appears to concede that the existence of probable cause would have permitted the warrantless seizure of the Devices, pursuant to one or more exceptions to the Fourth Amendment's warrant requirement.[6]  Second, and separately, Watson asserts that the government unreasonably delayed in obtaining the search warrant after seizing the Devices.

### 1.  The Agents Had Probable Cause to Seize the Devices Pursuant to Watson's Arrest

"In the ordinary case, the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly

---

[6] Somewhat confusingly, Watson's arguments that the initial seizure lacked probable cause primarily attack the Williams Affidavit, which was not filed until nineteen days after his arrest.  These arguments raised possible timing issues, as what Agent Williams knew at the time of the seizure may have differed from what he set forth in his search warrant affidavit.  Agent Williams, however, has since put this question to rest: he has attested that, with few minor exceptions, he possessed knowledge of all the information set forth in his affidavit at the time of the initial seizure.  *See* Williams Suppl. Aff. ¶ 5.  Thus, the Court can rely on the uncontested information in that Affidavit (among other information) to assess whether the agents had probable cause for the initial seizure.

describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).  The warrant requirement, however, "is subject to certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011).  Here, the government asserts two such exceptions to justify the Devices' seizure: plain view, and search (and seizure) incident to arrest.

Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if: "(1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." *United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017).  And under the exception for searches and seizures incident to arrest, an officer may "search for and seize any evidence [that is] on the arrestee's person" or in "the area within his immediate control" to "prevent its concealment or destruction." *Chimel v. California*, 395 U.S. 752, 762–63 (1969); *see also United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020) ("If the police have probable cause to believe that the property contains contraband or evidence of a crime and if it is necessary to seize or secure the property immediately to prevent its destruction or disappearance, the Fourth Amendment allows the police to seize or secure the property without a warrant . . . .").

The Second Circuit has made clear that these
exceptions apply to the warrantless *seizure* of electronic
devices, as long as the agents then obtain a warrant before
searching them.  *See Babilonia*, 854 F.3d at 179-80; *Smith*, 967
F.3d at 205; *see also Riley v. California*, 573 U.S. 373, 396
(2014) (upholding the warrantless seizure of a cell phone, but
requiring a warrant to search its contents).

Watson does not contest that the Devices were visible
to the agents in his hotel room as they lawfully executed the
arrest warrant (plain view), or that the Devices were within his
reaching distance at the time of seizure (seizure incident to
arrest).  Instead, his challenge comes down to probable cause —
that is, whether the agents had reason to believe that the
Devices contained or constituted evidence of criminal conduct.
He advances two primary arguments on this score.  First, he
contends that the agents at the time of the seizure, as
evidenced in the Williams Affidavit, lacked sufficient
information linking Watson to the Devices and linking the
Devices to criminal activity.  Def. Mot. 6-8.  Second, he argues
that any information linking the Devices to purported criminal
wrongdoing was stale because the Indictment alleges a fraudulent
scheme ending in September 2021, or "nearly eighteen months"
before the Devices' seizure.  *See id.* at 8-10.  Neither
argument, however, is convincing.

a. The Facts Known to Agent Williams, Considered
   with his Training and Experience, Established
   <u>Probable Cause</u>

Probable cause "exists where the facts and
circumstances within the officers' knowledge and of which they
had reasonably trustworthy information are sufficient in
themselves to warrant a person of reasonable caution in the
belief that evidence of a crime will be found in the place to be
searched." *Babilonia*, 854 F.3d at 178.  This standard is lower
than the preponderance of the evidence, *United States v. Juwa*,
508 F.3d 694, 701 (2d Cir. 2007), and requires only a "fair
probability" that "evidence of a crime will be found in a
particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
Probable cause "is a fluid concept — turning on the assessment
of probabilities in particular factual contexts — not readily,
or even usefully, reduced to a neat set of legal rules." *Id.* at
232.

Information supporting probable cause must establish
"a sufficient nexus between the criminal activities alleged" and
the object of the search. *See United States v. Singh*, 390 F.3d
168, 182 (2d Cir. 2004).  That showing "does not require direct
evidence and may be based on reasonable inference from the facts
presented based on common sense and experience." *Id.* Moreover,
as the Second Circuit has consistently recognized, "a law
enforcement officer's experience and training may permit the

officer to discern probable cause from facts and circumstances
where a layman might not." *Babilonia*, 854 F.3d at 178; *see
United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("[A]n
agent's expert opinion is an important factor to be considered
by the judge reviewing a warrant application.").

Even before consideration of the agent's expertise and
experience, common sense dictates that evidence of a complex,
long-duration financial fraud are likely to be found on the
electronic devices of the alleged leader of that activity.
Moreover, courts have repeatedly relied on agents' training and
experience with electronic devices and the criminal conduct at
issue generally — taken together with information known about a
specific defendant's conduct — to find the existence of probable
cause for the seizure of electronic devices. *See, e.g.*,
*Babilonia*, 854 F.3d at 180–81; *United States v. Gatto*, 313 F.
Supp. 3d 551, 559 & n.44 (S.D.N.Y. 2018).

Thus, as one example, officers investigating a
narcotics trafficking conspiracy had probable cause to search
the defendant's cell phone, based on the "circumstances leading
up to and surrounding [the defendant's] arrest" and the agents'
experience that "individuals involved in narcotics trafficking
typically use cellular phones to communicate and store
information and other records on their phones." *United States
v. Barret*, 824 F. Supp. 2d 419, 448 (E.D.N.Y. 2011).

Likewise, probable cause to seize devices has been established based on, among other evidence, an agent's "expert opinion" that "individuals who engage in wire fraud, bank fraud and money laundering activities commonly use phones, computers, or other electronic devices to access websites used for illegal activity, to communicate with victims and co-conspirators online, and to store records relating to transactions" and knowledge that such individuals "often store data on their computers related to their illegal activity." *See United States v. Ukhuebor*, No. 20-MJ-1155, 2021 WL 1062535, at *2–3. Similarly, a defendant's iPhone and iPod Touch, seized at the time of his arrest, "were immediately identifiable as evidence of criminal conduct" because "law enforcement suspected [his] involvement in racketeering and narcotics conspiracies," whose members, the agents had learned, "used cellular phones and social media to facilitate their criminal acts." *See United States v. Meregildo*, No. 11-CR-576, 2012 WL 4378047, at *4 (S.D.N.Y. Sept. 24, 2012) (upholding warrantless seizure under plain view doctrine).

Against this backdrop, the information known to Agent Williams at the time of the seizure supports a finding of probable cause. First, Agent Williams had knowledge of both the nature of Watson's purportedly criminal conduct and his use of electronic communications in connection with that conduct. As

set forth in the Williams Affidavit (and known to Agent Williams at the time of the Devices' seizure), between 2018 and 2021, Watson repeatedly sent and received emails containing purportedly fraudulent information, as well as emails containing information contradicting the statements he had made to investors.  *See* Williams Aff. ¶ 13 (citing to the Indictment allegations).[7]  Watson also sent and received text messages discussing the purported scheme, including text messages where he instructed co-conspirators regarding statements to make to victims.  *See id.* ¶ 14.  Such emails, text messages, documents, calendar entries, and other data — which can be stored on electronic devices for several years — would constitute evidence of the charged crimes.  *Id.* ¶¶ 13-16.

Second, Agent Williams had probable cause to believe that the Devices in Watson's hotel room, in particular,

---

[7] Agent Williams does not assert personal knowledge as to these facts, but instead "adopt[s] and incorporate[s]" the Indictment, which he attaches to his affidavit and the warrant application.  *Id.* ¶ 6.  Watson does not argue that the Court should ignore these allegations in making a probable cause determination *because* they came from the Indictment; instead, he only asserts that such allegations are too stale to be considered, as discussed below.

While the Second Circuit apparently has not resolved this question, numerous district courts have considered indictments' allegations in evaluating probable cause.  *See, e.g.*, *United States v. Feng Ling Liu*, No. 12 Cr. 93, 2014 WL 101672, at *5 (S.D.N.Y. Jan. 10, 2014) (collecting cases in which courts relied on indictments to assess probable cause); see *also United States v. Lahey*, 967 F. Supp. 2d 698, 726 n.33 (S.D.N.Y. 2013) ("[C]ase law suggest[s] that the fact that the Grand Jury had already returned the Indictment against [the defendant] . . . , without more, supports probable cause to search his residence.").

contained relevant electronic evidence.  According to Agent Williams, people commonly maintain the same electronic devices over a period of years.  *See id.* ¶ 13.  Indeed, this turned out to be the case for the device with the 7723 Number, which had been associated with Watson since at least 2003, *see* GPS Aff. ¶ 8, and from which agents obtained the GPS data used to locate Watson at the hotel.[8]  Williams knew, moreover, that Watson used the 7723 Number to conduct Ozy-related business.  As he attested, certain "witnesses and victims" of the alleged scheme identified the 7723 Number as a number they used to communicate with Watson and turned over to the government copies of text messages sent from that number in connection with its investigation.  *See* GPS Aff. ¶¶ 1, 8.

Moreover, Williams attested that he knew, based on his training and experience, that even if users change or upgrade devices, they often transfer data — like text messages and emails — from one device to another by "back[ing] up and sync[ing] data" among one or more devices.  *See* Williams Aff. ¶¶ 13-14.  Emails can be stored in multiple places if a person accesses his email account on multiple devices; similarly, emails that predate a newer device may still be found on it if the user accesses the email account from that newer device.  *See*

---

[8] For this reason, the Court finds immaterial the dispute over whether Williams could hear the 7723 Number cellphone ringing in Watson's hotel room.

*id.* ¶ 13.  Finally, Agent Williams attested to his knowledge, based on public reporting, of Watson's much more recent attempts to solicit additional investments for Ozy.  *See* Williams Suppl. Aff. ¶ 5(a); *see also* Williams Aff. ¶ 18.[9]  According to Williams, text messages, emails, documents, and other data relating to Watson's efforts would be evidence of continued fraudulent conduct, if he used the same or similar techniques that he used as alleged in the Indictment (including by denying his own participation in any prior misconduct at Ozy).  *See* Williams Aff. ¶ 18; Williams Suppl. Aff. ¶ 5(a).

Taken together, these facts established at least a "fair probability" that evidence of the crimes under investigation would be found on each of the Devices.  *Gates*, 462 U.S. at 232.  Watson's assertions that Williams possessed no information linking Watson to the Devices and no information linking the Devices to criminal activity are therefore unavailing.  Here, "reasonable inferences from the facts presented," based on "common sense and experience" regarding the nature and use of electronic devices, support the finding that

---

[9] The Williams Affidavit in support of the search warrant application cites to two newspaper articles regarding Watson's attempts to solicit additional investments — one published on February 9, 2023 and the other published on February 23, 2023 after Watson's arrest earlier that day. Williams Aff. ¶ 18.  In his supplemental affidavit, Agent Williams attested that he did not specifically recall whether he had reviewed the February 9 article prior to Watson's arrest, but "was aware" generally of Watson's recent efforts "according to public reporting."  Williams Suppl. Aff. ¶ 5(a).

Agent Williams had reason to believe that the Devices contained evidence of alleged criminal activity.  *See Singh*, 390 F.3d at 182; *see also United States v. Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) ("This Court is entitled to rely on . . . the commonsense notion that an individual engaged in a conspiracy may have evidence of that conspiracy, including telephone numbers and other contact information, located . . . on communication devices used by the individual.").

Watson argues that, in order to seize the Devices, the Fourth Amendment required the government to have had probable cause to believe that the Devices seized were the same ones used during the alleged scheme.  In *Babilonia*, however, the Second Circuit considered and rejected a similar argument.  There, the defendant asserted that "the ubiquity of cell phones and the fact that he was arrested in his home preclude a finding that the incriminating character of the phones and tablet was immediately apparent."  *See* 854 F.3d at 180.  Instead, the Court declined to require direct or conclusive proof, at the time of seizure, that the *particular* devices would provide evidence of criminality.  *Id.*  Instead, the Court upheld the seizure after applying the standard plain view doctrine.  Among other indicia supporting probable cause in that case, the agent's investigation revealed the defendant's use of numerous cell phones in connection with his criminal activity, and the agent

16

attested that, in his experience, cellphone address books usually contain contact information for associates. *Id.*

Numerous district courts have reached a similar conclusion, requiring only that agents have probable cause to believe that the defendant used some electronic device in connection with the criminal conduct and that the seized device belonged to the defendant. *See, e.g.*, *United States v. Chierchio*, No. 20-CR-306, 2022 WL 523603, at *11 (E.D.N.Y. Feb. 22, 2022) (rejecting argument that "the government could not have been sure that the phone it saw on [defendant's] countertop at the time of his arrest was the one it suspected was involved in criminality").

For example, sufficient cause supported the seizure and search of two phones obtained incident to a defendant's arrest, where the supporting affidavit both set out the agent's belief (based on his experience with narcotics crimes) that the phones contained relevant information and provided evidence that the defendant "used at least one cellphone" to communicate with a co-conspirator. *See United States v. Arias-Casilla*, No. 21-CR-218, 2022 WL 2467781, at *4 (S.D.N.Y. July 6, 2022). From this information, a magistrate could "conclude that *any* phones seized from Defendant's person incident to arrest would contain evidence . . . even if the Affidavit does not specifically reference communications from each phone." *Id.* Similarly, a

court had little trouble concluding that the arresting officers had probable cause to believe that two iPhones and a laptop seized incident to the defendant's arrest "contained evidence of [his] participation in the scheme to defraud, where "the arrest warrant include[d] allegations that [the defendant] sent and received text messages and email communications in connection with the fraud." *United States v. Sharma*, No. 18-CR-340, 2019 WL 3802223, at *6 (S.D.N.Y. Aug. 13, 2019) (upholding warrantless seizure under plain view and seizure incident to arrest exceptions).

   This principle has only garnered more force as smartphone operating systems (like Apple's) have incorporated the capability to synchronize text and email accounts across devices.  And the principle is appropriately invoked here.  At the time of the Devices' seizure, Agent Williams knew that Watson's alleged (and potentially ongoing) criminal conduct involved sending and receiving electronic communications and other data.  That Agent Williams may not have specifically known whether Watson used multiple cell phones or devices in furtherance of that conduct, *cf. Babilonia*, 854 F.3d at 180, does not obviate a finding of probable cause as to each Device seized — particularly given that Agent Williams had reason to believe, based on his experience with backing up and syncing data, that the Devices could contain relevant evidence.

b.   The Information Supporting Probable Cause Was Not
Stale

Next, Watson argues that the only specific information regarding Watson's criminal conduct is stale because it came from the Indictment, which alleged a fraudulent scheme "that occurred from August 2018 to September 2021" — thus, ending "nearly eighteen months" before the Devices' seizure.  Def. Mot. 8-10.  For many of same reasons discussed above, however, this argument is without merit.

The facts supporting probable cause "must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist at the time of the search and not simply as of some time in the past."  *See United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).  While there is no "bright-line rule for staleness," the "two critical factors" are "the age of the facts alleged" and the "nature of the conduct alleged to have violated the law."  *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015).  When the "facts supporting [probable cause] present a picture of continuing conduct or an ongoing activity," however, "the passage of time between the last described act and the presentation of the application becomes less significant." *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981).  A court may also consider "the kind of property sought" in

assessing whether an affidavit establishes probable cause.
*Singh*, 390 F.3d at 181.

First, regarding the kind of property sought, the electronic data at issue — including texts, emails, and online documents — is "not temporary in nature or likely to dissipate over the intervening time." *United States v. LaMorte*, 744 F. Supp. 573, 576 (S.D.N.Y. 1990). Thus, while "[s]taleness is highly relevant" to the probable cause inquiry "for a perishable or consumable object, like cocaine," it "is rarely relevant when it is a computer file. Computer and computer equipment are not the type of evidence that rapidly dissipates or degrades." *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012). Instead, digital "records and documents are more apt to remain in one place for extended periods, and likely to remain long after the defendant's criminal activity may have ceased." *United States v. Yu*, No. 22-CR-208, 2023 WL 4687970, at *4 (E.D.N.Y. July 21, 2023) (two-year age of information in support of search for physical and digital records and communications in murder-for-hire conspiracy not stale). The nature of electronic data storage — including the practices of backing up data and syncing it across devices — therefore supports the finding that the information known to Agent Williams was not stale.

Second, regarding the passage of time and nature of the criminal conduct, Agent Williams seized the Devices for

evidence of Watson's purported criminal conduct — which, as set
forth in the Indictment, involved a scheme to defraud Ozy's
investors over a three-year period from 2018 to 2021.  Even
assuming that the only information known to Agent Williams
related to conduct that was at least eighteen months old, the
"ongoing and long-term nature" of the scheme counsels against
any finding of staleness.  *Singh*, 390 F.3d at 181-82 (twenty-
month-old information about a healthcare scheme not stale); *see,
e.g.*, *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990)
(no staleness from eighteen-month delay between the informant's
statement and wiretap application in a narcotics conspiracy);
*United States v. Wells*, No. 20-CR-633, 2021 WL 5401494, at *5
(S.D.N.Y. Nov. 18, 2021) (fourteen-month-old information about
bank fraud and identify theft activity that "span[ed] many
months" and "was part of a broader pattern of fraudulent
conduct" not stale).  And Agent Williams also attested that, at
the time of the seizure, he had reason to believe that Watson
was endeavoring to raise additional capital on Ozy's behalf.
*See* Williams Aff. ¶ 18; Williams Suppl. Aff. ¶ 5(a).  Given the
Indictment's detailed allegations about (a) Ozy's extensive
financial difficulties and (b) the protracted prior efforts by
Watson and others to raise capital through false claims,
fabricated documents, and even the impersonation of a third-
party executive, Williams' two affidavits, together with the

Indictment incorporated therein, established a fair probability that relevant evidence would be present on the Devices.

In short, given the qualities of the electronic evidence sought and the long-term and ongoing nature of criminal conduct at issue, the passage of time as to some of the information known to Agent Williams did not render the facts supporting probable cause stale.

The two cases that Watson cites are distinguishable. The first did not involve a seizure and search of electronic devices, but instead the search of the defendant's apartment for evidence of illegal drug activities. *United States v. Kortright*, No. 10-CR-937, 2011 WL 4406352, at *6-7 (S.D.N.Y. Sept. 13, 2011). In that case, the warrant affidavit contained "no allegation of any criminal activity in or around the Apartment," but instead relied only on an expert opinion that "narcotics traffickers maintain evidence of their crimes in their homes." *Id.* The information that the defendant sold narcotics a "handful" of times during a two-month period "a full year" earlier was too stale to justify the apartment search. *Id.*

The second involved the search for a cell phone, but little else similar to the instant facts. In that (out-of-circuit) case, the police sought a warrant to search the defendant's girlfriend's home for his cell phone, in connection

with a murder committed over a year earlier. *See United States v. Griffith*, 867 F.3d 1265, 1268 (D.C. Cir. 2017). Concluding that the warrant was not supported by probable cause, the D.C. Circuit explained that, among other issues, "the warrant application provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence." *Id.* at 1270. The D.C. Circuit further observed that, even if the defendant had used it to communicate with co-conspirators at the time of the crime, the government provided no reason to believe that the defendant would retain the same phone after ten months of confinement, or that he would not have taken the "ample opportunity to delete incriminating information from the device by the time of the search." *Id.* at 1274. By contrast, Williams had both specific information that Watson used electronic devices in furtherance of his alleged criminal conduct and reason to believe that such electronic data would be on the Devices seized.[10]

\*     \*     \*

---

[10] In *Griffith*, moreover, the D.C. Circuit rejected the government's argument that "because nearly everyone now carries a cell phone, and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime ordinarily justifies searching her home for any cell phones." *Id.* at 1275. As Judge Garaufis observed in *Chierchio*, however, the Second Circuit's reasoning in *Babilonia* — discussed above — effectively forecloses such arguments about the effect of the "ubiquity of phones" on the probable cause analysis. *See Chierchio*, 2022 WL 523603, at *11.

In short, based on the specific facts known to Agent
Williams at the time of Watson's arrest, the agents had probable
cause to seize the Devices — whether under the plain view or
search and seizure incident to arrest exception.

2.  The Government Did Not Unreasonably Delay in Obtaining
    <u>a Warrant</u>

Watson next argues that, even if the temporary
seizure was appropriate, the government unreasonably delayed in
obtaining a warrant to search the Devices.  Def. Mot. 10–13.
While "[i]t is common for the police to temporarily seize a
suspect's personal property if they have probable cause and
intend to apply for a warrant to search the property for
evidence of a crime," "the Fourth Amendment requires that they
act with diligence to apply for a search warrant."  *Smith*, 967
F.3d at 202.  Thus, "even a seizure based on probable cause is
unconstitutional if the police act with unreasonable delay in
securing a warrant."  *United States v. Martin*, 157 F.3d 46, 54
(2d Cir. 1998).  In assessing whether a delay is unreasonable,
courts consider the following factors: "(1) the length of the
delay, (2) the importance of the seized property to the
defendant, (3) whether the defendant had a reduced property

interest in the seized item, and (4) the strength of the state's justification for the delay." *Smith*, 967 F.3d at 206.

       a.   Length of Delay

       The first factor, the length of delay, is neutral here.  The parties do not dispute that the Devices were seized on February 23, and the warrant authorizing their search was signed on March 14 — nineteen days later.  Six of these days were weekends and therefore may be discounted.  *See Martin*, 157 F.3d at 54; *accord United States v. Kamaldoss*, No. 19-CR-543, 2022 WL 1200776, at *16 (E.D.N.Y. Apr. 22, 2022).  In *Martin*, the Second Circuit found an eleven-day delay acceptable, although it acknowledged that such a delay might be unreasonable in some circumstances, *see* 157 F.3d at 54, while the *Smith* court concluded that a month-long "delay well exceeds what is ordinarily reasonable."  967 F.3d at 207.  *Kamaldoss* presents the closest post-*Smith* comparison identified by the parties, in which a delay of fifteen days (eleven business days) in that case did "not weigh against the government."  2022 WL 1200776, at *16; *cf. United States v. Wells*, No. 20-CR-633, 2023 WL 2223474, at *3 (S.D.N.Y. Feb. 23, 2023) (finding twenty-nine-day

delay that encompassed the Thanksgiving holiday weighed in favor of the defendant, "but only to a slight degree").

Given these data points, the nineteen-day delay — thirteen business days — weighs in favor of neither the government nor the defendant.

b.   Importance of the Property Seized

The second factor, the importance of the seized property to the defendant, weighs only slightly in favor of Watson.  In this more fact-intensive inquiry, the "starting point" is the "nature of the property seized."  *Smith*, 967 F.3d at 207.  Courts also consider any testimony about the use and particular significance of the device; whether the defendant had "alternative electronic devices that could serve the same functions" as those seized; and whether the defendant requested the return of the seized property.  *See id.* at 208; *United States v. Corbett*, No. 20-CR-213, 2021 WL 4480626, at *5 (E.D.N.Y. Sept. 30, 2021).

As the Supreme Court and Second Circuit have recognized, "special" privacy and possessory concerns apply to "people's personal electronic data and communication devices."  *Smith*, 967 F.3d at 207-08.  "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search[es]" of ordinary personal effects, *Riley*, 573 U.S. at 393, due to the "immense storage capacity of modern cell phones

26

and how people commonly use them to store vast amounts of highly personal information." *Smith*, 967 F.3d at 208.  These concerns apply to a similar degree to a laptop.  *See id.*  Watson also specifically requested that the government return the Devices, *see id.*, and he remains in a position (on pretrial release) to use them were the government to return them.  *Cf. United States v. Tisdol*, 544 F. Supp. 3d 219, 226 (D. Conn. 2021) (finding diminished importance of the defendant's cell phone because "he was incarcerated and would not have been able to access it even if it had not been seized"); *Corbett*, 2021 WL 4480626, at *5 (same).

Notwithstanding the generalized concerns that cell phones and electronic devices implicate, several facts diminish those concerns as applied in this case.  First, Watson has been relatively "spare in detail" regarding the "use and particular significance" of the devices to him.  *Smith*, 967 F.3d at 208; *see also Corbett*, 2021 WL 4480626, at *5 (describing the privacy and possessory concerns relating to "*personal* electronic devices" (emphasis added)).  Beyond noting that the Devices were "important enough" to travel with, *see* Def. Mot. 11, Watson initially provided no detail regarding the nature of the Devices at all.

Only more than five months later, and only at the Court's invitation, did Watson provide some — though not much —

27

additional color on the importance of the Devices.  He does not
specify whether he purchased the Devices personally or whether
they are the property of Ozy, apart from using the word "my" to
modify his references to the Devices.[11]  He does attest that the
"phones" — plural — "are of personal importance" to him, even if
he does not explicitly profess ownership.  They contain records
regarding his ailing father's various medications and doctors;
this information is not stored elsewhere, and his father's care
has been impacted as a result.  Watson Aff. ¶¶ 7-9.  Watson also
avers that the phones contain various sentimental photos,
voicemails, and videos of his family members (including several
who have passed away), with no copies existing elsewhere to "the
best of" his knowledge.[12]  In short, these attestations shed
little more light on the nature of the Devices — for example,
whether they were primarily intended for personal or business
use — or for what purposes Watson used them.[13]  Watson also does

---

[11] Watson uses the word "my" colloquially elsewhere in his Declaration,
referring, for example, to the hotel room desk — which he presumably does not
own — as "my desk."  Watson Aff. ¶¶ 3-4; *see also id.* ¶ 3 ("my New York hotel
room" and "my door").

[12] Watson does "not believe that any of [the Devices] are fully backed-
up to 'the cloud,'" *id.* ¶ 5, but he does not say what — if any — steps he has
taken to ascertain such information.

[13] The Court takes seriously Watson's suggestion that his 89-year-old
father's care has been affected by the Devices' seizure.  Watson does not say
how such care has been affected, however, and he raised this issue for the
first time more than five months after the seizure.

not specify which phone held which information, nor does he say anything specific about the personal data that the laptop might hold.[14]

Second, the government also indicates that Watson continued to have access to "alternative electronic devices" following the Devices' seizure, *see Smith*, 967 F.3d at 208, pointing to first-person Tweets sent from his Twitter handle on the day after his arrest. *See* Gov't Opp'n 22. Watson does not contest this assertion.

In sum, given Watson's privacy and possessory concerns in the Devices, which are diminished in part by the circumstances in this case, this factor weighs modestly in favor of Watson.

c. Reduced Property Interest in the Seized Items

The third factor, whether the defendant had a reduced property interest in the seized items, favors the government. This factor favors the government where probable cause existed to lawfully seize a defendant's phones at the time of his arrest. *See Smith*, 967 F.3d at 208-09; *Corbett*, 2021 WL 4480626, at *6. "The state has a stronger interest in seizures

---

[14] In the same vein, the government's April briefing on Watson's Rule 41(g) motion contended that he had failed to "offer *any* testimony regarding the importance of the Devices." Gov't Sur-reply 10, ECF No. 48. Despite being put on notice of this apparent deficiency, Watson's motion was silent on this topic. *See* Gov't Opp'n 22. Only at the Court's later invitation did Watson submit a declaration in which he finally included some specific details regarding the Devices.

made on the basis of probable cause than in those resting only on reasonable suspicion" and "all else being equal, the Fourth Amendment will tolerate greater delays after probable-cause seizures." *Smith*, 967 F.3d at 209. Some courts, moreover, have suggested that the weight given to this factor turns on the strength of the probable cause determination. *See, e.g.*, *In re Application for Search Warrant*, 527 F. Supp. 3d 179, 186 (D. Conn. 2020); *Wells*, 2023 WL 2223474, at *5 (noting "strong probable cause" existed where the defendant was subject to an ongoing criminal investigation involving text messages and phone calls exchanged in furtherance of illegal conduct).

Such is the case here. Because, as set forth above, the government had probable cause — and then some — to seize the Devices, Watson had a reduced property interest in them. This factor therefore weighs in favor of the government.

d.   Justification for the Delay

The fourth factor, the justification for the delay, relatively strongly weighs in favor of the government. According to the government, the nineteen-day total delay in obtaining the search warrant stemmed from the DOJ's policy regarding obtaining information from or records of members of the news media, like Watson. *See* 28 C.F.R. § 50.10. In accordance with this policy, the government asserts, the warrant application required both: (a) personal (written) approval by

30

the U.S. Attorney for this District, and (b) authorization by a
Deputy Assistant Attorney General for the Criminal Division at
Main Justice — with layers of intermediate review and approval
in between.  *See* Gov't Suppl. Ltr. 5 (citing 28 C.F.R. §
50.10(n)(1) and 28 C.F.R. §§ 50.10(d)(1), (2)).

Watson argues that the prosecution team cannot justify
its delay by pointing to a bureaucratic policy requiring review
by another part of the Department of Justice.  The government is
correct, however, that discounting this justification would
yield a perverse outcome.  In light of the government's stated
interest in according some protection to newsgathering efforts,
there is additional justification here for the time it took to
present the search warrant to the magistrate judge.  In other
words, "this is not a case in which the government provided no
explanation for its delay and did not show any sense of urgency
in obtaining a search warrant."  *United States v. Howe*, 545 F.
App'x 64, 66 (2d Cir. 2013); *cf. Smith*, 967 F.3d at 210-11
(factor weighed in defendant's favor where the delay stemmed not
from "any particular investigation or police duty," but instead
the officer's "generally heavy caseload").

Given the defense-friendly explanation for the delay
(*i.e.*, the desire to protect press independence) and the
timeline here — five days to obtain U.S. Attorney approval, and

another thirteen to obtain Deputy Assistant Attorney General authorization — this factor weighs in favor of the government.

       e.   Balancing the Factors and the Good-Faith Doctrine

       In sum, the first factor is neutral; the second factor weighs somewhat in favor of Watson; and the third and fourth factors tilt in favor of the government.  Under these circumstances, the government did not unreasonably delay in obtaining a warrant after seizing the Devices.

       Moreover, even if the nineteen-day delay here violated the Fourth Amendment, suppression would not be warranted.  "Not every violation of the Fourth Amendment justifies invocation of the exclusionary rule to require suppression of evidence." *Smith*, 967 F.3d at 211.  Instead, the exclusionary rule, an equitable remedy designed to deter misconduct by law enforcement, "applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence."  *Id.*  In *Smith*, although the delay was unreasonable, the exclusionary rule did not apply because the record did not indicate "any deliberate, reckless, or grossly negligent disregard" for the defendant's rights, and the delay was an "isolated act of negligence" that "did not afford the police any strategic advantage" in the case.  *Id.* at 212.

So too here: The record does not demonstrate that the government's delay was "deliberate, reckless, or grossly negligent," or the result of "systemic or recurring negligence." *See Corbett*, 2021 WL 4480626, at *7.  Rather, the record reflects that the government acted with the requisite diligence, in compliance with the applicable DOJ regulations, in applying for and obtaining a warrant.

For the reasons set forth above, Watson's motion to suppress and for the return of the Devices is denied.

## II. Motion to Require Removal of the Press Release

### A. Factual and Procedural Background

On February 23, 2023, the U.S. Attorney's Office (the "USAO") issued a press release regarding the Indictment.[15]  That release, which remains available on the USAO's website, sets forth the charges and a short summary of factual allegations. It also includes the following statement from the United States Attorney:

> "As alleged, Carlos Watson is a con man whose business strategy was based on outright deceit and fraud — he ran Ozy as a criminal organization rather than as a reputable media company," stated United States Attorney Peace.  "Investment fraud undermines confidence in our nation's markets and investors and makes it harder for honest businesses to compete. Our

---

[15] *See* Press Release, U.S. Att'y's Office for E.D.N.Y., *Ozy Media and Its Founder Carlos Watson Indicted in a Years-Long Multi-Million Dollar Fraud Scheme* (Feb. 23, 2023), https://www.justice.gov/usao-edny/pr/ozy-media-and-its-founder-carlos-watson-indicted-years-long-multi-million-dollar-fraud.

Office and the Department of Justice have made it
clear that prosecuting corporations and their corrupt
executives who flagrantly violate the law are top
priorities."

Watson has moved for an order directing the USAO to
"remove" the U.S. Attorney's statement.  Def. Mar. 10, 2023
Letter 5-6.  He asserts that the U.S. Attorney's remarks amount
to improper commentary on Watson's "character" and impermissibly
opine on his (and Ozy's) guilt.  *Id.* at 3-5; *see* Def. Apr. 7,
2023 Reply 8-10, ECF No. 45.

**B.   Legal Standards**

Watson invokes three "independent but related rules"
as the bases for his requested relief: this District's Local
Criminal Rules, New York State's Rules of Professional Conduct,
and the DOJ's internal regulations.

"Local rules have the force of law, as long as they do
not conflict with a rule prescribed by the Supreme Court, Congress,
or the Constitution."  *Contino v. United States*, 535 F.3d 124, 126
(2d Cir. 2008).  Rule 23.1(a) of the Local Criminal Rules for the
United States District Courts of the Southern and Eastern Districts
of New York provides:

It is the duty of the lawyer. . . not to release or
authorize the release of non-public information or
opinion which a reasonable person would expect to be
disseminated by means of public communication, in
connection with pending or imminent criminal
litigation with which they are associated, if there is
a substantial likelihood that such dissemination will

interfere with a fair trial or otherwise prejudice the
due administration of justice.

A later section of the Local Rule — 23.1(d) — establishes a
presumption of impropriety for certain types of statements.
Specifically, statements concerning "the character or reputation
of the accused," and "any opinion as to the accused's guilt or
innocence," "presumptively involve a substantial likelihood that
their public dissemination will interfere with a fair trial or
otherwise prejudice the due administration of justice."  L.
Crim. R. 23.1(d)(1), (7).

In contrast to that presumption, the following section
— Rule 23.1(e) — sets forth a safe harbor of sorts.  Under that
section, statements concerning the "nature, substance or text of
the charge" receive the opposite presumption — that they do not
present a substantial likelihood of interfering with a fair
trial.  L. Crim. R. 23.1(e).  Still, the "prejudicial effect of
otherwise improper comments is [not] magically dispelled by
sprinkling the words 'allege(d)' or 'allegation(s)' liberally
throughout the press conference or speech, or inserting a
disclaimer that the accused is 'innocent unless and until proven
guilty.'"  *United States v. Silver*, 103 F. Supp. 3d 370, 378
(S.D.N.Y. 2015).

Finally, Rule 23.1(h) speaks to remedies: the court
"may issue a special order governing such matters as

extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury . . . and any other matters which the court may deem appropriate for inclusion in such order."  L. Crim. R. 23.1(h).  As discussed below, however, Rule 23.1(h) requires district courts to make a finding of necessity before entering such a remedy.

Watson also invokes New York's ethical rules and the DOJ's internal regulations.  But the Local Criminal Rules best guide the inquiry here.  District courts generally do not police state ethics rules; those determinations are instead reserved for disciplinary proceedings.[16]  And the DOJ manual does not, by its terms, confer any third-party rights.

In applying the Local Criminal Rules, the Court remains mindful of the critical inquiry: whether the press release "has compromised this criminal proceeding and the future trial."  *United States v. Corbin*, 620 F. Supp. 2d 400, 411 (E.D.N.Y. 2009).

---

[16] *See, e.g.*, *United States v. Woodberry*, 546 F. Supp. 3d 180, 187 (E.D.N.Y. 2021) ("Defendant's argument that the Press Release and Statement violated New York Rule of Professional Conduct 3.6(a) is immaterial to the motion before the Court."); *Silver*, 103 F. Supp. 3d at 376 ("[T]he Court notes that this is not a disciplinary proceeding and therefore the question of whether the U.S. Attorney's extrajudicial remarks violated any ethical rules is not, per se, before the Court.").

C.   **Discussion**

As noted above, statements concerning the "nature, substance or text *of the charge*" are presumptively proper under the Local Rule.  L. Crim. R. 23.1(e) (emphasis added). Statements concerning the character, reputation, and guilt or innocence "of the *accused*," on the other hand, are presumed substantially likely to interfere with the defendant's fair-trial right.  L. Crim. R. 23.1(d)(1), (7) (emphasis added).

1.   "Con Man"

The U.S. Attorney's statement that "Watson *is* a con man" is properly located in the second of these two categories, notwithstanding the government's protest that it merely used "colloquial[]" shorthand to describe the "nature, substance or text of the charge."  *See* Gov't Prelim. Mot. Opp'n 17–18, ECF No. 39 (characterizing Watson's motion as a "quibble[] over word choice").  If nothing else, the government's verb selection makes it plain that the sentence is directed at the man being charged, rather than the conduct alleged.  This is precisely what the Local Rule is calculated to avoid.

The two supporting cases cited by the government — *Woodberry* and *Smith* — do not compel a different conclusion.  The *Smith* press release referred to conduct rather than character in its statement that the charges reflected an "unappetizing smorgasbord of graft and greed" and a "show me the money"

37

culture of corruption.  Even if it was "hard to find . . . any compelling law-enforcement purpose" for these statements, they did not "by themselves" "constitute opinions as to the Defendants' guilt."  *United States v. Smith*, 985 F. Supp. 2d 506, 539 (S.D.N.Y. 2013).  "The same [was] true" for the statement that the defendant "'quarterbacked' the scheme," which characterized his alleged *role* in the alleged and charged conspiracy.  *See id.*  Similarly, the terms at issue in *Woodberry* — "spree" and "unprecedented" — were used to "describe six separate incidents of robberies or attempted robberies" in a short span of time and therefore commented only on the charges, not the defendant.  546 F. Supp. 3d at 188.

Therefore, these statements presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the proceeding.  *See* L. Crim. R. 23.1(d)(1), (7).

2.  <u>"Corrupt Executives" and "Flagrant" Violations</u>

Watson objects next to the statement that "prosecuting corporations and their corrupt executives who flagrantly violate the law are top priorities."  Def. Apr. 7, 2023 Reply 10.  Despite being styled as a statement of law-enforcement priorities, rather than a comment on the defendants themselves, this language (and its placement) directly implies that Watson's and Ozy's indictment reflects these priorities in action.

38

Accordingly, this statement, too, walks the line between legitimate and illegitimate commentary.

In several cases, courts have expressed concern regarding statements "that appeared to bundle together unproven allegations regarding the Defendant with broader commentary" on societal ills and criminal conduct.  *See, e.g.*, *Silver*, 103 F. Supp. at 378–79.  In *Smith*, for example, the U.S. Attorney referred to "dirty" and "corrupt" politicians being "hauled off to prison" during press conference announcing charges against defendants for fraud and bribery.  985 F. Supp. 2d at 540. Given that timing and those contextual links, the court noted, listeners might reasonably "interpret the statements at the press conference, taken in their entirety, as holding Defendants out as the latest examples of 'dirty' and 'corrupt' politicians who will be 'hauled off to prison' in the broad-scale efforts to combat corruption and, therefore, to be a comment on the guilt of Defendants."  *Id.*

The press release here raises similar concerns: In the same paragraph that the U.S. Attorney describes Watson as a "con man," the statement references a "broader pattern of recognized wrongdoing," *see Silver*, 103 F. Supp. 3d at 379 — in Watson's case, "corrupt executives who flagrantly violate the law."  As a result, "it would not be irrational" for some to interpret the

press release as improperly commenting on Watson's guilt.  *See Smith*, 985 F. Supp. 2d at 540.

    3.   <u>"Criminal Organization"</u>

       Finally, Watson objects to the press release's reference to his having "[run] Ozy as a criminal organization." Def. Apr. 7, 2023 Reply 8-10.  This statement may be gratuitously hyperbolic: even if the Court was to presume, solely for the sake of argument, that all of the grand jury's allegations are true, Ozy was not a *Cosa Nostra* family.  Indeed, the Indictment describes Ozy Media as a business engaged in actual content dissemination: it "was a media and entertainment company whose businesses included digital newsletters, television production, podcasts and live events."  Indictment ¶ 1.  This statement is somewhat less troubling than the ones discussed above, however, as it describes the company, rather than a person, and the grand jury did indict Ozy itself along with Watson.

    4.   <u>Interference with a Fair Trial</u>

       Accordingly, under Rule 23.1(d), the press release statements at issue presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the proceeding.  The Court declines to decide, at this time, whether a "special order" is necessary to ensure an impartial jury, or whether "less extreme

available remedies" may "effectively mitigate" any prejudicial effect of this pretrial publicity.  *See* L. Crim. R. 23.1(h).  In the meantime, the government is advised to consider whether it wishes to excise or modify the language in light of the discussion above.  The Court will consider the viability of alternative remedies under Rule 23.1(h) as the case approaches jury selection.

### III. Conclusion

For the foregoing reasons, Watson's motion to suppress is denied.  The Court reserves decision on his request for the removal or modification of the press release.

SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:     November 6, 2023
           Brooklyn, New York