| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Case No. 23-CR-82(EK) |
| | * | |
| | * | Brooklyn, New York |
| | * | January 18, 2024 |
| v. | * | |
| | * | |
| CARLOS WATSON, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          JONATHAN SIEGEL, ESQ.
                             DYLAN STERN, ESQ.
                             Asst. United States Attorney
                             United States Attorney's Office
                             271 Cadman Plaza
                             Brooklyn, NY 11201


For the Defendant,           RONALD SULLIVAN, ESQ.
 Carlos Watson:              Ronald Sullivan Law PLLC
                             1300 I Street NW
                             Suite 400E
                             Washington, DC  20005

For the Defendant,           KENNETH MONTGOMERY, ESQ.
 Ozy Media, Inc.:            198 Rogers Avenue
                             Brooklyn, NY  11225



Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

1          (Proceedings commenced at 2:08 p.m.)

2               THE CLERK:  Criminal cause for status conference,

3     docket no. 23-CR-82, USA vs. Watson, et al.  Counsel, please

4     state your appearances for the record, beginning with the

5     government.

6               MR. SIEGEL:  Good afternoon, Your Honor.  Jonathan

7     Siegel and Dylan Stern for the United States.

8               MR. SULLIVAN:  And Ronald Sullivan on behalf of

9     Carlos Watson.

10              MR. MONTGOMERY:  Good afternoon, Your Honor.

11    Kenneth Montgomery on behalf of Ozy Media.

12              THE COURT:  Good afternoon, everyone.  And Mr.

13    Watson, good afternoon.

14              MR. SULLIVAN:  And Mr. Watson is present I forgot

15    to say, for the record, yes.

16              THE COURT:  All right.  So we are here for a status

17    conference.

18              As you all know, the government submitted a letter

19    that I think is helpful in terms of framing the agenda.

20              The most important reason that we're gathered here

21    today is to make sure that the trial schedule continues to be

22    met.

23              So my agenda is two, I don't think there's anything

24    for me to do on this question of privilege logs at this

25    point.  There's a suggestion from the government, which is

not the party best positioned to know this, but I which I

appreciate anyway, that Mr. Watson's counsel may have some

interest in withdrawing as counsel.  And obviously, we need

to deal with that.

I'll talk about the status of pretrial motions a

bit and we'll set a calendar for motions in limine.

And then there's the question of whether to modify

the protective order and if so, how.

Can we start with the question of representation,

Mr. Sullivan?  Is there anything you want to say on that

subject?

MR. SULLIVAN:  I am here for the duration.

Whatever happens I think those conversations flowed out the

California litigation.

The proposition I was making is that depending on

when that judge resolves those issues, I cannot in good faith

represent that I'll be able to provide constitutionally

adequately representation as defined by the Sixth Amendment,

unless this -- the California judge keeps moving its decision

back and back and back.  It was supposed to be in December.

Now we're up to February 16th, but there are some

things that need to get done.  I can lawyer this case but

there are other things that just have to get done in order to

ensure that Mr. Watson has constitutionally adequate

representation.

1          I will finish this thing pro bono.  That's no

2    problem.  But with a million case -- million document case we

3    need to get experts, or at least an expert.

4          I'm paying enormous sums of money for a document

5    management system right now.  I may or may not get it back.

6    So things have to change in order for us be able to go

7    forward.

8          So that's just a little context but I'm here. I'm

9    here and I'll be here on May 20th.

10         THE COURT:  Okay.  When you reference the

11   California case, I take that to be litigation with an insurer

12   about whether defense fees will be paid and if so, to whom.

13   That is what it is.

14         I appreciate your confirmation that you will be

15   here regardless.  As you and everybody else in the courtroom

16   will remember I permitted the substitution out of prior

17   counsel and in with you as counsel based on, and very much

18   dependent on your assurance that you would indeed meet the

19   trial schedule that we have set out.

20         I understand, even as unlikely as I would be to

21   seriously contemplate any substitution of counsel at this

22   point I am, of course, aware of the financial pressures

23   associated with defending a complex, white collar criminal

24   case like this one.

25         And I don't want to prejudge anything.  I don't

know exactly how the CJA plan in this district would work under these precise circumstances, but if your client reaches a point in which he is truly unable to pay for his defense, you know, one potential avenue is that he puts together a financial affidavit, applies for some relief under the Criminal Justice Act, whether that's fees to you or dispensation for experts or other specialists or otherwise.

Again, I don't know if that's a fully viable option but it sounds to me like something worth at least exploring.

All right.  Is there anything else the government wants to say at this point about the representation question?

MR. SIEGEL:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Can the government tell me then what's the bigger picture behind this dispute over the protective order?

What are these materials, to the extent it's relevant?  What do you know about who disclosed them? And when I say who, I don't mean which team.  I mean which person on that team and why are those particular materials sensitive, or potentially sensitive.

I understand there are concerns present when a protective order is violated irrespective of how we quantify the ensuing harm.  But what's really going on here is my question.

MR. SIEGEL:  So I think there's the narrow issue

1    and there's the larger issue.

2            The narrow issue of the three -- I think it's two

3    or three emails that we've identified that were quoted in the

4    complaint, those are emails between the CEO of BuzzFeed and

5    the publisher -- the then publisher of BuzzFeed news.

6            So those are high level conversations between

7    executives at a victim company that we received as part of

8    the investigation and that we produced --

9            THE COURT:  I'm sorry.  Emails from the time period

10    when that was a --

11            MR. SIEGEL:  Yes, they were emails about BuzzFeed's

12    potential acquisition of Ozy, which is one of the fraudulent

13    incidents that we allege in the indictment.

14            THE COURT:  Right.

15            MR. SIEGEL:  The emails between those executives

16    were quoted in Ozy's civil complaint.  When we saw that we

17    reached out to counsel, Mr. Sullivan and Mr. Montgomery.

18    They assured us that they were not the ones who disclosed it.

19            We asked them to follow up with their clients to

20    see if their clients had disclosed and they responded, and

21    their email is attached to their letter, that these were

22    inadvertently disclosed to Mr. Watson's lawyers for Mr.

23    Watson's civil suit.

24            What we don't know is were those the only two

25    emails that were produced, that were disclosed to the civil

1    lawyers, or was all of the discovery, or all of the discovery

2    related to BuzzFeed or some other set disclosed to the civil

3    lawyers in connection with the civil suit.

4         We only know about the ones that were quite clearly

5    quoted.

6         THE COURT:  What stage is that litigation at?  Pre-

7    motion to dismiss, post?

8         MR. SIEGEL:  The complaint was just filed in late

9    December.  I don't think there's been any answer or a motion

10   to dismiss at this time.

11        So in terms of what has been disclosed, we know

12   what's at a minimum.  We don't know how far the issue goes,

13   but it's clearly indicative to us of a breakdown of the way

14   the protective order is supposed to work.

15        In terms of who disclosed it, what we know is what

16   we've been told by defense counsel. Under the protective

17   order it's only supposed to be defense counsel and their

18   clients who can have it, as well as experts and certain

19   people who are listed in the complaint, none of whom would be

20   civil counsel in a case like this.

21        And our understanding, from what we've been told by

22   defense counsel, is that it was Mr. Watson who disclosed it.

23   This is Mr. Watson's civil suit.  These are Mr. Watson's

24   lawyers.  So that's our understanding of what the issue is.

25        And the concerns that that raises for us is not

1    just these specific documents, but whether the protective

2    order is functioning as it needs to for this protective order

3    to work, whether the court's order is being followed and the

4    larger pattern that this falls into, that we've seen

5    throughout this investigation, of Mr. Watson going after

6    people who are cooperating with this investigation.

7            THE COURT:  Going after them you're saying by

8    filing the litigation against BuzzFeed.

9            MR. SIEGEL:  Well, in this instant it's using

10   BuzzFeed's own documents, which we received in this

11   investigation, to file this lawsuit against BuzzFeed and Ben

12   Smith, who's the reporter who originally broke the story

13   against Ozy.

14           THE COURT:  And he was a potential witness in this

15   case?

16           MR. SIEGEL:  At this time I don't anticipate that

17   we would call Ben Smith, but witnesses from BuzzFeed will be

18   called.

19           THE COURT:  Okay.  He was the CEO at the time of

20   BuzzFeed?

21           MR. SIEGEL:  Ben Smith was the publisher of

22   BuzzFeed.  The CEO was Jonah Peretti.

23           THE COURT:  Okay.  I'm having a copy of the

24   protective order printed now.

25           MR. SIEGEL:  I have a copy that I can hand up if

1     that would be helpful.

2           THE COURT:  That would be helpful indeed.

3           Apart from a revocation of bail, what else is the

4     government seeking by way of relief at this point?

5           MR. SIEGEL:  So, Your Honor, I think the first

6     thing that we're requesting is the modification of the

7     protective order as laid out in our letter.

8           We designed this protective order to be fairly

9     liberal as to Mr. Watson's access to the documents.  There

10    aren't limitations to his ability to review anything, his

11    ability to possess things, which we were comfortable with

12    because there was a protective order that he signed and we

13    anticipated he would follow.

14          What we're proposing is a modification to make it

15    so that he can't have documents that are really third party

16    documents in his possession.

17          He would still be able to review all those

18    documents, but he would have to review them with counsel, or

19    with counsel's staff, and they would have to be possessed by

20    counsel so that counsel would have the responsibility to

21    ensuring that they're not being produced.

22          In terms of documents from Ozy, documents that were

23    produced by Mr. Watson, documents that are really documents

24    about Mr. Watson or Ozy, such as their tax records, their

25    bank records, their phone records, we're not proposing that

1     there be any limitations on those.

2          But things that are third party documents that

3     relate to witnesses, that related to victims in light of the

4     fact that these documents were disclosed and published, we

5     think it's appropriate to restrict Mr. Watson's unfettered

6     access to that.

7          THE COURT:  So obviously what your proposal runs

8     the risk of bumping up against is the situation we just

9     talked about a moment ago with respect to potential financial

10    pressures affecting the fullness potentially of the

11    representation here.  We'll see how that plays out.

12         But one reason I think that complex white collar

13    cases can go forward, even when they're not being lawyered in

14    the somewhat traditional large law firm mode, is that the

15    defendant, who is a highly educated person himself and knows

16    the documents perhaps better than anyone else who's going to

17    be associated with this case, can assist in reviewing

18    documents and identifying those that are relevant, either to

19    the defense theory of the case or to rebutting the government

20    theory of the case.

21         And so I think we need for this to play out in a

22    little bit more detail before I take a step like the one

23    you're urging on me right now.

24         Obviously, Mr. Sullivan and maybe more importantly

25    Mr. Watson, a protective order in place from the court is not

1    something to be disregarded.

2         But it might help me to know a little bit more

3    about the circumstances pursuant to which this course of

4    action unfolded.

5         How many documents are we talking about, and to the

6    extent you agree that those documents -- the sharing of those

7    documents was restricted by a protective order, why is it

8    that they appear to have been shared nevertheless had that

9    eventuality come to pass.

10        If the defense can get me a letter on that subject

11   within a reasonable time period, let's call it a week from

12   Monday, that will help me think through the question of next

13   steps here.

14        I'm not prejudging either of the government's

15   applications, either the modification of the protective order

16   or the question about bail.  I don't think we're really

17   heading for a detention hearing anytime very soon.

18        Think about what other measures, short of the ones

19   you've proposed so far, might bring you some solace, if not

20   everything you're hoping for.

21        And I don't want to revisit the basis for the

22   protective order in full. I think it was consented to by both

23   sides and so there wasn't really a lot of contested briefing

24   on the issue, but as to these materials that you see quoted

25   in the civil suit, give me a real world assessment in three

1    sentences or less of what the actual harm associated with

2    this disclosure is.

3              Is it just the obvious that I can hypothesize that

4    now Mr. Watson's able to put together a civil complaint that

5    includes allegations he would not otherwise have had access

6    to or is there something more severe and specific you can say

7    about that?

8         MR. SIEGEL:  Your Honor, in terms of these

9    documents specifically, I think the concern that's raised by

10   these documents specifically, it's really the broader,

11   general concern about the protective order and the way the

12   protective order is meant to work.

13             The protective order that we have here is a very

14   common one that's been blessed by courts, including Your

15   Honor, and we cited law for that when we made our

16   application, to provide the blanket protection for a large

17   number of documents, which in this case largely come from

18   victims, but to have a process by which anything that the

19   defense thinks ought to not be protected or ought to be

20   public, that they can do that.

21             That process was entirely ignored and --

22        THE COURT:  Okay. I understand the general interest

23   but you're not suggesting to me now that there's been a

24   disclosure of bona fide trade secrets.

25        MR. SIEGEL:  No, Your Honor.

1          THE COURT:  Or that someone's personal identifying

2     information or medical information has been disclosed, or any

3     of the things we would think of first when we think of the

4     need for sealing and protective orders.

5          I can't remember exactly how many rounds we went

6     through -- so you may have noticed I'm in the business of

7     occasionally rejecting protective orders sua sponte, or

8     calling for additional briefing in respect of their necessity

9     and legal appropriateness.

10          And so it may be relevant as we get letters from

11     the defense and maybe a follow up letter from the government,

12     whether and to what extent the specific materials disclosed

13     meet the standard for who protective orders are appropriate

14     in the first place.

15          I'm not saying that's dispositive of anything, but

16     it may be something of interest to me.

17          MR. SIEGEL:  Sure.  And Your Honor I think I can

18     answer that.

19          You know, the government is aware that Your Honor

20     is, I think, you know -- as you noted, you're very careful

21     about protective orders and you take the obligation to find

22     good cause seriously.

23          That's why in making our application we provided

24     law, including cases that have entered similar protective --

25          THE COURT:  You provide law, but you don't explain

1    in infinitesimal detail what every single document that's

2    going to be subject to the protective order consists of.

3           You know, these protective orders get litigated at

4    a relatively high level of generality where the government

5    says here are the kinds of privacy interests that are

6    implicated and the documents that are going to be subject to

7    this protective order present those -- you know, those

8    interests are implicated with respect to the documents we're

9    going to be producing.

10           But you don't demonstrate that on a document by

11    document basis, right?

12           And so I think this whole conversation is

13    proceeding on the assumption, which is for me right now is

14    just an assumption, that these documents we're talking about

15    implicate the interest that led to the imposition of the

16    protective order in the first place.

17           Again, people shouldn't violate protective orders,

18    whether they're over broad or not, but I haven't lost -- just

19    because the protective order has been entered doesn't mean

20    that I've lost all interest in the subject of whether this

21    one is potentially over broad or isn't.  And I think I'll

22    leave it at that.

23           The government has its Rule 16 disclosure

24    obligations, which you have to make, whether there's a

25    protective order in place or not.

1          It's I guess nice that the parties here were able

2     to work out a protective order that everybody agreed to, but

3     as I'm sure I indicated in this case and others, there are

4     additional interests implicated as well.

5          All right.  We'll leave that question at that.

6          Did I set a deadline for the -- I think I said a

7     week from Monday to --

8          MR. SULLIVAN:   The 29th by my calendar, yes.

9          THE COURT:  Okay.  And have I been clear enough on

10    what I'm hoping to learn through that letter?

11         MR. SULLIVAN:  Yes.

12         THE COURT:  Okay.  So that's the protective order

13    question.

14         MR. SIEGEL:  I'm sorry, Your Honor.  Do you want a

15    government response or --

16         THE COURT:  If you want to respond, you can.  I'm

17    not insisting on a government response.  You should -- if

18    that letter is coming in on the 29th, respond by February

19    2nd, please.

20         So that's the protective order question.  There is

21    a proposed schedule for the briefing of motions in limine,

22    which I think I'm advised is agreed to by both parties.

23         Motions in limine briefs by both sides March 8th.

24    Opposition March 29th and reply briefs April 12.

25         I really would like to have, if possible, one set

1    of briefing on motions in limine.

2            I know that it's sometimes hard to envision in

3    advance every evidentiary issue that can come up in a long

4    and complex trial, but A, I don't want to waste the jury's

5    time any more than is absolutely unavoidable and B, I'd like

6    all the motion in limine briefing to be contained in a single

7    set rather than having an iterative process as we go.

8            And so if anybody needs an extension of page

9    limits, that's fine.  Ask for it now.  But do try to envision

10   as comprehensively as possible the objections that you expect

11   I will need to resolve.

12           So that briefing schedule on motions in limine is

13   ordered.

14           What's next from the government's perspective?

15           MR. SIEGEL:  Your Honor, there's the date for

16   expert disclosures.  The government is flexible on that.

17           We would submit that it's appropriate to have that

18   before the motions in limine are due so that if there's any

19   motions about those expert disclosures, we can address them

20   in the motions in limine.

21           THE COURT:  What can you -- I mean, you've had

22   discovery on experts already, right?

23           MR. SIEGEL:  No, Your Honor.  This is the deadline

24   for discovery on experts.

25           THE COURT:  I'm sorry.  I'm just going to look at

1    Rule 16 for a moment.

2          (Pause.)

3          THE COURT:  Rule 16(a)(1)(G) says "If the

4    government requests discovery, under the second bullet point

5    in (b)(1)(C)(1) and the defendant complies, then the

6    government must, at the defendant's request, disclose all its

7    expert testimony.

8          What's the history here in terms of -- nobody's

9    disclosed anything by way of expert testimony?

10         MR. SIEGEL:  Your Honor, I'm just pulling it up

11   right now.

12         I think in that same provision that you're looking

13   at -- so this is (g) Roman number II, the time to disclose.

14   The court by order or local rule must set a time for the

15   government to make its disclosures.  And then there's a

16   parallel rule for the defense to make their disclosures.

17         THE COURT:  Right.

18         MR. SIEGEL:  So that's what we're asking.  We're

19   asking for the court to set a time for us to make those

20   disclosures and for the defense to make those disclosures.

21         And then there's a parallel rule for the defense to

22   make their disclosures.

23         THE COURT:  Right.  Okay.

24         MR. SIEGEL:  And as of now no such disclosures have

25   gone either way to date.

1          THE COURT:  That's right.  And you propose --

2    sorry, what time frame?

3          MR. SIEGEL:   We propose before the motions in

4    limine so that if there are any issues that anyone wants to

5    raise in a motion, we can address those in the motions in

6    limine.

7          THE COURT:  So if the motions in limine are

8    forthcoming on -- what did we say, March 8th?

9          MR. SIEGEL:  Yes.

10          THE COURT:  We would be talking about two or three

11   weeks before then, presumably.  What's the defense position

12   in this, if anything?

13          MR. SULLIVAN:  We cannot make a representation with

14   respect to that.  Our ability to secure our experts have been

15   retarded by the California litigation.

16          THE COURT:  What kinds of expert testimony might

17   you contemplate if money was no object?

18          MR. SULLIVAN:  Well, knowing that money is always

19   an object, but we will need at least an expert to explain to

20   the jury the nature of the venture capital world.

21          That it's different from PE.  That the people who

22   enter this world they -- what business people call bluff.

23   What lawyers call mere puffery, that they make claims about

24   the nature of their products.  Everything and everybody is

25   going to create the next Microsoft, the next big thing.

1          Unlike PE, north of 70 percent of their projects

2   zero out.  They absolutely fail.

3          That's the nature of this industry and that's why I

4   have this fancy cell phone now, because people take chances

5   on things and they fail most of the time.  Absolutely

6   inconceivable for private equity, right.  I mean, fail 70

7   percent of the time makes no sense.

8          So we're going to proffer an expert that's going to

9   explain the nature of our early funding, start ups, venture

10  capitalism.  There is mounds of literature in the academic

11  business journals about the difference between the two.

12  We'll be able to justify the proffer.

13          But that is at least one expert that we're going to

14  put forward.

15          THE COURT:  So, again, not prejudging anything, but

16  as I sit here right now I'm struggling a little bit to

17  comprehend the relevance of statistics, expert testimony,

18  whatever, about the percentage of start ups that fail.

19          The allegations are not that Mr. Watson committed a

20  crime by operating a business that failed.  The allegations

21  are that he made specific, or aided and abetted or conspired

22  to make specific misrepresentations about the then current

23  performance of his company by reference to a number of

24  objective metrics.

25          Like specifically how much money they were earning

1    and how many videos were being watched by how many unique

2    pairs of eyeballs and whatever else.

3            And so I'm going to set the deadline of -- let's

4    call it two weeks before March 8th for expert disclosure

5    under Rule 16, and even if you don't have a specific expert

6    engaged by that point, it might behoove you, I don't know, to

7    say as much as you can about what the testimony you envision

8    eliciting is, even with the identity of the witness to be

9    disclosed later.

10           MR. SULLIVAN:  Right.  That we can do.

11           And just for Your Honor's knowing, it's not a

12   question of specific representations.  It's a question of

13   material misrepresentations.  And I think it's analogous to

14   the -- quite analogous to the residential backed securities

15   fraud cases.

16           I've won those early ones in Connecticut and the

17   Second Circuit, *Litvak* and others came down and talked about

18   how specific the norms are for that industry.  How that

19   industry operates and judges have been giving bad

20   instructions before the Second Circuit kicked back *Litvak*.

21   And so that's the nature.

22           Whether -- to the extent there's a

23   misrepresentation, the question is what counts as a material

24   misrepresentation, and that is quite industry specific and

25   quite different from PE.

 1          But that time frame I can represent that I can

 2   produce at least a summary of the literature and what we

 3   would intend to introduce.

 4          I doubt very seriously with the new date in

 5   California, which just got kicked back to February 16th,

 6   two days ago, that we will have retained a particular

 7   expert at that point.

 8          THE COURT:  Yeah.  My memory of the *Litvak* case

 9   is I would say limited even in the first instance and has

10   faded since.

11          But I thought it had to do more with alleged

12   misrepresentations that, at least from the defense

13   perspective, did not speak to the intrinsic value of the

14   asset in question, right?

15          So it was like a bond and somebody would say oh,

16   this is in my inventory or this is an agency transaction

17   and the misrepresentations were about -- you know, from

18   whom at what price the seller had obtained the asset?

19          MR. SULLIVAN:  No, it was more representations

20   about the acquisition price.

21          So the broker/dealers --

22          THE COURT:  That's what I thought I was just

23   saying.

24          MR. SULLIVAN:  Their fee was the difference

25   between the acquisition price and the sale price. And some

1    broker/dealers were saying, you know, I bought it at 10

2    when they really bought it at 8.  So they were increasing

3    their fees by two points.

4            And the question was whether that's a material

5    misrepresentation and the court -- in the end the courts

6    had to instruct people about what constitutes -- what does

7    a reasonable investor rely on in that industry when people

8    are talking about their acquisition prices.

9            And in the end *Litvak* -- *Litvak* two I believe

10   came back the day we acquitted my guy on this very same

11   issue.                   And we got the instruction and we got

12   the expert that talked about the fact that at the time our

13   NBS was simply the wild, wild west.  Virtually unregulated

14   and that these multi-billion dollar companies had a room

15   full of applied math majors in the back valuing these

16   assets.

17           And that they did not reasonably rely on the

18   representation of the broker/dealer for something like the

19   acquisition price.

20           Now a jury was free to decide whether or not they

21   thought it was material, but the jury had a right to know

22   whether in that industry reasonable investors, particularly

23   these huge hedgefunds, that's who bought these things,

24   relied on those sorts of representations.

25           So if you go to a car lot and the used car lot

1    says, Judge, this grandmother -- elderly grandmother only

2    drove the car --

3            THE COURT:  I understand.

4            MR. SULLIVAN:  -- you don't -- you get a Carfax.

5    You have your own way to value that car and it's not

6    reasonable that -- you know, you can't go and sue the guy

7    if it's not true that only a grandmother drove it to and

8    from church everyday.

9            That's essentially what's going on in those

10   cases, but I'll do a more fulsome writing of it.

11           THE COURT:  Yes.  I think that's called for.

12           MR. SIEGEL:  Your Honor, I'm going to engage --

13

14           THE COURT:  We're not going to argue the motion

15   in limine now, yeah.

16           MR. SIEGEL:  I agree. I'll leave that for our

17   papers.

18           But look, the concern I have is Mr. Sullivan said

19   that by the 23rd he could get us a summary, and what Rule

20   16 calls for is a lot more than a summary.  The rule is --

21

22           THE COURT:  It's the qualifications of the expert

23   and so on.

24           MR. SIEGEL:  And also --

25           THE COURT:  I'm not making any -- when I say to

1     Mr. Sullivan, just to be clear, that you should tell me by

2     that date everything you can tell me, that's not a promise

3     that whatever information he omits will not be a problem

4     down the line for his request to call that witness.

5         But it may be that I can save everybody some

6     trouble here if the proposed testimony, irrespective of who

7     would give it, is so obviously irrelevant or legally

8     improper otherwise that we can cross that issue off the

9     list.

10         So let's leave it at that for now, but yes,

11     everybody has to comply with the rules of discovery in

12     their entirety irrespective of my invitation to make a

13     partial submission.

14         What else from the government's perspective?

15         MR. SIEGEL:  Your Honor, I mean, at some point

16     we'll have set a schedule for voir dire and jury

17     instruction submissions, but whatever is Your Honor's

18     standard schedule for that is fine with the government.

19

20         THE COURT:  I have a standard schedule that you

21     will find in my individual rules document.

22         On that, if anybody thinks there's a need to vary

23     that, they should let me know early.

24         I think the defendant has consented in this case

25     to have a jury selected by a magistrate judge rather than

1     me.  Is that --

2          MR. SULLIVAN:  I don't know, but I had no

3     objection.  That's the way I usually do it here.

4          THE COURT:  Okay.  What else?

5          MR. SIEGEL:  Just the -- oh, sorry.

6          You said that it might make sense to make the

7     application now for an extension on the page limitation for

8     the motions in limine.

9          I haven't started writing the motions in limine

10    so I don't know how long they'll be, but to avoid a last

11    minute application on that I would request for both parties

12    that we not have page limitations on the motions in limine

13    to ensure that we can address everything.

14         THE COURT:  No page limits?  We'll just all

15    submit -- no, I'm kidding.  That's fine as long as it --

16    you know, yeah, I mean, you run the risk that if you submit

17    a hundred pages of briefing that I think should have been

18    40, that I'll ask you to do the editing yourself.

19

20         But I think I'm fine to -- you're all -- to all

21    of your good judgment for the moment.

22         MR. SIEGEL:  Then the only other thing, Your

23    Honor, is you said you wanted to address the outstanding

24    motions.

25         THE COURT:  Oh, just to say -- the only motion I

1    understand to be outstanding still from the defense side is

2    the -- we'll call it the selective prosecution motion.

3              I will get an answer out on that in due course,

4    but everybody should assume for the time being that this

5    case will be going to trial, notwithstanding that motion.

6              Let's pick a date for our next status conference.

7    If we've got a trial date in May, maybe this next status

8    conference is in March right after the motions in limine

9    have come in.  Somewhere around March 15 perhaps.  So I'm

10   thinking the week of March 11th.  Maybe 2:30 on the 13th.

11             MR. SIEGEL:  That works for the government.

12             MR. SULLIVAN:  It works for Mr. Watson and Ozy.

13             THE COURT:  Meaning Mr. Montgomery's on board as

14   well.

15             MR. MONTGOMERY:  Yes, Your Honor.

16             THE COURT:  Okay.  All right.  So we will see you

17   all on March 13th.

18             MR. SULLIVAN:  I do -- if the court permits, I

19   have just a couple of things.

20             THE COURT:  Yeah, please.

21             MR. SULLIVAN:  I just want the record to be

22   clear.       I may have misheard the government but -- in

23   its presentation. I did not say, nor anybody who worked or

24   works for me, and neither did Mr. Montgomery say, that Mr.

25   Watson disclosed anything.   What we said is that

1    documents were inadvertently disclosed.  What the

2    government infers is what they infer.

3         But to the extent I heard them say that his

4    counsel said that he disclosed something that is

5    inaccurate, I did not say that. I never said, would not say

6    that, and did not say that. I just want to be crystal clear

7    on that.

8         The second thing, if this discussion comes to

9    fruition about the CJA bar, Your Honor listed off a number

10   of things they may be able to help with.  One was

11   attorney's fees.  Just as a former public defender, in good

12   faith I would never accept CJA fees.  Any fees we might

13   need would be for experts and other things. I'll be fine,

14   but we need other things desperately to finish the defense.

15        On Rule 16 if there is a technical violation of

16   Rule 16 that could "cause us trouble down the line," I want

17   to state very clearly on the record then that I will have

18   not provided Mr. Watson an adequate -- constitutionally

19   adequate defense under the Sixth Amendment.

20        The fourth thing I want to say is that I do not

21   think it's useful, and it's completely antagonistic for our

22   system of justice for the government to suggest that filing

23   a civil suit in good faith is going after "victims."

24        If the suit wasn't filed in good faith, they

25   should dismiss it and penalize everybody involved.  But Mr.

Watson was the victim of what Ben Smith did. So if there's
a victim here, he's sitting to my left.

And I don't think that the government should be
saying he's going after. It gets (indiscernible) baits
and all that other stuff but there's no substance to it. I
think it's improper and it's unfortunate.

Fifth and finally, Your Honor, with respect to
the protective order, I just want to say on behalf of my
client and the entire team that we a hundred percent agree
that a protective order is a protective order and it should
be abided by and stop on that proposition.

I'd also like to echo what the court mused that
the protective order by design and what formally was
written and it is over inclusive, the notion was there are
so many documents that we're going to produce an over
inclusive protective order -- so the value served by that
is one of expedience.

And you are correct, we didn't get into the
substance of each and every prior counsel. We did not get
into the substance of each and every document.

So I just want to echo that, Your Honor, and --

THE COURT: I may be entirely --

MR. SULLIVAN: -- nobody is flouting an order.

1          THE COURT:  -- correct, but -- even if I am

2     correct about that, which I may well be, nevertheless, the

3     appropriate course of action in the face of a protective

4     order that you view as overboard is to come back to the

5     court and ask for a modification, not to take it into your

6     own hands.

7          MR. SULLIVAN:  Absolutely. I can represent that

8     no one did that, which reminds me the sort of 5A.

9          We have taken efforts to ensure that nothing like

10    this happens again and I think that is -- I just want that

11    on Your Honor's mind.

12         THE COURT:  What are those efforts?

13         MR. SULLIVAN:  So as Your Honor knows, in these

14    cases we have well over a million dollars -- well over a

15    million documents on a huge database.  They're Ozy

16    documents.  They're Mr. Watson's telephone.  They're Ozy

17    business records.  Everything on a database.

18         What I've asked our vendor to do is just put

19    another designation on anything that we're received from

20    the government because everything we receive from the

21    government is subject to the protective order, hence the

22    over inclusive nature.

23         So the documents at issue, as I understand it,

24    there was nothing about those documents that would jump out

25    at one as oh, this is the sort of things that's protected.

1        So now we will have a mark, an indication -- an

2    electronic mark on everything that says produced by

3    government, protected.  And I think that is a better

4    prophylactic to ensure that nothing inadvertently slips

5    through our process.

6        So that's something that the court might consider

7    alongside of the government's recommendation, which I think

8    is a too aggressive response.  That's all.

9        THE COURT:  Okay.  Thank you. I'll look for the

10   letters on that subject from both sides and we'll tie off

11   that loop hopefully in the near future.

12       Anything else from the defense side?

13       MR. SULLIVAN:  Well, to not give a law professor

14   a page limit, you might do that --

15       THE COURT:  Is a colossal mistake.

16       MR. SULLIVAN:  I will be cautious.

17       THE COURT:  Thank you.  Anything else from the

18   government's side?  Do we have any -- I can't remember the

19   state of speedy trial exclusions.

20       MR. SIEGEL:  We've already excluded time through

21   the beginning of the trial.

22       THE COURT:  Okay.  Do you agree with that?

23       MR. SULLIVAN:  Agree, yes.

24       THE COURT:  Okay.  Anything else from the

25   government's side?

1    MR. SIEGEL:  No.  Thank you, Your Honor.

2    THE COURT:  All right.  We've got our path

3    forward charted here.  Thank you, everyone, and we will be

4    adjourned.

5    MR. SULLIVAN:  Thank you

6    (Proceedings adjourned at 2:56 p.m.)

7

8    I, CHRISTINE FIORE, court-approved transcriber and

9    certified electronic reporter and transcriber, certify that

10   the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13

14   *Christine Fiore*

15   _____        January 22, 2024

16   Christine Fiore, CERT

17

18

19

20

21

22

23

24