UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CARLOS WATSON AND OZY MEDIA INC.,<br><br>Defendants. | Case No. 23-Crim.-82 (EK)<br><br>DEFENDANTS' JOINT MOTION TO DISQUALIFY THE US ATTORNEY'S OFFICE AND MOTION TO DISMISS THE INDICTMENT FOR SIXTH AMENDMENT VIOLATIONS, PROSECUTORIAL MISCONDUCT, AND OUTRAGEOUS GOVERNMENT CONDUCT; OR IN THE ALTERNATIVE TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE |

INTRODUCTION

Mr. Watson and OZY media recently received a production from the government that indicates that the government has brazenly violated the protections of Mr. Watson's and OZY Media's attorney-client privileged relationship and both their work product doctrines. The government pierced the attorney-client privilege by improperly accessing and using hundreds, if not thousands, of documents that were prepared by at least three agents of defense counsel, all of whom engaged in work protected by the attorney client privilege and/or work product doctrine. The government repeatedly interviewed those defense counsel agents to extract detailed information about the services they provided to defense counsel. The government then proceeded to rampage through protected material and conversation, leveraging this ill-gotten knowledge of Defendants' core defensive strategies, theories, and tactics to shore up the government's own witnesses. The government engaged in this conduct despite being repeatedly put on notice that it was trespassing into protected territory. Dismissing the indictment is the appropriate remedy for the government's shocking breach of the attorney-client privilege. In the alternative, the entire prosecutorial team at the US Attorney's Office for the Eastern District of New York should be disqualified from the case. At a minimum, the government must be precluded from using this ill-gotten information against Defendants at trial.

Start up experts have clearly and consistently laid out that revenue is not material to early stage investors. Despite that widely accepted reality, the government has pursued a case against Carlos Watson and OZY focused on alleged material representations of OZY's revenue. While Watson and OZY do not accept that revenue is a key factor for early-stage investors, the defendants prepared a robust defense to this charge with the help of top experts hired by counsel and, thus, whose work is protected under the attorney client privilege and work product doctrine. Despite being repeatedly made aware of the clear attorney client privilege, the government ransacked Mr. Watson's defense work product, trampling on his attorney client privilege to interview his attorney's consultants and review more than 1000 pages of protected documents. That this happened so casually and blatantly that it shocks the conscience and demands that this case be immediately dismissed with prejudice.

## THE GOVERNMENT REPEATEDLY BREACHED THE SACROSANCT ATTORNEY-CLIENT PRIVILEGE

There are at least two groups of individuals who provided work protected by the attorney-client privilege and work product doctrine: a group comprising David Slayton ("Slayton") and his colleagues from Berkeley Research Group ("the BRG Group"); and a group comprising Frank Bland ("Bland") and Joe Clemente ("Clemente") of Waxman & Bland CPAs ("W&B"), and their associates (collectively, "the Waxman & Bland Group").[1]

The privileged relationship between Defendants' counsel and the BRG Group began in October 6, 2021, when Sarah Borders ("Borders"), counsel for OZY Media at King & Spalding, signed a letter engaging BRG for the purpose of "provid[ing] financial advisory and consulting services in connection with Law Firm's representation of Client," with services to include, among other things "the review . . . of financial reporting." Borders' cover note indicates that the signing of this letter was specifically arranged to ensure that the attorney client privilege attached to BRG's work: "Carlos and Sarah, I've attached a revised engagement letter which now has BRG being retained through King & Spalding."

---

[1] Defense counsel's review of the discovery provided by the government is ongoing and reserves the right to bring additional violations of the attorney-client privilege by the government to the court's attention.

The privileged relationship between Defendants' counsel and the Waxman & Bland Group dates back to January 14, 2022, when Jonathan Streeter ("Streeter") of Dechert LLP entered into a "Privileged and Confidential — Prepared at Request of Counsel" engagement letter with W&B "to assist Dechert in its provision of legal advice to Carlos Watson and OZY Media." Watson, Streeter, and Bland all signed this letter. W&B is the business entity through which Bland and Clemente operated. W&B's engagement continued with subsequent defense counsel. Both Bland and Clemente were and are agents of defense counsel whose work is protected by the attorney-client privilege and work product doctrine.

Slayton (beginning in October 2021), Bland (beginning in January 2022), and Clemente (beginning in August 2022) participated in numerous meetings with defense counsel (King and Spalding, Dechert, and subsequent counsel). They produced attorney-client protected work product for defense counsel and consistently marked this work product with designations such as "Privileged and Confidential," and "Attorney-Client Privilege," and "Attorney Work Product."

In the instant criminal prosecution, previous and current counsel for Watson and OZY repeatedly identified Bland, Clemente, and Slayton as covered by attorney-client privilege and therefore off-limits to prosecutors, with notifications on or around March 29, 2023 and again in the summer of 2023.

According to the 3500 FB-1, 3500 FB-3, the EDNY taint team, the FBI and the SEC received further confirmation in July 2023 from Bland that he was off-limits. Among other things, Bland produced a clear and unequivocal protected engagement letter and laid out that he and Clemente were both covered.

Notwithstanding these notices, law enforcement in the instant case breached the protected attorney-client relationship and exploited these initial forays to develop new leads and shore-up the government's theretofore weak case. Taint team AUSAs and the principal AUSAs and FBI agents participated in this breach and harvested fruit from this poisonous tree, including gaining insight to core defenses theories for Watson and OZY and using that insight to identify additional counter witnesses and prepare their own witnesses to counter Watson and OZY's defense.

The following is a non-exhaustive chronology of the government's repeated invasions of Defendants' attorney-client privileged and otherwise protected communications Defendants' defense strategy and case theory:

1. **3500-DS-1 (Slayton Interview):** On October 14, 2022, the USAO, SEC. and FBI invaded Watson and OZY's attorney client privilege when they interviewed Slayton. The 302 recounts Slayton stating that "OZY's legal counsel, King and Spalding, contacted BRG to assist with OZY." _____ notes of the interview are more direct: "OZY law firm engaged BRG to help." The government had a copy of the engagement letter between BRG and King and Spalding and asked Slayton questions about its language.

2. **3500-JC-2 (Clemente Interview #1):** On March 17, 2023, FBI Agents John Williams and Gurdeep Singh interviewed Clemente at his residence in Warren, New Jersey. The 302 memo does not contain any reference to the fact that Clemente's work was covered by attorney-client privilege and protected from disclosure. Clemente "started consulting for OZY MEDIA (OZY) in August 2022" and his focus was "on budgeting, driving sales, and cash management. . . . WATSON needed assistance getting OZY's financials organized." In this conversation, Clemente keyed in the government to the analytical distinction between gross revenue and net revenue. Clemente also said he participated in calls or meetings with several OZY investors: Tom Franco, Michael Dublier, Joon Oh, Sean Gudderson, Robert Quarta, Michael Moe, and Kosmo Kalliarekos. Subsequent to this interview, the government interviewed some of these OZY investors, referencing to them Clemente's name or showing them documents that Clemente provided: 3500-MM-3 (Michael Moe); 3500-TF-1 (Tom Franco).

3. **3500-JC-3, 3500-JC-3-A, 3500-JC-4, etc. (Email Communications with Clemente)** After the interview, in March and April 2023, Clemente transmitted documents protected by the attorney-client privilege to the government.

4. **3500-CL-2 (Lightfoot Interview #2):** On April 6, 2023, the government interviewed Claire Lightfoot for a second time. The government made use of Clemente's information in this interview with Lightfoot. Among other things, the government delved into the Bland/Waxman revenue analysis and Watson's revenue defense, barter revenue, and Rao's failure to keep NetSuite properly updated. Again, their breach of the attorney client privilege with Bland and Clemente led to additional and prejudicial interviews with

Lightfoot who had already done an untainted interview with prosecutors a year earlier. Notably, in that first Lightfoot interview in March 28, 2022 interview, <u>none</u> of these privileged topics came up.

5. **EDNYOZY003416200 (Clemente Privileged Documents):** On June 21, 2023, the government received more than 800 pages of privileged and protected documents from Clemente.

6. **3500-JC-5 (Clemente Interview #2) :** On June 29, 2023, AUSAs Stern, Siegel, and Kassner, and FBI Agent Singh interviewed Clemente at the US Attorney's Office in Brooklyn.

    a. In this conversation, the government ignored clear indications that Clemente and Bland's work was protected by the attorney-client privilege. For example, the government asked detailed questions of Clemente regarding an Operational Profit & Loss statement bearing the legend "DRAFT - ATTORNEY CLIENT PRIVILEGE":

    > **Ozy Media**
    > **Operational Profit & Loss**
    > (DRAFT - ATTORNEY CLIENT PRIVILEGE)

    b. Notwithstanding their knowledge that Clemente and Bland were agents of defendants' counsel, the government elicited from Clemente extensive details on the scope of his and Bland's privileged work for the Defendants. For example, as excerpted in the 302:

    > The project was to convert OZY's net revenue to gross revenue. CLEMENTE recommended FRANK BLAND, whom he knew previously, for this project. BLAND went through OZY's records to show net and gross revenue on their profit and loss statement. It was common in media industry to have 'gross revenue' and then discount the rates. Gross revenue represented the company's original rate while 'net revenue' represented the actual cash the company generated. The difference between the two was the 'discount' provided through negotiations . . . .
    >
    > WATSON wanted to replace 'gross revenue' with 'net revenue' on OZY's profit and loss statement. BLAND was hired for this project. To do this, OZY's profit and loss statements were exported from OZY's accounting software, NetSuite, with assistance from CLAIRE LIGHTFOOT. BLAND used OZY's net revenue (as the starting point and came up with gross revenue[)]. CLEMENTE recalled the top sheet showed actuals for 2019, 2020, 2021, a pro-form[a] 2022, and a budgeted

2023. CLEMENTE had access to a shared drive that was owned by BLAND. . . . CLEMENTE did not have access to the documents owned by OZY that were housed in the cloud on Google Drive nor did he have access to NetSuite. . . .

Some numbers were re-classed which may have caused the difference in revenue listed in tab 14 (000577) and 15 (000601). Some of the sources used to prepare this document were tab 14, information from LIGHTFOOT and M WEST. CLEMENTE did not know what barter revenue represented. . . .

OZY's EBITDA which stood for Earnings Before Interest, Taxes, Depreciation, and Amortization, was generally increasing. EBITDA was not a Generally Accepted Accounting Principles item as it did not consider non-cash transactions. The difference between EBITDA amounts in tab 14 and 15 could have been caused by previous year invoices being recorded in the current year.

7. **3500-FB-1 (Bland Interview #2):** On July 28, 2023, law enforcement agents interviewed Frank Bland.[2] The agents were on notice that Bland's work for Watson and OZY was covered by the attorney-client privilege because Bland told them "There was a letter from the attorney, [he] was engaged by an attorney . . . Dechert LLP[.] They wanted everything to be priviledged [sic]":

> - There was a letter from the attorney, was engaged by an attorney, but paid by Ozy.
> - Dechert LLP
> - They wanted everything to be priviledged so they

Nevertheless, the agents proceeded to pump Bland for details regarding the nature of his work for OZY and Watson, learning that Bland was "brought [in to] clean up ledger." Bland told them he "[w]ent through 2019, 2020, 2021 revenue[,] compared rate cards that Ozy had out there and came up w one average." Bland told the agents he was "[n]ever asked to do anything that FB was uncomfortable with," "nothing raised red flags," and

---

[2] The government has not produced a 302 reflecting this conversation; we know about it only because FBI Special Agent Gurdeep Singh made handwritten notes summarizing the conversation. The initials "GS" and "JA" (presumably FBI Special Agent Jordan Avery) appear on the margin of the notes.

there was "[n]o dishonest conduct." The agents learned from Bland that Claire Lightfoot and Mercedes West "provided Net Suite report" which revealed "nothing abnormal."

8. **3500-FB-2 and 3500-FB-3 (Email Communications with Bland):** Between July 28 and August 3, 2023, AUSA Siegel and FBI Agent Singh sought and secured protected attorney client privileged work products and coordinated a call with Bland — all despite having received written confirmation of the attorney- client privilege relationship. Siegel and others then sought to set up a Zoom call in early August 2023. The record (**3500-FB-4**) purposely covers up whether the August 2023 meeting happened and what happened during that meeting – clear recognition from the government of a major and sanctionable Constitutional violation.

9. **3500-FB-5 (Bland Interview #3):** On October 27, 2023, FBI Agent Todd Kaneshiro, and AUSAs Buford and Dugan interviewed Bland by telephone. Bland was crystal clear that the engagement letter was drafted by counsel for Watson and OZY: "BLAND did not draft the engagement letter . . . The letter read like it was written from BLAND to STREETER, but BLAND recalled it was drafted by Streeter . . . . The *Ozy Media – Waxman Engagement Letter* was draft[ed] by DECHERT" (italics in original).

10. **3500-SR-9 (Samir Rao Interview):** On April 8, 2024, the government interviewed Samir Rao at the US Attorney's Office and asked Rao detailed questions about topics that it had probed with Bland and Clemente, including barter revenue /in-kind revenue and Generally Accepted Accounting Principles.

## ARGUMENT

I. **Dismissal of the Indictment is Required Due to Prosecutors and Law Enforcement Engaging in Outrageous Government Conduct and Prosecutorial Misconduct Which Violated Carlos Watson's Constitutional Rights to Due Process and to Effective Assistance of Counsel**

*"Narrowly defined, riddled with exceptions, and subject to continuing criticism, the rule affording confidentiality to communications between attorney and client endures as the oldest rule of privilege known to the common law. Even in its debilitated form, however, it provides essential support for the constitutional right to the assistance of counsel. Without the attorney-client privilege, that right and many other rights belonging to those accused of crime would in large part be rendered meaningless. Designed to encourage full and frank communication between attorneys and their clients, this rule of confidentiality recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client. It also recognizes that a lawyer's assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure"*. United States v Schwimmer, 892 F.2d 237 (2d Cir 1989).

The work-product doctrine covers documents or materials prepared by an attorney or an attorney's agent in preparation for litigation and protects such documents or materials from discovery, and it "applies to criminal as well as civil litigation; while the doctrine most frequently asserted is a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital, since the interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case." United States v. Nobles, 422 U.S. 225, 238-39 (1975) (emphasis added). This doctrine is essential to the attorney-client relationship because attorneys must "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. 495, 510 (1947).

Together, "the attorney-client privilege and the work-product doctrine jointly support the Sixth Amendment's guarantee of effective assistance of counsel." In re Search Warrant Issued June 13, 2019, 942 F.3d 159, 174 (4th Cir. 2019).

The conduct of the United States Attorney's Office of the Eastern District of New York is not only reprehensible but it also warrants the dismissal of the indictment due to outrageous violations of due process of law.

A district court may dismiss an indictment either "*on the ground of outrageous government conduct if the conduct amounts to a due process violation*," United States v. Chapman, 524 F.3d 1073, 1084 (9th Cir. 2008), or under its supervisory power if warranted by the government's

pervasive and repetitive misconduct. Cf United States v. Hogan, 712 F.2d 757, 761-62 (2d Cir. 1983).

The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. "[G]overnment interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel." United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985) (citing Massiah v. United States, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964)). Thus, "[w]hen conduct of a Government agent touches upon the relationship between a criminal defendant and his attorney, such conduct exposes the Government to the risk of a fatal intrusion and must be accordingly carefully scrutinized." United States v. Gartner, 518 F.2d 633, 637 (2d Cir. 1975). To establish a Sixth Amendment violation based on Government interference with the attorney-client relationship, a defendant must demonstrate "'that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice.'" Ginsberg, 758 F.2d at 833 (quoting United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979)); see also United States v. Schwimmer, 924 F.2d 443, 447 (2d Cir. 1991). Absent a Government intrusion into the attorney-client relationship that is "manifestly and avowedly corrupt," "a defendant must ordinarily demonstrate prejudice stemming from the Government's conduct." United States v. Hoey, No. 15 CR. 229 (PAE), 2016 U.S. Dist. LEXIS 7261, 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016); see also United States v. Sattar, No. 02 Cr. 395 (JGK), 2002 U.S. Dist. LEXIS 14798, 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002) ("Where the intrusion [*65] upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice.

In this case, the Government's intrusion was not by any means unintentional or justified. On two different occasions (March 2023 and again in July 2023), the defense clearly communicated to prosecutors that Slayton, Bland, Clemente were off limits due to attorney client privilege protections and that all their work product was protected by attorney-client privilege. Defense counsel has repeatedly emphasized that such privileges were not waived and never would be. Nonetheless, the Government still secured these privileged documents and even went further to continue their investigation using that information they got ahold of in this corrupt manner, willfully invading the attorney-client relationship. On top of the intrusion being manifestly and

avowedly corrupt, prejudice stemmed from it, since the Government's subsequent conduct reflects they adjusted their theory of the case to deal with the information they gained regarding one of defendants' core strategies for defending this case, namely the specific arguments, evidence, and methodss that the defendants will use to rebut the government's contention that defendants supplied false financials to prospective investors.

The United States District Court for the Eastern District of New York recognized that "…the Supreme Court has observed, that there could be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1643, 36 L. Ed. 2d 366 (1973). The Second Circuit has explained further that "[t]o establish a due process violation on [the grounds of excessive government involvement in a crime], a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" United States v. Al Kassar, 660 F.3d 108, 121 (2d Cir. 2011)" United States v Schreiber, 2017 US Dist LEXIS 213951 [EDNY Dec. 28, 2017, No. 15-cr-377 (ENV).

The limits imposed on government conduct by the Due Process Clause cannot be "defin[ed], and thereby confin[ed]…" Rochin v. California, 342 U.S. 165, 173 (1952). The conduct in which the US Attorney's office incurred shocks the conscience. Although courts "tend to speak of that which 'shocks the conscience' largely in the context of excessive force [and entrapment] claims . . . it can apply to other areas of government activity as well" O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005) (internal quotation marks omitted). Thus, cases of outrageous government conduct are not limited to physical coercion or excessive government involvement in criminal enterprise.

As previously stated, the conduct of the United States Attorney's Office in the Eastern District of New York not only meets but exceeds this standard. Their actions amount to outrageous government conduct that is so extreme that it "shocks the conscience", in violation of Carlos Watson's and OZY's rights to due process and to the effective assistance of counsel. The prosecution interviewed as witnesses Frank Bland and Joe Clemente, who had been hired by Mr. Watson's previous counsel to review private information based on their specific instructions and questions, accessing the defense's state of mind and its strategy. The interviews they conducted allowed them access to privileged information and the core theory the defense elucidated in regards

to OZY Media's revenue, the most central element of the case. As if the prosecution's access to the defense's private information and communications was not egregious enough, they also engaged in further conduct to tailor their strategy to that of the defense, diluting its effectiveness by illegal and unethical means.

For example, in light of the new information they acquired, the prosecution called Samir Rao for a ninth day of interviews (SR-9) in which they asked him about the new numbers they got from Bland and Clemente.[3] They inquired about concepts that were initially brought to the case through the discovery of the aforementioned report, like "border revenue", "book revenue" and "recognized revenue". The interview conducted by the Government is clearly derivative from the information of Bland and Clemente's work product and subsequent interviews.

The Third Circuit Court of Appeals in United States v Levy, 577 F2d 200 (3d Cir 1978) reversed the conviction and dismissed the indictment against defendant because their right to representation by independent counsel was not protected. The Court found there was a knowing invasion of the attorney-client relationship and confidential information was disclosed to the government. The Court held that: "Where there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is (…) But it is highly unlikely that a court can, in such a hearing, arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself.

The Sixth Amendment ensures that defendants have the right to a fair trial, including the right to effective assistance of counsel and the right to present a defense. Allowing the government to obtain a defendant's defense strategy would inexcusably undermine these rights by impeding the ability of defense attorneys to provide zealous and confidential representation, leading to an

---

[3] This would have been at least the ninth day on which the government interviewed Rao: SR-1 (interview of December 1 and 2, 2021), SR-2 (interview of February 22 and 23, 2022), SR-5 (interview of August 3, 2022), SR-6 (interview of February 13, 2023), SR-8 (interview of February 21, 2023), and SR-9 (interview of April 8, 2024). The government "intentionally omitted" SR-4, so it is not clear to the defense if that designation pertains to yet another interview.

imbalance in the adversarial process, while undermining the principles of fairness and due process and eroding trust in the legal system's integrity and impartiality.

If a defendant meets the "very heavy burden" of showing "outrageous governmental misconduct," the remedy is dismissal of the indictment. See United States v. Walters, 910 F.3d 11, 27 (2d Cir. 2018)

As demonstrated above, prosecutors and law enforcement engaged in prosecutorial misconduct and outrageous government conduct which "shocks the conscience" in violation of Mr. Watson's fundamental rights to due process and to effective assistance of counsel, and therefore, the indictment should be dismissed.

**II. Alternatively, Disqualification of the Eastern District of New York U.S. Attorney's Office is Required.**

By knowingly, intentionally, and willfully interviewing Slayton, Bland, and Clemente and accessing their work product, the prosecution engaged in substantial misconduct requiring disqualification of the entire United States Attorney's Office (USAO).

An USAO should be disqualified only "when special circumstances demonstrate the interest of justice could only be advanced by this drastic remedy." United States v. Basciano, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011).

Stating that contending that there is air of impropriety is not enough to disqualify an entire SAO, the United States District Court for the Southern District of New York held that: "the extreme remedy of disqualification of an entire US Attorney's Office requires, at minimum, some showing of bad faith, misconduct, or actual prejudice on the part of the prosecutor" United States v Rodriguez Ramirez, 2004 US Dist LEXIS 1318 (SDNY Jan. 29, 2004).

In this case, the government's undue intentional breach into attorney-client privileged work-product gave the SAO substantial insight into the defense's available information and strategy, tainting the whole office through this prosecutorial misconduct. This taint became clear when, for example, the Government interviewed Samir Rao at the US Attorney's Office for the ninth time on April 8, 2024, and asked him detailed questions about topics that it had probed with Bland and Clemente, including barter revenue/in-kind revenue and Generally Accepted Accounting Principles. The same happened on April 6, 2023, when the Government interviewed Claire Lightfoot and delved into the Bland/Waxman revenue analysis and Watson's revenue

defense, barter revenue and Rao's failure to keep NetSuite properly updated; all privileged topics that did not come up in the first interview in March 28, 2022.

Allowing the USAO to prosecute a case subsequent to impermissibly accessing the defense's case theory is not only legally improper due to its infringement upon the defendant's Sixth Amendment rights, but also represents an unwarranted incentive for prosecutorial misconduct aimed at securing a favorable outcome, thereby posing a risk to the credibility and legitimacy of the judicial system as a whole.

**III. In Addition to Disqualification of the Eastern District of New York USAO, This Court Should Suppress all work product by David Slayton, Frank Bland, and Joe Clemente, all interviews to them and others in relation to their work product, and any other discovery that relates in any way to any information or production they were involved in, regardless of the Source.**

As discussed above, conduct by law enforcement and the U.S. Attorney's Office amounts to outrageous government conduct in violation of Mr. Watson's rights to due process and to effective assistance of counsel.

While the previously sought remedies are more apt for countering the prosecution's actions, given that access to the defense's strategy will not be disclosed during discovery but rather utilized as a tactical advantage, as a proper remedy for this breach the Court should at least issue a ruling "prohibit[ing] the opposing side from using the document at trial". United States v Stewart, 294 F Supp 2d 490 [SDNY 2003]). See also United States v. Morrison, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981).

Suppression of all of all documents, interviews and work products described in section "Procedural history" of this document is warranted. As shown above, the SAO engaged in prosecutorial misconduct that was substantial misconduct at best, and outrageous government conduct at worst.

Due to the improper conduct the Government engaged in, to protect the defendant's right to counsel under the Sixth Amendment and due process clause, the exclusion of the following and evidence is requested:

1. All documents, interviews and work products described in section "Procedural history" of this document.

2. All of Slayton, Bland, and Clemente's work products.
3. All interviews conducted with Frank Bland, Joe Clemente, and any other interview or conversation that deals with the information they provided or those that deal with anything which stems directly or indirectly from their confidential information, including but not limited to the following:
    a. The documents protected by the attorney-client privilege forwarded to the government by Clemente after the first interview on March 17, 2023 (3500-JC-3, 3500-JC-3-A, 3500-JC-4, etc.)
    b. Claire Lightfoot's interview conducted by the Government on April 6, 2023, in which they delved into the Bland/Waxman revenue analysis and Watson's revenue defense, barter revenue and Rao's failure to keep NetSuite properly updated. Again, their total desecration of the attorney client privilege with Bland and Clemente led to additional and injurious interviews with Lightfoot who had already done an appropriate interview with prosecutors a year earlier. Notably, in that first Lightfoot interview in March 28, 2022 interview, none of these privileged topics came up.
    c. Clemente's interview conducted by AUSAs Stern, Siegel, and Kassner, and FBI Agent Singh Gurdeep on June 29 in which he provided extensive details on the scope of his and Bland's work for the Defendants.
    d. Bland's interview conducted by law enforcement on July 28, 2023, for which the government has failed to produce a 302 (Note that the only reason the defense knows about it is because FBI Special Agent Gurdeep Singh made handwritten notes summarizing the conversation. Note that the notes themselves state: "There was a letter from the attorney, [he] was engaged by an attorney, but paid by OZY. Dechert LLP. They wanted everything to be priviledged [sic].").
    e. Bland's interview on October 27, 2023 by FBI Agent Todd Kaneshiro, and AUSAs Buford and Dugan interviewed by telephone.
    f. Samir Rao's interview on April 8, 2024 regarding topics first mentioned in Bland and Clemente's work product, such as barter revenue/ in-kind revenue and Generally Accepted Accounting Principles.

Suppression is appropriate and proportionate in this case to remedy the clear violation of Mr. Watson's constitutional rights and to serve as a deterrent.

Respectfully submitted,

**RONALD SULLIVAN LAW PLLC**
/s/
Ronald S. Sullivan Jr., Esq.
1300 I Street NW
Suite 400 E
Washington, D.C. 20005
Telephone: 202-313-8313
Email: rsullivan@ronaldsullivanlaw.com

Admitted Pro Hac Vice
*Counsel for Defendant Carlos Watson*

FRISON LAW FIRM, P.C.

_____/s/_____
Shannon Frison, Esq. USM
75 State Street, Suite 100
Boston, MA 02109
shannon@frisonlawfirm.com
(617) 706-0724
*Counsel for OZY Media, Inc.*

Case 1:23-cr-00082-EK   Document 131   Filed 04/26/24   Page 16 of 16 PageID #: 1538