1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK

3   UNITED STATES OF AMERICA,      .   Docket No. 1:23-CR-00082-EK
                                   .
4        Government,               .
                                   .   Brooklyn, New York
5          v.                      .   Friday, April 26, 2024
                                   .   10:10 a.m.
6   CARLOS WATSON, ET AL.,         .
                                   .
7        Defendants.               .
     . . . . . . . . . . . . .     .
8

9
                   TRANSCRIPT OF MOTION HEARING
10        BEFORE THE HONORABLE ERIC R. KOMITEE
              UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Government:        U.S. Attorney's Office
13                             Eastern District of New York
                               DYLAN ALEXANDER STERN, AUSA
14                             GILLIAN KASSNER, AUSA
                               JONATHAN SIEGEL, AUSA
15                             271A Cadman Plaza East
                               Brooklyn, New York  11201
16                             718-254-7000

17  For the Defendant, Carlos  Ronald Sullivan Law PLLC
    Watson:                    RONALD S. SULLIVAN, ESQ.
18                             1300 I Street Northwest
                               Suite 400 E
19                             Washington, D.C.  20005
                               202-313-8313
20
    For the Defendant, OZY     Frison Law Firm, P.C.
21  Media, Inc.:               SHANNON FRISON, ESQ.
                               75 State Street
22                             Suite 100
                               Boston, Massachusetts  02109
23                             617-706-0724

24  Also Present:             Jake Menz, Paralegal

25

1

Transcription Service:         Superior Reporting Services LLC
2                              P.O. Box 5032
                               Maryville, TN 37802
3                              865-344-3150

4

Proceedings recorded by electronic sound recording;
5    transcript produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  This is the United States of America

3    against Carlos Watson, et al., docket number CR-23-82.  For

4    the Government, please state your name for the record.

5          MR. SIEGEL:  Good morning, Your Honor.  Jonathan

6    Siegel, Gillian Kassner, and Dylan Stern for the United

7    States, and also joined at counsel table with the Court's

8    permission, with paralegal specialist, Jake Menz.

9          THE COURT:  Good morning.

10          THE CLERK:  For Mr. Watson?

11          MR. SULLIVAN:  Good morning, Your Honor.  Ronald

12    Sullivan on behalf of Carlos Watson, who is present.

13          THE COURT:  Good morning to you, Mr. Sullivan, and

14    Mr. Watson, good morning to you as well.

15          MS. FRISON:  Good morning, Your Honor.  Shannon

16    Frison for OZY Media.

17          THE COURT:  Good morning, Ms. Frison.  All right.

18    So we probably have a fairly comprehensive agenda today.

19    Pre-trial motions that have been with me for a while, I'm

20    going to issue an order on today.  We will not be dismissing

21    the indictment for failure to state an offense, which I'm

22    sure does not come as a surprise to anyone, or for selective

23    prosecution.  And I will not be granting discovery on that

24    issue either because I don't see a prima facie case even

25    having been made out or anything close there to.

1    I've read the motions in limine from the

2 Government.  I don't believe I've received any motions in

3 limine from the defense, other than the defense response to

4 the Government's motions.  I see that we have had motions

5 filed relatively late last night.  I have not read those, but

6 we can begin to talk about them perhaps today.

7    Beyond that, my agenda for this morning is to just

8 chart the path between here and jury selection, and then

9 opening statements themselves, talk maybe a little bit about

10 the division of labor between me and the magistrate judge who

11 will be presiding over jury selection with the defendants'

12 consent.  That's defendants plural.  Ms. Frison, I'm not sure

13 if you or your predecessor had consented, but I believe we

14 have both defendants' consent to jury selection by a

15 magistrate judge.

16    All right.  Why don't we start with the motions

17 filed last night?  Those were one, a motion to dismiss the

18 case, if I understand it correctly, on grounds that the

19 remaining tweets prejudice the jury pool?

20    MR. SULLIVAN:  Yes, Your Honor.  That's the first

21 motion.  Apologies for my voice.  I'm under the weather.  For

22 everyone --

23    THE COURT:  Sorry to hear that.

24    MR. SULLIVAN:  -- I've tested all week negative,

25 including this morning, but it's an old-fashioned cold.

1    THE COURT:  People, in my view, have tended to

2  forget over the last few years that there are lots of

3  maladies in the world besides COVID --

4    MR. SULLIVAN:  That's right.

5    THE COURT:  -- that continue to exist.

6    MR. SULLIVAN:  I didn't want to scare anybody.  So

7  including this morning, I'm negative.  So it was brought to

8  our attention that the very texts that the Government

9  volunteered to remove still exist on the United States

10  Attorney's Twitter account, that is, calling Mr. Watson a con

11  man and OZY a criminal organization.  We certainly rely on

12  Government's representation that they were going to remove

13  that language.  And they did from the --

14    THE COURT:  They took down the press release, or

15  amended --

16    MR. SULLIVAN:  I'm sorry, Your Honor?

17    THE COURT:  Did they take down the press release or

18  they amended the press release?

19    MR. SULLIVAN:  They amended the press release, but

20  I mean, that's a pirate victory, if it's going to remain

21  online on Twitter.  And we put in our motion the number of

22  hits that we were able to discern, and it's alarming.  So the

23  motion is twofold.  The motion is a motion to dismiss the

24  indictment on substantive due process grounds, or in the

25  alternative, to change venue.

1          THE COURT:  Yeah.  So I would expect -- I'm not

2     going to rule on this now, but I'm going to tell you that on

3     first blush, your motion seems A, untimely, because you're

4     not saying that these are new facts, right?  You could've

5     checked the Government's social media profile at the same

6     time you were litigating about the press release.  I think

7     it's pretty well-known that U.S. attorneys run Twitter feeds

8     these days, point 1.  And point 2, individual tweets, I

9     daresay, are like drops of water in the ocean of online

10    information that we all swim in these days.

11          And you know, I think my original ruling made

12    fairly clear that my issue with the Government was about

13    literal compliance with the Court's local rules, more than it

14    was about any sort macro level concern about, you know, taint

15    of a jury pool really rising to the level of a constitutional

16    or other legal violation.  And so, you know, the Government

17    can take whatever approach it wishes at this point with

18    respect to that --

19          MR. SULLIVAN:  Well, if I may be heard --

20          THE COURT:  -- but I think we'll have no problem

21    impaneling a fair jury on that.  I don't want to have

22    argument on this now, because it really is a late date to be

23    taking up this subject.

24          MR. SULLIVAN:  Well, Your Honor, if I just found

25    out about it, I'm under no affirmative obligation to run

1   around following their Twitter feed.  I'm not even on

2   Twitter.  But the jury pool is certainly on Twitter.  There

3   is no case in --

4           THE COURT:  You are under an --

5           MR. SULLIVAN:  -- this jurisdiction or any other

6   that --

7           THE COURT:  You are under an affirmative --

8           MR. SULLIVAN:  -- obligates me to run around,

9   following their Twitter, Your Honor.  So if I just found out

10  about it, I can't sit silent --

11          THE COURT:  You made a motion --

12          MR. SULLIVAN:  -- and then get prejudiced.  That's

13  unfair.  That's prejudice to him.

14          THE COURT:  Mr. Sullivan, I respect your

15  intelligence way too much to believe that you actually buy

16  the argument that you're making right now.

17          MR. SULLIVAN:  I actually buy the argument that I'm

18  under no obligation to follow the Government's Twitter.

19          THE COURT:  You're under an obligation to make

20  whatever pre-trial motions you want to make by the deadline

21  for pre-trial motions, and if you're already keyed into the

22  issue of pre-trial publicity and filing a motion on that

23  subject, the idea that you would ignore their Twitter feed in

24  the process strikes me as far-fetched at best.  But let's

25  call this subject concluded for the moment.  The second

1    motion you made --

2         MR. SIEGEL:  Your Honor, I apologize.  You having

3    said it's concluded, there is one thing that I think is

4    important to just -- that I think sort of clears the air of

5    some of this.

6         THE COURT:  One sentence to clear the air.

7         MR. SIEGEL:  I think part of the reason Mr.

8    Sullivan may not have been aware of this is that despite his

9    claims about affecting the jury pool, as it may not surprise

10   you, the U.S. Attorney's Office's Twitter account doesn't get

11   a lot of follows or views.

12        THE COURT:  Shocking.

13        MR. SIEGEL:  And you can actually see on Twitter

14   how many views the post is, and I'm just going to hand it up.

15        THE COURT:  This is factual argument on a subject

16   that I don't need any factual argument on.  But if you want

17   to drop me a letter that attaches whatever -- or you can just

18   hand it to -- yeah.  You can hand a piece of paper --

19        MR. SIEGEL:  Yeah.  I'm going to hand it up.

20        THE COURT:  -- that we'll mark as Court's Exhibit 1

21   for today's purposes.  Remind me what the second motion is?

22        MR. SULLIVAN:  The second motion has to do with

23   attorney-client privilege.  In the 3500 material that was

24   disclosed, we learned that the Government read, used,

25   interviewed their witnesses with material that's protected

1  under the attorney-client privilege.  Prior counsel, both

2  King & Spalding, and then Dechert entered into agreements

3  with an accounting company, clearly attorney-client

4  privilege.  In fact, King & Spalding hired one of the

5  companies itself but --

6          THE COURT:  What's the actual material we're

7  talking about?

8          MR. SULLIVAN:  It's accounting material that deals

9  with revenue of OZY Media.  It does a revenue analysis of OZY

10 Media's revenue.  And that company sat in defense meetings

11 and it's as though the Government was in our offices

12 discussing defense theory, because it explains --

13         THE COURT:  Let me just paraphrase what I --

14         MR. SULLIVAN:  -- much of our defense theory.  Yes,

15 Your Honor.

16         THE COURT:  If I understand correctly, Defense

17 counsel hires an accountant, maybe we would call them a Kovel

18 accountant, maybe not.  I can't remember.  To assist in

19 preparing this case for trial.  The idea is that because

20 they've been engaged by Defense counsel, the accountant's

21 work is going to be attorney work product.  They're asked to,

22 you know, reexamine the financial position and reporting of

23 OZY and determine how much it actually was earning,

24 notwithstanding either published financial statements or

25 representations by the defendants.

1          And the Government ends up -- this is KPMG, you

2     said?  Which firm?

3          MR. SULLIVAN:  No.  It's Bland & Waxman, and what's

4     this other one?  BRG.

5          THE COURT:  Two accounting firms?

6          MR. SULLIVAN:  Yes.

7          THE COURT:  Bland & Waxman and BRG, and somehow

8     that work product that you view as protected by the attorney

9     work product doctrine ends up in the hands of the Government.

10          MR. SULLIVAN:  By both the attorney-client

11     privilege and the work product doctrine.  Yes.

12          THE COURT:  Okay.  And you say it gets to the

13     Government via the cooperators, or you don't say?

14          MR. SULLIVAN:  I'm sorry?

15          THE COURT:  How does the material get into the

16     Government's hands?

17          MR. SULLIVAN:  Well, the Government accessed all of

18     our records, and then it went through the Government's taint

19     team --

20          THE COURT:  Accessed all your records how?

21          MR. SULLIVAN:  Through subpoenas and whatnot.  Or

22     the corporate records.  And everything went through a taint

23     team, and the taint team apparently determined that they

24     didn't think it was --

25          THE COURT:  Oh you're saying you produced this?

1          MR. SULLIVAN:  It was relevant.  No.  I'm not

2    saying I produced it.  No.

3          THE COURT:  You just said --

4          MR. SULLIVAN:  It was in response to either a

5    subpoena or after Mr. Watson was arrested, the Government

6    subpoenaing the materials from OZY Media.  Everything went

7    through a taint team.

8          THE COURT:  I'm seeing three possibilities here.

9    So one is, you know, the Government sees Mr. Watson's devices

10   at the time of his arrest, and then applied for and obtained

11   search warrants to seize those.  That's choice one.  They got

12   the stuff in the course of the search.  Choice two is they

13   sent you subpoenas and you produced things.  You should've,

14   obviously, withheld, or OZY's counsel should've withheld

15   anything that you thought was privileged or attorney work

16   product.  That's choice two.

17         Choice three would be the cooperators walked in and

18   handed this stuff to the Government.  And I'm sure there are

19   more choices also, but do you know whether it's choice A or

20   choice B?

21         MR. SULLIVAN:  My understanding is that most of it

22   is choice A, but I would have to look at the production more

23   closely.

24         THE COURT:  Well, that's going to make a

25   difference.

1    MR. SULLIVAN:  This more than literally just came
2  to my mind -- just came to my attention.
3    THE COURT:  Yeah.  If the way the Government gets
4  this stuff is that you produced it to them with no claim of
5  attorney privilege or attorney work product, that seems
6  potentially relevant to the analysis here.
7    MR. SULLIVAN:  That clearly did not happen.
8  Everything is marked attorney-client privilege, so I know my
9  office didn't produce anything.  So to extent it was
10  produced, if it was produced via subpoena, it would've been
11  clearly marked, but I think it's that first bucket, the A
12  bucket or 1 bucket, however.
13    THE COURT:  I mean, I'm not going to put the
14  Government on the spot here, because --
15    MR. SIEGEL:  I can answer it.  I know the answer to
16  all of this.
17    THE COURT:  Yeah.
18    MR. SIEGEL:  None of this came from Mr. Watson's
19  phone.  In the letter or motion, they talk about three
20  individuals.  There's David Slayton from BRG, there's Joseph
21  Clemente from Waxman & Bland, and then there's Frank Bland
22  from Waxman & Bland.
23    So just to take those in order, we sent a subpoena
24  to BRG.  OZY was notified of that subpoena, and we have a
25  written waiver from OZY that they are not asserting to

1   privilege as to either of the documents from BRG or the

2   interview with Mr. Slayton.  And I have a copy of that which

3   I can gladly pass to the defense counsel and pass up to the

4   Court.  So that's BRG and Mr. Slayton.

5              THE COURT:  Can we just pause there for a second?

6   That seems kind of dispositive of the BRG issue.

7              MR. SULLIVAN:  I certainly haven't seen a waiver

8   from OZY.

9              THE COURT:  Maybe we can resolve all this

10  efficiently then.  It sounds like we may just have a

11  miscommunication.

12             MR. SIEGEL:  Your Honor, should I pass it up?

13             THE COURT:  Yeah.  Please.

14             MR. SIEGEL:  And Your Honor, just to note, the

15  sender is Alexander Shapiro from Ford O'Brien, which is OZY's

16  former counsel.

17             THE COURT:  Okay.  Can I just make a comment here

18  on the efficient operations of this kind of litigation?  You

19  know, things get inadvertently produced all the time that the

20  producing party, nevertheless, wants to assert a privilege

21  over.  And in my experience, the kind of usual routine that

22  follow is before anybody runs into court and starts

23  litigating those issues, the defense calls the Government and

24  says, "Look.  We produced this material.  We think we may

25  have done so inadvertently.  We did not mean to waive any

1  applicable privilege.  Will you return it?", and there's a

2  conversation that follows between lawyers of good faith for

3  both sides, in which they see whether they can figure things

4  out themselves.

5          That kind of conversation here might have resolved

6  in the parties agreeing on how to proceed.  It might not

7  have.  But at least you would've been more informed about the

8  factual background here.  Like, pick up the phone and call

9  the Government to the extent you have potential qualms about

10  their conduct, and see what they say.  They may say, "We

11  don't want to talk to you about this.  You know, go to the

12  judge."  Or they may be able to say, "OZY's lawyers waived

13  the privilege."  And I may be missing something as to this

14  email, but it seems on its face to be dispositive of the BRG

15  stuff.

16          MR. SULLIVAN:  I mean, I have to look at it.

17  Obviously, two lawyers ago, with OZY, I don't know if it

18  encompasses the entire production or not, so I won't comment

19  on it now.

20          THE COURT:  "This will confirm that we are not

21  asserting any privilege with regard to Mr. Slayton's

22  interview or the documents he is producing to you."  All

23  right.

24          MR. SULLIVAN:  I mean, maybe.  I'm seeing this

25  initially.

1            THE COURT:  It's not very long.  All right.  What

2     was the other thing from the Government?

3            MR. SIEGEL:  So the next is Joseph Clemente.

4     Joseph Clemente was OZY's interim CFO.  He worked to handle

5     OZY's books, and he met with investors as part of trying to

6     raise money for OZY in the time after the New York Times

7     article, before the indictment.  When we interviewed Mr.

8     Clemente, he was represented by counsel.  We specifically

9     asked if they had any kind of privilege relationship with

10    OZY, and we were specifically informed in writing that they

11    did not.  And I can pass that around too.  We also followed

12    up with Mr. Sullivan.

13           THE COURT:  Was he the interim CFO at a time when

14    Mr. Watson was still CEO?

15           MR. SIEGEL:  Yes.  We also reached out to Mr.

16    Sullivan about this in August of last year.  We specifically

17    asked, did they view that there was a privilege relationship

18    with Mr. Clemente?  We got varying answers.  First we were

19    told that he had a privilege relationship with OZY.  We

20    pointed out that Kovel, the law is clear that you can't hire

21    your CFO through lawyers and assert that to be privileged.

22           They then switched and said, actually, it was a

23    privileged relationship with Mr. Watson.  We asked them to

24    provide any basis for that or any documents for that.  They

25    didn't do that, and then we emailed them to say that in light

1    of the fact that they --

2              THE COURT:  I'm sorry.  I thought this whole thing

3    was about litigation work product produced by outside Kovel

4    accounts.  Why are we even talking about the in-house CFO?

5              MR. SIEGEL:  Well, he was --

6              MR. SULLIVAN:  Because at the time, he was a

7    consultant, not the CFO.

8              MR. SIEGEL:  He was sort of a rent-a-CFO.

9              MR. SULLIVAN:  At the time, he was a consultant,

10   not the CFO.

11             THE COURT:  Consultant to whom?

12             MR. SULLIVAN:  Consultant to OZY.  So no, he was

13   not the CFO.

14             THE COURT:  But not a consultant to any law firm.

15   A consultant to the company.

16             MR. SULLIVAN:  Hired by the law firm to be a

17   consultant and help --

18             THE COURT:  Hired by what law firm?

19             MR. SULLIVAN:  -- the company.  It was Dechert, the

20   Dechert law firm.

21             THE COURT:  Do you have an engagement agreement

22   between Dechert and Mister --

23             MR. SULLIVAN:  Yes.  Absolutely.  Absolutely.

24             THE COURT:  Do you have it here?

25             MR. SULLIVAN:  I can get it.  I don't have it in my

1  file.

2  THE COURT:  Okay.  There's a lot of fact

3  development here.

4  MR. SULLIVAN:  We can get it if you want it.

5  THE COURT:  Maybe the Government can just put in a

6  letter on this subject within a week?  Sooner if you choose.

7  I don't want to hash this out on the record here.  Is a week

8  a sufficient amount of time?  It can be a short letter.

9  MR. SIEGEL:  Your Honor, in terms of the facts,

10 like just to get the facts out, that's fine.  To the extent

11 you also want us to address all the legal issues that are

12 raised, I don't want to rush that.

13 THE COURT:  I mean, I'm putting you to the task of

14 a full brief here.  Seems like these are pretty

15 straightforward issues, and one or two sentences reciting the

16 facts with maybe one sentence pointing to a case.  For

17 example, that says the in-house CFO can't be a Kovel

18 accountant or something like that.  I leave it up to you to

19 decide what goes in and what goes outside the letter.

20 MR. SIEGEL:  So then a week is fine, Your Honor.

21 THE COURT:  All right.

22 MR. SULLIVAN:  So I have it electronically, and

23 we'll follow up with letters, like Your Honor said.  But

24 January 14th, 2022 engagement letter, which we understand he

25 gave to the Government.  So the Government's saying, "Geez.

1  We asked them if there was any privilege," well, here's a

2  letter right here.

3          THE COURT:  So you're talking about two different

4  roles, though, and that's why we need some factual

5  development perhaps.  Companies have to have CFOs --

6          MR. SULLIVAN:  Which was --

7          THE COURT:  -- to the extent they have

8  complicated --

9          MR. SULLIVAN:  And their CFO was their cooperating

10  witness, Mr. Rao.

11          THE COURT:  Right.  But it sounds like it's at

12  least possible, I don't know, that this person was playing

13  multiple roles, wherein one is I'm helping Mr. Watson and/or

14  OZY get ready for a trial.  The other is, I'm working as the

15  CFO for this business that needs a CFO.  And role number 1

16  might give rise to some work product protection.  Role number

17  2, I don't think would.  And so, you know, you're going to

18  need to clarify.

19          MR. SULLIVAN:  I think Your Honor's right.  I think

20  the New York courts take the functional approach to the

21  question how the individual functions.  And we're confident

22  that the function --

23          THE COURT:  Yeah.  If he's the CFO for purposes of

24  producing a balance sheet that has to go to investors, like,

25  obviously that's not privileged activity.  But let's take

1  this up on paper now that I understand the issues a little

2  better.

3          MR. SULLIVAN:  Very well.

4          THE COURT:  Okay.  So motions in limine, there are

5  no defense motions in limine, correct?

6          MR. SULLIVAN:  At this point, Your Honor, no.  I

7  know we had a deadline.

8          THE COURT:  Early March deadline.

9          MR. SULLIVAN:  Yes.  Subsequent to that deadline,

10  we received 3500 material, so depending on what we see in

11  there, I may or may not file additional motions in limine, or

12  motions in limine.  I don't know.  I'm not saying I have

13  anything in mind, but we've got thousands and thousands of

14  documents, so there may be something in there, which we want

15  to bring to the Court pre-trial.  I could do it in the form

16  of a motion in limine.  I could do it right before trial, but

17  the notion is to make the trial run smoothly if I see

18  something that I think is objectionable in 3500 material.

19          THE COURT:  All right.  Let's just go through the

20  table of contents in the Government's motions.  Evidence

21  suggesting selective prosecution.  I feel like Roman I, III,

22  and IV in the Government's argument section are all of apiece

23  with one another.  Am I correct that the defense does not

24  intend to introduce any such evidence?

25          MR. SULLIVAN:  Evidence of selective prosecution,

1  no, Your Honor.  That's a matter before the Court, and we

2  understand the rules of court with respect to that.

3          THE COURT:  Okay.  So we have no dispute on

4  selective prosecution, evidence that will be excluded.  Roman

5  III --

6          MR. SIEGEL:  Your Honor, and I apologize.  In their

7  opposition, the defense said that they're not going to argue

8  selective prosecution, but they should be allowed to get into

9  the Government's motive for the investigation.  And I'm not

10  sure what the line of being drawn there is, but our view is

11  that all of that should be precluded.

12          MR. SULLIVAN:  The Government's investigation is

13  always admissible.  If the Government has a shoddy

14  investigation, the jury ought to hear it.  I don't know that

15  that's going to be one of my theories of the case, but

16  investigation is clearly relevant.

17          THE COURT:  But the Government's motives for

18  investigating Mr. Watson in the -- whether the investigation

19  was --

20          MR. SULLIVAN:  That piece, I think the Government

21  is concerned that I'm going to try to argue the selective

22  prosecution motion.

23          THE COURT:  Or selective investigation.

24          MR. SULLIVAN:  Look, I've tried cases for

25  30-some-odd years.  I mean, that's clearly improper.  But

1　investigation is not improper.  The Government's

2　investigation --

3　　　　　　　THE COURT:  There are two aspects of this.  And I'm

4　not saying anything about either of them at this point.  The

5　Government's motives for investigating your client, that's

6　excluded.  I want to be clear about that.  The quality of the

7　Government's investigation, I think I might need to know more

8　about what you have in mind.  If you're saying the Government

9　should've interviewed witness X but they didn't, maybe that's

10　admissible, maybe not.

11　　　　　　　MR. SULLIVAN:  That would be subject to maybe a

12　missing witness instruction.  I mean, some of these are

13　actual trial time motions, depending on what evidence the

14　Government puts on.  But just the traditional notion of the

15　Government's investigation and whether it's adequate is

16　always relevant.

17　　　　　　　THE COURT:  Adequacy as distinct from motive.

18　　　　　　　MR. SULLIVAN:  As distinct from motive.  I will

19　conceded that.

20　　　　　　　THE COURT:  Okay.  Yeah.  We won't have any

21　testimony about the Government's motives for either

22　prosecuting or investigating this case, those being as we

23　seem to have all agreed, questions for the Court and not the

24　jury.

25　　　　　　　MR. SULLIVAN:  Correct.

1          THE COURT:  All right.  But then Roman III,

2     evidence or argument that inflating financial figures was a

3     common practice in the media industry or the VC space.  Do we

4     have agreement on that?

5          MR. SULLIVAN:  No.  I think custom and practice

6     evidence is always admissible.  The notions of --

7          THE COURT:  Isn't this other people were doing it

8     too?

9          MR. SULLIVAN:  I'm sorry.  No.  Very different.

10    Very different.  And the Second Circuit is clear on other

11    people are doing it too.  That line of cases has to do with

12    other people are engaging in crimes too.  Ours is distinct.

13    We are saying that it is not a crime in negotiations to bluff

14    and engage in puffery.  It is a --

15         THE COURT:  What does bluff mean?

16         MR. SULLIVAN:  The same as puffery for lawyers, but

17    businesspeople use the word bluff, and that is they will

18    say -- you know, let's take the Litvak cases, because this

19    sort of evidence --

20         THE COURT:  I'm familiar with the Litvak case.  The

21    Government's motion is keyed specifically to inflating

22    financial figures.

23         MR. SULLIVAN:  Right.  So we disagree with the

24    Government's premise that financial figures are inflated, but

25    what we do is -- no.  I just saw the Court's eyebrows raise.

1          THE COURT:  No.  I'm saying of course that --

2          MR. SULLIVAN:  No.  We absolutely don't.

3          THE COURT:  That's the heart of the case.

4          MR. SULLIVAN:  That is the heart of the case, and

5    we think the Government is wrong.  We also think that custom

6    and practice evidence is always admissible.  And if it is the

7    custom and practice in this industry to engage in bluffing or

8    puffery, and we have an expert witness, PhD from Duke --

9          THE COURT:  About financial reporting?

10         MR. SULLIVAN:  About the financials of the company.

11   So the reporting, what's on the piece of paper is on the

12   piece of paper.  What comes out of somebody's mouth in

13   negotiation clearly falls into the area of custom and

14   practice in the industry.  And the jury has a right to know

15   what the custom and practice of an industry is if they're

16   going to determine what a reasonable investor might believe.

17   This is a well-known custom.

18         THE COURT:  So if it's the custom of the industry

19   to lie about financial performance, that's relevant here?

20         MR. SULLIVAN:  No.  Custom of an industry to engage

21   in puffery or bluffing.  Very different from lying.  Our

22   theory of the case is that Mr. Watson did not lie about

23   anything, and we're going to show that.  Didn't lie about

24   anything.  Now, to the extent there may have been some

25   puffery or bluffing, that is absolutely industry standard.

1  So, look, Your Honor, when you go in --

2          THE COURT:  Can you give me an example of something

3  that would not be a lie but would be puffery or bluffing

4  within your taxonomy?

5          MR. SULLIVAN:  Our company is the next Microsoft in

6  the VC space.  Our company's the next Microsoft.  That's a

7  big claim.  That's not a lie.  That may be puffery.  That may

8  be bluffing.  Clearly not a lie.  Our company is the next

9  Tesla.  That's the way that they talk in this industry, and

10  it is commonly -- otherwise, Your Honor, you'd arrest the

11  whole world.  I've got this restaurant for sale, and I think

12  it's going to generate $2 million in net revenue next year

13  because of the NBA championships are coming to town.

14          THE COURT:  So we can all draw the distinction that

15  the securities laws regularly draw on the civil side between

16  past performance, which is actually knowable, and future

17  projections and predictions, which are just that.

18          MR. SULLIVAN:  And all of his financials, they have

19  pro forma.  Pro forma has to mean something.  It's not mere

20  surplusage.  They're making guesses about future performance.

21  An aggressive guess is not against the law.  It's the way

22  that people do business.

23          THE COURT:  Obviously, you can't have an expert

24  tell the jury what's against the law and what's not.

25          MR. SULLIVAN:  Of course not.

1          THE COURT:  That's the Court's role.

2          MR. SULLIVAN:  But the witness can say what is

3    common in this industry based on reams of literature in the

4    industry about this VC world, that it is customary and is the

5    practice of the industry to engage in forms of bluffing.

6          THE COURT:  Who is the expert?

7          MR. SULLIVAN:  David Robinson, a finance professor

8    at Duke, PhD, Chicago, renowned expert in these areas.

9          THE COURT:  Does the Government have his report

10   now?

11         MR. SULLIVAN:  Yes.

12         THE COURT:  As of when?

13         MR. SULLIVAN:  I don't have the date handy.

14         THE COURT:  Because when you filed the response to

15   the motions in limine, I think you were saying, "We don't

16   know who this person is."

17         MR. SULLIVAN:  Correct.

18         MR. SIEGEL:  Yeah.  I think we got it two weeks ago

19   and we addressed it in our reply.

20         THE COURT:  Okay.

21         MR. SULLIVAN:  So there is a line between

22   puffery --

23         THE COURT:  Do I have a copy of this report?

24   Because that would help rule on the admissibility of his

25   testimony.

1          MR. SULLIVAN:  I think I filed it --

2          MR. SIEGEL:  Your Honor, I have a copy that I can

3   pass to you.

4          THE COURT:  Yeah.  Please.

5          MR. SULLIVAN:  Yeah.  I believe I filed it on the

6   record, Your Honor.

7          MR. SIEGEL:  Actually, I apologize, Your Honor.

8   That wasn't attached as an exhibit.  I don't have a copy of

9   that one.

10         THE COURT:  But it's on the docket?

11         MR. SULLIVAN:  I think so.  If not -- yes.  It's on

12  the docket, I'm told.  So there clearly is a line between

13  bluffing and misrepresentation, and that's clear just like

14  involved contract.

15         THE COURT:  Let me put this to the Government.

16  Let's say that your case-in-chief has you presenting evidence

17  not only about what you contend are objective misstatements

18  about actual performance, but also all kinds of evidence

19  about aggressive predictions as to the future.  A, is that

20  something we should expect, and B, would that give rise to

21  any relevance of, you know, how common are these kinds of

22  predictions and what are the typical ways in which people

23  approach them and expect to hear them?

24         MR. SIEGEL:  So, Your Honor, as I think you've

25  zeroed in on, the vast majority virtually aren't higher cases

1  without historicals.  What was our revenue last year?  To the

2  extent there are projections, I think there may be some

3  examples where, in September someone says, "This is how we're

4  doing this year," or September, October, December, where

5  investors would say, "By that point, I would really expect

6  this to be a number that has quite a bit of meaning."

7          THE COURT:  Well, yeah.  And if they're speaking

8  about how they have done for the prior eight or nine months,

9  that's also notable.

10          MR. SIEGEL:  Yeah.  But in terms of, this is how

11  we're going to do next year, we haven't alleged that any of

12  that is fraudulent in this case.  And in terms of, "We're

13  going to be the next Microsoft," or "We're going to be the

14  next Tesla," there's not going to be any allegations or

15  arguments that any of that is fraudulent.

16          THE COURT:  Yeah.  I mean, that would be a third

17  basis on which to preclude this expert's testimony.  Basis

18  one would be the discovery failures.  Basis two would be, you

19  know, the 702 analysis that, you know, this is not

20  appropriate subject matter for an expert, or the science, so

21  to speak, is not there to back it up.  Basis three would be

22  this just isn't relevant to meet the Government's evidence,

23  because they're not arguing that it was the forward-looking,

24  highly general predictions of, this company's going to be the

25  next New York Times.

1          MR. SULLIVAN:  Except they are.

2          THE COURT:  Well, we'll see.  Yeah.

3          MR. SULLIVAN:  I mean, it's in the indictment.

4          THE COURT:  What is?

5          MR. SULLIVAN:  For example, "I expect X millions of

6  dollars from Donor Y."  That's future.  That's a future

7  claim.

8          THE COURT:  Show me where that is in the

9  indictment.

10          MR. SULLIVAN:  Just a minute, Your Honor.  We'll

11  find it.

12          MR. SIEGEL:  Your Honor, to the extent --

13          MR. SULLIVAN:  And there's also -- sorry, Counsel.

14  And also, I'll point it before Your Honor, that both the

15  labels pro forma and unaudited applies to past financials as

16  well as future financials.

17          THE COURT:  So it's okay to lie on your unaudited

18  financial statements?

19          MR. SULLIVAN:  Well, that's your word.  So

20  they're --

21          THE COURT:  I'm asking.  It's my question.

22          MR. SULLIVAN:  It is okay to make aggressive

23  predictions in pro forma and unaudited financials.  And no,

24  not an outright lie.  And we're going to show that none of

25  them are outright lies.  They're based on something, but they

1    may be aggressive.

2            THE COURT:  Sorry.  Pro forma financial is about

3    what?  If you produce a pro forma earnings statement that

4    says -- I think we may be in need of a definition of pro

5    forma here.

6            MR. SULLIVAN:  Pro forma, it means, essentially,

7    best estimate at the time, and it deals both with past and

8    with future.  But it's the best estimate.

9            THE COURT:  Going back to the question of a minute

10   ago, where is the place in the indictment where the

11   Government alleges forward-looking statements to be

12   fraudulent?

13           MR. SULLIVAN:  We're looking for it, Your Honor.

14   Right.  So Harry Ox (ph.), for example.

15           THE COURT:  What paragraph?

16           MR. SULLIVAN:  Throughout all the Series C.  We're

17   looking for it, Your Honor.

18           THE COURT:  Misrepresentations to Series C investor

19   3.

20           MR. SULLIVAN:  I have the indictment at hand.

21   We'll find it.  We'll find it.  But throughout the Series C,

22   Your Honor, they claim that --

23           THE COURT:  Just humor me and find this before we

24   move on, because that'll help concretize.

25           MR. SULLIVAN:  I'm happy to humor the Court.

1    (Pause)

2         MR. SULLIVAN:  So let's look at paragraph 17, Your

3    Honor.  That's an example where the Government alleges,

4    essentially, that the two 2018 revenue forecasts was known to

5    Mr. Watson at the time, that he was not going to be able to

6    reach it.  Forecast, necessarily, is forward-looking.

7         THE COURT:  Where?  What sentence are you talking

8    about?

9         MR. SULLIVAN:  Page 5 of the indictment.  Paragraph

10   17.  It's the last sentence.

11        THE COURT:  That's talking about the revenue they

12   had booked.  Past tense.

13        MR. SULLIVAN:  Had forecast 2022.

14        THE COURT:  Right.

15        MR. SULLIVAN:  There's also --

16        THE COURT:  Oh 2018.  Yeah.  So the rule about

17   forward-looking statements is it's not a basis for a

18   liability to get them wrong in good faith, but when you make

19   forward-looking statements that you don't believe to be

20   achievable or you know for a fact are not achievable, that's

21   actionable.  We're going to have some homework to do on the

22   jury instructions here.  That's where all the rubber is going

23   to meet the road.  It may well be that the jury instructions

24   inform, once they settle, my assessment of this expert's

25   testimony.

1    I want to be expansive about this.  Obviously, the

2   jury can and should be entitled -- you should be entitled to

3   present a full picture to the jury of how much is knowable at

4   a given point in time, how much is inherently speculative,

5   how revenue estimates work.  What is the process from

6   actually earning the revenues to actually accounting for

7   them?  How long does that process take?  How much uncertainty

8   is there along the way?

9    It seems to me that all of that is imminently fair,

10   right?  If you're going to say he made a revenue forecast

11   that he had to know based on year-to-date performance he was

12   not going to achieve, the defense should be able to provide a

13   full picture of how that forecasting process works.  But that

14   seems to be an imminently different thing from saying you're

15   allowed to bluff, you're allowed to puff, and everybody does

16   it.  Let's say this.  My preliminary ruling is that until

17   further notice, we're not going to have testimony about what

18   everybody does when it comes to bluffing.

19    MR. SULLIVAN:  So no custom and practice evidence

20   can come in --

21    THE COURT:  Custom and practice of what?

22    MR. SULLIVAN:  Custom and practice of the way that

23   early stage companies talk to investors.  That's all I'm

24   asking for.  And here, 27, I found what I was looking for.

25   Page 9, last sentence, Rao claims Series C investor had

1  invested 10 million.  This actually, the facts will show,

2  references a future investment that was to come.  May not

3  have actually came, but was made in good faith.  The custom

4  and practice of an industry to make aggressive claims about

5  future earnings has to be fair game.

6      So in the paragraph that Your Honor just looked at,

7  as Your Honor said, some things are highly speculative,

8  particular last quarter, fourth quarter, before what those

9  numbers are going to show.  Given the ebbs and flows of this

10 particular industry, to make an aggressive projection for a

11 Q4 is within bounds, and it's not a lie.  And even if it is,

12 a lie is not the end of the story.  It has to be material.

13     THE COURT:  What's in bounds and what's out of

14 bounds, that's why I'm here, is to tell the jury what's in

15 bounds and what's out of bounds, in terms of the statute.

16     MR. SULLIVAN:  Is bounds is to make, in good faith,

17 aggressive predictions about what the company is going to do.

18 That, in short, is bluffing or puffery or what have you.  No

19 one is sitting here lying.  No one is sitting here saying

20 that the Courts say that yes, it's okay to tell boldface

21 lies.  But that has to be contextualized, Your Honor.  You

22 know, if we're just going to go with the Government's theory,

23 then I don't even need to be here.

24     We have our own theory.  And our theory, part of

25 our theory is that this is way early stage investors and

1  companies spoke to each other.  Everybody understood that

2  it's pro forma, it's unaudited, and they know that it might

3  be off a little bit, but that's not securities fraud.  But

4  they made a good faith estimate at the sorts of numbers they

5  were going to do, and a jury has the right to hear that, Your

6  Honor.  They have absolute right to hear that.

7          THE COURT:  What's the expert going to say?

8          MR. SULLIVAN:  What I just said, but probably a

9  little bit better because he's got a PhD.

10         THE COURT:  But that was factual testimony, so

11 we're not going to have fact testimony from an expert.

12         MR. SULLIVAN:  No, no, no.  Just what happens in

13 the industry, that they make these sorts of projections.  As

14 we said in our motion to dismiss, this is in the selective

15 prosecution case, our motion, we sort of laid out the

16 industry.  This is what literally a ruling that prohibits

17 aggressive pro forma --

18         THE COURT:  What does aggressive mean?

19         MR. SULLIVAN:  That --

20         THE COURT:  Optimistic.

21         MR. SULLIVAN:  Optimistic.  There you go.

22 Optimistic.  It would absolutely turn the industry upside

23 down.

24         THE COURT:  All right.  Let me give you some

25 preliminary reactions here, although I'm going to think about

1   this more.  So I accept the Government's argument that

2   reliance is not an element for criminal securities fraud or

3   wire fraud prosecution, but materiality is, and there's at

4   least some overlap on the Venn diagram there.  Materiality is

5   what would a reasonable investor in this space, essentially,

6   think is important and not important.

7           And it is true that when you look at the total mix

8   of information available about a security, the average

9   investor in true startups, Series A endeavors, is

10  prioritizing different variables in the mix of information

11  than somebody who invests in, you know, large cap public

12  equity, right?  I don't think that should be controversial,

13  because on the former hand, you have, essentially, an idea

14  and a leadership team on whom you're betting, and on the

15  latter hand, you have a mature developed operation.  You

16  know, cash flows are much more reliably predicted, perhaps.

17          All of that does seem like appropriate grounds for

18  an expert to inform the jury, right?  Because we're not going

19  to have a jury of venture capital and private equity

20  investors coming in.  And I'm guessing you don't disagree

21  with anything I just said.

22          MR. SIEGEL:  I don't disagree with the facts that

23  you said or the principles that you said.  I disagree that it

24  would be appropriate for an expert to testify about that in

25  this trial.  And there's several reasons.  One, Your Honor

1  talked about Series A, and there's not going to be any

2  allegations relating to the Series A or the Series B.  This

3  all starts at the Series C where there already were cash

4  flows and investors were being told cash flows.

5          But putting that aside, the question of are there

6  things that are more important than revenue or is revenue the

7  most important thing, that's a distinct issue from

8  materiality, because materiality doesn't require it to be the

9  most important thing.  It requires it to be one important

10  thing in the total mix of information.

11          THE COURT:  Right.  But presumably -- I mean, I

12  don't even think I have to presume this.  I think what Mr.

13  Sullivan is saying, and correct me if I get this wrong, is

14  that his expert's going to testify -- well, he can't testify

15  that cash flows are immaterial, because materiality is a

16  legal conclusion and usurp the jury's role, let alone mine.

17  But he can testify -- materiality is viewed not subjectively

18  through the lens of what did these actual investors think was

19  important, but objectively, what does a reasonable investor

20  in this setting tend to think?

21          And why can't the defense call someone to say,

22  "Look, the earlier the stage, the more important things like

23  the grand idea, the business plan, the quality of the

24  leadership team, you know, those things matter more at a very

25  early stage than current cash flows do," because you're

1  betting?

2        MR. SIEGEL:  So the issue is, with the "more."  The

3  law is clear in the Second Circuit that they can call an

4  expert to say, "This is not important and no one investor

5  would consider it important."  That is the Litvak 2 case.  If

6  they could find an expert who would testify prior revenue and

7  cash flow is not important and no reasonable investor would

8  consider it important, then they could call that person.  We

9  would cross them.  I think the testimony would be sort of

10 absurd, but they could call that person.  That's not the

11 expert they've noticed.  The expert they've noticed is to

12 say, "There are lots of things that are important and there

13 are some things that may be important than revenue."

14        THE COURT:  Where do you see that?

15        MR. SIEGEL:  Well, I don't have their expert notice

16 in front of me, but in the paragraph where it talks about

17 things that are important, there's nowhere where it says that

18 no investor would consider past revenue important.  They say

19 that there are other things they consider important.

20        THE COURT:  Yeah.  I've got to go through this --

21        MR. SULLIVAN:  I think that's wise, Your Honor --

22        THE COURT:  -- I suppose, more carefully.

23        MR. SULLIVAN:  -- because the mix is important.

24 And if the Court reads that, I was very careful in working

25 with Dr. Robinson to draft this to comport with applicable

1   law.  But I'll just say Mr. Siegel's understanding of Litvak

2   2 and it's progeny is overly narrow.  There are a mix of

3   factors that people conclude.  And in short, the standard for

4   whether an expert should be tendered is if it's something

5   outside the canon of the average juror.  And this stuff is

6   clearly outside the canon of an average juror.  They don't

7   understand about the notion that investors make bets on

8   people.  And I think Your Honor said the team, the management

9   team, the idea all through for early stage investors.

10          And here, we're talking about folks with under $100

11  million of revenue is generally in the industry considered an

12  early stage startup company, and Dr. Robinson will testify to

13  that.  So I mean, the Court might want to take a look at it,

14  but that has to be fair game for the jury to understand this

15  issue of materiality.  If the law were that, a statement that

16  is subsequently proved to be false, triggers criminal

17  liability, well, that would be Draconian, and that's not the

18  law, so it has to be material misrepresentation, and then Dr.

19  Robinson will contextualize the industry in a way that can

20  help the jury make a determination as to materiality.

21          THE COURT:  Okay.  So I mean, I can see immediately

22  in this expert disclosure -- it's actually kind of how the

23  helpful has divided this all by subject matter.  Section G

24  goes to the question of selective prosecution, and therefore,

25  I think we've actually even agreed that it should be

1 excluded, but I do now order that it should be excluded. And

2 the same with H, which talks about somebody else who might've

3 done something similar and not been prosecuted for it. I'm

4 reserving judgment on everything, but I think those are the

5 easier questions and others are the harder questions.

6 MR. SIEGEL: And Your Honor, as you go through

7 that, in our reply we do go through each of those paragraphs

8 one by one to explain why we believe that they are not

9 appropriate and why they still don't comply with the Rule 16

10 requirements.

11 THE COURT: How are you prejudiced by the discovery

12 timeline here?

13 MR. SIEGEL: Our argument isn't the timeline. I

14 mean, it's annoying, but it is what it is. In terms of the

15 Rule 16, you know, just for example, I think it's paragraph

16 B, but it's the one labeled "Seeking the Next Apple," he says

17 that his opinion is going to be based on a recent survey of

18 over 800 VC investors. The law is clear that under Rule 16

19 if you're going to be talking about the literature, you

20 actually have to cite the literature and provide the

21 literature.

22 THE COURT: But there were studies cited, and they

23 may fit this description in the expert disclosure that we

24 got, such as it was, right?

25 MR. SULLIVAN: Correct, Your Honor.

1          MR. SIEGEL:  I don't know what survey he's

2    referring to or what study he's referring to.

3          THE COURT:  I'll tell you right now.  It's in the

4    motion to dismiss, which is obviously not a proper venue for

5    disclosing this.

6          MR. SULLIVAN:  I believe it's a Harvard Business

7    Review article.  I'm pulling the document now, as soon as I

8    get online.

9          MR. SIEGEL:  I mean, I guess issue is a motion to

10   dismiss filed last August contains a citation that we're

11   supposed to figure out as to what this expert is talking

12   about, that defeats the purpose of the expert notice, which

13   is supposed to advise us of what completes their opinions and

14   basis.

15         THE COURT:  I'm not saying this does or does not

16   constitute adequate disclosure.

17         MR. SULLIVAN:  Whereas the Court said earlier --

18         THE COURT:  It may well be that it doesn't, but --

19         MR. SULLIVAN:  As the Court said earlier --

20         THE COURT:  -- footnote 2 --

21         MR. SULLIVAN:  -- Jonathan just called me.  I'll

22   give it to him.

23         THE COURT:  I do think the parties should speak to

24   each other with more frequency.  Footnote 2 in the motion to

25   dismiss, there's a sentence in the text, "Nine percent of VC

1   investors admit to using no financial metrics whatsoever, and

2   an even higher percentage admit that they make, quote, 'gut

3   investment decisions,'" citing Paul Gompers and other

4   professors, "How Do Venture Capitalists Make Decisions?"

5   This is Harvard Business School study cited at pages 2 and 3.

6         I mean, it will be interesting to me to know.  If

7   you're saying, "We might've called an expert of our own had

8   we known that the Court was going to admit expert testimony

9   about surveys like this," the question of whether a real

10  prejudice has obtained or not could inform the extent to

11  which I invoke any delay in my decision to admit or deny

12  expert testimony.

13        MR. SIEGEL:  Well, Your Honor, the issue is

14  twofold.  I mean, even sitting here today, we don't have a

15  full picture of what this witness would say or the basis for

16  his opinions.  And we believe that it's all inadmissible for

17  the reasons we lay out in our motion.  Had this been

18  something that we could've seen earlier and we could've had

19  the opportunity to call Mr. Sullivan and say, "Hey.  You

20  don't actually provide the basis for his opinions.  Can you

21  provide it?", then that would've allowed us to figure out, do

22  we need to call our own expert to rebut this?  But right now,

23  we don't know what he's going to say.  We don't know the

24  basis of what he's going to say is.

25        THE COURT:  But couldn't you have assumed that he

1    was going to say the things that Mr. Sullivan is saying?

2            MR. SIEGEL:  But the things that Mr. Sullivan is

3    saying --

4            THE COURT:  On pages 5 and 6, "Are focused on the

5    identity of the founders and the business model rather than

6    any real financial information.  In the hierarchy of decision

7    making in this particular economic context, the most

8    frequently cited important factor is the identity of the

9    founders themselves.  Twenty-six percent of venture capital

10   firms do not even cite the business model."

11           MR. SIEGEL:  But Your Honor, I mean, to that

12   particular point -- and then that comes back to the

13   relevancy, and the relevancy of a prejudice.  The standard

14   for materiality that are going to be in the jury instructions

15   is that it doesn't have to be determinative.  It doesn't have

16   to be the most important.  It has to be one thing that

17   substantially affects the total mix.

18           THE COURT:  Right.  But that's a live jury question

19   here.  And if I'm a juror who has never worked in the

20   financial industry, you know, doesn't manage a stock

21   portfolio, and I'm instructed by a federal judge to decide

22   whether given alleged misrepresentations were material or not

23   material, how am I supposed to think about that unless I have

24   some education on the subject of how investors in early stage

25   equity think about the investment decision?

1        MR. SIEGEL:  But Your Honor, this issue is what the

2   expert going to say that is actually going to be helpful?

3        THE COURT:  The expert's going to say, you know,

4   "This is not anecdotal.  I've surveyed hundreds of venture

5   capital investors and asked them in reliable surveys to tell

6   me which factors are more important and which factors are

7   less important in their decision making."  And I understand

8   that that doesn't map precisely onto the materiality

9   instructions, but it's something, and I'm going to say that

10  in general, in early stage investing, certain variables tend

11  to be relied on more than others, according to, you know, the

12  self-reporting of the people actually making those investment

13  decisions.  So for example, the quality of the management

14  team is generally more important than how much money did you

15  learn last year.  Like, you think that should be excluded on

16  relevance grounds?

17       MR. SIEGEL:  On relevance and prejudice, because

18  exactly as Your Honor said, it doesn't map on.  And so it's

19  answering the question to the --

20       THE COURT:  Well, but if it mapped on precisely,

21  then you'd have a different problem, which is the problem is

22  that the expert is usurping the role of the judge and jury in

23  defining the law and applying the law.

24       MR. SIEGEL:  But that's not so, Your Honor.

25  Because Litvak 2 is the case that talks about the value of an

expert to talk about materiality. And Litvak 2 makes all the
points you're making, which are right, but what the expert in
Litvak 2 was saying did map on for materiality analysis, and
it's quoted in Litvak 2 and it's quoted in our briefs. That
expert said, "This is information that no investor would
consider important. Here's the reasons it is not important
at all." That does answer the materiality question.

But just telling someone, "I did a study about
what's the most important thing, and revenue's not the most
important thing," one, that doesn't actually answer the
question, and two, it has the potential to mislead, because
it might be that the answer is revenue's the second most
important thing or revenue's the third most important thing.
But now you're putting the wrong question and you're putting
the wrong answer in the jury's mind. So I just want to be
very clear, we have no objection --

THE COURT: I'm going to give the jury the
definition of materiality and we're going to hash that out
amongst ourselves beforehand, and we will trust that the jury
is capable of understanding and following my instructions.
And you will ask that the instruction make clear that lots of
factors can be material, even if they're not right number 1
or 2 in some hierarchy, and the jury will get that.

But again, this does seem to me to be something
that's beyond the life experience of the median juror, for

1    sure.  And preliminarily, the testimony of an expert that I

2    have talked to a large representative sample of venture

3    capital investors and I find in my research and in reviewing

4    the research in the field, that they tend to prioritize some

5    factors and to deemphasize on a relative basis some other

6    factors, I see that as at least minimally relevant and also

7    inappropriate subject for expert testimony.

8         To the extent the expert's going to testify

9    everybody lies, investors expect people to lie, A, I doubt

10   that's a proper subject for expert testimony, and B, I doubt

11   that's even what the expert's research has shown.  And I

12   don't intend, barring some new developments, to hear expert

13   testimony along those lines.  And the defense should come to

14   me before arguing that kind of thing in opening arguments.

15   It's incumbent on me to give rulings here, but the reason I'm

16   giving preliminary ruling now is because I don't want to hear

17   about that kind of thing in opening statements until we've

18   had a fuller discussion.

19        MR. SULLIVAN:  Just to be clear, what kind of

20   thing?

21        THE COURT:  The kind of thing that everybody lies.

22        MR. SULLIVAN:  Oh yeah.

23        THE COURT:  And investors expect that everybody

24   lies.

25        MR. SULLIVAN:  That's not my opening.

1          THE COURT:  Okay.  That I expect will be out.

2    Here's a taxonomy of sorts of what investors care about more

3    and less.  I don't see, as we sit here, basis for excluding

4    that, and so I would expect it to be in, all things being

5    equal.  All the selective prosecution stuff is out for the

6    reason that we've talked about, and you know, some of what's

7    in the expert's report, obviously, fits that category.  I

8    think that takes us through Romans VI, if I'm using the table

9    of contents in the Government's motions in limine as my

10   agenda here.

11         MR. SIEGEL:  Your Honor, two things.  One, one of

12   the experts who they semi-noticed in their first letter,

13   they've now informed us that they intend to call a person

14   that's a fact witness to bring that same testimony in.

15         THE COURT:  Sorry, what testimony?

16         MR. SIEGEL:  So if you may recall, in their

17   original expert letter, they talk about expert number 2, who

18   is an accountant who did a post hoc analysis of --

19         THE COURT:  Oh this is the company that was

20   actually earning more revenue?

21         MR. SIEGEL:  That's right.  They've now said that

22   they're going to call that as a fact witness, not as an

23   expert witness.  And our argument, and this is laid out in

24   our reply because we only got it after the motions were

25   filed, is that's still irrelevant for all the reasons that we

1  talked about.  And two, it's not appropriate for a fact

2  witness anyway.

3         THE COURT:  So this, it feels analogous to the

4  issue that comes up all the time in tax cases, where, you

5  know, the Government says the defendant knows and believes he

6  earned a million dollars in a given year.  He reports only

7  $500,000 in income.  Government wants to prosecute this

8  person for tax evasion.  Defense hires an expert to say,

9  "Look, this defendant actually had all these deductions

10  available to them, such that $500,000 was the real number,"

11  but there's no evidence that the defendant actually knew

12  about those deductions or was thinking about them in any way,

13  shape, or form when he reported his income.

14         And the tax content may be distinguishable because

15  of the willfulness requirements, but if you're going to try

16  to prove the defendant's knowledge that his revenue

17  representations were false, knowledge is a true belief,

18  right?  Not just a belief that may be true or may not be

19  true.  If you're going to say the defendant knew those

20  representations to be false, does that implicate the question

21  of whether the representations actually were false or not?

22         MR. SIEGEL:  No, Your Honor.  And in part, it's

23  because it's a conspiracy.  Factual impossibility is not a

24  defense to conspiracy.  Just like you can agree to sell drugs

25  that are not really drugs, you can agree to rob a drug dealer

1  who doesn't exist, and there's plenty of law on that.  And

2  there's law in the securities fraud context that directly

3  addresses this.  It's Judge Garvey (ph.)'s decision.

4      THE COURT:  I got to think about this more.  It's

5  not a conspiracy if the thing you're agreeing to do is not

6  actually illegal.  Let's say I believe, in my heart of

7  hearts, that we've earned a million dollars this year at this

8  company, and I go to investors and say, "Hey.  You should

9  invest.  We just earned $5 million," you're saying if it

10  turns out we actually had -- you know, my head of sales

11  signed a $5 million contract with somebody that I just didn't

12  know about, I can still be prosecuted for conspiracy to

13  commit securities fraud, because that's what I intended and

14  agreed with others to do, even though the representations I

15  made were, in fact, the truth.

16      MR. SIEGEL:  That's right.  I mean, it's not this

17  case, but if you agree with someone, if I'm going to go tell

18  investors we made 5 million, even if you never tell those

19  investors, even if that never happens, it's the agreement

20  that's the crime.  And the facts of whether you made a

21  million or whether you made 5 million, that's not legal

22  impossibility.  That's factual impossibility.

23      THE COURT:  Right.

24      MR. SIEGEL:  And the law is clear that factual

25  impossibility is not a defense.

1          THE COURT:  Okay.  What are the facts of this case?

2     Like, what is the basis on which it's going to turn out in

3     the defense view, the revenue projections actually were true?

4          MR. SULLIVAN:  So I think I can short-circuit this.

5     We're going to present evidence that, to use Your Honor's

6     phrase, that in Carlos's heart of hearts he understood the

7     revenue to be what he said it is.  And the --

8          THE COURT:  Understood based on what?  Understood

9     it correctly or incorrectly?

10          MR. SULLIVAN:  Understood it correctly.  And as it

11     turns out, he was --

12          THE COURT:  The only person who can testify to

13     what's in his heart of hearts is him, for obvious reason.

14          MR. SULLIVAN:  Or we can provide evidence from

15     which a jury can make a reasonable inference, right?  I was

16     in a meeting with Mr. Watson and we saw a report where five

17     people were investing a million dollars.  Mr. Watson went out

18     and said, "Hey.  I've got 5 million."

19          THE COURT:  Oh I see.

20          MR. SULLIVAN:  Right.  So jury clearly can draw an

21     inference from that.

22          THE COURT:  All right.  So we're not even talking

23     about revenue here.  We're talking about capital

24     contributions.

25          MR. SULLIVAN:  Capital contributions.  Or even

1    revenue, but the point is that --

2          THE COURT:  That would go to good faith.  If we

3    could just pause there.

4          MR. SIEGEL:  So Your Honor --

5          THE COURT:  If the defendant's in a meeting where

6    his second in command says, "We have committed investments

7    from the following five people, and then the defendant

8    repeats that to" --

9          MR. SIEGEL:  Absolutely, Your Honor.  And I want to

10   make sure we're not talking past each other.

11         THE COURT:  Yeah.  We may have more agreement.

12         MR. SIEGEL:  Any evidence of contemporaneous

13   records, contemporaneous discussions, meetings, emails that

14   Mr. Watson got or received, that's fair game if they want to

15   show that.  The issue is the post hoc nature of it.  It's we

16   hired an accountant after all this happened.  That accountant

17   went back and made these calculations, and there's no

18   evidence that those calculations existed at the time.

19         THE COURT:  Made what calculations, though?  Made

20   what calculations?

21         MR. SIEGEL:  So the document that they produced to

22   us is an amended income statement that has different revenue

23   figures than the revenue figures that exist internally at the

24   company at the time.

25         THE COURT:  And the amendments are based on what?

1          MR. SIEGEL:  Well, that's not clear to us.

2          MR. SULLIVAN:  It is based on --

3          THE COURT:  Forget about what it's -- what is being

4    amended; top line revenue?

5          MR. SULLIVAN:  Oh it's revenue statements.  So the

6    Government's star witness, Samir Rao, we are going to contend

7    was a horrible CFO and simply got it wrong.  Carlos had the

8    right numbers.

9          THE COURT:  Got what wrong, revenue?

10          MR. SULLIVAN:  The revenue numbers.  Carlos had the

11   right numbers.  He had them all along.  We're going to

12   produce evidence that shows that he had them right along.

13   And the accountant is going to verify that by saying,

14   "Obviously, yes, the number was X.  The number was not Y,"

15   and that that's relevant.  That's easy.  That goes to his

16   good faith.  That goes to his mens rea, with respect to

17   making the statements.

18          THE COURT:  So who's the witness?  It's an

19   accountant?

20          MR. SULLIVAN:  Witness is an accountant.

21          THE COURT:  Who was not there at the time?

22          MR. SULLIVAN:  Who was not there at the time.  Who

23   looked at the books in order to -- and so, essentially, it

24   would be additive evidence --

25          THE COURT:  But how does that witness know what Mr.

1   Watson knew or didn't know?

2          MR. SULLIVAN:  A brick is not a wall.  Don't be

3   overly philosophical here, but famous statement from Whitmore

4   (ph.).  Probably the most famous evidence professor of all

5   time.  And he says relevant evidence is like a brick.  The

6   whole story is like a wall.  A brick is not a wall.  And just

7   one piece of evidence that tends to shift the probabilities

8   of some fact of consequence to the case that --

9          THE COURT:  Then it's post hoc expert analysis.

10          MR. SULLIVAN:  It's post hoc, but it verifies

11   what --

12          THE COURT:  I really need you to give me an example

13   of what the former CFO's mistakes of fact were.  He was lazy

14   and the head of sales came to him and said, "We've got a

15   signed contract here that should be recognized as revenue in

16   this year," and the CFO just lost the contract and didn't

17   count it in revenues?

18          MR. SULLIVAN:  That's one of them.

19          THE COURT:  Really?

20          MR. SULLIVAN:  Not necessarily lost, but

21   absolutely, simply did not understand how to account for

22   certain aspects in the media space.  Just didn't understand

23   it.

24          THE COURT:  Are we going to have testimony about

25   revenue recognition and how gap works on this point or not?

1       MR. SULLIVAN: Oh my goodness. I'm going to

2 cross-examine them on it. You know, he's here trying to put

3 Carlos in jail for 37 years. He's wrong. He absolutely did

4 not include all the numbers that were available to everyone.

5 And so --

6       THE COURT: Well, that can be --

7       MR. SULLIVAN: So Your Honor, I just got this

8 specific number. There were double digit contracts -- I'm

9 giving away my whole case, that Mr. Rao simply did not

10 include. Just didn't include.

11       THE COURT: Double digit signed contracts or

12 contracts that were being negotiated?

13       MR. SULLIVAN: Yes.

14       THE COURT: It was not a yes or no question.

15 Double digit contracts that were actually executed or that

16 were still being negotiated?

17       MR. SULLIVAN: I thought you said signed contracts.

18 That's why I was saying yes to the signed contracts, that

19 some of them actually were signed contracts. Some were

20 negotiated. The point here is that he got it wrong, and on

21 cross-examination I'm going to show that he got it wrong.

22       THE COURT: So let me paraphrase your argument to

23 the Government and put them to answer it. If I understand

24 this correctly, you're going to say the defendant made

25 certain misstatements in respect of accounting metrics,

things like revenue in a given year.  That obviously puts in

question A, what we mean when we say the word revenue, and B,

how much revenue OZY had truly earned in a given year.

And the CFO's, you know, internal financials are

not the God-given truth on that subject.  They're the CFO's

financials.  If Mr. Watson is seeing those financials that

his CFO is compiling, that's obviously relevant to what Mr.

Watson knows and believes, and you should be able to put

those internal financials in.  But to the extent Mr. Watson

genuinely believes in good faith that the company has earned

more revenue than his CFO seems to think, then he should be

able to mount a good faith defense on that front, or just

argue his lack of intent to begin with.

And so to me, if I was on the jury and I was not an

accountant, which as it happens, I'm not, I would want to

know what do we mean when we say the word revenue?  Do you

need to have two signatures on a written contract before you

can truthfully say, "We've earned these revenues"?  Or is it

enough that you have a handshake?  I don't know.  What does

gap have to say about that?

And maybe this is expert testimony and they've got

disclosure problems or otherwise, but put that aside for the

moment.  Why wouldn't that be a proper subject for an

accountant to come in and testify about, that look, the CFO

seemed to think he didn't recognize this contract as revenue

1   because, you know, he lost it in his desk or it didn't have a

2   second signature or whatever, but the accounting rules don't

3   require that.  You know, the accounting rules say a handshake

4   is enough, which I doubt the accounting rules say, but just

5   assume that for now.

6           MR. SIEGEL:  Sure.  So the premise of that is that

7   there's some evidence that Mr. Watson was aware that this

8   handshake contract existed.

9           THE COURT:  Yeah.  There's got to be a factual

10  predicate.  I agree with that.  And certain bricks have to

11  come in before certain other bricks become relevant.

12          MR. SIEGEL:  But that's the issue that we're

13  drilling down on.  Putting aside the question -- and I think

14  you're right --

15          THE COURT:  I think we all agree on that.  Like, if

16  I can just pause you for a second there, Mr. Sullivan is

17  going to tell me now that he agrees that this accountant's

18  testimony about -- you know, if it's going to Mr. Watson's

19  good faith belief, obviously, there has to be a foundation

20  laid for the idea that this is information Mr. Watson knew.

21  But I think that Mr. Sullivan has actually already told us

22  that that's the case.  Is that --

23          MR. SULLIVAN:  Absolutely, Your Honor.  And just to

24  beef up the factual predicate, in addition to contracts,

25  there are at least two other bases where we think Mr. Rao has

1    made significant accounting mistakes, which --

2                THE COURT:  On what line item?

3                MR. SULLIVAN:  Well, one, he conflated the accrual

4    basis of accounting with cash basis of accounting, so that

5    produced some weird numbers.

6                THE COURT:  Timing shifts.

7                MR. SULLIVAN:  But the actual numbers were in

8    Carlos's head, because he was the big picture guy, so I mean,

9    he knew what these numbers were.  And there's at least one

10   other basis.  So in addition to just out and out missed

11   contracts, some signed, some not, there was a lot of revenue

12   floating around, of which Mr. Watson was aware.

13               THE COURT:  What's the cash flow versus accrual

14   thing?  You were going to say he should've been entitled to

15   recognize revenues.

16               MR. SULLIVAN:  Well, you got to choose one.  On an

17   accrual basis, if that's what you're using, but you can't

18   sort of go back and forth.

19               THE COURT:  And the CFO was saying, "I'm not going

20   to recognize anything until the cash comes in the door," even

21   though there's a contractual commitment to pay those --

22               MR. SULLIVAN:  Correct.  Correct.  I mean, both are

23   appropriate methods of accounting, but you can't --

24               THE COURT:  Because I understand the accounting

25   rules, which I really don't, I think one thing I might know

1   is that you're either on the cash method or you're on the

2   accrual method.  You can't be on both as you see fit at one

3   given time.  I think you should treat this person as an

4   expert, since from what I hear, the only thing they're

5   adding -- you're not going to talk to Mr. Watson's knowledge.

6        You're going to have to get that in through other

7   sources.  What this accountant is going to say is, "Here's

8   how the accounting rules ought to have been applied," and

9   that sounds to me like classic expert testimony that may be

10  excludable for Rule 16 violations having occurred, but I

11  haven't decided that yet, so I think it's incumbent on you to

12  get the Government as clear, concise, and explicit a

13  statement of what this person's going to say as soon as

14  humanly possible.

15       MR. SULLIVAN:  Fair enough, Your Honor.  Let me

16  just tell you what I was thinking when I changed it over to a

17  fact witness, is because he was dealing with the company's

18  actual numbers.

19       THE COURT:  Yeah, but he's making accounting

20  judgments.

21       MR. SULLIVAN:  But that's fine.  On the notice

22  requirement, just to remind the Court, because of the

23  California litigation, as I advised the Court, Mr. Watson

24  simply -- all of his funds were stopped and couldn't retain

25  an investor.

1          THE COURT:  That's not a good basis for

2    overcoming --

3          MR. SULLIVAN:  Well, it's a Sixth Amendment

4    question, but what Your Honor said was to write a letter,

5    which I did, so that was (indiscernible) --

6          THE COURT:  Yeah, I think I keep saying the same

7    thing, though, which is, I'm not telling you that it's okay

8    to omit whatever the Government is saying needs to be

9    included.  I'm just telling you whatever you can say, say it

10   as soon as possible.  That's not a safe harbor.

11         MR. SULLIVAN:  No.  It's not.  And I'll just say,

12   then, if the Court finds a Rule 16 violation, I'm in effect

13   of under the Sixth Amendment, so want to put that on the

14   record.  But we'll get it as fast as we can.

15         MR. SIEGEL:  But Your Honor, I mean, now this gets

16   into the prejudice issue that you asked about before.

17         THE COURT:  It's all premature.  Yeah.  Let's

18   understand what it is this accountant would say, and then we

19   can decide A, is this so late that the Government's been

20   prejudiced?  B, is this appropriate subject matter for an

21   expert's testimony to begin with?  Right now we're just kind

22   of grasping at straws.

23         MR. SULLIVAN:  Fair enough.

24         THE COURT:  Okay.

25         MR. SIEGEL:  And Your Honor, I don't know that you

1  addressed Roman numeral II.

2          THE COURT:  That goes to selective prosecution.

3  You know, obviously --

4          MR. SULLIVAN:  Not necessarily, Your Honor.  Just

5  briefly, part of the founding story of OZY Media, and Ms.

6  Frison may want to speak to that, does have to do with Mr.

7  Watson's race.  It was the absence in a particular space of

8  anyone of color to have a media platform.  It's why he

9  founded OZY.  And to the extent he decides to testify, or to

10  the extent people talk about the founding of OZY, that would

11  be odd and weird and strange to not mention that.

12          "As an African American man, I saw that there were

13  no media spaces where people looked like me."  This is why he

14  founded OZY.  I'm not trying to relitigate the selective

15  prosecution issue.  The Government seems really worked up

16  about that.  And I will say to the Government, I'll say to

17  the Court, I understand where that line is.  I'm not

18  litigating selective prosecution, but to erase race, to

19  deracinate that issue is an extraordinary --

20          THE COURT:  Here's how I see what you're talking

21  about.  You know --

22          MR. SULLIVAN:  Crediting a witness.

23          THE COURT:  -- when a defendant takes the stand, it

24  is, I think, almost a universal custom that that person's

25  going to tell their life story in brief.  You know, it may be

1   that where somebody went to college is not technically

2   relevant under Rule 401, but the introduction is the

3   introduction.  If he wants to say, you know, a couple

4   sentences on why he decided to leave cable news, if I'm

5   understanding his career trajectory correctly, and start his

6   own new media company, I think that's well within bounds.

7               MR. SIEGEL:  Yeah.  We have no objection to what

8   Professor Sullivan just described.

9               THE COURT:  Okay.

10              MR. SULLIVAN:  And there are also investors who

11  said, "We want to invest in Black-owned companies."  That is

12  a fee, and is Your Honor going to issue an order to say you

13  can't say the word Black?

14              MR. SIEGEL:  We have no objection to that either.

15  If that's what all we're talking about, then that's fine.

16              MR. SULLIVAN:  So what I'm not talking about is the

17  selective prosecution arguments.  And what I am talking about

18  are (indiscernible) --

19              THE COURT:  I mean, there's a limit obviously to

20  relevance.  I take it you're not saying that that's relevant

21  to materiality, although maybe -- no.  Because materiality is

22  an objective test, not a subjective test, and so the fact

23  that one investor said, "Look, I was looking for companies

24  founded by, you know, minority founders," you know, again,

25  the one sentence is fine, but we're not going to confuse the

1  jury about how materiality works by suggesting that that

2  somehow, you know, is relevant to their consideration of the

3  mix of information available in connection with the

4  investment decision.  Like, I think we all know where the --

5            MR. SULLIVAN:  Where the line is.

6            THE COURT:  -- land mines lie here.  Yeah.  And so

7  we have agreement on that subject.

8            MS. FRISON:  Your Honor, may I be heard?  Briefly

9  on that same point, I think there will also be some testimony

10  that will flow from all the witnesses, witnesses on both

11  sides about the difficulties that a Black founder has in

12  raising money in this environment.

13            THE COURT:  Why is that relevant?

14            MS. FRISON:  I think that even Mr. Rao will be

15  actually discussing, okay, what were the barriers to raising

16  money generally?  How do you do that in this space and what

17  problems did OZY have in particular with raising money

18  anyway?  So the whole story and the context necessarily

19  includes some discussion of race, I mean, even by the

20  Government's witnesses.  This is going to be a part of the

21  reason we had such a hard time raising money aside from any

22  communication --

23            THE COURT:  But what's the relevance?  Assume

24  that's 100 percent true, what is the relevance of that to the

25  elements of securities fraud or wire fraud?

1          MS. FRISON:  It wouldn't be offered, or it wouldn't

2    be elicited, because it is proving or disproving an element.

3    But as we have discussed the context of this industry, that

4    is a part of the context.  So this may not even be something

5    that is -- this is going to come out.  It has already come

6    out, that this is a part of this industry.  So it's not

7    something that's --

8          THE COURT:  I'm not seeing the relevance.

9          MS. FRISON:  There's a whole -- I'm sorry.

10         THE COURT:  And I'm not seeing the relevance, and

11   I'm telling you I don't think it's relevant.

12         MS. FRISON:  So if Mr. Rao is asked on the witness

13   stand, "What were some of the difficulties you had in raising

14   money for OZY Media," and he lists that as one of the many

15   difficulties you would have with a startup company, is that

16   evidence coming from him or any other witness who sort of,

17   obviously, know it and would say it, is that going to be,

18   then, stricken or excluded from the jurors' consideration?

19         THE COURT:  Why is it relevant?  You know, what's

20   relevant here is who did what when.

21         MS. FRISON:  But if Your Honor has already opined

22   and discussed the fact that, sure, some context.  This is,

23   after all, a story, and it's a story about human beings.  So

24   it's not just, we're putting these numbers in front of the

25   jury, you decide if the numbers are correct or not.

1          THE COURT:  Because --

2          MS. FRISON:  We've discussed that the --

3          THE COURT:  -- the baseline proposition is that the

4    law is the law and, you know, what we're having a trial about

5    is whether the law applied to the facts of this case shows

6    that the Government has carried its burden or has not carried

7    its burden beyond a reasonable doubt.  And you know, I'll

8    hear the question, but this sounds like a pretty sizable

9    detour from what's actually at issue in this case, and, you

10   know, one that has the possibility to suggest, you know, the

11   kinds of basis for a decision that Rule 403 tells us are not

12   valid bases for a decision.

13         MS. FRISON:  Well, the introduction of that

14   information, or how it will come out, would not be what Your

15   Honor is calling a detour, that we're attempting to distract

16   the jury and go over here with information.  But it would be

17   akin to someone asking, as Mr. Sullivan said, if an investor

18   is asked, "Why did you invest in OZY?" or "What went into

19   your thought process of investing in OZY?", and one of the

20   reasons is, "I wanted to invest in a Black founder, a Black

21   media company, specifically, and I was looking for

22   minority-owned businesses."

23         I don't think it's right that that's a third rail

24   that witnesses can't touch and the lawyers in the room can't

25   touch, because it is literally about race.  It doesn't mean

1 then I take that thread and do a whole half hour with that

2 person, or a half day.

3 　　　　THE COURT:  Yeah.  Look, I can put specifics to

4 this if it will help.  I think if the question is put to an

5 investor, "Why did you decide to invest in OZY?", and there's

6 an objection to that question, that objection will be

7 overruled.  To the extent there are a long series of

8 follow-up questions about the extent to which somebody's skin

9 color did or did not play into the investment decision, I

10 think we get at least closer to, if not over the line of,

11 Rule 403.  And you know, we'll probably take that question up

12 as it goes.

13 　　　　Same with Mr. Rao or Rayo, however you pronounce

14 his name, if he's asked, you know, "What were some of the

15 challenges that this company faced in raising money?",

16 probably going to let that question be answered, depending on

17 the context, but again, if we're talking about a focused

18 effort to put, you know, race front and center, that's not

19 going to happen.

20 　　　　MS. FRISON:  Certainly.  And I think that this is

21 more so not for defense strategy purposes, but for our use in

22 knowing what the witnesses are even allowed to say.  Again,

23 I'm trying to make sure that the rulings aren't meant to say

24 race cannot be mentioned by any witness.  Because it is

25 simply a fact that it is part of this case.  It is a part of

1  the difficulties OZY had.  It is something that was discussed

2  between the CFO and Mr. Watson.

3          THE COURT:  But it's not legally relevant.  I mean,

4  let's just say, hypothetically, that you had an investor who

5  was willing to say, "I wanted to invest in a, you know,

6  business with a certain founder's profile, and I did not care

7  about how my investment would do.  I didn't care about

8  profit.  I didn't care if I lost the whole thing.  I didn't

9  care if they lied to me in every single word they said about

10  the basis for investment," that's not how the materiality

11  standard works, because it's objective rather than

12  subjective.

13          And so I disagree with you.  I want to be very

14  clear about this.  I don't think an individual investor's

15  views concerning the importance of skin color are going to be

16  relevant.  It may be that to the extent we have individual

17  investors talking about their investment process, it becomes

18  relevant because it was, in fact, part of their investment

19  process, but we're all going to bear in mind the distinction

20  between objective analyses and subjective, and, you know,

21  we'll take the objections as they come.  But I hope I'm being

22  clear that I do view all of what we're talking about here as

23  relevant on background in a very passing way, and legally

24  relevant, you know, generally not at all, and we'll take the

25  possible exceptions to that up as we find them.

1          All right.  The coconspirator statements I will

2    reserve judgment on, but I think the parties should expect

3    that those will be admissible against both defendants.

4          MR. SIEGEL:  And Your Honor, in addition to the

5    coconspirators, there's the employees and agents of OZY that

6    we also moved would be admissible against both defendants

7    that I don't understand the defense to be objecting to.

8          THE COURT:  Which employees?

9          MR. SIEGEL:  Well, there will be a number of them.

10   Former accountants who worked at OZY, a former CFO.

11         THE COURT:  And the reason is they're statements by

12   a party opponents?

13         MR. SIEGEL:  They're statements of a party

14   opponent, and that they're all agents of both OZY and Mr.

15   Watson.

16         THE COURT:  Why are they Mr. Watson's agents

17   personally?

18         MR. SIEGEL:  So the law in the Second Circuit, and

19   we cited the Second Circuit in district court cases on this,

20   is that where you have a single person who is the ultimate

21   decision maker at a company, who owns the company and leads

22   the company, then that company's officers and employees are

23   also that person's agents.

24         THE COURT:  Okay.  Tell me where in your table of

25   contents we see the employees' statements.

1          MR. SIEGEL:  Sure.  Just one moment.

2      (Pause)

3          MR. SIEGEL:  It's on page 32, and that section

4  discusses both Samir Rao and Susie Han, who are two

5  particular employees, but then also discusses employees

6  generally.

7          THE COURT:  Does this language from the Roo (ph.)

8  case about the employees being answerable and directly

9  responsible to the defendant, does that limit the universe of

10 employees that you're talking about here?

11         MR. SIEGEL:  No.  And if you look at the Zakin

12 (ph.) case and the In re Reserve Fund, where it talks about

13 in the reserve fund language, the declarant is the ultimate

14 supervisor, not the direct supervisor.

15         THE COURT:  What's the theory?

16         MR. SIEGEL:  The theory is that these people worked

17 for Mr. Watson.

18         THE COURT:  Personally?

19         MR. SIEGEL:  He was their boss.  He controlled the

20 company.  He was a majority owner of the company.  Those are

21 the factors that are set forth in those cases.

22         THE COURT:  I mean, what I would've thought was

23 you're trying to admit these statements as statements of a

24 party opponent, and that extends not only to the party

25 opponent, him or her or itself, but also to its agents or his

1    agents.

2              MR. SIEGEL:  That's right.

3              THE COURT:  And the standard in the Roo case that

4    says, "Were answerable and directly responsible to the

5    defendant," kind of picks up the law of agency, right?  It

6    shows an ability to control.  I guess you're saying --

7              MR. SIEGEL:  The Zakin case says that, "Where the

8    CEO was the company's principal owner, directed its

9    operations, and ultimately made all the final decisions."

10   That very much describes Mr. Watson at OZY.

11             THE COURT:  So all we're talking about right now is

12   the hearsay component.  You're saying the statement of every

13   employee of OZY Media is admissible over a hearsay objection

14   as the statement of a party opponent.

15             MR. SIEGEL:  If it's within the scope and relates

16   to the their agency relationship.

17             THE COURT:  Within the scope of their employment.

18   Yeah.  But you're still going to have the relevance issue --

19             MR. SIEGEL:  Absolutely.

20             THE COURT:  -- of if there's no evidence that Mr.

21   Watson knew or heard any of this stuff, then it's not coming

22   in, right?  Can you give me an example of what we're talking

23   about here?

24             MR. SIEGEL:  Yeah.  So I mean, one is going to be

25   the statement from the CFO, which is going to be in the next

1    Roman numeral that we're going to get to.  Statements where

2    the internal finance team is talking about, "Here are our

3    numbers for the month."

4              THE COURT:  Is Mr. Watson there?

5              MR. SIEGEL:  And then that'll be accompanied by

6    testimony of, "This is a record of what our numbers were, and

7    we discussed that Mr. Watson all the time."  So it's the

8    hearsay objection to get in, like, this is what the numbers

9    were at the time, but in order for it to be relevant, as Your

10   Honor put your finger on, it'll need to be accompanied by,

11   "Yes.  And of course we talked about that with Mr. Watson."

12             THE COURT:  Yeah.  I think we have agreement on

13   that.  Okay.  So that is --

14             MR. SULLIVAN:  I'll just point out briefly, Your

15   Honor, if I may, two issues, and we have it in our brief.

16   One, the attenuation issue.

17             THE COURT:  Yeah.  Which goes to relevance.

18             MR. SULLIVAN:  Yes.  And that's our big issue,

19   which I think much of what they might want to enter is not

20   going to be relevant, and I think that's a game-time

21   decision.  You know, a random, you know, person who's been

22   there two weeks, fresh out of high school, at some point it's

23   both attenuated and irrelevant.  Unless there's some evidence

24   that that person was in conversation with Mr. Watson or had

25   some kind of authority within the organization, then it

1 really becomes problematic.  So it's a relevance question,

2 potentially a 403 question.  But I think it's a game-time

3 decision.

4          THE COURT:  Well, we just heard it's going to be a

5 witness who can say, "This is the kind of financial

6 information we talked about with Mr. Watson all the time."

7          MR. SULLIVAN:  If they have the right witness, then

8 we'll cross-examine.  If it's Rao, obviously.  But you can go

9 so far down the line that it becomes irrelevant.  That's our

10 only point.  And the general proposition the law stated

11 correctly, but the devil's in the details.

12          MR. SIEGEL:  So Your Honor, I guess the -- let's

13 try and concretize this.  I mean, the example that I'm

14 thinking of is, there's an email from OZY's accounting

15 manager to OZY's outside accountants, saying, "Here's our

16 financial statement for the year."  We want to admit that to

17 show that that's what was in OZY's books at the time.  We'd

18 say that's not hearsay because that is a statement by an

19 agent of the company and Mr. Watson about what was in OZY's

20 books at the time.

21          In terms of the relevance, we'll have a witness

22 says, "I don't remember what was in the books at the time.

23 If this is what was in the books at the time, that's fine,

24 but whatever was in the books, we talked about that with Mr.

25 Watson all the time."

1    MR. SULLIVAN:  So the concretized example, at first

2  blush, that might be admissible against OZY.  If they

3  produced evidence that they talked to Mr. Watson, then we'll

4  deal with that on cross-examination.  Absent that sort of

5  evidence that Mr. Watson even knew what they were doing, I

6  don't see how that's admissible against Mr. Watson.  Maybe

7  OZY.

8    THE COURT:  Well, the question is, what's an

9  adequate foundation, right?

10    MR. SULLIVAN:  Correct.

11    THE COURT:  And there are at least two choices,

12  where choice one is the witness who's testifying can say, "I

13  talked about this particular number in this particular email

14  with Mr. Watson at this time."  Choice two is, "I don't

15  remember what we said on that day, but we had a habit, a

16  pattern and practice, if you will, of discussing current

17  revenue."

18    You know, it's not going to come as a surprise to

19  anybody that one of the big questions on a CEO's mind is how

20  are we doing this quarter or this year, in terms of money

21  coming in and money going out.  Is it a sufficient foundation

22  to say, "This is the kind of stuff we were talking about all

23  the time"?

24    MR. SULLIVAN:  I agree with the Court's analysis.

25  And particularly the part about custom and practice or habit,

1    absolutely right.

2              THE COURT:  So we may have no dispute on this

3    stuff.

4              MR. SULLIVAN:  Custom and practice, very important

5    in this industry.

6              THE COURT:  Okay.  Is item 8 disputed, that the

7    Government should be permitted to authenticate documents

8    based on their production, by either defendant in response to

9    subpoenas?  I do want to not waste the jury's time.

10             MR. SULLIVAN:  Which one is this?

11             THE COURT:  This is Roman VIII in the Government's

12   table of contents.

13             MR. SIEGEL:  Having spoken to Mr. Sullivan, I

14   understand there's going to be a stipulation about that,

15   unless has changed, but that's what we were told.

16             THE COURT:  Yeah.  This does seem to be the kind of

17   thing on which reasonable minds should prevail.  And it would

18   not be a good use, in my view, of the jury's time for us to

19   have hours of authenticity of foundation on this.

20             MR. SULLIVAN:  Agreed.  We agreed on that, Your

21   Honor.

22             THE COURT:  Item 9, is that disputed?  Roman IX?

23             MR. SULLIVAN:  Brief indulgence, Your Honor.

24             THE COURT:  Please.

25        (Pause)

1          MR. SULLIVAN:  I think similar to the others, if a

2     proper foundation is laid, we'll make objections as

3     appropriate.  At least I'll make objections as to Mr. Watson.

4     So I don't know what sort of foundation the Government plans

5     to lay.

6          THE COURT:  The Government describes the foundation

7     in the lead up to the excerpt on page 41.  Assume that that's

8     the context.  Do you object to this email coming in?  And if

9     so, on what basis?

10          MR. SULLIVAN:  For what purpose?  I guess that

11     would be the --

12          THE COURT:  I would imagine it's to show knowledge

13     and intent to their fraud.  You got a CFO who said, "I'm not

14     doing this."

15          MR. SULLIVAN:  Right.

16          THE COURT:  "It's a lie."  And the defendant did it

17     anyway.

18          MR. SULLIVAN:  So as stated, I do not think this is

19     a sufficient foundation.  However, were the Government to lay

20     a sufficient foundation, then I think it becomes a question

21     of weight, not admissibility, and we would deal with it

22     thusly.

23          THE COURT:  What's insufficient about the

24     foundation?

25          MR. SULLIVAN:  That it doesn't go to Mr. Watson's

1  mens rea at the time.  This is a context note that was

2  written well after the fact, and in context, a note that

3  initially presumed Mr. Watson did not know anything about

4  this.  So I don't think the Government's going to be able to

5  lay that foundation.

6          THE COURT:  Yeah.  I mean, I think some of the

7  weight of this question rests on the phrase, "after the

8  then-CFO refused."

9          MR. SULLIVAN:  Yeah.

10          THE COURT:  I think the foundation questions are to

11  whom did the then-CFO direct his or her refusal.  Did he or

12  she say it directly to Watson or to some other person?  And

13  you know, perhaps, what did the then-CFO say about the reason

14  or the refusal?

15          MR. SIEGEL:  Sure.

16          THE COURT:  I presume you're going to say it was

17  communicated directly to Watson, and the reason was, "I'm not

18  doing this because it's a lie."  And to me, that would be a

19  sufficient foundation.

20          MR. SIEGEL:  The testimony is going to be that Mr.

21  Watson asked the then-CFO to prepare a fake contract.  The

22  then-CFO said, "No.  I will not do that."

23          THE COURT:  Said that to whom?

24          MR. SIEGEL:  Mr. Watson.

25          THE COURT:  Okay.

1    MR. SIEGEL:  Within a matter of days, Mr. Rao sent

2    out a fake contract, copying the CFO.  The CFO forwarded that

3    to Mr. Watson, said, "Why did you do this?  This is a lie.

4    How could you put me at risk?  I told you I wouldn't do

5    this," and then resigned.  And what that goes to -- and this

6    is in 2019.  The fact that Mr. Watson is, at a minimum, put

7    on notice that Mr. Rao was sending out fake contracts in

8    2019 --

9    THE COURT:  And continues to for some period of

10   time?

11   MR. SIEGEL:  And continues for the next year and a

12   half, working with Mr. Rao, at which time Mr. Rao's testimony

13   will be that Mr. Watson was in on it the entire time.  This

14   supports that, that the reason Mr. Watson had no reaction or

15   no negative reaction to this is because he was fully aware of

16   it, and in fact, had directed the sending of the fake

17   contract.

18   THE COURT:  Yeah.  Seems eminently adequate as a

19   foundation to me.

20   MR. SULLIVAN:  If that's the testimony of the

21   witness, that certainly meets foundational requirements.

22   It's untrue, and I think the Government owes us some Brady

23   based on that witness's statement, but that's what

24   cross-examination is for.

25   THE COURT:  Okay.

1      MR. SULLIVAN:  And I'll just point out that, you

2  know, if the Government is sponsoring a witness, the

3  Government ought to be sure that it is familiar with all of

4  the witnesses' statements, if they're going to sponsor that

5  testimony.  But as articulated, yeah, that could be a

6  foundation.  It builds an inference on an inference, but

7  weight, not admissibility.

8      THE COURT:  Okay.  The Government should be

9  permitted to introduce contemporaneous statements by victims.

10  This looks like it's maybe tied up with Roman XII, maybe not.

11  Are X and XII the same thing; or related subjects?

12      MR. SIEGEL:  They're related, but examples of this

13  are what specifically Mr. Watson was telling them, so there's

14  some oral conversations that Mr. Watson has with investors.

15  You know, there's one particular event where we talk about in

16  our motion.  Mr. Watson calls the investor and says that this

17  is what happened.  That investor immediately sends a voice

18  memo to his colleague saying, "I just got off the phone with

19  Mr. Watson.  This is what he told me."  We're saying that

20  that's admissible as a present-sense impression, because it's

21  basically contemporaneous with what Mr. Watson told him.

22      THE COURT:  Oh I see.  Present-sense impression.

23      MR. SULLIVAN:  Well, that's wrong.  Present-sense

24  impression is not basically.  It's present sense, not right

25  after.  That's just wrong as a matter of law.

1          THE COURT:  Well, there's the substantially

2    contemporaneous requirement, so that would be the foundation,

3    right, of how substantially contemporaneous -- what if

4    somebody writes the email 48 hours later?

5          MR. SIEGEL:  That would not be a present-sense

6    impression.

7          THE COURT:  Okay.

8          MR. SULLIVAN:  So it depends on when.

9          MR. SIEGEL:  It has to be substantially

10   contemporaneous.

11         THE COURT:  Which means what in this case?  Like,

12   are we going to fight over the delay?

13         MR. SIEGEL:  I would think it would need to be

14   within a matter of minutes.

15         THE COURT:  And your witnesses will say that?

16         MR. SIEGEL:  Yes.

17         THE COURT:  What if they get off the phone with Mr.

18   Watson, they get another call immediately thereafter, and

19   they don't end up writing the email, you know, for four more

20   hours?

21         MR. SIEGEL:  The foundation that we're going to lay

22   is, "I got off the phone and I sent this memo."

23         THE COURT:  Okay.

24         MR. SULLIVAN:  We shall see.

25         MR. SIEGEL:  And similarly, we have text messages

1  sent by employees during the call, during the impersonation

2  call, where they're describing what is happening on the call

3  as it's happening.

4          THE COURT:  Okay.  Number 11, just walk me through

5  the other-acts evidence.

6          MR. SIEGEL:  So there's two buckets here.  One is

7  going to be at all within the conspiracy, in between the

8  conspirators that are not specifically alleged in the

9  indictment.  I don't think there's an objection to that, but

10  obviously, the defense will correct me if I'm wrong.

11          Then there's other interactions with other

12  employees who are not part of the conspiracy.  But for

13  example, where Mr. Watson tells an employee, "If you want to

14  win, you have to lie," we submit that that goes to Mr.

15  Watson's state of mind and intent and motive.

16          THE COURT:  That's not an other-act at all.  It's

17  just a statement.

18          MR. SULLIVAN:  It's a statement.  I'm sorry, Your

19  Honor.

20          MR. SIEGEL:  But it's statements of him telling

21  people to lie.  That is an act of him instructing other

22  people to lie.  It's not hearsay.  It's something he said.

23  We think it's admissible, and maybe you're looking at me

24  because you think it's obviously admissible, but we just

25  wanted to flag it and didn't want to have to deal with it at

1  trial

2         MR. SULLIVAN:  It's not admissible as conduct.

3  Counsel said something about conduct, instructing people to

4  lie.  It's a statement by a party opponent, and that's a

5  statement.  They can ask the jury to draw an inference, but

6  if they're going to say -- I'm not sure I understood what he

7  said, that that means I'm telling you to lie.  Well, no.  The

8  statement means exactly what it says.  We're going to dispute

9  that he said it.

10         I mean, they can argue inferences, but if they're

11  saying -- he said the word conduct, and to my mind, assertive

12  conduct comes up, like a contract exception to a hearsay

13  rule, contract rules assertive conduct.  And maybe that was

14  just an errant word, but if they're admitting on the basis of

15  statement of a party opponent, we have no objection.  But if

16  it's 404(b) evidence, I don't see it.

17         THE COURT:  But there are two levels we're thinking

18  about this.  I don't think it's 404(b) evidence.  I think

19  there's a potential hearsay objection, which is overcome by

20  the party opponent status, and then there's just the usual

21  kind of relevance and prejudice versus probative value.  And

22  from what you're saying, I'm imagining a scenario, like, you

23  know, Mr. Watson and some colleague, who the Government does

24  not allege has any role in the conspiracy, are watching CNBC

25  as the Elizabeth Holmes cases being reported, and Mr. Watson

1   says to that person, you know, "If you want to launch a

2   successful company, you have to lie to investors."

3           MR. SIEGEL:  That's not quite right.

4           THE COURT:  I'm making this up.

5           MR. SIEGEL:  No.  I mean, OZY had an event called

6   OZY Fest.  They had people who came to speak at it, and based

7   on who was speaking at it, they sold tickets and they sold

8   sponsorships.  A former employee would testify, "Mr. Watson

9   told me to lie about who was coming to OZY Fest, and when I

10  protested, he said, 'If you want to succeed, you have to

11  lie.'"  So that's not conduct directly in furtherance of the

12  conspiracy, because the conspiracy is about lying to

13  investors and lenders.

14          THE COURT:  Is there an objection?  And if so,

15  what?

16          MR. SULLIVAN:  If it's statement by a party

17  opponent -- but he puts this in 404(b), as I understand it,

18  category.  So if the statement gets party opponent, then I

19  don't have an objection.  Mr. Watson didn't make that

20  statement, and I'll cross-examine the person.  I just don't

21  get the conduct here, bad acts, unless --

22          MR. SIEGEL:  If there's no objection, then we're

23  good.

24          THE COURT:  Okay.  Moving on.

25          MR. SULLIVAN:  Well, Your Honor, as long as the

1    Government's not going to try to argue some kind of bad act

2    under 404(b) --

3            THE COURT:  I don't think it's 404(b) evidence, and

4    if it were, it would be the kind of 404(b) evidence that it

5    seems necessary to complete the story of the crime on trial.

6    To me, this is more a question of -- the jury might have a

7    legitimate question of, is that part of the conspiracy?  Is

8    that not part of the conspiracy?  What is the Government

9    telling me here?  And you know, that's just for the parties

10   to argue about and the jury to make their decisions.

11           MR. SIEGEL:  And then, Your Honor, on the third

12   bucket, and what the evidence about the conspiracy will show

13   is that part of the way Mr. Watson directed and controlled

14   the conspirators was yelling at them, demeaning them,

15   threatening them.  And we expect testimony from other

16   witnesses at OZY that that was his management style and

17   that's how he ran the company, which we view as just

18   corroboration when there's testimony about that's what he did

19   to the conspirators and that's how he controlled them,

20   testimony that that's how he ran the company, that's how he

21   controlled everybody, is relevant.

22           THE COURT:  So there's a relevant use of that and

23   there's an irrelevant and possibly prejudicial use of that,

24   right?  The relevant use of that is the jury may have

25   legitimate questions about, okay, why was this other person

1  doing what they did if they weren't necessarily directly

2  benefiting financially from this fraud or whatever.  And so

3  it explains, you know, why the allegedly criminal conduct

4  actually occurred.

5          But there's also the obvious risk that, you know,

6  if the jury just concludes, like, this person was mean to his

7  subordinates, that that provokes or could tend to provoke an

8  emotional reaction to the evidence rather than a logical one.

9  And so we're going to be careful about both the extent to

10 which this information comes in and the context, and, you

11 know, the uses for which it's elicited, to make sure that we

12 stay solely within the first universe and not in the second

13 one.

14          MR. SIEGEL:  Understood and agreed.

15          THE COURT:  Anything else to say about that?

16          MR. SULLIVAN:  We definitely would have a 403

17 objection.  There may be foundational objections, depending

18 on what the witness says, but --

19          THE COURT:  Do you want a --

20          MR. SULLIVAN:  I'm sorry?

21          THE COURT:  Do you want a limiting instruction at

22 the time that it's not a crime to be a tough boss?

23          MR. SULLIVAN:  Yeah.  I probably will ask for a

24 limiting instruction on that.

25          MR. SIEGEL:  No objection to that.

1    THE COURT:  We'll see.  All right.  Roman XII,

2  testimony from victims regarding their views on materiality,

3  I agree with your reading of the Litvak case, like, yes, the

4  subject of decision making processes of specific investors

5  can tend to inform, perhaps, the objective assessment of

6  what's material and what's not material, but you can't have

7  it both ways on this.  And if you're going to want some limit

8  on the extent to which investors can be asked, you know, how

9  much was the race of the founders relevant to you in your

10  investment process or whatever, you can't then oppose that on

11  the basis that, oh, that goes to subjective motivation, not

12  objective motivation, right?

13    MR. SIEGEL:  Well, on the race example, that's less

14  about subjective, objective, and more about relevance and

15  about prejudice.  But in terms of, if they want to ask an

16  investor, "Did you think revenue was important?", that's

17  fine.  And if there's an investor who will say, "No.  I

18  didn't think that was important," then that's fine too.

19    THE COURT:  All right.  I'm going to reserve

20  judgment on that.  So item 13, I agree, you know, the

21  subjective belief that even though I was lying to investors

22  and those lies were material, that everything would work out

23  in the end and nobody would lose money, is not a defense.

24  That line will be hard to police in practice, but that

25  motion, I think, is indisputably correct.

1          MR. SULLIVAN:  And that's not and never has been

2   our argument.

3          THE COURT:  Yeah.  Roman XIV, argument that Watson

4   did not profit from the scheme, I mean, the fact -- so what

5   about the idea that he lost money, because as the ship was

6   potentially going down, he's injecting more of his own

7   capital into the business?  Is that relevant to his intent or

8   any other subject?  I think I got the suggestion from the

9   defense briefs that that happened, or that they think it

10  happened.

11         MR. SIEGEL:  I think if there's argument that I put

12  money into OZY and I believed in OZY, because I believed it

13  was making money, or however he wants to link it up, that's

14  fine.

15         THE COURT:  Okay.

16         MR. SULLIVAN:  And also that the way the Government

17  frames it did not profit --

18         THE COURT:  But then what is number 14?  That he

19  didn't profit.  I take that to mean he wasn't -- he is

20  profiting on paper, right?  If they're raising money at

21  successively higher valuations, then he would marking his

22  investment up in value.  But I think you're saying he's not

23  taking any money out of the business.

24         MR. SIEGEL:  It's the argument that, well, in the

25  end, I never made a dollar on this because the company

1    collapsed.

2            THE COURT:  Why is that different from what I just

3    posited about him putting more money in?  Not taking money

4    out, is the other side of the same coin.

5            MR. SIEGEL:  Well, it's not about putting the money

6    in or taking it out.  It's the fact that this conspiracy

7    didn't work.

8            THE COURT:  The jury will be clear that the fact

9    that he didn't mint millions is not a defense, obviously, but

10   to the extent his intent is an issue, I don't know if he ever

11   had the opportunity to take money out of this business.

12   There may have been insufficient cash flow for that purpose.

13   But you see the relevance and I think you agree.

14           MR. SIEGEL:  Yeah.  No.  In terms of whether he

15   took money out, whether he tried to take money out, we think

16   that's fair and we're going to have evidence on that.  It's

17   the issue of what you put your finger on, the fact that he

18   didn't mint millions is not a defense and shouldn't be argued

19   as a defense.

20           THE COURT:  Okay.

21           MR. SULLIVAN:  But it goes to intent, and to the

22   extent intent is a defense.  I just want to make sure we're

23   on the same page of music.  Whether he made money as OZY was

24   going on is relevant to his intent and what the Government is

25   arguing.  Whether he took money out is relevant to his

1  intent, is relevant to good faith.

2         THE COURT:  I mean, the Government --

3         MR. SULLIVAN:  I think that's what the Government's

4  saying that they're not objecting to, but I just want to be

5  clear, it is not an affirmative defense.  Maybe that's the

6  better way to put it, but intent is a defense.

7         THE COURT:  I think we're all on the same page

8  here.  I think we're in --

9         MR. SULLIVAN:  I think so.

10        THE COURT:  -- something like unanimous agreement.

11 The Government is, not in this case, but in many corporate

12 fraud causes, is seeking affirmatively to admit evidence of a

13 defendant's lavish lifestyle on the theory that that all

14 provides a motive to continue to lie, and the Department of

15 Justice obviously should not want to have it both ways on

16 that issue, to the extent that, you know, the defense never

17 pays himself a dividend.

18        MR. SIEGEL:  The fact that he didn't get paid

19 during the course of the conspiracy, I mean, as Your

20 Honor -- we are going to admit evidence that he tried to take

21 money out and was not able to, but it's the question that

22 we're getting to is the point that Your Honor raised, the

23 fact that he didn't mint millions is not a defense.

24        THE COURT:  Agreed.  Although I think that's a

25 question of degree rather than kind.  Okay.

1    MR. SIEGEL:  Your Honor, I'm sorry, did we address

2  Roman numeral V?  You mentioned that you agree that reliance

3  is not an element, but there's been a lot of talk about sort

4  of disclaimers of unaudited and pro forma, and we just want

5  to make clear that just because you call something unaudited

6  or pro forma doesn't give you a license to mislead people

7  about it.

8    THE COURT:  Yeah.  Pro forma can mean a lot of

9  things, I guess.  I think of pro forma financial statements

10  in the merger context, where we say here's what the combined

11  company would have earned, had these two parties actually

12  been combined.  It's almost a counterfactual.  Pro forma

13  could just mean, here's what we expect to earn.  You know, to

14  me that distinction is better described as historical

15  performance versus forward-looking statements of performance.

16  To the extent there are statements that were labeled -- you

17  know, I think this comes down to the expert testimony, right?

18    If there is an expert whose testimony is admitted,

19  over all the different objections we have to that, I don't

20  see why it would be inappropriate for that expert to say,

21  look, obviously, there's a difference between financial

22  statements that speak to historical performance, which is

23  actually known and knowable, and projections.  Or, you know,

24  unaudited financial statements, like, I don't think anybody's

25  going to say that you're allowed to lie on the unaudited

1   financial statements in the hopes that your auditor will

2   clean that up in the audited ones.  That would strike me as

3   strange testimony and probably lack a sufficient basis in the

4   literature.  But, you know, everybody knows that unaudited

5   financial statements are still subject to change.

6           MR. SIEGEL:  So we're focused on the historicals,

7   and the motion that we're making, which is based on the law

8   that reliance isn't an element and disclaimers for reliance

9   aren't an element, that if you give someone a historical

10  number and say, "This is not audited," that you can't then

11  point to that and say, "Well, I mean, so what that it was off

12  by $30 million and we knew it was off by $30 million?"

13          THE COURT:  Agreed.  That would not be a defense,

14  and I don't think anybody's going to say it is.

15          MR. SULLIVAN:  And that's not what we're saying.

16  So here's the problem.  The Government phrases these things,

17  where it superimposes its theory on everything.  So the

18  Government says in number 5, for example, "Watson or

19  conspirators' false statements."  Of course not.  Our theory

20  is that the statements are not false.  The statements are not

21  false, that they are pro forma, they are unaudited.  They're

22  not false.

23          There was a good faith belief based on evidence

24  that we will elicit, that these numbers were real.  That they

25  were, you know, maybe with a little bit of variance, but not

1 false.  You know, that would be silly for us to say that you

2 shouldn't rely on false -- no.  You shouldn't rely on false

3 numbers.  But the numbers that they put out there, they

4 believe to be true.

5            THE COURT:  Is this all about revenue recognition

6 again?

7            MR. SIEGEL:  I don't think so.  I mean, look --

8            THE COURT:  There's a rule somewhere that

9 somebody's going to need to tell me about when the company

10 could recognize -- what was the company selling?  They were

11 selling podcasts, or advertising in podcasts, and --

12            MR. SULLIVAN:  Television programs, festivals.

13 Mixed base in the media.

14            THE COURT:  Okay.  So say -- I don't know who's

15 going to be an advertiser.  Crest toothpaste wants to

16 advertise on YouTube videos that this company's going to put

17 up.  There's a rule somewhere that says, "Here's when you can

18 recognize revenue associated with those contracts."  I assume

19 that rule's going to say you can recognize the revenue only

20 when you have two signatures on the contract, one from Crest

21 toothpaste and one from OZY Media.  And if you're putting

22 that contract in revenue despite it not being signed, it's

23 still a lie, obviously, despite the fact that that first

24 draft of a financial statement has not been audited.

25            MR. SULLIVAN:  I think that Your Honor will learn

1    that in the early startup space, that some of the sort of

2    traditional accounting rules are not in play, because they

3    simply don't know.  So what Your Honor --

4            THE COURT:  Yeah.  I got to run because I have a

5    12:30 call.

6            MR. SULLIVAN:  Okay.

7            THE COURT:  I doubt I'm going to learn from any

8    expert that it is okay to lie about your revenue just because

9    your financial statements have not yet been audited.

10           MR. SULLIVAN:  And I would just say you can't

11   accept the Government's premise.  There are no lies here.

12   There are no lies here.  They're good faith estimates as to

13   what it was.

14           THE COURT:  Well, what we're going to have to talk

15   about -- if I'm trying to run the move forward here in my own

16   mind, it may be that the defense is going to want to say,

17   "Yeah.  We didn't have Crest toothpaste's actual signature on

18   the advertising contract yet, but we were highly confident it

19   was going to come in."

20           MR. SIEGEL:  Judge, I just want to cut through all

21   this.  We're not making any arguments about, "Oh this was

22   recognized in December and it should've been recognized in

23   January."  Our argument is the revenue was six.  They told

24   investors the revenue 53 million, and the way they got --

25           THE COURT:  But they're going to say, maybe, "We

1   were in talks with these other 15 advertisers and I had the

2   world's best good faith belief that those contracts were all

3   going to come in."

4           MR. SIEGEL:  But this is historical.  "Last year we

5   made 6, we told people we made 53, and the way we came to

6   that number is we thought, 'What number would sound good?

7   Fifty-three sounds good.'"  Those are the lies we're talking

8   about.

9           THE COURT:  But does 53 change from unaudited to

10  audited?  Why does this whole --

11          MR. SIEGEL:  It's a made-up number.

12          THE COURT:  So then why does the whole concept of

13  what an unaudited financial statement is matter to this

14  trial?

15          MR. SIEGEL:  Because --

16          THE COURT:  Or maybe you're saying it doesn't.

17          MR. SIEGEL:  -- you can't give someone made-up

18  number and say unaudited, and then argue, "Well, it was

19  labeled unaudited, so that's not material."

20          MR. SULLIVAN:  And that's just wrong.  I know Your

21  Honor has to go.  May I do two things in two minutes?

22          THE COURT:  Yes.  Two real minutes.

23          MR. SULLIVAN:  One, is this courtroom equipped with

24  the --

25          THE COURT:  So that you're going to take up with

1   the Court's law clerk and staff after I leave.  All the stuff

2   about audio, video.  I do want everybody to really understand

3   how the tech is going to work so we don't waste the jury's

4   time with technological difficulties, but I don't want to be

5   here for that conversation.

6           MR. SULLIVAN:  Absolutely.  The second question,

7   then, or issue is more substantive, and we might take this up

8   later as well.  Just the timing.  I don't have the number in

9   front of me, but the notion of what evidence about Ben Smith

10  and Busby may be relevant.

11          THE COURT:  None.

12          MR. SULLIVAN:  I'm sorry?

13          THE COURT:  None.

14          MR. SULLIVAN:  Our position is that if the

15  Government produces a theory that suggests that OZY fails

16  because of either misrepresentations or the absence of

17  revenue, then we are able to tell a story that OZY fails

18  because a competitor with inside information tainted.  They

19  don't have the exclusive right to a theory about why a

20  business fails.  So we think that this is going to be part of

21  their case, and if they open the door to that, we get to tell

22  our story about why it ultimately didn't make it.

23          THE COURT:  We'll take this up again.  This sounds

24  like some sort of loss causation argument that you all are

25  going to have investors testify that they lost all their

1   money and that that loss hurt them, and the defense is

2   saying, "Well, absent this short squeeze or competitors

3   maligning us," or whatever the alternative cause is,

4   "everything would've worked out beautifully in the end."

5   We'll take that up at a next conference.

6           MR. SULLIVAN:  Very well.

7           THE COURT:  Why don't we schedule that next

8   conference now for the afternoon of May 8th, 2:30 p.m.?  Is

9   that after voir dire has come in?  Jury instructions have

10  come in?

11          MR. SIEGEL:  Yes, Your Honor.

12          THE COURT:  What's the due date for all of that?

13  It's key to my --

14          MR. SIEGEL:  May 6th.

15          THE COURT:  Okay.  So yeah, two days after, we'll

16  have everything.

17          MR. SULLIVAN:  I'm sorry, Your Honor.  What time?

18          THE COURT:  2:30 p.m., May 8th.  Please, everybody

19  should be highly cognizant of the deadlines in my individual

20  rules and practices.  I think they say before jury selection,

21  but if I say before trial, I'm thinking of trial as starting

22  the first day of jury selection.  All requests for jury

23  instructions should come to me.  Even though there is a

24  magistrate judge picking the jury, to the extent there's any

25  dispute about who's going to say what concerning the case or

1  beginning to instruct the jury -- I don't think the

2  magistrate judge is going to give any instructions, other

3  than things like don't read about this case in the media.

4        MR. SIEGEL:  Judge, in our motion that we didn't

5  get to, there's motion about discovery deadlines, and

6  obviously we can't address it, but obviously, we do need that

7  decided so that we all know what deadlines we're talking

8  about.

9        THE COURT:  Discovery deadlines --

10        MR. SIEGEL:  Of, like, when exhibits are due from

11  both sides.

12        THE COURT:  Oh.  What do my individual rules say?

13        MR. SIEGEL:  Your individual rules, I believe, say

14  10 days before trial, so we keyed it to May 10th, so we have

15  it for May 10th for both sides.

16        THE COURT:  Okay.  There you have it.

17        MR. SIEGEL:  Okay.

18        THE COURT:  All right.  Thank you all.  We will be

19  adjourned.

20      (Proceedings adjourned at 12:31 p.m.)

21

22

23

24

25

Superior Reporting Services LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com

1     TRANSCRIBER'S CERTIFICATE

2    I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter.

5

6          April 30, 2024

7    *Laura Hunt*

8
_____  _____

9
Laura Hunt        DATE

10
Legal Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25