UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

                                            **MEMORANDUM & ORDER**
                    -against-                    23-CR-82(EK)

 CARLOS WATSON and OZY MEDIA, INC.,

                    Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Defendants Carlos Watson and Ozy Media, Inc. are
charged with conspiracies to commit wire and securities fraud,
and Watson is charged with aggravated identify theft as well.
Trial is set to begin on May 29, 2024.  Among its motions *in
limine*, the government has moved to exclude the proposed
testimony of two defense experts: David T. Robinson, Ph.D., and
Barry Pincus.  The reports submitted by these experts, or in
respect of their proposed testimony, are attached as exhibits
hereto.

          The Federal Rules of Evidence task district courts
with "ensuring that an expert's testimony both rests on a
reliable foundation and is relevant to the task at hand."
*United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)
(quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S.
579, 589 (1993)).  Thus, while the proponent of expert testimony
bears the burden of establishing its admissibility, the trial

court has a special obligation to act as "the ultimate gatekeeper" of such evidence.  *Id.*; *see also United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015); *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003).

As discussed below, the motion to exclude Professor Robinson's testimony is granted in part and denied in part (with the Court reserving judgment on several specifics).  The motion to exclude Pincus's testimony is granted.  Decisions on the government's remaining motions *in limine* will follow separately, either before or during trial.

## I.   Professor Robinson's Proposed Testimony

Professor Robinson has a doctorate and an MBA from the University of Chicago.  He is currently on the faculty of Duke University's Fuqua School of Business.  The following headings generally track the order of disclosures in his report dated April 12, 2024 (attached hereto as Exhibit A).

## A.   "Bluffing" and "Puffery"

First, the defense has indicated that Dr. Robinson will testify about the use of "bluffs" and "puffery" by start-up companies — especially in the media space — in their capital-raising efforts.  Dr. Robinson has not defined these terms, and his opinions on these subjects are not entirely clear.  Still, some contours have emerged.  At a pretrial conference on January 18, 2024, defense counsel stated that they would call:

an expert to explain to the jury the nature of the venture capital world.  That it's different from PE [private equity].  That the people who enter this world they — what business people call bluff.  What lawyers call mere puffery, that they make claims about the nature of their products.  Everything and everybody is going to create the next Microsoft, the next big thing.

ECF 106, Tr. 18:19-25.  Additionally, Dr. Robinson's initial report states:

When a black, Ivy-league educated entrepreneur (Carlos Watson) engages in puffery it results in a federal indictment; when a rowdy, white Canadian (Shane Smith) or the wealthy white son of a former judge of the New York State Court of Appeals (Ben Smith) does it, it is simply understood as business as usual.

Ex. A at 3.

General testimony about the venture-capital investment process will be permitted.  As best the Court can discern, however, the quoted sentiments appear to contemplate two types of improper testimony.  The attorney's comment implies support for an "everybody does it" defense.  It is well settled, however, that evidence that other individuals engaged in the same (or similar) behavior but were not prosecuted is irrelevant.  Simply put, "that others . . . engag[ed] in improper behavior does not make it lawful."  *United States v. Gatto*, 986 F.3d 104, 129 (2d Cir. 2021); *see also Gonnella v. Sec. & Exch. Comm'n*, 954 F.3d 536, 549 (2d Cir. 2020) ("[T]he fact that behavior is common does not mean it is not fraud."); *United States v. Connolly*, No. 16-CR-370, 2019 WL 2125044, at

*13 (S.D.N.Y. May 2, 2019) ("'[E]verybody is doing it' is not a defense to the crime of wire fraud or conspiracy to commit wire fraud."); *United States v. Mahaffy*, No. 05-CR-613, 2007 WL 1213738, at *3 n.5 (E.D.N.Y. Apr. 24, 2007) ("Industry practice is not a permissible defense to fraud.").[1]

Second, the quote from Dr. Robinson's disclosure sounds in selective prosecution. However, "[b]ecause it involves a defect in the institution of the prosecution, the selective prosecution defense is an issue for the court rather than the jury," *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997), and the Court has already denied the defense's motion to dismiss the indictment on this ground. ECF 132. The government's motives for charging the defendants are not a proper consideration for the jury. *See, e.g. United States v. Knox*, 687 F. App'x 51, 54 (2d Cir. 2017) (upholding instruction that "the government is not on trial" as "appropriate"); *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) ("The Court properly charged the jury to base its decision on the evidence or lack of evidence that had been presented at trial.").

For these reasons and others — including relevance under Rule 401, the lateness of disclosure, and the failure to

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

4

articulate the basis and reasons for these opinions — Dr. Robinson's testimony will be excluded to the extent that it touches on these issues that are not properly before the jury.

**B.    "Prioritizing People" Over Revenue**

Next, Dr. Robinson writes that "the literature is clear that early-stage investors prioritize people and ideas over revenues or profits.  In simple language, they bet on the jockey more than the horse."  Ex. A at 1.  (Beyond referring to "the literature," Dr. Robinson does not identify any specific source.)  These priorities are "especially true," he continues, of investors in content-generating media startups, as opposed to pharmaceutical, biotechnology, and other patent-driven companies.  *Id.*

This disclosure is clearer about the nature of Dr. Robinson's opinions.  Further, while the disclosure that the defense filed with the Court does not cite to any sources, the government submitted on May 24 a defense disclosure that does include a handful of footnotes, as well as two appended scholarly articles on this topic.  ECF 158-1.  Therefore, this testimony will be admissible over a Rule 702 objection, but will remain subject to possible limitation under rules regarding, for example the foundation for the testimony, Rule 401, or Rule 403.

## C.   Definition of "Pro Forma"

Dr. Robinson's report on this subject is concise.  He writes:

> Many startups label their financials "pro forma,"
> "unaudited," "subject to revision," or with some similar
> caveat.  In lay terms, this is a well-accepted signal to
> sophisticated investors that the data they are receiving
> are projections — unaudited estimates — based on
> assumptions about how future events will unfold.

Ex. A at 2.  This definition appears to conflate two concepts: "unaudited" and "pro forma."  Dr. Robinson is therefore directed to amend this report to define these concepts separately and express what he intends to testify about each of them.

The Court currently expects that this testimony will otherwise be admitted, if Dr. Robinson satisfies this directive.

## D.   Highly Speculative Investments

Next, Dr. Robinson writes that "[e]arly-stage investors, unlike investors in mature public companies, realize that their investments are highly speculative."  Ex. A at 2. Dr. Robinson will be permitted to briefly explain, as a means of assisting the jury's understanding of the investment process, that venture capital investors typically expect some degree of failure in their investments.  The relevance of this testimony will be limited, however, because the defendants are charged with conspiracies to defraud investors rather than simple business failure.  Objections relating to such relevance will be

taken up as necessary during trial.  But absent a more definite context, the Court will not categorically prohibit all testimony on this topic at this stage.

**E.  "Black Entrepreneurs"**

Dr. Robinson's report next opines that "black-owned businesses have a more difficult time raising external capital." Ex. A at 2.  He further reports:

> As Columbia Professor Emmanuel Yimfor and his coauthors have carefully detailed, both explicit and implicit bias materially affects the amount of venture investments that black entrepreneurs are able to raise.  Related work by Yimfor and other coauthors has shown that black investment managers are punished in follow-up fundraising after mediocre performance more severely than their white contemporaries with similar performance.

*Id.* at 3.  The relevance of this testimony to the fraud charges at issue remains unclear.  What fact "of consequence in determining" this action would the defendant's race tend to make "more or less probable than it would be without the evidence"? Fed. R. Evid. 401.  Watson does not say,[2] and the Court is unable to hypothesize a valid answer.  *See generally United States v. Dzionara-Norsen*, No. 21-454-CR, 2024 WL 191803, at *4 (2d Cir.

---

[2] In his initial response to the government's motions *in limine* — before making his expert report available — Watson made a general argument about the salience of race.  "More broadly," he wrote, "Mr. Watson's family background, including his race, goes to his intent, state of mind, and / or the lack of intent to commit the alleged crimes."  ECF 123 at 3.  As the government points out, Watson does not say how his race informed his intent (or the lack of it).  ECF 129 at 3.  And his assertion is inconsistent with jury instructions that have been standard in this Circuit for decades.  *See* Leonard B. Sand et al, *Modern Federal Jury Instructions - Criminal*, § 2.01, at Instruction 2-11, *Improper Considerations: Race, Religion, National Origin, Sex or Age* (2023).

Jan. 18, 2024) (upholding preclusion of evidence that "individuals with Asperger's syndrome" were "especially vulnerable to committing this sort of [child pornography] offense"; testimony was "irrelevant because it has no tendency to make the existence of any element of the relevant offenses less likely").

At the risk of stating the obvious, it is not a defense to securities or wire fraud conspiracy that the defendant faced additional — even unfair or illegal — hurdles in his or her capital-raising efforts. *See generally Graham v. Collins*, 506 U.S. 461, 504 (1993) (Stevens, J., dissenting) (referring to the "irrelevant factor of race" in criminal proceedings). Moreover, to the extent this testimony might support a defense argument about selective prosecution, the Court has already articulated why that is not a question for the jury. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) (selective prosecution "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution"); *Regan*, 103 F.3d at 1082.

For these reasons, this aspect of Professor Robinson's testimony will be excluded.

**F.    "Competing Interests"**

The final topic in Professor Robinson's report concerns the *New York Times* and its former columnist — Ben Smith, who (according to the Professor) wrote about Ozy Media for the *Times* while holding Buzzfeed stock options worth approximately $23 million.  Ex. A at 4.  The relevance of this testimony is unstated.  One might speculate that Watson believes Smith's Buzzfeed options gave him a motive to damage (or kill) Ozy, a competitor, from Smith's perch at the *Times*.  As of now, however, this evidence will be provisionally excluded, pending a further written showing by Watson or Ozy — within seven days of this order — regarding its relevance.

## II.  Mr. Pincus's Testimony

The defendants have also indicated their intent to call Barry Pincus, who appears to work for a firm called TechCXO.[3]  Alternatively, they seek to introduce Pincus's analysis of Ozy's financials through the testimony of Dr. Robinson.

Pincus's testimony relates to Ozy's revenue accounting.  From what defense counsel has said, the thrust of

---

[3] Pincus's report – attached hereto as Exhibit B – does not reveal his employer or title.  But the Amended Disclosure as to Expert witness David T. Robinson, Ph. D., which defendants filed on May 22, refers to Pincus's work on an analysis prepared by TechCXO.  Robinson also describes Pincus as the "former CFO for the New York Yankees."  Ex. C at 1.

Pincus's testimony appears to be that even if Ozy's *internal* revenue calculations did not match the numbers that Ozy was sharing *externally* (i.e. with potential investors), the internal calculations were wrong; there was more revenue to be found among the signed contracts in Ozy's possession than its then-serving Chief Financial Officer had managed to record.  Pincus's report is attached hereto as Exhibit B, and the amended Robinson disclosure, which also refers to Pincus's analysis, is attached as Exhibit C.

## A.   Untimeliness

The defense failed to comply with its discovery obligations (and this Court's directives) in respect of Mr. Pincus's testimony.

Rule 16 requires that, upon a request from the government, a defendant must produce certain disclosures relating to any expert witness he intends to call.  Those disclosures must include, among other things, "a complete statement of all opinions" the defense intends to elicit in its case-in-chief, together with "the bases and reasons" for those opinions.  Fed. R. Crim. Proc. 16(b)(1)(C)(iii).

The rule charges the Court with setting a deadline for such disclosures.  In this case, that deadline was February 23,

2024.[4]  On that date, Watson filed a letter indicating that he planned to call three witnesses.  The letter did not name any expert; instead, it provided a paragraph-length summary of each anticipated expert's opinion(s).  ECF 117.  Watson then filed a disclosure for one expert, Dr. Robinson, about six weeks later. Ex. A.  Two days after that, the government reports, defense counsel provided Pincus's name.  At that point, the defense reported that it would call Pincus as a fact witness, not as an expert.  ECF 142 at 2.  At the status conference on April 26, 2024, however, after some colloquy about Pincus's intended testimony, the defense indicated on the record that they would in fact offer Pincus as an expert.  ECF 133, Tr. 45-57.

       The government reports that they then requested expert disclosures for Pincus, as well as the underlying materials for Dr. Robinson's testimony.  ECF 142 at 2.  The defense finally provided a document titled Summary of Revenue Expert Witness Testimony (Exhibit B) on May 1 — less than three weeks before jury selection.  This document provided a set of broad (and

---

[4] When Watson's counsel indicated that he might be unable to provide a full expert disclosure by the deadline, the Court directed him to produce as much as he could by then.  ECF 106, Tr. 20:5-8 (The Court: "[E]ven if you don't have a specific expert engaged by that point, it might behoove you . . . to say as much as you can about what the testimony you envision eliciting is.").  At the same time, the Court made clear that a partial showing might not suffice, stating: "that's not a promise that whatever information [Watson] omits will not be a problem down the line for his request to call that witness"; this is because "everybody has to comply with the rules of discovery in their entirety irrespective of my invitation to make a partial submission."  *Id.*, Tr. 24:2-13.

vague) observations regarding Ozy's revenue, but did not include a sufficient exposition of the basis or reasoning behind such analysis, as discussed more fully in the next section.

Thereafter, the government (again) requested the documents underlying both Robinson's and Pincus's opinions. ECF 142 at 2. Finally, following another status conference, on May 16, 2024, defendants submitted a supplemental expert disclosure indicating (for the first time) that they will seek to introduce Pincus's analysis through Dr. Robinson's testimony. The defense attached a handful of contracts to this supplement — contracts that, they contend, were incorrectly omitted from Ozy's revenue calculations. Ex. C. This came three months after the Court's deadline, and still the intended testimony remains utterly unclear.

This delay is a basis for preclusion in itself. The Second Circuit recently affirmed a district court's decision to preclude an expert who submitted his "*curriculum vitae* and a brief summary of the proposed testimony, but failed to provide a statement of [his] opinions and reasons for them." *Dzionara-Norsen*, 2024 WL 191803, at *4; *see also United States v. Ulbricht*, 858 F.3d 71, 114 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018) (holding that expert witnesses were properly precluded after defendant "did not timely or adequately disclose his intent to

call them"). Given the delay in identifying Pincus as a potential witness, the government was meaningfully prejudiced in its ability to counter his potential testimony (including by engaging an accounting expert of their own, if they deemed it necessary to rebut Pincus). *See Ulbricht*, 858 F.3d at 114 ("The purpose of the expert disclosure requirement is to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.") (citing Fed. R. Crim. P. 16, advisory committee's note to 1993 amendment).

## B.   Inadequate Disclosure

Even when Mr. Pincus's expert disclosure did arrive, it was inadequate by any measure.

The Summary of Revenue Expert Witness Testimony says nothing about Mr. Pincus's qualifications, in contravention of Rule 16(b)(1)(C)(iii). *See* Ex. B.  The supplement at Exhibit C identifies him only as "the former CFO of the New York Yankees." Ex. C at 1.  Nor does Pincus list "all publications" he authored in the previous ten years, as Rule 16 also requires.  Indeed, the report does not even contain basic information from which the government could try to learn these things for itself — for instance, a statement as to where he currently works.

More importantly, Pincus's report leaves the reader to infer what his opinions *are*.  The sentence that seems to best capture one is: "Expert's review confirmed support for revenue amounts listed in the pro forma."  Ex. B at 1.  The disclosure states that Pincus "encountered signed contracts that were not recorded in OZY's books of record," but still reflected revenue that "supported the revenue calculations provided in OZY's pro forma financial statements."  *Id.* at 2.  Supported which revenue calculations, and when?  As best we can understand, Pincus is essentially proposing to perform a restatement of Ozy's revenue reporting on the fly at trial, without showing his work in advance in any meaningful way.

Neither disclosure explains exactly how much revenue should have been recognized from these contracts, in what periods,[5] or *why* this revenue should properly have been recorded.  It is unclear what methodologies and accounting rules Pincus followed in constructing his analysis, and what parameters he employed in identifying contracts that he understands to reflect recognizable revenue.  At one point, the initial report appears to qualify Pincus's opinion about finding "support for revenue amounts" with an equally vague disclaimer: "Expert used several

---

[5] The timing of revenue recognition is of course a critical metric.  *Cf. United States v. Vaccarelli*, No. 20-3768-CR, 2021 WL 4805218, at *1 (2d Cir. Oct. 15, 2021) (medical expert's report properly excluded where, among other shortcomings, it failed to specify "the time period for which his diagnosis applies").

estimates provided by OZY Media, Inc. including discount levels, barter arrangements, revenue bookings and the classification of the various components of revenue." *Id.* at 2.

The defense finally attached nine contracts to the supplemental disclosure as "illustrations of booked revenue" that was improperly recorded. These do little, however, to remedy the deficiencies at issue. Ex. C at 4. For example, the contract with Discover Products appears to be a master services agreement that, by its terms, describes *no* associated revenue. In the Price, Billing and Payment section, the agreement reads: "No Fees will be due or owed with respect to any Services unless and until: (a) the parties execute a Task Order covering such Services; (b) Discover accepts the relevant Services under Section 3; and (c) Discover receives an invoice under Section 8.4 for the relevant fees." Ex. C at 20, ¶ 8.1; *see also id.* at 18 ¶ 2.1 ("Any Affiliate of Discover *may* request Services and execute Task Orders under this Agreement . . . Discover will have no obligation with respect to any draft Task Order unless and until it is executed by Discover.") (emphasis added). Thus, the basis for Mr. Pincus's (or Dr. Robinson's) testimony that Ozy should have recognized revenue from this contract remains elusive.

Mr. Pincus also opines: "Upon reviewing the various presentation decks Expert determined there were some variances

in the numbers, but overall, the decks were within 76% of the actual results as shown on the pro forma with respect to gross revenue." Ex. B at 2. He shows some revenue figures under the heading "Comparisons of Various Company Prepared Decks to the Pro Forma." Those figures are in rows labeled TV, Events, Digital, and "Barter / Other," but there is no supporting detail for these figures (or even an explanation of what "Barter" means).[6] *Id.* at 2-5. The upshot is that the government (and the jury) cannot test the accuracy of these representations in any meaningful way.

In the end, Pincus says virtually nothing about the "bases and reasons" for his (opaque) conclusions. Fed. R. Crim. P. 16(b)(1)(C)(iii); *see also Dzionara-Norsen*, 2024 WL 191803; *Ulbricht*, 858 F.3d 71; *United States v. Vaccarelli*, No. 20-3768-CR, 2021 WL 4805218, at *1 (2d Cir. Oct. 15, 2021) (affirming preclusion of defense expert where notice "failed to specify the basis for his opinion"); *United States v. Mahaffy*, No. 05-CR-613, 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007); *United States v. Wilson*, 493 F. Supp. 2d 484, 487 (E.D.N.Y. 2006); *United States v. Daskal*, No. 21-CR-110, 2023 WL 9424080, at *11

---

[6] At the status conference on May 16, 2024, defense counsel explained that Ozy earned "barter revenue," meaning "In exchange for X we'll give you Y. That has value and accountants value it and it should be in the financial statements. Any and every expert will tell the Court that." ECF at 21:22 – 22:1. Pincus has not identified any specific "X" or "Y", despite this summary by counsel.

(E.D.N.Y. July 12, 2023).  Therefore, Pincus's testimony and analysis will be excluded, both as testimony from Pincus himself, and as a source for Dr. Robinson's testimony.

### III. Conclusion

For the foregoing reasons, the government's motion is granted in part and denied in part.


SO ORDERED.




_ /s/ Eric Komitee _____
ERIC KOMITEE
United States District Judge


Dated:   May 26, 2024
         Brooklyn, New York