UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

                                        **MEMORANDUM & ORDER**
                                          23-CR-82(EK)

          -against-

 CARLOS WATSON and OZY MEDIA, INC.,

               Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Before the Court are two defense motions, both seeking

to dismiss this case.  These motions were filed well after the

close of pretrial motion practice; the defense reports that they

were prompted in part by the exchange of 3500 material shortly

before trial.  The first is a motion to dismiss — or to transfer

this case to a different district — based on pretrial publicity.

ECF 130.  The second is a motion to dismiss, or in the

alternative to disqualify the United States Attorney's Office

from the case and suppress certain evidence, based on the

government's alleged access to certain privileged materials and

information.  ECF 131.  Familiarity with the facts and

procedural posture of this case is largely assumed.

          The Court previously declined on the record to dismiss

or transfer this case.  The reasons for the denial of those

late-breaking remedies (and other associated relief) are now set forth below.

## I.   Motion to Dismiss or Transfer

Both defendants moved to dismiss the indictment, or in the alternative to transfer venue, arguing that the government's failure to remove allegedly disparaging language about the defendants from a post on its "X" account irrevocably tainted the jury pool.

### A.   Legal Standard

In exceptional cases, a sufficient volume of "unfair and prejudicial news comment" concerning a pending trial may undermine a defendant's due process right to an impartial jury. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966);[1] *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979).  The party moving for relief on this basis must, however, meet a high threshold — for example, by establishing that the publicity has been so pervasive as to engender a "huge . . . wave of public passion." *Sheppard*, 384 U.S. at 351.

In such cases, the court may transfer the case to another jurisdiction pursuant to Rule 21(a) or take other, more measured steps.  *Id.* at 363; *accord Estes v. State of Tex.*, 381

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

U.S. 532 (1965).  Transfer is appropriate when the defendant faces "so great a prejudice" that he "cannot obtain a fair and impartial trial" in the district in which he was charged.  Fed. R. Crim P. 21(a).  But "to prevail on a motion under Rule 21(a), the defendant must show a reasonable likelihood" that the media coverage would have such a prejudicial effect.  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990).  Rule 21(a) "applies only in extraordinary circumstances." *United States v. Shea*, No. 20 CR. 412-4, 2022 WL 4298704, at *3 (S.D.N.Y. Sept. 19, 2022); *accord United States v. Awadallah*, 457 F. Supp. 2d 246, 250 (S.D.N.Y. 2006).

Dismissal is a potential remedy in still rarer circumstances, available only if the government has engaged in conduct that was "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (quoting *United States v. Russell,* 411 U.S. 423, 431-32 (1973)).[2]

**B.  Discussion**

The facts at issue here do not come close to meeting the standard for dismissal or transfer.  In March 2023, Watson

---

[2] Local Rule 23.1 allows a separate remedy for adverse pretrial publicity: the issuance of a "special order" limiting extrajudicial statements to redress the risk of tainting the jury pool.  No party has requested such an order in the instant motion.

moved for an order directing the U.S. Attorney's Office to
remove statements made in a press release.  Def. Mar. 10, 2023
Letter 5-6, ECF 33.  In response, the Court observed that
certain of the statements at issue were in tension with, if not
contrary to, Local Rule 23.1.  Mem. & Order, ECF 96, at 37-41.
The Court's order invited the government to consider removing
the language from the press release — a "relatively modest" ask,
see *United States v. Perryman*, No. 12-CR-0123, 2013 WL 4039374,
at *13 (E.D.N.Y. Aug. 7, 2013).  But the Court reserved judgment
concerning the issuance of any "special order" pursuant to the
local rule.  *Id.* at 40-41; *see also* Local R. Crim. P. 23.1(h)
(setting out the "special order" option).  In response, the
government removed the quote at issue.  ECF 100.

Now, the defendants raise the issue again.  Despite
the removal of the relevant language in the press release, the
defense says they have suffered additional prejudice from the
government's decision not to remove the same language from a
post on its X account.[3]  Through this decision, the defense
argues, "the government has prejudiced Mr. Watson such that he
is unable to receive a fair trial."  ECF 130 at 3.

---

[3] The post itself, which the defense does not quote or link to, appears
to read only: "Ozy Media and its Founder Carlos Watson Indicted in a Years-
Long Multi-Million Dollar Fraud Scheme" and links to the press release that
was at issue in the prior order.  However, because the post was made before
the press release had been updated, the quote visible in the linked article
reads: "As alleged, Carlos Watson is a con man whose business strategy was
based on outright deceit and fraud."  *See*
https://x.com/ednynews/status/1628806662604693506?s=46.

Defendants have not, however, put forth any evidence suggesting that the media at issue was particularly pervasive, or that the public reaction thereto was particularly strong. Instead, the defendants cited a small handful of news articles that include disparaging descriptors of the defendants, none of which reference (let alone quote) the U.S. Attorney's Office's X account.  They also proffer statistics regarding articles with certain key words.  In the end, though, they have not demonstrated that the post at issue — a drop in the ocean of social media content — so pervaded this district as to preclude a fair trial for defendants. *See Maldonado-Rivera*, 922 F.2d at 967 (upholding denial of transfer motion even when news coverage had been "continuing and prominent"); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) ("[W]e have held in other cases that trials have been fair in spite of widespread publicity."); *see also Shea*, 2022 WL 4298704, at *3.

As courts in this circuit have recognized, "[m]any high profile cases have been tried in the Southern and Eastern Districts of New York, and courts have relied on thorough voir dire examinations to produce unbiased juries." *Awadallah*, 457 F. Supp. at 254; *accord United States v. Livoti*, 8 F. Supp. 2d 246, 249 (S.D.N.Y. 1998); *Sabhnani*, 599 F.3d at 234.  Indeed, voir dire has produced unbiased juries in cases involving subject matter far more inflammatory that that at issue here,

such as organized crime, bombings of public places, and high-profile police brutality.  *See United States v. Volpe*, 42 F. Supp. 2d 204, 218 (E.D.N.Y. 1999) (collecting cases).  The motion to transfer is therefore denied.

Given that the government's actions do not warrant transfer under Rule 21, the omission to remove the single X post certainly does not meet the higher standard of "extreme," "outrageous," or conscience shocking conduct that would constitute a due process violation.  Accordingly, the motion to dismiss on this basis is denied.

## II.  Motion to Dismiss, Disqualify the U.S. Attorney's Office, and / or Suppress Evidence

Both defendants also moved to dismiss the indictment for what they say was the government's invasion of the attorney-client privilege in violation of their Sixth Amendment rights. In the alternative, they moved to disqualify the prosecution team and to preclude the government from using certain disputed materials at trial.  ECF 131.

Ozy and Watson contend that the government invaded "[t]he privileged relationship [with] Defendants' counsel," ECF 131 at 2, and contravened the work product doctrine through its contact with two nonlegal firms' personnel.  First, the defense objects to government interviews of David Slayton and his colleagues at the Berkley Research Group (BRG).  BRG "provid[ed]

6

financial advisory and consulting services" to Ozy Media; the defense reports that BRG's remit included "the review . . . of [Ozy's] financial reporting."  ECF 131 at 2.

The defense also objects to government interviews of accountants at Waxman & Bland CPAs (W&B), which was engaged by Dechert LLP.  The description of W&B's remit is even more generic than that of BRG's: they were engaged "to assist Dechert in its provision of legal advice to Carlos Watson and OZY Media."  *Id.* at 3.  The government interviewed W&B accountants including Frank Bland and Joe Clemente.

Because the defendants have adduced insufficient evidence to establish that the materials at issue were privileged or protected, and because they have waived any potential protection anyway, this motion is denied.

## A.   Background

In October 2021, King & Spalding — then representing Ozy — signed an engagement letter with BRG.  ECF 131 at 2.[4] Slayton began work with Ozy that same month.  *Id.* at 2-3.  A few months later, in January 2022, a partner at Dechert LLP and Watson signed a separate engagement letter with W&B, and Bland began accounting and advisory work with Ozy.  *Id.* at 3. Exhibits to the government's submission indicate that Dechert

---

[4] The defense motion does not specify whether Watson had an attorney-client relationship with King & Spalding in his individual capacity.

LLP represented Watson at the time.  ECF 134-5.  Clemente became Ozy's interim Chief Financial Officer in August 2022.  *Id.*; ECF 134 at 2.  Apart from that, the defendants have not explained the mandate to Slayton, Bland, or Clemente with much specificity.  Indeed, to the extent the defense does provide specifics, they speak to the provision of business, not legal, services.[5]  The defense likewise has not said what the state of the government's (or grand jury's) investigation was at this time.

   We do learn that the grand jury was investigating by October 2022, when the Federal Bureau of Investigation began to conduct interviews, in certain instances together with U.S. Attorney's Office personnel.  That month, the government informed counsel at Ford O'Brien Landy LLP — which by then had apparently taken over representation of Ozy Media — that they intended to interview Slayton.  In response, Alexander Shapiro of Ford O'Brien emailed the government explicitly confirming that Ozy would *not* assert privilege over Slayton's interview or

---

[5] For example, the defense states that after Clemente "started consulting" for Ozy, his "focus was 'on budgeting, driving sales, and cash management.'"  ECF 131 at 4.  Clemente also "participated in calls or meetings with several Ozy investors."  *Id.*  The defense also quotes an FBI memorandum indicating that Bland undertook a "project" to "replace 'gross revenue' with 'net revenue' on Ozy's profit and loss statement."  *Id.* at 5.  The construction of an income statement is, of course, a basic function of corporate finance and accounting professionals at companies — especially those engaged in ongoing calls and meetings with investors.  In the end, the defense offers no coherent explanation as to why this "project" entailed a legal, rather than business, purpose.

the documents he produced in connection with it.  ECF 134 at 2;
*see also id.* Ex. A, Def. Counsel Email, ECF 134-1 ("This will
confirm that we are not asserting any privilege with regard to
Mr. Slayton's interview or the documents he is producing to
you.").  Two days later, the government went ahead with the
interview.  ECF 131 at 4.

The government interviewed Clemente in March 2023.
*Id.*  Following that interview, Clemente emailed the government
"documents."  The defense does not say anything about the
contents of these documents, apart from offering the conclusion
that they were "protected by the attorney-client privilege."
ECF 131 at 4.  The next month, the government produced the
materials received from Clemente to (or back to) the defendants
pursuant to Rule 16.  *Id.*; ECF 134 at 3.  In June, Clemente sent
additional, also unspecified, documents to the government ahead
of a second interview conducted later that month.  ECF 134 at 5.

Following receipt of these documents, the government
reached out to Clemente's personal counsel to ask whether the
attorney had reviewed the Clemente materials for privilege with
Ozy Media.  *Id.* at 2.  Clemente's counsel replied that he and
his client were "not aware of any arrangement by which Waxman
and Bland would be within a privilege with Ozy Media, so our
assessment was that any privilege regarding these documents had
been waived by their being shared with Waxman and Bland."  *Id.*

Ex. C, ECF 134-3 at 2.  The government produced these documents, too, to the defense pursuant to Rule 16 in July 2023.  Despite these productions, the defense did not assert a privilege until the filing of the instant motions in April 2024.  ECF 134 at 3.

Also in July 2023, law enforcement agents conducted their first interview with Bland, outside the presence of the prosecution team.  ECF 131 at 6.  Between this interview and August 2023, the government communicated with Bland over email; like Clemente, Bland shared documents (though, again, the defense does not identify the contents or nature of these documents).  *Id.*  However, these materials, as well as the notes and report from the Bland interviews, were reviewed by a filter team in the first instance, to assess any potential privileges.  ECF 134 at 4.  After determining that the materials were not privileged, the filter team provided all relevant documents to the defense.  They requested that the defense inform them of any privilege they intended to assert over the materials before February 19, 2024, when the materials would be released to the prosecution.  The defense did not respond or otherwise assert privilege in response to this communication.  *Id.*

In August 2023, the government approached Watson's trial counsel to discuss the issue of privilege as to the Clemente materials.  The government informed Watson's counsel that "[b]ased on [their] understanding that Clemente was Ozy's

10

interim CFO and acted on Ozy's behalf in dealings with third parties, [they] understand that Waxman & Bland provided accounting work for Ozy, not for Ozy's attorneys, so *Kovel* would not apply."  ECF 134-5 at 5 (referring to *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)).  Watson's counsel responded that "Dechert engaged the Waxman & Bland [sic] for the purpose of providing legal advice to Mr. Watson & Ozy.  Accordingly, their communications are privileged."  *Id.* at 4.

Again, however, defense counsel did not specify the nature of the accountants' work.  The government requested a privilege log and a copy of the engagement letter, but defense counsel provided neither.  *Id.*  As a result, the government informed the defense that they would proceed on the understanding that "there is no privilege with Waxman & Bland," and suggested that the defendants could raise the issue with the Court if they disagreed.  *Id.* at 1.  The government interviewed Bland a second time in October 2023, and defendants did not pursue the matter until the filing of this motion in April 2024.

## B.  Discussion

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."  *United States*

*v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).  In order to balance litigants' interest in confidentiality with the public interest in disclosure, courts "apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly." *Id.*

The related — but conceptually distinct — work product doctrine protects documents "prepared (1) 'in anticipation of litigation' (2) by a party or its representative and (3) not in the ordinary course of business." *Ricoh Co. v. Aeroflex Inc.*, 219 F.R.D. 66, 68 (S.D.N.Y. 2003) (quoting Fed. R. Civ. P. 26(b)(3)); *see also United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998) (explaining that this doctrine protects "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation").

The attorney client privilege and work product doctrine can extend to communications with financial professionals.  This is the case when the communications are "made in confidence for the purpose of obtaining legal advice," and the presence of the accountant is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Kovel*, 296 F.2d at 922.  If, however, "what is sought is not legal advice but only accounting service . . . or if the advice

12

sought is the accountant's rather than the lawyer's, no
privilege exists." *Id.*

### 1. Defendants Have Not Established the Existence of a Privileged Relationship

To establish the existence of a privilege that
encompasses an accountant or financial advisor, defendants must
present "sufficient evidence" that the material at issue
constituted "communications made to [the accountant], in
confidence, in [his] capacity as an agent of an attorney for the
purpose of obtaining legal advice from that attorney." *Von
Bulow by Auersperg v. Von Bulow*, 811 F.2d 136, 146 (2d Cir.
1987); *see also United States v. Ackert*, 169 F.3d 136, 139–40
(2d Cir. 1999) (holding communications with an investment banker
unprotected, and noting that *Kovel* applies only when "the
purpose of the third party's participation is to improve the
comprehension of the communications between attorney and
client"). The ultimate "caveat" to the rule of *Kovel* and its
progeny "is that the advice rendered must be that of the
attorney, not the agent." *Gucci Am., Inc. v. Guess?, Inc.*, 271
F.R.D. 58, 70–71 (S.D.N.Y. 2010). Given that, "[c]ourts must
narrowly construe the exception to third-party waiver recognized
in *Kovel*." *In re Restasis (Cyclosporine Ophthalmic Emulsion)
Antitrust Litig.*, 352 F. Supp. 3d 207, 211 (E.D.N.Y. 2019).

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow*, 811 F.2d at 144.[6]  "That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."  *Id.* at 146.  Instead, "[t]his burden can be met only by an evidentiary showing based on competent evidence."  *Bowne*, 150 F.R.D. at 470.  Such a showing is typically made through the use of affidavits, *id.* at 472, or, in cases involving a high volume of materials, through a privilege log that is "adequately detailed" — meaning that "as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege."  *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 47 (E.D.N.Y. 2011).

Defense counsel produced no such affidavits or privilege log.  Perhaps more importantly, the defense has not offered a general definition of the universe of materials at issue, let alone the specific contents thereof.  And as noted above, the defense has not told us how the accountants at issue

---

[6] Similarly, the "heavy" burden of establishing work product protection rests with the party asserting it.  *See United States v. Correia*, 468 F. Supp. 3d 618, 624 (S.D.N.Y. 2020); *Harris v. Provident Life & Accident Ins. Co.*, 198 F.R.D. 26, 29 (N.D.N.Y. 2000).

were functioning as agents of the attorneys, rather than performing necessary accounting services.  As a result, we cannot ascertain whether the documents and communications at issue were "nearly indispensable or served some specialized purpose in facilitating the attorney-client communication," as courts in this Circuit have required.  *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999).

    What defendants do include is a handful of factual assertions that, if anything, suggest that the accountants' (and consultant's) work in this case was unprivileged from inception. For example, the defense refers to Bland's explanation that Dechert LLP hired him to "clean up the ledger."  ECF 131 at 4-5. With another Ozy finance professional — Claire Lightfoot — the government "delved into" Ozy's "failure to keep Netsuite [Ozy's accounting software] properly updated."  *Id.* at 4, 14; *see also* note 5, *supra*.  Given that Ozy still had obligations to its investors, revenue authorities, and other constituencies, there were business reasons to maintain these accounting records.

    In the end, the defense falls back on high-level generalities — for example, that the government learned form Slayton that "Ozy's legel counsel, King and Spalding, contacted BRG to assist with Ozy."  ECF 131 at 4; *see also id.* (referring to government agent's note from Slayton interview that "OZY law

firm engaged BRG to help").  Ultimately, the defense contends
that the interviews at issue "allowed [the government] access to
privileged information and the core theory the defense
elucidated in regards to OZY Media's revenue."  *Id.* at 10-11.
But they do not articulate, at least with any precision, what
this theory is, let alone how attorneys' communications are
implicated.  Instead they suggest only that it relates to
concepts like "Watson's revenue defense," the "Bland / Waxman
revenue analysis," "barter revenue," and the status of Ozy's
NetSuite account, all of which the defense refer to as
"privileged topics."  *Id.* at 12-13.[7]

These assertions do not suffice to establish that the
accountants' communications were privileged.  Here, as in other
cases, there remains "no concrete evidence on a host of key
issues" such as "whether any, some or all of the documents at
issue were communications for the purpose of facilitating the
rendition of legal advice or other types of legal services by
the attorney to the client" or were "intended to be and were

---

[7] This notion of privileged "topics" is in tension, at least, with
settled precedent dictating that the privilege covers *communications*, not
facts or other informational content.  "The privilege only protects
disclosure of communications; it does not protect disclosure of the
underlying facts by those who communicated with the attorney."  *Upjohn Co. v.
United States*, 449 U.S. 383, 395 (1981); *see also, e.g.*, *In re Grand Jury
Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984)
("[I]t is important to bear in mind that the attorney-client privilege
protects communications rather than information; the privilege does not
impede disclosure of information except to the extent that that disclosure
would reveal confidential communications.").

kept confidential." *Bowne*, 150 F.R.D. at 472.  There is similarly no evidence regarding "which of the documents and oral communications that [defendants] claim[] are covered by the work-product rule were in fact made principally in anticipation of litigation and which were made principally for other purposes." *Id.*

Defendants also fail to "establish . . . the essential elements of the privileged relationship," *von Bulow*, 811 F.2d at 144, with respect to the individuals at issue — namely, whether they are *properly* considered agents of the defense at all. Instead, they make a number of generic and "conclusory invocations of the privilege or work-product rule." *Bowne*, 150 F.R.D. at 474.  The defendants' statement that the professionals at issue "were and are agents of defense counsel whose work is protected" does not make it so.  ECF 131 at 3.  Indeed, it is well settled at this point that a financial professional's "inexplicable retention by [the defendant's] personal lawyers, rather than the Company" — as we see here — "cannot magically transform routine corporate accounting work into a protected *Kovel* relationship." *United States v. Hatfield*, No. 06-CR-0550, 2010 WL 183522, at *2 (E.D.N.Y. Jan. 8, 2010).

Thus, the defendants have not established that the protection of the attorney-client privilege or work-product

doctrine should be accorded to the documents or communications at issue.

### 2. Defendants Have Waived Any Potential Privilege or Protection

Even if any of the documents or communications at issue were in fact initially protected, that protection has been waived.  "[I]t is the client's responsibility to insure continued confidentiality of his communications."  *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987).  The failure to do so results in waiver of applicable privileges.  *Id.*  The party seeking to assert a privilege must take "affirmative action" to maintain this confidentiality.  *Id.; accord Niceforo v. UBS Glob. Asset Mgmt. Americas, Inc.*, 20 F. Supp. 3d 428, 437 (S.D.N.Y. 2014)*; see also In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973) ("It is not asking too much to insist that if a client wishes to preserve the privilege . . . , he must take some affirmative action to preserve confidentiality.").[8]  Such action must be taken in a "timely" manner.  *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (work product protection waived because

---

[8] Additionally, "work product privilege is waived when protected materials are disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information." *Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 103 (S.D.N.Y. 2000).

not asserted timely); *Brown v. Dep't of Corr. Servs.*, No. 09-CV-00949S F, 2011 WL 2182775 (W.D.N.Y. June 2, 2011) (same as to attorney client privilege).

### a. Slayton and BRG Materials

With respect to the Slayton interview and BRG materials, Ozy Media's former counsel explicitly stated that they would not assert any privilege over these materials. *See* Def. Counsel Email, ECF 134-1 ("This will confirm that we are not asserting any privilege with regard to Mr. Slayton's interview or the documents he is producing to you."). This unequivocal waiver destroys any protection over these materials, to the extent that any existed, as both attorney-client and work product privileges can be waived.[9]

### b. Waxman & Bland Materials

The defense also waived privilege and work product protection over the Clemente and Bland materials, if one ever existed, by failing to assert these protections on a timely basis. As the government explains, the defendants took no

---

[9] While the attorney-client privilege belongs to, and may be waived only by, the client, a "client may nonetheless by his actions impliedly waive the privilege or consent to disclosure," and "an attorney may, in appropriate circumstances, possess an implied authority to waive privilege on behalf of his client." *In re von Bulow*, 828 F.2d at 100-01. Here, despite the government's argument regarding waiver, the defendants have not asserted that prior counsel's waiver was made against their will or without authorization.

"affirmative action" to assert privilege over the W&B materials between the time they were produced in discovery, in April and July 2023, and the filing of the instant motion nearly a year later.  ECF 134 at 3.  Privilege may be waived when, as here, a defendant "failed to assert it for more than six months *after* learning that the Government had obtained the document."  *United States v. Schulte*, No. 17-CR-548, 2022 WL 1284549, at *2 (S.D.N.Y. Apr. 29, 2022).

Similarly, when the government asked explicitly about the W&B materials in August 2023, the defense failed to state a basis for the privilege they sought to invoke, to provide a privilege log, or to object when the government informed them that they would proceed as if no privilege existed.  ECF 134 at 3.  This, too, constitutes a waiver, as "privilege is waived if the disclosing party failed to take reasonable steps to maintain the confidentiality of the assertedly privileged documents."  *de Espana v. Am. Bureau of Shipping*, No. 03-CV-3573, 2005 WL 3455782 (S.D.N.Y. Dec. 14, 2005); *see also S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 145-56 (S.D.N.Y. 2004) (finding documents withheld as "communications with counsel" an insufficient basis to sustain an assertion of privilege).  As to the Bland materials, the defense failed an additional time to assert privilege, when they did not respond to the filter team's direct request to inform them of any intent to protect these

documents.  ECF 134 at 4.  Any claim of privilege or work product protection that the defense may have had over the Waxman & Bland materials has thus been waived.

### III. Conclusion

For the foregoing reasons, the motions to dismiss, as well as the alternative relief requested therein, are denied.


SO ORDERED.


                                   /s/ Eric Komitee
                                  ERIC KOMITEE
                                  United States District Judge


Dated:     June 27, 2024
           Brooklyn, New York