UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES,

                                        **MEMORANDUM & ORDER**
                                         23-CR-82 (EK)

            -against-

 CARLOS WATSON and OZY MEDIA, INC.,

                Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

        Trial is currently proceeding in this case.  The
defense indicated its intention to call Beverly Watson, the
individual defendant's sister, in its case-in-chief.  The
government moved to preclude her testimony based on what it
calls the defense team's "repeated and flagrant" violations of
court orders and the Federal Rules of Criminal Procedure.  Mot.
*in Limine* to Preclude Testimony of Beverly Watson at 6, ECF No.
221; *see also* Mot. to Exclude Additional Defense Witnesses, ECF
No. 214.

        The government's motion is also predicated on Federal
Rules of Evidence 401 and 403.  In response, the defense
proffered that Ms. Watson is a former executive of Ozy who could
testify about Ozy's revenue and operations.  ECF No. 218 at 3.
The defense later added that they "plan to inquire [of Ms.

Watson] as to the formation of OZY which she was present for and a part of." Tr. 2968:6-8.[1]

The government replied that it understands the period of Ms. Watson's employment at Ozy to post-date the indictment period in this case entirely. *E.g.*, *id.* at 3072:3-13 (Ms. Watson "worked at the company, at least according to the press release, starting in 2022, which is all post the conspiracy"); *see also* ECF No. 214 at 5-7; ECF No. 221 at 6-7.

The Court granted the motion to exclude Ms. Watson's testimony, ECF No. 232, and this memorandum memorializes the reasons for that order. The motion is granted to remedy willful violations of the Court's orders regarding notice and discovery, under Rule 26.2 and otherwise. Those violations involved materials related to Beverly Watson specifically, as discussed below. In addition, the broader pattern of abuses throughout this case demonstrates the willfulness of the defense's conduct, so that broader pattern is discussed below in some detail. The testimony is further excluded under Rules 401 and 403.

## I.   Background

The government's motion to preclude describes a series of notice and discovery violations by the defense. These include violations of the defendants' legal obligations pursuant

---

[1] All citations to "Tr." without further descriptive language are citations to the trial transcript.

to grand jury subpoenas issued to Ozy Media and Mr. Watson in October 2021, *see* Gov't Mot. to Compel, ECF No. 59, at 1; Ex. A, ECF No. 59-1; Ex. B, ECF No. 59-2.; and revised in July 2022, *see* Gov't Mot. to Compel, at 1-2; Ex. C, ECF No. 59-3; Ex. D, ECF No. 59-4.  They also include violations of the Court's order of compulsion, which directed the defense to comply with those subpoenas on or before September 11, 2023.  ECF No. 81.  Lastly — and most central here — is the defense's failure to meet the schedule for the production of witness statements pursuant to Fed. R. Crim. P. 26.2 — a schedule that was agreed upon by both parties and so-ordered by the Court.  *See* ECF No. 125; April 12, 2024 Order.

Although documents relating to Ms. Watson are implicated in each of these categories, the discovery violations at issue have not been confined to documents relevant to Ms. Watson's testimony.  The story of this case has been, in large part, a function of the current defense team's decision to treat as optional a variety of rules, deadlines, and court orders relating to discovery and witness statements — notwithstanding repeated government motions for relief, and repeated inquiries from the Court.

As discussed in further detail below, the defense has responded to the Court's inquiries throughout with generalities and platitudes, promises to provide additional responses that

3

never materialized, and — at times — factual representations that turned out to be false.  This has led to persistent inefficiencies in the management of this trial.  Among other things, the defense's decision to produce no exhibits — literally none — on the agreed-upon, court-ordered schedule, precluded the government from moving *in limine* to exclude these documents before trial, and required the jury to be excused for substantial periods of time in the middle of trial while such objections — many relating to discovery failures — were argued.  Throughout that period, the Court has been unable to elicit specific, accurate information from defense counsel about the discovery timeline.[2]

A detailed — but by no means exhaustive — recitation of this noncompliance follows.

## A.    Noncompliance with Grand Jury Subpoenas

A grand jury sitting in this district issued subpoenas to both Ozy and Mr. Watson in October 2021.  *See* Gov't Mot. to Compel at 1; Ex. A, ECF No. 59-1; Ex. B, ECF No. 59-2.  A number of productions, all made by prior counsel to the two defendants, followed.  But the government informed defense counsel that it

---

[2] In addition to the inefficient use of the jury's time, these failures of production and candor led the Court to observe that it was "flying with less instrumentation, less lighting than I would like to be flying through this trial on the subject of evidentiary objections."  Tr. 1960:20-22; *see generally United States v. Nobles*, 422 U.S. 225, 235 (1975) (noting that the discovery rules are designed "to enable the district court to avoid unnecessary delay or multiplication of motions," among other purposes).

had identified meaningful gaps in these productions.  Gov't Mot. to Compel.  The grand jury then issued revised subpoenas in July 2022.  These subpoenas called for production of the same documents but clarified, among other things, that Mr. Watson was being served as a corporate custodian for Ozy, rather than in his personal capacity.  *Id.*; *see* Ex. C, ECF No. 59-3; Ex. D, ECF No. 59-4.

Still, the government reported, "Watson never produced any emails from any Ozy email accounts in his possession — rather, the productions were primarily composed of emails from a personal email account and text messages."  Gov't Mot. to Compel, at 2.  The government indicated to Ozy's prior counsel, Ford O'Brien Landy LLP, that it had obtained documents from third parties that were responsive to the subpoenas but had not been produced.  These included, importantly, weekly emails to Mr. Watson tracking Ozy's revenue.  (Prior counsel had produced some examples of these, but not all.)  Gov't Mot. to Compel, at 2.  Ford O'Brien told the government that it was continuing to search for documents and would make rolling productions.  *Id.* Ford O'Brien discontinued its representation of the company, however, prior to the filing of the indictment, as did Dechert LLP (prior counsel to Mr. Watson).

**B.    The Case is Filed, and Current Counsel Enters the Case**

The grand jury returned the indictment in this case in February 2023, and defendant Watson made his initial appearance before a magistrate judge — still represented by prior counsel — that same month.  At a status conference on April 21, 2023, the Court set the case for trial on May 29, 2024.  Min. Entry, ECF No. 56.

On May 4, 2023, the government moved to compel compliance with the subpoenas.  Gov't Mot. to Compel, at 1.  They argued that, eighteen months after the subpoenas were issued, the defendants' productions remained incomplete despite numerous conversations between defense counsel, the government, and the Court about compliance.  *Id.*

On May 17, 2023, Mr. Watson's prior counsel wrote to say that Mr. Watson wished to change counsel to his current defense attorney, Ronald Sullivan, Esq.  ECF No. 61.  The Court reserved judgment on that request until the status conference set for a week later, on May 24, and asked that Mr. Sullivan appear at that conference.  May 18, 2023 Order.  At the conference, the Court noted that some prior confusion about Mr. Watson's representation had led to the defense missing the deadline to respond to the government's motion to compel.  May 24, 2023 Status Conf., ECF No. 66, Tr. 3.  The Court continued:

> I understand that [the missed filing deadline] was
> attributable to a misunderstanding or miscommunication
> between incoming and outgoing counsel and those things
> happen.  But the high-level message I want to get
> across first is this case is set to go to trial in May
> of 2024, so about a year from now, and I have every
> expectation that that schedule will hold.  And so
> before we proceed actually to grant the motion for
> substitution of counsel here, I just wanted to hear
> from Mr. Sullivan whether you believe you're in a
> position to meet the existing schedule.  And I mean
> not just the existing schedule for jury selection and
> trial, but also we have a handful of motions, the
> briefing of which is in progress.  And I want to make
> sure those kind of intermediate deadlines will hold as
> well.

*Id.* at 3:25-4:13.

Mr. Sullivan responded that he was available to try the case as scheduled.  He went on to indicate: "With respect to things on the scheduling order, which I have looked at, I can certainly say that I should be prepared to meet those."  *Id.* at 4:18-20.[3]  These "things" that had already been the subject of the Court's scheduling order included, of course, the government's motion to compel compliance with the grand jury subpoenas issued to Ozy and Mr. Watson.

Based on these representations, the Court authorized prior counsel's withdrawal.  Mr. Sullivan filed his initial notice of appearance on May 30, 2023.  ECF No. 68.

---

[3] Mr. Sullivan qualified this by saying that he could envision "that something in one particular incident pops up that I might need more time. I don't know. But for the most part I can represent to your Honor that nothing in the scheduling order seems prohibitive for me to meet."  *Id.* at 4:21-25.

## C.    The Court Orders Compliance With The Subpoenas

Defense counsel opposed the motion to compel compliance with the two grand jury subpoenas on the grounds that Mr. Watson and Ozy had made efforts to comply with the subpoenas, and that the subpoenas were unreasonable and oppressive.  ECF No. 64.  Mr. Watson also contended that he had a Fifth Amendment right not to be involved in the production, and that the Court should allow him to appoint a "substitute" corporate custodian — a third-party from outside the company — to effectuate the responses.  *Id.* at 10-12.

Notwithstanding these objections, the Court granted the government's motion to compel compliance on July 28, 2023.  ECF No. 81.  The Court also denied Mr. Watson's request for a "substitute corporate custodian," holding that Mr. Watson, acting in a representative capacity on behalf of Ozy, could not assert a Fifth Amendment act-of-production privilege to discharge his obligations under the subpoenas.  *Id.* at 19-24.[4]

The Court's order directed the defense to comply with the subpoenas within 45 days.  *Id.* at 26.  The final day of this period was September 11, 2023.  On that date, Mr. Sullivan produced approximately 3,093 documents to the government.  ECF No. 228; Ex. A, ECF No. 228-1; ECF No. 227; Ex. A, ECF No.

---

[4] Mr. Watson confirmed, in his trial testimony, that he remains CEO of OZY to this day.  Tr. 3737:21-22.

227-1.  This represented less than one-half of one percent of
the documents the current defense team would later *themselves*
acknowledge to be responsive.[5]  Despite that failure to produce
more than 99% of the responsive material in compliance with the
Court's order, the defense never wrote to the Court to ask for
more time or indicate that a rolling production was
necessary.[6]

Mr. Sullivan also asserted that the attorney-client
privilege protected some documents that would otherwise be
responsive to the grand jury subpoenas, *see* ECF No. 228; Ex. C,
ECF No. 228-3, and undertook to provide a privilege log.  *Id.*;
Ex. A, ECF No. 228-1 ("We have additional documents over which
we assert privilege, and we will provide a privilege log
shortly.").  The government has indicated — and Mr. Sullivan has
not disputed — that the promised privilege log never
materialized.  ECF No. 228 at 1.

---

[5] The defense produced another 685,900 documents after the deadline
passed and the government advised the defense that the production was "not
acceptable."  ECF No. 228-2.  3,093 represents .45 percent of that universe:
3,093 + 685,900 = 688,993; 3,093 / 688,993 = .00448.  As noted below,
additional responsive documents were produced even later, including during
trial.

[6] This case has also witnessed, at times, a lack of clarity as to which
lawyer was in charge of the production.  As noted, Mr. Sullivan made the
production on September 11 — presumably because his client, Mr. Watson,
served as a custodian of Ozy's documents.  *See* ECF No. 228 at 1; Ex. A, ECF
No. 228-1; Order to Compel at 19-24 (discussing Watson's role as corporate
custodian).  Just recently, however, Mr. Sullivan suggested that he has no
proper role in this process.  *See* July 5, 2024 Def. Letter , ECF No. 226.

As discussed further below, some of the documents that the defense later produced as witness statements under Rule 26.2 are responsive to the grand jury subpoenas. But these documents were not produced until well after trial began. *See* ECF No. 214 at 4 n.3; ECF No. 221 at 3-4.

The defense's failure to comply with the grand jury subpoenas and Federal Rules has been raised over and over at trial, causing delays and raising the substantial likelihood that responsive documents remain unproduced even to this day. The following exchange is representative of the defense response to these issues:

> **The Court:** [D]oes the defense dispute that the Government does not have this [investment agreement]?
>
> **Mr. Sullivan:** Yes, of course we dispute it.
>
> **The Court:** When was it produced?
>
> **Mr. Sullivan:** I can look. I can — I don't know offhand.

Tr. 2687:20-2688:1.

## D.   Noncompliance with Court-Ordered Deadline for Exchange of Trial Exhibits

Defense counsel similarly produced no pre-marked trial exhibits — zero — by the relevant deadline. According to this Court's Individual Rules and Practices, pre-marked exhibits are to be exchanged ten days before the start of jury selection. Thus, the deadline for marked exhibits in this case was May 10,

2024.  The parties discussed this deadline in court well in advance.  *See* Apr. 26, 2024 Status Conf., Tr. 93:10-16.  The defendants turned over no exhibits on or before that date.  ECF Nos. 167, 184.  At a pretrial conference the following week, the government raised this failure:

> **AUSA Siegel:** We have received no defense exhibits. . . .
>
> **Mr. Sullivan:** I can submit it this afternoon. It's all things the government has produced to us with the exception of some video reels. . . .
>
> **The Court:** How many exhibits are we talking about? Order of magnitude?
>
> **Ms. Frison (counsel for Ozy):** Just over 6,000. . . . Those are individually marked. . . .
>
> **The Court:** You've individually marked 6,000 exhibits?
>
> **Mr. Sullivan:** Yes.

May 16, 2024 Status Conf., ECF No. 152, Tr. 44:14-46:6.

The submission Mr. Sullivan offered did not, in fact, occur that day or in the ensuing days.  Therefore, on May 24, the Court ordered defendants to produce pre-marked copies of "the 250 exhibits it currently believes it is most likely to introduce" by 5:00 p.m. on May 26, 2024, little more than forty-eight hours before opening statements, and sixteen days *after* they were originally due.  ECF No. 160.  On May 26, the defense sought leave to file the exhibits late, ECF No. 163, which the Court denied on the docket, noting that "this is only the latest

instance of the defense's failure to comply with its discovery obligations and court orders."  May 24, 2024 Order.  The defense then provided a set of 250 *un-marked* documents after the Court-ordered deadline.

Finally, on the first day of trial, May 29, 2024, the defense provided the government with marked exhibits for the first time — over 500 of them.  Since then and throughout trial, the defense has continued to provide new exhibits.  The government has repeatedly indicated that those new exhibits "bear Bates numbers indicating that they had not previously been produced in discovery" — that is, that the government was seeing them for the first time in the midst of trial.  *See* ECF No. 221 at 2; *see also* ECF No. 214 at 4, 4 n.2; ECF No. 184 at 1.

**E.  Noncompliance with the Deadline for Exchange of 26.2 Material**

The defense's approach to witness statements under Rule 26.2 reveals a similar disregard for court-ordered deadlines.  Rule 26.2 states that, in connection with the testimony of a witness other than the defendant, and on a motion by the opposing party, the court must order the party calling the witness "to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony."  Fed. R. Crim. P. 26(a).  Section (e) of

12

the rule sets forth a remedy for noncompliance: "If the party who called the witness disobeys an order to produce or deliver a statement, the court must strike the witness's testimony from the record."  Fed. R. Crim. P. 26(e).[7]

On April 11, 2024, the government informed the Court that "the parties ha[d] conferred and agreed upon the mutual, simultaneous exchange of now-existing" Rule 26.2 material one day later — on April 12 — and had "further agreed to produce any future Rule 26.2 material on a rolling basis."  ECF No. 125.  They requested that the Court so-order the disclosure deadline, which the Court did the following day.  April 12, 2024 Order.

On April 12, the agreed-upon deadline, the government disclosed over 1,200 marked witness statements.  The defendants disclosed materials for two proposed experts, but — despite their agreement of the *previous day* — disclosed no Rule 26.2 material for any fact witness, including Beverly Watson.

On June 10, at the beginning of the third week of trial, the government reported that they still had not received any witness statements from the defense's proffered fact

---

[7] Other circuit courts have said divergent things regarding whether this sanction is mandatory.  *Compare United States v. Riley*, 189 F.3d 802, 805 (9th Cir. 1999) (holding that "[d]espite the mandatory ring of these provisions, a district court has discretion to refuse to impose sanctions" for violations of Rule 26.2) *with United States v. Pugh*, 39 F. App'x 392, 397 (7th Cir. 2002) ("Rule 26.2 requires the trial judge to strike a witness' testimony" when statements are not produced).  The Second Circuit has not weighed in on this issue.  This order does not assume that Rule 26.2(e)'s language is mandatory.

witnesses.  Tr. 1405:11-24.  Mr. Sullivan stated, by way of explanation, "We haven't talked to the prospective witnesses yet," *id.* at 1406:14-15, and added that "I don't think there's anything that the Government doesn't have.  Not to my knowledge."  *Id.* at 1406:25-1407:1.  To this, the Court responded: "Don't assume that the Government already has this stuff.  Figure out what exists, confirm or deny that the government has it, comply with your undertakings, or risk the consequences."  *Id.* at 1409:1-4.  Four days later, the government complained that the defense had *still* produced no Rule 26.2 material for its fact witnesses.  This prompted the Court to advise the defense that "the extent to which the defense complies with court orders, complies with its own agreements, and complies with federal statutes and rules . . . will all go into the analysis [of the government's motion to preclude defense witnesses]."  *Id.* at 1966:4-9.

On June 18, another source of potential Rule 26.2 material emerged, when the government informed the Court of a documentary that had been made public on YouTube.  The video, titled *The Case Against Carlow Watson: When They Come For You*, discusses this case at some length.[8]  *Id.* at 2280-2283.  A number

---

[8] The government describes the video as showing "a series of interviews with Mr. Watson, his family, his attorneys talking about the case, talking about the witnesses, [and] making a variety of accusations" about the prosecutors.   2277:12-15.

14

of potential defense witnesses, including Beverly Watson, appear in the documentary.  When asked about the film, Mr. Sullivan stated, "I don't know anything about a YouTube video." *Id.* at 2280:24-25.

The government responded, incredulously, that notwithstanding this denial, Mr. Sullivan sits for an on-camera interview *himself* in the documentary he claimed to know nothing about.  *See id.* at 2280:24-25.  The Court directed the defense to conduct a diligent search for, and produce any outtakes from, the documentary that are covered by Rule 26.2.  *Id.* at 2793. The defense, however, has produced no such material.  Instead, they filed a letter stating that they had contacted the producer and director of the documentary to request outtakes, and that she "responded as follows:"  ECF No. 212.  However, what "follows" in the letter is only blank space.  *Id.*  The Court directed the defense to "correct this omission forthwith," *see* June 30, 2024 Order, but no correction or additional information has been provided.

Finally, on June 24, after a week-long pause in trial, the defense disclosed witness statements for a single defense witness, Kosmas Kalliarekos.  On June 26, the morning the government planned to rest, the defense disclosed over 300 witness statements for five potential witnesses (including Mr. Kalliarekos and Ms. Watson).  ECF Nos. 204, 205.  Many of these

items were created in 2023 or earlier, indicating that they were available to be produced before the original (April 2024) deadline for 26.2 material.  ECF No. 214 at 2.

On June 27, the government conducted a *voir dire* of Mr. Kalliarekos, during which it became clear that there remained "a live question here about whether there are other documents out there that should have been produced but weren't." Tr. 2793:5-7.  The Court directed the defense to file a letter addressing outstanding issues relating to witness statements, including whether any responsive investment documents, video outtakes, or communications existed for Mr. Kalliarekos.  *Id.* at 2793.  The defense filed a letter that evening indicating that it was producing some Rule 26.2 material for Mr. Kalliarekos and certain other witnesses (but not Ms. Watson).  ECF No. 212. Finally, on June 28 — approximately ten weeks after the deadline — the defense disclosed over 2,600 witness statements.  ECF No. 212.

With respect to Ms. Watson's testimony in particular, the government has indicated that that the witness statements belatedly provided by the defense are incomplete and fall almost entirely outside the time period of the charged fraud.  The majority of the twenty-five documents produced for Ms. Watson are from the time period following Mr. Watson's arrest.  ECF No.

221; *see* ECF Nos. 204, 205.  They also contain "unexplained" redactions.  ECF 214 at 6-7.

The government also represented that they received no *relevant* text messages or emails sent by Ms. Watson, including to her brother, Mr. Watson.  ECF No. 214 at 7 ("There are no text messages in the disclosures between Ms. Watson and her brother or any other member of the defense team or defense witness, nor are there any emails about substantive topics — even though Ms. Watson worked at Ozy for almost a year from 2022 to 2023 and likely sent thousands of emails in that period.").[9] They similarly have not received her investment agreements with Ozy, despite the existence of written stock-purchase agreements from other investors, or any outtakes from the documentary.  *Id.*

On *July 1* — more than ten weeks after the 26.2 deadline — the government again raised the subject of disclosure relating to Ms. Watson.  The Court asked: "Does [the] defense know if anybody made a diligent search along the way for Ms. Watson's text message communications?  And if so, who that was?"

---

[9] Materials such as emails, texts, and notes on relevant topics are plainly "statement[s] of the witness" under Rule 26.2.  Fed. R. Crim. P. 26.2(a); *see United States v. Cole*, 20-CR-424, 2022 WL 229045, at *1 (N.D. Ohio Jan. 25, 2022) (granting in part Rule 26.2 motion to produce emails of potential government witness); *cf. United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995) (observing that "notes would be considered a substantially verbatim recital of the witness's statement [under Rule 26.2] if they could fairly be deemed to reflect fully and without distortion what had been said [by the witness] . . .  and thus be used to impeach the witness's testimony at trial"); *see id.* (holding that if "it is doubtful whether [particular statements] are subject to discovery," the statements should be submitted "to the trial court for an *in camera* determination").

Mr. Sullivan's co-counsel responded (candidly): "Not since the previous disclosures, but — so, no." Tr. 3071:2-3. The Court pressed for additional information about the delays and omissions of production, as they related to Ms. Watson. Mr. Sullivan responded definitively that he had "no additional representations" to make regarding the defense's efforts. *Id.*

Thus, the defense's Rule 26.2 disclosures for Ms. Watson were both delayed and incomplete, and they reveal — as discussed more fully below — violations not only of the 26.2 deadline, but of this Court's previous order to compel compliance with grand jury subpoenas.

## F.   Further Failures of Production and Unsubstantiated Representations to the Court

In addition to these missed deadlines, the defense has repeatedly made unsubstantiated representations to the Court. Specifically, defense counsel made a number of blanket representations that material had been previously produced to the government by prior counsel (or that the defense received the material in question *from* the government). On a series of occasions, the Court asked for evidence supporting such a representation: a production cover letter, for example, showing the Bates range that subsumes the Bates number on a disputed document, or statements from prior counsel about the history of production. The defense said it would provide that information

18

on a number of occasions but often declined, for whatever
reason, to follow through on such undertakings.  A few examples
of this dynamic follow.

    1.   <u>Productions Related to Beverly Watson</u>

      The defense has indicated that Ms. Watson will testify
about three topics, broadly defined: the formation of Ozy; her
employment at the company; and her investment in the firm.  ECF
No. 218 at 3; Tr. 2968.  Her status as a witness on these topics
implicates the subject matter underlying the grand jury
subpoenas, the Court's order to compel, and Rule 26.2.

      The October 2021 subpoena issued *to Mr. Watson*
requested, among other things:

- Any and all written, email or text, text messages, encrypted text messages . . . or other instant messaging service . . . correspondence with any officer, principal, owner, employee or consultant/third party representative of OZY Media.

- Any and all written, email or text, text messages, encrypted text messages . . . or other instant messaging service . . . correspondence with . . . any investors or potential investors in OZY Media.

Gov't Mot. to Compel 1; *see* Ex. A, ECF No. 59-1.  As noted,
Ms. Watson's testimony has been offered both in her
capacity as an Ozy employee and investor.

      The October 2021 subpoena *to Ozy* requested, among
other things:

- Documents to identify current and past investors in
  OZY Media, Inc. . . . and size and dates of such
  investments.

- All presentations to current and prospective
  investors, including drafts of presentations.

Ex. B, ECF No. 59-2.  These subpoenas were re-issued in July
2022, clarifying that Mr. Watson was served as a custodian for
Ozy.  *See* Gov't Mot. to Compel; Ex. C, ECF No. 59-3; Ex. D, ECF
No. 59-4.  The government re-issued a subpoena to Watson again
on March 6, 2023, extending the date range to April 5, 2023.
Gov't Mot. to Compel at 3; *see* Ex. E, ECF No. 59-5.

Given Ms. Watson's employment at Ozy from 2022 to
2023, *see* ECF No. 221 at 6, and the fact that she was an
investor in Ozy Media, Tr. 3070-3075, these subpoenas would
extend to correspondence and agreements involving Ms. Watson.[10]

However, the government indicated that the defense
produced only a single document connected to Ms. Watson in their
initial subpoena responses, prior to the order to compel
litigation, and seventeen additional documents following that

_____

[10] In connection with the government's seizure of Mr. Watson's
electronic devices in 2023, Mr. Watson's counsel identified Beverly Watson as
an individual with whom Mr. Watson had an attorney-client relationship,
suggesting that correspondence with her would be privileged.  *See* ECF No. 228
at 2; Ex. D, ECF No. 228-4; Ex. E, ECF No. 228-5.  However, as the government
noted, and the defense did not dispute, Ms. Watson's law license was
suspended during the time that she worked at Ozy.  Tr. 2966:20-23.  As noted
above, the defense never submitted a privilege log, despite Mr. Sullivan's
invocation of the privilege in connection with production.  *See, e.g.*, *United
States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) ("The burden of
establishing the attorney-client privilege, in all its elements, always rests
upon the person asserting it.").

order (albeit *after* the deadline for compliance).  *See* ECF No.
228 at 1-2.  None of those documents included Ms. Watson's Ozy
emails or text correspondence.  *See* ECF No. 184 (noting that as
of June 9, the defense had provided "no prior statements" for
Ms. Watson, "including emails and text messages").

One reason we know the defense failed fully to comply
with the subpoenas and orders of compulsion is that responsive
documents appeared in the midst of trial.  The defense's Rule
26.2 disclosures for Ms. Watson, made on June 26, 2024, included
material that would have been responsive to the 2022 subpoenas
and the Court's order to compel, given her status as an investor
and later employee of Ozy.  These documents include an
"acceptance," in 2019, of an invitation to one of Mr. Watson's
fundraising trips; a June 2022 letter about Ms. Watson's
employment at Ozy; and a text thread between Ms. Watson and
another former Ozy Employee.[11]  ECF No. 221 at 3-4.  However, the
government reports that "[e]ach of the documents bore Bates

_____

[11] In their latest submission on the subject, on July 1, 2024, the
government describes the universe of 25 documents submitted as Rule 26.2
disclosures for Ms. Watson: "There are two documents from 2019: one is an
email exchange between Ms. Watson and another individual about a job offer
that other individual received (not at Ozy), and the second is her acceptance
of an invitation regarding one of [Mr.] Watson's fundraising trips to the
Middle East.  The other three documents are a June 14, 2022 letter Ms. Watson
wrote about why she decided to work at Ozy; a June 26, 2023 LinkedIn post in
which she publicizes [Mr.] Watson's selective prosecution arguments that have
since been rejected by the Court; and what appears to be a text thread, with
numerous unexplained and likely improper redactions, between Ms. Watson and
Ms. Rudy that terminates on February 26, 2024 (despite the government's
understanding that there were more recent communications between them)."  ECF
No. 221 at 4.

numbers that were not covered in any range previously produced by either defendant in response to the subpoenas or order to compel."  ECF No. 221 at 3 n.3.[12]

As recently as July 1 — very late in the proverbial day for this trial — the government continued to insist that it had received *no* employment-related communications involving Ms. Watson, nor any investment-related documents.  The Court thus proceeded to conduct yet another colloquy on the issue of whether these defense exhibits and 26.2 materials had been produced.  In response, the defense continued to contend that prior counsel had produced "everything":

> **The Court:** You think it may be true [that prior counsel produced these materials], but you don't have any specific reason as you sit here to believe that it's true.
>
> **Mr. Sullivan:** Sure I do. They got everything -- the Government has everything from OZY, the entire OZY Google Drive.  That's where we got it from.
>
> **The Court:** Show me the cover letter then[,] and we'll wait for this right now.  Show me the cover letter under which that production was made with the Bates range.  I would like somebody to hand up a copy of that letter of production and then show me that these documents at issue fall within the specified Bates ranges.
>
> (Pause in proceedings.)

---

[12]  In addition, the defense produced a number of statements and documents for Kosmas Kalliarekos, an investor in Ozy, pursuant to Rule 26.2, which the government notes "bear Bates numbers indicating that they have not been produced previously," despite their responsiveness to both the grand jury subpoenas and the order to compel.  ECF No. 214 at 4.

Tr. 2977:5-17.  After the pause in the proceedings, the defense
handed up prior counsel's response to the government's motion to
compel (ECF No. 64), and pointed the Court to a passage that,
notwithstanding the Court's inquiry, contained no information
about any specific document or Bates range.  Tr. 2977:18-2979:4.

The Court then observed that "[i]f it's true that
there were these productions by Ford O'Brien and Dechert LLP, .
. . [then] all somebody had to do is go back to Dechert LLP and
Ford O'Brien and say may we have copies of the cover letters."
*Id.* at 2978:25-2979:4.

At that point, another lawyer for Mr. Watson (Ms.
Gilbert) blamed her predecessors for their inability to confirm
any prior production.  She responded: "They're not responsive to
us, Your Honor."  *Id.* at 2979:5-6.

The Court then invited current defense counsel to
provide some documentary support for the proposition that prior
counsel would not provide copies of cover letters: "And in the
vein, Ms. Gilbert, of things that might be helpful, *if there's a
record* of you asking Dechert and Ford O'Brien for information,
share that record with me."  Tr. 2980:25-2981:3 (emphasis
added).  The defense never provided any such record in response.

And later, the defense proved Ms. Gilbert's own
assertion false: on July 6, 2024, defense counsel filed what
appear to be *all* of prior defense counsel's cover letters.  ECF

23

Nos. 229, 230.  They did not say how they obtained these letters in the face of their earlier representations regarding prior counsel's non-responsiveness.  Nor, importantly, did these letters confirm the defense claims that any specific disputed documents had been produced by prior counsel.

　　　2.　Production of Other Key Evidence

As the Court has articulated on the record, this case is driven in large part by documentary evidence, particularly documents that speak to Ozy's financials.  *See* Tr. 273:21-24. As such, the company's contracts — with advertisers and investors, among others — and its general ledger are at the heart of the case.  Nevertheless, the defense has repeatedly failed to provide clarity on whether or when these materials were produced, despite multiple assurances that they would.

　　　a.　"Barter Revenue" Contracts

The defense has argued that the revenue numbers Mr. Watson shared with investors were not in fact overstated — instead, that revenue from a variety of sources simply had not been properly recorded in Ozy's internal financial records.  Tr. 50:13-51:3; 66:4-17.  This theory is predicated on a number of contracts, both oral and written, through which Ozy purportedly earned "barter," or "in-kind," revenue — value that was received not in cash but through an exchange of services.  *See, e.g.*, Tr. 50:13-51:3; Tr. 183:24-184:24.

At a pretrial status conference on May 16, 2024, Mr. Sullivan mentioned written contracts that, he suggested, would evidence unrecorded barter revenue.  May 16, 2024 Status Conf., ECF No. 152, Tr. 24:1-25:3.  The government stated that they had "no idea" what contracts he was discussing, because no such contracts had been produced or identified.  *See* 26:15-17.  To this, Mr. Sullivan responded, "we got them from discovery from the government.  I will give them to them this afternoon." *Id.* at 29:22-24; *see also id.* 32:25-33:1 ("They sent us all of these documents.  They know they're there.").  A government submission from several days later, however, suggested that the promised production had still not occurred.[13]

The status of an even broader set of Ozy contracts was discussed on the first day of trial, May 29, when the government reported that the defense had "produced 185 contracts with new Bates numbers that we're not aware of."  Tr. at 163:20-21.  The government stated: "These contracts that the defense keeps saying are from the discovery, they all have Bates numbers, but they're Bates numbers that aren't from our discovery and they're Bates numbers that we've never seen before."  Tr. at 233:19-22.  At that point, Mr. Sullivan made the following representation:

---

[13] *See* ECF No. 158 at 6 ("[T]he identified contracts — which the disclosure indicates are 'examples' and not a complete set — are not Bates-stamped and, based on the government's best efforts to review prior productions, it appears that many of the contracts were never previously produced to the government and do not appear on Ozy's trial exhibit list.").

> **Mr. Sullivan:** [These contracts were] sent to them by
> previous counsel in 2022 with the Google documents.

Tr. 234:18-19.  He continued:

> **Mr. Sullivan:** I'll get them the task orders for this
> so that there's no mistakes. But again, it's been in
> their possession since 2022.  You know, it's not a
> random document.

> **The Court:** Who produced that in 2022?

> **Mr. Sullivan:** Whoever was previous counsel in 2022.
> Ford O'Brien.

> **The Court:** Ford O'Brien.  Thank you.  What was the
> Bates number on that document when it was produced by
> Ford O'Brien to the Government? . . . .

> **Mr. Sullivan:** I can tell you that in a letter tonight
> or tomorrow.  I don't have that in front of me. . . .
> [i]t's 229 contracts that they had.

> **AUSA Siegel:** If they can do that for all of their
> exhibits, that would greatly simplify our task of
> reviewing these. . . .

> **Mr. Sullivan:** It's 229 contracts that they had.

Tr. 250:6-250:25.  The Court then instructed the defense:

> You're going to tell the Government precisely what
> date [the task order] was produced and what Bates
> number was stamped on it at the time.  And this letter
> is not just going to go to the Government.  It's going
> to be filed so that I can see it also.

Tr. 253:3-6.  The defense did file a letter that evening,

setting forth Bates numbers and dates of production (mostly by

the government) for the nine contracts originally at issue, but

not the full 229.  *See* ECF No. 170 (defense letter incorrectly

dated March 29, but filed on May 29).

When the question of whether the full set of 229 contracts had been produced came up yet again on June 26, the Court directed the defense "to go back through the history of productions, pull cover letters that might indicate that these documents had been produced," and noted that nothing had yet been "forthcoming in response to that [previous] invitation." Tr. at 2496:6-11.  Mr. Sullivan responded that "we did do that. . . . I can attach a rather detailed letter from previous counsel that might clear that up a bit."  Tr. at 2496:12-14.

No such letter was produced.  Instead, Mr. Sullivan filed a chart that evening that set forth a large number of contracts with Bates numbers and production dates, almost all of which were *on or after* the first date of trial.  *See* ECF No. 207; Ex. A, ECF No. 207-1.  Suffice it to say that this chart did not support Mr. Sullivan's earlier claim that the contracts at issue had been "sent to them by previous counsel in 2022." Tr. 234:18-19; *see also id*. at 250:7-8 ("[I]t's been in their possession since 2022.").

In the same exchange, on June 26, the Court asked the defense whether they wanted a hearing on the question of *when* prior counsel had produced these apparently late-breaking contracts to the government, as the defense had claimed.  Tr. 2497.  The Court specifically suggested that it would entertain testimony from prior counsel.  Mr. Sullivan responded that the

27

defense did want such a hearing, "[i]f that's of assistance to the Court." *Id.* at 2497:7-8.  The Court confirmed that it was. *Id.* at 2497:9-17.  Mr. Sullivan undertook to "look and see who the best witness is and which law firm," and to identify them in a letter by 11:00 a.m. the following day.  *Id.* at 2497:25; 2498:20-22.  No such letter or identification was ever submitted.

       b.   2017 "NetSuite" General Ledger

A similar pattern of unsubstantiated representations emerged regarding Ozy's general ledger.  On May 30 — the first day of trial following opening statements — a dispute emerged about whether the defense had produced a copy of the company's 2017 general ledger (maintained in a software system called "NetSuite").  The government indicated that it had not received the ledger, despite its being responsive to grand jury subpoenas (among other potential sources of authority).  *Id.* at 277:5-7; 281:7-282:9 .  The Court expressed hesitancy to exclude defense exhibits and a desire, instead, to conduct "a more nuanced assessment on an exhibit-by-exhibit basis of the extent to which the defense has a good reason for not having produced this as an exhibit on time, and the extent to which the Government is prejudiced by that delay."  *Id.* at 506:15-18.

Mr. Sullivan reported with "absolute" certainty that the ledger had been produced:

**The Court:** Does the general ledger of OZY Media from 2017 exist?

**Ms. Frison:** Does the NetSuite exist for 2017? . . . . Yes.

**The Court:** And yet, it has not been produced to the Government?

**Mr. Sullivan:** I'm ***absolutely sure it has***. . . .

**The Court:** Get me a Bates number if you're absolutely sure it has, when it was produced, by whom.

**Mr. Sullivan:** Previous counsel. It was downloaded to Google Suites and sent to [the government in] 2022 . . . either Ford O'Brien or Dechert, but they took the entire Google Suites in which everything was loaded down.

**The Court:** Get me a number.

**Mr. Sullivan:** I will try to find it. . . . It was an entire download of the Google Suites that included everything they had, including NetSuite.[14]

*Id.* at 282:12-283:10 (emphasis added).  No Bates number was ever forthcoming to the Court.[15]

_____

[14] When asked later by the Court *how* he knew that Ford O'Brien had produced this material, Mr. Sullivan responded that "[t]he people at Sher Tremonte" had informed him of this exchange.  Tr. 3347:10.  When asked who specifically had told him this, he was unable to remember.  Tr. 3349:21-22.

[15] This was not the only topic on which the defense would shoot first and aim later.  To pick just one stark example, the defense filed their motion regarding the government's alleged invasion of privilege on April 26, 2024 — the morning of a scheduled status conference.  Mot. to Disqualify Counsel and Dismiss, ECF No. 131 at 7 ("Dismissal of the Indictment is Required Due to Prosecutors and Law Enforcement Engaging in Outrageous Government Conduct and Prosecutorial Misconduct").  This motion was filed without, apparently, defense counsel making any inquiry of prior counsel or the government.  At the status conference the next day, the government revealed a *written privilege waiver* from Ozy's prior counsel, and other conversations with prior counsel.  Mr. Sullivan's response made clear that he was learning these key — and easily obtainable — facts for the first time. *See* April 26, 2024 Status Conf., ECF 133, Tr. 13:7-8 ("I certainly haven't seen a waiver from OZY.").

Despite his expression of absolute certainty, Mr. Sullivan acknowledged eight days later that the opposite was true: "the government said they have not received [the 2017 general ledger], and I don't dispute that . . . the NetSuite account is shut down and we can't get access to it.  We have been trying."  Tr. 959:16-19.  He further explained that "none of us, since I've joined the team . . . have [] been able to access the original NetSuite."  *Id.* at 960:18-20.

## II.  Discussion

### A.  Ms. Watson's Testimony is Precluded for Violations of Rule 26.2 and Other Obligations

In 1975, the Supreme Court held that the "Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth."  *Nobles*, 422 U.S. at 241.  The Court considered, in *Nobles*, whether "the prosecution can call upon that same power" that the defense is accorded — namely, "the federal judiciary's inherent power to require the prosecution to produce the previously recorded statements of its witnesses so that the defense may get the full benefit of cross-examination and the truth-finding process may be enhanced."  *Id.* at 231 (citing *Jencks v. United States*, 353 U.S. 657 (1957)).

The Court answered this question in the affirmative, holding that the trial court "properly exercised its discretion" when it precluded a criminal defendant from calling a private investigator whose investigative report the defense declined to produce. *Id.* at 240.  Along the way, the Court quoted its recent holding in *United States v. Nixon*, 418 U.S. 683, 709 (1974):

> The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.  To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed *either by the prosecution or by the defense*.

(emphasis added).

The Court returned to these themes in *Taylor v. Illinois*, 484 U.S. 400 (1988).  There, the Court framed the systemic interests at issue as follows:

> The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.  The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony.  Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence.  The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

> The defendant's right to compulsory process is itself
> designed to vindicate the principle that the ends of
> criminal justice would be defeated if judgments were
> to be founded on a partial or speculative presentation
> of the facts.  Rules that provide for pretrial
> discovery of an opponent's witnesses serve the same
> high purpose.  Discovery, like cross-examination,
> minimizes the risk that a judgment will be predicated
> on incomplete, misleading, or even deliberately
> fabricated testimony.  The State's interest in
> protecting itself against an eleventh-hour defense is
> merely one component of the broader public interest in
> a full and truthful disclosure of critical facts.

*Id.* at 410-12.[16]  On this basis, the Court authorized trial
judges (again) to preclude defense witness testimony in cases of
discovery or notice violations.  And Justice Brennan, even in
dissent, echoed the principles at stake: "Criminal discovery is
not a game.  It is integral to the quest for truth and the fair
adjudication of guilt or innocence.  Violations of discovery
rules thus cannot go uncorrected or undeterred without
undermining the truthseeking process."  *Id.* at 419.

As a matter of process, the *Taylor* Court contemplated
that the trial judge might "insist on an explanation for a
party's failure to comply" with witness-related rules, 484 U.S.
at 415 — as this Court did in the instant case.  The Second
Circuit picked up this thread in *Wade v. Herbert*, 391 F.3d 135
(2d Cir. 2004).  The *Ward* panel concluded that the trial court

---

[16] Unless otherwise noted, when quoting judicial decisions this order
accepts all alterations and omits all citations, footnotes, and internal
quotation marks.

could reasonably have rejected the trial counsel's proffered explanation for delay, "[e]specially in the absence of any qualified evidence" to support it.  *Id.* at 142.  As the extended discussion above indicates, no specific — let alone consistent or persuasive — explanation has been forthcoming in this case.

Three years after *Taylor*, the Supreme Court returned to the issue in *Michigan v. Lucas*, 500 U.S. 145 (1991).  The Court reiterated that the Sixth Amendment is "unquestionably" implicated by a rule or statute that "operates to prevent a criminal defendant from presenting relevant evidence."  *Id.* at 149.  Nevertheless, the Court concluded — yet again — that violation of a notice rule (there, a state rape-shield law) could result in the preclusion of a criminal defendant's witness.  *Id.* at 153.

Here, we have even less (from the defense perspective) than the mere "absence of any qualified evidence" in support of the defense explanation, as was the case in *Wade*.  Rather, the defense has presented the Court with shifting explanations that have in some cases been revealed to be false.

The violation of Rule 26.2 in this case was plainly willful.  The term willful generally "denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental."  *Bryan v. United States*, 524 U.S. 184, 191 n.12 (1998).  As discussed above, the defendants have repeatedly

33

violated court orders, of which they have been notified in writing and orally; they agreed to a disclosure deadline under Rule 26.2 (which was itself then court-ordered) and flouted it within twenty-four hours; and they have declined, time and again, to respond adequately to the Court's invitations to explain these failures.

The explanations they have provided have proven groundless.  In response to the government's motion to preclude defense witnesses, the defense proffered that its omissions were "the result of multiple substitutions of counsel, a voluminous document-based case consisting of 2.5 million documents, a short timetable for discovery and trial, sparce [sic] resources of the trial team, and a slow e-discovery process vendor."  ECF No. 224 at 7.  I will discuss these issues in turn.

*Substitutions of Counsel.*  The defense argues that both defendants' multiple substitutions of counsel caused — and should excuse — the failures of production here.  But on Mr. Sullivan's first appearance in the case, he represented to the Court that "nothing in the scheduling order seems prohibitive for me to meet."  May 24, 2023 Status Conf., ECF No. 66, Tr. 4:23-25.  Mr. Sullivan also indicated that if "something in one particular incident pops up," "I might need more time," suggesting that he might apply on a case-by-case basis for the

adjournment of particular deadlines.  *Id.* at 4:20-23.  He never did.

Similarly, when Ms. Frison replaced Ozy's prior counsel, she represented that she was "apprised of the schedule" and would "be ready."  Mar. 13, 2024 Status Conf., ECF No. 124, Tr. 4:10-13.  Neither defendant moved to adjourn the trial date or otherwise requested any adjournment of the discovery or motion calendar.

Nonetheless, the defense has now, at the "eleventh-hour," *see Taylor*, 484 U.S. at 412 & n.17, made new arguments about the impact of the substitutions.  Counsel for Watson argues — for the first time — that "the Court should have designated this case a complex case and granted counsel additional time to prepare in order to ensure a fair trial." ECF No. 224 at 4.  This argument should, of course, have been made many months ago (at least).  The defense also maintains that prior counsel "has repeatedly refused to cooperate with current Watson and OZY counsel including sharing previous productions."  *Id.* at 3; *see also* Tr. 2979:5-6 ("They're not responsive to us, Your Honor.").  As noted above, however: the defense never reported any difficulties communicating with their predecessors until after trial had begun; even at that time, they still provided no specifics about the alleged non-cooperation, *despite* the Court's several requests for records;

and defense counsel did indeed — albeit only very recently — file what appear to be *all* cover letters under which prior counsel produced documents.  ECF Nos. 230, 230-1, 230-2, 230-3.[17]

     *E-Discovery Vendor Issues.*  The defense argued — again, only very recently — that "due to [their] third-party vendor not being paid on time due to the lack of financial resources previously explained, during extended periods of time the defense was unable to run searches to properly and timely review the documents in their power."  ECF No. 224 at 4.  At a status conference earlier this year, Mr. Sullivan indicated that the defendants' insurer was disputing its obligation to advance fees.  Mr. Sullivan was "paying enormous sums of money for a document management system right now" — money that he "may or may not get [] back."  Jan. 18, 2024 Status Conf., ECF No. 106, Tr. 4:4-5.  The Court suggested that the defense should consult the Criminal Justice Act plan for the district, and that:

> if your client reaches a point in which he is truly unable to pay for his defense, you know, one potential avenue is that he puts together a financial affidavit, applies for some relief under the Criminal Justice Act, whether that's fees to you or dispensation for experts or other specialists or otherwise.

---

[17] Even if prior counsel had been unresponsive, current counsel was not without recourse.  The Second Circuit has held that "when [a] client has an urgent need for papers to defend a criminal prosecution and will be seriously prejudiced by withholding of them," the court may "require the lawyer to release the papers on reasonable conditions," upon a showing by the defendant.  *Pomerantz v. Schandler*, 704 F.2d 681, 683 (2d Cir. 1983).  Here, the defendants did not attempt to make such a showing and requested no relief.

*Id.* at 5:2-7.  As in so many other contexts, the defense did not respond or otherwise follow up on this invitation.

*Large Volume of Documents*.  The defense has also used the large volume of documents in this case as an excuse for their delayed and incomplete productions.  ECF No. 224 at 7. The defense knew, of course, that this was a document case when they came into it.  The attorneys undertook to meet the schedule, and never sought to modify or retract that commitment until trial was underway.  As the Supreme Court has noted, meeting deadlines is a key aspect of the litigator's remit.  *See Taylor*, 484 U.S. at 415 ("Lawyers are accustomed to meeting deadlines.").  And as noted above, the Court invited them to apply for CJA funds, but they never did.[18]

*Witness Interviews*.  The defense also sought to explain the failure to turn over Rule 26.2 material for any fact witness by asserting — even on the sixth day of trial, and over a month past the mutually agreed-upon, court-ordered deadline — that they "[hadn't] talked to the prospective witnesses yet." Tr. 1406:14-15 (June 10, 2024).  But Rule 26.2's requirements are not keyed to witness *interviews*.  The Rule requires parties

---

[18] During trial, when the defense belatedly crystallized its argument about e-discovery, the Court invited them to request a hearing regarding production and document-management problems, to substantiate its explanation. The defense declined that offer.  *See* Tr. 2497:5-25 (indicating that the defense would "look and see who the best witness is and which law firm," and submit a letter identifying them).  The proffered letter never materialized.

to produce "any statement" of a witness that is "in their possession and that relates to the subject matter of the witness's testimony."  Fed. R. Crim. P. 26.2(a).  Critically, as discussed above, the defense's eventual Rule 26.2 disclosures reveal that such statements did, in fact, exist by the mutually agreed upon, court-ordered deadline, and were in the defendants' possession.  And it is simply implausible that the defense had not *identified* a single fact witness by the Rule 26.2 deadline in this case, whether they had interviewed those witnesses or not.  Thus, the failure to disclose these materials was, in and of itself, a violation of that court-sanctioned agreement.[19]

Taken in their totality, the shifting — and ultimately flimsy — nature of these explanations support a finding that the violations at issue were willful.  In *Taylor*, after noting that the district court "may certainly insist on an explanation" for notice and discovery violations, the Supreme Court counseled:

> If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

---

[19] *See generally United States v. Dickerson*, 228 F. App'x 864, 866 (11th Cir. 2007) (upholding district court's exclusion of undisclosed evidence under Rule 16, after defense "attorney offered the court no justifiable" reason for his delay in providing the Government with the payroll records, which "were readily available").

484 U.S. at 415.  That is plainly the case here.[20]

Trial courts regularly divine willfulness from a party's omissions.  In *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers et al. v. Car-Wi Const. Inc. et al.* — a civil case — the trial judge "gave an order" to provide plaintiffs with affidavits on a certain topic. 88 F. Supp. 3d 250, 264 (S.D.N.Y. 2015).  The Court noted that the "defendants had the ability to comply, but they purposefully chose not to do so for reasons all their own and without first asking permission from this court.  Without our resorting to the dictionary, this seems as good a definition of 'willful' as any."  *Id*.  The same is true here.[21]

---

[20] The *Taylor* Court clearly endorsed the approach of identifying a willful violation by eliminating the proffered legitimate (or negligent) bases for delay: "If a pattern of discovery violations is *explicable only on the assumption* that the violations were designed to conceal a plan to present fabricated testimony, it would be entirely appropriate to exclude the tainted evidence regardless of whether other sanctions would also be merited."  484 U.S. at 414 (emphasis added).  This Court does *not* suggest that such an assumption would be merited on the instant facts.  But the only other explicable assumption here is that the defense intended to secure an advantage — prohibited by the Federal Rules and the Court's orders — of unfair surprise.  This, too, renders the violation willful.

Like the Supreme Court, the Second Circuit has countenanced this process of elimination (albeit in a different context).  *See generally ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 175 (2d Cir. 2022) (discussing the elimination of impossible options, followed by the adoption of what remains).

[21] Similarly, "defaults have been found willful in instances where an attorney failed to respond to a motion for summary judgment *and failed to proffer a reason*."  *Dixon v. Ragland*, No. 3-CV-826, 2005 WL 2649484, *7 (S.D.N.Y. Oct. 14, 2005) (emphasis added) (citing *United States v. Cirami*, 535 F.2d 736, 739 (2d Cir. 1976)).

In the context of expert witnesses, the Second Circuit has found that a criminal defendant's failure to "take advantage" of "repeated opportunities to supplement its disclosures" was a sufficient basis to exclude defense witness testimony.  *United States v. Reichberg*, 5 F.4th 233, 245 (2d Cir. 2021); *see also United States v. Wilson*, 493 F. Supp. 2d 484, 488 (E.D.N.Y. 2006) (same).  This has held true in the habeas context as well.  *See Umali v. Heath*, No. 10-CV-1787, 2011 WL 4929459 (S.D.N.Y. Oct. 14, 2011) (finding that evidence that petitioner "could have given notice" of expert testimony "and that therefore the choice to wait until after the trial started to give notice was deliberate" such that exclusion of testimony was warranted); *see also Sheehan v. Powers*, No. 14-CV-2898, 2021 WL 3710436 (E.D.N.Y. Aug. 19, 2021) (denying habeas petition and accepting trial court's finding that defendant's "willful[]" refusal to cooperate in psychiatric examination, based on counsel's obstruction of questioning, constituted "a deliberate strategy of delay" that warranted the preclusion of the psychiatric testimony).

In opposing preclusion, the defense cites *Escalara v. Coombe*, 852 F.2d 45 (2d Cir. 1988).  That case is distinguishable because the district court had not clearly *found* that the noncompliance was willful; instead, the district judge had referred to the defense attorney's "apparent bad faith — or,

at least, the absence of a good excuse" for the violation.  *Id.* at 48.  The Court of Appeals held that the "absence of a good excuse is not *necessarily* commensurate with 'willful' conduct." *Id.* (emphasis added).[22]

Alternative sanctions are not sufficient.  *Taylor* suggests that courts should consider the following other options for notice violations: continuance, mistrial, or disciplinary sanctions against the defendant or defense counsel.  484 U.S. at 413.  None of those would be workable or sufficient in this case.  A continuance would have risked a mistrial, given the number of jurors with travel plans in August, and the need to retry this case on that basis would have severely negatively affected the Court's calendar for at least the next year.  *See United States v. Ulbricht,* 858 F.3d 71, 116 (2d Cir. 2017) (finding that juror availability is a valid basis to exclude untimely evidence, rather than grant an alternative remedy such as a trial continuance), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).  And the imposition of

---

[22] The Court of Appeals instructed the district court, on remand in *Escalara*, to "hold an evidentiary hearing to determine whether or not the failure of Escalara's counsel to list [the witness at issue] as a potential alibi witness meets the standards enunciated in *Taylor* and in this opinion." 852 F.2d at 48..  The need for a hearing is heightened, of course, in the habeas context, where the violation occurred years earlier, in a different court, and perhaps with different attorneys than the ones litigating the habeas petition.  Still, the Court in this case *did* offer the defense a fact hearing on this question — on multiple occasions — but those offers were declined.  *See supra* p. 29.

sanctions on defense counsel would not undo the harm to the adversarial process and the government's case.[23]

The adversary system of the federal trial court simply cannot function when the Rules of Criminal Procedure, grand jury subpoenas, the Court's order to compel, and other sources of authority are treated as optional.  No other outcome but preclusion is sufficient in this case.

**B.   Ms. Watson's Testimony is Precluded Under Fed. R. Evid. 401 and 403**

---

[23] In addition, Watson's counsel has openly mocked the prospect of sanctions in this case.  In one such example, Mr. Sullivan claimed — in open court — that the Court had sustained an objection *sua sponte* when, in truth, the Court was sustaining a Rule 403 objection made by the government at sidebar.  *See* Tr. 1056:2.  The Court responded by directing defense counsel (also at sidebar): "Ask an additional wrapping up question on this subject and then let's move on."  *Id.* at 1056:24-25.  Mr. Sullivan then proceeded to ask a *dozen* or so additional questions on the same topic, *see id.* at 1058:6-1059:13, following which the Court intervened: "All right.  I'm going to sustain the objection we had at sidebar."  *Id.* at 1059:14-15.  After the jury exited, Mr. Sullivan characterized this ruling (inaccurately) as *sua sponte*, presumably for the benefit of the audience that had not been privy to the sidebar.  *Id.* at 1063:4-6 (asserting that "the Court, *sua sponte*, stops me when I am reading all of these clients that he had"); *see also id.* at 1063:9-11 ("You sustained your own objections, Your Honor, and I think it's improper. I just want to make a record.").  When the Court pointed out the misstatement, Mr. Sullivan responded: "Then I say refer me to bar counsel." *Id.* at 1063:24; *see also id.* at 1064:21 ("Refer me.  Refer me.").

So the threat of disciplinary sanctions appears unimpressive to Mr. Sullivan, and there is no reason to think it would have had any effect on the broader defense team.  *See Taylor*, 484 U.S. at 413-14 ("The risk of a contempt violation may seem trivial to a defendant facing the threat of imprisonment for a term of years.  A dishonest client can mislead an honest attorney and there are occasions when an attorney assumes that the duty of loyalty to the client outweighs elementary obligations to the court."); *cf. id.* at 418 (noting that "it would be highly impracticable to require an investigation into [the defendant and defense counsel's] relative responsibilities before applying the sanction of preclusion"); *see also id.* at 416 (rejecting the argument that it would be "unfair to visit the sins of the lawyer upon his client" in this context).

The government also argues that Ms. Watson's testimony is irrelevant and likely to cause confusion.  On this score, too, the Court concurs.

The defense made only limited proffers of Ms. Watson's expected testimony.  In a letter to the Court dated June 30, the defense proffered that Ms. Watson would:

> describe her understanding of OZY's revenue as an investor and lender.  This will relate to the materiality of [Ozy's former Chief Operating Officer's] misrepresentations.  Additionally, as an OZY executive, she can testify as to her understanding of OZY's revenue.  This will underscore that OZY's revenues were in fact higher than what Mr. Rao [the COO] believed them to be.  Finally, Ms. Watson can testify as to what Mr. Watson's role was in OZY.  Through this testimony, the jury will learn that Mr. Rao managed OZY's finances and that Mr. Watson was primarily the outward-facing leader of OZY.

ECF No. 218 at 3.  The next day at trial, the Court requested further information about Ms. Watson's expected testimony.  The defense proffered that they would "inquire as to the formation of OZY which [Ms. Watson] was present for and a part of.  She also was an investor in OZY and she was employed by OZY for a while."  Tr. 2968:6-9.

As to "the formation of [Ozy]," the government noted — correctly — that "[t]here has never been any dispute" regarding that subject.  *Id.* at 3072:6-8.  Ms. Gilbert replied that Ms. Watson's testimony went beyond Ozy's origins: "[S]he's an investor . . . She can testify as to what her experience was,

43

what she looked for in the company, what her — what her
experience was with respect to the various series." *Id.* at
3072:14, 17-19.

The relevance of Ms. Watson's testimony remains
unclear following such proffers.  She worked at Ozy from 2022 to
2023 — after the indictment period, which spans 2018 to 2021.
Thus, it is not clear what light she could shed as an employee —
absent hearsay — on the alleged misrepresentations at issue.
*See United States v. Merker,* 334 Fed. App'x 953, 963 (11th Cir.
2009) (holding that "the district court did not abuse its
discretion in excluding certain testimony that was untethered to
the time frame of the conspiracy" under Fed. R. Evid. 401 and
403).  Moreover, her role at the company remains unclear: the
defense has described her as an "executive" and a "key member of
its management team," ECF No. 218 at 3, but has not said what
she did in that nebulously defined role.

The defense has likewise failed to proffer any
relevant testimony that Ms. Watson would offer in her capacity
as an investor.[24]  The indictment in this case describes a series
of alleged misrepresentations that, the evidence at trial has
shown, were directed to particular investors (or prospective
investors).  These representations are set forth in emails,

---

[24] The Court has already authorized the defense to call another investor,
Kosmas Kalliarekos, notwithstanding other (somewhat more muted, as discussed
on the record) discovery omissions as to him.

slide decks, and the like, but there has been no indication that any of them were directed to Ms. Watson.  *See generally United States v. Williams*, 205 F.3d 23, 34 ("A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions.").

### III. Conclusion

For the foregoing reasons, the government's motion to preclude the testimony of Beverly Watson is granted.


SO ORDERED.



<u>/s/ Eric Komitee</u>
ERIC KOMITEE
United States District Judge


Dated:    July 9, 2024
          Brooklyn, New York