# RONALD SULLIVAN LAW, PLLC
Ronald S. Sullivan Jr.

July 17, 2024

<u>By ECF</u>

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Carlos Watson and Ozy Media, Inc.
              <u>Criminal Docket No. 23-82 (EK)</u>

Dear Judge Komitee:

      Thank you for this opportunity to be heard on your potential finding of contempt for the incident that occurred during the discussion of the jury note which the Court received in evidence as Court Exhibit 15 on July 15, 2024, in the case of the United States v. Carlos Watson and OZY Media, Inc., Dkt. No. 23-CR-82. I had no intention of displaying any contemptuous behavior, only to zealously advocate on behalf of my client, as is required of all defense counsel. If the court received my expression of frustration disrespect, I sincerely apologize.

      In order to truly be heard, I believe that it is important for the Court to have some background to assist you with your evaluation of my behavior. As the Court may or may not be aware, after working for big law and then clerking for the Honorable Sterling Johnson, Jr., U.S. District Court Judge, E.D.N.Y., I spent the vast majority of my career as prosecutor and in law enforcement. I was an Assistant District Attorney, for nearly 15 years with the New York County District Attorney's Office. I was a senior Assistant District Attorney who was tasked with prosecuting some of the most serious and most violent sex crimes and homicide cases in Manhattan. As such, I have considerable familiarity with and respect for courtroom procedures, ethics, and conduct. I have always shared mutual respect with the Judges I have been in front of and the attorneys I have had cases against. I have a reputation for being fair, honest, and someone who is interested in seeking the truth and justice, not in trying to outmaneuver my opposing counsel. I have exonerated defendants that I believed to be not guilty, and I have prosecuted to the fullest extent of the law those who are guilty and not willing to take responsibility for their actions.

      After leaving the District Attorney's Office, I continued my career as a public servant for the City of New York, by serving as an Assistant Deputy Commissioner at the New York City Police Department (NYPD), the second highest level a civilian can hold below Police Commissioner. I held key roles in the Risk Management Bureau, the Office of Equity and Inclusion, and the Criminal Justice Bureau. I brought much needed change to the NYPD, from police reform to diversity, equity, and inclusion awareness to changing the document discovery process, I always worked to make a more transparent, responsive, and accountable agency. After leaving the NYPD, I brought this same approach to the City's internet agency, the Department of Information Technology and Telecommunications ("DoITT"), now the Office of Technology and Innovation ("OTI"), where I was appointed the First Deputy Commissioner and Chief Diversity, Equity, and Inclusion Officer. In April 2023, I left DoITT due to the change in the Mayoral Administration and a restructuring of the executive staff.

  On May 10, 2024, I joined the Carlos Watson defense team. This is my first defense case since leaving Fried Frank Harris Shriver & Jacobson in 2000. I represented Mr. Watson pro bono, as previous lawyers lef the case after Mr. Watson's insurance funds depleted.

  On July 15, 2024, during jury deliberations, the jury sent out a note, Court Exhibit 15, which the Court asked the parties to discuss to determine how to appropriately respond. The defense team and the Government agreed to send certain sections of the trial transcript to the jury and disagreed about whether additional pages should be sent as well, which the defense believed to be responsive to the note. We subsequently discussed on the record our respective positions regarding our interpretation of the jury note.

  During that discussion, the Court asked Mr. Siegel what the disputes were between the parties with respect to how to respon to Court Exhibit 15, and allowed him to outline them. Specifically, with respect to, whether the request for the testimony about the "Goldman Call" included just the testimony about the call itself or all that Mr. Watson had done in the aftermath of the call, the Court seemed to be explaining why he agreed with the government and disagreed with the defense position without having yet heard the defense position – although, admittedly the Court did say that you would hear from defense counsel in a moment. However, I made an effort to actually explain the defense position, and in doing so, I interrupted the Court three times. I had no intention of being rude, I was solely attempting to advocate for my client during a moment when it appeared to me that a decision was being made without any input from the defense. When the Court brought the interruptions to my attention and told me to stop interrupting, I ceased the behavior immediately.

  Towards the end of the discussion, when determing which redactions to make in the testimony, after the Court asked the government why they were redacting a question and answer that at first blush appeared to be appropriate to the Court and which the defense argued should remain in the transcript being submitted to the jury, the Court ultimately again agreed with the government's position. At the conclusion of this discussion, I muttered under my breath the word "unbelievable," not intended to be heard on the record, by the Court, or by any audience members. It was an expression of exasperation and frustration out of yet again feeling unheard by the Court.

  All parties were subsequently called back to court within approximately 30 minutes of leaving the courtroom. Upon our arrival, the Court publicly chastised the whole defense team, accusing us of being belligerent, and reprimanded me, specifically, ultimately threatening me with a finding of contempt and a sanction.

  In <u>Bowens v. Atlantic Maintenance Corp.</u>, 546 F.Supp.2d 55, 63-64 (E.D.N.Y. 2008), the Court discussed the elements for civil contempt and factors courts should consider when contemplating holding someone in contempt. The <u>Bowens</u> Court outlined in relevant part:

> It is well established that " '[t]he power to punish for contempts is inherent in all courts.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873)); *see also People v. Terry,* 45 F.3d 17, 23 (2d Cir.1995). The underlying concern is " 'disobedience to the orders of the [j]udiciary,' " not " 'merely the disruption of court proceedings.' " *Chambers v. NASCO, Inc.,* 501 U.S. at 44, 111 S.Ct. 2123 (quoting *Young v. United States,* 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)); *see also People v. Terry,* 45 F.3d at 23 (noting that the power of contempt is " 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases' ") (quoting *Chambers v. NASCO, Inc.,* 501 U.S. at 43, 111 S.Ct. 2123 (internal quotations omitted)); *United States v. D–M Sales Corp.,* 903 F.Supp. 431, 433 (E.D.N.Y.1995)….
>
> There are three essential elements which must be established before a party can be held in civil contempt: **1) there must be an order that is "clear and unambiguous,"** *Powell v. Ward,* 643 F.2d at 931 (citing *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 75–76, 88

S.Ct. 201, 19 L.Ed.2d 236 (1967)); **2) the proof of non-compliance with that order must be " 'clear and convincing,' "** *id.* (quoting NLRB v. Local 282, 428 F.2d 994, 1001–02 (2d Cir.1970)); and **3) it must be shown that the contemnor has not " 'been reasonably diligent and energetic in attempting to accomplish what was ordered.' "** *Id.* (quoting Aspira of New York, Inc. v. Bd. of Educ., 423 F.Supp. 647, 654 (S.D.N.Y.1976)). *See also* King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995) (holding that "[a] contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict"); United States v. D–M Sales Corp., 903 F.Supp. at 433.

The court's order must leave " 'no uncertainty in the minds of those to whom it is addressed,' " and one " 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.' " King v. Allied Vision, Ltd., 65 F.3d at 1058 (citations omitted). Moreover, in determining whether civil contempt sanctions should be imposed for the purpose of making a contemnor comply with an order, the Supreme Court has set forth several factors for the courts to consider: **"(1) the character and magnitude of the harm threatened by continued contempt, (2) the probable effectiveness of the proposed sanction, and (3) the financial consequence of that sanction upon the contemnor."** In re Grand Jury Witness, 835 F.2d at 443 (citing United States v. United Mine Workers of Am., 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). Since a contempt order is a "potent weapon," International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. at 76, 88 S.Ct. 201, courts should be cautious in imposing this sanction if " 'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.' " King v. Allied Vision, Ltd., 65 F.3d at 1058 (quoting California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)).

Bowens, 546 F.Supp.2d at 63-64 (emphasis added); see also King v. Allied Vision, Ltd., 65 F.3d 1051, 1058(2d Cir. 1995); A Royal Flush, Inc. v. Arias, 855 Fed. Appx. 23; 2021 WL 1307394 (2d Cir. 2021)(when considering imposing sanctions, a court should consider the character and magnitude of the harm). When evaluating the first factor, even as alleged here, the conduct does not rise to the level of contemptuous behavior. The character and magnitude of the harm of my saying the word "unbelievable" is minimal. I said the word "unbelievable" under my breath, out of frustration, exasperation, and it was not intended to be heard by anyone. The audio would reveal that the word "unbelievable" at best was muttered under my breath, and as the transcript reveals the court had to ask what I said because it was not yelled or spoken at an increased volume. Tr. 4562, ln 13-25. I clearly did not say it loudly, as is evidenced by the fact that the Court had to ask what I said to ensure that it be captured on the record. Id.

As the Court is aware, throughout the trial, I have had problems with my microphone and not being heard. So naturally, I did *not* expect to be heard when I made that statement. Despite what this Court may think, I have tremendous respect for the Court and take my duty as an officer of the court very seriously and would never lie to nor mislead the Court. So, once questioned about what I said, I answered truthfully and restated what I had said under my breath which, again, was "unbelievable."[i] Finally, my comment was not aimed at the Court, it was simply a statement of frustration and exasperation.

Regarding the first element of contempt, I did not violate any order of the court which was directed at me and that was clear and unambiguous. I was not given any warning other than being told to stop interrupting. Once I was told to stop interrupting the Court, I complied with that order immediately. Moreover, I do not believe that any showing can be made that I have not complied with a court order by clear and convincing evidence, as required by the second element outlined by both the Bowens and King courts. See King, 65 F.3d at 1058; Bowens, 546 F.Supp.2d at 63. Additionally, I do not believe that my personal history with the case merits a finding of contempt. At most, I believe a warning would have been appropriate. While the Court has had flare ups with other members of the defense team, I have attempted to treat the Court courteously and with the utmost respect throughout the trial, and any past flare ups have been relatively benign and as the result of a feeling as though my character was being attacked with absolutely no basis. The only

other two "flare-ups"[ii] of which I am aware that I participated in resulted from what I perceived to be personal attacks on my character which I found to be both highly offensive and inaccurate. I did react on both occasions. Having never experienced that manner of attack on my character, even when I have disagreed with others, both professionally and personally, I felt truly offended, as I take my reputation for honesty and good character very seriously.

The last factor the Court needs to consider should the court decide to hold me in contempt is the financial consequence of any sanction on me. At this time, I would request an *in camera* review of my finances to make any sanction determination, if necessary.

Furthermore, threatening contempt for a minor incident like saying the word "unbelievable" sets a dangerous precedent as it has a chilling effect on attorneys and their ability to advocate for their clients in our adversarial justice system. The impact of that can be devastating. As the Court may have noticed, I did not speak again after being publicly embarrassed and threatened with contempt for this incident, except to ask for additional time to hand in this letter after receiving the verdict yesterday afternoon.

Finally, once again, to the degree the Court found my expression of exasperation after a very long and difficult trial to be disrespectful, I apologize as that was not my intent at all.

Respectfully submitted,

_[signature]_

Janine Gilbert, Esq.
*Counsel for Carlos Watson*

---

[i] Although the Court was kind enough to limit this inquiry to the incident on July 15, 2024, and exclusively to the statement made ("unbelievable") and not any question of volume, it should be noted that out of concern that I was unaware of whether I had raised my voice, I polled my defense team, several members of the audience, and a member of the prosecution team to determine if I had "shouted" at the Court as the Court suggested. Everyone polled indicated that I had not shouted at the Court nor raised my voice during the proceedings. The member of the prosecution team did point out that I interrupted the Court during the proceedings, which I readily acknowledge, and which is also clear from the transcript. Finally, when the Court has perceived other members of the defense team to be shouting in the past, the Court as asked them to lower their voice on the record, which is clearly not present in the transcript here.

[ii] The first incident of which I am aware was when I incorrectly stapled the pages of the Goldman Investment memo because the front page looked like it should be on top. Tr. 1801, ln 20-1808, ln 9. The Court insinuated that I did so in an effort to sneak a document in evidence or mislead the Court and jury in some way and that I was being mysterious about it. The language that the Court used with audible emphasis that is not able to be read in the transcript was that it was "an extreme coincidence in [our] favor." Tr. 1803, ln 25- 1804, ln 1. I perceived that to be casting aspersions on me. I was neither being mysterious or attempting to do anything improper. It was an honest mistake. I had been out sick the day before and was trying to prepare the cross-examination late at night while feeling horrible. I was surprised and offended by the insinuation made by the Court which was not withdrawn even after the government confirmed that the document was produced as one document. Additionally, I was surprised that the Court was asking me to preview my cross-examination for the Government as I had never experienced that in my 27 years as a litigator. I was not trying to hide anything, I was genuinely surprised as I had never seen that done in any trial I have ever had or observed. I ws extremely offended because it seemed as though the Court was accusing me of being intentionally cagey, secretive, and misleading. I did react, as I had never in my life been accused of something like that.

The second incident of which I am aware was when I was answering your question regarding the testimony of Mr. Rafael Zahlraddin, Esq. I was not able to fully provide an answer regarding what his testimony would be about and then I was accused of being mysterious when I was trying to answer the Court's questions. Tr. 3913. Ln 2-13. Again, I responded because until this trial, I have never been disparaged in such a manner.

      Finally, while this was not a flare up, it is indicative of how the Court treated and interacted with me throughout the trial, despite the fact that I had just joined the team ten days before jury selection. In the Court's Memorandum and Order, dated July 9, 2024, filed at ECF No. 245, on page 23, the Court writes that I said that the defense team had made efforts to reach out to the prior attorneys several times, but that they were not responsive to us. When I said that on July 1, 2024, that was in fact the case. The defense team had made several efforts to reach out to prior counsel. It was not until July 5, 2024, after repeated efforts by Ms. Frison that Ford O'Brien finally responded to our numerous inquiries. However, rather than give the defense team, and me personally, the benefit of the doubt, the Court writes at the bottom of page 23 of ECF 245 that, "the defense proved Ms. Gilbert's own assertion false: on July 6, 2024, defense counsel filed what appeared to be *all* of prior defense counsel's cover letters." The Court again assumed bad faith on the part of the defense team rather than ask us the timing of when we received the letters. We have an email to show when the letters were in fact received.