

U.S. Department of Justice

United States Attorney
Eastern District of New York

DCP:JRS/GK/DAS  
F. #2021R00900

271 Cadman Plaza East  
Brooklyn, New York 11201

July 25, 2024

By E-Mail and ECF

The Honorable Sanket J. Bulsara  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Carlos Watson  
             Criminal Docket No. 23-82 (EK)

Dear Judge Bulsara:

      The government respectfully submits this letter in opposition to defendant Carlos Watson's motion for release on bail following his conviction on all counts of the indictment following an eight-week jury trial and Judge Komitee's order that his bail be revoked and he be remanded while awaiting sentencing. See ECF No. 263 ("Mot."). Pursuant to 18 U.S.C. § 3143(a), a convicted defendant "shall" be ordered detained unless the defendant shows "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." On July 17, 2024, Judge Komitee found that the defendant posed a flight risk — a determination that the Court stated was "not a particularly close one," in light of the defendant's established pattern of dishonest conduct and repeated, flagrant violations of court orders and the conditions of his release. Trial Tr. 4606. The proposed bail conditions contained in the defendant's motion do nothing to respond to Judge Komitee's concerns and do not mitigate his significant risk of flight. Accordingly, the defendant's request to overturn Judge Komitee's order that the defendant be remanded should be denied.[1]

---

      [1]    Many of the facts and arguments contained herein are drawn from a detention memorandum filed on July 16, 2024, and are included for ease of reference. See ECF No. 255.

I.      Factual Background

      A.      The Offenses of Conviction

As proven at trial, from approximately 2018 to 2021, Watson directed a scheme to defraud investors in and lenders to Ozy Media, Inc. of tens of millions of dollars. Watson repeatedly lied directly to investors and lenders and ordered his top employees — Samir Rao and Suzee Han — to lie to investors and lenders, forge contracts, falsify Ozy's general ledger, and impersonate media executives from other companies, among other things.[2]

Following his conviction for these offenses, the defendant faces a mandatory-minimum sentence of two years' imprisonment for Count Three and a maximum potential sentence of 37 years. At present, the government estimates his Guidelines range of imprisonment as follows: A base offense level of 7 pursuant to U.S.S.G § 2B1.1(a)(1), a 24-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M) (loss of more than $65 million), a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) (more than 10 victims); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A) (more than $1 million from a financial institution); a two-point enhancement pursuant to U.S.S.G. § 3B1.1(c) (organizer or leader); and a two-point enhancement pursuant to U.S.S.G. § 3C1.1 (obstruction of justice), for a total offense level of 39. Assuming a criminal history category of I, this would yield an initial Guidelines range of 262 to 327 months' imprisonment for Counts One and Two. Pursuant to 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6, an additional 24 months' consecutive sentence is then added for Count Three, for a total of 286 to 351 months' (approximately 24 to 29 years') imprisonment.

      B.      The Pre-Indictment Obstructive Behavior

Watson has a lengthy history of obstructive and dishonest conduct and has demonstrated a brazen willingness to lie and inability to adhere to court orders.

From the onset of the government's investigation, Watson attempted to conceal the scheme and his role in it. After receiving grand jury subpoenas, Watson and Ozy produced some responsive materials but withheld plainly responsive documents that incriminated Watson. For example, Watson and Ozy withheld emails showing that Watson received regular updates on Ozy's true financial performance, which drastically contradicted the information Watson provided to investors. Watson and Ozy additionally withheld a resignation email that Ozy's then-CFO sent to Watson and Rao after Rao sent a falsified contract to a potential lender — which Watson had previously instructed the then-CFO to do and which she had refused to do. In the email, the then-CFO described Watson's and Rao's conduct as "illegal," a "fraud," and a "felony." These withheld materials were plainly inculpatory, and Watson's failure to produce them evidences an attempt to preclude the government from uncovering the depth of Watson's crimes.

---

[2]     Rao and Han both subsequently cooperated with the government and testified at the trial.

Watson's obstruction extended to attempts to tamper with witnesses and retaliate against individuals he believed were cooperating with the government's investigation. At the beginning of the investigation, Watson agreed on behalf of Ozy that Ozy would pay Rao's and Han's legal bills. As to Rao, however, Ozy required Rao to sign a document claiming that Rao had acted in good faith at all times, a claim that Watson well knew was false. For a time, Ozy did in fact pay Rao's and Han's bills. In late December 2021, however, then-counsel for Ozy spoke separately with counsel for Rao and counsel for Han and told them that Ozy would no longer pay their legal bills because Ozy believed they were cooperating with the government's investigation. At the time of these decisions, Watson was the only executive at Ozy and the only person at Ozy with authority to make such a decision.

In January 2022, after counsel for Rao challenged the legality of Ozy's actions, then-counsel for Ozy wrote to counsel for Rao and stated that Ozy would be willing to pay Rao's legal bills only if Rao signed a second affirmation re-affirming that Rao had acted in good faith, which Rao refused to do. Later that month, counsel for Rao spoke with then-counsel for Watson, who reiterated that Ozy would not pay Rao's legal bills because of the belief that Rao was cooperating with the government.[3]

During 2022, while the investigation remained pending, Watson hired accountants to retroactively alter Ozy's books and records to increase the amount of revenue recorded in an attempt to obscure his fraud. Unaltered records for the years 2015 to 2018 had been requested pursuant to the outstanding grand jury subpoenas but were never produced, and defense counsel has indicated that those unaltered records are now inaccessible.

C.     Post-Indictment Misconduct

Watson was indicted in February 2023, following which he was arrested and released on stringent bail conditions. Since that time, he has engaged in a pattern of ongoing violations of the law and the conditions of his release.

First, even after indictment, Watson and his attorneys continued to obstruct the investigation by refusing the produce documents responsive to the grand jury subpoenas. Even after the Court ultimately issued an order to compel production of materials by Watson, Watson largely ignored that order and continued to withhold documents, several of which were first produced as defense exhibits in the midst of trial, and many of which have never been produced to this day. See ECF No. 257 (memorandum and order precluding testimony of a defense witness and citing willful violations of the Court's orders regarding notice and discovery by defense counsel).

Second, in December 2023, in violation of the Court's protective order, Watson used discovery materials produced in this case to sue a victim in the case, Buzzfeed, and others.

---

[3] Rao subsequently sued Ozy in Delaware Chancery Court seeking advancement of his legal fees. The Delaware Court ordered Ozy to advance the fees, as required under Delaware law. The government understands that Ozy nevertheless continued to refuse to advance Rao's legal fees and was ultimately held to be in contempt of court.

In particular, in his civil complaint, Watson quoted from internal Buzzfeed documents that had been produced in discovery, which was explicitly in violation of the Court's protective order.

Third, during the trial, Watson repeatedly smuggled phones into the courthouse and lied to court security officers about his possession of phones. Even after being ordered by the Court to stop bringing phones, Watson continued smuggling in phones on at least two occasions, during which he falsely indicated that he did not have phones on him when he in fact did, and on at least one occasion he falsely told a security officer that the electronic device in his bag that was visible in the x-ray machine was a charger, when it was in fact a phone. See, e.g., Tr. 2642-2643 (Court observing that a phone just rang at counsel table to Watson's righthand side and stating, "And, again, I put this in the category of inexplicable. There is no explanation for it other than the total and brazen disregard of the rules and practices of this Court.").

Fourth, after the Court issued a special order forbidding public statements about the case, Watson continued to publish a website about the case, tooblackforbusiness.org. That website remained live for several weeks after the Court's order until the government specifically called it to the Court's attention, after which it was taken down within 24 hours. Social media accounts for the website repeating much of the same content remain available online.

Fifth, Watson testified and flagrantly perjured himself, as Judge Komitee found, thereby committing further illegal activity. Tr. 4604 ("I do think among the most prominent factors for me to consider at this point is Mr. Watson's clearly perjured trial testimony.").[4]

II. Applicable Law

Pursuant to 18 U.S.C. § 3143(a)(1), "the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline . . . does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community." Because a convicted defendant "is no longer entitled to the presumption of innocence" the statute places "the burden on a defendant." United States v. Madoff, 316 F. App'x 58, 59 (2d Cir. 2009).

The statute thus "establishes a presumption in favor of detention." United States v. Abuhamra, 389 F.3d 309, 319 (2d Cir. 2004). "[S]uch detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by law." Id. at 320.

---

[4] In his motion, it appears that Watson continues to misrepresent facts to the Court. Watson claims that "after Mr. Watson was remanded to MDC, a detainee was killed just a few cells away from Mr. Watson." Mot. 6. According to MDC records, Watson was not housed on the unit where the referenced killing occurred, and according to an MDC official consulted on this issue, inmates are not able to travel between units, which are separated by locked doors.

III. <u>Argument</u>

For the reasons set forth below, Watson cannot meet his burden of showing by clear and convincing evidence that he is not a flight risk or a danger to the community and should therefore be detained.

First, Watson's demonstrated dishonesty and contempt for the Court's orders make it impossible to believe that he would comply with any conditions of release. As noted above, Watson defied the motion to compel ordered by the Court, violated the Court's protective order to file a lawsuit against a victim of his crimes and lied to courthouse staff to try and sneak phones into the courthouse in violation of the courthouse's rules and the Court's specific orders. Moreover, Watson spent five days lying under oath in an effort to avoid accountability for his crimes. Any claim that he can now be trusted to comply with the Court's directives now rings hollow. Indeed, for that precise reason, courts have not hesitated to remand defendants, even in white-collar cases, whose conduct establishes that they cannot be trusted. See <u>United States v. Scali</u>, 738 F. App'x 32, 33 (2d Cir. 2018) ("[T]he court reasonably found that Scali's perjury conviction makes it difficult to trust his promise that he will not flee."); <u>United States v. Rahmankulov</u>, No. 21-CR-653 (RA), 2023 WL 3479696, at *2 (S.D.N.Y. May 16, 2023) (denying bail following money laundering conviction and noting that defendant's demonstrated dishonesty heightened risk of flight); <u>United States v. Dupree</u>, No. 10-CR-627 (KAM), 2014 WL 12690878, at *1 (E.D.N.Y. Apr. 7, 2014) (denying bail pending appeal; court "not satisfied that Mr. Dupree would abide by any conditions of release . . . [i]n light of this past non-compliance with the conditions of his release"); <u>United States v. Nicolo</u>, 706 F. Supp. 2d 330, 334 (W.D.N.Y. 2010) (defendant's dishonest conduct demonstrates that he "could not be trusted to abide by any conditions that might be set on his release"); <u>United States v. Nouri</u>, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (Chin, J.) (denying reconsideration of decision to remand following fraud conviction; in light of fraudulent and obstructive conduct proven at trial and prior dishonesty with the court, "I simply do not trust him to return to court were he released").

Judge Komitee cited Watson's proven dishonesty when deciding that remand was required. First, he observed that Watson demonstrated a willingness to directly lie to CSOs and to the jury during his trial:

> [Watson] did perjure himself on the witness stand in ways both large and small during this case, as the jury necessarily found and as was plainly evident when one compares Mr. Watson's testimony to other evidence that we all saw with our own eyes. We also do have the litany of instances in which Mr. Watson manifested his disregard for the rules of the court and manifested his willingness to say anything, no matter how deeply removed his comments were from reality, including the statements to the CSOs that he had no phone in his bag, which . . . shows a brazen willingness to look an officer of the court in the eye and say something that was just plainly false.

Tr. 4598. Judge Komitee further observed, "I do think the among the most prominent factors for me to consider at this point is Mr. Watson's clearly perjured trial testimony . . . . Testimony

5

under oath — false testimony under oath is unequivocally a crime. And so I think we're now in a different place not only with respect to who bears the burden but also with respect to the factual record." Tr. 4604-05. Judge Komitee quoted Judge Chin's observation in Nouri (cited above) that, given a defendant's dishonesty throughout the case, "'I simply do not trust him to return to court were he released,'" and stated "I don't see how I can come to any different conclusion here." Tr. 4605. Judge Komitee thus found, in light of the history of the case and the presumption of detention, "I think that leaves me with my hands tied, with no option on my part but to revoke bail and order the defendant remanded." Id. Put plainly, pretrial supervision necessarily relies upon a degree of trust that is not possible in this case. Watson's seemingly unbounded willingness to lie to further his own interests undermines any argument that even the most restrictive forms of pretrial supervision would be appropriate.

   Second, unlike many white-collar defendants, Watson is guaranteed to be sentenced to time in prison due to the mandatory-minimum sentence, and likely faces a substantial sentence given his Guidelines range of 286 to 351 months' imprisonment. He therefore faces a strong incentive to flee. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"). Indeed, the Second Circuit has affirmed remanding a convicted sentence facing a significantly lower Guidelines range, holding that a range of "87-108 months' imprisonment was significant enough to provide an incentive to flee." Scali, 738 F. App'x at 33; see also United States v. Cubangbang, No. 18-CR-601 (PGG), 2020 WL 1905591, at *5 (S.D.N.Y. Apr. 17, 2020) (denying motion for bail pending sentencing and noting that "a range of 210 to 262 months' imprisonment under the Sentencing Guidelines . . . provides [the defendant] with an obvious incentive to flee); United States v. Paulino, No. 19-CR-54 (PGG), 2020 WL 1847914, at *6 (S.D.N.Y. Apr. 13, 2020) (denying bail pending sentencing where defendant faced a "Guidelines range of 84 to 105 months' imprisonment, a potential sentence that provides an obvious incentive to flee").

   Third, Watson's years-long fraudulent scheme and his ongoing dishonesty indicate that he remains a danger to the community. Danger includes the risk of economic harm, and courts have found that defendants convicted of fraud offenses may continue posing a danger where the evidence does not suggest "that [a defendant's] scruples would stand in the way of his engaging in such activity [again], if he saw an opportunity to do so and thought that it might benefit him in some way," particularly where the defendant has demonstrated a "refusal to accept any responsibility for his actions, and his utter lack of remorse for his crimes, or for the harm and suffering that he has inflicted upon others." Nicolo, 706 F. Supp. 2d at 335-36; see also Madoff, 316 F. App'x at 59-60 (noting that danger to the community includes "pecuniary" harm). That risk is particularly salient here, where Watson continued to raise money from investors while the government's investigation was overt using post-hoc, fraudulent financials and has testified that he believes Ozy is simply "paused" pending this case. Tr. 3551. When one considers that Watson has already committed numerous crimes of dishonesty (including lying to court security officials, in violation of 18 U.S.C. § 1001, and perjury) while on bail, there is reason to believe

6

he would continue to raise money from investors or others based on his false view that he has not committed a crime.

Watson's arguments to the contrary are unavailing.  First, Watson cites numerous cases where white-collar defendants were not remanded but largely fails to respond to Judge Komitee's request for examples where a defendant was released on bail following conviction notwithstanding "a defendant's perjured testimony," particularly "where somebody is facing as much time as we're talking about here."  Tr. 4597-98.  With the lone exception of United States v. DiScala, No. 14-CR-399 (ENV), none of the cases cited by Watson involve perjury by a defendant.  And DiScala is readily distinguishable.  In DiScala, the defendant faced no mandatory minimum, had caused losses of approximately $16 million during one year of fraudulent conduct, and had been on pretrial release for approximately four years with no issues; by contrast, Watson is facing a mandatory-minimum sentence of two years, caused well over $50 million in actual loss (and over $100 million in intended loss) during his four years of pervasive fraud, and in his 17 months on bail, has repeatedly violated court orders and nearly had his bail revoked even prior to his conviction.

Watson also cites to United States v. Chavez, No. 22-CR-303 (JMF), 2024 WL 5023 (S.D.N.Y. Jan. 4, 2024), in arguing that the conditions at the MDC constitute "exceptional reasons" supporting his release.  See ECF No. 263 at 6.  But Chavez was clear that the "exceptional reasons" analysis applies only after the district court first found, by clear and convincing evidence, that the defendant was not likely to flee or pose a danger to the community. See Chavez, 2024 WL 50233, at *3.  Indeed, the Court in Chavez found that the defendant had been "100% compliant with the terms of his release to date, [did] not pose a danger to anyone, and [did] not present a risk of flight."  Id. at *9.  Here, by contrast, Judge Komitee found that Watson plainly posed a risk of flight and based that determination on Watson's own choices and conduct during the course of the investigation and trial.  So Chavez, like DiScala and the other cases cited by Watson, is inapposite.

Finally, the additional conditions of release proposed by Watson do not address Judge Komitee's concerns or meaningfully change the analysis.  At the last detention hearing, Watson had proposed a $1 million bond secured by Watson's home and signed by two of Watson's sisters, and consented to home confinement and electronic monitoring.  Tr. 4599-4600.  Judge Komitee found those conditions inadequate.  The only changes Watson offers now is to increase the bond to $2 million, replace one of his sisters as a surety with a cousin and a family friend, and to add additional property owned by others to secure the bond.  See Mot. 1, 5.  But there is no reason to believe that an increase in the bond amount will have any impact on Watson, who is likely insolvent and who faces looming restitution and forfeiture penalties in the tens of millions of dollars.  There is also no reason believe that the new sureties would provide any more moral suasion than the sister he proposes to replaced, particularly since the evidence at trial showed that Watson was willing to take millions of dollars from his own family to further his fraud.  And the additional property offered as collateral similarly would do little to restrain Watson should he choose to flee, as the loss would all fall diffusely on others (the $1 million of property he offers is owned by nine separate individuals) and because the large majority of the value of the additional collateral comes from undeveloped land in rural Virginia whose asserted

7

value of $750,000 is supported by nothing other than Watson's say-so.[5]  The $1 million of collateral also includes $100,000 from Watson's cousin's tax-advantaged retirement account, which depending on the cousin's age potentially may be ineligible for use as collateral under IRS rules.

In the alternative, Watson offers to retain a "private security firm," the details of which he does not elaborate.  Mot. 5.  But the Second Circuit has held that allowing wealthy defendants to obtain bail through such arrangements where less wealthy defendants could not is impermissible.  See United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) ("We now expressly hold that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails."); accord United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("And finally, the Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act, which the Second Circuit has held 'does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.'").  This offer is therefore a nonstarter.

At bottom, the conditions that Watson permissibly proposes— a bond secured by the money and property of his friends and family, electronic monitoring, and home confinement — all inherently require a modicum of trust that Watson will adhere to basic rules imposed by the Court.  As Judge Komitee previously found, Watson through his own conduct has violated every grant of trust the Court and others have given him and can no longer be afforded that trust.

\*          \*          \*

Even before his conviction, when Watson was presumptively entitled to bail, Judge Komitee held that, as a result of Watson's repeated misconduct, it was "as close to [the] point [of revoking bail] as I can possible be without actually crossing that line."  July 8, 2024 Bail Hr'g Tr. 14:19-22.  In light of both the statutory presumption of detention and the jury's finding that Watson engaged in a massive fraudulent scheme and perjured himself in this case, Watson cannot now assure the Court — yet alone present clear and convincing evidence — that he will not use his resources and connections to flee rather than face punishment.  Judge Komitee's original decision to remand him should therefore remain in force.

---

[5]  Without any support, Watson claims that this land is worth approximately $17,730 per acre ($750,000 divided by 42.3 acres).  Mot. at 4-5.  A cursory Google search for undeveloped land for sale in the same county (Gloucester County, VA) reveals prices as low as $6,975 per acre, suggesting that Watson's valuation may be inflated.

8

IV.   Conclusion

   For the foregoing reasons, the government respectfully requests that the Court adhere to Judge Komitee's prior order that the defendant be remanded pending sentencing.

              Respectfully submitted,

              BREON PEACE
              United States Attorney

         By: /s/
              Jonathan Siegel
              Gillian Kassner
              Dylan A. Stern
              Assistant U.S. Attorneys
              (718) 254-6293/6224/6213

cc: Clerk of the Court (via ECF)
   All Counsel of Record (via ECF)