

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DCP:JRS/GK/DAS  ⠀⠀⠀⠀⠀⠀⠀⠀ *271 Cadman Plaza East*
F. #2021R00900  ⠀⠀⠀⠀⠀⠀⠀⠀ *Brooklyn, New York 11201*

August 5, 2024

<u>By ECF</u>

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

⠀⠀⠀⠀⠀⠀ Re:⠀⠀ United States v. Carlos Watson
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ <u>Criminal Docket No. 23-82 (EK)</u>

Dear Judge Komitee:

⠀⠀⠀⠀⠀⠀ The government respectfully appeals the July 31, 2024 order of the Honorable
Vera M. Scanlon, United States Magistrate Judge, granting the defendant bail pending
sentencing.  <u>See</u> ECF Nos. 285, 286.  The bail package offered by the defendant rests on the
premise that the defendant would not inflict financial harm on others in order to advance his own
interests — a premise wholly contradicted by the facts proven at trial.  Accordingly, on <u>de novo</u>
review, the Court should find that the defendant has failed to meet his burden of showing by
clear and convincing evidence that he is not a flight risk or a danger to the community and deny
his motion for bail.[1]

I.⠀⠀⠀⠀ <u>Factual Background</u>

⠀⠀⠀⠀⠀⠀ A.⠀⠀⠀⠀ <u>The Offenses of Conviction</u>

⠀⠀⠀⠀⠀⠀ As proven at trial, from approximately 2018 to 2021, the defendant directed a
scheme to defraud investors in and lenders to Ozy Media, Inc. of over $100 million, causing an
actual loss of over $50 million.  The defendant repeatedly lied directly to investors and lenders
and ordered his top employees — Samir Rao and Suzee Han — to lie to investors and lenders,
forge contracts, falsify Ozy's general ledger, and impersonate media executives from other

---

⠀⠀⠀⠀⠀⠀ [1]⠀⠀⠀⠀ Many of the facts and arguments contained herein are drawn from the
government's previous filings regarding detention and are consolidated here for the convenience
of the Court.

companies, among other things.[2]  As relevant here, the defendant frequently targeted friends and family for investments in and loans to Ozy.  Even after the fraud was revealed in the New York Times in September 2021 and the government began its investigation, the defendant in 2022 and 2023 solicited investments and loans to Ozy of over $1 million from his sister Beverly Watson, $750,000 from his friend Kosmas Kalliarekos, and $100,00 from longtime supporter Thomas Franco, all or nearly all of which was ultimately lost.

Following his conviction for these offenses, the defendant faces a mandatory-minimum sentence of two years' imprisonment for Count Three and a maximum potential sentence of 37 years.  At present, the government estimates his Guidelines range of imprisonment as follows:  A base offense level of 7 pursuant to U.S.S.G § 2B1.1(a)(1), a 24-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M) (loss of more than $65 million), a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) (more than 10 victims); a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A) (more than $1 million from a financial institution); a two-point enhancement pursuant to U.S.S.G. § 3B1.1(c) (organizer or leader); and a two-point enhancement pursuant to U.S.S.G. § 3C1.1 (obstruction of justice), for a total offense level of 39.  Assuming a criminal history category of I, this would yield an initial Guidelines range of 262 to 327 months' imprisonment for Counts One and Two.  Pursuant to 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6, an additional 24 months' consecutive sentence is then added for Count Three, for a total of 286 to 351 months' (approximately 24 to 29 years') imprisonment.[3]

B.      The Pre-Indictment Obstructive Behavior

The defendant has a lengthy history of obstructive and dishonest conduct and has demonstrated a brazen willingness to lie and an inability to adhere to court orders.

From the onset of the government's investigation, the defendant attempted to conceal the scheme and his role in it.  After receiving grand jury subpoenas, the defendant and Ozy produced some responsive materials but withheld plainly responsive documents that incriminated the defendant.  For example, the defendant and Ozy withheld emails showing that the defendant received regular updates on Ozy's true financial performance, which drastically contradicted the information the defendant provided to investors.  The defendant and Ozy additionally withheld a resignation email that Ozy's then-CFO sent to the defendant and Rao

---

[2]      Rao and Han both cooperated with the government and testified at the trial.

[3]      According to data maintained by the U.S. Sentencing Commission, there is insufficient data to determine the average sentence imposed from 2019 to 2023 for defendants with a controlling Guideline of U.S.S.G. § 2B1.1, with an offense level of 39, and criminal history category I, who were also convicted of 18 U.S.C. § 1028A.  The closest offense level with sufficient data is an offense level of 37.  For defendants with that lower offense level, in criminal history category I, with a Section 1028A conviction, with a controlling Guideline of U.S.S.G. § 2B1.1, the average sentence imposed from 2019 to 2023 was 228 months' (19 years') imprisonment and the median sentence imposed was 216 months' (18 years') imprisonment.  See Judiciary Sent'g Info., U.S. Sent'g Comm'n, https://jsin.ussc.gov.

after Rao sent a falsified contract to a potential lender — which the defendant had previously instructed the then-CFO to do and which she had refused to do.  In the email, the then-CFO described the defendant's and Rao's conduct as "illegal," a "fraud," and a "felony."  These withheld materials were plainly inculpatory, and the defendant's failure to produce them evidences an attempt to prevent the government from uncovering the depth of the defendant's crimes.

The defendant's obstruction extended to attempts to tamper with witnesses and retaliate against individuals he believed were cooperating with the government's investigation. At the beginning of the investigation, the defendant agreed on behalf of Ozy that Ozy would pay Rao's and Han's legal bills.  As to Rao, however, Ozy required Rao to sign a document claiming that Rao had acted in good faith at all times, a claim that the defendant well knew was false.  For a time, Ozy did in fact pay Rao's and Han's bills.  In late December 2021, however, then-counsel for Ozy spoke separately with counsel for Rao and counsel for Han and told them that Ozy would no longer pay their legal bills because Ozy believed they were cooperating with the government's investigation.  At the time of these decisions, the defendant was the only executive at Ozy and the only person at Ozy with authority to make such a decision.

In January 2022, after counsel for Rao challenged the legality of Ozy's actions, then-counsel for Ozy wrote to counsel for Rao and stated that Ozy would be willing to pay Rao's legal bills only if Rao signed a second affirmation re-affirming that Rao had acted in good faith, which Rao refused to do.  Later that month, counsel for Rao spoke with then-counsel for the defendant, who reiterated that Ozy would not pay Rao's legal bills because of the belief that Rao was cooperating with the government.[4]

During 2022, while the investigation remained pending, the defendant hired accountants to retroactively alter Ozy's books and records to increase the amount of revenue recorded in an attempt to obscure his fraud.  Unaltered records for the years 2015 to 2018 had been requested pursuant to the outstanding grand jury subpoenas but were never produced, and defense counsel has indicated that those unaltered records are now inaccessible.

C.     Post-Indictment Misconduct

The defendant was indicted in February 2023, following which he was arrested and released on stringent bail conditions.  Since that time, he has engaged in a pattern of ongoing violations of the law and the conditions of his release.

First, even after indictment, the defendant and his attorneys continued to obstruct the investigation by refusing the produce documents responsive to the grand jury subpoenas. Even after the Court ultimately issued an order to compel production of materials by the defendant, the defendant largely ignored that order and continued to withhold documents, several

---

[4]     Rao subsequently sued Ozy in Delaware Chancery Court to seek advancement of his legal fees.  The Delaware Court ordered Ozy to advance the fees, as required under Delaware law.  The government understands that Ozy nevertheless continued to refuse to advance Rao's legal fees and was ultimately held to be in contempt of court.

of which were first produced as defense exhibits in the midst of trial, and many of which have never been produced to this day.  See ECF No. 257 (memorandum and order precluding testimony of a defense witness and citing willful violations of the Court's orders regarding notice and discovery by defense counsel).

Second, in December 2023, in violation of the Court's protective order, the defendant used discovery materials produced in this case to sue a victim in the case, Buzzfeed, and others.  In particular, in his civil complaint, the defendant quoted from internal Buzzfeed documents that had been produced in discovery, which was explicitly in violation of the Court's protective order.  That civil case was dropped a week after the defendant was convicted, suggesting that the lawsuit was intended all along to harass victims and potential witnesses.

Third, during the trial, the defendant repeatedly smuggled phones into the courthouse and lied to court security officers about his possession of phones.  Even after being ordered by the Court to stop bringing phones, the defendant continued smuggling in phones on at least two occasions, during which he falsely indicated that he did not have phones on him when he in fact did, and on at least one occasion, he falsely told a security officer that the electronic device in his bag that was visible in the x-ray machine was a charger, when it was in fact a phone.  See, e.g., Trial Tr. 2642-2643 (Court observing that a phone just rang at counsel table to the defendant's righthand side and stating, "And, again, I put this in the category of inexplicable. There is no explanation for it other than the total and brazen disregard of the rules and practices of this Court.").

Fourth, after the Court issued a special order forbidding public statements about the case, the defendant continued to publish a website about the case, tooblackforbusiness.org. That website remained live for several weeks after the Court's order until the government specifically called it to the Court's attention, after which it was taken down within 24 hours. Social media accounts for the website repeating much of the same content remain available online.

Fifth, the defendant testified and flagrantly perjured himself, as the Court found, thereby committing further illegal activity.  See Trial Tr. 4598.

D.     The Defendant's Remand

Following the defendant's conviction on all counts, the government moved for remand pursuant to 18 U.S.C. § 3143(a)(1).  See Trial Tr. 4586; ECF No. 255.  The defendant argued in response that the defendant had consistently appeared in court and should be released pursuant to the same bond that had existed pretrial (i.e., a $1 million bond signed by the defendant, his sister Beverly Watson, and his sister Carolyn Watson), along with home confinement and location monitoring.  See Tr. 4595-96, 4599-4600.

The Court remanded the defendant, finding that "given the history of Mr. Watson's conduct here, I think the determination on risk of flight is not a particularly close one and Mr. Watson has not carried his burden."  Id. at 4606.  (The Court did not address whether the defendant had carried his burden of showing he was not a danger to the community. See id.)  In explaining its ruling, the Court stated:

4

> [The defendant] did perjure himself on the witness stand in ways
> both large and small during this case, as the jury necessarily found
> and as was plainly evident when one compares Mr. Watson's
> testimony to other evidence that we all saw with our own eyes.  We
> also do have the litany of instances in which Mr. Watson manifested
> his disregard for the rules of the court and manifested his willingness
> to say anything, no matter how deeply removed his comments were
> from reality, including the statements to the CSOs that he had no
> phone in his bag, which . . . shows a brazen willingness to look an
> officer of the court in the eye and say something that was just plainly
> false.

Id. at 4598.  The Court further observed, "I do think the among the most prominent factors for
me to consider at this point is Mr. Watson's clearly perjured trial testimony . . . . Testimony
under oath — false testimony under oath is unequivocally a crime.  And so I think we're now in
a different place not only with respect to who bears the burden but also with respect to the factual
record."  Id. at 4604-05.  The Court quoted Judge Denny Chin's observation in United States v.
Nouri, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009), that, given a
defendant's dishonesty throughout the case, "'I simply do not trust him to return to court were he
released,'" and stated, "I don't see how I can come to any different conclusion here."  Trial
Tr. 4605.  The Court thus found, in light of the history of the case and the presumption of
detention, "I think that leaves me with my hands tied, with no option on my part but to revoke
bail and order the defendant remanded."  Id.

The Court, however, left open the possibility of reconsideration with a
"meaningfully strengthened bail package":

> If the defense wants to come back with a meaningfully strengthened
> bail package, I would be willing to consider that, of course.  I'm not
> suggesting that that will carry the day or that it won't, but I would
> have expected that people would at least be thinking about that
> possibility and that plans be at least in the works to see what
> additional sureties, maybe independent third-party sureties, I don't
> know, might have something to add.
>
> Again, I don't want to extend any false hopes here.  I'm not saying
> that will carry the day.

Id. at 4505-06.

E.    The Revised Bail Application and Judge Scanlon's Decision

One week later, on July 23, 2024, the defendant moved for bail pending
sentencing, which motion the Court referred to Judge Scanlon.  See ECF No. 263 ("Bail Mot.").
As originally formulated, in addition to the home confinement and location monitoring
previously proposed, the defendant proposed a $2 million bond to be signed by Beverly Watson,
Carolyn Watson and the defendant's cousin Annye Watson (sometimes also referred to as

Michelle Watson).  See id. at 1; July 26, 2024 Bail Hr'g 5.  The defendant proposed that this bond would be secured by a purported $1 million in property, consisting of a condominium owned by Beverly Watson in Washington, D.C., with approximately $100,000 of equity;[5] the retirement account of Annye Watson, with a then-estimated value of $100,000; undeveloped land in Gloucester County, Virginia (the "Virginia Land"), owned by the defendant's family, with a claimed value of $750,000; and $50,000 of home equity from the home of Allison Wallace Estes, a friend of the defendant's through Beverly Watson.  See Bail Mot. 5.  The defendant also offered to retain a private security firm to ensure him compliance with bail conditions.  See id.

   The government opposed bail, arguing, among other things, that the one additional surety and the additional property offered as collateral did not meaningfully change the package previously rejected by the Court, particularly because no evidence was provided to demonstrate that the Virginia Land was worth anything close to $750,000, and that even the new package did not satisfy the defendant's burden.  See ECF No. 265.  The government also noted that the defendant's offer to retain a private security firm was unavailing, as the Second Circuit has held that allowing wealthy defendants to obtain bail through such arrangements where less wealthy defendants could not is impermissible.  See id. at 8 (citing United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) ("We now expressly hold that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails."); United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("And finally, the Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act, which the Second Circuit has held 'does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.'")).

   Over four days of hearings between July 26 and July 31, 2024, Judge Scanlon heard argument regarding the adequacy of the proposed bond and the value of the Virginia Land.  See ECF Nos. 276, 279, 281 (government letters setting forth its view that the Virginia Land was worth less than $130,000); ECF Nos. 267, 280 (defense letters defending $750,000 valuation); compare July 26, 2024 Bail Hr'g Tr. 44-45 (claim by defense counsel that $750,000 valuation was supported by "a forestry report that shows the value of the land," which would show that the actual value of the land was "greater than" $750,000), with id. at 52 (subsequent admission by defense counsel that the forestry report contained no valuation information).  During these hearings, the proposed bond shifted to a final package consisting of a $3 million bond signed by Beverly Watson, Carolyn Watson and Annye Watson, secured by: (1) Beverly Watson's condominium; (2) Annye Watson's retirement account; (3) the Virginia Land; (4) $100,000 of equity from the Wallace Estes home; (5) $100,000 pledged by Kosmas Kalliarekos, an Ozy investor and defense witness from the trial; (6) $12,500 in cash pledged by Amy Troner, a friend of the defendant's through Beverly Watson; (7) $25,000 in stock pledged by Michael Troner,

---

[5]   Beverly Watson resides in California, and it is unclear if the condominium is rented or vacant.  See Feb. 23, 2023 Arraignment Tr. 25-26 (statement by Beverly Watson that she resides with Carolyn Watson in California but owns a condominium in D.C.).

Amy Troner's father; and (8) $100,000 in cash and stock pledged by Jacqueline Mattis, a friend of the defendant's through Carolyn Watson.  See July 31, 2024 Bail Hr'g Tr. 54-57.

Judge Scanlon held that the revised packaged "meaningfully strengthened" the prior package and satisfied the defendant's burden under 18 U.S.C. § 3143(a)(1).  Id. at 77-78. Judge Scanlon offered several reasons for the decision:

- White-collar defendants had been released on bail in cases cited by the defendant (id. at 78 (citing Bail Mot. 3));

- The defendant's "good performance" pretrial and the fact that "bond was not revoked until the conviction" (id. at 79);

- The strict conditions of home confinement (id. at 79-80);

- The incentive the defendant had to not flee so he could spend time with his elderly father and ill sister (id.);

- The amount of money pledged as collateral, the number of sureties, the sureties' belief in the defendant, and the sentimental value of the Virginia Land (id. at 80-82); and

- The incentive the defendant had to not flee to preserve his ability to appeal and to avoid a higher potential sentence (id. at 83-84).

As to the dispute regarding the value of the Virginia Land, Judge Scanlon adopted the government's valuation of between approximately $106,000 and $130,000.  See id. at 81.[6] Judge Scanlon also acknowledged the government's argument that it was inappropriate for Mr. Kalliarekos, a victim of the defendant's scheme, to serve as a surety, but held that Mr. Kalliarekos "has enough independence of thought and will to evaluate his own circumstance."  Id. at 83.

Judge Scanlon held that all collateral would need to be posted by August 14, 2024 and stayed the order of release pending the proper posting of all collateral and stayed the order pending the resolution of an appeal to this Court.  See id. at 28-29, 74.

II.    Applicable Law

A.    Standard of Review

"A district court reviews de novo a magistrate judge's decision to release or detain a defendant pending trial."  United States v. Williams, No. 20-CR-293 (WFK), 2020 WL

---

[6]    The defendant had also claimed to Judge Scanlon that the Virginia Land earned "a six-figure yearly income . . . from forestry."  July 26, 2024 Bail Hr'g Tr. 6.  The government repeatedly asked defense counsel for any evidence of any income earned from the Virginia Land, but none has been provided.

4719982, at *1 (E.D.N.Y. Aug. 13, 2020); see also United States v. Leon, 766 F.2d 77, 80 (2d
Cir. 1985) ("In our view a district court should fully reconsider a magistrate's denial of bail and
in ruling on a motion for revocation or amendment of a detention order should not simply defer
to the judgment of the magistrate, but reach its own independent conclusion.").

> B.   Detention Generally

Pursuant to 18 U.S.C. § 3143(a)(1), "the judicial officer shall order that a person
who has been found guilty of an offense and who is awaiting imposition or execution of
sentence, other than a person for whom the applicable guideline . . . does not recommend a term
of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence
that the person is not likely to flee or pose a danger to the safety of any other person or the
community."  Because a convicted defendant "is no longer entitled to the presumption of
innocence," the statute places "the burden on a defendant."  United States v. Madoff, 316 F.
App'x 58, 59 (2d Cir. 2009).

The statute thus "establishes a presumption in favor of detention."  United States
v. Abuhamra, 389 F.3d 309, 319 (2d Cir. 2004).  "[S]uch detention promotes public safety by
removing a presumptively dangerous person from the community; it also encourages general
respect for the law by signaling that a guilty person will not be able to avoid or delay imposition
and service of the sentence prescribed by law."  Id. at 320.

III.   Argument

> A.   The Proposed Package Does Not Satisfy the Defendant's Burden

The proposed bail package undoubtedly shows that numerous individuals are
committed to the defendant and are willing to put their faith in him.  The same, however, could
have been said about Ozy's investors and lenders — over 75 investors and lenders believed in
the defendant sufficiently to entrust him with approximately $100 million.  That faith proved to
be unjustified.  Under these circumstances, the question the Court must address is not the extent
of the sureties' faith but, rather, whether that faith can be relied upon to meet the defendant's
burden.

It cannot.  As the Second Circuit has long recognized, "[i]t is not the sum of the
bail bond that society asks for, but rather the presence of the defendant.  If the court lacks
confidence in the surety's . . . ability to secure the appearance of a bailed defendant, it may
refuse its approval of a bond even though the financial standing of the bail is beyond question."
United States v. Nebbia, 357 F.2d 303, 304 (2d Cir. 1966).  Thus, where a defendant's conduct
suggests that financial loss to sureties would not adequately motivate him to appear, bail is
properly denied.  See United States v. Wang, 670 F. Supp. 3d 57, 68 (S.D.N.Y. 2023), aff'd,
No. 23-CR-118 (AT), 2023 WL 4551637 (S.D.N.Y. July 14, 2023) (denying bail where the
sureties "may be loyal to [the defendant], but the reverse is by no means apparent"); United
States v. Valerio, 9 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) ("Given the extremely strong evidence
against him and the substantial penalties that he faces, the Court does not believe any condition
or combination of conditions will reasonably assure his appearance in court.  It is unclear what
moral suasion his family, or the bail package they propose, will have over defendant under these

8

circumstances."); <u>United States v. Hollender</u>, 162 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2001) ("This evidence of Hollender's preying on the religious and cultural sensibilities of the Jewish community strongly suggests to the Court that Hollender would not be amenable to the moral suasion of bail — whether from rabbis or from his neighbors, who might be persuaded to put up their homes as collateral for his release."); <u>United States v. Sarivola</u>, No. 94-CR-236 (CSH), 1994 WL 613259, at *4 (S.D.N.Y. Nov. 4, 1994) (bail package secured by home owned by two sisters was inadequate; "Philomena does not live there; and it is clear enough from the hearing that dislodging Carol Lahain from her home would not overly trouble her brother").

The proposed bail package here consists of two groups of sureties: three full sureties, who have pledged $3 million, and a series of limited sureties who have pledged certain property, but only up to a set limit.  As to the limited sureties — who have pledged property valued between approximately $10,000 and $100,000 each[7] — there is no reason to believe that the threat that those individuals would lose that property would prevent the defendant's flight.  The defendant stole millions of dollars from victims of his fraudulent scheme, including millions from individuals who had known him for years and considered him to be a friend.  If the defendant would cheat Laurene Powell Jobs, Harry Hawks, and Joe O'Hara — each of whom believed in the defendant because they had known him for over a decade and each of whom he defrauded of more than $2 million — why could he be expected to hesitate to cause a loss of $100,000 to his sister's friend Ms. Wallace Estes, or a loss of $100,000 to his sister's friend Dr. Mattis, or a loss of $12,500 to his sister's friend Ms. Troner, especially if he thought doing so could benefit him?

The most glaring example of this problem is Mr. Kalliarekos, who has pledged $100,000.  While Judge Scanlon was correct that Mr. Kalliarekos can make choices for himself, that does little to answer the fundamental issue of what comfort the Court can take that the defendant will be persuaded to not flee to avoid harm to Mr. Kalliarekos.  Given that the defendant has already stolen over $1 million from Mr. Kalliarekos over the years, there is simply no basis to find that the defendant would be unwilling to cause a loss of another $100,000.  Indeed, for that exact reason, other courts have recognized that fraud victims are generally not proper sureties.  <u>See</u> <u>Wang</u>, 670 F. Supp. 3d at 67 ("While each of those individuals may be fully committed to Wang . . . six of the individuals tendered are believed by the Government to be investors in the fraud of which Wang is accused.  It is unlikely that Wang would be concerned with forestalling loss of security by the very people she is alleged to have defrauded.").

Nor is any purported sentimental value of the Virginia Land sufficient to ensure the defendant's appearance.  As Judge Scanlon noted, it is unclear how long the Virginia Land has actually been in the defendant's family.  <u>See</u> July 31, 2024 Bail Hr'g Tr. 81.  But even assuming that the land has strong sentimental value to the defendant's family, there is no reason to believe that that the defendant would prioritize that sentimental attachment over his freedom if given the choice.

---

[7]     Because the Virginia Land is held in common by approximately 15 individuals, each individual's interest in the property is less than $10,000 at the government's valuation, which Judge Scanlon adopted.

As to the full sureties — the defendant's sisters Beverly and Carolyn, and his cousin Annye Watson — there is the additional flaw that there has been no showing that these individuals have the assets to pay a $3 million bond, rendering that impressive-sounding number illusory.  Such a showing is required under the Bail Reform Act to ensure that a bond be more than an empty promise, and the failure to make that showing here standing alone demonstrates the inadequacy of the package.  See 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that a surety "shall have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"); Wang, 670 F. Supp. 3d at 66 ("The Act requires cosigners to be 'solvent,' and to 'have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond.'"); United States v. Batista, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) (sureties must have "the ability to pay the amount specified in the bond if the defendant fails to appear at trial").  Moreover, given the devotion the defendant's sisters have shown him, including taking on significant debt to support him, it is unclear to what extent the defendant's sisters would not prefer to take on a judgment — particularly a judgment that cannot be meaningfully enforced — if doing so would allow him to evade a significant jail sentence.  See United States v. Shakur, 817 F.2d 189, 200 (2d Cir. 1987) (denying bail where "it is more likely that those supporters would seek to obtain his freedom through flight by any means necessary, including the loss of their homes"); United States v. Diaz, No. 98-CR-1434 (CSH), 1998 WL 915896, at *2 (S.D.N.Y. Dec. 30, 1998) ("In view of the limited financial resources of defendant's father, I cannot regard the moral suasion against flight generated by his signature alone on the bond as sufficient to overcome the statutory presumption.  I cannot close my eyes to the possibility, given the ties of affection between parent and child, that defendant's father might encourage her to flee rather than persuade her to remain.").[8]

At its foundation, the purpose of sureties is to create circumstances where a defendant would be so loath to harm the sureties that he would not flee.  Unfortunately, the defendant has shown a consistent willingness to inflict financial harm on others, including those close to him, to advance his own interests.  The defendant cannot show by clear and convincing evidence that he would not deprive these sureties of the money and property they have pledged just as he deprived his victims of vastly larger sums of money and property.  The motion for bail should therefore be denied.

---

[8]     It is also questionable whether Beverly Watson or Carolyn Watson are appropriate sureties given their conduct in this case.  For example, during the bail proceedings, Beverly Watson falsely presented herself to the Deputy Marshals in the courthouse basement as the defendant's attorney in an attempt to visit him in the cell block.  When she was turned away there, she attempted to visit him in the cells next to Judge Scanlon's courtroom by repeating the claim that she was the defendant's attorney to the Deputy Marshals and by falsely stating that the Deputy Marshals downstairs had said she would be allowed into the courtroom cells.

B.      The Remaining Justifications Given by Judge Scanlon Do Not Warrant Bail

Because the proffered financial package is insufficient, the Court need not address the additional justifications cited for bail cited by Judge Scanlon.  A review of each of these justifications, however, shows that they too do not warrant bail, either together or separately.

1.      Precedent in White-Collar Cases

Judge Scanlon noted cases cited by the defendant where white-collar defendants had been released on bail following conviction.  With the lone exception of United States v. DiScala, No. 14-CR-399 (ENV), none of the cases cited by the defendant or Judge Scanlon involve perjury by a defendant.  And DiScala is readily distinguishable.  In DiScala, the defendant faced no mandatory minimum, had caused losses of approximately $16 million during one year of fraudulent conduct, and had been on pretrial release for approximately four years with no issues; by contrast, the defendant is facing a mandatory-minimum sentence of two years, caused well over $50 million in actual loss (and over $100 million in intended loss) during his four years of pervasive fraud, and in his 17 months on bail, repeatedly violated court orders and nearly had his bail revoked even prior to his conviction.

As the government has previously noted, where a defendant has demonstrated ongoing dishonesty during court proceedings, there is substantial caselaw in white-collar cases supporting remand, including prior to conviction under a higher standard.  See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("[T]he court reasonably found that Scali's perjury conviction makes it difficult to trust his promise that he will not flee."); United States v. LaFontaine, 210 F.3d 125, 135 n.6 (2d Cir. 2000) (remand appropriate where "LaFontaine had previously disregarded court orders . . . and her latest violation of the trial process, as demonstrated by her perjury, would tend to suggest that she would do so again."); United States v. Wang ("Wang II"), No. 23-CR-118 (AT), 2023 WL 4551637, at *3 (S.D.N.Y. July 14, 2023) (denying bail pretrial in fraud prosecution in light of "past obstructive conduct in this case"); United States v. Rahmankulov, No. 21-CR-653 (RA), 2023 WL 3479696, at *2 (S.D.N.Y. May 16, 2023) (denying bail following money laundering conviction and noting that defendant's demonstrated dishonesty heightened risk of flight); United States v. Dupree, No. 10-CR-627 (KAM), 2014 WL 12690878, at *1 (E.D.N.Y. Apr. 7, 2014) (denying bail pending appeal; court "not satisfied that Mr. Dupree would abide by any conditions of release . . . [i]n light of this past non-compliance with the conditions of his release"); United States v. Nicolo, 706 F. Supp. 2d 330, 334 (W.D.N.Y. 2010) (defendant's dishonest conduct demonstrates that he "could not be trusted to abide by any conditions that might be set on his release"); Nouri, 2009 WL 2924334, at *2 (denying reconsideration of decision to remand following fraud conviction; in light of fraudulent and obstructive conduct proven at trial and prior dishonesty with the court, "I simply do not trust him to return to court were he released").  Indeed, less than one week ago, on July 30, 2024, the Honorable William F. Kuntz, II, remanded a white-collar defendant post-trial

where the defendant had perjured himself, despite a $20 million fully secured bond signed by 14 sureties.  See United States v. Motovich, No. 21-CR-497 (WFK).[9]

Ultimately, every case must be decided on its own facts.  The defendant's behavior in this case — both during the charged conduct and thereafter — demonstrates an unusual willingness to lie and break the rules applicable to everyone else.  Under those circumstances, similar to the cases cited above, the defendant cannot meet his burden of proving by clear and convincing evidence that somehow this time will be different and now he can be trusted.

2.      The Defendant's Pre-conviction Conduct

Judge Scanlon's finding that the defendant had "good performance" complying with his bail conditions prior to conviction is not supported by the record.  One of the most basic requirements of bail is that a defendant not commit any crimes while on release.  In addition to perjury, which the Court has previously noted "is unequivocally a crime" (Trial Tr. 4605), the defendant willfully disobeyed numerous court orders, which is a felony.  See 18 U.S.C. § 401(3). The defendant lied to court security officers, which is a felony.  See 18 U.S.C. § 1001(a)(2). The defendant failed to comply with the lawful directives of courthouse security officers, which is a misdemeanor.  See 41 C.F.R. § 102-74.385 (regulation requiring compliance with lawful directives); 40 U.S.C. § 1315(c)(2) (penalty provision).  Even prior to trial, the Bail Reform Act imposes a presumption that a defendant who commits a felony cannot be released.  See 18 U.S.C. § 3148(b)(2) ("If there is probable cause to believe that, while on release, the person committed a . . . felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community.").  Here, the defendant's past conduct undermines any finding, let alone a finding by clear and convincing evidence, that he can be trusted to comply with the conditions of release now.

To be sure, the defendant did not flee prior to trial.  That, however, is true in almost any case where a defendant is remanded following conviction, as a defendant who fled pretrial would likely have been detained already.  Cf. Motovich, No. 21-CR-497 (WFK), July 30, 2024 Tr. 21, 31-32 (remanding defendant despite argument by defense counsel "that the Defendant has been aware of the investigation for five years.  He has been on bail for approximately, I believe, three and a half years.  At no point has there been any indication throughout that time period that the Defendant ever intended to flee."); Nouri, 2009 WL 2924334, at *2 (remanding convicted defendant despite argument that "when he was on bail for two years following his arrest he made every court appearance and com[plied] fully with all the terms of his release").  Moreover, the defendant's incentives to flee have dramatically changed now that he has been convicted.  For similar reasons, courts have repeatedly rejected the analogous argument that a defendant who did not flee prior to arrest can be trusted to not flee

_____

[9]      When the government raised Motovich to Judge Scanlon, defense counsel claimed that "Mr. Motovich was born overseas."  July 31, 2024 Bail Hr'g Tr. 23.  The government has conferred with the prosecutors handling that case, who have confirmed that Motovich was born in the United States.

after arrest.  See United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (affirming denial of bail for defendant who did not "flee when confederates were first apprehended"; "the court could think that a defendant would perceive a greater threat to his liberty — and, therefore, posed a greater risk of flight — when he faced actual charges rather than simply anticipated possible charges"); Wang II, 2023 WL 4551637, at *2 (denying bail pretrial even though defendant "did not flee after learning that the Government began seizing funds from entities associated with her co-defendant, Kwok, or after learning about the grand jury investigation of Kwok"; "Wang is now in a categorically different position; she is facing decades in prison and . . . undoubtedly has more incentive to flee now than she did [before]").

As to Judge Scanlon's reliance on the fact that bail was not revoked before conviction, the government respectfully submits that the defendant should be entitled to no benefit from the fact that the Court took great care to avoid interfering with the defendant's ability to mount his defense during trial, his numerous violations notwithstanding.  Even with the Court's caution in revoking bail before conviction, the Court explicitly stated during the detention hearing held during the trial, when the defendant was still presumptively entitled to bail, that as a result of the defendant's repeated misconduct, the Court was "as close to [the] point [of revoking bail] as I can possible be without actually crossing that line."  July 8, 2024 Bail Hr'g Tr. 14:19-22.  The defendant's perjury and the change in the legal standard push the defendant's conduct well over that line.

The defendant's past conduct demonstrates that he cannot be trusted.  While before his conviction he may have believed he might prevail at trial — perhaps through his perjured testimony — it is now certain that he will be going to prison.  His incentive to flee is thus at its apex, and he cannot demonstrate by clear and convincing evidence that he will not violate the conditions of his release by fleeing just as he has violated so many court requirements in the past.

### 3.   The Conditions of Home Confinement and Location Monitoring

Although Judge Scanlon found that the conditions of home confinement and location monitoring will serve to prevent the defendant's flight, numerous courts have recognized that such conditions in fact serve as little impediment to a defendant who chooses to flee.  See Wang II, 2023 WL 4551637, at *3 ("Location monitoring is inadequate because ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee." (citing cases)); United States v. Jimenez-Rodriguez, No. 21-CR-11 (EK), 2023 WL 3603411, at *3 (E.D.N.Y. May 23, 2023) ("It is well settled that electronic monitoring can detect flight but is not guaranteed to prevent it."); United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("As other courts have observed, home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.").  Such confinement and monitoring may be particularly ineffectual where a defendant resides in another state, as the law enforcement officials working on this case would have less ability to promptly respond to any suspected flight.

As with the rest of any bail package, home confinement at its heart relies on trust in the defendant.  No such trust can be extended here.

13

### 4.    The Incentive to Remain to Visit Family Members

Judge Scanlon found that the desire to visit ill family members would give the defendant an incentive to not flee. The government respectfully submits that to the extent the desire to see ill family members is at play at all, it would favor flight. In the coming months, the defendant faces a substantial incarceration sentence. While serving that sentence, he may not be able to see his ill family members at all. The defendant's best hope to maximize time with relatives may therefore be to fail to surrender for his sentence and to visit them surreptitiously while a fugitive over time, as opposed to serving a sentence that could prevent any further visits. Even if the defendant could not visit his family as a fugitive, the desire to see his family would incentivize him only to visit them before he flees, but would not prevent flight, as he may not be able to see them again in either event. The government therefore respectfully submits that this factor does not meaningfully affect the analysis.

### 5.    The Incentive to Remain to Preserve His Appeal and Avoid a Higher Sentence

Finally, although Judge Scanlon noted that the defendant could jeopardize his right to appeal and would risk a higher sentence if he fled, there is no reason to believe that either factor will influence the defendant's behavior. As an initial matter, this factor is equally present in every case post-conviction and is therefore entitled to little weight. In any event, the defendant has not identified any substantial issues of law or fact that would support a meritorious appeal, and it is unlikely that he could do so given the overwhelming evidence in the case from various independent sources. And to the extent that he is concerned about the length of his sentence, the defendant could well decide that the sentence he faces here is high enough that it would be well worth it to risk the chance of a slightly higher sentence against the opportunity to serve no time in jail at all by fleeing. Indeed, the defendant's past decisions demonstrate an appetite for risk different from the careful cost-benefit analysis posited by Judge Scanlon — if the defendant were seeking to minimize his anticipated sentence, he likely would not have perjured himself or gone to trial at all, to say nothing of his original decision to defraud investors and lenders. The government therefore respectfully submits that this factor also does not meaningfully affect the analysis.

*          *          *

As the Court previously stated, the defendant is in the situation he is in now because of choices he made. See Trial Tr. 4607-08. The choice to repeatedly violate court orders, the choice to commit perjury, and the choice to unfailingly put his own interests ahead of others have all led to this point. Based on the defendant's conduct, and his conduct alone, the record shows that he is a flight risk and a danger to the community and that his misconduct cannot be deterred by rules, conditions, legal sanction, or threats of harm to others. He therefore cannot meet his burden of proving by clear and convincing evidence that he is not a risk of flight or a danger to the community. He should remain detained.

IV.    <u>Conclusion</u>

          For the foregoing reasons, the government respectfully requests that the Court grant the government's appeal and deny the defendant's motion for bail.

Respectfully submitted,

BREON PEACE<br>
United States Attorney

By:     /s/ _____

        Jonathan Siegel<br>
        Gillian Kassner<br>
        Dylan A. Stern<br>
        Assistant U.S. Attorneys<br>
        (718) 254-6293/6224/6213

cc:    Clerk of the Court (via ECF)<br>
       All Counsel of Record (via ECF)