# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

August 8, 2024

**VIA ECF**
The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 112011

*Re: United States v. Carlos Watson and OZY Media, Inc. Criminal Docket No. 23-82 (EK): Response to Government's Appeal re Carlos Watson's Bail Pending Sentencing*

Dear Judge Komitee:

    Mr. Watson, by and through undersigned counsel, respectfully requests that the Court affirm Magistrate Judge Scanlon's Order granting Mr. Watson bail. See ECF No. 286. When the Court remanded Mr. Watson on July 16, 2023, the Court noted:

> If the defense wants to come back with a meaningfully strengthened bail package, I would be willing to consider that, of course. I'm not suggesting that it will carry the day or that it won't, but I would have expected that people would at least be thinking about that possibility and that plans be at least in the works to see what additional sureties, maybe independent third-party sureties, I don't know, might have something to add.

Tr. 4645, Ln 1 – 4646 Ln 1-7. We believe that Mr. Watson has tendered a "meaningfully strengthened bail package," which Magistrate Judge Scanlon – after five consecutive days of hearings – accepted.

    Although the government's letter (ECF No. 287) veers into a sprawling range of issues it invites the Court to consider, a long and unchanging line of cases confirms that the Court should *only* consider whether Mr. Watson's bail package will reasonably ensure his presence at sentencing and protect against harm to others and the community. This meaningfully strengthened bail package satisfies both conditions. Indeed, as the Magistrate Judge remarked, "[T]here is really an extraordinary number of sureties here. I don't know if I have ever seen this number." Judge Scanlon also observed, after both the government and the Court interviewed the prospective guarantors, "Often bail packages effectively decrease because the more people

learn about the circumstances of the case, the less willing they are to be sureties. That's not what happened here. We had more people come forward…" Indeed, in Mr. Watson's revised and meaningfully strengthened bail package, he has 17 sureties who collateralize over $1m dollars of a $3m bond.

**Moral Suasion**

The moral suasion consideration is quite evident in Mr. Watson's bail package. This is particularly apparent in the family land in Virginia that nine members of Mr. Watson's family – most in their 80's and 90's – agreed to utilize as collateral to support the bail package, which an independent real estate expert valued at between $400,000 and $800,000.  See Exhibit A.[1]

In addition to the family land, Mr. Watson has several family friends who have come forward and put up assets on his behalf.  Long-time family friend Allison Wallace Estes and her husband GL Estes Wallace have put up $100,000 equity in their home in support of Mr. Watson. Amy Troner, another long-time friend of the Watsons, and her father, Dr. Michael Troner, have encumbered cash from their money market accounts. Dr. Jacqueline Mattis, who holds a decanal position, at a local university, pledged everything she was able to encumber from two retirement account plus cash to raise $100,000 in support.  All in, approximately 19 friends and family supported Mr. Watson in creating a meaningfully strengthened bail package.  All the security has been perfected.  See Exhibit B1-B9.

Below is a grid that outlines the various sureties who support Mr. Watson:

***

---

[1] Per Judge Scanlon's approval, the exhibits are filed under seal as they contain private information.

| No | Name | Surety | Description | Amount? | Perfected? | Evidence of Perfection | Additional Documentatation |
|---|---|---|---|---|---|---|---|
| 1 | Lois Blackshear, Mildred Chaney, Susie Carolyn Thomas, Jeannette Shegog, James Arond-Thomas, Beverly Watson, Carlos Watson, Carolyn Watson, Carla Watson Rieger, Gary Thomas, Terri Thomas, Allen Thomas | VA Family Land | Gloucester County, Virginia: Tract # GLO94027; East Chestnut Fork Rd. and Horseshoe Lane; Total Acres = 42.13 Used for Forestry | $ 750,000.00 | Recorded at Gloucester County's Clerk Office. Aug 5, 2024 | **Confirmation Receipt** from Gloucester County | Notice of Lien + Affidavit of Confession |
| 2 | Beverly Watson | Condo | 1831 Belmont Rd, NW, Washington, DC 20009 | $ 100,000.00 | **Recorded at DC's Recorder of Deeds**- Aug 5, 2024 | **Confirmation receipt** from the DC Recorder of Deeds | Notice of Lien + Affidavit of Confession + Bond |
| 3 | Annye Watson | 457b | One America | $ 130,000.00 | **Filing Number**: 24-0045055732 from **Texas Secretary of State** on Aug 4, 2024 | **UCC-1 Financing Statement** and Acknowledgement from Aug 4, 2024 | Affidavit + UCC financing Statement |
| 4 | Allison Wallace Estes | Home | 520 Main Street, Hatfield, MA 01038 | $ 100,000.00 | **Recorded at Hampshire Registry of Deeds.** Aug 5, 2024 | **Confirmation receipt** from the Hampshire Registry of Deeds | Notice of Lien + Affidavit of Confession of Judgement |
| 4 | GL Estes Wallace | Home | 520 Main Street, Hatfield, MA 01038 | - | **Recorded at Hampshire Registry of Deeds.** Aug 5, 2024 | **Confirmation receipt** from the Hampshire Registry of Deeds | Notice of Lien + Affidavit of Confession of Judgement |
| 5 | Kosmo Kalliarekos | Stock | Schwab account | $ 100,000.00 | **FILING NUMBER:** 57331294 from NJ Secretary of State on Aug 5, 2024 | **UCC-1 Financing Statement** and Acknowledgement from Aug 5, 2024 | Affidavit + UCC statement |
| 6 | Carlos Watson | Home | 435 Kent Drive, Mountain View CA 94043 |  | **Existing Lien as of March 2023** | **Existing Lien** still in effect from March 2023 | Deed of Trust |
| 7 | Amy Troner | Cash | Money Market Account from Truist Bank | $ 12,500.00 | **Filing Number**: 202402059247 from **Florida Secretary of State** on Aug 4, 2024 | **UCC-1 Financing Statement** and Acknowledgement from Aug 5, 2024 | Affidavit + UCC statement |
| 8 | Dr. Michael Troner | Cash | Money Market Account from Truist Bank | $ 25,000.00 | **Filing Number**: 202402059263 from **Florida Secretary of State** on Aug 4, 2024 | **UCC-1 Financing Statement** and Acknowledgement from Aug 5, 2024 | Affidavit + UCC statement |
| 9 | Dr. Jacqueline Mattis | $57,876 from TIAA Cref retirement account, $12,000 from a TIAA CREF mutual fund account, $23,000 in non-IRA funds from my Ameriprise Investment portfolio, and $7,124 in cash. | TIAA Cref retirement account, TIAA Cref mutual fund, non-IRA funds from Amerprise Investments and cash | $ 100,000.00 | **FILING NUMBER:** 57331283 from **NJ Secretary of State** on Aug 4, 2024 | **UCC-1 Financing Statement** and Acknowledgement from Aug 4, 2024 | Affidavit + UCC statement |
|  |  |  | Total | $ 1,317,500.00 |  |  |  |

**Most White-Collar Defendants remain on Release Status in the EDNY**

For non-violent, white-collar cases, the clear practice in this jurisdiction (and other federal districts) is to allow a convicted individual to remain on bail pending sentencing. See, e.g., United States v. Abboud, No. 16 Cr. 396 (ERK) (E.D.N.Y. July 9, 2019) (ECF No. 154, Tr. 1363:15–1364:20) (where the defendant was convicted of stealing more than $1 million from a charity to buy luxury goods and had "extensive ties to Egypt," the government determined on the record not to seek postconviction remand) (Komitee, J.); United States v. Javier Aguilar, No. 20 Cr. 390 (ENV) (E.D.N.Y.) (Government sought post-conviction bail for foreign-national defendant convicted of white-collar offenses. Post-conviction bail was granted by increasing secured bond from $100k to $2mm and changing home confinement secured by smartlink app to ankle bracelet.); United States v. Desu, No. 18 Cr. 613 (MAS), 2019 WL 5693222, at *1–2

(D.N.J. Nov. 4, 2019) (defendant convicted of six counts of tax fraud, who had strong ties to India and the United Arab Emirates (which lacks an extradition treaty with the United States) released where he "ha[d] been compliant with all conditions of his release," surrendered his passport, secured his bond with his family home, and had "deeply-rooted emotional, familial, and reputational ties to the United States"); United States v. Hagen, No. 3:19 Cr. 146 (DLH), 2021 WL 2895915, at *2, *4–5 (N.D. Tex. July 9, 2021) (agreeing that "[t]he release of defendants pending sentencing on charges related to health care fraud is routinely granted" and releasing defendant who "currently has no passport or other international travel document or history of failing to appear for court, and has an incentive to stay in place and work with her attorneys to prepare for sentencing and to get her affairs in order, including planning for life after incarceration"); United States v. Koerber, No. 2:17 Cr. 37 (FB) (PMW), 2019 WL 3937024, at *1 (D. Utah Aug. 20, 2019) (Block, J., sitting by designation) (allowing defendant to remain on post-trial release pending sentencing after conviction on "fifteen counts of wire fraud, money laundering, and securities fraud"); United States v. Sogbein, No. 12 Cr. 54 (JSW), 2014 WL 12705058, at *2 (N.D. Cal. Jan. 10, 2014) (granting motion to reconsider postconviction detention order in healthcare fraud case where defendant posted bond, was subject to travel restrictions and location monitoring, and had "a strong incentive not to create any further disruptions to her familial relationships"); United States v. Mikell, No. 97 Cr. 81493 (DT), 2007 WL 188566, at *2 (E.D. Mich. Jan. 22, 2007) (defendants posed no risk of flight after conviction given the many years they "remained on bond without any incident" and their "substantial family and community ties"); United States v. Boyd, No. 21 Cr. 486 (SHS), 2022 WL 790771, at *1 (S.D.N.Y. Feb. 3, 2022) (defendant met heightened standard for presentencing release in drug case because preexisting conditions of release, including $250,000 bond, home detention, location monitoring, and travel restrictions, were enough to limit any risk of flight); United States v. Campbell, No. 20 Cr. 631 (AKH), 2022 WL 2209371, at *1 (S.D.N.Y. June 21, 2022) (heightened standard for presentencing release met in drug case because defendant was "not likely to flee or pose a danger" since he "has been at liberty on bail since December 2020 and in that time has had no violations"); United States v. McDuffie, 451 F. Supp. 3d 281, 285 (S.D.N.Y. 2020) ("[t]here is no serious dispute that [the defendant] is unlikely to flee" after conviction on drug charges given his lack of prior record, his community ties, and because "any flight attempt would be hampered by his surrendering of travel documents"); United States v. Rentas, No. 09 Cr. 555 (HB), 2009 WL 3444943, at *2 (S.D.N.Y. Oct. 26, 2009) (heightened standard for presentencing release met in drug case where defendant with no criminal history "was released on bail for five months without incident and complied fully with the conditions of her release"). See also, United States v. Johnson, No. 16 Cr. 457 (NGG), 2017 WL 11563342, at *1–3 (E.D.N.Y. Dec. 13, 2017) (Garaufis, J.); United States v. Sabhnani, 529 F. Supp. 2d 377, 382–83 (E.D.N.Y. 2007) (Spatt, J.); United States v. Roger Ng, No. 18 Cr. 538 (MKB) (E.D.N.Y.) (Brodie, J.); United States v. Scott, No. 17 Cr. 630 (ER) (S.D.N.Y. Nov. 21, 2019) (ECF No. 209, Tr. 2080:18–2081:22) (Ramos, J.).

There is ample doctrinal support to affirm Judge Scanlon's order. The weight of authority militates in favor of release, and we urge to the Court to so order forthwith.

**Dangerous Conditions at MDC**

As recently as this Monday, August 5, 2024, Judge Brown of EDNY has recognized "the dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn." U.S. v Colucci, ___ F.Supp.3d ___, 2024 WL 3643857 at *1 (E.D.N.Y. Aug. 5, 2024). Mr. Watson's experience at MDC has indeed borne this out. A mere two days after Mr. Watson was remanded to MDC, a non-violent detainee was murdered – stabbed to death, marking the second violent death at the facility within a two-month span.[2] In response, the institution has suspended all visitation privileges, strongly suggesting the implementation of draconian lockdown measures previously deployed by MDC, and described more fully below.[3] In addition, Mr. Watson has been in isolation at the Special Housing Unit due to particularized threats to his life.[4]

Even this Court has recognized the "severe prison conditions" that exist at MDC and in U.S. v. Griffin, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024), granted compassionate release to a defendant serving time for violating supervised release primarily on those grounds. Colucci, --- F.Supp.3d ---, 2024 WL 3643857 at *2.

The Court has discretion to maintain Mr. Watson's release status pending sentencing upon a finding of the presence of "exceptional reasons" why Mr. Watson's "detention would not be appropriate." 18 U.S.C. § 3145(c). Notably, the Chavez court concluded "the conditions at the MDC are themselves "exceptional reasons" why … detention pending sentencing would not be appropriate." United States v. Chavez, No. 22-CR-303 (JMF), 2024 WL 5023 (S.D.N.Y. Jan. 4, 2024).

The July 18, 2024, murder is not the only condition that militates in favor of release pending sentencing. To begin, detainees at the MDC are currently subject to excessive periods of "lockdown," during which they are confined to their cells and barred from accessing visits, phone calls, hygiene facilities, educational programs, or physical activity. Id. As recently as June 24, 2024, following a different murder at the facility, detainees were subjected to a stringent lockdown. One detainee reported, "we come out of our cell every three days for a 15-minute

---

[2] Courtney Gross, *Exclusive: Inmates Decry Conditions Inside Brooklyn Jail*, NY1 (June 24, 2024, 7:30 PM), https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions.

[3] https://www.bop.gov/locations/institutions/bro/ (last visited July 18, 2024).

[4] The details were discussed at side bar with Magistrate Judge Scanlon.

shower."[5] Both the Chavez Court and the Supreme Court have emphasized that confining inmates to their cells is … tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. Id. See Johnson v. Prentice, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" (quoting Davis v. Ayala, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring)). On July 18, 2024, MDC's physical infrastructure has been consistently condemned as deplorable, with numerous federal judges and attorneys vehemently criticizing its inhumane and degrading conditions. Chavez at *12. In 2021, the MDC carried out "planned maintenance" on the electrical system by enforcing a lockdown "over the course of four nights" with no power and no water, Federal Defenders of NY, Inc. v. Federal Bureau of Prisons, No. 19-CV-660 (MKB) (E.D.N.Y. Oct. 15, 2021), Conf. Tr. at 8-9. The problems persist and have seemingly gotten worse. Just last month, David Patton, the former head of Federal Defenders of New York, decried that "a lack of medical care to real serious sanitation issues to maggots in the food to violence, everything you can think about that's problematic at a jail or prison is problematic at the MDC, and it has been for a very long time."[6] Disturbingly, it has also been reported that the emergency call buttons in the MDC are often not working — even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown.[7]

The most alarming and dangerous problem facing the facility is its severe understaffing. Operating at a mere 55% of required correctional officer staffing over the past year, the institution faces a perilous scenario where a single officer is responsible for monitoring ten prisoners—a ratio that severely compromises safety and security. Chavez at *14. According to a recent memo by the president of the union local that represents MDC's correctional officers, "[o]n a daily basis housing units . . . are left . . . unmanned by staff and locked down, with the expectation . . . that a single [] Officer is to make rounds, feed, and perform additional correctional duties" on three units during a single shift. United States v. Irizarry, 23-CR-60 (JMF), ECF No. 47-3 (S.D.N.Y. Oct. 30, 2023) at 1-2. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and [/] or inmate medical emergencies." and there is "no reason to believe that the staffing side of the equation will change any time soon." Id. And it is for this reason the Chavez court urged that the "only option is to reduce – or at least not add unnecessarily to – the prisoner population." Chavez at *15. For the aforementioned reasons, the Chavez Court held that the conditions at the MDC constitute "exceptional reasons" why detention of most defendants who do not pose a risk of

---

[5] Gross, supra note 1.

[6] Id.

[7] Letter from Loretta E. Lynch at 4, *Fed. Defenders of N.Y., Inc. v. Fed. Bureau of Prisons*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403.

flight or danger to the community "would not be appropriate." 18 U.S.C. § 3145(c). See <u>United States v. Arias</u>, No. 22-CR-495 (PAE), slip op. at 33 (S.D.N.Y. May 5, 2023) (continuing defendant's bail pursuant to § 3145(c) due to MDC's "unacceptable," "inhospitable, [and] terrible" conditions, despite the fact that "[t]he pandemic is now on the wane").

**Carlos Watson Sr.'s Health**

      Mr. Watson's father, Carlos Watson Sr., is in a precarious status with respect to his health. Attached is a letter from his physician, Dr. Rhonda Hamilton outlining Mr. Watson Sr.'s deteriorating health. See Exhibit C. Mr. Watson Sr. is now 90 years old and suffering from metastatic prostate cancer, advanced diabetes, significant heart issues, including congestive heart failure, and excessive bleeding. The devastating news of his son's conviction further impacted his already deteriorating health. Should Mr. Watson be released, we fear but expect that this will be the final opportunity for Mr. Watson to see his father before he passes.

***

      Based on all the foregoing, we respectfully request that this Court affirm Magistrate Judge Scanlon's grant of bail.

Sincerely,

*[signature]*

Ronald S. Sullivan Jr.
Janine Gilbert
*Counsel for Carlos Watson*