UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------ x

UNITED STATES OF AMERICA

     - v -                        Criminal Case No. 23-00082 (EK)

CARLOS WATSON and
OZY MEDIA, INC.,

          Defendants.

------------------------------------------------ x


### MEMORANDUM OF LAW ON BEHALF OF THE DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISQUALIFY THE HONORABLE ERIC R. KOMITEE


Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Carlos Watson and OZY Media, Inc.*


October 25, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x

UNITED STATES OF AMERICA

       - v -                  Criminal Case No. 23-00082 (EK)

CARLOS WATSON and
OZY MEDIA, INC.,

             Defendants.

------------------------------------------------- x

## MEMORANDUM OF LAW

This Memorandum of Law is respectfully submitted on behalf of Defendants Carlos Watson and OZY Media, Inc. ("OZY") in support of their motion for an order disqualifying the Honorable Eric R. Komitee from this case, vacatur of the convictions of the Defendants, and dismissal of the indictment. While dismissal of the indictment is the only proper remedy for the irreparable constitutional prejudice to the Defendants, alternate relief should include a new trial upon reassignment of the case to a different district judge.

### Introduction

On October 2, 2024, Judge Komitee's annual financial disclosure covering the calendar year 2023 (Form AO 10, the "2023 Disclosure," Exhibit A) first became available to the public, more than two months after conclusion of the trial in this case. Such disclosures are required by the Courthouse Ethics and Transparency Act ("CETA"), Pub. L. No. 117-125, 136 Stat. 1205, 5 U.S.C. §§ 13101, 13105, 13107 (2022), which served to amend the Ethics in Government Act of 1978, enacted in the aftermath of Watergate, to "increase public confidence

2

in the federal government, demonstrate the integrity of government officials, deter conflicts of interest . . . and enhance the ability of the citizenry to judge the performance of public officials." *Lovitky v. Trump*, 949 F.3d 753, 754 (D.C. Cir. 2020) (citation and quotation marks omitted); *Bader v. United States*, 97 F.4th 904, 909 (Fed. Cir. 2024). CETA "mandates the creation of a publicly-available online database to house judges' financial-disclosure reports." Albert Diaz and Steven J. Alagna, *"The Courthouse Ethics and Transparency Act: New Obligations for Federal Judges,"* 107 Judicature 78, 79 (2023)[1]; *see also* Memorandum of Director of the Administrative Office of the United States Courts, May 17, 2022 (Hon. Rosylnn R. Mauskopf memorandum to "All United States Judges" with overview of CETA requirements).[2] By signing the AO 10, Judge Komitee stated:

> I certify that all information given above (including information pertaining to my spouse and minor or dependent children, if any) is accurate, true, and complete to the best of my knowledge and belief, and that any information not reported was withheld because it met applicable statutory provisions permitting non-disclosure. I further certify that earned income from outside employment and honoraria and the acceptance of gifts which have been reported are in compliance with the provisions of 5 U.S.C. app. § 13141 et. seq., 5 U.S.C. § 7353, and Judicial Conference regulations.

Exhibit A, Part IX.

The 2023 Disclosure reveals that Judge Komitee, through four hedge funds, maintained holdings in four entities alleged to be victims in this case (the "Four Alleged Victims," the "Four Victims," or the "Victims") between February 23, 2023 (when he was assigned to the case by Order of the Hon. Margo K. Brodie) through December 31, 2023 (the end

---

[1] *Available at https://judicature.duke.edu/articles/the-courthouse-ethics-and-transparency-act-new-obligations-for-federal-judges/*

[2] *Available at https://fingfx.thomsonreuters.com/gfx/legaldocs/zdpxowxrgvx/udiciary_stocks_memo2.pdf*

date covered by the Form AO 10), and possibly through the trial in this case in 2024 and currently.[3]

Judge Komitee's 2023 Disclosure shows that he had between $6 million and $30 invested in two hedge funds managed by Viking Global Investors LP ("Viking"), a large hedge fund manager, with $64.5 billion in regulatory assets under management ("AUM"). Judge Komitee's two Viking hedge funds were Viking Global Equities LP (in which his interest is worth between $5,000,001 and $25,000,000) and Viking Global Opportunities LP ($1,000,001 to $5,000,000). Judge Komitee served as Viking's General Counsel from 2008 until June 2018 (upon his nomination to the federal bench by then-President Trump) and personally signed periodic reports to the Securities and Exchange Commission about Viking's investments, including investments in the Four Alleged Victims, as detailed below.

In 2023, Judge Komitee also had between $5 million and $25 million in D1 Capital Partners Onshore LP, a hedge fund offered by D1 Capital Partners LP ("D1"; $27.5 billion AUM). Another $5 million to $25 million of Judge Komitee's net worth in 2023 was in the form of investment interests in a fourth hedge fund, Junto Capital Partners LP, managed by Junto Capital Management LP, $8.8 billion AUM.[4] Both Junto and D1 were founded by former Viking portfolio managers who worked side-by-side with Komitee at Viking and sat with him on

---

[3] There does not appear to be any Periodic Transaction Report (required by CETA) filed in 2024 indicating any change of the positions, and Judge Komitee's positions in these hedge funds held constant (in terms of the value code on the Forms AO 10) from 2020 to 2023. Judge Komitee's AO 10 for 2024 has not yet been filed and is not due until May 15, 2025. *See* 5 U.S.C. § 13103(d).

[4] *See* Exhibit A, Part I (2023 Disclosure detailing Judge Komitee's ownership in the funds); Viking Global Investors LP, Form ADV, filed with the SEC on Sept. 3, 2024 ("Viking Current ADV"), p. 10, Item 5F(2)(a) (AUM $64,496,929,630); D1 Capital Partners LP Form ADV, filed with the SEC on Mar. 31, 2023 (most recent ADV available), p. 9 (AUM $27,551,209,342); Junto Capital Management L.P., Form ADV, filed with the SEC on Sept. 17, 2024, p. 20 (AUM $8,821,371,747).

Viking's Management Committee.[5]

Judge Komitee's 2023 Disclosure also establishes that, even after his assignment to this case, he continued to have working relationships with Viking's principals, including Viking's Chief Executive Officer, Ole Andreas Halvorsen, who was Judge Komitee's boss at Viking. In 2023, Judge Komitee served as a director of Viking Global Foundation Inc. ("the Foundation"), along with Halvorsen and other senior officials at Viking.[6] The Foundation that Komitee directs is a charitable entity headquartered at Viking's headquarters[7]; is entirely dependent on Viking for its operating revenue[8]; and is itself invested in a Viking hedge fund.[9] During the pendency of this case, while Judge Komitee sat on the Foundation's board with

---

[5] James Parsons ("Parsons") is a co-founder and Chief Executive Officer of Junto Capital Management LP. Junto Capital Management L.P., Form ADV, filed with the SEC on Sept. 17, 2024, p. 30. Parsons worked at Viking "for almost a decade" before co-founding Junto. *Manhattan's Renovated 550 Madison Adds Junto Capital*, *Bloomberg*, Feb. 6, 2023. Daniel Sundheim ("Sundheim") is the founder and Chief Investment Officer of D1 Capital Partners LP. D1 Capital Partners LP Form ADV, filed with the SEC on Mar. 31, 2023 (most recent ADV available), p. 109. Sundheim joined Viking as an analyst in 2002 and became sole Chief Investment Officer of Viking in 2014; he exited Viking to launch D1 in July 2018, a month after Komitee's departure from Viking. *See* Katya Kazakina and Hema Parmar, *Ex-Viking CIO Daniel Sundheim Plans to Start Equity Hedge Fund,* Bloomberg, July 3, 2017. *See* https://dealbreaker.com/2010/04/dear-viking-global-investors (letter to Viking investors announcing elevated responsibilities for then General Counsel Komitee).

[6] *See* Exhibit A, Part I, line 1 (Judge Komitee was a director of the Foundation in 2023); Viking Global Foundation Inc., EIN 90-0512778, Form 990 ("Foundation 2023 Form 990"), filed with the IRS on July 12, 2024, Part VII (roster of Foundation directors), *available at https://projects.propublica.org/nonprofits/organizations/900512778/202421949349100722/full.*

[7] *Compare* Foundation 2023 Form 990, Part I (address of 600 Washington Boulevard, 11th Floor, Stamford, CT 06901) *with* Viking Current ADV, Item I(F) (same).

[8] Foundation 2023 Form 990, Part I ($2,206,268 total contributions *received by* Viking Foundation) and Schedule B ($2,206,268 total contributions *from* Viking).

[9] Foundation 2023 Form 990, p. 45 (Foundation has $5,861,315 invested in "Viking Global Equ. III Ltd."). Like Viking Global Equities LP, in which Judge Komitee has a $5 million to $25 million investment interest, Viking Global Equities III Ltd. is a feeder fund into Viking Global Equities Master Ltd., Viking's flagship hedge fund, with gross assets of $36.7 billion Viking Current ADV, p. 35.

Halvorsen and other senior Viking officials, Viking held stock positions worth hundreds of millions of dollars in one or more of the Alleged Victims, as discussed in more detail below.

The Four Alleged Victims in which Judge Komitee, through the hedge funds, held investments throughout 2023 are referred to in the Indictment, and representatives of two of them testified at trial:

(1) **the Goldman Sachs Group, Inc. ("Goldman"),** to which the Defendants allegedly made material misrepresentations and omissions about OZY's "historical and projected financial results, debts and business relationships" to induce an investment of up to $45 million, and to which a conspirator posed as an employee of YouTube, owned by Google, Inc. ("Google"), in a call to Goldman to misrepresent the extent of Google's interest in OZY.[10]

(2) **Google, owned by Alphabet, Inc.,** which the Defendants allegedly misrepresented had made certain investments in OZY, and to which the Defendants allegedly provided false and inflated revenue figures.[11]

(3) **LiveNation Entertainment ("LiveNation"),** which conspirators allegedly misrepresented had committed to an investment in OZY of $10 million.[12]

(4) **JPMorgan Chase ("JPMC"),** to which conspirators allegedly misrepresented

---

[10] S*ee* Indictment at ¶¶ 62-71, 99(p), 99(s), and 99(t); Testimony of Goldman's Hillel Moerman (T 1744) and Allison Ross Berardo (T 1464).

[11] *See* Indictment at ¶¶ 64, 82, 85, 88, 90, 91; Testimony of Sundar Pichai, Google's Chief Executive Officer (T 1734); Testimony of Donald Harrison, President of Google's Global Partnerships (T 1638); Testimony of Alex Piper, Google subsidiary YouTube's former Head of Unscripted Content (T 1675).

[12] *See* Indictment at 49; T614-67 (Testimony of Samir Rao); T 1417-21 (Testimony of Mohammed Abbas Maniar); T 2014-15 (Testimony of Suzee Han); T 2236-38 (Testimony of Maurice Werdegar); T 2434 (Testimony of FBI Special Agent Cara Alpaugh).

OZY's "historical and projected financial reality" in the context of a Series E fund raising round administered by JPMC.[13]

The government at trial stressed the importance of the Alleged Victims to its proof.  "I want to start with the Goldman call because, keep in mind, to find the defendants guilty, you only need one lie . . . . If you find beyond a reasonable doubt one of those lies including the Goldman call, that is enough to convict and you can stop" (T 4401-02). "[I]f you find beyond a reasonable doubt that Watson was in on the impersonation, then this case is basically over.  If he agreed with [conspirator Samir] Rao to impersonate [YouTube's] Alex Piper to land an investment from Goldman, that's fraud.  Because Goldman was buying OZY stock, that's securities fraud.  And that means Watson is guilty of Count One.  Because the impersonation involved electronic communications between California and New York, that's wire fraud and that means Watson is guilty of Count Two.  And because they stole Alex Piper's identity to do it, Watson is guilty of Count Three . . . . [T]he Goldman call alone is enough to find Watson and OZY guilty on all counts and to be done" (T 4412-13).  "You have learned over the last several weeks that for years, Carlos Watson went around the country and around the world telling people that OZY was a proven success . . . that it had secured licensing agreement[s] with major media players like [Google's] YouTube and that OZY's fundraising rounds were being led by big names like Google and Live Nation . . . . But you now know that none of that was true" (T 4127). "Watson, Rao, and [conspirator Suzee] Han also told Goldman Sachs that OZY had earned $5.75 million in licensing revenue from YouTube based on a

---

[13] S*ee* Indictment at ¶¶ 96, 99(w), 99(x); T 923-26 (Testimony of Samir Rao); T 2562-66 (Testimony of Chetan Bansal)

licensing agreement . . . But you know that was a lie" (T 4180). *See also, e.g.,* T 4140, 4159, 4167, 4169-75, 4177, 4191, 4195, 4199, 4206, 4214, 4216-17, 4222, 4238.[14]

The analysis of Judge Komitee's holdings contained herein is based on his 2023 Disclosure as well as two sets of periodic reports filed with the Securities and Exchange Commission by Viking and the other hedge fund managers through which Judge Komitee maintained investments: (1) Form 13F, required by Section 13F of the Securities Exchange Act of 1934 to be filed each quarter by investment managers with control over at least $100 million in "13F securities" and which lists all equity assets under management, including the name of the issuer, the class of security, the number of shares owned, and the fair market value; and (2) Form ADV, required by the Advisors Act, 15 U.S.C. §§ 80b-3 and b-4, to be filed annually by investment advisors with assets over $25 million and to disclose information about the investment adviser's business, ownership, clients, employees, business practices, and affiliations. When Judge Komitee was General Counsel of Viking, he personally signed dozens of Viking's Forms 13F and Forms ADV, vouching for their truth.[15]

The analysis contained herein establishes that Judge Komitee's indirect beneficial ownership, through the four hedge funds, of the Four Victims in 2023 alone was worth at least

---

[14] As detailed below, the Four Alleged Victims are not the only alleged victims whose relationships to Viking and Judge Komitee form a basis for disqualification.

[15] *See* Viking Global Investors LP, Forms 13F, filed with the SEC on the quarters ending June 30, 2009 through Mar. 31, 2018 (41 filings) (General Counsel Komitee representing each time "that all information contained herein is true, correct and complete, and that it is understood that all required items, statements, schedules, lists, and tables, are considered integral parts of this form."); Viking Global Investors LP, Forms ADV, filed with the SEC on May 27, 2011 and at least annually through Mar. 29, 2018 (16 filings) (General Counsel Komitee "certify[ing], under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct.").

between $126,000 and $1.1 million, depending on the financial quarter. These holdings were not transient, one-time positions but part of continuing, longstanding, and substantial relationships. For example, the analysis shows that Judge Komitee's equity interest in the Four Victims between 2018 and 2021, even before his assignment to this case, temporally overlapped with the Indictment's allegations about the charged conspiracy to commit securities and wire fraud from January 2018 to October 2021 [Indictment at ¶¶ 13-101], which allegedly began about six months *before* Judge Komitee resigned as Viking's General Counsel. Viking and the other hedge funds in which Judge Komitee was invested held positions in the Four Victims throughout the entire duration of the events laid out in the Indictment, beginning with OZY's inception in 2012 [Indictment at ¶ 5], its accumulating debt beginning in 2016 [Indictment at ¶¶ 10-11], and at least through to trial. In the fourth quarter of 2020 - - when many of the acts against Goldman and Google alleged to be part of the charged conspiracy occurred - - each of Judge Komitee's hedge funds owned securities in each of the Four Victims, conferring upon Judge Komitee an allocable beneficial ownership interest in the Four Victims worth between $1.3 million and $6.5 million.

While the available information contained in the 2023 Disclosure alone warranted the disqualification of Judge Komitee from presiding over this case *ab initio*, this motion does not purport to detail the universe of facts and circumstances that may further support his disqualification: (1) Judge Komitee's required financial disclosure for 2024 is not due until May 15, 2015 [*see* 5 U.S.C. § 13103(d)]; (2) information about all the investment funds and advisors through which Judge Komitee holds investments does not appear to be publicly available; and (3) the conservative analyses contained herein almost certainly *understate* the value of Judge

Komitee's financial holdings in the Victims.[16]

Even apart from Judge Komitee's connections to the Four Victims through his investments alone, it is a fair inference that a General Counsel of a hedge fund like Viking making such substantial investments in entities like the Four Victims would have had communications and relationships with the Victims that are relevant to this motion.

For example, Judge Komitee has publicly acknowledged his close friendship with Patrick J. Carroll ("Carroll"), a veteran of the Federal Bureau of Investigation. Goldman hired Carroll in 2015 as a vice president in its compliance, surveillance, and strategy group, according to Bloomberg News, which reported that "Carroll says he already knew many people at Goldman Sachs, having worked with 'their compliance for many years.'" Patricia Hurtado, *Goldman New Cop Is FBI Agent Who Put Away Madoff, Rajaratnam*, Bloomberg News, May 16, 2015 ("[i]t can help to have some people who know how government prosecutors and investigators think"). Carroll eventually became Global Head of the Monitoring and Assurance Group and Law Enforcement/Regulatory Liaison for Federal Crime Compliance, retiring in late February or

---

[16] To calculate the approximate value of Judge Komitee's holdings in the Four Victims (and every other public equity disclosed by the investment advisers on quarterly Form 13Fs), we allocated Judge Komitee's hedge fund interests (at the low-end and high-end valuations disclosed in the Forms AO 10) pro-rata across *all* of the "AUM" of Viking, D1, and Junto (per Item 5F2A of their ADVs). The investment advisers' AUM figures encompasses two types of funds: private equity funds and hedge funds. Private equity funds generally hold illiquid positions in private companies. Therefore, the publicly traded equity securities reported in the Form 13Fs (so-called "13F securities") are in all likelihood held in Viking's *hedge* funds, not its *private equity* funds. Even though Judge Komitee has disclosed that he owns interest in the applicable hedge funds, in order to estimate most conservatively Judge Komitee's beneficial interest in the Four Victims, we used the manager's entire AUM figure (i.e. hedge funds + private equity funds) as the denominator, not just that portion of the AUM allocated to the manager's hedge funds. Further, we ignored the manager's use of leverage, which would amplify Judge Komitee's beneficial ownership of the Four Victims. Accordingly, the allocable portion of Judge Komitee's public equity beneficial ownership in the Four Victims, in reality, is almost certainly greater than stated herein.

March 2023.[17]  Thus, when the government was investigating the Indictment's alleged misrepresentations to Goldman, including a conspirator's highly-publicized call to Goldman in which he impersonated a representative of Google's YouTube [*see, e.g.*, *Goldman Sachs, Ozy Media and a $40 Million Conference Call Gone Wrong,* The New York Times, Sept. 26, 2021], Carroll or his underlings were presumably in contact with the FBI agents and the prosecutors investigating the Defendants.  Goldman hired Carroll for precisely that type of purpose, and he remained employed at Goldman until just after the Indictment was filed in this case.

Carroll accompanied then nominee-Komitee to his confirmation hearing before the United States Senate Judiciary Committee in 2018, during which Komitee singled out Carroll as "a great friend.  Pat was the FBI Special Agent in charge of squad C1, which is one of the two securities fraud squads in New York, when I was chief of the securities fraud section for the US Attorney's Office in Brooklyn.  Pat and I forged a friendship that has survived and only grown stronger over the years."[18]

Similarly, in 2020 and 2021, after Judge Komitee was confirmed by the Senate, and during the period of the conspiracy for which the Defendants were indicted, he held an interest worth up to $1 million in Warlander Asset Management LP ("Warlander"), a hedge fund then in the process of winding down.[19]  Raph Posner ("Posner"), Warlander's General Counsel (and thus Judge Komitee's counterpart at Warlander when he served Viking as General Counsel)

---

[17]  *Compare* LinkedIn for Patrick Carroll, available at *https://www.linkedin.com/in/patrick-carroll-92860911/* (giving title and retirement date of "March 2023") *with* Carroll's Finra CRD Snapshot Report (showing employment dates with Goldman Sachs of Apr. 22, 2015 to Feb. 28, 2023).

[18]  *Available at https://www.judiciary.senate.gov/committee-activity/hearings/08/01/2018/ nominations (testimony beginning at 1:11:36)*

[19]  2020 Disclosure, line 6.

left Warlander and became General Counsel of Antara Capital ("Antara"), another alleged victim of the charged conspiracy. *See* Indictment ¶¶ 84-91. Before jury selection, the government filed a list of potential witnesses or names about which the jury might hear to assure that selected jurors would be fair and impartial. *See* Docket No. 141. Posner was identified in the government's pretrial disclosure as such a person, *id.* at 15, and his business partner at Antara, Chetan Bansal, testified at trial. *See* T 2514-70. Like Carroll at Goldman, Posner or his underlings were presumably in contact with the government investigating the alleged fraud on Antara.

Additionally, Viking's substantial and longstanding institutional relationships with two of the Victims themselves create the appearance of impartiality in violation of Section 455(a). Viking's regulatory filings for 2023, as well as those signed by Judge Komitee when he was Viking's General Counsel, disclose that both Goldman and JPMC served Viking as qualified custodians of Viking's client's assets and Viking's prime brokers. The Custody Rule of the Investment Advisers Act requires Viking to maintain its clients' assets at qualified custodians. *See* 17 C.F.R. § 275.206(4)-2. Prime brokers provide multiple indispensable services to clients like Viking, including extension of credit and financing that permits transactions to be conducted efficiently, investment banking and consulting services, and introductions to sources of capital. *See Securities Law Handbook Series: Advising Private Funds, a Comprehensive Guide to Representing Hedge Funds, Private Equity Funds and Their Advisors, 2023-24* (Thomson Reuters) (Chapter 22 citing Staff Report to the SEC, Implication of the Growth of Hedge Funds

12

(Sept. 2023)[20]; *The Role of a Prime Broker,* www.investopedia.com, June 26, 2024.[21]  Serving as qualified custodian and prime broker are among the core capacities of Goldman and JPMC, can generate hundreds of millions of dollars in revenue for them, and require deep relationships with their clients.  Viking's relationships with its prime brokers are of crucial importance: without prime brokers, Viking simply could not conduct its business.  Conversely, the largest prime brokers, like Goldman and JPMC, compete for the highly lucrative role of serving as prime broker for the large hedge funds - - and Viking's are among the largest such funds in the world. Goldman and JPMC provided prime broker services to Viking in 2023 when Judge Komitee maintained his positions in the Four Victims through Viking.[22]

In addition to its positions in public equities, Viking and D1 often co-invest with other investors in emerging businesses.  Viking's co-investors in these private equity or venture capital deals were also investors in OZY - - and are among the Alleged Victims in this case.  *See* Table 1 (Exhibit B), List of Viking Co-Investment Deals.  For example, Viking has co-invested alongside the private equity or venture arms of Google, Goldman, and JPMC more than a dozen times, including as recently as June 11, 2024, when Viking and the venture arms of Google, Goldman, and JPMC *all* co-invested together in a $650 million deal with AlphaSense; Goldman

---

[20] *Available at https://www.sec.gov/files/implications-growth-hedge-funds-09292003.pdf*

[21] *Available at https://www.investopedia.com/articles/professionals/110415/ role-prime-broker.asp*

[22] Judge Komitee's expertise in managing Viking's relationships with its prime brokers is apparent from his participation on a panel "about best practices" in managing such relationships.  *See* Eric Ross Komitee, US Senate Judiciary Committee Questionnaire for Judicial Nominees, p. 9, *available at  https://www.judiciary.senate.gov/imo/media/doc/Komitee%20SJQ.pdf* (disclosing then General Counsel Komitee's participation on a panel on June 26, 2012, entitled "Managing Your Prime Broker Relationship and Counter-Party Risk.").

and Google representatives testified in Komitee's courtroom two and three days after this deal closed, respectively.[23]

Additionally, as Table 1 (Exhibit B) also presents, Viking co-invested alongside other OZY investors who are alleged victims:  Clayton Dubilier Rice, one of whose former partners, Thomas Franco, testified in this case and was presented as a victim of the charged conspiracy (T 1328); Emerson Collective; SV Capital; GSV/SuRo Capital; and Wilson Sonsini. Persons from or affiliated with these investment firms, and the names of the investment firms themselves, appeared on the Government's List of "Possible Witnesses and Other Individuals," Docket 141 at 13-18 (*e.g.*, SV Angel: Ron Conway; Emerson Collective: Laurene Powell Jobs, Steve McDermid; Clayton Dubilier & Rice: Dave Novak, Robert Quarta, Michael Dubilier, the Martin Tate Dubilier Accumulation Trust, the Riley Conchrane Dubilier Accumulation Trust; SuRo Capital Corp. and GSV: Mark Klein, Michael Moe, Tom Franco, Deborah Quazzo; Wilson Sonsini and WS Investment Company LLC).  To the extent that Judge Komitee's investments in Viking or D1 are deployed in private equity holdings, or invested in these investment advisers' sidecar "side pocket" deals or co-investment vehicles, it is possible that he is or was an indirect co-investor with some of the same alleged victims in the instant case.

These issues created by the 2023 Disclosure arise as public confidence in the judiciary is plummeting.  Earlier this year, the United States Court of Appeals for the Second Circuit ruled that a district judge should have recused himself, pursuant to 28 U.S.C. § 455(a), because his spouse owned $15,000 worth of stock in a party through a retirement account at

---

[23] Goldman representative Allison Berardo testified on June 13, 2024; Google representative Donald Harrison, testified on June 13; Google representative Alex Piper testified on June 13 and June 14; Google CEO Sundar Pichai testified on June 14; and Goldman's Hillel Moerman testified on June 14.

Charles Schwab, and even though she divested herself of the stock before the judge ruled on a motion to dismiss. *See Litovich v. Bank of America, Corp.*, 106 F.4th 218, 228-29 (2d Cir. 2024); Financial Disclosure Report for 2021 of the Honorable Lewis J. Liman at 23, 28. Section 455(a) provides that a "judge of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned" (emphasis added). While a judge's actual knowledge of a disqualifying conflict requires recusal, actual knowledge is not required. Because the statute's purpose is to "promote public confidence in the integrity of the judicial process," even an appearance of impropriety requires recusal. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859-60 (1988). "The test for whether an appearance of partiality exists is an objective one based on what a reasonable person knowing all the facts would conclude." *Litovich*, 106 F.4th at 224 (quoting *Chase Manhattan Bank v. Affiliated FM Ins. Co*, 343 F.3d 120, 127 (2d Cir. 2003); *Liteky v. United States*, 510 U.S. 540, 548 (1994) (Section 455(a) requires an "objective" evaluation of a potentially disqualifying interest; "what matters is not the reality of bias or prejudice but its appearance.").

    The judge in *Litovich* disclosed his spouse's holding only after he was contacted by the Wall Street Journal as part of research for an article which it published a few days later. *See Litovich*, 106 F.4th at 224 (citing James V. Grimaldi, et al., *"Fallout From Judges' Financial Conflicts Spreads to Appeals Courts,"* Wall St. J. (Sept. 28, 2021)). Citing the article, Chief Justice John G. Roberts, Jr. wrote in 2021 that judges must "adhere to the highest standards:"

> We are duty bound to strive for 100% compliance because public trust is essential, not incident, to our function. Individually, judges must be scrupulously attentive to both the letter and spirit of our rules, as most are.

2021 Year-End Report on the Federal Judiciary (Dec. 31, 2021) at 3-4. Legislators also

recognize the imperative of avoiding judicial conflicts of interest: "Failure to recuse can cause real harm to parties seeking fair and impartial justice and leave a cloud of doubt over any decision that is made once the conflicts are subsequently uncovered." 168 Cong. Rec. H4522 (daily ed. Apr. 27, 2022) (statement of Rep. Hakeem Jeffries). *See also* "Senator Warren, Representative Jayapal Reintroduce the Judicial Ethics and Anti-Corruption Act," June 8, 2023 (statement introducing legislation to "forbid[] judges from owning individual stocks and securities, commercial real estate, trusts, and private companies").

Unlike the civil litigants in *Litovich*, the Defendants here have a constitutional right to due process and a fair trial. As the Supreme Court has explained:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 [1927]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 [1954].

*In re Murchiso*, 349 U.S. 133, 136 (1955).

Also unlike *Litovich*, Judge Komitee is not a casual investor presumptively disinterested in the nuts-and-bolts of a retirement account like the judge's spouse in *Litovich*. Investors in Viking hedge funds, such as Judge Komitee, are sent a constant stream of detailed account reports from Viking, including "weekly performance estimates" and "monthly attribution reports containing performance and exposure estimates, long equity positions reports and

16

statements of net asset value."  Viking Global Investors LP, Part 2A of Form ADV: Firm

Brochure, filed with the SEC March 28, 2024, p. 62.

Further, apart from Judge Komitee's multiple professional and longstanding

connections to the Victims and his experience as General Counsel of a major hedge fund, he is

not a casual or disinterested investor.  His financial disclosures reveal that, since his investiture,

he has continued to be an active investor who trades in highly volatile assets, such as high-risk

short sales of GameStop, a "meme" stock; trades in Tesla during a period of high volatility; and

buying and selling hundreds of thousands of dollars' worth of crypto-currencies, which are

subject to wild price swings (Bitcoin and Ethereum).[24]

---

[24]  The timing of Judge Komitee's trading activity - - trades on high volatility days, trades of multiple stocks on the same day, etc. - - appears to be more consistent with deliberate trades, as opposed to pre-set orders or setting pre-set execution instructions.

GameStop: Judge Komitee reported gains of between $115,002 and $1,050,000 on his December 2022 GameStop trades; these were only some of his GameStop transactions disclosed on various Forms AO 10 and AO-10T.  *See, e.g.* Eric R. Komitee, Form AO 10 for 2021, line 35 (Judge Komitee held GameStop); Form AO 10 for 2022, lines 37-56 (GameStop trades).  In the aggregate, Judge Komitee reported trading between $1,950,015 and $3,450,000 worth of GameStop common stock.

Tesla:  In both 2020 and 2021, Judge Komitee held up to $15,000 in Tesla.  *See* Eric R. Komitee, Form AO 10 for 2020, line 32; Form AO 10 for 2021, line 32.  Judge Komitee did not disclose acquiring Tesla in 2020, so it is presumed that he went into 2020 already holding this position.  This 2020–2021 period is when Tesla's stock price had its highest volatility, ranging from a low of $28.71 (Jan. 2020) to a high of $414.50 (Nov. 4, 2021). *See https://finance.yahoo.com/quote/TSLA/history/?period1= 1577836800&period2=1640908800*

Bitcoin: Judge Komitee bought or sold Bitcoin in 2021, 2022, and 2023.  *See* Form AO 10 for 2021, line 41; Form AO 10 for 2022, lines 63-65; Form AO 10 2023, lines 44-45.  On Feb. 15, 2021, when Komitee first disclosed buying Bitcoin, the price was $47.945.06.  On Sept. 19 or 20, 2023, when Komitee sold between $250,001 and $500,000 worth of Bitcoin, Bitcoin closed at $27,211.12.

Ethereum: Judge Komitee traded in Ethereum in 2022 and 2023.  *See* Form AO10 for 2022, lines 66-67; AO10 Form for 2023, line 46.  Judge Komitee bought into Ethereum at closing prices of $3,142.47 and $2,933.48; when he exited Ethereum, the closing price was $1,806. *See https://finance.yahoo.com/quote/ ETH-USD / history/?period1=1675209600&period2=1680307200.*

Judge Komitee should not have presided over this case and should be disqualified *nunc pro tunc* as of February 23, 2023. Because Judge Komitee presided over the case in violation of Sections 455(a) and (b), the Defendants were denied their constitutional rights to due process and a fair trial. Judge Komitee's connection to the Victims was far more substantive, longstanding, and lucrative than the relatively *de minimis* holding of $15,000 in a retirement account by the judge's spouse in *Litovich,* a civil case. Yet the Circuit vacated the judgment in *Litovich*. *Id.* at 228. So here, the convictions must be vacated.

In addition, upon vacatur, the Indictment should be dismissed. The Defendants endured an unconstitutional two-month trial, revealed their defenses, and subjected their witnesses (including Mr. Watson himself) to cross-examination, even apart from the extraordinary costs of litigation - - "in terms of personal, financial and judicial resources." *See United States v. Mahaffy*, 693 F.3d 113, 133 (2d Cir. 2012). The Defendants have been irreparably prejudiced, and dismissal is the only proper and effective remedy. Meanwhile, the government can seek redress for the Defendants' allegedly fraudulent conduct in the pending *Securities and Exchange Commission v. OZY Media, Inc., Carlos R. Watson, Jr., Samir Rao, and Suzee Han*, 1:23-cv-01424 (E.D.N.Y.).

18

Argument

A.    *The actual and apparent conflicts should have been disclosed*
      *when the case was assigned to Judge Komitee.*

When an indictment is filed, it is incumbent on the government to advise the

judge of victims of the alleged criminal activity so that the judge may evaluate whether any

actual or perceived conflict disqualifies the judge from presiding over the case.  On February 23,

2023, the day that the Indictment was unsealed, the government filed a statement with the Court,

pursuant to Federal Rule of Criminal Procedure 12.4, presumably identifying any and all

organizational victims.  The government's disclosure was filed *ex parte* and under seal.  Within

the last two weeks, defense counsel requested the filing from the Court via email and thereafter

from the government, which said that would it discuss counsel's request internally and also

determine whether a court order was needed to share it, but neither the Court nor the government

has otherwise responded.

On May 6, 2024, over a year after the government's *ex parte* disclosure to the

Court pursuant to Rule 12.4, the government filed a "list of persons, entities and places" to be

provided to prospective jurors during *voir dire* to assure that selected jurors could be fair and

impartial.  That list identified the victims and witnesses and potential witnesses identified above,

including Goldman, Google and Alphabet, Inc., JPMC, Live Nation, Raph Posner, Hillel

Moerman, Sundar Pichai, and Chetan Bansal.  Docket No. 141 at 13-18.

Independent of the government's various disclosures, a judge has an obligation to

"inform himself about his personal and fiduciary financial interests," *see* 28 U.S.C. 455(c), to

avoid an "objective appearance of a conflict of interest requiring disqualification under Section

455(a)." *Chase Manhattan Bank,* 343 F.3d at 129.  As the Second Circuit has explained,

19

> [I]t is important to understand that judges have an obligation to exercise reasonable effort in avoiding cases in which they are disqualified.  Section 455 is not a provision that requires judicial action only after a party to the litigation requests it.  The relevant provisions are directive and require some reasonable investigation and action on the judge's own initiative . . . .  to avoid damage to public confidence in the federal judiciary's impartiality that would result from constant recusal motions or recurrent controversies over judges' financial interest in parties to litigation.  Another reason is that lawyers for the most part expect judges to disqualify themselves under Section 455(b)(4) without a formal motion.  In fact, lawyers do not routinely search judges' financial disclosure forms - - the only information available on a particular judge's financial holdings - - but even if they did, those forms are generally a minimum of four months out-of-date, i.e., the forms are filed by May [15] and report holdings and transactions for the previous calendar year.  Judges therefore be the principal burden of compliance with that section."

*Id.* at 130-31.

Thus, it was not incumbent on the defense to identify the bases on which the judge's "impartiality might reasonably be questioned" under 28 U.S.C. § 455(a), nor whether the judge had any "financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding" under  28 U.S.C. § 455(b)(4).  Nor was it incumbent on the defense to search Judge Komitee's financial disclosure forms - - nor could the defense have done so effectively, since the 2023 Disclosure was not publicly available until October 2, 2024.[25]  Moreover, Judge Komitee's disclosure for 2024, when the Defendants were tried, has not yet been filed and is not due until May 15, 2025.  *See* 5 U.S.C. § 13103(d).

It is not the defense's obligation to speculate as to whether the government failed

---

[25]  On October 2, 2024, a representative of the Administrative Office of the United States Courts, the entity that maintains judges' financial disclosures, emailed the defense that Judge Komitee's 2023 Disclosure had been posted to the public website on which such financial disclosures are maintained.  Metadata shows that the PDF of the 2023 Disclosure posted to the website was created on October 1, 2024 at 8:09 p.m.

to provide a sufficiently fulsome disclosure pursuant to Rule 12.4 to enable a judge to evaluate any apparent or actual disqualifying conflict, or whether a judge failed to recognize all the possible bases for his disqualification.  Here, at the very least, Judge Komitee must have realized that he might benefit from an order of restitution in favor of any of the Four Alleged Victims or other entities discussed herein.   Indeed, Judge Komitee acknowledged that Mr. Watson "is facing a restitution obligation."  T 4595.  Whether or not any restitution is ultimately ordered for the benefit of one or more victims in this case, Judge Komitee's apparent failure to appreciate the potential that he himself might benefit from such restitution creates precisely the appearance of partiality that Section 455(a) is meant to guard against.  See *Litovich*, 106 F.4th at 224; *Liteky*, 510 U.S. at 548.  At the very least, a judge with Judge Komitee's atypical prior experience as General Counsel of one of one world's largest hedge fund managers and his continued holdings in 2023 should have appreciated his connections with the victims in this case and addressed the issue at the earliest opportunity.

B.    *Judge Komitee's holdings in the Four Victims in 2023*

The 2023 Disclosure establishes that Judge Komitee in 2023 owned investments in four hedge funds, among other investments.  Table 2 (Exhibit B) sets forth Judge Komitee's holdings in the Four Victims in 2023.  It shows that, through hedge funds, Judge Komitee's allocable investments in the Four Victims in 2023 amounted to between $120,000 and $1.1 million, depending on the quarter.  For comparison, in the second quarter of 2023, when his allocable ownership interest in the Four Victims was at its lowest (approximately $120,000 to $630,000), his lowest possible ownership interest in the Four Victims amounted to half of his annual judicial salary of $232,600; in the fourth quarter of 2023, when his allocable ownership in

the Four Victims was at its highest (approximately $215,000 to $1.1 million), the maximum

value of his allocated investments in the Four Victims exceeded his salary by a factor of four.

Unlike the single investment of $15,000 that was part of a retirement account

maintained by a judge's spouse at Charles Schwab in *Litovich*, Judge Komitee's investments in

the Four Victims in just 2023 were substantially larger.  Moreover, his relationship with at least

one of his investment advisors (Viking) was far more substantive and longstanding than the

relationship at issue in *Litovich*.

C.    *Judge Komitee's holdings in 2023 continued investments in the tens of millions*
*of dollars that he held when he was Viking's General Counsel and signed forms*
*disclosing investments in the Four Victims on behalf of Viking — all during the time*
*period covered in the Indictment.*

The test for disqualification under Section 455 "is an objective one which

assumes that a reasonable person knows and understands all the relevant facts."  *In re Drexel*

*Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988).  "[J]udges determine appearance of

impropriety . . . by examining the record facts and the law, and then deciding whether a

reasonable person knowing and understanding all the relevant facts would recuse the judge."  *Id.*

Judge Komitee's investments in the Four Victims in 2023 represent a continuation

of his investments in and relationships with the Alleged Victims - - covering the time period of

events alleged in the Indictment and in the government's evidence presented at trial.

1.    *2008-2011 (Pre-Indictment Events)*

Beginning in 2008, Judge Komitee began as Viking's General Counsel.[26]  In April

---

[26] Biography of Eric Ross Komitee, Federal Judicial Center, *available at https://www.fjc.gov
/history/ judges/komitee-eric-ross; see also* Eric Ross Komitee, US Senate Judiciary Committee
Questionnaire for Judicial Nominees, p. 25, *available at https://www.judiciary.senate.gov/imo/media
/doc/Komitee%20SJQ.pdf* (he "oversaw the firm's legal and regulatory affairs," "managed a broad
spectrum of transactional work," and "supervised the legal aspects of Viking's counterparty-risk

2010, Viking's CEO Halvorsen promoted Judge Komitee to Viking's Management Committee, to take on "greater responsibility for the day-to-day management of the firm."  *"Dear Viking Global Investors,"* Dealbreaker, Apr. 14, 2010 (publishing Halvorsen's first quarter letter to investors announcing promotions).[27]  Judge Komitee signed all of Viking's quarterly Form 13Fs, itemizing Viking's public stock holdings.[28]  Because he signed Viking's initial Form ADV and subsequent ADVs, he also was presumably aware of Viking's investments beyond public equities.  *See CIE Prepares for Post-Registration Exams,* Compliance Reporter, Jan. 27, 2012 (reporting on Viking's initial ADV registration process).  It is reasonable to infer that a general counsel in Judge Komitee's position would have gained familiarity with the Four Victims and may have had occasion to participate in or oversee interactions with their key managers, even apart from Goldman's and JPMC's roles as qualified custodians and prime brokers.  Because Viking's public stock positions were, and are, the largest part of its portfolio, with Viking using a "limited diversification" strategy and concentrating assets in a few select stocks [Viking Global Investors LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC May 27, 2011, p. 10], Viking "investigat[ed]" companies before purchasing stocks, a process that included "interviews with a company's management team; background checks on key members of a management team; discussions with a company's customers and competitors; analysis of the assets on a company's balance sheet; a detailed review of a company's products and services; and

---

management effort," among other things).

[27] *Available at https://dealbreaker.com/2010/04/dear-viking-global-investors*

[28] Viking Global Investors LP, Forms 13F, filed with the SEC on the quarters ending 6/30/2009, 9/30/2009, 12/31/2009, 3/31/2010, 6/30/2010, 9/30/2010, 12/31/2010, 3/31/2011, 6/30/2011, 9/30/2011, 12/31/2011.

consultation with industry experts." *Id.* at 9.

As Table 3 (Exhibit B) shows between 2008 and 2011, Viking's largest quarterly position in the Four Alleged Victims worth $835 million position, and held an average quarterly position in the Four Victims worth $162.4 million.

*2. 2012 - 2017 (The Pre-Conspiracy Period Described in the Indictment)*

A line can be drawn from Judge Komitee's 2023 Disclosure to the pre-conspiracy period described in the Indictment and evidence presented at trial (2012 to 2017). *See, e.g.,* Indictment ¶¶ 5 (OZY's history beginning with its inception in 2012), ¶ 7 (OZY's official launch in 2013), ¶ 8 (Emerson Collective's investment in OZY in 2014), ¶¶ 10-11 (transactions in 2016 and 2017); T at 3688 (cross-examination of Watson regarding 2017 term sheet referencing OWN/Discovery and Google). During this time period, the importance of Google to Viking's investment portfolio is difficult to overstate. Returns from Viking's ownership of Google stock "saved" Viking in 2015's third quarter and, in 2016, propelled Viking into the "top tier" of global hedge fund operators, ranking sixth in the world with $33 billion in assets under management. Stephen Taub, *Hedge Funds Get a Boost from Microsoft, Google,* Institutional Investor's Alpha, Oct. 26, 2015; Stephen Taub, *In a Tough Year Viking Global Stages an October Comeback, Institutional Investor's Alpha,* Nov. 4, 2015; Antoine Gara, *Billionaire Andreas Halvorsen's Viking Global is Betting Over $6 Billion on FANG [Facebook, Amazon, Netflix, and Google] Stocks,* Forbes, May 17, 2016; Stephen Taub, *Hedge Fund Report Card,* Institutional Investor's Alpha, Feb. 11, 2016.

Other Alleged Victims were also important stock positions for Viking during this time period, as Table 4 (Exhibit B) shows. For the quarter ending March 31, 2017, for example,

24

Viking held combined positions in Google and JPMC exceeding $2.4 billion. (This quarter was the high-water mark for Viking's AUM during Judge Komitee's tenure at Viking. Viking Global Investors LP, Form ADV, filed with the SEC March 29, 2017.  The following quarter, when Viking co-invested alongside OZY investor Clayton Dubilier & Rice in a $233.5 million private deal, Viking held a $634.3 million stake in Google.  Another hedge fund which appears on Judge Komitee's 2023 Disclosure, Junto, also held positions in Google and Live Nation exceeding $100 million in the final quarters of 2017, as shown in Table 5 (Exhibit B).

    3.     *2018 and 2019  (First Two Years of the Charged Conspiracy)*

          As alleged in the Indictment, the charged conspiracy extended from January 2018 (Q1 2018) until October 2021 (Q4 2021).  During the first part of the conspiracy (2018 to 2019), Judge Komitee was not yet required to file financial disclosures pursuant to CETA, but evidence supports the reasonable inference that Judge Komitee in fact maintained investments in Viking during this period.  After Judge Komitee's nomination to the bench, a reporter for the publication *Corporate Counsel* gained access to and reported on the then-nominee's financial disclosures to the Senate Judiciary Committee, revealing, among other details, that then-nominee Komitee was "contractually obligated" to maintain a specified minimum balance in certain funds managed by Viking for at least three years, unless Viking waived the lock-up period.  *See* C. Ryan Barber, *Eric Komitee, Trump Pick for NY Court, Made Millions as Hedge Fund GC,* Corporate Counsel, July 11, 2018 (disclosing Judge Komitee's Viking salary and bonus).[29]  Further, according to the same article, the nominee's Senate disclosures "reveal[ed] interests in several investment funds,

---

    [29] *Available at https://www.law.com/corpcounsel/2018/07/11/eric-komitee-trump-pick-for-ny-court-made-millions-as-hedge-fund-gc/*

including some run by Viking Global Investors," meaning that Judge Komitee, in 2018, was invested in funds outside of Viking, as he was in 2023 (Junto and D1).

As Table 6 (Exhibit B) illustrates, during the first part of the charged conspiracy (2018 to 2019), Viking owned sizeable positions in Google in every quarter, exceeding $1 billion in 1Q 2018 and $969 million in 4Q 2018.  If Judge Komitee had been invested in the Viking funds in 2018 and 2019 at the same level as he was in the 2020 to 2023 period, then his pro-rated allocation of Viking's holding in Google from 2018 to 2019 was worth as much as $900,000.

Tables 7 and 8 (Exhibit B) show, respectively, that D1 owned positions in Google between 4Q 2018 and 4Q 2019, topping out at $308.3 million in 1Q 2019; and that at various quarters in 2018 and 2019, Junto owned tens of million dollars' worth of stock in Google, Goldman, and Live Nation.

4.    *2020 and 2021 (Second Two Years of The Charged Conspiracy)*

For 2020 and 2021, Judge Komitee was first required to make financial disclosures as a judicial officer.  As Table 9 (Exhibit B) sets forth, during just the fourth quarter of 2020, Viking, D1, and Junto collectively held more than $2 billion worth of Google and $80 million worth of Goldman.  Judge Komitee's allocable interest in these two alleged victims for 2020 to 2021 was between $700,000 and $3.5 million, depending on the quarter in question. For each quarter of 2020, Judge Komitee's minimum financial interest in the Four Victims was between approximately $346,000 (low-end of 1Q 2020) and $6.5 million (high-end of 4Q 2020) - - exceeding his salary as a judge, for example, by a multiple of 1.6 for 2020's first quarter and by a multiple of six for 2020's fourth quarter.

5.      *2023 and 2024 (The Pendency of the Case, Including Trial)*

The pendency of this case covers calendar year 2023 (for which Judge Komitee's 2023 Disclosure only recently became available) and calendar year 2024 (for which his disclosure will not be available until May 15, 2025).  The analysis below assumes that Judge Komitee, in 2024, maintained ownership in the four hedge funds at the same levels as he did in 2023 and before.

Table 11 (Exhibit B) sets forth Judge Komitee's pro-rata financial interest in the Four Alleged Victims in 2023 and 2024.  The table reveals the following.  *First,* Judge Komitee's average allocable position in the Four Alleged Victims was between $180,854.46 and $904,272 per quarter in 2023.  The first quarter of 2024 was the high-water mark, with Judge Komitee holding an ownership interest in all four of the Four Victims between $219,703.95 (low-end) and $1,098,519.54 (high-end).  *Second,* 4Q 2023 was the second highest quarter in terms of Judge Komitee's stake in the Four Victims; he held, collectively, between $214,789.29 (low-end) and $1,073,946.10 (high-end).  *Third*, of the seven relevant quarters during the pendency of this case, Judge Komitee's ownership in the Victims was lowest in Q2 2024: between $126,050.17 (low-end) and $630,250.71 (high-end).  In other words, even at its lowest point, Judge Komitee's allocable ownership interest in the Four Victims still measured into the six digits.

D.      *Apart from Section 455(a), Section 455(b) also requires disqualification*

Apart from Section 455(a)'s mandate, Section 455(b) also requires Judge Komitee's disqualification.  Section 455(b)(4) requires disqualification when a judge possesses an equitable interest in "the subject matter in controversy or in a party in the proceeding, or any

other interest that could be substantially affected by the outcome of the proceeding." Section 455(d)(4)(I) exempts ownership in "a mutual or common investment fund" that holds "securities unless the judge participates in the management of the fund," but that exemption is inapplicable here for at least three reasons.

First, while the exemption is expressed in the present tense (e.g., "unless the judge *participates* in the management of the fund") (emphasis added), Congress could not have intended to exempt a judge under the circumstances here who served the fund as General Counsel (thereby participating in the management of the fund), signed its Forms 13F and ADV, and who continues to serve with his former colleagues on a foundation, which itself is invested in the same fund and depends entirely on the fund for its operating revenue and endowment.

Second, the United States Courts Guide to Judiciary Policy Vol. 2B, Ch. 2, Nos. 57 and 106, provides guidance for compliance for Canon 3(C)(1)(c) and (3)(c) of the Code of Conduct for United States Judges, which tracks the language of Section 455 and focuses on the judge's interest, not his current management. *See id.* at 204 ("At the same time, however, a judge who chooses to invest in such mutual funds should evaluate whether his or her 'interest' in the fund might be affected substantially by the outcome of a particular case, which would require recusal under Canon 3C(1)(c)."). The government's claims about the materiality of the Defendants' misrepresentations to the Four Victims coupled with the temporal and monetary extent of Viking's investment in them precludes any reasonable conclusion that Judge Komitee's interests could not be substantially affected.

Third, the Committee on Codes of Conduct Advisory Opinion No. 106 (issued in March 2011) provides six criteria to assist judges "in determining whether a fund is a 'mutual or

28

common investment fund," within the meaning of the Code: "(1) the number of participants in the fund; (2) the size and diversity of fund investments; (3) the ability of participants to direct their investments; (4) the ease of access to and frequency of information provided about the fund portfolio; (5) the pace of turnover in fund investments; and (6) any ownership interest investors have in the individual assets of the fund." *Id.*

Each factor militates against viewing Judge Komitee's interests in the funds as exempt "mutual or common investment funds." *First*, unlike mutual funds, which can have hundreds of thousands or even millions of investors, the funds here have fewer than 1,000 investors each, because the thresholds to entry are so high.[30] *Second*, the funds concentrate their positions in a few public stocks, explicitly employing "limited diversification," unlike mutual funds.[31] *Third,* the funds are actively and aggressively managed, with positions changing quarter by quarter, as the Forms 13F show. *Fourth*, investors in the funds are sent a steady incoming stream of information about their investment portfolios - - "weekly performance estimates" and monthly "attribution reports" reporting long equity positions from Viking,[32] and, from Junto,

---

[30] Junto Capital Management L.P., Form ADV, filed with the SEC on Sept. 17, 2024, p. 20 (minimum investment commitment of $5 million, 387 beneficial owners). D1 Capital Partners LP Form ADV, filed with the SEC on Mar. 31, 2023, p. 29 ($2 million investment minimum, 812 beneficial owners). Viking Current ADV, pp. 38 ($5 million minimum investment commitment, 637 beneficial owners for Viking Global Equities LP), 73 ($5 million minimum investment commitment, 276 beneficial owners for Viking Global Opportunities LP).

[31] Viking Global Investors LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC March 28, 2024, p. 19 (allowing for up to 12% of certain funds' investment capital to be concentrated in a single position); D1 Capital Partners LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC in Mar. 2024, pp. 22-23 ("limited diversification"); Junto Capital Management LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC on Sept. 17, 2024, p. 23 (same).

[32] Viking Global Investors LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC March 28, 2024, p. 62.

monthly reports and "information on a more frequent and detailed basis" for some investors.[33]

*Fifth,* as the Forms 13F show, the funds turnover their portfolios rapidly within each quarter and across quarters. *Sixth*, these funds offer "sidecar" and other customized investment opportunities for individual investors to co-invest in specific assets, unlike mutual funds.[34]  In sum, because ownership in a hedge fund is a "financial interest" not subject to the "mutual or common investment fund" safe harbor, disqualification is mandatory under § 455(b).

E.      *Dismissal of the Indictment is the proper remedy*

The Second Circuit in *Litovich* considered three factors in determining that the holding of just $15,000 of the judge's spouse in a Charles Schwab retirement account required vacatur of the judgment in that case.  Application of those factors to this case requires both vacatur of the convictions and dismissal of the indictment.

As to the first factor, *Litovich* considered "the risk of injustice to the parties in the particular case."  *See Litovich*, 106 F.4th at 226-27.  The court concluded that "there is a plausible risk of injustice . . . because it is conceivable, albeit highly unlikely, that the district judge's conflict of interest impacted the outcome of the case."  *Id.* (citing *Liljeberg*, 486 U.S. at 867-68) (noting that even where the district court judge did not know of his fiduciary interest in the litigation, he should have known, which was "precisely the kind of appearance of impropriety § 455(a) was intended to prevent.").

As to the second factor, *Litovich* considered "the risk that the denial of relief will

---

[33] Junto Capital Management LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC on Sept. 17, 2024, p. 40.

[34] Viking Global Investors LP, Part 2A of Form ADV: Firm Brochure, filed with the SEC March 28, 2024, p. 17 (describing "co-investment opportunities").

produce injustice in other cases." *Id.*   The court concluded that the injustice "is that federal judges will fail to recuse themselves in future cases, which . . . may increas[e] the likelihood that conflicts [] go unnoticed and unremedied." *Id.* (quotation marks and citation omitted).   As the court explained:

> As we have stated before, "judges have an obligation to exercise reasonable effort in avoiding cases in which they are disqualified," and accordingly bear the burden of complying with the strictures of § 455(a).  *Chase Manhattan Bank*, 343 F.3d at 130. Thus, by enforcing it here, we hope to "prevent a substantive injustice in some future case" by urging our peers "to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered."  *Liljeberg*, 486 U.S. 868.

*Id.*

As to the third factor, *Litovich* considered "the risk of undermining the public's confidence in the judicial process." *Id.*  The court concluded that "vacating the judgment both complies with our statutory mandate and is the best means of dispelling any potential loss of faith in the judiciary" in part because "recurrent controversies legitimately risk undermining public confidence in the federal judiciary and its function: the fair adjudication of the law." *Id.* at 227-28.  The court also concluded that the appearance of impartiality was sufficiently significant to require vacatur even though the judge's spouse divested her holding before the judge ruled on the motion to dismiss in part because of the length of time that the judge had already presided over the case. *Id.*

*Litovich* and this case are a galaxy apart in multiple ways.  The basis for the appearance of impartiality here is not a spouse's holding of $15,000 through a Charles Schwab retirement account, but the judge's own six or seven figure holdings in victims during the pendency of the case, which followed holdings in the millions before his assignment to the case

and attendant relationships that were extensive, longstanding, at least some of which continued during the pendency of the case.  It is far too late even to try to put the cat back into the bag.

*Litovich's* reasoning should compel dismissal of the Indictment.  The Defendants have been irreparably prejudiced.  They endured an unconstitutional two-month trial, revealed their strategies through cross-examination and argument, and subjected their witnesses to cross-examination, including Mr. Watson himself who testified, waiving his constitutional right to remain silent.  While vacating the judgment in *Litovich* was sufficient to return the parties to the *status quo ante* in that civil case, it would not do so here as a new trial would represent a windfall to the government, which could prepare to meet the defense with advance granular knowledge of it and virtually unlimited resources - - all apart from the defense's irreplaceable investment in resources and time.  *See Mahaffy*, 693 F.3d at 133.  A new trial would perpetuate the irreparable prejudice already suffered and compromise the imperative to restore integrity to and public confidence in the courts, especially as the government can seek redress for the alleged fraud in the pending *Securities and Exchange Commission v. OZY Media, Inc., et al.*

<u>Conclusion</u>

For these reasons, an order should issue disqualifying Judge Komitee from this case, vacating the convictions of the Defendants, and dismissing the indictment or, alternatively, random reassignment of the case to a different district judge and a new trial.

<u>*/s/ Andrew J. Frisch*</u>
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Carlos Watson and OZY Media, Inc.*