DGR:JRS/GK/DAS
F. #2021R00900

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -                                        No. 23-CR-82 (EK)

CARLOS WATSON and
OZY MEDIA, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTION TO DISQUALIFY THE HONORABLE ERIC R. KOMITEE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Jonathan Siegel
Gillian Kassner
Dylan A. Stern
Assistant United States Attorneys
    (Of Counsel)

Table of Contents

BACKGROUND ........................................................................................................... 1

LEGAL PRINCIPLES ................................................................................................. 2

      A.     Disqualification Generally ...................................................................... 2

      B.     Timeliness is a Threshold Issue on a Section 455 Disqualification Motion........... 3

      C.     Section 455's "Safe Harbor" Provisions Expressly Include Fund Investments ..... 4

      D.     Financial Interests in Victims or Non-Parties Do Not Require Recusal................. 5

ARGUMENT ................................................................................................................ 6

I.      The Motion is Untimely............................................................................. 6

II.     The Fund Investments at Issue Do Not Require Recusal Under Section 455 ................... 9

      A.     Judge Komitee's Investments in Various Funds Do Not Warrant Recusal ........... 9

      B.     Judge Komitee's Prior Relationships with Victims Do Not Warrant Recusal ..... 16

CONCLUSION............................................................................................................ 17

# TABLE OF AUTHORITIES

Page(s)

Apple v. Jewish Hosp. & Med. Ctr.,
  829 F.2d 326 (2d Cir. 1987) ................................................................................. 3, 4, 7, 8

Cellspin Soft, Inc. v. Fitbit, Inc.,
  No. 17-CV-5928 (YGR), 2023 WL 2176758 (N.D. Cal. Feb. 15, 2023) ................................ 11

Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va.,
  715 F.3d 501 (4th Cir. 2013) ................................................................................. 4, 5, 11

Clemmons v. Comm'r of Soc. Sec.,
  No. 11-CV-1645 (KAM), 2011 WL 6130926 (E.D.N.Y. Dec. 8, 2011) ................................ 3, 4

HC2, Inc. v. Messer,
  No. 20-CV-3178 (LJL), 2022 WL 61370 (S.D.N.Y. Jan. 6, 2022) ........................................... 8

In re Aguinda,
  241 F.3d 194 (2d Cir. 2001) ................................................................................. 2, 3

In re IBM,
  45 F.3d 641 (2d Cir. 1995) ................................................................................. 3

Katzman v. Victoria's Secret Catalogue,
  939 F. Supp. 274 (S.D.N.Y. 1996) ........................................................................... 8

Keesh v. Quick,
  No. 19-CV-08942 (PMH), 2022 WL 2160127 (S.D.N.Y. June 15, 2022) ................................ 4

Litovich v. Bank of America, Corp.,
  106 F.4th 218 (2d Cir. 2024) ................................................................................. 15

N.Y.C. Dev. Corp. v. Hart,
  796 F.2d 976 (7th Cir. 1986) ................................................................................. 4, 5, 10, 13, 14

NEC Corp. v. Intel Corp.,
  654 F. Supp. 1256 (N.D. Cal. 1987) ........................................................................... 11

Omega Eng'g, Inc. v. Omega, S.A.,
  432 F.3d 437 (2d Cir. 2005) ................................................................................. 4

Polizzi v. United States,
  926 F.2d 1311 (2d Cir. 1991) ................................................................................. 3

Qualls v. United States,
  No. 07-CR-14 (DLI), 2018 WL 1513625 (E.D.N.Y. Mar. 27, 2018) ........................................ 3

Reese-Thomas v. United States,
    No. 03-CV-1812 (FB), 2003 WL 22709080 (E.D.N.Y. Nov. 17, 2003) ................................... 5

United States v. Brinkworth,
    68 F.3d 633 (2d Cir. 1995) ..................................................................................................... 3, 4

United States v. Burke,
    756 F. App'x 93 (2d Cir. 2019) ................................................................................................. 3

United States v. Durrani,
    835 F.2d 410 (2d Cir. 1987) ...................................................................................................... 4

United States v. Gedinez,
    280 F. App'x 47 (2d Cir. 2008) .............................................................................................. 5, 6

United States v. Halkbank,
    No. 15-CR-867 (RMB), 2020 WL 4932772 (S.D.N.Y. Aug. 24, 2020) ................................... 4

United States v. Lauersen,
    348 F.3d 329 (2d Cir. 2003) ................................................................................... 5, 6, 10, 16

United States v. Lewis,
    No. 22-1742, 2024 WL 1756104 (2d Cir. Apr. 24, 2024) ........................................................ 3

United States v. Lovaglia,
    954 F.2d 811 (2d Cir. 1992) .................................................................................................... 16

United States v. Murphy,
    768 F.2d 1518 (7th Cir. 1985) ................................................................................................. 16

United States v. Nobel,
    696 F.2d 231 (3d Cir. 1982) ...................................................................................................... 6

United States v. Pescatore,
    No. 05-CR-128 (TCP), 2006 WL 47451 (E.D.N.Y. Jan. 5, 2006) ............................................ 5

United States v. Ravich,
    421 F.2d 1196 (2d Cir. 1970) ............................................................................................... 6, 15

United States v. Rogers,
    119 F.3d 1377 (9th Cir. 1997) ................................................................................................... 6

United States v. Sellers,
    566 F.2d 884 (4th Cir. 1977) ..................................................................................................... 6

United States v. Teman,
    No. 21-1920-CR, 2023 WL 3882974 (2d Cir. June 8, 2023) ................................. 6, 10, 12, 15

United States v. Wedd,
    993 F.3d 104 (2d Cir. 2021) ................................................................................... 2

United States v. Yu-Leung,
    51 F.3d 1116 (2d Cir. 1995) ................................................................................... 3

Weisshaus v. Fagan,
    456 F. App'x 32 (2d Cir. 2012) .............................................................................. 3

The government respectfully submits this letter in response to the defendants' motion to disqualify the Honorable Eric R. Komitee.  See ECF Nos. 325, 326 ("Mot."), 328.  The motion is nothing more than the next step of the defendants' ongoing efforts to attack and blame anyone and everyone who attempts to hold them accountable.  It is untimely and utterly baseless, and it should be denied.

BACKGROUND

From the beginning of this case, the defendants have attempted to avoid responsibility by deflecting blame onto others.  When the impersonation of Alex Piper was first discovered, Carlos Watson developed a plan for co-conspirator Samir Rao to take the fall by concocting a made-up mental health crisis.  See Trial Tr. 841-44.  When it became clear that the New York Times was about to break the story, Watson and Rao discussed plans to attack and undermine the story and its author, including "Accuse Ben [Smith]," "Not kosher to attack mental health" and "Not kosher to take down a black owned company."  See Government Exhibit ("GX") 5131.  The defendants later sued the author of the article.  See Ozy Media Inc. v. Benjamin Smith, et al., No. 23-CV-9412 (FB).

Once the indictment was filed, the defendants turned their attacks to the individual prosecutors through wholly invented claims of racial bias, which they pushed publicly in press releases, websites, and even a feature film screened in New York a month before trial. See ECF No. 264.  After a jury convicted them of fraud, the defendants redoubled their efforts, turning their focus to the judge presiding over the trial, the Honorable Eric R. Komitee.  For example, the defendants and their supporters have published a series of letters accusing Judge Komitee of misconduct, which letters they posted on the same website previously used to accuse the prosecutors of racial bias.  See Too Black for Business, 23 Separate Complainants Write

Letters of Judicial Complaint, available at https://www.tooblackforbusiness.org/cw/cw-unfair-trial & https://cdn.prod.website-files.com/6548cda829d7c8ad6c8d9e3f/670e311942b415a30af23c4f_Eric%20Komitee_Combined%20Letters%20of%20Complaint_FINAL_092624%20redacted-compressed.pdf.

On October 25, 2024, less than two months before the scheduled sentencing date, the defendants advanced their latest effort to avoid responsibility for their crimes by seeking to disqualify Judge Komitee and vacate their convictions. See Mot. Principally, the defendants claim that Judge Komitee must be disqualified because (1) he holds investments in hedge funds (the "Funds") managed by Viking Global Investors LP ("Viking"), D1 Capital Partners LP ("D1") and Junto Capital Partners LP ("Junto") that in turn have invested in four intended victims of the defendants' scheme: Goldman Sachs, Alphabet (Google), J.P. Morgan and Live Nation; and (2) he formerly served as Viking's general counsel and allegedly interacted in that role with several intended victims' of the defendants' scheme.

LEGAL PRINCIPLES

A.    Disqualification Generally

Pursuant to 28 U.S.C. § 455, a judge must disqualify her or himself when the judge's "impartiality might reasonably be questioned" (§ 455(a)), including, as relevant here, when the judge "knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding" (§ 455(b)(4)). A district court's decision on whether to recuse itself is reviewed only "for abuse of discretion" and will "rarely" be disturbed on appeal. United States v. Wedd, 993 F.3d 104, 114 (2d Cir. 2021). However, "where the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). As the Second Circuit has repeatedly stated, "a

2

judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." Id.

>    B.    Timeliness is a Threshold Issue on a Section 455 Disqualification Motion

"While § 455 does not explicitly contain a timeliness requirement for the filing of a recusal claim, timeliness has been read into this section" by the Second Circuit. Polizzi v. United States, 926 F.2d 1311, 1321 (2d Cir. 1991). The timeliness of a § 455 motion is "a 'threshold' issue — i.e., one to be evaluated before matters of substance are reached." Clemmons v. Comm'r of Soc. Sec., No. 11-CV-1645 (KAM), 2011 WL 6130926, at *4 (E.D.N.Y. Dec. 8, 2011); see also Weisshaus v. Fagan, 456 F. App'x 32, 34 (2d Cir. 2012) ("The timeliness of a recusal motion is a serious threshold question.").

In order to be timely, a recusal motion must be filed "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333-34 (2d Cir. 1987); accord United States v. Lewis, No. 22-1742, 2024 WL 1756104, at *2 (2d Cir. Apr. 24, 2024); United States v. Burke, 756 F. App'x 93, 94 (2d Cir. 2019); United States v. Brinkworth, 68 F.3d 633, 639 (2d Cir. 1995). Strict adherence to the requirement of a "prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." In re IBM, 45 F.3d 641, 643 (2d Cir. 1995); accord Qualls v. United States, No. 07-CR-14 (DLI), 2018 WL 1513625, at *1 (E.D.N.Y. Mar. 27, 2018). As a result, the Second Circuit has held that where a defendant "fail[s] to file a timely disqualification motion," the motion is "waived." United States v. Yu-Leung, 51 F.3d 1116, 1120 (2d Cir. 1995); see also Polizzi, 926 F.2d at 1321 ("[W]e agree with the Government that [defendant] waived the claim that [the district judge] should have recused himself when he failed to timely move for such recusal pursuant to . . . 28 U.S.C. § 455"). "The timeliness requirement of motions to disqualify

and for recusal is strictly applied."  Keesh v. Quick, No. 19-CV-08942 (PMH), 2022 WL 2160127, at *10 (S.D.N.Y. June 15, 2022).

In assessing whether a recusal motion is timely, courts consider whether, among other things, "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings, (2) granting the motion would represent a waste of judicial resources, (3) the motion was made after the entry of judgment, and (4) the movant can demonstrate good cause for delay."  Apple, 829 F.2d at 334; accord Brinkworth, 68 F.3d at 639.  And while "the actual time elapsed between the events giving rise to the charge of bias or prejudice and the making of the motion is not necessarily dispositive," Apple, 829 F.2d at 333-34, courts regularly consider the length of this period when evaluating a motion to recuse, see, e.g., id. (finding a delay of two months untimely); United States v. Durrani, 835 F.2d 410, 427 (2d Cir. 1987) (delay of four months warranted denial of motion); Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 448 (2d Cir. 2005) (delay of seven months rendered recusal motion untimely).  In fact, "[r]ecusal motions are often denied on the basis of untimeliness when there has been only a short delay." Clemmons, 2011 WL 6130926, at *4; accord United States v. Halkbank, No. 15-CR-867 (RMB), 2020 WL 4932772, at *5 (S.D.N.Y. Aug. 24, 2020).

C.    Section 455's "Safe Harbor" Provisions Expressly Include Fund Investments

Under § 455, a "financial interest" does not include an indirect interest in securities through "[o]wnership in a mutual or common investment fund that holds [such] securities . . . unless the judge participates in the management of the fund."  28 U.S.C. § 455(d)(4)(i).  This provision is "a safe harbor" to allow "judges to hold securities without needing to make fine calculations of the effect of a given suit on their wealth." N.Y.C. Dev. Corp. v. Hart, 796 F.2d 976, 980 (7th Cir. 1986); accord Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va., 715 F.3d 501, 515 (4th Cir. 2013) ("Congress created this exception to

4

enable judges to hold securities without risking recusal across a broad range of cases.").  The

safe harbor applies without regard to the size of any investment, and "it is unnecessary and

inappropriate to inquire how a case might affect the value of the fund's assets."  N.Y.C. Dev.

Corp., 796 F.2d at 980; accord Cent. Tel. Co., 715 F.3d at 516.  Moreover, the safe-harbor

provision applies to both § 455(a) and § 455(b)(4) — a "reasonable person would not question

the impartiality of a judge who holds nothing but well diversified mutual funds," and permitting

disqualification under either provision "would prevent § 455(d)(4)(i) from acting as a safe

harbor."  N.Y.C. Dev. Corp., 796 F.2d at 980; see also Cent. Tel. Co., 715 F.3d at 516 ("We note

at the outset that a judge whose conduct has satisfied the § 455(d)(4)(i) safe harbor will almost

certainly have complied with § 455(a) by acting in a reasonable and impartial manner.").

 D.  <u>Financial Interests in Victims or Non-Parties Do Not Require Recusal</u>

   Even where the § 455(d)(4)(i) safe harbor does not apply, a judge's interest in a

victim of a crime is treated differently than an interest in a party.  See United States v. Pescatore,

No. 05-CR-128 (TCP), 2006 WL 47451, at *9 (E.D.N.Y. Jan. 5, 2006) ("The Second Circuit has

held that while even a judge's de minimis interest in a party will be grounds for automatic

recusal, the same is not true of a judge's de minimis interest in a non-party.").  In particular, a

financial interest in a victim in a criminal case does not trigger automatic recusal under

§ 455(b)(4).  See United States v. Lauersen, 348 F.3d 329, 336 (2d Cir. 2003) ("[W]e decline to

adopt a per se rule requiring recusal in every instance where a judge has an interest in the victim

of a crime."), judgment vacated on other grounds, 543 U.S. 1097 (2005); accord United States v.

Gedinez, 280 F. App'x 47, 49 (2d Cir. 2008) (judge's stock ownership in victim bank did not

require recusal); Reese-Thomas v. United States, No. 03-CV-1812 (FB), 2003 WL 22709080, at

*2 (E.D.N.Y. Nov. 17, 2003) ("[C]ourts have held that the victim of a crime is not a party to a

criminal proceeding under § 455(b)(4), and that stock ownership in a corporate victim cannot be deemed a financial interest under that section.").[1]

Stock ownership in a victim also does not implicate § 455(a) unless "the extent of the judge's interest in the crime victim is so substantial, or the amount that the victim might recover as restitution is so substantial, that an objective observer would have a reasonable basis to doubt the judge's impartiality." Lauersen, 348 F.3d at 336-37. Ownership of a fractional percentage of a victim's total stock does not meet this threshold. See Gedinez, 280 F. App'x at 49 (ownership of 0.000091% of victim did not require recusal); see also United States v. Teman, No. 21-1920-CR, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023); United States v. Ravich, 421 F.2d 1196, 1205 (2d Cir. 1970). Further, even if a claim for restitution by a victim partially owned by a judge might raise potential concerns, such concerns are eliminated where the victim does not seek restitution. See Lauersen, 348 F.3d at 338 ("Even if Judge Pauley's ownership of AXA shares had provided a basis for recusal, we see no valid reason why AXA's decision to forgo its restitution claim would not have sufficed to eliminate such a basis.").

ARGUMENT

I.    The Motion is Untimely

The Court can deny the defendants' motion at the threshold because it is untimely. The defendants were required by law to file their motion at the earliest possible moment. They did not. Instead, the defendants waited until after they were convicted following a two-month

---

[1]    See also United States v. Rogers, 119 F.3d 1377, 1384 (9th Cir. 1997) ("The victim of a crime is not a party under [§ 455(b)(4)]. The only parties in a federal criminal case are the named defendant and the United States. In addition, stock ownership in the corporate victim of a crime cannot be deemed a financial interest in the subject matter in controversy."); United States v. Nobel, 696 F.2d 231, 234-35 (3d Cir. 1982) (§ 455(b)(4) inapplicable where judge owned stock in corporate victim); United States v. Sellers, 566 F.2d 884, 887 (4th Cir. 1977) (recusal not required where judge owned stock in corporate victim).

trial and then deployed this motion as a last-ditch effort to avoid accountability and punishment. Based on the Second Circuit's precedent, as detailed above, the instant motion is untimely and should be denied on that basis alone.

Each of the factors for assessing whether a claim is timely weighs against the defendants.  See Apple, 829 F.2d at 334.  First, the defendants have certainly "participated in a substantial manner in trial or pre-trial proceedings."  Second, in light of the substantial efforts put into the case by the Court over the prior 20 months, "granting the motion would represent a waste of judicial resources."  Third, although the motion was made prior to the entry of final judgment, it was made after the defendants had been found guilty at a trial and only weeks before sentencing.  And fourth, for the reasons set forth below, the defendants cannot demonstrate any good cause for the delay.

To the extent the motion is premised on Judge Komitee's investments in the Funds, those investments were a matter of public record before the beginning of this case and certainly long before trial.  The defendants attempt to excuse their delay by suggesting that they learned of Judge Komitee's investments in the Funds only when Judge Komitee's 2023 annual financial disclosure was published online on or about October 2, 2024.  See Mot. 2, 20.  But that information had been known publicly for years — Judge Komitee's 2021 and 2022 financial disclosures (dated May 10, 2022, and July 7, 2023, respectively) both disclose his interests in the Funds.  See Exs. 1, 2.  The motion cites Judge Komitee's 2021 and 2022 financial disclosures — as well as his 2020 disclosure, which is not available online and is available only by request — making it plain that the defendants had access to those reports.  See Mot. 17 n.24.  Indeed, the defendants acknowledge that they corresponded with the Administrative Office of the United States Courts prior to October 2, 2024 to find out when the 2023 disclosure would be posted (see

Mot. 20 n.25), demonstrating that they were alert to and already investigating this claim prior to that date.  See ECF Nos. 329-1, 329-2.  And the defendants even admit that they began searching for Judge Komitee's 2022 financial disclosure as early as March 2024 and obtained that disclosure by at least August 27, 2024, approximately two months before they filed their recusal motion.[2]  See ECF No. 329-1; see, e.g., Apple, 829 F.2d at 333-34 (finding a delay of two months untimely); Katzman v. Victoria's Secret Catalogue, 939 F. Supp. 274, 277 (S.D.N.Y. 1996) (same).  There is thus no good cause for the defendants' delay in raising this claim.

Further, much of the motion is based on Judge Komitee's role and activities at Viking before becoming a judge.  See Mot. 10-14, 22-26.  The fact that Judge Komitee was Viking's general counsel prior to his appointment has long been a matter of public record — indeed, it is listed in his biography on the District's website.[3]  Cf. HC2, Inc. v. Messer, No. 20-CV-3178 (LJL), 2022 WL 61370, at *3 n.4 (S.D.N.Y. Jan. 6, 2022) ("The Court also finds the recusal motion to be untimely as it comes over a year and a half after the start of the case and as the Court's former affiliation with the predecessor of WilmerHale has been a matter of public knowledge since I joined that firm over two decades ago." (citing cases)).  And at the very first status conference in this matter, Judge Komitee noted that he reviewed the list of interested parties that the government provided ex parte and "didn't see any overlap between the people and entities listed there on the one hand, and my bio on the other. . . . Obviously, if you saw the name Viking in anything that would be meaningful."  Mar. 6, 2023 Tr. 7:22-8:4.  Thus, the defendants were on notice from the outset of the case of Judge Komitee's history with Viking.

---

[2]     The defendants are notably silent with regard to when they had access to Judge Komitee's 2020 and 2021 financial disclosures.

[3]     See, e.g., U.S. Dist. Ct. E.D.N.Y., Judge Eric R. Komitee, https://www.nyed.uscourts.gov/content/judge-eric-r-komitee; see also Wikipedia, Eric R. Komitee, https://en.wikipedia.org/wiki/Eric_R._Komitee.

They cannot show good cause for their delay in raising this aspect of their motion, and indeed they do not even attempt to make such a showing.

Finally, the defendants were of course aware of the potential victims in the case. Even putting aside their personal knowledge of the facts, the defendants were charged in a detailed indictment (see ECF No. 1), and the government disclosed a list deanonymizing the entities in the indictment on April 21, 2023 (see ECF No. 55). Three of the four victims that are at the core of the defendants' instant motion — Goldman Sachs, Google and Live Nation — were included on that list. Moreover, all four of the victims referenced in the defendants' motion were included on the government's list of persons, entities and places for use in voir dire, which was filed before trial. See ECF No. 141. Thus, there can be no argument that the defendants have not long known the identities of the victims in this case.

Accordingly, the defendants' recusal motion is untimely. It should therefore be denied.

II.    The Fund Investments at Issue Do Not Require Recusal Under Section 455

Even were the Court to consider the defendants' untimely motion, the defendants' claims fail on the merits. All of the challenged investments fall within the § 455(d)(4)(i) safe harbor, the indirect interests in certain victims at issue here are insubstantial in any event, and none of the past business or social relationships identified by the defendants warrant recusal. Each of the defendants' claims should therefore be rejected.

A.    Judge Komitee's Investments in Various Funds Do Not Warrant Recusal

1.    The § 455(d)(4)(i) Safe Harbor Applies

The defendants do not claim that Judge Komitee has directly invested in any victims but instead challenge Judge Komitee's investments in funds that, in turn, have at times invested in certain victims of the scheme. That is precisely the situation covered by the

§ 455(d)(4)(i) safe harbor.  The motion for disqualification under both § 455(a) and § 455(b)(4) therefore fails.  <u>See</u> <u>Teman</u>, 2023 WL 3882974, at *3 (affirming denial of recusal based on ownership of shares of "Berkshire Hathaway, which in turn owns stock in Bank of America, the victim in [the] case" because "such an ownership interest" fell within ambit of § 455(d)(4)(i)).

The defendants make three attempts to escape this conclusion.  First, the defendants claim that despite the statutory language stating that the exception applies "unless the judge participates in the management of the fund," the exemption should not apply here because Judge Komitee previously participated in the management of Viking before becoming a judge.  <u>See</u> Mot. 28.  The defendants cite no authority for this claim; nor could they, as the claim makes no sense.  The reason the lack of management participation matters is that it eliminates a judge's ability to control what stocks she holds at the time of a given decision.  <u>See</u> <u>N.Y.C. Dev. Corp.</u>, 796 F.2d at 980 (safe harbor is justified "in part because the fund may sell the stock before the judge decides the case").  The fact that a judge participated in a fund's management years before the case began therefore has no bearing on the safe harbor.

Second, the defendants assert that even where the safe harbor technically applies, a judge must consider whether her or his interest in a fund would be substantially affected by the outcome of a case.  <u>See</u> Mot. 28.  In support of this claim, the defendants cite an opinion from the Judicial Conference's Advisory Committee on Codes of Conduct (the "Advisory Committee").  <u>See</u> <u>id.</u>  But the Second Circuit has held that such opinions are not authoritative interpretations of § 455.  <u>See</u> <u>Lauersen</u>, 348 F.3d at 336 (declining to follow view of Advisory Committee).  And the available judicial precedents reject such an analysis, holding that "§ 455(d)(4)(i) eliminates any inquiry into the size of the likely effect of a decision on the value of securities held through a mutual fund."  <u>N.Y.C. Dev. Corp.</u>, 796 F.2d at 980; <u>accord</u> <u>Cent. Tel.</u>

10

Co., 715 F.3d at 516.  In any event, as discussed below, there is no basis to conclude that the

outcome of the proceedings could have any effect, let alone a substantial effect, on the value of

Judge Komitee's investments.  This claim therefore also fails.

Third, the defendants claim that the Funds are not "mutual or common investment

fund[s]" for purposes of the safe harbor.  See Mot. 28-29.  The defendants purport to reach this

conclusion by applying six factors set forth in an Advisory Committee opinion, specifically:

"(1) the number of participants in the fund; (2) the size and diversity of fund investments; (3) the

ability of participants to direct their investments; (4) the ease of access to and frequency of

information provided about the fund portfolio; (5) the pace of turnover in fund investments; and

(6) any ownership interest investors have in the individual assets of the fund."  Mot. 29.  As

noted, the Second Circuit has not treated the Advisory Committee's opinions as authoritative.

See Lauersen, 348 F.3d at 336.  But even assuming these are the correct factors to consider, they

weigh in favor of applying the safe harbor under the facts of this case.  See Cellspin Soft, Inc. v.

Fitbit, Inc., No. 17-CV-5928 (YGR), 2023 WL 2176758, at *8 (N.D. Cal. Feb. 15, 2023)

(treating above-listed factors as "not binding" but "instructive").

Number of Participants in the Fund.  As the defendants acknowledge, each of the

Funds has hundreds of participants.  See Mot. 29 n.30.  Although the defendants argue that this

factor nevertheless weighs against applying the safe harbor, they cite no authority for that

proposition.  The sole case that has declined to apply § 455(d)(4)(i) based in part on the number

of participants in the fund involved far fewer participants — only 24 — suggesting that hundreds

of participants in facts weighs in favor of the safe harbor.  See NEC Corp. v. Intel Corp., 654 F.

Supp. 1256, 1258 n.1 (N.D. Cal. 1987) (§ 455(d)(4)(i) did not apply to an investment fund where

"membership is limited to 24 members and decisions to buy or sell securities are made by vote of

a majority of the voting power present at the meeting"), order vacated, appeal dismissed sub

nom. NEC Corp. v. U.S. Dist. Ct. for N. Dist. of California, 835 F.2d 1546 (9th Cir. 1988).

Size and Diversity of Fund Investments.  The defendants do not dispute that the

Funds are all large, with each managing billions of dollars.  See Mot. 4, 5 n.9.  But the

defendants assert that the Funds lack diversity, claiming that "the funds concentrate their

positions in a few public stocks, explicitly employing 'limited diversification.'"  Mot. 29.  The

defendants are correct that the Funds' firm brochures identify the potential for limited

diversification as a risk factor, but the actual disclosed assets of the Funds' advisors suggest that

they are sufficiently diversified and in particular that the victims in this case make up a small

fraction of each the advisors' portfolios.  According to the Form 13Fs for each of the Funds'

advisors for the periods since the beginning of 2023:  (1) Viking has held 13F securities in

between 80 and 86 different issuers each quarter, with no individual victim's securities ever

making up more than 2.34% of the total 13F securities in a given quarter and the consolidated

total of victims' securities never rising above 2.34% of the total 13F securities in a given quarter;

(2) D1 has held 13F securities in between 29 and 39 different issuers each quarter, with no

victim's securities ever making up more than 5.66% of the total 13F securities in a given quarter

and the consolidated total of victims' securities never rising above 9.98% of the total 13F

securities in a given quarter; and (3) Junto has held 13F securities in between 69 and 81 different

issuers each quarter, with no victim's securities ever making up more than 3.94% of the total 13F

securities in a given quarter and the consolidated total of victims' securities never rising above

5.28% of the total 13F securities in a given quarter.  By comparison, as noted above, the Second

Circuit has held that the safe harbor applied where a judge held an indirect interest in Bank of

America through investments in Berkshire Hathaway, see Teman, 2023 WL 3882974, at *3, and

according to Berkshire Hathaway's Form 13F for the period ending June 30, 2021 (the last filing

prior to the district court's entry of judgment in that case), Bank of America shares alone then

constituted over 14% of Berkshire Hathaway's 13F holdings.  The Funds are therefore

sufficiently diversified that "a change in the value of [a victim's] stock [would] have a small

effect on the fund as a whole," thus weighing in favor of the safe harbor.  N.Y.C. Dev. Corp.,

796 F.2d at 980.

        Ability of Participants to Direct Investments.  The defendants note that the Funds

are "actively and aggressively managed" (Mot. 29), but the defendants make no claim that any of

the Funds' participants have any ability to direct their investments.  This factor therefore weighs

in favor of the safe harbor.

        Ease of Access to, and Frequency of, Information About the Fund Portfolio.  The

defendants state that some of the Funds provide monthly reports regarding their positions and

some of the Funds provide weekly reports of the Funds' performance.  See Mot. 29-30.  While

the defendants suggest this is unusually frequent, they offer no basis for that claim.  For example,

broad-based ETFs such as the SPDR S&P 500 ETF and the Schwab US Broad Market ETF —

paradigmatic examples of common investment funds — publish their weighted holdings on a

daily basis.  See State Street Global Advs., SPDR S&P 500 ETF Trust,

https://www.ssga.com/us/en/individual/library-content/products/fund-data/etfs/us/holdings-daily-

us-en-spy.xlsx; Charles Schwab, Schwab US Broad Market ETF SCHB,

https://www.schwab.wallst.com/schwab/Prospect/research/etfs/schwabETF/index.asp?type=hold

ings&symbol=SCHB.  Thus, even accepting the defendants' claims as true, Judge Komitee has

less visibility into the current positions of the Funds than investors in many popular diversified

ETFs, weighing in favor of the safe harbor.

Pace of Turnover in Fund Investments.  The defendants acknowledge that the Funds have rapid turnover in their portfolios, as reflected in the Form 13Fs.  See Mot. 30.  The defendants appear to believe that this weighs against the safe harbor, but the opposite is true. The more rapid the turnover, the less ability a judge would have to predict what effect a given case outcome would have on her or his holdings because it is less possible to predict what those holdings would be by the time the case is decided.  See N.Y.C. Dev. Corp., 796 F.2d at 980 (safe harbor is justified "in part because the fund may sell the stock before the judge decides the case").  For example, while some of the Funds held positions in Alphabet or Goldman Sachs for portions of the case, none held positions in those companies as of the most recent 13F filings (for the second quarter of 2024).  This factor therefore weighs in favor of the safe harbor.

Investors' Ownership Interest in the Individual Assets of the Fund.  The defendants state that the Funds' advisors offer investment opportunities to individual investors (Mot. 29), but they do not claim that Judge Komitee, or any other investor, has an ownership interest in the individual assets of the fund by virtue of his fund investment.  This factor therefore also weighs in favor of the safe harbor.

Accordingly, all of the factors set forth by the Advisory Committee weigh in favor of the safe harbor.  Judge Komitee's investments in the Funds therefore categorically do not warrant recusal under either § 455(a) or § 455(b)(4).[4]

---

[4]    The defendants call attention to Judge Komitee's service as a director of the Viking Foundation, a charitable entity affiliated with Viking, but do not argue that this service is a basis for recusal.  See Mot. 5-6.  In any event, such service is covered by a separate safe harbor providing that an "office in an educational, religious, charitable, fraternal, or civic organization is not a 'financial interest' in securities held by the organization."  28 U.S.C. § 455(d)(4)(ii).

2.      Any Interest in the Victims is Insubstantial

Even if the safe harbor did not apply (and it does), the purported interests Judge

Komitee has in the victims would not warrant recusal even if he directly owned stock in those

companies.  As set forth below, even using the absolute highest "pro rata beneficial interest" for

each victim ascribed by the defendants to Judge Komitee during the pendency of the case, the

amounts invested by Judge Komitee in each of these companies is a tiny fraction of each

company's overall market capitalization.

| Company | Highest Ascribed Pro-Rata Beneficial Interest (see Mot. Ex. B tbl. 10) | Market Capitalization at Relevant Time[5] | Ownership Percentage |
|---|---|---|---|
| Alphabet | $513 thousand | $1.765 trillion | 0.000029% |
| Goldman Sachs | $214 thousand | $136 billion | 0.00016% |
| J.P. Morgan | $545 thousand | $421 billion | 0.00013% |
| Live Nation | $318 thousand | $21.7 billion | 0.0015% |

The Second Circuit has held that even direct ownership percentages in corporate

victims many times higher than those here do not amount to a substantial interest and cannot

justify recusal.  See Ravich, 421 F.2d at 1205 (interest from ownership of 0.0072% of a victim's

shares "not merely unsubstantial but nonexistent"); see also Teman, 2023 WL 3882974, at *3

(ownership of "approximately 0.00075 percent of the [victim] bank's $265 billion market

capitalization" did not require recusal).  The defendants ignore these cases, pointing the Court

instead to Litovich v. Bank of America, Corp., 106 F.4th 218, 228-29 (2d Cir. 2024).  See Mot.

15-16, 18, 21-22, 30-32.  But Litovich involved an investment in a party to the case, a situation

---

5        All market capitalization data obtained from YChart.com.

subject to entirely different rules and precedents than those governing investments in victims. See Pescatore, 2006 WL 47451, at *9.  Litovich is thus wholly inapplicable.

Moreover, and in any event, the Second Circuit has held that any possible basis for recusal is eliminated where a victim does not seek restitution.  See Lauersen, 348 F.3d at 338 ("Even if Judge Pauley's ownership of AXA shares had provided a basis for recusal, we see no valid reason why AXA's decision to forgo its restitution claim would not have sufficed to eliminate such a basis.").  Here, none of the victims in which Judge Komitee has an indirect interest ultimately invested in Ozy, and none have sought restitution at this time.  That fact standing alone is sufficient to reject the defendants' claims that Judge Komitee's investments require recusal.

  B.  Judge Komitee's Prior Relationships with Victims Do Not Warrant Recusal

The defendants' arguments that recusal is required because Judge Komitee had business relationships with victims as a result of his role at Viking prior to becoming a judge fare no better.  See Mot. 22-26.  Although the defendants again do not cite the applicable law, the Second Circuit has held that a social or business relationship with a victim from years in the past does not require recusal.  See United States v. Lovaglia, 954 F.2d 811, 815-17 (2d Cir. 1992) (recusal not required where judge formerly represented victim company, had socialized with company's owners, and had been involved in a restaurant business with one of the company's owners).

Further, while the defendants single out Judge Komitee's friendship with one former Goldman Sachs employee (see Mot. 10-11), there is no case law suggesting that a friendship with a victim's employee is a basis for recusal.  To the contrary, the law is that even a friendship with a party's attorney in the case at bar is not a basis for recusal, absent unusual circumstances.  See United States v. Murphy, 768 F.2d 1518, 1537 (7th Cir. 1985) ("Many

courts therefore have held that a judge need not disqualify himself just because a friend — even

a close friend — appears as a lawyer.").[6]

Thus, none of the relationships identified by the defendants form a basis for

recusal.  The motion should be denied.

<u>CONCLUSION</u>

For the reasons set forth above, the defendants' disqualification motion should be

denied in its entirety.

Dated:          Brooklyn, New York
                November 1, 2024


                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                        By:     /s/_____
                                        Jonathan Siegel
                                        Gillian Kassner
                                        Dylan A. Stern
                                        Assistant U.S. Attorneys
                                        (718) 254-6293/6224/6213

---

[6]      The defendants speculate that this individual was somehow involved in the case.
<u>See</u> Mot. 11.  While the government cannot speak to Goldman Sachs's internal workings, the
government has no knowledge of this individual's involvement in the case.

17