UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x
UNITED STATES OF AMERICA


                -vs-
                                              Case No. 23-00082 (EK)

CARLOS WATSON and
OZY MEDIA, INC.

                    Defendants.

-------------------------------------------------- x


## MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF CARLOS WATSON AND OZY MEDIA, INC.


Ronald Sullivan Law, PLLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
(202) 313-8313
*Attorneys for Carlos Watson*

Frison Law Firm, P.C.
75 State Street, Suite 100
Boston, Massachusetts 02109
(617) 706-0724
*Attorneys for OZY Media, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x
UNITED STATES OF AMERICA

-vs-                                                    Case No. 23-00082 (EK)

CARLOS WATSON and
OZY MEDIA, INC.

Defendants.

------------------------------------------------- x


MEMORANDUM IN AID OF SENTENCING
ON BEHALF OF CARLOS WATSON AND OZY MEDIA, INC.


Preliminary Statement

On July 16, 2024, a jury found Carlos Watson and OZY Media, Inc. ("OZY") guilty of conspiracy to commit securities and wire fraud and aggravated identity theft. This Memorandum is submitted jointly on their behalf in aid of sentencing.

Introduction

By Memorandum and Order dated September 13, 2024, the Court directed the parties to address two questions at sentencing: (1) "What proportion of the funds raised via the charged scheme flowed into the operations of Ozy Media's business, versus flowing to Mr. Watson or other individuals;" and (2) "Which federal criminal cases from the last (roughly) fifteen years presented the most comparable sets of sentencing factors, and why?" Docket No. 313.

The answer to the Court's first question is that *all* the funds flowed into OZY's operations except for Mr. Watson's modest annual salary of $50,000. Mr. Watson marshalled his own and his family's financial resources to build OZY into a flourishing and viable company

that published five newsletters, produced fourteen television shows, produced top ten podcasts, built a cutting-edge awards program, put on four "OZY Fest" festivals, developed more than 200 revenue-generating partnerships with top-tier advertisers like Coca-Cola, Target, and Wal-Mart, and employed more than 1,000 employees and freelancers. Mr. Watson and his family consistently invested their own money each time OZY raised capital from investors. Mr. Watson deferred salary and secondary stock sales to free up the funds to hire more people, produce more programs, and grow the company's infrastructure. In total, Mr. Watson and his family invested approximately $20 million in OZY, including cash, deferred salary, and deferred stock options. *See* Tr. at 3013-15.

As for the Court's second question, we have thus far found no comparable criminal case in which a defendant founded and nurtured a successful start-up like OZY to realize his family's longstanding vision of empowering, educating, and lifting up others, all while putting millions of dollars into the company and taking virtually nothing out. The selflessness, civic-mindedness, and goals of Mr. Watson and OZY distinguish this case from the lion's share of federal prosecutions for fraud, which are typically motivated by greed, excess, personal indulgence, or all of them. Indeed, either the Harvard- and Stanford Law-educated Mr. Watson is the world's stupidest conman who somehow forgot to take any money out of the supposedly elaborate, multi-year, eight-figure fraud - - or he is an innocent man.

The truth is that Mr. Watson and OZY are innocent. He is not a fraudster and OZY is not a criminal enterprise, as the government alleged. Mr. Watson and OZY did not engage in a conspiracy to commit securities fraud, conspiracy to commit wire fraud, or aggravated identity theft. The truth is that Mr. Watson, marshaling his own resources, his family's financial support, and the contributions of hundreds of employees and contractors, built OZY into a real and viable

3

company whose achievements are laid out throughout this memorandum. OZY was an attractive company that competitors such as BuzzFeed tried multiple times to acquire, finally offering up to $300 million dollars.

Mr. Watson was the visionary and entrepreneur, known as "Mister Outside." He oversaw content, set the company's strategic direction, brought in investors and advertisers, and stood up a corporate governance infrastructure by engaging reputable outside law firms, investment banks, and board members. Mr. Watson instilled a culture of being "blisteringly honest" at OZY (as a witness for the government, Tripti Thakur, wrote in her resignation email, which the government used as evidence against Mr. Watson). Fraudsters do not build real companies, establish outside control and accountability mechanisms, foster a culture of honesty, and invest their own money and their family's money in a fraudulent enterprise.

By contrast, the government's cooperators, Samir Rao and Suzee Han, functioned as "Mister Inside" and "Miss Inside," responsible for finance, tech, and operations. But as OZY grew quickly from a digital-only operation to a bustling five-part new media company, Mr. Rao and Ms. Han found themselves unable to keep up with OZY's growth and lacked the skills to perform their functions competently. Some of those shortcuts Mr. Watson could see and advised Mr. Rao and Ms. Han to fix, such as pushing them to properly account for all of OZY's revenue including missing contracts, strategic barter revenue and both gross and net revenue, or recommending that they bring in more senior talent and auditors to help. Mr. Watson hired outside consultants such as BRG to validate OZY's audience and delivery metrics and a former Time Warner finance executive to vet OZY's revenue numbers when he caught wind of Mr. Rao and Ms. Han's potential deception.

OZY employees, including some of the government's own witnesses, knew that Mr. Rao engaged in his deceptive acts alone.  For example, when Ms. Thakur, who was looking to quit OZY anyway, resigned after discovering Mr. Rao's forged OWN contract, Ms. Thakur made it clear that it was Mr. Rao who had engaged in deceit; Ms. Thakur emailed Mr. Rao's wife underscoring her disappointment in Mr. Rao (not in Mr. Watson); and subsequently Ms. Thakur messaged Mr. Watson on LinkedIn multiple times to express her admiration for him — behavior inconsistent from a former employee who believes their boss directed them to commit a felony. Mr. Watson hired three top tier law firms at different points and four investment banks to ensure compliance, especially during Series C, D and E fundraising rounds.  Mr. Watson also actively sought the participation and input of investors and board members.  Indeed, OZY's board met rough quarterly or semi-annually on a formal basis and there were weekly if not daily calls in between.  Mr. Watson and the OZY team reviewed each aspect of OZY's business with investors in detail.

Despite Mr. Watson's efforts to build a culture of compliance, Mr. Rao engaged in shortcuts and elaborate deceptions that were designed to elude detection.  A non-exhaustive list of Mr. Rao criminal acts, to which he admitted, includes:  doctoring OZY's general ledger; orchestrating a juggling act to manage OZY's loans with merchant lenders; fabricating documents and providing fake invoices and UCC termination emails to lenders; forging at least one contract as part of the BuzzFeed due diligence process; registering a fake website and creating multiple fake email personas to impersonate an OWN employee; and forging the signature of an OWN partner on a contract and sending the altered contract to Hanmi Bank.

To address the government's main contentions:

First, OZY's revenue was not inflated and OZY's investors did not rely on OZY's revenue statements in valuing OZY. Mr. Watson had a working knowledge of OZY's revenue numbers, but he did not receive or review weekly internal revenue numbers from Mr. Rao and Ms. Han, as multiple witnesses for the government and the defense testified. The most important and material items for OZY's early stage investors - - and hence the greatest focus of OZY's board and investor decks - - were OZY's vision, content, diversified business model and key partnerships. Revenue, especially historical revenue, was simply not a central factor to OZY's early-stage investors as it is not at other startups. And the sophisticated investors who sought to invest money in OZY proactively discounted OZY's numbers in calculating their potential return on investment - - hence Goldman's determination that even if OZY's revenues were substantially discounted, Goldman would still expect to triple its money.

In fact, Mr. Rao's and Ms. Han's accounting and bookkeeping errors had the effect of actually understating, rather than overstating, OZY's revenue. Between 2016 and 2021, their pitch decks disclosed revenue of $182 million, when in fact according to analysis by Bland Waxman and later by TechCXO, OZY actually delivered $186 million in revenue. Mr. Rao and Ms. Han failed to account for key contracts from JP Morgan, Discover, Intuit and others; failed to account for millions in valuable strategic barter revenue; failed to track both gross and net revenue; and conflated cash and accrual accounting standards.

Second, Mr. Watson did not engage in identity theft, and Goldman's own post-call conduct shows that Mr. Rao's impersonation call was not material to this investor. Mr. Rao admitted, in multiple contemporaneous confession letters and to the government's own investigators, that he and he alone decided to impersonate the Google executive on the Goldman call. Mr. Watson immediately addressed Mr. Rao's impersonation and, in point of fact, two

weeks after the impersonation call, Goldman itself resumed doing advertising business with OZY - - a sign that Goldman, which had been OZY's longest term advertiser going back to 2016 and which counted a half-dozen senior partners as OZY's investors, did not view OZY as a fraudulent company.

Third, Mr. Watson had nothing to do with the fake contract that Mr. Rao delivered to Hanmi Bank and there is no evidence to the contrary. If the government possessed any evidence showing Mr. Watson's involvement in the forged contract, it would have presented it at trial front and center.

Fourth, Mr. Watson never falsely claimed to have interest from investors or institutions who were not actually interested in investing in OZY. Mr. Watson had signed term sheets or other writings from prominent investors indicating their bona fide interest in or prior investments in OZY, including Oprah Winfrey, Alex Rodriguez, and LiveNation.

Fifth, Mr. Watson never claimed to have a $600 million takeover offer from Google. If he had such an offer, Antara - - which subjected its contemplated investment in OZY to a sophisticated due diligence process resulting in a 35+ page investment memo - - would have trumpeted such an offer in its investment memo, because Antara's prospective investment in OZY would have immediately been more valuable. Antara's investment memo did not mention any such offer. Nor was there any email, text message, or other communication from Mr. Watson touting a $600 million offer from Google.

Sixth, Mr. Watson did not direct Mr. Rao or Ms. Han to alter OZY's books, create fake contracts, engage in forgery, or misrepresent OZY's numbers. The government never produced an email or text message in which Mr. Watson directed others to engage in fraud.

In short, Mr. Watson did not engage in fraud, intend fraud, or intend any investor to lose money.

The truth is also that this prosecution should never have been brought. Titans of American commerce like Goldman Sachs, JPMorgan Chase, Google, and the other highly sophisticated investors alleged to have been victims were not truly defrauded by Mr. Watson, nor could any reasonable, properly instructed factfinder at a fair trial conclude that he intended to steal their money; the investors wanted in on the next big thing. This case bears no true resemblance to prosecutions for fraud to which it was compared at trial. To the contrary, this case was advanced by prosecutors chasing a conviction, spurred on by a series of sensationalist newspaper reports penned by a financially conflicted *New York Times* "journalist" who owned undisclosed, multi-million dollar stock options in one of OZY's main business rivals, with a history of targeting Black and Brown people at disproportionate rates, motivated to magnify missteps out of any rational proportion, and willing to use prosecutorial power to conform facts to their theories - - not because any federal fraud cried out for criminal justice. As explained in the pending motion for a judgment of acquittal, not every alleged deceit proves that fraud is afoot. Even in litigation arising from Mr. Rao's call with Goldman Sachs, purporting to serve as an independent reference for OZY (not itself a call pitching an investment), a district judge in Silicon Valley observed that "[S]ometimes there can be things that our eyebrows jump of our heads because it's so shocking that it's done, but it might actually not be a violation of the law." *Lifeline Legacy Holdings, Inc. v. OZY Media, et al.*, CV-21-07751-BLF (N.D. Cal. May 4, 2022) (Docket No. 55 at 5). At most, any true disputes between any investor and Mr. Watson and OZY could have been litigated in civil court or in the pending companion enforcement action initiated

by the Securities and Exchange Commission.   Meanwhile, it is the government that has lost perspective and steadfastly refuses to take responsibility for itself.

This Memorandum is accompanied by fifty-eight letters in Mr. Watson's support from family, friends, former colleagues, and investors.[1]  They speak to a selfless man of vision whose defining trait is lifting up, mentoring, and helping others to lead their best lives.  The observations of so many people from so many walks of life are at irreconcilable odds with the caricature of a fraudster pressed by the prosecutors.

A.    *OZY is rooted in a vision of community service and empowerment*

Mr. Watson is the second of four children born to church-going parents, both school teachers, of modest means.  His oldest sister is a retired doctor.  His younger sisters are, respectively, a clinical psychologist and a lawyer.  Mr. Watson and his sisters are legacies of their parents' focus on education, volunteering, and helping others.  Mr. Watson graduated from Harvard College and Stanford University's School of Law.  Before founding OZY, Mr. Watson's work included running Achieva College Prep Services ("Achieva"), founded by him and one of his sisters; serving as a television anchor and contributor to CNN and MSNBC; and working as a managing director at Goldman Sachs.

OZY was formed in 2012 by Mr. Watson and his mother Rose after she was diagnosed with ultimately fatal metastatic kidney cancer.  Their vision was to create a fresh and forward looking news and information source that would profile new trends, rising stars, and big ideas - - what they described as "the new and the next" - - while empowering and inspiring minority communities.  OZY ultimately developed premium newsletters, top tier television shows for

---

[1] The letters are arranged alphabetically by the correspondents' last names.  Personal identifying information has been redacted and is available upon request.

PBS, Hulu, Amazon and others; leading podcasts for Apple, iHeart, Spotify and others; and four world class "OZY Fest" festivals and leading award programs. OZY won more than 200 clients including Coca Cola, Target, and Walmart. OZY won an Emmy award, and two OZY series were submitted for Pulitzer Prize consideration. Mr. Watson was a visionary who worked tirelessly at work and in the community to give voice to his mother's vision and values.

Lamar Bunts met Mr. Watson at Harvard and has been his close friend for thirty years. Mr. Bunts writes that Mr. Watson's "actions reflect values instilled by his late mother, Rose, who taught him the importance of loyalty, love, and standing by those you care about." Nancy King met and worked for Mr. Watson at Achieva and observes that Carlos "was raised with the understanding that education transforms lives and entire communities, and it was clear that he was determined to do his part to advance that mission":

> I never had the chance to meet Rose Watson, but I'd certainly heard about her: It was impossible for Carlos to mention her without his face breaking into an enormous grin. She was a force, unflagging in her devotion to her children and in her belief that they could and would do great things. How he loved her, and I know losing her was unspeakably hard on Carlos, his sisters, and their father.

Mr. Bunts writes that "[h]is actions reflect values and instilled by his late mother, Rose, who taught him the importance of loyalty, love, and standing by those you care about." Anthony Hamilton, a barber and poet who has known Mr. Watson for twenty-five years, writes:

> Despite his impressive achievements, including being a political analyst on CNN and Harvard graduate, Carlos never presented himself with arrogance. Instead, he engaged me in conversations that reflected his genuine interest in my experiences and perspective. Carlos's humility and ability connect with people from all walks of life have left an indelible mark on me.

Shamir J. Simmons met Mr. Watson in Mr. Hamilton's barber shop. Mr. Simmons's mother had succumbed to drug abuse and died in prison. To Mr. Simmons, "the idea of family

[was] an interesting foreign concept like space travel or deep sea exploration." Mr. Watson "was curious about not only [Mr. Simmons's] opinions on things but a few others as well who came from different walks of life." Mr. Watson invited Mr. Simmons to help care for Mr. Watson's mother even though she may not have really needed his help. It was Mr. Watson's way of helping Mr. Simmons:

> As Carlos and I would go to church with his mom and go to eat and run errands with her and just sit and conversate with her she didn't understand why I wasn't in school or helping more people or inspiring others . . . . Being around him and his family allowed me to find joy in helping others and servicing those who need it . . . . I do the same thing now . . . I feel blessed that I have met Carlos and his family. With the birth of my first and only child, a son, [Carlos] and his mother changed the trajectory of not only me but also my entire family and lineage going forward.

Mr. Watson's cousin, Kyla Thomas, says that he "grew up without much monetary resource[s], but he was surrounded by love and encouraged to be a person of character, a person in relationship with God, and to reach for the stars." Another cousin, Thomas Watson, remarks:

> He's the kind of person who wants to know what you're up to and if there is a way he can help you. He is often generous when there is a need, but also when there isn't a clear need, just because, as an active unexpected kindness. When a family members' child was in college and they didn't have enough money to pay for the tuition, he paid it - that simple. I doubt he was ever paid back for that, I've never heard him mention it; I doubt he knows that I know about it. It is not his style to brag about the things he's done for others.

> When he was in law school, he cofounded an organization to help underperforming neighborhoods to enter the college application process, and to successfully attend and graduate from college. He would attend his weekends with his kids, tutoring and assisting them, encouraging them to dream big dreams for themselves.

> He works harder than anyone I know, his ethic and dedication are unsurpassed.

Thomas Watson's remarks are echoed by Otto Zequeira ("Carlos slept only 4 hours a day. His hard work and belief in what he was building was admirable."); LaMar Bunts ("Carlos's impact on those around him is undeniable. His dedication to the community, his unwavering support for his friends and family, and his commitment to creating positive change through his work

11

exemplify the values that have guided his life."); Roxana Shershin ("He is a self starter and a visionary possessing the ability to see ideas as much larger than . . . I think most people."); Carmen Yulin Cruz Soto ("[H]is ambition stems from a deep rooted belief in the goodness of people. He dreams big without forgetting what centers him and he never departs from his roots . . . . Carlos's enthusiasm for life and his willingness to uplift others is contagious.")

Mr. Watson has lived his mother's legacy of selflessness and service to others. Rodney Taylor met Mr. Watson at Harvard when they were eighteen years old. Mr. Taylor recalls Mr. Watson as "someone whose leadership and vision shown brightly, even during our earliest days in college":

> As the president of the freshman Black table, he played a transformative role in fostering community and uplifting his peers, significantly improving our collective college experience. It was evident early on the Carlos had a rare and genuine talent for inspiring those around them to aim higher, dream bigger, and unite as a community.
>
> [I] have witnessed his commitment to creating opportunities for the underrepresented, launching initiatives that have profoundly impacted young high school students aspiring to attend college. Carlos's entrepreneurial spirit drove him to create platforms and businesses that were uniquely mission-driven, focusing on a societal advancement. I have vivid memories of Carlos envisioning and bringing to life ideas that seemed almost improbable at first. For instance, as we traveled abroad, Carlos shared his dream of interviewing emerging stars and delving into the essence of their passion and vision. What followed was nothing short of extraordinary. He brought that vision to life and engaged with figures like Barack Obama, John Legend, and Arnold Schwarzenegger before their meteoric rise to fame, capturing insights no one else could.

*See* Letter of Tericke Blanchard ("I want to emphasize the positive impact he has had, not just on me, but on many members of our college community. I never could have imagined he would find himself in this situation, as his character has always been one of kindness and support."); Letter of Sophia Victor ("Carlos has a rare and remarkable gift - - he sees the potential in people even before they see it in themselves. His ability to bring individuals from all walks of life together, bridging backgrounds, beliefs, and cultures, fosters genuine dialogue and meaningful

change.") Letter of David Victor ("Carlos Watson has consistently used his platform to inspire positive change, advocate for underrepresented communities, and create opportunities for others."); Letter of Patrice Johnson Chevannes ("I have always known the Watson family to stand for honesty, compassion, and a dedication to doing what is right."); Letter of Troy Christmas ("Carlos's ability to think ahead and build innovative programs that serve the common good has always impressed me.  Where others might see obstacles, Carlos sees opportunity . . . . Carlos's creativity and determination to merge business with social responsibility has been a recurring theme throughout his career.").

Steven Schillaci, a television producer, "first met Carlos Watson after the murder of George Floyd when Carlos and Ozy produced the Townhall television event for A&E network, titled 'Race in America: A Town Hall meeting.'  It was here I learned what a socially conscious tireless advocate for justice Carlos truly is":

> He assembled the diverse group of professionals, celebrities, police chiefs, community leaders and civilians to start the conversation on Race Relations and how we can all do better. . . . .
>
> I've worked with countless host and producers, but none whom I have respected or enjoyed working with more than Carlos. Furthermore, many publicists, celebrities and their managers would write me after the interview stating what a great experience it was for them to appear on Carlos' show and what a gracious and intelligent interviewer he was. . . .

Jason Cahilly, is co-founder and chief executive officer of a private investing and consulting firm and previously served as chief strategic and financial officer for the National Basketball Association.  Mr. Cahilly met Mr. Watson when they both worked at Goldman Sachs:

> Despite being exceptionally smart and having a very impressive business pedigree coming into Goldman Sachs, he was unfailingly humble and gracious and 100% of my and others interactions with him. He developed a quick reputation for clearly caring about others, and as a standard operating procedure he would inquire sincerely about how

others were doing not just professionally but also personally it struck me how well he truly listened to others and, almost always, would find some way to leave the other person with a sense of positivity, optimism, and that they mattered.

Mr. Cahilly reports that he's "spoken to Carlos multiple times since the charges were brought (most recently on November 17, 2024) and, characteristically, each of our conversations has started with him genuinely inquiring about how I, my wife and each of my kids are doing, and whether there's anything he can do for us. It's a small point perhaps, but I think it speaks to Carlos core goodness and character conduct himself this way even under the current extreme circumstances." Mr. Cahilly elaborates:

> One of Carlos' most pronounced traits is this radical generosity, extrinsic focus and selflessness. He is persistently externally-focused and unfailingly generous with his time and attention toward *all* others. He unusually perceives the needs of others and proactively spends significant time and energy to improve others' situations.

According to Angela Spears, "His vision for OZY was driven by the desire to give voice to underrepresented perspectives, fostering conversations that are often overlooked by mainstream media . . . .To Carlos, OZY was never just a business; it was a platform to drive change and connect people. Through OZY and his other business endeavors, Carlos has hired individuals from diverse backgrounds, providing career opportunities to people who might otherwise face barriers in the media industry."

Jennifer Lopez operates a successful taxi business in Freeport, New York. She praises Mr. Watson's vision of OZY as a means to provide "platform to the unheard and challenging us to think critically . . . offer[ing] the kind of hope that can't be easily measured or replaced":

> I was honored to meet Carlos Watson in 2018, when I was selected to participate in PBS's *Taking on America* program, where he brought together individuals from diverse backgrounds to discuss the challenges faced by the Latino community and other under representative groups across America. As we met several times in an intimate focus group before the taping of the show, I got to know Carlos and his diplomacy. This experience allowed me to share my own story as a Latina and connect with people from

different walks of life in a respectful and open form.  Carlos's work through *Taking on America* was just one example of how he has dedicated himself to fostering understanding and loving voices that are often unheard. . . . .

Through his media company, OZY, Carlos pushed the boundaries by covering unconventional topics in a way that was accessible and engaged to all readers.  His vision was bold, but his demeanor was always humble - - never flashy, never seeking attention to himself.  Carlos's show, the Carlos Watson show, symbolized hope for a more inclusive and diverse America.  He invited challenging, important conversations with a range of people, often highlighting voices and perspectives that are overlooked in mainstream media.  This commitment to providing a platform for these voices as a rare quality, one that is invaluable in today's polarized world.  Carlos is a modern day abolitionist, working tirelessly for change, but always through a diplomatic and constructive approach.  His mission has always been to foster empathy, understanding, and unity, something American needs now more than ever.

*See* Letter of Delores Eberhart ("Carlos co-founded Ozy Media, aiming to offer diverse perspectives in news and culture.  His vision was to create a platform that highlighted underrepresented voices and stories, reflecting his commitment to inclusivity and broadening public discourse."); Letter of Steven Schillaci ("The ability to spark meaningful dialogue and serve as a bridge between diverse groups is an invaluable skill, especially in today's polarized world.  Carlos possesses a rare talent for creating spaces where tough but necessary conversations can happen with respect, empathy, and insight.").

Charlynn White worked for OZY as editorial traffic manager.  She witnessed firsthand how he ran the company and responded to the charges in this case:

When [Carlos] was arrested in February of 2023, it not only impacted him and his family - - who I had grown close to - - but also the entire OZY team, which was making a remarkable comeback. The company was rebuilding crucial relationships with investors and, once again, producing groundbreaking content.

Carlos is a visionary with a strong commitment to amplifying the voices of marginalized groups.  His dedication to diversity was evident in his focus on hiring people of color and women, which set OZY apart in the media landscape. . . .

Carlos's genuine concern for others and his ability to uplift those around him truly exemplify the compassionate individual I have come to know. . . .

Despite the overwhelming weight of these events, Carlos continues to demonstrate a remarkable level of empathy and concern for others, prioritizing their well-being above his own.

*See* Letter of Ricky Spears ("I regularly reference Carlos's work with OZY Media in my classes as a powerful example of resilience and entrepreneurship. Carlos built OZY from the ground up without the traditional resources many entrepreneurs have, creating a platform that brought new, diverse perspectives to the forefront . . . Carlos's ability to expand his company's reach and establish a media platform that amplifies marginalized voices has been an inspiring example to my students.").

Mr. Watson's sister Carolyn writes as follows:

When Carlos envisioned OZY media, his mission was clear: to elevate underrepresented voices and bring bold, diverse perspectives to the forefront of media. Watching OZY grow from an idea at our mother's kitchen table to a global platform producing award-winning content was a testament to Carlos's vision and perseverance.

B.    *Mr. Watson's Widely Respected Role as a Mentor*

Mr. Watson is widely respected for mentoring others, instinctively reaching out to people he meets in a variety of contexts to encourage and inspire. Dona Brathwaite has been a teacher in New York City's public schools for twenty years:

I first met Carlos in 2007 when he volunteered as a guest speaker for the Upward Bound program, where I was working as a teacher supporting youth struggling academically. Despite his prestigious position at MSNBC at the time, Carlos made it a priority to volunteer his time, demonstrating his dedication to uplifting others. His sincerity, humility, and commitment to service left an indelible mark on both my students and me.

Carlos and I have remained in contact over the years, and I have personally witnessed his strong commitment to serving his community without any personal gain. He possesses a remarkable ability to connect with people, meeting them exactly where they are, with genuine respect and empathy. When he spoke to my students, he openly shared personal stories of perseverance that resonated deeply with them, including his experiences in summer school. Carlos lit up the room and his message that setbacks (like having to attend summer school each summer during his formative years) can serve as stepping

16

stones reframed how they, and I, viewed our challenges.  Carlos has a way of making each individual feel seen, heard, and value.  Carlos's sincerity makes a uniquely effective mentor.  His approach ability allows young people to not only look up to him but also relate to him on a personal level.

Caroline Champagne shares a similar recollection:

In 2007, he traveled from New York City to speak at my 8th-grade graduation ceremony at Harford Day School in Bel Air, Maryland.  Despite the distance and the relatively small size of our community, Carlos graciously made time to share his insights, experiences, and encouragement with us.  His words resonated deeply with everyone in attendance and left an indelible mark on our young minds. . . .

His willingness to invest his time and energy in supporting a small group of students in the "middle of nowhere," as we affectionately called it, reflects his extraordinary character and commitment to giving back.

*See* Letter of Amy Toner ("He has mentored many people with all sorts of challenges, giving his time in a way that most people would not."); Letter of Rodney Taylor ("Carlos has consistently uplifted those around him, myself included. His resilience, optimism, and unwavering belief in the potential of others have left a profound impact on my life and countless others.").

Tericke Blanchard, Director of International Policy at AbbVie, met Mr. Watson at Harvard, where

Carlos was known for his friendliness and ability to engage others.  He created an inclusive atmosphere that encouraged connection and collaboration. . . . It was heartening to see that he continued to foster a sense of community, bringing people together for meaningful discussions and fellowship.

*See* Letter of Shanti Perkins ("Carlos has proven to be a man of extraordinary empathy and social consciousness.  As an upperclassman at Harvard, he took it upon himself to mentor and engage younger students like me, demonstrating kindness and generosity that exceeded mere social obligation . . . .Carlos's dedication to social change, inclusion, and dialogue has had a lasting impact on countless individuals and communities.").

Otto Zequeira met Mr. Watson in elementary school and have been close friends for 48 years. For Mr. Zequeira, "Carlos was a source of strength and support for me as I was the first person from my family to go away to college":

> Carlos also mentored a low-income, African-American student from a local high school and showed him our campus and dorm. This commitment to give voice to those who lack it surely influenced my becoming a teacher and union representative. . . .I would not be the same person if I had not met him and shared so much time together.

*See* Letter of Dr. Karen A. Johnson ("I have witnessed his evolution into a leader whose work has had a significant societal impact, particularly in promoting social justice and amplifying marginalized voices."); Letter of Dr. Nehemiah Mabry ("Carlos has been a pioneer and a source of hope, someone who has shown kindness, generosity, and a genuine commitment to supporting others.").

Troy Christmas met Mr. Watson at Stanford Law School:

> From the earliest days of our friendship, Carlos distinguished himself as someone with an unwavering sense of purpose. While many of us were focused primarily on the rigors of law school, Carlos always made time to give back to the community. His passion for mentoring and empowering young people was evident even then.

Carlos has a long history of supporting those in need, whether through his mentoring programs or by offering career guidance to countless young professionals navigating their way in competitive industries. *See* Letter of Patrice Johnson Chevannes ("[I]n my work with inner-city youth, I see firsthand how critical it is for them to have positive role models and advocates. Carlos's platform has given a voice to these inner-city youth, particularly Black and other minoritized youth in the U.S. who often feel unseen and unheard . . . . . His platform has provided hope and inspiration, helping these youth believe in their potential and understand that their voices matter."); Letter of Kyla Thomas ("There are a lot of lives that he has touched for the better. He is a person who believes strongly in hope, and is always willing to brainstorm or

18

wonder with you about what is possible."); Letter of Nina Benton ("He is a genuine person who goes out of his way to help others. Not only did he graciously agree, he flew a red eye, and somehow managed to make it to Bel Air, MD in time to talk to a small group of young 8th graders about how the world, while it can seem daunting, is changing in so many ways, ways that will make all of our lives better. I realize this is an anecdote that can seem trivial but I knew that day that a man of great character, integrity and compassion stood before these young children and demonstrated a deep sense of caring and the importance of showing up for friends and strangers."); Letter of Tiffany Madera ("A couple of years ago, I was dreaming big for a new film project. I needed help to reach past a local framework and expand my audience and tell my story. I asked Carlos if Ozy Media would be willing to profile me and give me a global opportunity. His answer was a resounding yes! I will never forget what that felt like, because having a hand reach over to pull you up is an extraordinary blessing. Carlos was opening a pathway to success for me and his generosity was a gift."); Letter of Carlos Watson Sr. ("Carlos is also a role model and mentor to many, inspiring young people around the world with his visionary ideas and commitment to building a better society. His innovation and tireless efforts have created jobs, driven forward-thinking conversations, and fostered opportunities for others to grow and thrive. His work and his heart have always been focused on the greater good."); Letter of Jeremy Winter Delaplane ("Carlos is a positive force in every community I have experienced. He built dreams, jobs, ideas, his impact on the world is significantly and overwhelmingly positive.").

C.    *Mr. Watson's Continuing Devotion to Family, Friends, and the Community*

Amy Troner, an environmental crime officer in the United Kingdom, has known Mr. Watson and his family for forty years. She traveled to Brooklyn to attend parts of the trial: "As I am sure you have seen over these many months, Carlos has a very strong and loving support

system.  Family, friends and even his investors have been there during the trial.  We were also there for him both financially and emotionally during bail proceedings because we all know who Carlos really is as a person." *See* Letter of Angela Spears (" Carlos's commitment to his family is genuine, rooted in values instilled by his late mother, Rose, and it reflects his sense of loyalty and responsibility.").

Mr. Watson's close relationships with his family have been his beacon through the ups and downs over the years.  His cousin Kwame Thomas explains:

> We come from an unusual[,] phenomenal family.  Our grandparents were college graduates, a rare accomplishment in the 1920s for many, but especially Black Americans.  Believing in and deeply wanting to enrich the community, our grandmother became a teacher and our grandfather, pastor.  After our grandfather passed away in 1945, our grandmother, through immense strength and unwavering family support, raised their seven children, ensuring that each one earned a college degree.  They went on to have 19 children - - my cousins and I, and stealing us the value of showing love, giving of yourself to uplift another, gaining knowledge and the value of community, and I am proud to say that Carlos exemplifies those values and everything he does.

For most of the past decades, Mr. Watson has cared for his now 90 year-old father, Carlos Watson Sr., who mostly lived with Mr. Watson before Mr. Watson began devoting time to his criminal defense.  The sentiments of a father might seem biased but they are echoed by so many other correspondents:

> I was blessed to share nearly 50 years of marriage with my late wife, Dr. Rose T Watson, and together we raised four extraordinary children, with Carlos as our only son.  His integrity, intellect, and commitment to uplifting others have been constant throughout his life.

> Carlos has always been an exceptional individual.  As a young boy, I called him "Senator" because of his curiosity, leadership, and passion for learning.  These early traits blossomed into extraordinary accomplishments.  Carlos graduated from Harvard University and earned a logically from Stanford law school, achievements that reflect not only his intellect but also his relentless work ethic and determination to excel.

> He later founded Ozy, where his innovative leadership built a platform that celebrates diversity, fosters understanding, and inspires action.  His work has created opportunities

for many and left an indelible mark on media and education.

> Family is at the heart of Carlos life.  During my late wife's battle with late stage kidney cancer, Carlos worked tirelessly to extend life by over three years, giving our family precious time together.  His love and dedication during that period exemplify the extraordinary son, brother, and caregiver he has always been.  Beyond his immediate family, Carlos has supported extended relatives, such as my nephew Shelton, ensuring that opportunities and encouragement were always within reach.

Mr. Watson's sister Beverly knows him as "a trailblazer, dedicated to uplifting others and amplifying voices often left unheard."  She invested $1.1 million in OZY.  She knows Mr. Watson as her employer, her brother, and a father figure to her three year-old son, named after Mr. Watson:

> As a former employee of OZY, I witnessed Carlos' relentless work ethic, integrity, and belief in the power of storytelling to create meaningful change.  He built a culture that celebrated creativity and excellence, mentoring countless individuals in creating opportunities for reporters, freelancers, and interns from all walks of life.
>
> As his sister, I have experienced Carlos' profound generosity and unwavering commitment to family.  Whether it's supporting our livelihood and underwriting the daily expenses of our parents, aunts, uncles, cousins and a multitude of community members or whether it's supporting dreams and investing time, energy, resources to propel others in their own journeys.  His care and encouragement reflected the depth of his character - - a man who consistently puts others before himself and inspires those around him to aim higher.
>
> Carlos vision for OZY has always been about more than media; it is about building bridges, fostering understanding, and empowering communities. In a time when the world is more divided than ever, OZY's mission is needed now more than ever. I believe in my brother. I have witnessed the positive force for good and the profound impact he and OZY has had and can continue to have on the world. . . .
>
> Carlos is a wonderful father figure to my 3-year-old son and his love, example and encouragement play a vital role for him, as I am a single Mother. Carlos has given so much of himself to elevate others, and I remain confident in the positive contributions he will continue to make it given the opportunity.

*See* Letter of Carolyn Watson ("From a young age, Carlos demonstrated the qualities that make him the natural leader he is today.  I recall his generosity and encouragement with our family - - rewarding my younger sister and me with his own lunch money when we excelled in school, and

instilling in us a sense of value and motivation.  These early acts of selflessness and leadership

foreshadowed the incredible drive he would bring to his professional endeavors.").

Mr. Watson's aunt, Jeannette Shegog, has "watched Carlos grow from a bright and

curious child into a compassionate and responsible man.  From a young age, he demonstrated

remarkable intelligence and a unique way of thinking.  He approached life with curiosity, always

seeking to understand the world and help those around him":

> His love for family has always been at the center of his life, instilled by his mother, my
> sister Rose.  Carlos's upbringing was rooted in faith, love, and a sense of responsibility to
> family and community—values he has carried forward throughout his life. . . .
>
> In recent years, after his mother's passing, Carlos has stepped into the role of family
> caretaker, providing essential support to his aging father and assisting his sisters.  His
> commitment to family has never wavered, even in difficult times.

*See* Letter of Gary Thomas ("Carlos comes from a family that places God first.  They believe in

God, family and community.").

D.   *Imprisonment of Mr. Watson Would Unduly Punish His Community*

Theoretical benefits of custody should yield to the actual harm to the community if Mr.

Watson is removed from it.  "Incarcerating Carlos for an inordinate amount of time would not

only be a loss to his family and friends but also to the communities he has touched so deeply."

Letter of Anthony Hamilton.  As Kwane Thomas puts it:

> It is deeply concerning to see him facing significant time in jail.  Carlos has always acted
> with a sincere heart, striving to create opportunities for himself and others.  Locking him
> away would not only affect our family and friends, but also deprive the community of the
> positive influence he provides. . . .
>
> Please allow Carlos to continue contributing to society and helping others, rather than
> isolating him from the very community he has worked so hard to support.  We love him
> and need him.

*See* Letter of Dr. Karen A. Johnson ("Carlos's absence from public life would not only affect those of us who work alongside him in advancing social justice, but it would also be a loss to the many communities that rely on his voice for representation and support. . . . The importance of this cannot be overstated, especially for individuals like Carlos, whose impact on society has been both far-reaching and transformative."); Letter of David Victor ("His contributions to society are invaluable, and his ability to continue this work would benefit many."); Letter of Troy Christmas ("I firmly believe that incarceration would not serve the greater good in Carlos's case. His talents, passion, and commitment to making a positive impact are far too valuable to be lost. Carlos has the potential to continue contributing to society in meaningful ways - - through mentorship, advocacy, and community-building initiatives."); Letter of Lois Chaney-Smith ("I know Carlos feels deep remorse for the circumstances that led to this point, and I am confident he has learned from this experience. It has already changed him profoundly and will propel him forward in ways that will benefit society and reflect the values that shaped him."); Letter of Patrice Johnson Chevannes ("His absence would be a significant loss not only for his company or family, but for the youth and marginalized communities who depend on the representation he provides."); Letter of David Price ("His talents and dedication are too valuable to be lost.").

For Nancy King, "[i]t is close to impossible for me to imagine Carlos behind bars":

My mother was a longtime prisoners' advocate at Rikers Island (she started the *Rikers Review*, an inmate-written and produced literary magazine, and Fresh Start, a widely praised culinary training and placement program for inmates), and I visited the jail with her on occasion. When I think of Carlos, I think of his unbounded curiosity - - about politics, sports (especially basketball), and everything in between - - his generosity, his quick and capacious mind, and how he delights in other people's success. . . .I believe that the Carlos I know has so much more good work to do and to offer his community.

*See* Letter of Fred Harman ("The thought of Carlos being incarcerated for an extended period of time seems to not only be disproportionately punitive relative to the alleged offense but would also incapacitate a life that has proven to be so capable of giving back to friends, family and the community.").

E.    *A criminal penalty for OZY Media Inc. is unwarranted*

The letters quoted throughout illustrate that no penalty is warranted for OZY Media Inc. - - an entity that should never have been charged, let alone prosecuted.  It is incredibly rare for a company to be indicted; the corporate entities were not indicted in the spectacular frauds that brought down Theranos, FTX, Harvey Weinstein's companies, and Enron.  And yet OZY - - a Black-owned business in California which had a very real product with a very real client base and won very real awards - - found itself indicted on the other side of the country.  To be clear, OZY had no connection to the Eastern District of New York.  And to be clear, counsel at trial argued - - and the evidence, in the form of Mr. Rao's confession letters and communications between Mr. Rao and Ms. Han established - - that Mr. Rao and Ms. Han were acting outside the scope of their employment and were not acting on behalf of OZY.

OZY attracted sophisticated investors such as Kosmo Kalliarekos, a graduate of Harvard Business School (High Distinction) and the Wharton School (Magna Cum Laude) who is now a partner at EQT and who testified in this trial, recounts in his letter that "Under Carlos's guidance, OZY grew into a groundbreaking media company with remarkable achievements[, including]: An Emmy Award for its programming; A global audience of more than 50 million people across digital platforms, TV, podcasts, and live events; More than 200 clients . . . ; Over $250 million in booked gross revenue over its lifetime; . . . [O]ne of the most richly diverse, inclusive, and talented teams in media, with more than 1,000 full-time and freelance staff - - 90% of whom

were women and people of color." Another supposed victim, angel investor Damian Rouson, Ph.D., invested more than $175,000 in OZY as a "form of social-impact investing: every business in which I invested was founded by a person of color, including women of color." Mr. Rouson laments that with OZY having been convicted, "I have lost the one media company that I counted on for introducing me to an African author, an American biracial woman biotech entrepreneur, a black physicist, and other 'new and next' thinkers and achievers across so many walks of life."

F.    *The Guidelines are not reliable in fashioning a proper sentence*

Last month, Judge Hellerstein sentenced Sung Kook ("Bill") Hwang to a term of imprisonment of 18 years for a fraud that cost banks more than *$10 billion*, noting that "the amount of losses that were caused by [Hwang's] conduct are larger than any other losses I have dealt with." *See United States v. Hwang*, 22-CR-240 (AKH); *"Archegos' Bill Hwang sentencing to 18 years in prison for massive US fraud,"* www.reuters.com, Nov 20, 2024. In recommending a term of imprisonment of 21 years for Hwang (less than the PSR's recommended 22 years here), the government described Hwang's case as "among a rare class of cases that truly could be described as a national calamity." And yet despite the government's view of loss in *Hwang* of *$10 billion*, and the PSR's view of purported loss of $65 million in the instant case (*0.65%* of $10 billion), the PSR recommends a sentence for Mr. Watson even greater than recommended by the government and imposed by Judge Hellerstein in *Hwang*. (Defendants contest the $65 million loss amount - - actual or intended - - on every level.)

*Hwang* is not an outlier. Since *United States v. Booker*, 543 U.S. 220 (2005), "virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the

judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines and
the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not
greater than necessary' to comply with its objectives."  Frank Bowman, "*Sentencing High-Loss
Corporate Insider Frauds After Booker*," 20 Fed. Sent'g Rep. 167, 169 (Feb. 2008).  The
Department of Justice has itself acknowledged that fraud loss calculations under the guidelines
have "lost the respect of a large number of judges."  Letter to Hon. William K. Sessions from
Jonathan J. Wroblewski (June 28, 2010).  *See, e.g., United States v. Milton,* 21-cr-00478 (ER)
(S.D.N.Y.) (48 months after trial for securities fraud estimated by the government to be at least
$660.8 million); *United States v. Hild*, 19-cr-602 (R)(RA) (S.D.N.Y.) (44 months for fraud
causing almost $70 million on losses to lenders); *United States v. Johnson*, 17-cr-482 (JSR)
(S.D.N.Y.) (36 months on guilty plea for fraud of $359 million); *United States v. Ebbers*
["WorldCom"], 458 F.3d 110, 128 (2d Cir. 2006) (affirming sentence of 25 years for defendant
with loss figure exceeding $1 billion); *Skilling v. United States,* 561 U.S. 358 (2010) (lead *Enron*
defendant sentenced to 24 years); *United States v. Kumar* ["Computer Associates"], 617 F.3d
612 (2d Cir. 2010) (affirming sentence of 91 months for fraud greater than $400 million and
adjusted offense level of 51 calling for life imprisonment); *United States v. Starr,* No. 10-CR-
520 (S.D.N.Y. 2011) (sentencing defendant to 90 months after $33 million fraud loss); *United
States v. Ferguson,* 584 F. Supp. 2d 447, 456 (D. Conn. 2008) (imposing four years for $544
million fraud loss and life guidelines range); *United States v. Forbes,* 2007 WL 141952 (D.
Conn. 2007) (sentencing defendant under 1999 guidelines to 10 year term for fraud loss of $14
billion); *United States v. Treacy,* No. 08-CR-366 (S.D.N.Y. 2009) (sentencing defendant to 24
months after guidelines calculation by government calling for 24-37 years); *United States v.*

*Turkcan,* No. 08-CR-428 (E.D. Mo. 2009) (imposing sentence of 366 days to defendant responsible for fraud loss of $25 million).

Application Note 21(C) to § 2B1.1, entitled "Downward Departure Consideration," provides, in pertinent part: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." This is such a case. For the reasons set forth below, a downward departure is warranted.

In fraud cases, "the amount of the loss [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.*

Many cases recognize that the Guidelines go too far in fraud cases: The Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *cf. United States v. Thompson*, 19 Cr. 698 (ER) (S.D.N.Y. Feb. 4, 2021), Sentencing Tr. at 28:25-29:7 (Ramos, J.) ("perhaps the fraud guidelines put entirely too much emphasis on the amount of the fraud, the money that's involved in the fraud. . . . I take the point that the amount of money does not necessarily get at the crux of the conduct that we are trying to prevent."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The guidelines place undue weight on the amount of loss involved in the fraud.").

The Guidelines do not "explain[] why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509. Certainly, "the Sentencing Commission's loss-

enhancement numbers do not result from any reasoned determination of how the punishment best fits the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018). Rather, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Gupta*, 904 F. Supp. 2d at 351; *see Johnson*, 2018 WL 1997975, at *4 (noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

For such reasons, one district judge summarized as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guidelines advice to sentencing judges." *Id*. at 380. Therefore, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id*. at 379.

Specific offense characteristics yield even more overstatement. Section 2B1.1 directs a court to add offense levels based on the amount of loss but also to add still more levels based on factors, as here, such as the number of victims, gross receipts from a financial institution, and, separately though related, an aggravated role based on supervision or management of the fraud. This accumulation of offense levels "has a significant effect upon the applicable sentencing range[,]" *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), and "represents . . . the

kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Adelson*, 441 F. Supp. 2d at 510. In short, "the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense." *Id*. at 512. *See United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (describing "another example where the guidelines in a securities-fraud [case] 'have so run amok that they are patently absurd on their face[]'").

Here, Mr. Watson's adjusted level, if applied, would result in all or most of the rest of his life in prison, an absurd result for a defendant who put his own money in the company and took virtually nothing out. "[T]he Sentencing Guidelines for white-collar crimes" should not "be a black stain on common sense." *Parris*, 573 F. Supp. 2d at 754. "The notion that th[e] complicated analysis, and moral responsibility," required at sentencing, "can be reduced to the mechanical adding-up of a small set of numbers[,] artificially assigned to a few arbitrarily selected variables[,] wars with common sense." *Gupta*, 904 F.Supp.2d at 350.


G.     *The Sentencing Factors Favor a Non-Custodial or a Minimal Sentence*

We recommend that a non-custodial sentence be imposed with community service that would enable Mr. Watson to serve the community rather than be taken from it, enable him to continue to care for his ailing 90 year-old father and help care for his three-year old nephew, and otherwise devote himself to his life's work on lifting up others. Custody is not a cure-all for any crime and certainly not here where the conduct was not motivated by greed, excess, or tangible indulgence, but encouraging and inspiring others.

Or as Shamir Simmons, put it: "I tell children like Carlos told me, (he quoted Gandhi) "Be the light you wish to see in the world."

29

December 2, 2024

/s/\
Ronald Sullivan Law, PLLC\
1300 I Street NW, Suite 400E\
Washington, D.C. 20005\
(202) 313-8313\
*Attorneys for Carlos Watson*

/s/\
Frison Law Firm, P.C.\
75 State Street, Suite 100\
Boston, Massachusetts 02109\
(617) 706-0724\
*Attorneys for OZY Media, Inc*