HDM:JRS/GK/DAS
F.#2021R00900

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                            Docket No. 23-CR-82 (EK)

CARLOS WATSON and
OZY MEDIA, INC.,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X


## THE GOVERNMENT'S SENTENCING MEMORANDUM


BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Jonathan Siegel
Gillian Kassner
Dylan A. Stern
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 1

I.      Ozy's History and Watson's Management ............................................................ 1

II.     The Offense Conduct ........................................................................................... 4

        A.      Initial Misrepresentations Regarding Finances .......................................... 4

        B.      The Fraudulent Series C Offering ............................................................... 6

        C.      Misrepresentations During the Potential Acquisition by Buzzfeed ............ 9

        D.      Misrepresentations to Hanmi Bank ........................................................... 11

                1.      Fraudulent Misstatements .............................................................. 11

                2.      Identity Theft ................................................................................. 13

        E.      Additional Misrepresentations to Al-Nahdha ........................................... 13

        F.      Additional Misrepresentations to WTI ..................................................... 15

        G.      Attempted Fraudulent Investment from Goldman Sachs ........................... 19

                1.      Material Misrepresentations ........................................................... 19

                2.      Identity Theft ................................................................................. 21

        H.      Misrepresentations to Lifeline Legacy Holdings ...................................... 22

        I.      Attempted Fraudulent Investment from Google ........................................ 24

        J.      Misrepresentations to Antara Capital ........................................................ 25

        K.      Misrepresentations for a Series E Fundraising Round ............................... 27

III.    Watson's Obstructive Conduct ........................................................................... 28

        A.      Pre-Indictment ......................................................................................... 28

        B.      Post-Indictment ........................................................................................ 29

        C.      During Trial ............................................................................................. 30

IV.     Post-Trial Conduct ............................................................................................ 32

LEGAL PRINCIPLES ..................................................................................................... 34

I.      Sentencing Generally ......................................................................................... 34

II.     The Effect of Section 1028A (Count Three) ...................................................... 36

THE GUIDELINES .......................................................................................................... 38

I.      The Guidelines Calculation ............................................................................... 38

II.     Watson's Objections Should Be Rejected .......................................................... 39

III.    The Obstruction Enhancement ........................................................................... 39

THE APPROPRIATE SENTENCE ............................................................................... 40

I.       The Court's Questions ................................................................................... 40

         A.       The Uses of the Fraudulent Proceeds........................................... 41

         B.       Comparable Cases.......................................................................... 43

II.      The Section 3553(a) Factors ........................................................................ 47

         A.       Consideration of the Guidelines.................................................... 48

         B.       The Nature and Circumstances of the Offense ............................. 50

         C.       The History and Characteristics of the Defendant ....................... 54

         D.       The Purposes of Sentencing.......................................................... 56

                  1.       The Seriousness of the Offense, Respect for the Law and Just
                           Punishment......................................................................... 57

                  2.       General Deterrence ............................................................ 57

                  3.       The Need to Protect the Public from the Defendant ......... 60

         E.       The Need to Avoid Unwarranted Sentencing Disparities.............. 61

         F.       The Sentence Imposed Should Account for the Time Watson Will Actually
                  Serve ............................................................................................. 62

                  1.       Sentencing Under the First Step Act.................................. 63

                  2.       Calculating the Actual Time in Prison............................... 66

         G.       Balancing the Factors.................................................................... 68

FORFEITURE AND RESTITUTION............................................................................ 69

I.       The Court Should Order the Defendants to Forfeit $65,680,352.40 .............. 69

         A.       The Forfeiture Rules and Statutes................................................. 69

         B.       The Defendants Must Forfeit the Gross Proceeds of Their Fraud ....... 71

         C.       The Amount of the Forfeiture Money Judgment Is a Conservative Estimate
                  of the Gross Proceeds.................................................................... 74

         D.       Both Defendants Obtained and Should Be Required to Forfeit
                  $65,680,352.40............................................................................... 74

II.      The Court Should Impose Restitution of $37,319,720.68 ............................. 76

CONCLUSION............................................................................................................. 77

# TABLE OF AUTHORITIES

Dean v. United States,
    581 U.S. 62 (2017)......................................................................................................... 36

Gall v. United States,
    552 U.S. 38 (2007)......................................................................................................... 35

Harmelin v. Michigan,
    501 U.S. 957 (1991)....................................................................................................... 59

Honeycutt v. United States,
    581 U.S. 443 (2017)....................................................................................................... 74

Kimbrough v. United States,
    552 U.S. 85 (2007)......................................................................................................... 35

Libretti v. United States,
    516 U.S. 29 (1995)......................................................................................................... 70

Rita v. United States,
    551 U.S. 338 (2007)....................................................................................................... 35

Robinson v. Heath,
    No. 12-CV-2116, 2013 WL 5774544 (E.D.N.Y. Oct. 24, 2013)................................... 56

Sash v. Zenk,
    439 F.3d 61 (2d Cir. 2006)............................................................................................ 62

United States v. Adekanbi,
    675 F.3d 178 (2d Cir. 2012).......................................................................................... 36

United States v. Adelson,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)........................................................................... 48

United States v. Al-Din,
    631 F. App'x 313 (6th Cir. 2015) ................................................................................. 63

United States v. Balwani,
    No. 18-CR-258 (EJD), 2023 WL 2065045 (N.D. Cal. Feb. 16, 2023)......................... 46

United States v. Bellomo,
    176 F.3d 580 (2d Cir. 1999).......................................................................................... 70

United States v. Bergstein,
    No. 16-CR-746 (PKC), 2018 WL 9539768 (S.D.N.Y. Sept. 20, 2018) ........................ 75

United States v. Bonventre,
    646 F. App'x 73 (2d Cir. 2016) .................................................................................... 73

United States v. Booker,
    543 U.S. 220 (2005)...................................................................... 34

United States v. Capoccia,
    503 F.3d 103 (2d Cir. 2007)......................................................... 70

United States v. Cavera,
    550 F.3d 180 (2d Cir. 2008)......................................................... 57

United States v. Cosmo,
    497 F. App'x 100 (2d Cir. 2012) ................................................. 61

United States v. Crosby,
    397 F.3d 103 (2d Cir. 2005)......................................................... 34

United States v. Cutler,
    520 F.3d 136 (2d Cir. 2008)......................................................... 60

United States v. Daugerdas,
    521 F. Supp. 3d 320 (S.D.N.Y. 2021).......................................... 75

United States v. Daugerdas,
    No. 09-CR-581 (WHP), 2012 WL 5835203 (S.D.N.Y. Nov. 7, 2012) ............................... 73

United States v. Diawara,
    797 F. App'x 672 (2d Cir. 2020) ................................................. 38

United States v. Ebbers,
    458 F.3d 110 (2d Cir. 2006).......................................................... 44

United States v. Emmenegger,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)........................................... 48

United States v. Faibish,
    No. 12-CR-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)........................... 48, 49

United States v. Fernandez,
    443 F.3d 19 (2d Cir. 2006)............................................................ 35

United States v. Fowler,
    948 F.3d 663 (4th Cir. 2020) ....................................................... 62

United States v. Goffer,
    721 F.3d 113 (2d Cir. 2013).......................................................... 60

United States v. Guerrier,
    No. 20-3469, 2022 WL 610338 (2d Cir. Mar. 2, 2022)..................... 75

United States v. Guillen-Esquivel,
    534 F.3d 817 (8th Cir. 2008) ............................................ 37

United States v. Heffernan,
    43 F.3d 1144 (7th Cir. 1994) ............................................ 57

United States v. Holmes,
    No. 18-CR-258 (EJD), 2023 WL 149108 (N.D. Cal. Jan. 10, 2023) .................................... 46

United States v. Johnson,
    No. 16-CR-457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .......................... 48, 57

United States v. Lara,
    733 F. App'x 433 (10th Cir. 2018) ............................................ 37

United States v. Marsh,
    No. 10-CR-480 (JBW), 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) ................................. 59

United States v. Martin,
    455 F.3d 1227 (11th Cir. 2006) ............................................ 59

United States v. Mathieu,
    853 F. App'x 739 (2d Cir. 2021) ............................................ 70

United States v. McClatchey,
    316 F.3d 1122 (10th Cir. 2003) ............................................ 54

United States v. Milton,
    No. 21-CR-478 (ER), 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024) ................................. 71, 72

United States v. Monsanto,
    491 U.S. 600 (1989) ............................................ 69

United States v. Ng Chong Hwa,
    No. 18-CR-538 (MKB), 2023 WL 4194002 (E.D.N.Y. Mar. 24, 2023) .......................... 69, 71

United States v. Nicolo,
    597 F. Supp. 2d 342 (W.D.N.Y. 2009) ............................................ 72, 74

United States v. Peters,
    732 F.3d 93 (2d Cir. 2013) ............................................ 75

United States v. Prevatte,
    66 F.3d 840 (7th Cir. 1995) ............................................ 63

United States v. Qualls,
    613 F. App'x 25 (2d Cir. 2015) ............................................ 62

United States v. Rhodes,
    No. 21-2236-cr, 2023 WL 2194529 (2d Cir. Feb. 24, 2023)................................. 76

United States v. Rigas,
    490 F.3d 208 (2d Cir. 2007)................................................................................. 45

United States v. Rivernider,
    828 F.3d 91 (2d Cir. 2016)................................................................................... 49

United States v. Roberts,
    660 F.3d 149 (2d Cir. 2011)................................................................................. 70

United States v. Rosario,
    988 F.3d 630 (2d Cir. 2021)................................................................................. 39

United States v. Sampson,
    898 F.3d 287 (2d Cir. 2018)................................................................................. 61

United States v. Shkreli,
    779 F. App'x 38 (2d Cir. 2019) ........................................................................... 73

United States v. Sigillito,
    899 F. Supp. 2d 850 (E.D. Mo. 2012)................................................................. 72

United States v. Stein,
    No. 09-CR-377, 2010 WL 678122 (E.D.N.Y. Feb. 25, 2010)............................. 59

United States v. Tanner,
    942 F.3d 60 (2d Cir. 2019)................................................................................... 75

United States v. Tartaglione,
    No. 15-CR-491, 2018 WL 1740532 (E.D. Pa. Apr. 11, 2018) ............................ 76

United States v. Tocco,
    135 F.3d 116 (2d Cir. 1998)................................................................................. 63

United States v. Torres,
    703 F.3d 194 (2d Cir. 2012)................................................................................. 74

United States v. Treacy,
    639 F.3d 32 (2d Cir. 2011)........................................................................ 70, 71, 74

United States v. Uddin,
    551 F.3d 176 (2d Cir. 2009)................................................................................. 71

United States v. Ulbricht,
    858 F.3d 71 (2d Cir. 2017)................................................................................... 60

United States v. Wahid,
   614 F.3d 1009 (9th Cir. 2010) .............................................. 37

United States v. Yusuf,
   781 F. App'x 77 (3d Cir. 2019) ............................................ 37

Weaver v. Graham,
   450 U.S. 24 (1981).............................................................. 62

## PRELIMINARY STATEMENT

As overwhelmingly proven at trial, the defendant Carlos Watson directed a years-long brazen and audacious scheme to defraud investors and lenders to his company, Ozy Media, Inc. Despite his persistent refusal to accept responsibility — including efforts to obstruct the investigation, ongoing attempts to undermine the judicial process against him through public attacks on the Court and the assigned prosecutors, and perjuring himself at trial — Watson was convicted by a jury of all charges: securities fraud conspiracy (Count One), wire fraud conspiracy (Count Two), and aggravated identity theft (Count Three). In light of all of the facts and circumstances of this case, the government respectfully submits that the Court should sentence Watson to a combined sentence of 180 months' imprisonment on Counts One and Two, to be followed by a mandatory two-year consecutive sentence on Count Three, in addition to imposing forfeiture and restitution.

## BACKGROUND

### I. Ozy's History and Watson's Management

Watson founded Ozy in 2012 and, that same year, recruited Samir Rao to join the company. See Trial Transcript ("Tr.") 223-24. At the time, Watson was 43 and Rao had just turned 26. See Presentence Investigation Report ("PSR") at 2; Tr. 222. Watson served as Ozy's Chief Executive Officer, as well as the star and host of several of Ozy's television programs. Rao had multiple titles at the company, but he acted as Watson's lieutenant and ultimately held the title of Chief Operating Officer.

Ozy officially launched in 2013. At the time, its core products were its website and daily newsletters sent to subscribers summarizing news and highlighting content on Ozy's website. From its inception to approximately the end of 2014, Ozy raised over $30 million. See Tr. 293-306. During this time period, Ozy closed three fundraising rounds (the Series Seed,

Series A and Series B rounds), grew its audience and obtained several high-profile interviews and collaborations.  See id.

By 2015, however, Ozy's digital business was not succeeding.  In part as an attempt to diversify revenue away from a pure digital business, Ozy began to focus more on creating television content and on producing a live festival, known as "Ozy Fest."  See Tr. 307-11.  Ozy's television and festival businesses were significantly more expensive to run than a digital business.  Tr. 311-12.  As a result, by 2016, Ozy was rapidly spending its available cash and needed to borrow several million dollars, primarily from preexisting investors.  Tr. 312-16.

That cash began to run out in 2017.  Beginning in 2018, Ozy took on increasing debt in order to survive.  Tr. 120-22, 318, 342-46.  Much of this debt was high-interest loans secured by Ozy's accounts receivable.  Id.  At times, Ozy was paying tens of thousands of dollars a day in interest on these debts.  Tr. 126, 358-60.  To service that debt and to continue its operations, Ozy took on even more debt and sought additional money from investors and potential investors.

In 2019, during this time of financial strain, Ozy hired Suzee Han to be its Chief of Staff.  Han was in her mid-20s at the time, about the same age that Rao was when Watson recruited him to work at Ozy.  Tr. 222, 457-58, 1878-79, 2106.  After Han was brought into the company — and then brought into the conspiracy by Watson and Rao (Tr. 1883-87) — the overall hierarchy between the three individuals was Watson at the top, Rao beneath him and Han below them both.  Tr. 323, 1565-66, 1872, 2134.

As the founder, CEO and ultimate authority at Ozy, Watson was involved in everything at the company, and he demanded employee compliance, as former employees Janeen Poutre and Tripti Thakur testified.  Tr. 175, 1563.  Watson was controlling; as Han testified,

when she told Watson she was struggling with what she was doing at Ozy, Watson suggested that either he or Rao join her in therapy. Tr. 2133. And former employees have described Watson as cruel and demeaning. For example, Rao testified that Watson "would shout at me. Sometimes in person, sometimes on the phone." <u>See</u> Tr. 321; <u>see also</u> Tr. 324 ("[S]ometimes it felt like he was shouting at you about how -- how -- how not good enough you were."). Han testified that Watson set "impossible expectation[s]" of her and that he frequently "admonished or yelled at" her. <u>See</u> Tr. 2069. In a letter that has been incorporated into the PSR, former employee Eugene Robinson wrote:

> I think it's safe to say that not only was Watson the worst boss I have ever had, he's also probably the worst human being that I've also had the occasion to work with. Screaming, shouting, desk pounding, docking pay, and this is without mentioning cutting salaries . . . and laying people off even when he had gotten PPP money to not do so. And always, despite him claiming that these charges against him are racially motivated, he was always much worse with his employees of color.

PSR ¶ 76; <u>see also</u> <u>id.</u> (calling Ozy a "horror show" and describing "the pervasive and abusive culture created by Watson at Ozy"). Public reporting and statements by former employees to law enforcement corroborate these accounts. <u>See, e.g.</u>, Pooja Bhatia, <u>Diary: Media Theranos</u>, London Rev. Books (Nov. 4, 2021), https://www.lrb.co.uk/the-paper/v43/n21/pooja-bhatia/diary (likening working at Ozy to a horse being beaten to death); Jeff Wise, <u>'It Was Weird and Culty':</u> <u>Carlos Watson's Mismanagement of Ozy</u>, New York Magazine (Oct. 1, 2021), https://nymag .com/intelligencer/2021/10/carlos-watsons-mismanagement-of-ozy-it-was-culty.html ("[Former] staffers say that founder and CEO Carlos Watson's demands, expectations, and plans were often detached from reality, yet were enforced with an intensity that some felt bordered on cruelty. . . . [Watson] was volatile, switching abruptly from solicitous charm to screaming rage."); Kerry Flynn, <u>18-hour days and panic attacks: Former Ozy staffers allege an abusive environment</u>, CNN

(Sept. 30, 2021), https://www.cnn.com/2021/09/30/media/ozy-work-culture/index.html ("Carlos was a bully. . . . He would do whatever it took to get what he wanted. He did not accept no for an answer."); see also, e.g., Government Exhibit ("GX") 3500-ECO-1 (former employee recounting incident in which another employee asked for a raise to account for new responsibilities and in response "Watson screamed at [her] and fired her on the spot"); GX 3500-KCR-1 (statement by former employee that "Watson was able to smell someone's weakness and then exploit it . . . [and] when it came to Watson cruelty was the point"); GX 3500-ST-2 (statement by former employee that "Watson was verbally abusive when he thought things were not being done in a timely fashion or when employees were not meeting his expectations"). Thus, Watson created an environment at Ozy where he led through fear and abuse — and as discussed more below, it was from his perch atop Ozy that he led the company, and his co-conspirators, to commit a years-long fraud.

## II.     The Offense Conduct

In or about and between 2018 and 2021, Watson and Ozy, together with Rao and Han, engaged in a scheme to defraud Ozy's investors and potential investors, lenders and potential lenders, and potential acquirors through material misrepresentations and omissions about, among other things, (i) Ozy's historical and projected financial results, (ii) Ozy's debts, (iii) the identities of Ozy's investors and the sizes of their investments, (iv) the existence and timing of investment rounds, (v) the identities of Ozy's business partners, (vi) the existence and terms of key contracts and (vii) purported offers to purchase Ozy by high-profile corporations.

### A.     Initial Misrepresentations Regarding Finances

Beginning in at least January 2018, Watson, together with Rao and later Han, misrepresented, among other things, Ozy's historical revenue in an effort to induce investors to fund Ozy. For example, Watson, together with Rao, represented to numerous investors and

potential investors that Ozy had approximately doubled its revenues from 2016 to 2017, from approximately $6 million in 2016 to approximately $12 million in 2017.  See GX 5002.  In reality, Ozy's revenue had been almost flat in 2017 and totaled less than $7 million.  See GXs 1009, 1010, 5033, 5033D.

Watson, together with Rao, further represented to investors and potential investors that Ozy would approximately double its revenue again in 2018 and would achieve revenue of $22 million.  Watson and Rao repeated this forecast to investors and potential investors in emails over the course of 2018, even after it became clear that Ozy could not achieve that result, and knowingly provided false representations on Ozy's progress towards meeting that result.  For example, on or about August 5, 2018, Watson sent an email to an Ozy investor, which email included a company update and an invitation to invest further.  The email stated that Ozy had earned $12 million in revenue in 2017 and had already booked $14 million in revenue in 2018 against its $22 million goal.  See GX 5007.  However, Watson knew at that time that Ozy had earned less than $7 million in revenue in 2017 and had not booked $14 million in revenue at that time in 2018.  Indeed, Watson received weekly internal revenue updates, and on or about August 4, 2018, Watson received an internal weekly revenue update stating that Ozy had as of that date booked approximately $8.1 million in revenue for 2018.  See GX 5006.

As another example, on or about August 27, 2018, Rao, copying Watson, sent an email to Maurice Werdegar, the CEO of Western Technology Investments ("WTI"), a venture lender.  The email from Rao to Werdegar falsely stated that Ozy had earned $12 million in revenue in 2017 and booked $14 million in revenue against its $22 million goal.  See GX 5010.  At that time, both Watson and Rao knew that Ozy had not earned $12 million in revenue in 2017, had not booked $14 million in revenue in 2018 and did not expect to earn $22 million in revenue

in 2018; this is because on or about August 17, 2018, Janeen Poutre, who ran Ozy's finance department at the time, sent an email to Watson and Rao in which she explained that she had reduced Ozy's 2018 revenue forecast from $22 million to $12.7 million.  See GX 6018.  Further, on or about August 25, 2018, Watson and Rao received a weekly internal revenue update stating that Ozy had booked only approximately $8.3 million in revenue for 2018.  See GX 5009.

At the end of 2018 and in early 2019, Watson, together with Rao, sent emails to numerous investors and potential investors in Ozy falsely representing that Ozy had achieved $22 million in revenue in 2018.  See GX 6023.  In fact, Watson knew from weekly internal revenue emails he received in December 2018 that Ozy's final revenue for 2018 was less than $11 million.  See GXs 1011, 5014, 5033D.

### B.     The Fraudulent Series C Offering

Ozy's financial difficulties persisted into late 2018 and throughout 2019.  See Tr. 357-58.  During that period, Watson, together with Rao and Han, sought to raise additional money for Ozy through the sale of preferred stock in a new "Series C" financing round.  During the Series C process, Watson, together with Rao and Han, induced and attempted to induce investors and potential investors to purchase Series C preferred shares by means of material misrepresentations and omissions regarding, among other things, Ozy's historical and projected financial results, as well as the participants in the Series C offering and the size of various individuals' and entities' investments in Ozy.

In addition, to induce investors to provide money to Ozy as quickly as possible, Watson, together with Rao and Han, misrepresented and omitted material facts regarding the timing of the Series C closing and the authorization of the Ozy Board of Directors (the "Board")

for the issuance of Series C shares.[1]  The Board did not authorize issuance of Series C shares

until September 2019.[2]  Nevertheless, beginning in at least February 2019, Watson, together with

Rao and Han, falsely claimed to certain investors that the Board had already approved the

Series C issuance and that closings were scheduled to occur on a rolling basis beginning as early

as February 2019.  As a result, Watson, together with Rao and Han, induced these investors to

transfer millions of dollars to Ozy on the basis of misrepresentations and omissions, purportedly

in exchange for shares that, unbeknownst to those investors, did not in fact exist and whose

issuance had not yet been authorized by the Board.

    For example, on or about March 1, 2019, Rao, blind carbon copying Watson,

emailed Harry Hawks, an investor from Interlock Partners, a set of purported closing documents

for the Series C.  See GX 5020.  On or about March 7, 2019, Interlock Partners wired $2 million

to Ozy, purportedly in exchange for Series C preferred stock, which in fact had not been issued

and the issuance of which had not been authorized by Ozy's Board.[3]  See Tr. 406-10.

    As another example, on or about February 25, 2019, Watson sent an email to

Marc Lasry, the principal of the investment firm Avenue Capital, to which he attached a set of

purported Series C closing documents and falsely claimed that a first Series C closing was

scheduled for that week.  See GX 6031.  In the email, Watson repeated, among other material

misrepresentations, that Ozy had earned $22 million in revenue in 2018.  See id.  The

---

[1]     Watson was the Chairman of the Board.  See Tr. 396, 638, 854.

[2]     Specifically, Ozy's Board did not authorize the issuance of the Series C shares
until on or about September 11, 2019.  See Tr. 394-95; GX 5030G.

[3]     Watson appeared to have particular difficulty remembering false financial figures
provided to Hawks over the course of the conspiracy.  On numerous occasions, Watson texted
Rao and Han while Watson was on the phone with Hawks, asking which false revenue and profit
numbers had been sent to Hawks.  GXs 3005, 3020.

attachments to this email were not real Series C documents, but were rather fraudulent documents that Rao generated, with Watson's knowledge and approval, to create the false impression that the issuance of Series C shares had been approved by the Board.  See Tr. 401-03. On or about March 21, 2019, Lasry wired $1 million to Ozy, purportedly in exchange for Series C preferred stock, which in fact had not been issued and the issuance of which had not been authorized by Ozy's Board, and a seat on the Board.  See Tr. 404-05.

Watson also made misrepresentations to international investors in connection with the Series C.  For example, in or about May 2019, Watson flew to South Korea, where he met with potential investors, including a firm called Atinum Investment.  See GX S-1.  On or about June 4, 2019, after Atinum had expressed interest in investing in Ozy, Rao, copying Watson, sent Atinum a purported income statement claiming that Ozy earned approximately $22 million in revenue in 2018.  See GXs 6044, 6044A.  As set forth above, Ozy in fact earned less than $11 million in revenue in 2018.  See GX 5033D.  After this misrepresentation, on or about July 1, 2019, Atinum wired $2 million to Ozy, purportedly in exchange for Series C preferred stock, which in fact had not been issued and the issuance of which had not been authorized by Ozy's Board.  See Tr. 420-21.

Watson, along with Rao and Han, also made numerous misrepresentations to potential investors in the Middle East, which began with false statements in connection with the Series C.  In or about March 2019, Ozy engaged an intermediary named Abbas Maniar to assist Ozy in raising funds from Middle Eastern investors.  See Tr. 1371-75.  In or about May 2019, Maniar and Watson traveled to the Middle East to meet potential investors in person, including Al-Nahdha Investment LLC and Venture Souq.  In meetings with these potential investors,

Watson falsely claimed, among other things, that Ozy had earned $12 million in revenue in 2017 and $22 million in revenue in 2018. <u>See</u> GXs 6039, 6039A.

On or about June 21, 2019, Maniar sent an email to representatives of Al-Nahdha, copying Watson and Rao, to which he attached Ozy documents provided by Rao. <u>See</u> GXs 6051, 6052. One of the attached documents purported to list committed investors in the Series C offering and falsely stated that Interlock Partners had committed to invest $10 million and that the "Lasry Group" had committed to invest $5 million. <u>See</u> GX 6052-B. In fact, Interlock Partners had invested only $2 million, and Lasry had invested only $1 million, all of which was in his individual capacity. <u>See</u> GX 19. No "Lasry Group" existed. On or about July 24, 2019 and July 26, 2019, Al-Nahdha and Venture Souq wired to Ozy $3 million and $250,000, respectively, purportedly in exchange for Series C preferred stock, which in fact had not been issued and the issuance of which had not been authorized by Ozy's Board. <u>See</u> GXs 6056A, 6057A.

### C. Misrepresentations During the Potential Acquisition by Buzzfeed

Just prior to the real Series C closing, beginning in or about August 2019, Watson began discussions with Buzzfeed, a digital media company headquartered in New York, New York, about Buzzfeed potentially acquiring Ozy and hiring Watson to work at Buzzfeed. In connection with those discussions, and in an effort to induce Buzzfeed to acquire Ozy at a higher price, Watson, together with Rao and Han, made a series of material misrepresentations and omissions about, among other things, Ozy's revenue, the existence of certain key contracts and the terms of key contracts.

For example, on or about September 26, 2019, Han sent an email to Watson to which she attached an Ozy presentation intended for Buzzfeed and in which she stated, "Samir [Rao] wanted you to take a look @ the numbers to confirm this is what we want to share." <u>See</u>

GX 6066. The purported financial results shown in the presentation were false. For example, the presentation stated that Ozy's 2018 revenue was $18.5 million, which was not only different from the fraudulent $22 million figure that Watson, Rao and Han had previously provided to Series C investors, but also was well above the true revenue of less than $11 million. See GXs 5033D, 6066A. The presentation also stated that Ozy's 2017 revenue was $12 million, which was well above the actual total 2017 revenue of less than $7 million. See id.

Soon after Han sent the presentation, Watson sent a text message to Rao and Han in which he stated that he had spoken to Han about the presentation and told her to "[m]ake sure we lead with TV/Festivals throughout the deck" and to "[u]pdate financials appropriately." GX 3058. Han then sent Watson and Rao a revised presentation for Watson's review. See GX 5032. The revised presentation altered the false numbers to, among other things, increase Ozy's projected revenue for 2020 and increase the share of Ozy's forecasted revenue in 2019 and 2020 attributed to television and events. See GX 5032A. After receiving the revised presentation, Watson sent a text message to Han and Rao, in which he stated, "Looks good overall . . . Financials — Please review numbers with Samir. Check things like comparative growth rates to make sure it will stand up to fresh scrutiny." GX 3058. Later that night, Han sent Buzzfeed a further revised presentation, copying Watson and Rao. See GX 6067. The revised presentation further increased the already false 2020 revenue forecast and again increased the share of Ozy's revenue in 2019 and 2020 attributed to television and events. See GX 6067A.

As part of due diligence for Ozy, Buzzfeed asked to review Ozy's contracts for some of its television shows. See GXs 5034, 5035, 5036. Watson, together with Rao and Han, had previously misrepresented to Buzzfeed that some of the contracts contained terms more

favorable to Ozy than the actual terms of the contracts. As a result, Rao and Han, with Watson's agreement, fraudulently altered the contracts for two of Ozy's television shows to make the contracts' terms appear to be significantly more favorable to Ozy than the true contracts were. See Tr. 541-42, 1928; GXs 2001, 2037, 5037A, 5037C. Han then emailed the falsified documents to Buzzfeed on October 16, 2019. See GXs 5037, 5037A, 5037B, 5037C.

In reliance in part on the false financial data and false descriptions of Ozy's television contract terms, Buzzfeed began preliminary discussions with Watson and Rao to potentially acquire Ozy for up to $225 million of Buzzfeed stock. See GX 6088A. Ultimately, however, the transaction did not proceed. Nevertheless, Watson, together with Rao and Han, made false claims about the negotiations with Buzzfeed in order to induce investors and potential investors to invest in Ozy. For example, on or about December 7, 2019, Watson sent a text message to Rao and Han, in which he stated: "FYI — told Abbas [Maniar] that [Buzzfeed] offered $300M to buy us." See GX 3002. As Watson knew, Buzzfeed had not offered $300 million to buy Ozy.[4] See Tr. 557-59, 2016-17.

### D. Misrepresentations to Hanmi Bank

#### 1. Fraudulent Misstatements

In or about December 2019, Ozy was again on the verge of running out of money. See Tr. 569, 1580. To address the need for cash, Watson, together with Rao and Han, attempted to induce Hanmi Bank, an FDIC-insured financial institution, to lend Ozy money based on

---

[4] Watson testified, and continues to claim even now, that Buzzfeed made five separate offers to purchase Ozy, all of which he claimed he declined after consultation with the Board. See Tr. 3204-06. This testimony was false. As the evidence demonstrated, Buzzfeed discussed only one possible offer to purchase Ozy (for $225 million), and this came after Watson and his co-conspirators had repeatedly misrepresented many aspects of Ozy's business to Buzzfeed. See GX 6088A.

misrepresentations and omissions about, among other things, Ozy's revenue, the existence of signed contracts for new Ozy television shows and the terms of such contracts.

Specifically, Watson, together with Rao, sought a loan from Hanmi Bank to be secured by anticipated revenues from a second season of Black Women OWN the Conversation ("BWOTC"), an Ozy television show whose first season had aired on the Oprah Winfrey Network ("OWN"). Because the loan from Hanmi Bank was predicated on the anticipated revenue from the second season of BWOTC, the loan could not go forward until the contract with OWN for the second season was finalized. See Tr. 570-74, 1578-80.

To induce Hanmi Bank to make the loan and make it sooner, Watson directed the then-CFO of Ozy, Tripti Thakur, to send Hanmi Bank a fake signed contract purporting to be for the second season despite the fact that negotiations with OWN were still ongoing. See Tr. 1581-83. When the Thakur refused, Watson and Rao agreed that Rao would send a fake contract to Hanmi Bank with false terms that were unrealistically favorable for Ozy and a forged signature for the representative of OWN. See Tr. 574-75; GX 6100.

Rao sent the fake contract to Hanmi Bank on or about December 30, 2019 and copied Thakur. See GXs 5042, 5042A. This fake contract contained numerous favorable terms for Ozy, including terms regarding the number of episodes and the contributions of OWN to the production budget, and a forged signature of OWN's representative. See id. Later the same day, after receiving the email with the fake contract, Thakur emailed Watson and Rao to say that she was resigning effective immediately. She explained, "this . . . is illegal. This is fraud. This is forging someone's signature with the intent of getting an advance from a publicly traded bank." GX 6100. She continued, "To be crystal clear, what you see as a measured risk — I see as a felony. Did either of you (Carlos, when you asked me to put together a contract and / or Samir,

when you sent the email) have any idea (or did it even occur to you to care) that I could go to jail for forgery and bank fraud?" Id. (emphasis in original).

### 2. Identity Theft

Despite Thakur's email, for the next several months, Watson, together with Rao, continued to attempt to induce Hanmi Bank to lend Ozy several million dollars based on misrepresentations and omissions about, among other things, the expected revenue from the second season of BWOTC. See Tr. 599-601. As these discussions continued, Hanmi Bank asked to speak to a representative of OWN. Because Watson and Rao had misrepresented the status of the relationship between Ozy and OWN and had sent Hanmi Bank a fake contract, Watson and Rao agreed that Rao should impersonate Darlene Hopkins, an actual executive from OWN, in communications with Hanmi Bank. See id. On February 13, 2020, with Watson's approval, Rao created a fake email address in Hopkins' name, without her authorization (see Tr. 1312-13), which he used to communicate with representatives of Hanmi Bank about the potential loan. See GXs 5048, 5055.

### E. Additional Misrepresentations to Al-Nahdha

In or about and between August 2019 and October 2020, Watson, together with Rao and Han, sought to induce Al-Nahdha and others to invest additional money in Ozy by means of misrepresentations and omissions regarding, among other things, Ozy's historical and projected financial results, the size of potential offers to acquire Ozy and the identities of potential investors in Ozy. Watson, Rao and Han ultimately succeeded in inducing Al-Nahdha to wire Ozy an additional $5 million, purportedly in exchange for Series D preferred shares, which at that time had not been issued or authorized by the Board.

Specifically, in an effort to induce additional investments, Watson, together with Rao and Han, repeatedly told Al-Nahdha and other potential investors through a series of

fraudulent communications that Ozy would soon have a Series D financing round led by Oprah Winfrey and Live Nation.  In fact, neither Winfrey nor Live Nation were ever in discussions to invest in Ozy, and neither ever invested in Ozy.  See GX 19; Tr. 2021-22, 2508-09.  For example:

1. On or about August 20, 2019, Watson sent an email to Maniar, copying Rao, in which Watson stated that he wanted "to confirm our Series D fundraising trip" the following month to the Middle East.  Watson wrote that he "expect[ed] to have clarity on Oprah and Live Nation" participation in the Series D offering by the time of the trip, which would be "good ammo to drive conversations."  GX 6059.

2. Also on or about August 20, 2019, Rao sent an email to Maniar, copying Watson and Han, in which Rao falsely stated, among other things, "We are pleased to share that we have commitments from both Oprah and Live Nation to lead our Series D financing round."  GX 5027.  Prior to sending the email, Rao had sent a draft of the email to Watson and Han, stating, "Are we good to send this note? Wanted to make sure we're aligned on the Series D timing / details."  Watson responded, "Yes send."  GX 5025.

3. On or about September 3, 2019, Watson, Rao and Han had a telephone call with Maniar.  During the call, Watson sent text messages to Rao containing instructions of what to say, writing "$10M committed by LN [Live Nation] and O [Oprah] — each," "$325M-pre" (a reference to the supposed valuation of Ozy in the purported Series D), and "Great job!"  GX 3507.

4. On or about January 27, 2020, Rao sent an email to Maniar, copying Watson and Han, in which he stated that "Oprah is going to double her commitment to Ozy in conjunction with the Series D."  GX 5047.  Prior to sending the email to Maniar, Rao sent a draft to Watson and Han for their review.  GX 6113.

Watson, together with Rao and Han, repeatedly provided Al-Nahdha inflated revenue figures for 2019 and inflated projections for 2020.  For example, although Ozy's actual revenue in 2019 was, at most, approximately $13 million, Watson, together with Rao and Han, falsely told Al-Nahdha that Ozy had earned $35 million in revenue in 2019.  At the same time they were providing these inflated figures to Al-Nahdha, Watson, together with Rao and Han, was providing contradictory (but also false) figures to other investors.  For example, on or about January 3, 2020, Watson sent an email to Maniar, copying Rao and Han, to which he attached a

letter stating, "Ozy revenue grew about 50% last year to $35M." GXs 6103, 6103A. However, on or about January 5, 2019, Watson sent a letter to Tom Franco,[5] another investor, that claimed that Ozy earned $30 million in revenue in 2019.[6] See GXs 6106, 6106A. As set forth above, Ozy's actual 2019 revenue was, at most, approximately $13 million. See GXs 20, 2016, 5126A.

On or about April 5, 2020, Al-Nahdha wired $3 million to Ozy, purportedly in exchange for Series D preferred stock, which in fact had not been issued and the issuance of which had not been authorized by Ozy's Board. See GX 11; Tr. 1438. On or about October 7, 2020, Al-Nahdha wired an additional $2 million to Ozy, purportedly in exchange for additional Series D preferred stock, which still had not been issued and the issuance of which had still not been authorized by Ozy's Board, which did not actually authorize issuance of any Series D preferred shares until 2021. See GX 11, Tr. 2021-22.

## F.     Additional Misrepresentations to WTI

Ozy remained heavily in debt in 2020, and much of Ozy's debt was high-interest debt requiring tens of thousands of dollars of interest payments each day, which Ozy often struggled to pay. In part to attempt to replace that debt load, Watson, together with Rao and Han, induced WTI to lend Ozy approximately $11.5 million by means of misrepresentations and

---

[5]     Franco submitted a victim impact statement, stating that Watson's fraud "has caused very significant harm to my life and those around me." PSR ¶ 78. Franco noted that the "financial loss I suffered due to this fraud was very substantial" and that his being defrauded has also "taken a severe toll on my family," weighing heavily not only on Franco himself, but also on his wife and children. Id. As someone who introduced Watson to his friends and colleagues, Franco also spoke about the harm that this fraud has done to his reputation, something that he "developed over more than 40 years in the financial industry." Id. Ultimately, Franco considered Watson a trusted friend, and Watson betrayed him, both financially and emotionally.

[6]     Prior to sending a similar letter to Lasry that falsely claimed $30 million in revenue in 2019, Watson, Rao and Han exchanged a series of text messages and emails trying to decide which false revenue figures to provide him. See GXs 3003, 6109, 6110, 6111.

omissions regarding, among other things, Ozy's historical and projected financial results, debt load and equity fundraising.  See GX 19; Tr. 2259.

For example, on or about February 11, 2020, Rao sent an email to Werdegar, copying Watson, to which he attached a presentation falsely claiming that Ozy was in the middle of a Series D financing round led by Winfrey and Live Nation and that Ozy had earned approximately $30 million in revenue in 2019.  See GXs 6121, 6121A, 6121B, 6121C.  As set forth above, each of these representations was false.  The presentation also falsely claimed that Ozy had lost only $1 million in 2019.  In fact, Ozy had lost over $6 million in 2019.  See GXs 2016, 5126A.

Among the conditions for WTI's loans to Ozy was that Ozy not have any outstanding liens from prior debts.  Although Ozy was subject to numerous liens and had significant outstanding debt, Watson, together with Rao, falsely told WTI that Ozy had no outstanding debt.  See Tr. 2246-47.  In addition, to remove liens imposed by other lenders, Rao fraudulently terminated several liens by forging emails from lenders stating that the liens had been released.  See Tr. 668-75.  Rao then represented to WTI that there were no liens against Ozy, but omitted the material fact that the pre-existing liens had been fraudulently removed.  See id.  On or about March 3, 2020, WTI wired Ozy $5 million in connection with its first loan to Ozy.  See Tr. 675, 2247.

In April and May 2020, Watson, together with Rao and Han, sought an additional loan from WTI.  On April 17, 2020, Rao, copying Watson and Han, sent an email to Werdegar to which he attached a presentation that included numerous misstatements and claimed, among other things, that Lasry and Interlock Partners had committed to additional investments in Ozy in

2020, which was not true.  See GX 6176.  On or about May 13, 2020, WTI wired Ozy $3 million in connection with a second loan to Ozy.  See Tr. 2247-48.

In or about July 2020, Watson, together with Rao and Han, sought an additional loan from WTI.  On or about July 19, 2020, Rao sent an email to Werdegar in which he falsely claimed that Ozy had earned over $18 million in revenue in the first half of 2020 and was on pace to exceed its target of $45 million in revenue for the year.  See GX 5084.  Rao also attached to the email a presentation claiming that Ozy had $14.9 million in cash as of June 30, 2020, as well as other misstatements about Ozy's investors and the size of its revenues from particular customers and partners.  Rao did not copy Watson on the email to Werdegar, but less than one minute after sending the email, Rao forwarded the email and attachments to Watson and Han. See GX 6231.  Contrary to the claims in the email and attachments, Watson, Rao and Han had been informed earlier that week by Stan Zmachynski, Ozy's then-head of finance, that Ozy was on track to earn only approximately $8 million in revenue in 2020.  See GXs 5083, 6229. Watson, Rao and Han had also been informed by Zmachynski that Ozy had less than $5 million in cash as of June 30, 2020 and had less than $4 million in cash at the time the email was sent. See id.  On July 29, 2020, WTI wired Ozy $2 million in connection with a third loan to Ozy.  See Tr. 2256.

In September and October 2020, Watson, together with Rao and Han, sought an additional loan from WTI.  On or about September 14, 2020, Rao sent an email to Werdegar soliciting an additional loan in which he claimed that Ozy was on track to earn over $52 million in revenue in 2020.  See GX 5092.  The email also attached a purported diligence file, which falsely stated, among other things, that Ozy had been profitable in the second quarter of 2020 and was expected to earn over $5 million in profit in 2020.  Before sending the email, Rao sent a

draft of the email and its attachments to Watson and Han for their review.  See GX 5091.

Watson, Rao and Han all knew that Ozy was not on track to earn $52 million 2020; one week

earlier, Zmachynski had informed Watson, Rao and Han that Ozy was on track to earn only

approximately $8.3 million in revenue in 2020.  See GXs 5089, 5089A.  Watson, Rao and Han

also all knew that Ozy was not profitable.  On or about August 12, 2020, Watson had sent a text

message to Rao in which he complained that a new person had been hired to work on one of

Ozy's newsletters, stating, in part, "Why?  WTF?  Are we profitable and I do not know it?"

GX 3525.  Ozy in fact lost over $8 million dollars in 2020.  See GXs 2016, 5126A.

    In addition, in 2020, Werdegar's daughter, Mimi, was an intern at Ozy.  See

Tr. 2256-57.  To prevent Werdegar from learning of Ozy's true financial situation, Watson, Rao

and Han reminded each other to be careful in what they said around Werdegar's daughter.  See

Tr. 2003-04.  For example, on or about August 11, 2020, Han sent a text message to Watson and

Rao in which she stated: "Need to be careful as Mimi is on . . . Her dad thinks we had a good

q2."  GX 3006.  Similarly, on or about September 17, 2020, Han sent a text message to Watson

and Rao, in which she stated: "Be careful what Mimi hear[s] . . . Maurice thinks we're doing

52."  GX 3010.  Watson responded: "Assume he is listening . . . Unequivocally [s]ay we are

doing well."  Id.  On or about October 23, 2020 WTI wired Ozy $1.5 million in connection with

a fourth loan to Ozy.  See Tr. 2258-59.

    As Werdegar's victim impact statement on behalf of WTI makes clear, Watson's

fraud struck at the heart of WTI's business and greatly damaged the company.  See PSR ¶ 77.

As Werdegar wrote, "The fraud perpetrated by Mr. Watson and Ozy is one of the most

significant — and brazen — incidents of misconduct by a portfolio company that WTI has faced

in its more than 40 years of venture lending."  Id.  In addition to the significant financial harm

18

sustained by WTI as a result of Watson and Ozy's fraud, it has also "suffered less tangible harms," including damage to its reputation as "a careful steward" of its investors' funds. Id. As the evidence at trial demonstrated, Watson and his co-conspirators repeatedly lied to and victimized WTI, obtaining over $10 million in funding based on numerous material misrepresentations without regard for the financial and reputational damage they inflicted.

### G. Attempted Fraudulent Investment from Goldman Sachs

#### 1. Material Misrepresentations

From approximately November 2020 to February 2021, Watson, together with Rao and Han, attempted to induce Goldman Sachs, a financial institution headquartered in New York, New York ("Goldman"), to invest up to $45 million in Ozy by means of material misrepresentations and omissions regarding Ozy's historical and projected financial results, debts and business relationships. Had the full $45 million investment occurred as intended, $6 million of the $45 million would have been paid to Watson personally, $3 million would have been paid to Rao and $1 million would have been paid to Han. See GX 6325A; Tr. 765-70, 2105-06.

On or about November 1, 2020, Rao, copying Watson and Han, sent an email to a Goldman employee to which he attached an Ozy investor presentation. See GXs 6293, 6293A. The presentation falsely stated, among other things, that Ozy had earned $22 million in revenue in 2018 and $33 million in 2019 and expected to earn $45 million in revenue and $4 million in profit in 2020. See id. In fact, as set forth above, Ozy's internal estimates from September 2020 predicted annual revenue of approximately $8 million, and Watson, Rao and Han knew that Ozy was not profitable. The presentation also included false claims about the size of payments by certain Ozy business partners that significantly overstated the payments by these partners to Ozy. See id. The presentation also claimed that certain individuals would be investing in Ozy's

Series D investment round, even though these individuals had not agreed to invest in the Series D offering.  See id.

On or about December 4, 2020, Rao, copying Watson and Han, sent an email to Goldman employees to which he attached a spreadsheet containing purported 2021 revenue forecasts.  See GXs 6300, 6300B.  The attachment falsely stated that Ozy had already booked approximately $39 million in revenue for 2021, approximately $5.75 million of which was purportedly payments from YouTube for the Ozy show "The Carlos Watson Show" ("TCWS").  See GX 6300B.  In fact, Ozy was not paid by YouTube to produce TCWS.  See Tr. 724, 1682-83.  Prior to sending the materials to Goldman, Rao sent a draft of the cover email and the attachments to Watson and Han for their review.  See GXs 6297, 6297B.

On or about December 9, 2020, Rao, copying Watson and Han, sent an email to a Goldman employee to which he attached due diligence materials, including a purported income statement for January through November 2020, which stated that Ozy had earned over $41 million in revenue in that period.  See GXs 6307, 6307B.  In fact, Ozy earned only approximately $11 million in revenue in all of 2020.  See GXs 20, 2016, 5126A.  The due diligence materials also again claimed that Ozy had already booked $5.75 million in licensing revenue for TCWS for 2021 from YouTube, even though Ozy never earned any licensing revenue for TCWS.  See GX 6037B.  Prior to sending the materials to Goldman, Han sent a draft of the purported diligence materials to Watson and Rao for their review.  GXs 6036, 6036B.

In connection with the ongoing due diligence process, Watson, Rao and Han agreed to deceive a third-party accounting firm, the Connor Group, by providing them with falsified financial records.  See Tr. 773-817, 2107-16.  Specifically, Rao and Han, at Watson's direction and at his urging (see GXs 3539, 3542), created a falsified version of Ozy's general

ledger, which is a document that captured a line-by-line listing of the company's transactions and accounting. See Tr. 773-817; 2107-27; GXs 6322, 6323, 6323A, 6566A. Rao and Han falsified this document in order to make the financial figures contained therein align with the fabricated numbers that they, along with Watson, had provided to Goldman. See Tr. 773-817; 2107-27. The goal of lying to Connor Group and providing them with fake financial records was to obtain the accounting firm's signoff on the legitimacy of Ozy's numbers, which could in turn be used to secure Goldman's $45 million investment. See Tr. 773-817; 2107-27.

### 2. Identity Theft

On or about January 13, 2021, as part of the due diligence process, Goldman asked Watson and Rao to arrange a meeting with someone from YouTube to discuss Ozy's relationship with YouTube. See GX 6321. Watson and Rao knew that the arrangement with YouTube that they had described to Goldman was false and that such a meeting would reveal the falsity of their representations. See Tr. 819-24. Accordingly, Watson and Rao agreed that Rao would impersonate Alex Piper, an executive from YouTube, in communications with Goldman, without Piper's knowledge or authorization. See Tr. 1683.

On or about January 28, 2021, Rao, with the agreement of Watson, created a fake email address in Piper's name. See GX 5100; Tr. 824-25. That same day, Rao sent an email to Goldman employees, copying the fake email address he had created for Piper, to purportedly introduce them all to one another. See GX 5102. The Goldman employees corresponded with who they believed to be Piper by email and scheduled a call for February 2, 2021 at 11:00 a.m. Pacific Time ("PT"). GXs 3546, 5102, 5104.

During the February 2, 2021 call between Goldman (who was represented on the call by Allison Berardo and Hillel Moerman) and Rao posing as Piper, Watson and Rao were in a room together. Rao used a voice alteration app he had downloaded to his cellular telephone to

mask his voice on the call, and impersonated Piper.  See Tr. 829-37.  On the call, Rao,

impersonating Piper, said, among other things, that he ordered a multi-episode pilot after meeting

with Watson, that TCWS had done exceptionally well in terms of viewership, and that YouTube

was expecting future seasons of TCWS and was considering whether TCWS could be

YouTube's premium talk show.  Id.; GX 3545.  These statements were false.

Throughout the call, Watson sent a series of text messages to Rao, which included

instructions of what to say and not say in order to both conceal their actual identity and convince

Goldman to invest in Ozy.  For example, at approximately 11:19 a.m. PT, Watson texted Rao, "I

am a big fan of Carlos, Samir and the show."  GX 3545.  At approximately 11:21 a.m. PT,

Watson texted Rao, "Use the right pronouns . . . You are NOT Ozy."  Id.  At approximately

11:26 a.m. PT, after Rao had repeatedly used Berardo's first name while pretending to be Piper,

Watson texted Rao, "Stop using her name."  Id.; GX 4058.

Shortly after the February 2, 2021 call, Berardo contacted the real Alex Piper,

who confirmed that he had not been on the call and that YouTube had no role in the production

of TCWS.  See GX 5106.  As a result of the impersonation of Piper on the telephone call,

Goldman ended its due diligence and did not invest in Ozy.

**H.      Misrepresentations to Lifeline Legacy Holdings**

From approximately November 2020 to February 2021, Watson, together with

Rao and Han, induced the investment fund Lifeline Legacy Holdings ("Lifeline") and related

individuals to invest approximately $2 million in Ozy by means of misrepresentations and

omissions regarding Ozy's historical and projected financial results and existing investors, as

well as the reasons that Goldman had not invested in Ozy.

On or about November 5, 2020, Han, copying Watson and Rao, sent an email to

Joseph O'Hara, a Lifeline representative, to which she attached an Ozy investor presentation.

See GXs 6293, 6293A. The presentation included misrepresentations including, but not limited to, that Ozy had earned $11 million in revenue in 2017, $22 million in revenue in 2018 and $33 million in revenue in 2019, and that Ozy was on track to earn $45 million in revenue and $4 million in profit in 2020. See id. As set forth above, Watson, Rao and Han knew that each of these claims was false.

Lifeline's investment strategy was to invest alongside larger investors. See Tr. 2371-73. On or about January 4, 2021, Watson spoke to O'Hara and falsely told him that Ozy had term sheets from three prominent financial institutions to invest in the Series D offering. See GX 1003. In fact, Ozy had not had any discussions regarding a Series D investment with any of the financial institutions Watson named except Goldman. See Tr. 852-53.

On February 15, 2021, O'Hara spoke to Watson by telephone. See GX 1005_R. During the call, Watson falsely stated that Ozy was significantly overperforming its financial goals and, as a result, Watson no longer wanted to move forward with the investment from Goldman or the Series D offering at that time. See id.; Tr. 2374-75. Watson omitted the true reasons that Goldman would not be investing in Ozy, including the impersonation of Piper.

On or about February 17, 2021, Rao spoke to O'Hara and falsely told him that the Ozy Board had agreed that Lifeline could invest in the Series C offering at the Series C valuation level, which was significantly lower than the purportedly anticipated Series D valuation level. See Tr. 853-54. On February 17, 2021, Rao sent an email to O'Hara to which he attached fabricated documents for a Series C closing. See GX 6365. In response to the email, O'Hara said that Lifeline might be willing to invest up to $2 million. Rao forwarded the email thread to Watson and Han. See GX 6366. Then, on or about February 23, 2021, Lifeline, along with

individual partners in Lifeline and their families, wired a total of $2 million to Ozy, purportedly in exchange for Series C preferred stock.  See Tr. 2376-79.

## I.     Attempted Fraudulent Investment from Google

From approximately March 2021 to May 2021, Watson, together with Rao and Han, attempted to induce Google to invest $25 million in Ozy by means of misrepresentations and omissions regarding, among other things, Ozy's historical and projected financial results and investors.  More specifically, beginning in approximately November 2020, Google considered hiring Watson to lead Google's news business.  In discussions with Watson about the potential position, Google informed Watson that he would have to leave Ozy if he were to take the role.  See Tr. 1645-47.  Because Watson's leaving would potentially harm Ozy's business, in or about March 2021, Google and Watson began discussing the possibility that, if Watson were hired by Google, Google would invest $25 million in Ozy's Series D offering to help smooth Watson's transition away from Ozy.  See GX 5109; Tr. 1656-59.  Watson requested that $5 million of Google's investment would be paid personally to Watson, Rao and Han.  See id.

On or about March 16, 2021, Watson sent a text message to Rao and Han in which he stated that he had a "[g]ood convo" with Google and that he "told them $300M pre . . . and EC [Emerson Collective] as the lead.  I should have said Lasry."  GX 3015.  In fact, Emerson Collective was not the lead investor in the Series D round, and neither Emerson Collective nor Lasry was investing in the Series D offering.  See GX 19A; Tr. 2059.  The next day, March 17, 2021, Rao sent an email to two Google employees, copying Watson and Han, which included a summary of the purported Series D terms and an investment presentation.  See GXs 6386, 6386A.  In the email, Rao falsely claimed that the Series D offering would be led by Lasry.  See id.  The presentation attached to the email contained false and inflated revenue figures for 2017, 2018, 2019 and 2020.  See id.

Conversations between Google and Watson about Watson leaving Ozy to come work for Google continued through approximately May 2021. Throughout those conversations, Google was clear that any investment by Google in Ozy was contingent on Watson leaving Ozy to come work for Google, and that Google would not lead any investment round. See Tr. 1648-50, 1663-66. At approximately the end of May 2021, Watson withdrew from consideration for the position at Google, and Google did not ultimately invest in Ozy.

J.      **Misrepresentations to Antara Capital**

From approximately March 2021 to August 2021, Watson, together with Rao and Han, induced Antara Capital, an investment firm headquartered in New York, New York, to invest $22.5 million in Ozy by means of material misrepresentations and omissions regarding, among other things, Ozy's historical and projected financial results, debt and investors, as well as misrepresentations regarding purported offers to purchase Ozy.

On or about April 21, 2021, Watson sent an email to Rao and Han, in which he asked Rao to send Ozy's Series D investor presentation to Chetan Bansal, a partner at Antara. That same day, Han emailed a Series D investor presentation to Watson, Rao and Bansal. See GXs 5423, 6423A. The presentation falsely stated that Ozy had earned $46 million in revenue and $4 million in profit in 2020, when in fact Ozy had earned only approximately $11 million in revenue that year and had lost over $8 million. See id.; GXs 20, 2016, 5126A. The presentation also claimed that the Series D offering was being led by Google, which would invest $30 million. As noted above, Google had never agreed to lead the Series D offering and had not agreed to invest $30 million. The presentation also omitted that any investment by Google was contingent on Watson leaving Ozy to work at Google. On or about April 22, 2021, Watson spoke with Bansal and repeated the false claims that Ozy had earned $46 million in revenue in 2020 and that Google would be investing $30 million. See GX 5113; Tr. 2530-32.

As discussions between Ozy and Antara progressed, on or about May 5, 2021, in response to due diligence questions, Han sent an email to Bansal, copying Watson and Rao, in which she stated that Ozy had booked revenue of $35.8 million for 2021.  See GX 5115.  That claim was false.  Less than 24 hours earlier, Han had sent to Watson and Rao an email in which she stated that the total revenue booked for 2021 was $13.3 million as of May 4, 2021.  See GX 6439.

On or about May 17, 2021, Antara wired Ozy $20 million, purportedly in exchange for Series D shares.  See GX 3019.  Over the following several days, Antara representatives repeatedly asked for confirmation that Google, who Antara had been told by Watson, Rao and Han was the lead investor, had also closed on its investment in Ozy.  Rao, working in coordination with Watson, repeatedly assured them that Google would be closing soon, which was false.  For example, on or about May 18, 2021, Rao sent an email to Bansal, in which he falsely stated that "Google gave us a heads up that they should be closing tomorrow given the focus on their [developer] conference today."  GX 6453.  Although Rao did not copy Watson on the email, prior to sending it, he sent Watson a text message containing the draft language for the email for Watson's approval.  GX 3556.  And later on or about May 18, 2021, Rao sent an email to Antara in which he falsely stated that "remaining investors are coming in this week, and in Google's case, facilitating the close is just mechanical at this point."  GX 6455.  Although Rao did not copy Watson on the email, prior to sending it, he sent Watson a text message containing the draft language for the email for Watson's approval.  GX 3556.

Despite these assurances, on or about May 19, 2021, Bansal asked Rao to reverse the wire and return Antara's money so that Antara could close at the same time as Google.  See GX 6455; Tr. 2545.  Desperate not to lose the $20 million investment — and knowing that

Google was not investing at all — Watson and Rao agreed to make additional false statements to Antara. Specifically, on or about May 20 and 21, 2021, on calls with Bansal, Watson falsely claimed that he had spoken to Sundar Pichai, the CEO of Google, who said that Google was not going to be investing in Ozy's Series D offering because Google instead wanted to purchase Ozy for $600 million. See GXs 5123_R, 5127; Tr. 2550-51, 2556-59. In fact, Google and Pichai had never offered to purchase Ozy at any price. See Tr. 1739. Watson eventually told Bansal that Watson had decided not to sell Ozy to Google, and Antara proceeded with its $20 million investment in Ozy, believing that a $600 million acquisition offer had been made. See Tr. 2559-60.

### K. Misrepresentations for a Series E Fundraising Round

From approximately August 2021 to September 2021, Watson, together with Rao and Han, attempted to induce potential investors to invest in a purported Series E fundraising round based on continued misrepresentations about Ozy's historical and projected financial results. For example, on or about September 21, 2021, Watson sent an email to a potential investor in which he claimed that he expected Ozy to earn approximately $94 million in revenue in 2021. See GX 6547. This was a lie; just three days after this email, Han reported to Watson and Rao that Ozy had booked only $34 million for 2021 as of September 24, 2021. See GX 6553. Moreover, Ozy's internal accounting demonstrated that the company ended up earning only a little over $16 million for 2021. GXs 20, 2016. Watson also claimed in his email that Ozy had earned $50 million in revenue in 2020, when the true number was approximately $11 million. See id.

### III.     Watson's Obstructive Conduct

#### A.     Pre-Indictment

From the onset of the government's investigation, Watson attempted to conceal the scheme and his role in it.  After both Watson and Ozy received grand jury subpoenas, Watson and Ozy produced some responsive materials but did not produce clearly responsive documents that incriminated Watson.  For example, Watson and Ozy did not produce emails showing that Watson received regular updates on Ozy's true financial performance, which drastically contradicted the information Watson provided to investors.  Watson and Ozy additionally withheld the resignation email that Thakur sent to Watson and Rao after Rao sent a falsified contract to Hanmi Bank — which Watson had previously instructed Thakur to do and which she had refused to do.  See GX 6100; Tr. 1581-83.  In the email, Thakur described Watson's and Rao's conduct as "illegal," a "fraud," and a "felony."  GX 6100.  These withheld materials were plainly inculpatory, and Watson and Ozy's failure to produce them evidences an attempt to prevent the government from uncovering the depth of Watson's crimes.

Watson's obstruction extended to attempts to tamper with witnesses and retaliate against individuals he believed were cooperating with the government's investigation.  At the beginning of the investigation, Watson agreed on behalf of Ozy that Ozy would pay Rao's and Han's legal bills.  As to Rao, however, Ozy required Rao to sign a document claiming that Rao had acted in good faith at all times, a claim that Watson well knew was false.  For a time, Ozy did in fact pay Rao's and Han's bills.  In late December 2021, however, then-counsel for Ozy spoke separately with counsel for Rao and counsel for Han and told them that Ozy would no longer pay their legal bills because Ozy believed they were cooperating with the government's investigation.  At the time of these decisions, Watson was the only executive at Ozy and the only person at Ozy with authority to make such a decision.  See Tr. 940-43.

In January 2022, after counsel for Rao challenged the legality of Ozy's actions, then-counsel for Ozy wrote to counsel for Rao and stated that Ozy would be willing to pay Rao's legal bills only if Rao signed a second affirmation re-affirming that Rao had acted in good faith, which Rao refused to do. Later that month, counsel for Rao spoke with then-counsel for Watson, who reiterated that Ozy would not pay Rao's legal bills because of the belief that Rao was cooperating with the government. See GX 3500-SR-3.

During 2022, while the investigation remained pending, Watson hired accountants to retroactively alter Ozy's books and records to increase the amount of revenue recorded in an attempt to obscure his fraud. Unaltered records for the years 2015 to 2018 had been requested pursuant to the outstanding grand jury subpoenas but were never produced, and defense counsel has indicated that those unaltered records are now inaccessible. See Tr. 744-48, 758-59, 957-64.

B.    Post-Indictment

Watson was indicted in February 2023, following which he was arrested and released on bail. After his indictment, Watson and his attorneys continued to obstruct the investigation by refusing the produce documents responsive to the grand jury subpoenas. Even after the Court ultimately issued an order to compel production of materials by Watson, he largely ignored that order and continued to withhold documents, several of which were first produced as defense exhibits in the middle of trial, and many of which have never been produced to this day. See ECF No. 257 (memorandum and order precluding testimony of a defense witness and citing willful violations of the Court's orders regarding notice and discovery by defense counsel).

Then, in December 2023, in violation of the Court's protective order, Watson used discovery materials produced in this case to sue a victim in the case, Buzzfeed, and others. In particular, in his civil complaint, Watson quoted from internal Buzzfeed documents that had

been produced in discovery, which was explicitly in violation of the Court's protective order. That civil case was dropped a week after Watson was convicted, suggesting that the lawsuit was intended all along to harass victims and potential witnesses.

C. **During Trial**

Watson's misconduct continued throughout the trial itself. For example, Watson repeatedly smuggled phones into the courthouse and lied to court security officers about his possession of phones. Even after being ordered by the Court to stop bringing phones, Watson continued smuggling in phones on at least two occasions, during which he falsely indicated that he did not have phones on him when he in fact did, and on at least one occasion, he falsely told a security officer that the electronic device in his bag that was visible in the x-ray machine was a charger, when it was in fact a phone. See, e.g., Tr. 2642-2643 (Court observing that a phone just rang at counsel table to Watson's righthand side and stating, "And, again, I put this in the category of inexplicable. There is no explanation for it other than the total and brazen disregard of the rules and practices of this Court.").

In addition, after the Court became aware of numerous inappropriate public statements made by the defense team and their surrogates, the Court issued a special order forbidding public statements about the case. See ECF No. 194. Despite this Court order, Watson continued to publish a website about the case, tooblackforbusiness.org, that was rife with the sort of statements the Court's order forbade. That website remained live for several weeks after the Court's order until the government specifically called it to the Court's attention, after which it was taken down within 24 hours.[7] Social media accounts for the website repeating much of the same content continued to remain available online.

---

[7] As discussed below, the website is now back up and running.

Finally, Watson testified for multiple days and perjured himself, as the Court found, thereby committing further illegal activity.  See Tr. 4598, 4604.  For example, Watson testified extensively about the Ozy "board meetings" at which financial figures, acquisition offers and other key information were purportedly presented.  E.g., Tr. 2913, 2930-31, 2996-3000, 3025, 3039-43, 3178-85, 3204-07, 3227-29, 3434, 3467-69, 3556-60.[8]  These board meetings did not occur.  Watson also testified about a video that Winfrey created for Ozy (which was essentially a commercial for BWOTC, which aired on her network) that he claimed was conservatively valued at $20 million in revenue and was shown in both board meetings and to start investor meetings.  See Tr. 2927-32.  Investors were never shown this Oprah video, the board meetings never happened, and any valuation of the video did not occur at the time.  Watson also testified about meetings with and representations from high-ranking business executives — like Tina Perry, the president of OWN, and Jonah Peretti, the CEO of Buzzfeed — that never took place.  See Tr. 3091-92, 3201-06.  Watson even told an elaborate story about his actions and movements on the morning of February 2, 2021 — the day of the Piper impersonation call — in which he claimed to retrace his exact steps and which ended with him desperately trying to get an incoherent Rao to end the call.  See Tr. 3160-70.  This was a lie:  Rao was entirely cogent, Watson was in the room, coaching him via text message (as the jury saw), and Watson's minute-by-minute recitation of events was clearly false because he was three hours off about the time of the call.  GXs 3545, 3546.

These examples are just a fraction of the lies that Watson told from the stand, over the course of multiple days, about his conduct in connection with the charged offenses.

---

[8]     Notably, Watson provided such testimony after the government had rested without calling any Board members to testify.

## IV.     Post-Trial Conduct

Watson's efforts to avoid responsibility continued after his conviction.  The tooblackforbusiness.org website that he took down during trial is back online.  In various locations on the website, Watson accuses the prosecutors assigned to this case of engaging in selective prosecution (e.g., https://www.tooblackforbusiness.org/cw/cw-selective-prosecution) and specifically claims that "[a] biased, largely white jury and a hostile white judge (Eric Komitee) in Brooklyn railroaded [him]" (https://www.tooblackforbusiness.org/cw/cw-unfair -trial).  He and his allies released a second movie about his case — The Troubling Case of Carlos Watson Part 2: Whose Son Is Next?, https://www.youtube.com/watch?v=P-JIsNxptYQ — that in addition to repeating prior attacks on the prosecution and the Court, includes numerous drawings depicting them as demonic figures, such as the below:





Picking up on some of the subtext of Watson's claims, one supporter has published a series of articles suggesting that the prosecution was biased and the Court corrupt, including one suggesting that the proceedings are part of some kind of Jewish conspiracy.  See, e.g., Frank Parlato, <u>Wealthy Judge, Familiar Faces: How the Carlos Watson Trial May Have Been Pre-Determined</u>, The Frank Report (Sept. 29, 2024), https://frankreport.com/2024/09/29 /wealthy-judge-familiar-faces-how-the-carlos-watson-trial-may-have-been-pre-determined; <u>see also</u> Frank Parlato, <u>96% Market Moves, 4% Justice: Meet Wall Street's Favorite Judge Eric Komitee</u>, The Frank Report (Nov. 27, 2024), https://frankreport.com/2024/11/27/96-market -moves-4-justice-meet-wall-streets-favorite-judge-eric-komitee.[9]

---

[9]      The author of these posts, Frank Parlato, featured prominently in the second movie discussed above and has stated that he was hired "to investigate and report on the federal convictions of Carlos Watson, Samir Rao, Suzee Han, and Ozy Media Inc."  Frank Parlato, <u>Samir Rao's Transformation: From Culprit to Cooperating Witness in Ozy Media Scandal</u>, The Frank Report (Sept. 14, 2024), https://frankreport.com/2024/09/14/samir-raos-transformation -from-culprit-to-cooperating-witness-in-ozy-media-scandal.

In the last several weeks, Watson has gone on a publicity tour of sorts, giving several interviews in which he repeats his claims of innocence, prosecutorial misconduct and judicial corruption.  See, e.g., Way Up With Angela Yee, <u>Carlos Watson Talks Indictment, Ozy Media Charges, Legal Battles, Judge's Goldman Sachs Ties + More</u> (Nov. 21, 2024), https://www.youtube.com/watch?v=5Vk7Vl7lV4M; Unwine with Tasha K, <u>Rising Black Billionaire Carlos Watson Opens Up about Facing 40 Years in Prison! | Full Interview</u> (Nov. 25, 2024), https://www.youtube.com/watch?v=uzF-w42Tjss; Brent Cassity - Nightmare Success, <u>EXPOSED: Lies, Justice, and Carlos Watson's Fight for Freedom</u> (Nov. 28, 2024), https://www.youtube.com/watch?v=UtfllVrTrKU.  In these interviews, in addition to other claims (such as comparing his trial to a lynching), he has begun making the claim that Rao and Han were having an affair — a gratuitous personal attack that he knows is completely false and which serves no purpose at this point other than to defame.[10]

**LEGAL PRINCIPLES**

I.      **Sentencing Generally**

In the Supreme Court's opinion in <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), which held that the Guidelines are advisory rather than mandatory, the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence, but also may "tailor the sentence in light of other statutory concerns."  <u>See</u> 18 U.S.C. § 3553(a).  Subsequent to <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005).

---

[10]      The government respectfully urges the Court to watch these interviews to see Watson address the case in his own words and to fully appreciate Watson's rejection of responsibility, attempts to undermine public confidence in his conviction, and attacks on others.

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Id. at 49. Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act — "to diminish unwarranted sentencing disparity." Id. at 354.

The Supreme Court has recognized that "it is uncontroversial that a major departure should be supported by a more significant justification than a minor one." Gall, 552

U.S. at 50.  If the court decides to impose a non-Guidelines sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Id.

## II.    The Effect of Section 1028A (Count Three)

"As a general matter, [the sentencing statutes] permit a court imposing a sentence on one count of conviction to consider sentences imposed on other counts."  Dean v. United States, 581 U.S. 62, 67 (2017).  Thus, for example, where a defendant faces a mandatory consecutive sentence pursuant to 18 U.S.C. § 924(c), a court may reduce the sentence on another count from what the court might have otherwise imposed to achieve what the court determines to be an appropriate total aggregate sentence.  See id. at 67-71.

That general principle does not apply to convictions under 18 U.S.C. § 1028A. Under that statute, "in determining any term of imprisonment to be imposed for the felony during which the means of identification was transferred, possessed, or used [here, Count Two], a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of [§ 1028A]."  § 1028A(b)(3).  In other words, "in calculating the sentence for the predicate offense, a judge must ignore the fact that the defendant will serve the mandatory minimum[] imposed under [§ 1028A]."  Dean, 581 U.S. at 64, 70 (rejecting government argument that such a rule applies to § 924(c) but stating that "Section 1028A says just what the Government reads § 924(c) to say"); see also United States v. Adekanbi, 675 F.3d 178, 187 (2d Cir. 2012) ("The statute . . . required the court not to consider this mandatory minimum in determining the appropriate sentence for the other convictions.").

Accordingly, when applying the § 3553(a) factors, the Court should determine the sentence that it believes is appropriate for Count Two without giving any consideration to Count

Three.  Once the Court imposes that sentence on Count Two, the Court should then impose on

top of that the two-year consecutive sentence on Count Three.[11]  As numerous courts of appeals

have held, to do otherwise and to consider the total sentence including Count Three when

deciding the sentence for Count Two may be reversible error.  See, e.g., United States v. Yusuf,

781 F. App'x 77, 80-81 (3d Cir. 2019) (vacating sentence where district court "referenced its

position that it could not ignore Yusuf's sentence on [the § 1028A count] because to do so would

risk 'a form of double counting'"; "The Supreme Court as well as the First, Seventh, Eighth,

Ninth, and Tenth Circuits have explained that under § 1028A, a sentencing court cannot reduce

the sentence it would have otherwise imposed on a predicate conviction because of the

knowledge of a defendant's two-year mandatory minimum sentence for aggravated identity

theft."); United States v. Lara, 733 F. App'x 433, 436, 438-39 (10th Cir. 2018) (vacating

sentence where district court stated "that 'the fact that Lara will be required to spend an

additional two years beyond the six months as to [other] counts' informed its decision to

sentence Lara to six months in prison for those counts"; "under the plain language of § 1028A,

the district court was precluded from considering § 1028A(a)(1)'s mandatory two-year sentence

for aggravated identify theft in crafting Lara's sentences for bank fraud"); United States v.

Guillen-Esquivel, 534 F.3d 817, 818 (8th Cir. 2008) (vacating sentence where district court

imposed below Guidelines sentence on predicate offense because district court thought "the

---

[11]        The Court could theoretically reduce the sentence on Count One to account for
the sentence on Count Three, while not reducing the sentence for Count Two.  See United States
v. Wahid, 614 F.3d 1009, 1014 (9th Cir. 2010) ("The statutory language is clear.  While a district
court may not reduce the sentence of a predicate felony to compensate for the mandatory two-
year consecutive term, it may exercise its discretion to reduce a sentence for a non-predicate
felony." (emphasis in original)).  Because Counts One and Two group for purposes of the
Guidelines and because Count Two has a significantly higher statutory maximum, it is unlikely
that any reduction in only Count One would impact Watson's total sentence.

guidelines sentence in conjunct with the two-year mandatory sentence is excessive"; "The statute required the district court to ignore altogether the twenty-four month sentence [on the § 1028A count] when imposing a sentence for the [underlying offense]"); see also United States v. Diawara, 797 F. App'x 672, 674 (2d Cir. 2020) (§ 1028A "explicitly prohibits a sentencing court from lowering the punishment for other crimes to compensate for the imposition of [the] mandatory consecutive sentence").

## THE GUIDELINES

### I.    The Guidelines Calculation

The government submits that the Guidelines offense level for Counts One and Two is correctly set forth in the PSR at paragraphs 84 through 99.  Specifically, the government and the PSR calculate the Guidelines offense level as follows:

|  |  |  |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2X1.1(a), 2B1.1(a)(1)) | | 7 |
| Plus: | Loss in excess of $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | $1 million in gross receipts from one or more financial institution (U.S.S.G. § 2B1.1(b)(17)(A)) | +2 |
| Plus: | Organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)) | +2 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | | 39 |

Based on a criminal history category of I (PSR ¶ 102), this yields a Guidelines range of imprisonment for Counts One and Two of 262 to 327 months.  When the two-year mandatory minimum sentence for Count Three is included, the total Guidelines range is 286 to 351 months' imprisonment.

## II.     Watson's Objections Should Be Rejected

Watson has raised numerous objections to the Guidelines as calculated in the PSR.  See ECF No. 341 ("Def. PSR Obj.").  As set forth in the government's responses to those objections, none have merit.  See ECF No. 349 ("Gov. PSR Resp.") at 3-4, 5-7.  For the reasons set forth in the government's responses to Watson's PSR objections, which the government incorporates herein by reference, each of those objections fail, and the Court should adopt the PSR's calculations of the Guidelines.

## III.    The Obstruction Enhancement

In order to impose a two-point enhancement under U.S.S.G. § 3C1.1 for perjured trial testimony, a district court must "make findings to support all the elements of a perjury violation in the specific case, namely, that the defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  United States v. Rosario, 988 F.3d 630, 633 (2d Cir. 2021).  "It is preferable for a district court to address each element of the alleged perjury in a separate and clear finding, although the court can also satisfy these requirements by finding an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury."  Id. The government respectfully requests that the Court make those findings as to Watson's testimony.  Such findings could be made with respect to any number of Watson's lies at trial, some examples of which are described below:

1.      Watson denied planning and participating in Rao's impersonation of Alex Piper. See Tr. 3160-71.  In fact, as Rao testified, and as was corroborated by text messages and a calendar invite, Watson was part of the plan from the beginning, had a practice call with Rao using the voice changing application beforehand, and texted Rao about what to say during the call.  See Tr. 821-37; GXs 3545 (text messages), 3546 (calendar invite).  This false testimony was willful and intentional — indeed based on errors in the timeline in Watson's false version of events that mirrored errors in the indictment, it was apparent that he had crafted it specifically to respond to the indictment.  See Tr. 3631-42, 3646, 3649-50.  It was

also material to every count, as it demonstrated Watson's agreement in a scheme to defraud Goldman Sachs in connection with a securities transaction, using wires, and using a stolen identity.

2.    Watson denied any involvement in Rao's sending a fake contract for season 2 of BWOTC to Hanmi Bank.  See Tr. 3094-96.  In fact, as Rao testified, Watson had directed him to send the fake contract (see Tr. 572-75), and as Thakur testified, Watson had instructed her to draft a fake contract (see Tr. 1582-84).  This false testimony was also willful and intentional and was material to each count, as Watson's role in that part of scheme corroborated his involvement in the overall scheme.

3.    Watson denied telling Chetan Bansal that Google wanted to purchase Ozy for $600 million, going so far as to accuse Bansal of lying about it.  See Tr. 3252-53.  But as Bansal — who had no incentive to lie — credibly testified, Watson had made such a claim to him on multiple occasions.  See Tr. 2556-60.  This false testimony was also willful and intentional and was material, at a minimum, to Counts One and Two.

4.    Watson repeatedly claimed that he had discussed a possible investment by Oprah Winfrey — or maybe Discovery on behalf of Ms. Winfrey or OWN — in 2019 with Dan Fox and others.  See Tr. 3099-3104, 3113-14, 3691-93.  After the government informed defense counsel that it would call Dan Fox as a witness, Watson backtracked and attempted to remove Fox from his story.  See Tr. 3887-89, 3972-76.  When Fox testified, he denied ever having such conversations and denied speaking to Watson at all in 2019 or any time thereafter.  See Tr. 4005-08.  That testimony, including Watson's effort to change his story, was willful and intentional, and the veracity of Watson's claims to investors that Ms. Winfrey was investing in Ozy was material, at a minimum, to Counts One and Two.

## THE APPROPRIATE SENTENCE

## I.    The Court's Questions

The Court has directed the parties to address two specific questions in connection with sentencing:

1.    What proportion of the funds raised via the charged scheme flowed into the operations of Ozy Media's business, versus flowing to Mr. Watson or other individuals?

2.    Which federal criminal cases from the last (roughly) fifteen years presented the most comparable sets of sentencing factors, and why?

ECF No. 313.  The government's responses are set forth below.

A.    **The Uses of the Fraudulent Proceeds**

Virtually all of the money raised through the charged scheme flowed into Ozy's business. The government, however, submits that attempting to trace money to Ozy versus money to Watson presents a false dichotomy. Ozy was at all times wholly controlled by Watson and operated primarily for his benefit, and in particular to serve his vanity and hunger for fame. See Steven Perlberg, April Joyner, JP Mangalindan & Claire Atkinson, 18 current and former Ozy employees say there've been widespread internal doubts about the company's stated audience, 80-hour work weeks, and a 'cult of Carlos', Business Insider (Oct. 1, 2021), https://www.businessinsider.com/ozy-media-staffers-describe-hard-driving-culture-metrics -concerns-2021-9 (quoting former employee describing Ozy as the "cult of Carlos"). Money flowing to Ozy thus directly benefited Watson and served his interests.

Ozy had television shows, podcasts and festivals, but the uniting thread among them all was placing Watson front and center. Indeed, by the end of 2020 and continuing to the end of the scheme, Ozy had only one television show: The Carlos Watson Show. That show exemplified Ozy's ultimate purpose. Money obtained through the fraudulent scheme was used to produce a high-gloss series about Watson speaking to celebrities. See Tr. 2068 (testimony by Han that The Carlos Watson Show spent more than $150,000 per week on payroll alone). All of Ozy's office space was converted into a studio for that one show. See Tr. 777. To attempt to build an audience to watch Watson's show, Watson insisted that Ozy spend money obtained through the fraudulent scheme to buy ads across the country — posters, billboards, and bus advertisements — almost all of which prominently featured Watson's face and all of which featured his name. See id. ("[W]hile running that show, we were paying for marketing for that show, posters, radio ads, social media, as well as YouTube ads, that Carlos wanted to run for his show every single week."); see also Tr. 2005 (testimony by Han describing the advertisements

for the show: "There is a poster with Carlos' face on it, it says The Carlos Watson Show with some catchy quote on it.  There is a poster we ran that had Carlos' face with The Carlos Watson Show and a collage of celebrity guests behind in the poster.  I think if we did not have -- if we had a poster without Carlos' face on it, we would very clearly say The Carlos Watson Show on it.").  When no audience materialized, Ozy spent money obtained through the fraudulent scheme to purchase views to create the veneer of success, leading to comically distorted viewing figures, with some episodes reflecting "fewer than 100 views, while others have hundreds of thousands or more than a million views," Ben Smith, Ozy Built a TV Show on a False Claim, Says Its Former Producer, N.Y. Times (Sept. 30, 2021), https://www.nytimes.com/2021/09/30/business /media/ozy-media-carlos-watson.html, and with many of the videos that had supposedly been viewed millions of times lacking any meaningful user engagement, see, e.g., https://www.youtube.com/watch?v=LsjTXkkCi74 (episode of The Carlos Watson Show with 4.2 million views but only 252 "likes" and 62 comments, including the comment, "Can someone explain how this video has 4.1M Views but has 200 likes?????.... and Less than 40 comments as of March 3, 2021").

The government respectfully submits that the fact that a defendant chooses to use the proceeds of the fraud to further his goals of fame or influence or the illusion of business success instead of funneling the illicit proceeds toward luxury items or a personal bank account has no bearing on his culpability or any other sentencing factor.  To give an example, if two men rob a bank, and one man uses his money to buy a yacht and the other invests the money in a production company to make a television show about himself, there can be no argument that this makes one more or less culpable than the other — they just have different priorities about how to spend their money.  The same is true here.

Moreover, while Watson did not pocket large sums of money, that was not for lack of trying. In each of the Buzzfeed, Goldman Sachs, Google, and Antara deals, Watson unsuccessfully attempted to extract millions of dollars for himself. See Tr. 563-64 (Rao discussing Watson's desire for cash as part of a Buzzfeed deal), 1657-59 (Donald Harrison discussing Watson's request for a $5 million payout as part of the Google deal), 1756-57 (Hillel Moerman discussing Watson's request for a payout of $6 million as part of the Goldman deal), (Bansal discussing Watson's request for a payout of $10 million as part of the Antara deal). And given Watson's large ownership stake in Ozy, there is no way to disentangle his purported belief that his fraud would lead to Ozy's success from his own financial gain. See Tr. 198 (testimony of Rao) ("[O]ur hope was that if Ozy was successful, if the company was successful, that would lead to success for us in a number of ways, but ideally, also including financial success for us."). The fact that the scheme unraveled before Watson had the opportunity to profit also does not in any way mitigate his conduct.

## B.    Comparable Cases

The government respectfully submits that while no case can present a perfect comparison to another, the below listed cases are the most comparable to this case that the government has identified. In particular, like this case, these cases involve the leader of a business falsifying financial and other results to induce investments in the company. None, however, involve the unusual levels of obstruction and attacks on the judicial process present here. In addition, none involved a mandatory consecutive two-year sentence for aggravated identity theft.

United States v. Ebbers, No. 02-CR-1144 (BSJ) (S.D.N.Y.). Ebbers was the CEO of WorldCom, a publicly traded global telecommunications company. Ebbers was convicted of engineering a scheme to disguise WorldCom's declining operating performance by falsifying its

financial reports.  Like Watson, Ebbers instructed his employees to tell investors that his company was hitting growth and revenue targets despite knowing that those financial benchmarks had not been achieved.  Although the WorldCom fraud involved a publicly traded company and generated a more significant windfall for the defendant, the core misconduct was the same: a powerful CEO insistently lying to investors about his company's financial performance rather than acknowledge losses or periods of stagnancy.  See United States v. Ebbers, 458 F.3d 110, 129-30 (2d Cir. 2006) (noting that "the securities fraud here was not puffery or cheerleading," but rather was "specifically intended to create a false picture of profitability").  Ebbers was convicted after a jury trial; his advisory Guidelines range was 30 years to life imprisonment (which did not include an enhancement for obstruction of justice), and he was sentenced to 25 years' imprisonment.

United States v. Kirchner, No. 23-CR-127 (N.D. Tex.).  Kirchner was the founder and CEO of Slync, a supply chain management software company.  Over the course of approximately two years, Kirchner raised approximately $71 million from numerous investors based on false representations about Slync's business operations, financials, customers and revenues — actions very similar to the misconduct undertaken by Watson and his co-conspirators.  Kirchner also attempted to raise funds with a Series C investment round that had never been authorized by the Board of Directors, something that Watson did as well.  Kirchner was convicted at trial of multiple counts of wire fraud and engaging in monetary transactions in property derived from specified unlawful activity — Kirchner, unlike Watson, misappropriated

millions of dollars for lavish personal expenses — and was sentenced to 240 months' imprisonment.[12]

United States v. Rigas, No. 02-CR-1236 (LBS) (S.D.N.Y.).  John and Timothy Rigas were the CEO and CFO, respectively, of Adelphia Communications Company, a publicly traded cable television provider.  The offense conduct underlying the Rigases' convictions has multiple components, including fraudulent stock purchases, fraudulent accounting and misappropriation for personal expenses.  However, the Rigases were also convicted of fraudulently misrepresenting Adelphia's financial performance — specifically, by artificially inflating the EBITDA conveyed to investors and to bank lenders.  This type of misrepresentation tracks closely the type of misrepresentations made by Watson and his co-conspirators to Ozy's investors and lenders as well, and like the Rigases, Watson directed the fraud from the top.  See United States v. Rigas, 490 F.3d 208, 217-18 (2d Cir. 2007).  Unlike Watson, neither of the Rigases perjured themselves at trial.  See id. at 219.  After their conviction by a jury, the Rigases' Guidelines range was life imprisonment; Probation recommended a ten-year sentence for John and a twenty-year sentence for Timothy.  United States v. Rigas, 583 F.3d 108, 112 (2d Cir. 2009).  John and Timothy received sentences of 12 and 17 years, respectively.

United States v. Holmes and Balwani, No. 18-CR-258 (EJD) (N.D. Cal.). Elizabeth Holmes and Ramesh Balwani were the CEO and COO, respectively, of Theranos, a privately held health technology company that raised hundreds of millions of dollars from venture capitalists based on its claims that it had developed a revolutionary blood testing device.

---

[12]     https://www.justice.gov/usao-ndtx/pr/slync-founder-sentenced-20-years-federal -prison-fraud.

In connection with their roles leading Theranos, Holmes and Balwani were convicted of conspiracy to commit wire fraud and wire fraud.

Although Theranos's product was quite different than Ozy's, the lies that Watson told investors were very similar to those told by Holmes and Balwani — all lied about revenue and contractual relationships to outside investors while silencing or ignoring concerns raised by employees. Both sets of founders fully embodied the "fake it till you make it" approach and used it as a justification for their behavior. Like Holmes specifically, Watson played up his image as a charismatic founder, drawing investment to his company based on a success story that he knew was not true, all while actively courting as much press and personal attention as possible.

In Holmes and Balwani, based on a loss amount of approximately $120 million, and finding no role adjustment or enhancement for obstruction of justice appropriate, the sentencing court determined that each defendant's advisory Guidelines range was 135 to 168 months' imprisonment, significantly shorter than the Guidelines range for Watson. See United States v. Balwani, No. 18-CR-258 (EJD), 2023 WL 2065045 (N.D. Cal. Feb. 16, 2023); United States v. Holmes, No. 18-CR-258 (EJD), 2023 WL 149108 (N.D. Cal. Jan. 10, 2023). Both received within-Guidelines sentences, with Holmes receiving a sentence of 135 months, and Balwani receiving a sentence of 155 months.

United States v. Hu, No. 20-CR-360 (AKH) (S.D.N.Y.). Hu was the cofounder of a company that provided investment management and advisory services. In this capacity, he engaged in multiple deceptive and fraudulent practices to conceal from current and prospective investors the value of the funds in their portfolio, including by creating fake documents. Like Watson, Hu controlled an entity whose financial performance was willfully obscured from its

investors through a series of lies, misstatements and fraudulent documentation. Hu pleaded

guilty to conspiracy to commit investment adviser fraud, securities fraud and wire fraud. His

Guidelines range was 235 to 293 months' imprisonment, and he received a sentence of

144 months.[13]

> United States v. Smerling, No. 21-CR-317 (DLC) (S.D.N.Y.). Smerling was the

CEO of a private equity fund that received loans of approximately $133 million on the basis of

falsified documents and misrepresentations about how much money others had already

committed to the venture. Like Watson, Smerling used forged documents and lies about others'

investments in order to bring in additional funding. Smerling pleaded guilty to an information

charging him with bank fraud and securities fraud. His Guidelines range was 97 to 121 months'

imprisonment, and he received a within-Guidelines sentence of 97 months.[14]

## II.      The Section 3553(a) Factors

> For the reasons set forth below, the government submits that a sentence of

180 months' imprisonment on Counts One and Two would be sufficient, but not greater than

necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).[15]

---

[13]      https://www.justice.gov/usao-sdny/pr/former-managing-partner-manhattan
-investment-advisory-firm-sentenced-12-years.

[14]      https://www.justice.gov/usao-sdny/pr/ceo-private-equity-fund-sentenced-97
-months-133-million-bank-and-securities-fraud.

[15]      Because, as set forth above, the Court may not consider the effect of Count Three
when determining the sentence for Count Two, the government limits its discussion herein to the
sentences for Counts One and Two.

### A.    Consideration of the Guidelines

Pursuant to § 3553(a)(4)(A), the Court must consider the Guidelines range of imprisonment recommended for Watson, which, as set forth above, is 262 to 327 months' imprisonment as to Counts One and Two.

The government recognizes that the applicable Guideline here, U.S.S.G. § 2B1.1, has been criticized by numerous courts, including courts in this District, for its heavy reliance on the amount of loss.  See, e.g., United States v. Johnson, No. 16-CR-457 (NGG), 2018 WL 1997975, at *1 (E.D.N.Y. Apr. 27, 2018), United States v. Faibish, No. 12-CR-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015).  Particularly in cases involving publicly traded companies, where any fraud can lead to monumental loss, overreliance on loss as a sentencing factor can lead to ranges that are difficult to defend.  See United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) ("Since successful public companies typically issue millions of publicly traded shares . . . the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart."), aff'd, 301 F. App'x 93 (2d Cir. 2008).  And even in cases with less extreme loss amounts, focusing on loss alone can fail to account for "the moral seriousness of the offense or the need for deterrence."  United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).

The government respectfully submits that the Guidelines range here does not overstate Watson's culpability, the moral seriousness of his crime, or the need for deterrence.  Unlike some cases where the amount of loss is distorted by effects on public markets or is out of all proportion to the defendant's conduct, every dollar of loss here is a dollar that Watson himself actually stole to benefit himself and his company.  Thus, for example, in several of the comparison cases set forth above in which loss directly reflected money stolen from investors,

the sentences imposed were within the Guidelines or close to the Guidelines.  Moreover, to the extent the Guidelines overemphasize loss as a factor, they also underemphasize factors like culpability, character and overall conduct.  As detailed below in connection with the other § 3553(a) factors, these factors weigh heavily against Watson, counterbalancing any discount that could be considered for loss enhancements.

Notably, applying proposed alternatives to the current Guidelines would yield substantially similar results.  The alternative structure to the current Guidelines that courts most frequently look to for guidance is the Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes ("ABA Report") (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications /criminaljustice/economic_crimes.pdf.  See, e.g., Faibish, 2015 WL 4637013, at *2 (considering ABA Report as alternative to Guidelines); see also United States v. Rivernider, 828 F.3d 91, 114 (2d Cir. 2016) (affirming sentence imposed after district court considered ABA Report guidelines range but imposed a sentence above that range; "The district court was (to understate the case) no more bound by a hypothetical set of guidelines issued by proponents of changes in the law than it was by the actual Guidelines promulgated by the Sentencing Commission.").  Applying the ABA Report's proposed restructuring of § 2B1.1 would yield the following calculation:

|  |  |  |
|---|---|---|
| Base Offense Level (ABA Report § 2B1.1(a)) | | 7[16] |
| Plus: | Loss in excess of $50,000,000 (ABA Report § 2B1.1(b)(1)(F)) | +14 |
| Plus: | Highest Culpability (ABA Report § 2B1.1(b)(2)(E)) | +8 |

---

[16]     The ABA Report in some instances offers a range instead of a specific number for an offense level or enhancement, as the report is intended to illustrate a revised structure rather than propose any specific offense levels.  See ABA Report 9.  For simplicity, in the calculations above, the average of any range proposed in the ABA Report is used.

| Plus: | Moderate Victim Impact (ABA Report § 2B1.1(b)(3)(C)) | +4 |
| Plus: | Organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)) | +2 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | | 37 |

An offense level of 37 and a criminal history category of I would yield a Guidelines range of imprisonment of 210 to 262 months' imprisonment for Counts One and Two. Thus, even taking a different approach to the Guidelines that deemphasizes loss while emphasizing other factors, Watson's range would be only slightly below his range under the actual Guidelines.

Accordingly, while the government acknowledges that there may be cases where U.S.S.G. § 2B1.1 produces a range that is not proportional to the conduct and is thus a less helpful baseline for the sentencing analysis, the government submits that the Guidelines in this case remain an appropriate and instructive starting point for the Court's consideration.

## B. The Nature and Circumstances of the Offense

The "nature and circumstances of the offense" weigh heavily in favor of a serious sentence. 18 U.S.C. § 3553(a)(1).

Watson's conduct could not have been more brazen. For years, Watson lied to every investor and every lender in Ozy about every possible financial metric — revenue, profit, debt, cash on hand. He lied about the critical facts of Ozy's business, including its contractual relationships, the shows it was producing, and its audience size. He lied about who the other investors were, and he went so far as to sell stock that did not even exist.

His lies went well beyond the fudging of accounting principles that sometimes underlies these kinds of fraud. In most cases, he simply made the numbers up, telling investors and lenders whatever he thought they wanted to hear, compounding his lies over time. When he needed to prove up his false claims, he directed conspirators to forge documents and impersonate

executives from other companies. He lied in emails, he lied on calls, and he lied right to people's faces, including people who thought they were his friends.

And he did it not once or twice, but pervasively, in every investor interaction, for years. He recruited others into his scheme and taught them to lie as well. That conduct was deliberate and calculated, and it shows a willingness to lie that is so beyond normal experience that it is difficult to process.

That conduct of course had a serious impact on victims, many of whom lost millions. Some, like Antara, lost money that had been entrusted to them by clients, including pension funds. See Tr. 2514. Some, like Tom Franco, lost their own money, in Franco's case causing him substantial personal loss and creating a severe emotional toll for him and his family. See PSR ¶ 78. All have had to deal with the embarrassment and reputational harm that comes from being victimized by a fraud, and all have had to face the disquieting horror of realizing that they had been conned by a person they trusted. See PSR ¶ 77; see also Tr. 1497 (testimony of Berardo) ("[Y]ou always give people the benefit of the doubt, and initially, you think that you're wrong in this and then when you realize you've been violated like this. It's a pretty bad feeling."); Tr. 1763 (testimony of Moerman) ("The call was disturbing and shocking and something that I've never had happen to me in all the years of investing."); Tr. 2402 (testimony of O'Hara) (explaining why he had texted Watson, "Heart hurts, man.": "[T]hings became clear to me that this was all -- no substance that was there. It was all -- you know, it was -- it became clear that we had been had.").

His conduct also harmed his employees, whose reputations were tarnished by their association with a fraudulent enterprise, as reflected in letters submitted by Watson in connection with sentencing. See ECF No. 347-1 at 5 ("Most employees worked their hearts out

for Carlos' vision and many of us felt betrayed and angry after his wrongdoings came to light. We have suffered reputational harm; our bylines are tainted."), 36 ("My friends who were still at OZY when the shocking story first hit the New York Times were plunged into financial uncertainty as they lost jobs overnight and temporarily became pariahs in our industry.").

But the impact of an investment fraud goes further. The money available for investment in startups is finite. Every dollar that Watson wrongfully took for himself and Ozy was a dollar that otherwise could have gone to an honest business or some other worthy cause. See PSR ¶ 78 (statement of Franco) ("The financial loss I sustained has limited [m]y ability to invest in legitimate start-up businesses, and to provide much-needed monetary support to local charities, educational programs, and community development efforts. Instead, I now find myself much less able to contribute to these important causes, depriving those who depend on and are worthy of such funding."). Building a startup is hard enough as it is without having to compete for investments against people who simply make up their numbers. Indeed, as much as Watson has tried to weaponize throughout this case the lack of investment in Black-owned businesses, his conduct in fact deprived honestly run Black-owned media companies of investments and revenue that they needed and could have used to build something real. See Ben Smith, What They Saw in Ozy, N.Y. Times (Oct. 3, 2021), https://www.nytimes.com/2021/10/03/business /media/ozy-media-investors.html ("[N]obody I spoke with over the last week was more piqued than Roland Martin and Todd Brown, two members of a group led by the mogul Byron Allen that shook the advertising industry this year, with a campaign meant to persuade marketers to spend more money with Black-owned media companies," and explaining that Ozy had taken money that otherwise could have gone to other Black-owned businesses); see also

https://www.youtube.com/watch?v=JLadIT-TBtY, at 6:45-12:30, 19:00-20:22 (video by Martin discussing how Ozy starved other Black-owned media companies of funding and attention).

Worse still, frauds like Watson's undermine our economy at large. Trust is particularly important in business and investment transactions. Investing in companies is risky because the future is unknown, but no one accepts the risk that a company's results are entirely fabricated. See Tr. 1445 (testimony of Maniar) ("[I]nvestors do expect that the numbers that are being shown to them are accurate."); Tr. 1747 (testimony of Moerman) ("These are historical information, so this has already happened, it's not a projection, so we would expect these to be 100 percent accurate."); Tr. 2519 (testimony of Bansal) ("As is standard practice when reviewing investment materials, I would expect that the company would provide accurate financials."); Tr. 3931 (testimony of Kosmas Kalliarekos) (Q: And, fair to say, you assumed that the financial information that was sent to you was accurate? A: Yes, that's a correct assumption."). Investors' ability to trust the data they receive allows them to accurately assess and weigh risk, which increases the amount investors are willing to put at risk, reduces the overall cost of capital, and opens up funding opportunities for businesses in need of capital. Our economy is fundamentally based on trust, and that trust has enabled our country's thriving startup culture and strong investment markets, to the benefit of everyone.

Watson's fraud cynically exploited that trust. He was able to get away with his fraud for years because no one imagined that another human being would lie to the extent he did. And Watson's fraud undermines that trust. If investors come to believe that businesses lie or fake it to make it, they will be less willing to invest. If they invest at all, it will be after more costly and intrusive due diligence, the friction of which would discourage some investments and make all investments more costly. The need for investors to protect themselves against

fraudsters like Watson imposes a tax on every business and every investor in the country. That tax can be lessened only if the law and the courts help reestablish trust and a sense of safety by successfully punishing, deterring, and reducing such frauds.

All of these aspects of the crime — the moral bankruptcy, the harm to victims, the harm to competitors, and the harm to society — support a substantial sentence for Watson.

**C.    The History and Characteristics of the Defendant**

The "history and characteristics of the defendant" also weigh in favor of a serious sentence. 18 U.S.C. § 3553(a)(1).

The letters submitted by Watson, as well as the testimony of several trial witnesses, demonstrate that there are many good things about him. He is deeply loved by his family and friends. He is smart and incredibly hard working. He is charismatic, and he can be warm and inspirational. Given his success in life, those characteristics are unsurprising. See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."). But the evidence shows that there is another side of Watson.

He is dishonest. The ease with which he lied to victims, again and again, and the ease with which he lied on the stand, is frankly unsettling. It sometimes appears that he chafes against the very concept of following the rules that others are subject to — whether it be following Court orders, telling the truth, bringing phones into court, or even waiting in line. See Eugene S. Robinson, Did you hear about the summer's big grifter trial? It didn't involve Donald Trump, Salon (Sept. 14, 2024), https://www.salon.com/2024/09/14/did-you-hear-about-the -summers-big-grifter-trial-it-didnt-involve-donald ("I was Ozy Media's employee no. 1, and witnessed Watson's antics up close, constant and continual, both large and small. Here's the

craziest and smallest one, which I still find weird to this day: I <u>never</u> saw Carlos stand on line for anything.  We flew together on a couple of business trips, and while I stood there bemoaning the length of the security line, he would just walk to the front.  He didn't have Clear membership or even TSA PreCheck.  He just had unlimited gall." (emphasis in original)).

He is manipulative.  He zeroed in on what each victim wanted to hear and glibly told them exactly that.  He met Rao and Han when they were young people starting out their careers, and he preyed on their admiration for him and their weaknesses to convince them that they had to lie for him and in Rao's case, take the fall for him.  <u>See</u> Tr. 323 (testimony of Rao) ("[Carlos] was, you know, other than my wife and my family, he was -- he was the person I was spending the most -- he was the most -- he was the most -- important other person in my life.").

He is cynical.  He falsely claimed that his elderly father had died or was seriously ill to avoid talking to Piper when Piper confronted him about the impersonation.  <u>See</u> Tr. 1687. When his crimes came to light, his singular strategy, at every point, was to attack, attack, attack, hoping he could distract from his own misdeeds.  <u>See, e.g.</u>, GX 5131.  And he chose to attack by exploiting and cheapening real issues that real people face — inventing a mental health crisis for Rao and fabricating a narrative of racial bias and selective prosecution for himself.

He is callous.  There has never been any indication that Watson feels any empathy for any of his victims, people who believed in him, whom he stole from.  He berated and abused his employees, especially Rao and Han.  The quickness with which he was willing to throw Rao under the bus — a man who had toiled under him for years, who "would bend over backwards to do anything" for Watson, including running out to get him a new sandwich if Watson did not like a particular sauce (Tr. 1565), a man who promised Han that "Carlos will always protect us" (Tr. 2177) — is hard to comprehend.  And he has been persistently willing to wage a publicity

campaign of baseless and targeted personal attacks not just against the witnesses who cooperated against him, but also against anyone and everyone who has at any point tried to hold him accountable for his crimes, including journalists who exposed his fraud, the prosecutors assigned to this case, and the Court.

It is difficult to find mitigation for Watson. In many cases, a defendant's history and characteristics are a primary source of mitigation. All too often, a defendant's crimes can be traced, at least in part, to a terrible childhood or a lack of opportunities or a life of hardship, or often all three. None of those are present here. Watson has always had a loving and supportive family. He went to Harvard and Stanford. He sold a company, worked at Goldman Sachs, lived in a $2 million house and still had millions left to invest in Ozy. He could have done anything, and what he chose to do was fraud.

In most cases, a defendant accepts responsibility. Watson has done the opposite, not just fighting his case on the merits — as is his right — but taking every opportunity to obstruct, to retaliate, to undermine the justice system, and to continue lying and breaking the rules. See Robinson v. Heath, No. 12-CV-2116, 2013 WL 5774544, at *11 (E.D.N.Y. Oct. 24, 2013) ("lack of remorse and failure to acknowledge responsibility consistently have been recognized as constitutionally-permissible factors that courts may take into account in determining an appropriate sentence" (citing cases)); see also United States v. Jeffers, 505 F. App'x 223, 227 (3d Cir. 2012) (district court may consider a defendant's behavior at trial in imposing sentence).

Watson's history and characteristics thus further support a substantial sentence.

### D.    The Purposes of Sentencing

Courts must consider the purposes of sentencing set forth in § 3553(a)(2), including the need for the sentence "(A) to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." Each of these factors weigh in favor of a substantial sentence.

### 1. The Seriousness of the Offense, Respect for the Law and Just Punishment

As detailed above, the conduct here is profoundly serious. Watson has shown a fundamental disrespect for the law and for any other rules that apply to him, whether they be rules of court or rules of decency. The sentence imposed therefore must send an unmistakable message to him and to others that such behavior — including Watson's fraudulent conduct, his grooming and recruitment of co-conspirators, and his efforts to undermine the judicial process throughout this case — will not be tolerated.

### 2. General Deterrence

This case presents a particular need for general deterrence. As courts have recognized, the "need for general deterrence is particularly acute in the context of white-collar crime." Johnson, 2018 WL 1997975, at *5. In particular, given the strong economic incentives to commit fraud, it is critical that there be equally strong counterincentives. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, C.J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); see also S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the

area of white collar crime and government corruption.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

Such deterrence is particularly warranted given the documented increase in fraudulent conduct in recent years.  See Jonathan R. Macey, Fraud in a Land of Plenty, 118 Nw. U. L. Rev. 227, 228 (2023) ("Fraud is on the rise.  A recent survey of 1,296 executives in fifty-three countries revealed a rising threat of fraud.  An astonishing 46% of surveyed organizations reported experiencing fraud or related economic crimes over the past twenty-four months. Reports of consumer fraud increased by 70% in 2021 alone relative to 2020, according to the Federal Trade Commission.  Virtually everyone who uses the internet regularly faces actual or attempted fraud, and 83% of organizations report phishing attacks.  In fact, one in ninety-nine emails is a phishing attack, with a majority of companies losing data and 52% experiencing credential compromise." (footnotes omitted)).  The ideology of "fake it till you make it" that drove the conduct in this case appears to be becoming ever more entrenched in startup culture, as reflected in letters submitted on Watson's behalf.  See ECF No. 347-1 at 35 ("During my stint in Silicon Valley, I saw a culture that constantly, consistently, absolutely rewards risk taking and 'fast and loose' behavior.  Lines were always blurred and startup founders who took big swings and toed the line of propriety were lionized and lauded as models to be emulated.  Puffery and the 'fake-it-'til-you-make-it' ethos were the prevailing forces and the rules of the game.").  Such conduct will not stop until people see that the consequences of fraud are simply too great to risk.

Moreover, the Court's sentence should serve to deter not only fraudulent conduct similar to Watson's, but also his obstructive conduct.  Obstruction, by its nature, is difficult to

detect and makes other crimes more difficult to detect, thus requiring an even more substantial sentence to achieve deterrence. See Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties."). Watson's perjury and other attacks on the judicial system similarly require a higher sentence to achieve deterrence. Watson gambled that he could use such conduct to escape any accountability or punishment and that the rewards of such an outcome would outweigh the costs. The Court's sentence should impose a punishment for that cynical gamesmanship, one that will make clear to future defendants that perjury and attacks on the system are simply not worth it.

Notably, white-collar cases present the scenario where deterrence is most likely to be effective. As Judge Weinstein explained, "Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010). Thus, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished."). Other executives at other companies will be aware of the sentence imposed by the Court in this case, and the Court should ensure that its sentence serves to firmly dissuade them from any dishonest conduct.

In weighing the need for general deterrence, a court may not consider the deterrent effect (if any) of being "publicly prosecuted and suffer[ing] public humiliation," as such circumstances are "an ordinary consequence of [criminal] conduct, not a condition imposed by the criminal codes or the judicial process." United States v. Cutler, 520 F.3d 136, 171 (2d Cir. 2008). "Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment." Id. Indeed, the high-profile nature of this case and the public attention, if anything, emphasize the need for a sentence that will make clear to everyone who hears of it that fraud is not "a game worth playing." United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013); see also United States v. Ulbricht, 858 F.3d 71, 94, 133 (2d Cir. 2017) (affirming district court's imposition of a life sentence, which considered, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

### 3.      The Need to Protect the Public from the Defendant

A substantial sentence is necessary to protect the community from further crimes by Watson. His conduct since conviction has shown that he is unrepentant and undeterred. He continues his pattern of lying in order to benefit himself in a manner that borders on the compulsive, and he has demonstrated a shameful willingness to attack those who stand in his way. There is every indication that Watson has learned nothing and would engage in exactly the same kind of conduct again if given the opportunity. Indeed, in his media appearances, he has expressed that the primary mistake he believes he made at Ozy was hiring Rao and Han — the witnesses who turned against him by admitting their crimes and telling the truth.

While one might hope that Watson's conviction in this case will serve to protect the public by preventing others from trusting him in the future, the unfortunate fact is that many fraudsters are able to continue to engage in fraud notwithstanding prior convictions. See, e.g.,

United States v. Sterritt, No. 21-CR-193 (KAM) (defendant defrauded investors of $17 million, in part by concealing his prior convictions for securities fraud); United States v. Isen, No. 17-CR-372 (JS) (defendant engaged in boiler-room scheme after previously being barred from acting as a broker by FINRA and prior conviction for wire fraud conspiracy and obstruction of justice); see also United States v. Cosmo, 497 F. App'x 100, 102 (2d Cir. 2012) ("The court in imposing sentence on this plea was considering a multi-year Ponzi scheme, undertaken by a recidivist offender who began committing the instant crime within months of finishing his previous fraud sentence.").  Watson appears to have already convinced members of his family, certain of his friends, and at least a few media personalities — despite overwhelming evidence to the contrary — that he is innocent, that he was persecuted, and that everything that happened was someone else's fault.  Anything other than a substantial sentence will only make it easier for him to make such arguments to future victims.

Accordingly, the Court should impose a substantial sentence both to deter Watson to the extent possible and to ensure that he is not able to harm others for a meaningful period of time.

E.      **The Need to Avoid Unwarranted Sentencing Disparities**

A sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This "provision does not require a district court to conform its sentence to any single other sentence adduced by a defendant."  United States v. Sampson, 898 F.3d 287, 314 (2d Cir. 2018).  Rather, "the primary purpose . . . is to reduce unwarranted sentence disparities on a nationwide level."  Id.

While a court may consider nationwide averages and medians in assessing this factor, a court should not give those statistics or this factor "dispositive weight," but should

instead weigh that data against the particular facts of the case.  United States v. Qualls, 613 F.

App'x 25, 31 (2d Cir. 2015) (affirming sentence for white-collar defendant above nationwide

averages in light of facts of case).  To aid in that consideration, the government provides the

following information:

       According to data from the United States Sentencing Commission, in cases such

as this one, involving U.S.S.G. § 2B1.1, a Guidelines offense level of 39, and a criminal history

category of I, from 2019-2023, the average defendant received a sentence of 144 months'

imprisonment and the median defendant received a sentence of 120 months' imprisonment.  See

Judiciary Sentencing Information (JSIN), United States Sentencing Commission, https://jsin

.ussc.gov.  This data does not include defendants convicted of a violation of 18 U.S.C. § 1028A

and is therefore not skewed by an additional two-year sentence for such a count.  But this data

may be somewhat skewed from the facts here in that most of the defendants accounted for in

those statistics likely accepted responsibility, did not obstruct justice or perjure themselves, and

did not engage in any of the other extreme conduct present in this case.  As a result, the

government submits that a sentence meaningfully above these statistics is appropriate.

    **F.**    **The Sentence Imposed Should Account for the Time Watson Will Actually Serve**

       Courts have repeatedly held that a district court may consider the time a defendant

is likely to actually serve when weighing the § 3553(a) factors.  See, e.g., Weaver v. Graham,

450 U.S. 24, 32 (1981) ("[A] prisoner's eligibility for reduced imprisonment is a significant

factor entering into . . . the judge's calculation of the sentence to be imposed."); Sash v. Zenk,

439 F.3d 61, 67-68 (2d Cir. 2006) ("defendants and judges routinely consider good time

calculations in their decisions about plea bargains and sentencing"); United States v. Fowler, 948

F.3d 663, 670 (4th Cir. 2020) (holding that consideration of potential good time credit was

proper in assessing § 3553(a) factors); United States v. Al-Din, 631 F. App'x 313, 338 (6th Cir. 2015) (same); cf. United States v. Tocco, 135 F.3d 116, 131 (2d Cir. 1998) (district court may consider "maximum good-time credit in its calculation of a defendant's sentence" to determine if a sentence amounts to a life sentence); United States v. Prevatte, 66 F.3d 840, 848 (7th Cir. 1995) (Posner, C.J., concurring) ("I do think the maximum good-time credits should be subtracted. The defendant should not be allowed to say, 'My sentence is too long because I am planning to be a bad boy in prison and so won't earn the maximum good-time credits.'"). Accordingly, to assist in that assessment, the government provides an overview of the current law governing sentencing credits.

1.      **Sentencing Under the First Step Act**

The First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) ("FSA"), was enacted on December 21, 2018. It directs the Bureau of Prisons ("BOP") to take specific actions regarding programming, Good Conduct Time, and compassionate release, among other issues. As relevant here, a prisoner can earn time credit under the FSA in two ways: Good Conduct Time and Earned Time Credit.[17]

---

[17]      The Residential Drug Abuse Program ("RDAP"), the BOP's most intensive treatment program, can also reduce prisoners' sentences. In RDAP, cognitive behavioral therapy is used in a modified therapeutic community model where offenders experience living in a pro-social community. Offenders live in a unit separate from the general population; they participate in half-day programming and half-day work, school, or vocational activities. RDAP is typically nine months in duration. Once an inmate successfully completes RDAP, the inmate is eligible to receive an additional year reduction in his sentence, as long as the sentence was longer than 36 months (with less time available for shorter sentences). 18 U.S.C. § 3621(e)(2)(B). Such a reduction is in addition to Good Conduct Time and Earned Time Credit.

It is the government's understanding that, in order to qualify for RDAP, an inmate must have a verifiable substance abuse disorder. See 28 C.F.R. § 550.53(b)(1). Because Watson has no documented history of alcohol or drug use and no history of treatment for substance abuse (PSR ¶ 118), the government does not believe he would qualify for RDAP.

### a. Good Conduct Time

A well-behaved prisoner can earn "up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the [BOP] that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b).  All inmates convicted of a federal offense are eligible to earn Good Conduct Time.[18]

Before the FSA, there had effectively been a cap of about 47 days earned annually on such Good Conduct Time.  Section 102(b) of the FSA amended 18 U.S.C. § 3624, making this provision more generous by allowing additional credit for good conduct and providing that the credit be based on the sentence imposed rather than actual time served.  See 18 U.S.C. § 3624(b)(1).  This means that the BOP will calculate Good Conduct Time based on a prisoner's whole sentence, not just the time a prisoner actually serves.  For example, a 10-year sentence now yields a maximum Good Conduct Time of 540 days (54 × 10), rather than the maximum of 470 days it would have yielded prior to the FSA.  As such, prisoners who exhibit "exemplary compliance with institutional disciplinary regulations" may now receive a maximum of "54 days for each year of the prisoner's sentence imposed by the court," including credit for time they never actually serve.  Id.

### b. Earned Time Credit

The FSA also established a second, new system under which a prisoner can earn credit — Earned Time Credit — by participating in programs aimed at reducing recidivism.  Each prisoner, who is to be evaluated by BOP for suitable "evidence-based recidivism reduction programming or productive activities," will be classified as presenting a minimum, low, medium

---

[18]     BOP, FSA — Frequently Asked Questions (last visited Dec. 8, 2024), https://www.bop.gov/inmates/fsa/faq.jsp#fsa_good_conduct_time.

or high risk of recidivism. 18 U.S.C. § 3632(a)(3)-(6).[19]  For defendants who are determined to be a minimum or low risk and who do not increase their risk of recidivism, these incentives and rewards include, among other things, the accrual of up to 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities for the first seven months of incarceration and up to 15 days of time credits for every 30 days of participation thereafter.  See § 3632(d)(4)(A)(i)-(ii).  Accordingly, an inmate can earn 12 months of Earned Time Credit after serving approximately 27 months in prison: 10 days per month for the first 7 months, and 15 days per month for the following 20 months.[20]

These first twelve months of Earned Time Credit may be used to reduce a defendant's total sentence.  See 18 U.S.C. § 3624(g)(3) ("If the sentencing court included as part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment . . . the [BOP] may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time

---

[19]     A prisoner's classification as minimum, low, medium or high risk is based on the prisoner's Prisoner Assessment Tool Targeting Estimated Risks and Needs ("PATTERN") score. Static factors include, among other things, a prisoner's age at the time of assessment, the offense conduct and criminal history.  Dynamic factors that can add to a PATTERN score include, among other things, disciplinary infractions, a history of violence, or a history of escape. Dynamic factors that can reduce a prisoner's PATTERN score include, among other things, programs completed, work programming, drug treatment and education.  See BOP – PATTERN Risk Assessment (last visited Dec. 5, 2024), https://www.bop.gov/inmates/fsa/pattern.jsp.

        Here, while only BOP can assess the defendant's PATTERN score, one can reasonably conclude — based on the BOP's publicly available Male PATTERN Risk Scoring worksheet — that the defendant will likely be classified as minimum risk, the lowest possible risk classification.  Id. at https://www.bop.gov/inmates/fsa/docs/male_pattern_form.pdf?v=1.3.

[20]     The reason a defendant can accrue 15 days per 30 day period only after 7 months is that accruing 15 days requires the defendant to have been at minimal or low risk "over 2 consecutive assessments," § 3532(d)(4)(A)(ii), and risk assessments occur every sixth months.  It therefore takes 7 months to meet the qualifications to accrue 15 days per 30 day period.

credits under [the FSA].").  The remaining Earned Time Credit earned after the initial 12 months

of Earned Time Credit are "applied toward time in prerelease custody," allowing for early

release to a residential reentry center ("RRC") (also referred to as a halfway house) or home

confinement.  18 U.S.C. § 3632(d)(4)(C).  If a defendant earns the maximum possible Earned

Time Credits, up to one third of time remaining after a defendant has reduced his sentence by

12 months can be spent in prerelease custody.[21]

## 2.    Calculating the Actual Time in Prison

The government provides the following estimates of time credits and effective

sentences depending on various terms of imprisonment for Watson.

As a starting point, provided Watson complies with institutional disciplinary

regulations, he will earn Good Conduct Time on the sentence imposed by the Court.  Assuming a

180-month sentence — the total sentence recommended by the government on Counts One and

Two[22] — Watson would earn 27 months of Good Conduct Time.[23]  Thus, considering only Good

Conduct Time, Watson's effective sentence in a BOP custodial facility would be 153 months'

imprisonment.

---

[21]       The math behind why the fraction of time that can be applied to prerelease
custody is one third, not one half, may not be immediately obvious.  Once the Earned Time
Credits equal the time remaining in the sentence, a defendant can be released to prerelease
custody.  See 18 U.S.C. § 3624(g)(1)(A).  Thus, for any given period, after spending two thirds
of the period earning credits, one third of the period can be spent in prerelease custody.  To give
an example, if a defendant has 9 years left on his sentence, in 6 years he will have accrued
enough credit to be released to 3 years of prerelease, with the result that one third of his 9-year
remaining sentence can be spent in prerelease custody.

[22]       As discussed above, the Court may not consider the two-year sentence on Count
Three in determining the sentence as to Counts One and Two.

[23]       Calculated as follows:  54 days/year × 15 years = 810 days.  Using a 30-day
month, 810 ÷ 30 = 27 months.

Watson can also earn Earned Time Credit in addition to Good Conduct Time. Following the calculation through on the government's recommended sentence of 180 months on Counts One and Two, should Watson not "opt out" of FSA programming or otherwise not earn credit for, among other reasons, disciplinary segregation, he could earn 12 months of Earned Time Credit to reduce his total sentence and 38 months of Earned Time Credit to be credited to prerelease custody (for a total of 50 months of Earned Time Credit).[24] Thus, considering only Good Conduct Time and Earned Time Credit, Watson's effective sentence in a BOP custodial facility would be 103 months' imprisonment (or 8.58 years).

The following chart outlines the potential credits and effective sentences for Watson for a variety of sentences[25]:

---

[24] Calculated as follows: 153 Months (time remaining after subtracting Good Conduct Time) − 27 Months (the minimum time necessary to get a year off of a sentence) – 12 Months (reduction in sentence from Earned Time Credits) = 114 Months (remaining time on the sentence). 114 Months ÷ 3 (a prisoner can earn up to one-third of that time in Earned Time Credits) = 38 Months (Earned Time Credit towards RRC or home confinement).

[25] The calculations set forth herein, including but not limited to this chart, are not binding on the BOP. These calculations are reasonable, educated estimates, based on information currently available and providing the best-case scenario (e.g., Watson does not have any disciplinary infractions while in custody).

| Sentence | Good Conduct Time Reduction[26] | Earned Time Credit Reduction[27] | Total Time Credit | Time in a BOP Custodial Facility |
|---|---|---|---|---|
| 240 Months | 36 Months | 67 Months | 103 Months | 137 Months (57.1% of imposed sentence) |
| 180 Months | 27 Months | 50 Months | 77 Months | 103 Months (57.2% of imposed sentence) |
| 144 Months | 21.6 Months | 39.8 Months | 61.4 Months | 82.6 Months (57.4% of imposed sentence) |
| 120 Months | 18 Months | 33 Months | 51 Months | 69 Months (57.5% of imposed sentence) |

G.      **Balancing the Factors**

The government submits that a sentence of 180 months' imprisonment on Counts One and Two appropriately balances all of the § 3553(a) factors. While the sentence is below the Guidelines, that is appropriate to maintain consistency with other cases, including both the comparable cases identified above and the nationwide averages. At the same time, the sentence is appropriately above nationwide averages and some of the comparable cases. This case is unusual for the audacity, the pervasiveness and the length of Watson's fraud, as well as for his obstruction, perjury, repeated attacks on the justice system, and complete rejection of any responsibility. Further, as discussed above, such a sentence could result in as little as 8.5 years in prison for Counts One and Two, which would allow Watson the opportunity to live a full and hopefully more honest life after serving his sentence.

---

[26]      Calculated using a 30-day month.

[27]      Includes 12 months of Earned Time Credit put towards a sentence reduction and the remainder applied toward RRC and/or home confinement.

*   *   *

Accordingly, the government submits that the Court should impose a combined sentence of 180 months' imprisonment on Counts One and Two, to be followed by a mandatory two-year consecutive sentence on Count Three.

**FORFEITURE AND RESTITUTION**

**I. The Court Should Order the Defendants to Forfeit $65,680,352.40**

As set forth herein, both Watson and Ozy should forfeit $65,680,352.40, which is a reasonable estimate of the proceeds that they each obtained as a result of their fraud offenses. Accordingly, the Court should impose forfeiture money judgments (the "Forfeiture Money Judgment") in that amount against both defendants. See ECF No. 345.

**A. The Forfeiture Rules and Statutes**

Forfeiture is mandatory for defendants convicted of fraud offenses. 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." (emphasis added)); see United States v. Monsanto, 491 U.S. 600, 607 (1989) (finding that statute setting forth that a court "'shall order' forfeiture of all property described" means that forfeiture is mandatory); United States v. Ng Chong Hwa, No. 18-CR-538 (MKB), 2023 WL 4194002, at *2 (E.D.N.Y. Mar. 24, 2023) ("forfeiture is mandatory under the relevant criminal forfeiture statutes, 18 U.S.C. § 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c)"). The forfeiture statutes that apply to defendants Watson and Ozy's securities and wire fraud offenses, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), require the forfeiture of all proceeds of their offenses. See 18 U.S.C. § 981(a)(1)(C) (requiring the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as set forth in 18 U.S.C. §1956(c)(7), and further defined in 18 U.S.C. § 1961

69

to include wire fraud and "fraud in the sale securities"). The forfeiture determination as to the amount of proceeds is governed by Rule 32.2 of the Federal Rules of Criminal Procedure.

Where, as in this case, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). That amount "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007).

As forfeiture is "an aspect of sentencing," forfeiture amounts are determined by a preponderance of the evidence. Libretti v. United States, 516 U.S. 29, 49 (1995); Capoccia, 503 F.3d at 116; see also United States v. Roberts, 660 F.3d 149,166-67 (2d Cir. 2011) ("district courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence"); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).

Further, because the "calculation of forfeiture amounts is not an exact science," "[t]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011); see also United States v. Mathieu, 853 F. App'x 739, 742 (2d Cir. 2021) ("[d]istrict courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case" and may make "a reasonable estimate" given the available information and evidence). Accordingly, the court "may make reasonable extrapolations from the evidence

established by a preponderance of the evidence at the sentencing proceeding." <u>Treacy</u>, 639 F.3d at 48.

**B.     The Defendants Must Forfeit the Gross Proceeds of Their Fraud**

In fraud cases where defendants have engaged in "illegal services [and] unlawful activities," the "proceeds" they are liable to forfeit is calculated on a gross, rather than a net, basis pursuant to 18 U.S.C. § 981(a)(2)(A).  Specifically, Section 981(a)(2)(A) provides:

> [i]n cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

This definition of "proceeds" is broader than the definition under Section 981(a)(2)(B) which, in contrast, applies to cases "involving lawful goods or lawful services that are sold or provided in an illegal manner" and allows for the deduction of "direct costs" (excluding overhead expenses and income taxes) if proven by the defendant.  18 U.S.C. § 981(a)(2)(B).

Courts have generally interpreted Section 981(a)(2)(A) to apply to conduct that is "inherently unlawful," meaning conduct that cannot be committed in a lawful manner, "such as robbery, embezzlement, soliciting funds as part of a Ponzi scheme, and selling food stamps without authorization."  <u>United States v. Milton</u>, No. 21-CR-478 (ER), 2024 WL 779210, at *3 (S.D.N.Y. Feb. 26, 2024) (rejecting defendant's contention that he was entitled to deduction and net calculation of proceeds); <u>see also</u> <u>United States v. Uddin</u>, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture of gross proceeds under § 981(a)(2)(A) in a case involving food stamp fraud (an unlawful activity), and refusing deduction based on any amount shared by defendant with food stamp beneficiary); <u>Ng Chong Hwa</u>, 2023 WL 4194002, *1-2 (holding that the "court is statutorily required to order forfeiture in the full amount sought by the government" and "does

not have discretion to reduce the forfeiture amount" by amount re-paid to victim); United States v. Sigillito, 899 F. Supp. 2d 850, 864-65 (E.D. Mo. 2012) (ruling defendant in an investment fraud scheme must forfeit the gross amount he took from investors, without credit for his use of the later investments to pay the early investors; § 981(a)(2)(A) applies because the scheme was entirely unlawful); United States v. Nicolo, 597 F. Supp. 2d 342, 347-350 (W.D.N.Y. 2009) (defendant must forfeit all money he received as a consequence of his kickback scheme without any reduction for the value of the services actually provided to his victims).

For example, in Milton, the court found the gross calculation of "proceeds" under Section 981(a)(2)(A) applied to the defendant's purchase of a ranch for cash and stock that had been falsely inflated in value due to the defendant's misrepresentations. 2024 WL 779210, at *3. As the court reasoned, "[t]he unlawful conduct . . . stems from the inflated stock options themselves rather than from the manner in which [the defendant] purchased the property." Id. Selling the inflated stock options was an unlawful activity (as opposed to the sale of a lawful good in an illegal manner) analogous to the type of conduct in Ponzi scheme cases where gross proceeds are subject to forfeiture.

Like the Milton court, other courts have found that obtaining investment funds through fraudulent misrepresentations constitutes "unlawful activities," as opposed to "lawful services . . . provided in an illegal manner," such that the defendant is required to forfeit the gross proceeds of his offense. In Sigillito, for instance, the defendant operated a fraudulent loan program that induced investors to loan money to a real estate developer. 899 F. Supp. 2d at 865. After the defendant and his co-conspirators then deducted fees from a new investment, they used the rest of the investment to pay other investors. Id. Following the defendant's conviction on several charges of wire fraud, mail fraud, and other offenses, the court concluded that the

definition of "proceeds" under Section 981(a)(2)(A) rather than Section 981(a)(2)(B) applied to the defendant's forfeiture.  Id. at 865.  The court explained: "Defendant offered no lawful goods or lawful services as part of the [loan program]; rather, Defendant merely took lenders' investments under false pretenses, and, then, after deducting fees for himself and his co-conspirators, he redistributed new investments as interest or principal to old investors."  Id.; see also United States v. Bonventre, 646 F. App'x 73, 90 (2d Cir. 2016) (affirming district court's order of forfeiture based on gross proceeds of securities and other fraud offenses where "the evidence showed that the criminal conspiracy at issue did not sell or provide 'lawful services . . . in an illegal manner' so as to require deduction of direct costs" (alteration in original)).

Similar to the defendant in Milton, Watson made false representations to induce victims to invest in Ozy.  Given that the defendants obtained the proceeds as a result of misrepresentations concerning, among other things, Ozy's historical and projected financial results, the existence and timing of investment rounds, and the identities of Ozy's investors and business partners — all "unlawful activities" — the gross calculation of "proceeds" under Section 981(a)(2)(A) should apply here.

Moreover, giving the defendants credit for whatever direct costs of their fraud that they might claim would undermine the punitive purpose of criminal forfeiture.[28]  See United States v. Daugerdas, No. 09-CR-581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012) ("Criminal forfeiture is designed to be punitive and its scope is broad"); United States v. Shkreli, 779 F. App'x 38, 42 (2d Cir. 2019) (because "forfeiture is gain based, not based on the losses (or

---

[28]    In any event, even if the narrower definition of proceeds under § 981(a)(2)(B) were to apply, it would not result in any reduction in the amount of the forfeiture as defendants cannot meet their burden of proving any permissible direct costs that they incurred in connection with their offenses.

gains) to victims," a defendant should be required to forfeit "the total amount invested by

investors" even if investors were paid back by the defendant during the scheme (emphasis in

original)).  Accordingly, the defendants should be held financially responsible for the full

amount of the Forfeiture Money Judgment as they obtained that amount as a result of their

unlawful activities.

## C. The Amount of the Forfeiture Money Judgment Is a Conservative Estimate of the Gross Proceeds

As noted above, the government is not required to provide a precise calculation of

the amount of money a defendant must forfeit.  Treacy, 639 F.3d at 48.  Instead, the amount of

the Forfeiture Money Judgment can be a conservative estimate of the proceeds, provided that the

estimate is based upon evidence in the record and is not overly speculative.  Id.

Here, the defendants' forfeiture liability should reflect the total amount obtained

from investors and lenders, which (as set forth in the government's responses to the defendant's

PSR objections), are conservatively estimated at $65,680,352.40.  See Gov. PSR Resp. 6.

Notably, these funds were critical to Ozy's survival, and the defendants would not

have obtained the $65,680,352.40 but for the lies they told investors; as such, the full amount is

subject to forfeiture.  See, e.g., Nicolo, 597 F. Supp. at 346 ("To put it another way, proceeds are

property a person would not have but for the criminal offense."); United States v. Torres, 703

F.3d 194, 199-200 (2d Cir. 2012) (finding that "so long as there is a causal nexus between the

wrongdoer's possession of the property and her crime, the property may be said" to be

forfeitable).

## D. Both Defendants Obtained and Should Be Required to Forfeit $65,680,352.40

In Honeycutt v. United States, 581 U.S. 443 (2017), the Supreme Court held that

a defendant convicted of a narcotics offense cannot be held jointly and severally liable for the

offense proceeds that the defendant never personally obtained but which his co-conspirator did, id. at 447. Post-Honeycutt, the Second Circuit and district courts within the circuit have declined to extend Honeycutt to fraud and other offenses. See United States v. Tanner, 942 F.3d 60, 68 (2d Cir. 2019) (refusing to apply Honeycutt's limitation on joint and several liability where co-conspirators in fact acquired the full proceeds); United States v. Daugerdas, 521 F. Supp. 3d 320, 326 (S.D.N.Y. 2021) (holding that Honeycutt does not require invalidating joint and several liability in forfeitures based on 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A) and noting that Second Circuit precedent permits joint and several liability in such cases), aff'd, No. 21-605, 2022 WL 274226 (2d Cir. Jan. 31, 2022). Given the limited application of Honeycutt, it is at best questionable whether the decision could serve as a basis for reducing either defendant's forfeiture liability here.

Further, even if Honeycutt did apply to their fraud convictions, it would not result in any reduction of their forfeiture liability as both defendants "obtained" the full $65,680,352.40. United States v. Guerrier, No. 20-3469, 2022 WL 610338, at *2-3 (2d Cir. Mar. 2, 2022) (holding co-conspirator may be held liable to forfeit the value of the tainted proceeds that he controlled even if those proceeds are no longer in his possession). The law is clear that the government can forfeit corporate assets based on a defendant's crimes when those assets were maintained through and on behalf of a company the defendant "extensively controls" or "dominates," such that "money paid to the corporation was effectively" under the defendant's control. United States v. Peters, 732 F.3d 93, 103-04 (2d Cir. 2013) (forfeiture proceeding under Section 982); United States v. Bergstein, No. 16-CR-746 (PKC), 2018 WL 9539768, at *2 (S.D.N.Y. Sept. 20, 2018), aff'd, 788 F. App'x 742 (2d Cir. 2019) (declining to reduce forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), of defendant convicted of investment advisor and securities

fraud who controlled loan proceeds); see also United States v. Rhodes, No. 21-2236-cr, 2023 WL 2194529, at *1 (2d Cir. Feb. 24, 2023) (affirming order that individual defendant forfeit funds passing through LLC's accounts for which defendant was a signatory); United States v. Tartaglione, No. 15-CR-491, 2018 WL 1740532, at *21 (E.D. Pa. Apr. 11, 2018), aff'd, 815 F. App'x 648 (3d Cir. 2020) ("Even when proceeds are received through an intermediary or a corporate entity, a defendant still receives the proceeds for purposes of forfeiture, given that forfeitable property may be obtained directly or indirectly").  Based upon the trial evidence, there can be no question that Watson had extensive control of Ozy and, thus, the proceeds that it obtained.

Finally, the government notes that the proposed Orders of Forfeiture submitted on November 29, 2024 provide that "any payment or other collection of the forfeiture money judgment" imposed against one defendant shall be credited against the other.  See ECF No. 345. As such, the maximum amount the government can collect against both Watson and Ozy, in total, is $65,680,352.40.

## II.     The Court Should Impose Restitution of $37,319,720.68

As per the PSR, restitution is mandatory pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1(a)(1).  The Court should therefore impose restitution in the full amount set forth in the PSR Addendum of $37,319,720.68.  See PSR Addendum ¶ 150.  To the extent the defendants challenge the restitution amount —as the government expects they will — the Court should set a hearing for a date "not to exceed 90 days after sentencing" for a final determination of restitution.  18 U.S.C. § 3664(d)(5).[29]

---

[29]     The PSR indicates that Watson and Ozy appears unable to pay a fine (PSR ¶ 135), and the government defers to PSR's assessment.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that (1) the Court should sentence Watson to a combined sentence of 180 months' imprisonment on Counts One and Two, to be followed by a mandatory two-year consecutive sentence on Count Three, (2) the Court should impose forfeiture against Watson as set forth in the government's proposed orders of forfeiture, and (3) the Court should impose restitution of $37,319,720.68.

Dated:     Brooklyn, New York
            December 9, 2024

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/
       Jonathan Siegel
       Gillian Kassner
       Dylan A. Stern
       Assistant United States Attorneys
       (718) 254-6293/6224/6213