Docusign Envelope ID: B4477E33-9571-4ADE-B2A7-ADEDBF121ACB

# RONALD SULLIVAN LAW, PLLC
### Ronald S. Sullivan Jr.

December 9, 2024

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Carlos Watson and OY Media, Inc., 23-CR-0082 (EK)

Dear Judge Komitee:

On behalf of Carlos Watson and OZY Media, Inc., and with Ms. Frisson's consent, I respectfully submit this letter (a) objecting to the government's letter of November 29, 2024, seeking forfeiture of $65,680,352.40 (Docket No. 345); and (b) identifying investors and others who wish to speak at sentencing on Mr. Watson's behalf.

A. No Forfeiture Is Authorized Under the Facts of this Case

    1. *Forfeiture must be of net proceeds (proceeds minus direct costs) and there are zero net proceeds to forfeit.*

The statute which authorizes forfeiture of proceeds of criminal conduct distinguishes between a service that is inherently illegal from a service that is legal but dispensed in an illegal manner.  Under the statute, proceeds of an inherently illegal service is fully forfeitable, but proceeds of a legal service dispensed in an illegal manner is forfeitable only to the extent it exceeds the direct costs in providing the service:

> [T]he term "proceeds" is defined as follows:
>
> (A)  In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, *and is not limited to the net gain or profit realized from the offense*.
>
> (B)  In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, *less the direct costs incurred in providing the goods or services*.  The claimant shall have the burden of proof with respect to the issue of direct costs.  The direct costs shall not include any part of the overhead expenses

RONALD SULLIVAN LAW, PLLC
Ronald S. Sullivan Jr.

of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. 981(a)(2) (emphasis added).

As Mr. Watson and OZY have established - - without dispute - - OZY was a burgeoning media company.  Virtually all of the proceeds raised from investors were spent on OZY's legitimate endeavors, including hiring at least 1,000 employees and contractors; publishing five newsletters; producing 14 TV shows (garnering an Emmy Award in the process); making podcasts; hosting four festivals and five awards programs; landing more than 200 advertising clients, including large deals with major entities such as WPP, Dentsu, Omnicom and General Motors.

Mr. Watson and the board put in place a robust corporate governance infrastructure that guided and approved fundraising including a board of directors, well-known law firms, key investment bankers, and several boutique accounting firms.  Mr. Watson made efforts to ensure a strong and transparent process, and he and his family invested in every capital-raising round.  Watson (and his family) ultimately invested approximately $20 million and took *de minimis* salary of approximately $50,000 per year from 2017 to 2021.  Mr. Watson did not misappropriate any investment funds or convert investor monies to personal use.  Thus, the statute requires that the money acquired through illegal transactions, namely the investments in OZY, be adjusted for the direct costs of operating OZY.

The government's approach to forfeiture ignores the distinction of Section 981(a)(2) between illegal and legal businesses and treats OZY like a Madoff-style *Ponzi* scheme predicated on smoke and mirrors, which provided no true service, and was inherently worthless because it was itself a fraud.  *See United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016) (holding that Madoff's business did not fall under Section 982(a)(2) because "the evidence showed that the criminal conspiracy at issue did not sell or provide "lawful services . . . in an illegal manner so as to require deduction of direct costs . . . . [Madoff] never purchased any securities on behalf of its [investment] clients in exchange for their investments.") (citation and quotation marks omitted); *see United States v. Mahaffy*, 693 F.3d 113, 137-38 (2d Cir. 2102) (forfeiture for brokers who legally traded securities in an illegal manner was limited to only such portions of their commissions that they kept).  There is nothing unlawful about selling equity for investments or obtaining loans.  Assuming for the purposes of this letter that Mr. Watson or OZY committed a crime, Section 981(a)(2)'s second paragraph applies, requiring that any forfeiture be calculated with an adjustment for the direct costs of operating OZY.

## RONALD SULLIVAN LAW, PLLC
### Ronald S. Sullivan Jr.

Because the government has applied the wrong section of 981(a)(2), it has failed to carry its burden to prove forfeiture. If the government narrows its application to qualifying victims under the applicable part of Section 981(a)(2), OZY's forfeiture is zero.

### 2. *The government's proposed forfeiture award is unconstitutional.*

The incongruity of a prosecution for fraud that results in no forfeiture flows directly from the government's prosecution of a business that was legitimate and its chief executive officer (and his family) who invested in the business without drawing from it (except for Mr. Watson's *de minimis* annual salary). If the government's approach is sustained, the resulting forfeiture would constitute a disproportionate and excessive penalty in violation of the Eighth Amendment. *See United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016) ("A forfeiture is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'") (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

In addition, in measuring the proportionality of a forfeiture award, the court must evaluate the extent to which "the forfeiture would destroy a defendant's livelihood." *Viloski* at 111-12. A forfeiture award of more than $65 million would destroy the future livelihoods of Mr. Watson and OZY. Mr. Watson has a negative net worth, a negative monthly cash flow, and no assets with which to satisfy any forfeiture award. *See* Presentence Report at 31 (disclosing ownership of an automobile worth $7,500, Goldman Sachs securities worth $1,000, two bank accounts with a collective balance of $1,100, and real estate that is encumbered by a mortgage). OZY has no assets. *See* Presentence Report at 28 ("The financial form noted that the company has no active bank accounts or other assets. Liabilities of $1.5 million to Beverly Watson, $2 million to the defendant, $2 million to various individuals, and an amount unknown to the defendant for payroll were also noted."). Even if Mr. Watson survives incarceration, it will be impossible for him to come close to satisfying an eight-figure forfeiture judgment. Assuming that Mr. Watson obtains post-incarceration employment at minimum wage (currently $7.25 per hour), it would require more than 8 million hours of labor to satisfy the government's proposed forfeiture award of approximately $65 million, or the equivalent of more than 4,000 years of working full-time at minimum wage and devoting 100% of pre-tax earnings towards paying down the forfeiture award. The court should reject the government's bypass of Section 981(a)(2).

3. *The record does not establish a starting point for the government's forfeiture calculation.*

The government's approach of seeking forfeiture of *all* funds received during the period of the charged conspiracy is further undermined by two related facts: (1) the jury found Mr. Watson and OZY guilty of *conspiracy* to commit securities and wire fraud, not any substantive fraud identifying any particular victim, any particular amount, or any particular date; and (2) some investors claim to have been defrauded, others do not, and others have not taken a position. Apart from Section 981(a)(2), the record therefore does not establish the starting point for the government's analysis of forfeiture let alone that forfeiture of $65,680,352.40 - - the entirety of OZY's receipts from investors during the charged period - - is appropriate.

4. *The government's "Investor Wire Payments" chart includes investments from outside the time of the charged conspiracy.*

There is a significant timing problem with the government's forfeiture calculation, namely, the government is seeking forfeiture of certain proceeds that were not raised during the conspiracy.

The government alleged in the indictment and throughout trial that the conspiracy occurred over a *four* year period (2018 to 2021) without specifying the dates within those years when the conspiracy actually began and ended. But the government's "Investor Wire Payments" chart includes investments and loans that occurred over a *six* year period (2018 to 2023), including dates for which no information was presented in the indictment or at trial as to the particular investor's investment.

Further clouding the forfeiture issue, FBI forensic accountant Cara Alpaugh testified at trial that her analysis of incoming wire transfers encompassed all wires into OZY over an *eight year* period: "for the analyzed period January 5, 2016 to February 28, 2023." *See* Tr. 2428, 2429, 2430, 2431, 2432, 2433. The period of her analysis thus pre-dates (by two years) and post-dates (by two years) the charged conspiracy.

Ms. Alpaugh recited her findings as to only 12 of the 55 investors who are listed in the government's "Investor Wire Payments" chart: Marc Lasry, Thomas Franco, Interlock, Lifeline, Antara, Al Nadha, WTI, Atinum Partners, Emerson Collective, GSV, VentureSouq, and Alex Rodriguez. This means that pertinent details are missing for 43 of the 55 investors (78% of the

RONALD SULLIVAN LAW, PLLC
Ronald S. Sullivan Jr.

would-be forfeiture components). Ms. Alpaugh gave specific dates as to only three of these investors: Emerson Collective (last wire to OZY April 13, 2020) (Tr. at 2431); Alex Rodriguez (first wire to OZY August 12, 2021) (Tr. at 2432); and GSV (last wire to OZY January 12, 2018 funds to OZY) (Tr. at 2432).

As to the first year of the conspiracy, the "Investor Wire Payments" chart includes $2,955,000 in investments in calendar year 2018, without specifying the exact dates of investments within that 365 day period. To the extent that any of the investments made in calendar year 2018 predate the conspiracy, these investments should be excluded from the forfeiture calculation. For example, GSV's last investment in OZY was January 12, 2018, which predates by 10 days the government's first admitted exhibit. *Compare* Tr. at 2432 (GSV's last investment in OZY) *with* Tr. 103 (testimony of Janeen Poutre) and Gov't Exh. 5001 (January 22, 2018 email with the subject "Cash Update).

As to the years on the back end of the conspiracy, the government's "Investor Wire Payments" chart includes $950,000 in the 2022 and 2023 post-conspiracy-period: $500,000 from Kosmas Kalliarekos (2022) (line 11); $100,000 from Thomas Franco (2023) (line 4); $250,000 from Kosmas Kalliarekos (2023) (line 11); $50,000 from The Martin Tate Dubilier ($2023) (line 37); and $50,000 from The Riley Cochrane Dubilier (2023) (line 39).

All of these investments from 2022 and 2023 should be excluded from the forfeiture calculation because these transactions postdated the conspiracy.

    5. *The government's "Investor Wire Payments" chart omits, without explanation, Goldman partners, Watson family members, and other investors.*

The government's chart of "Investor Wire Payments" between 2018 and 2023 omits numerous investors who invested during the conspiracy period, thereby undermining its claim of gross forfeiture, including:

    a.    executives and partners of Goldman who personally invested in OZY in 2018 (Gene Sykes, George Lee, Gregg Lemkau, Iain Drayton, and Richard Campbell-Breeden/Omeshorn Holdings Ltd.);
    b.    Dr. Damian Rouson, an investor who submitted a letter of support on the defendants' behalf with the sentencing memo in which he disclaimed the notion of being a victim;
    c.    Louise Rogers;
    d.    Michael Carter / Phoenix Holdings Ltd.;

Case 1:23-cr-00082-EK   Document 357   Filed 12/09/24   Page 6 of 9 PageID #: 11006

RONALD SULLIVAN LAW, PLLC
Ronald S. Sullivan Jr.

  e. Tim Jones;
  f. Kelvin Beachum;
  g. Ian Thomas; and,
  h. Mike Thaxton.

  More, the fact that the government has omitted Mr. Watson and members of his family who invested in OZY during the charged conspiracy period and who collectively were among OZY's three largest investors (approximately $20 million), shows that the government recognizes that Mr. Watson was not intending to defraud himself or his family - - or anyone else.

  The omission of these potential forfeiture components raises questions about the reliability of the government's methodology.  Omitting the names of the Goldman partners who were personally invested in OZY is glaring in light of the government's focus on Goldman as an unequivocal victim of the fraud (the government argued to the jury in summation that the "Goldman call . . . is reason enough to convict and you can stop" deliberating, Tr. at 4401-02).

> 6. *WTI-managed funds Venture Lending & Leasing VIII and Venture Lending & Leasing IX are not entitled to a forfeiture award because these creditors were paid back in full, with interest and fees.*

  Line 2 on the "Investor Wire Payments" chart is for $11,275,364.59 to Venture Lending & Leasing VIII Inc. / Venture Lending & Leasing IX Inc. ("the WTI Funds"), two creditors managed by Western Technology Inc. ("WTI").  The WTI Funds are not entitled to any forfeiture because OZY paid back these creditors in full, with interest and fees, before Mr. Watson or OZY were aware of any formal investigation.

  As Maurice Werdegar testified at trial, WTI "raises capital every three or four years from institutional investors.  They commit capital to us.  That becomes a fund. . . . WTI is the manager of those funds," which lent money to OZY. Tr. 2206. Werdegar testified that over the course of WTI's relationship with OZY, WTI Funds gave $11.5 million in loans and OZY repaid all $11.5 million of principal, plus approximately $2 million in interest and fees. Tr. at 2296, 2318. Because WTI-managed funds Venture Lending & Leasing VIII Inc. and Venture Lending & Leasing IX Inc. did not lose any money, they are not entitled to any forfeiture.  An $11.3 million forfeiture award to WTI would be a windfall to the government.

> 7. *Forfeiture liability, if any, should be against OZY only and not jointly and severally with Mr. Watson.*

**RONALD SULLIVAN LAW, PLLC**
Ronald S. Sullivan Jr.

Moreover, the government's demand for joint and several liability in forfeiture contravenes clear Supreme Court precedent. In *Honeycutt v. United States*, the Court held that forfeiture under 18 U.S.C. § 981(a)(1)(C) is limited to property the defendant personally acquired through criminal conduct. Joint liability for forfeiture is impermissible unless the defendant directly benefited from the alleged proceeds. Here, the government conflates OZY's revenues and investments with Mr. Watson's personal financial gain, seeking to impose liability far beyond what the statute allows. Even if OZY were subject to forfeiture, Mr. Watson should not be held jointly liable for amounts he did not personally acquire or control.

> 8. *The evidence does not support an award of forfeiture to any investors, let alone all investors.*

Even if the convictions are supported by sufficient evidence (and we do not believe they are), the government has not proven that all of the fifty-five victims listed on the government's "Investor Wire Payments" chart can be included in the forfeiture order. Here, the jury heard testimony from only four of the investors listed on the government's "Investor Wire Payments" chart (which, as we have demonstrated, is an incomplete list): Tom Franco, an Antara representative, Mr. Werdegar of WTI, and Kosmas Kalliarekos.

Of those three, Mr. Werdegar was paid back and Mr. Kalliarekos ($1,320,000; line 11) has disclaimed that he is a victim. Mr. Kalliarekos is the only investor to have invested in each of the six years on the government's "Investor Wire Payments" chart (including 2022 and 2023 -- a time period outside the scope of the conspiracy); he testified for the defense at trial; and he submitted a letter with the defendants' sentencing memo rejecting the notion that he sees himself as a victim. All of the proceeds that OZY and Mr. Watson raised from this investor were used for OZY's legitimate business expenses, including the creation of award-winning programming, hiring and personnel, marketing, technology, and expansion. For a further explication of our position on Mr. Franco and other investors, see defendants' objection letter, ECF No. 341, and sentencing memorandum, ECF No. 347.

As to the other fifty-two victims who have not articulated a position and who have not testified at trial (i.e. 95% of the government's victims), the jury did not necessarily find that they were victims.

Lest we be critiqued for undue repetition, we state the following to preserve the record: we do not believe that *any* investors are entitled to *any* forfeiture, because no investors were in fact defrauded. Earlier today, the Supreme Court heard oral argument in *Kousisis v. United States*, 23-909, which tees up an issue on which the prosecution in this case was based. The

**RONALD SULLIVAN LAW, PLLC**
Ronald S. Sullivan Jr.

question presented in *Kousisis*, as stated on the Supreme Court's website, is "whether deception to induce a commercial exchange can constitute mail or wire fraud, even if inflicting economic harm on the alleged victim was not the object of the scheme." In the instant case, there was no intent to defraud any investor within the meaning of the statute, and no investor was defrauded within the meaning of the statute.

### B. Supporters of Mr. Watson and OZY

The following wish to speak in support of Mr. Watson and OZY at sentencing. Two of them wish to appear via remote video, Mr. Kalliarekos who lives and works in Hong Kong, and Mr. Cahilly, who will be in Tennessee where he will be attending the graduation of a student who unfortunately has a fatal disease; he will step out of the graduation ceremony if permitted to appear remotely at the sentencing hearing:

a. Jason Cahilly, Mr. Watson's colleague at Goldman Sachs;
b. Carmen Yulin Cruz, former mayor of San Juan and an OZY contributor;
c. Hurmon Hamilton, Mr. Watson's Pastor at the New Beginnings Church;
d. Fred Harman, managing partner at venture capital firm Oak Investment Partners;
e. Kosmo Kalliarekos, an OZY investor;
f. Antonia Klemmt-Ginsberg, a former OZY employee;
g. Dr. Jacqueline Mattis, Dean of School of Arts and Sciences, Newark, Rutgers University, ad a noted psychologist;
h. Sasha Mitchell-Fuller, former OZY executive;
i. Rachel Timoner, Senior Rabbi of Congregation Beth Elohim in Park Slope;
j. Beverly Watson, OZY investor and employee;
k. Dr. Carolyn Watson, OZY investor and Mr. Watson's former business partner; and,
l. Rafael Zahlraddin, a corporate and restructuring lawyer who represented OZY from 2020 to 2024

Sincerely,

/s/ Ronald Sullivan
Ronald Sullivan Law, PLLC
1300 I Street NW, Suite 400E

# RONALD SULLIVAN LAW, PLLC
### Ronald S. Sullivan Jr.

Washington, D.C. 20005
(202) 313-8313
*Attorney for Carlos Watson*

/s/ Shannon Frison
Frison Law Firm, P.C.
75 State Street, Suite 100
Boston, Massachusetts 02109
(617) 706-0724
*Attorney for OZY Media, Inc*