UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -     Docket No. 23-CR-00082 (EK)

CARLOS WATSON, and
OZY MEDIA,

     Defendants.

- - - - - - - - - - - - - - - -X


POST-TRIAL ORDER


February 16, 2025

## TABLE OF CONTENTS

I.    Introduction.................................................. 1

II.   Discussion................................................... 2

  A.  The Rule 29 and 33 Motions............................... 2

    1. The Motions Are Procedurally Defective.................... 4

       a.   The Defense Forfeited Any Objection to
            the Instruction in Question........................ 5

       b.   The Rule 29(c) and Rule 33 Motions Are
            Untimely........................................... 8

       c.   The Rule 29 Motions are Improper................... 9

    2. The Motions Fail on the Merits......................... 10

  B.  Potential Violations of Local Rule 23.1................. 14

  C.  Contempt............................................... 20

  D.  Bias Allegations....................................... 24

    1. Context From Trial and Pretrial Proceedings............ 24

    2. Select Allegations of Bias............................ 27

    3. Rulings for the Defense............................... 35

    4. Allegations of Financial Conflict..................... 37

  E.  Unsealing.............................................. 39

  G.  Restitution............................................ 39

    1. Applicable Law........................................ 39

    2. Defendants' Causation Arguments....................... 40

    3. Defendants' Arguments as to Specific Victims.......... 43

    4. Amount of Restitution and Payment Schedule............ 45

  H.  Forfeiture............................................. 46

    1. Section 981's Application to Securities and
       Wire Fraud........................................... 46

    2. Watson's Arguments................................... 50

  III.  Conclusion........................................... 52

## I.    Introduction

Trial in this case concluded on July 16, 2024, when the jury found Carlos Watson and Ozy Media ("Defendants") guilty of conspiracy to commit securities fraud and conspiracy to commit wire fraud.  Watson was also convicted of aggravated identity theft.  In December, the Court sentenced Watson to 60 months' imprisonment on the securities fraud count, 92 months' imprisonment on the wire fraud count, and 24 months' imprisonment on the identity theft count.  The first two sentences were ordered to run concurrently; the third was consecutive by statutory mandate.  Ozy Media received one year of probation.  The Court deferred the calculation of restitution and forfeiture until after a hearing scheduled for February 7, 2025.  Having now held that hearing, the Court now determines restitution and forfeiture here.

This order also memorializes the reasons for the Court's prior decision denying Defendants' motions for acquittal and a new trial; closes out questions that the Court had tabled until after trial, including potential violations of Rule 23.1 and contempt of court by defense counsel; responds to certain bias allegations from the defense; and resolves several other housekeeping issues (e.g., unsealing).  Although Defendants appealed the judgment prior to the entry of restitution and forfeiture, the Court may resolve those issues and — in aid of

appeal — write to clarify the basis for oral rulings made during trial and sentencing, such as on the Rule 29 and Rule 33 motions. *See, e.g.*, *United States v. Horne*, 552 F. App'x 44, 46 (2d Cir. 2014); *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995). The Court may also resolve ancillary issues, such as unsealing, that the appeal does not implicate. *See United States v. Brown*, 732 F.3d 781, 787 (7th Cir. 2013); *cf. Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (reaffirming the "well settled" principle that a notice of appeal divests a district court of its control "over those aspects of the case *involved in the appeal*" (emphasis added)).

## II.  Discussion

### A.   The Rule 29 and 33 Motions

Defendants move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, a new trial under Rule 33. *See* Mot. to Set Aside Verdict, ECF No. 314. The gravamen of both motions is that the Court erroneously included a "no-ultimate-harm" jury instruction as to the wire fraud count. *See* Tr. 4507:18-21 (instructing jury that "no amount of honest belief on the part of a defendant that the scheme ultimately will make a profit for the investors will excuse fraudulent actions or false representations by him"). According to Defendants, this instruction resulted in an erroneous conviction on the wire-fraud conspiracy and (with

respect to Watson) identity theft counts, and so "infected" the trial as to require acquittal on the securities fraud count as well.  *See* Mot. to Set Aside Verdict 1.  The Court denied both motions from the bench, *see* Sent. Conf. Tr. 10:25-11:3, ECF No. 385, and now memorializes the reasons for those rulings.

Under Rule 29, a defendant may move for acquittal on "any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  This is the only basis on which a defendant may seek a judgment of acquittal.  *See United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983) ("[T]he very nature of [Rule 29] motions is to question the sufficiency of the evidence to support a conviction.");[1] *see also* 2A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 466 (4th ed. 2009) (sufficiency of the evidence is the "only . . . ground for a motion for a judgment of acquittal").  The motion must be filed either after the close of the evidence, *see* Fed. R. Crim. P. 29(a), or "within [fourteen] days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed R. Crim. P. 29(c).  A defendant may only exceed this deadline because of "excusable neglect."  Fed. R. Crim. P. 45(b)(1)(B); Fed. R. Crim. Pro. 29 advisory committee's note to 2005 amendment.

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

A defendant may also move for a new trial under Rule 33, which the court may grant "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting a new trial is an "extraordinary" remedy. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). To justify such relief, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* Motions for a new trial generally must be filed within fourteen days of the "verdict or finding of guilty," Fed R. Crim. P. 33(b)(2), unless the defendant demonstrates excusable neglect. *See* Fed R. Crim. P. 45(b)(1)(B); Fed. R. Crim. Pro. 33 advisory committee's note to 2005 amendment.[2]

1.    The Motions Are Procedurally Defective

Defendants' motions are procedurally flawed. First, they challenge a jury instruction, but Defendants forfeited this challenge by failing to object to the instruction when the Court proposed it. Second, the motions are untimely. And third, the Rule 29 motion falters because that rule is not an appropriate vehicle for challenging jury instructions.

---

[2] A defendant has three years to file for a new trial if the request relies on "newly discovered evidence." Fed. R. Crim. P. 33(b)(1). But Defendants make no such request here.

a.  The Defense Forfeited Any Objection to the
Instruction in Question

Defendants forfeited their objection to the jury
instructions.  "A party who objects to any portion of the
instructions or to a failure to give a requested instruction
must inform the court of the *specific objection and the grounds
for the objection* before the jury retires to deliberate."  Fed.
R. Crim. P. 30(d) (emphasis added).  Here, Defendants leveled no
objection — either in their written objections[3] or at the lengthy
charge conference that followed[4] — against the no-ultimate-harm
instruction.  And this was not for want of opportunity.  The
parties discussed the *location* of the no-ultimate-harm language
at the charge conference.  *See* Tr. 4086:14-89:22.  During that
discussion, Defendants never objected to the language's
inclusion in the final jury instructions.  *Id.*

Anticipating this outcome, Defendants'
post-trial letter offers the following argument for why their
jury-instruction objection is, in fact, preserved:

Mr. Watson objected to the Court's "scheme to
defraud" instruction at trial.  He proposed
revised jury instructions that made clear he
could not be guilty of wire fraud unless he
intended to harm Ozy's investors.  *See* Dkt.
No. 135 at 27 ("In addition to proving that a
statement was false or fraudulent and related

---

[3] Watson Proposed Jury Instructions, ECF No. 135; Defendants' Requested
Revisions to Jury Instructions, ECF No. 235; Motion in Limine on Aiding and
Abetting Jury Charge, ECF 235; Supplemental Letter re Jury Instructions, ECF
No. 246.
[4] *See* Tr. 4010:6-25:8, 4030:2-42:3, 4050:25-112:17, 4132:20-42:25.

> to a material fact, in order to establish a
> scheme to defraud, the government must prove
> that the alleged scheme contemplated depriving
> another of money or property."). However, the
> Court rejected these instructions."

*See* Def.'s Mot 3.  Here, Watson is pointing to his proposed

instruction on Count Two (Conspiracy to Commit Wire Fraud),

First Element (Existence of a Scheme to Defraud).  That is not

the instruction that corresponds to the Court's no-ultimate-harm

instruction.[5]  And the Court did include language virtually

identical to the language quoted above from Defendants' letter.

*See* Tr. 4506:4-9 (instructing jury that to conclude that a

scheme to defraud existed, "you must find that the scheme

contemplated depriving another of money or property"); Gov't

Br. 13, ECF No. 321 (collecting similar instances).[6]

     To be sure, Defendants' proposed instructions did *omit*

the no-ultimate-harm instruction.  But that is insufficient to

avoid forfeiture, as "the mere fact that a defendant submitted

his proposed language as part of a requested charge does not in

itself preserve the point for appeal."  *United States v.*

---

[5] The Court included the no-ultimate-harm instruction in its description
of Count Two's *second* element, on intent to defraud.  *See* Tr. 4086:14-89:12,
4506:21-07:21.  That location was appropriate because the no-ultimate-harm
instruction is a component of the description of what it does — and does not
— mean to act in good faith.

[6] As discussed in more detail below, a contemplated-harm instruction and
a no-ultimate-harm instruction are different things.  The former concerns
whether the defendant planned to deprive another person of money or property
(i.e., to cause them economic harm).  The latter concerns whether the
defendant intended for that harm to be permanent.

*Crowley*, 318 F.3d 401, 413 (2d Cir. 2003).[7]  It is well-settled that "a requested charge is not a distinct objection to a charge adopted by the district court."  *United States v. Friedman*, 854 F.2d 535, 555 (2d Cir. 1988).  So, Defendants' objection here, like the one in *Friedman*, "defies the plain language of Rule 30."  *Id.*[8]  Indeed, were the law otherwise, "district judges would have to speculate on what sorts of objections might be implied through a request for an instruction and issue rulings on implied objections that a defendant never intends to raise." *Jones v. United States*, 527 U.S. 373, 388 (1999).  Thus, an objection is sufficiently specific under Rule 30 only when "the trial court can perceive the *basis on which* it is claimed that the instruction was erroneous."  Wright & Miller, *Federal Practice and Procedure* § 484 (collecting cases) (emphasis added).

---

[7] In *Crowley*, the Court of Appeals wrote that "a party who has requested an instruction that has not been given is not relieved of the requirement that he state distinctly his objection to the instruction that is given." 318 F.3d at 412.  The opposite proposition applies with as much, if not more, force: that a defendant's mere *omission* of certain language from its proffered charge does not excuse that defendant from the need to object specifically to its inclusion in the Court's charge.

[8] At the time of the trial in *Friedman*, Rule 30 required that a party "stat[e] *distinctly* the matter to which he objects and the grounds of his objection."  854 F.2d at 555 (emphasis added).  While this later became "inform the court of the *specific* objection and the grounds for the objection," the change in phrasing was stylistic, not substantive. *See* Fed. R. Crim. P. 30 (emphasis added); 2A Wright & Miller, *Federal Practice and Procedure* Rule 30, nn. 3-4 (outlining the substantive and stylistic elements of the 1988 and 2002 amendments to Rule 30).

      b.   The Rule 29(c) and Rule 33 Motions Are Untimely

      Defendants' motions under Rules 29(c) and 33 are also untimely.  Defendants filed those written motions sixty-one days after their convictions.  *Compare* Mot. to Set Aside Verdict (dated September 15, 2024), *with* Jury Verdict, ECF No. 256 (dated July 16, 2024).  The applicable deadline under Rules 29(c) and 33 is fourteen days, as noted above.  So, absent a showing of excusable neglect, the Court must deny the motions.  *See Eberhart v. United States*, 546 U.S. 12, 17-19 (2005) ("properly invoked" timeliness objections under the Federal Rules of Criminal Procedure require dismissal, assuming no excusable neglect).[9]

      Defendants have failed to demonstrate excusable neglect.  When evaluating an excusable neglect claim, the most important factor is the "reason for the delay."  *See In re Enron Corp.*, 419 F.3d 115, 122-24 (2d Cir. 2005).  Defendants offer two reasons for missing the applicable deadline by more than forty-five days.  The first reason is that counsel was "consumed with resolving bail issues" after trial.  Def.'s Reply 2.  However, "preoccupation or an excessive workload does not

---

[9] Watson's counsel did enter a Rule 29(a) motion at the end of the government's case-in-chief.  Tr. 2684:18-85:2.  But that motion said nothing about the jury instructions.  And a reserved Rule 29(a) motion can only be decided "on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  Here, the defendants' post-trial Rule 29 and 33 motions invoke evidence from the defense case.  *See, e.g.,* Mot. to Set Aside Verdict 6-7.  The post-trial Rule 29 motion therefore fell under Rule 29(c).

typically render a mistake excusable." *In re Enron*, 419 F.3d at 126.  The second reason is that Watson could not easily communicate with counsel for the period when he was held, post-trial, in the Metropolitan Detention Center while he worked to assemble a stronger bail package.  Def.'s Reply 2.  But Defendants do not claim Watson had no access to counsel whatsoever, and they fail to explain why the access Watson did have, "even if it could be deemed limited, prevented the timely filing of [the Rule 29 and 33 motions]." *Garraway v. Smith*, No. 12-CV-924, 2020 WL 8910842, at *3 (W.D.N.Y. Apr. 2, 2020).

In sum, because Defendants have failed to show excusable neglect, the Rule 29(c) and 33 motions can be — and are — dismissed as untimely.

        c.    The Rule 29 Motions are Improper

Finally, Defendants' motions for acquittal under Rules 29(a) and 29(c) are procedurally improper.  The only permissible basis for a Rule 29 motion is insufficiency of the evidence.  *See* 2A Wright & Miller, *Federal Practice and Procedure* § 466.  So, Rule 29 is an inappropriate vehicle for challenging jury instructions.  *See United States v. Dawkins*, 999 F.3d 767, 780 n.12 (2d Cir. 2021) (jury instruction challenges not preserved by raising them in a Rule 29 motion); *see also United States v. Goklu*, No. 19-CR-386, 2023 WL 184254, at *5 (E.D.N.Y. Jan. 13, 2023) (Rule 29 motion was improper

"attempt to end run the procedural requirements of challenging
the Court's . . . instructions to the jury"); *United States v.
Levy*, No. 11-CR-62, 2013 WL 3832718, at *3 n.2 (S.D.N.Y. July
15, 2013) (Rule 29 motion was not a proper vehicle for
"rehash[ing] certain jury instruction arguments").[10]  The Rule 29
motions can be denied on this basis alone.

    2.  <u>The Motions Fail on the Merits</u>

       Thus, Defendants' motions can be dismissed without
recourse to the merits.  But they are also meritless.
Defendants' challenge to the inclusion of the no-ultimate-harm
instruction relies on two Second Circuit cases: *United States v.
Rossomando*, 144 F.3d 197 (2d Cir. 1998) and *United States v.
Gramins*, No. 21-CV-5, 2022 WL 6853273 (2d Cir. Oct. 12, 2022).
That reliance is misplaced.

       In *Rossomando*, the Court of Appeals held that a
no-ultimate-harm instruction was inapposite to the facts, not
that it misstated the law.  There, a city employee was convicted
of underreporting the "outside income" he earned while
simultaneously receiving a public disability pension.  144 F.3d
at 198.  Had the employee disclosed his true income, his pension
payments would have been reduced.  *Id.*  Rossomando had not —

---

[10] This approach comports with the Second Circuit's command that the
"proper remedy [for an erroneous jury instruction] is not to dismiss the
charge, but to remand for further proceedings, including a new trial if the
government chooses to pursue the count further."  *United States v. Capers*, 20
F.4th 105, 128 (2d Cir. 2021).

unlike Defendants — sold securities or borrowed money.  He owed
no return on any investment.  So, the no-ultimate-harm defense
was simply never in play: it was not possible that Rossomando
would grow his way out of the fraud and deliver an ultimate
return or interest payment.  *See id.* at 202.  The Second Circuit
acknowledged this explicitly in *Rossomando*, observing the
"absence of a sufficiently clear referent for the court's 'no
ultimate harm' instruction."  *Id.*  Because there was no referent
for the no-ultimate-harm instruction, offering the instruction
could have only "confused [the jury] into believing" that no
harm *at all* needed to be shown.  *Id.*[11]

   *Rossomando* is inapposite here.  As the jury concluded,
Watson and Ozy made misrepresentations to Ozy Media's lenders
and investors.  And the idea that everything might ultimately
work out in the end — the "no harm, no foul" defense — was
clearly in play, as the testimony excerpted in the government's
response indicates.  *See* Gov't Br. at 14; *see e.g.*, Tr.
334:14-20 (Samir Rao testifying that fraud was necessary "in
order for [Ozy] to ultimately be successful for investors at
all"); *id.* at 334:22-35:1 (Rao testifying that the "larger
justification was that if we do whatever we can to keep the

---

[11] Indeed, that is what happened.  The *Rossomando* jury manifested its
"evident confusion on the issue of intent" in a jury note, and the Second
Circuit concluded that the district judge's response failed to clarify
things.  *Id.* at 203.

company alive so that it can succeed, that is ultimately the greatest fulfillment of our responsibility to our investors").

In cases like this one, the general rule prevails, and the no-ultimate-harm instruction is appropriate. *See United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) (instruction was "proper" where a factual predicate existed for it, the instructions accurately defined the intent requirement, and the jury indicated no confusion regarding intent requirement); *United States v. Calderon*, 944 F.3d 72, 90-91 (2d Cir. 2019) (same).[12]  Indeed, *Rossomando* remains the "only" case in which the Second Circuit has "ever concluded that a 'no ultimate harm' instruction was given in error."  *United States v. Ingram*, 490 Fed. App'x. 363, 367 (2d Cir. 2012) (noting the "unique facts" of *Rossomando*); *see also United States v. Ferguson*, 676 F.3d

---

[12] Defendants have submitted an affidavit from a juror who claims she found the jury instructions "confusing."  *See* Decl. of Carlisa Brown-Simons ¶¶ 8-9, ECF No. 323-1.  The Supreme Court has made clear that such belated affidavits should, at best, be viewed skeptically.  *See Tanner v. United States*, 483 U.S. 107, 120 (1987) ("Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process . . . . Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.").  As such, matters that "pertain to the jurors' mental processes . . . should not become the subject of [post-verdict] inquiry absent extraordinary circumstances." *United States v. Aiyer*, 433 F. Supp. 3d 468, 474 (S.D.N.Y. 2020).  Such circumstances hardly exist here.  Indeed, there was "no suggestion during deliberations that the jurors were confused in any way, such as a note to the Court requesting clarification" of the no-ultimate-harm instruction.  *Id.*  In these circumstances, "[t]he post hoc misgivings of a single juror are an insufficient basis to conduct a post-verdict inquiry." *Id.*

260, 280 (2d Cir. 2011)("*Rossomando* is limited to the quite peculiar facts that compelled its result. . . .").

Defendants' reliance on *Rossomando* also highlights the fundamental confusion at the heart of their motions.  Defendants are essentially arguing that by instructing the jury that no "*ultimate* harm" was required to show wire fraud, the Court instructed the jury that no harm was required *at all*.  But this is obviously incorrect.  As an initial matter, the jury instructions clearly indicated that an intent to deprive someone of money or property was, in fact, required.  *See* Tr. 4504:18-4508:2.  Moreover, as discussed above, Defendants' position wrongly conflates "harm" and "*ultimate* harm."  A defendant deprives someone of money or property (i.e., causes economic harm) by inducing them to part with that money based on misrepresentations — lies — about the value of the securities they receive in return.[13]  So, the government demonstrates economic harm where, as here, victims purchased a security at an inflated value based on misrepresentations by the security's issuer.  The no-ultimate-harm instruction simply confirms the (presumably uncontroversial) view that the issuer cannot escape criminal liability based on the mere belief that he could ultimately grow his way out of the lies and deliver the

---

[13] This is especially true where the lies are about revenue or other metrics that flow through to an entity's assessed net present value.

13

initially promised value.  *See Rossomando*, 144 F.3d at 201 (noting that the "key word" in the instruction is "ultimately").

Defendants' reliance on *Gramins* fares no better. According to Defendants, *Gramins* held that a no-ultimate-harm instruction is only permissible in the securities fraud context. Mot. to Set Aside Verdict 5.  This is not correct.  *Gramins* simply rejected the argument that such an instruction could have confused the jury as to the elements of wire fraud, because the court "expressly limited the no-ultimate-harm charge instruction to *securities* fraud."  2022 WL 6853273, at *5.  Thus, *Gramins* said nothing about the general appropriateness of no-ultimate-harm instructions.  Defendants' contrary argument mischaracterizes the limited nature of that case.[14]

## B.    Potential Violations of Local Rule 23.1

Local Criminal Rule 23.1(c) directs that during a jury trial, no lawyer "associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview" that would be substantially likely to interfere with a fair trial.  Local Crim. R. 23.1(c).  The Rule goes on to say

---

[14] None of the Court's merits analysis depends on the Second Circuit's longstanding right-to-control theory of wire fraud, which was recently upended by the Supreme Court.  *Ciminelli v. United States*, 598 U.S. 306, 308 (2023).  Under that theory, "a defendant is guilty of wire fraud if he schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions."  *Id.* (citing *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021)).  Here, Defendants were convicted of depriving their victims of money, which is the type of "traditional property interest" that falls within the ambit of the wire fraud statute.  *Id.* at 309, 312.

that statements opining on "the evidence in the case" will "presumptively" give rise to such a substantial likelihood. Local Crim. R. 23.1(d).

During trial, the *New York Times* published a story stating that:

> Shannon Frison, a defense counsel for Ozy, denied the government's allegations that Mr. Watson had told an investor about a $600 million takeover offer from Google, calling the claim "unequivocally untrue," in a statement on Friday. "He never had such a conversation with Google and never told any person that he did," Ms. Frison said.

Danielle Kaye, *Google C.E.O. Testifies in Ozy Media Founder's Fraud Trial*, N. Y. Times (June 14, 2024).[15]

In response to the Court's inquiry, Ms. Frison acknowledged giving a statement to the Times reporter. Tr. 1980:25-81:18.  The government then pointed to similar — but more troubling — statements on Ozy's Instagram account.[16]  *Id.* at

---

[15] https://www.nytimes.com/2024/06/14/business/media/google-ceo-ozy-fraud-trial.html.

[16] One Instagram post (since deleted) reported that the "full statement" Ms. Frison provided to the New York Times was this:

> It is unequivocally untrue that Carlos Watson told anyone that Google offered to buy Ozy for $600 million. He never had such a conversation with Google and never told any person that he did. This allegation is one of many fabricated stories about Ozy's CEO.  Ozy Media did not tell any investor or potential investor that lie.  This testimony shows the extensive coaching of the government's witnesses to say things that are not true in an effort to falsely include Ozy and Mr. Watson in Samir Rao's crimes.

1982:24-83:25.  Asked about the management of the Instagram
account, Ms. Frison first responded that it was run by
"individuals who are not a part of the trial team."  *Id.* at
1983:13-14.  Pressed for specifics, though, Ms. Frison almost
immediately reversed position, acknowledging that the account
was managed for an intern who was "[i]nterning with this trial
and for [her] office."  *Id.* at 1984:17-85:1.

Based on these revelations, the Court directed Ms.
Frison to show cause why these public statements did not
constitute a presumptive or actual violation of the Local Rule.
*Id.* at 1985:2-11.  The Court also entered a "special order"
under Rule 23.1, barring the parties, their attorneys, and their
agents from publicly disseminating certain information about the
case.  *See* ECF No. 194.

Thus began a cascade of revelations; in time, it
emerged that Watson and his attorneys had been running a
multifront media offensive.  As described in a partial
compilation assembled by the government, this included
Instagram, Twitter, and LinkedIn accounts bearing the names of
Watson, "ProfRonSullivan," "JudgeFrison,"
"thecarloswatsontrial," "2black4business," and defendant
Watson's sister.  *See* Gov't Ltr. on Rule 23.1 Timeline 3, ECF

---

Ozy (@Ozy), Since-Deleted Instagram Post (dated June 2024),
https://www.instagram.com/ozy/?hl=en (printout on file with chambers).

No. 264.[17]   The defense also posted elaborately produced videos on YouTube, hosted the "tooblackforbusiness.org" website,[18] and sponsored Google search results.  *Id.* at 3-4.

Several days after the *New York Times* story, prosecutors questioned the defense team's compliance with the special order, noting that a video entitled "The Case Against Carlos Watson: When They Come For You" remained publicly available on YouTube.  Tr. 2277:11-18.  Asked about the film, Mr. Sullivan responded categorically: "I don't know anything about a YouTube video."  *Id.* at 2280:24-25.  The government replied that this response was false: Mr. Sullivan was interviewed in the video himself, and the video had been screened at Mr. Sullivan's workplace in an event that was "open to the public, and advertised on social media."  *Id.* at 2281-83. Mr. Sullivan responded that he could not remember "if the trial had begun" when he sat for the interview.  *Id.* at 2282:1-2.  In the interest of moving the proceedings forward, the Court indicated that the Rule 23.1 issues would be "tabled for now" and taken up after trial.  *Id.* at 2283:23.

---

[17] This media offensive included posts beginning before trial.  For example, on May 2, a post on the Instagram account of "thecarloswatsontrial" urged "justice watchers" to "COME PACK THE COURTROOM."  The Carlos Watson Trial (@thecarloswatsontrial) (dated May 2, 2024), https://www.instagram.com/p/C6fbMtTtt_L/?igsh=YnJvbzd3Zm5vYjk5.

[18] Posts on this website attacked (among others) the "biased, largely white jury and [] hostile white judge."  *See Too Black for Business*, https://www.tooblackforbusiness.org/cw/cw-unfair-trial (last visited February 11, 2025).

Ms. Frison and Mr. Sullivan cannot plead ignorance of Rule 23.1, given that the defense had themselves challenged statements the government made in a press release announcing the charges in this case. *See* Mem. & Order dated Nov. 6, 2023, ECF No. 96.  In response to the Court's order on this challenge, the government excised certain statements from the press release.[19] *See* Gov't Ltr. dated Nov. 17, 2023, ECF No. 100.  Later, in the lead-up to trial, the defense team noted that the government's media office had left up a Twitter post containing some of the same statements. *See* Def. Mot. for Change of Venue 2-3, ECF No. 130.  (This happened before Twitter was renamed.)  Based on that tweet, the defense moved to dismiss the indictment or, alternatively, transfer venue. *Id.* at 3-4.

This dichotomy — between the defense's outsized reaction to a single tweet posted long before trial, on the one hand, and its own massive media campaign, on the other — is another stark reflection of the defense view that various rules of general applicability were optional for them. *See generally* Supp. Mem. & Order of July 17, 2024, ECF No. 257 (observing that

---

[19] The Court observed that some of the challenged statements in the press release triggered the Local Rule's presumption of prejudice. *See* Mem. & Order dated Nov. 6, 2023, at 40-41.  The Court reserved judgment on the need for the "special order" contemplated by that Rule, and advised the government "to consider whether it wishes to excise of modify" the challenged language in light of the Court's observations. *Id.; see also United States v. Perryman*, No. 12-CR-0123, 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013) (referring to the "relatively modest" remedy of removing language from a press release).  The government did excise the challenged statements. *See* Gov't Ltr. dated Nov. 17, 2023.

the defense consistently flouted federal rules and court orders regarding notice and discovery).

The defense media blitz continued after trial.  The government reported — and Watson did not dispute — that a blogger was paid to post stories attacking the prosecutors and the Court on a near-daily basis, complete with gratuitous references to the participants' religion and race.  Gov't Sent. Mem. 33, ECF No. 354.  Some posts came with stereotypically sinister renderings that — in the government's apt description — showed the prosecutors and Court as "demonic" figures.  *See id.* at 32-33.  Google searches showed that these stories were "sponsored" results, meaning "someone ha[d] paid Google to have [the results] be at the top of search results for any search for Carlos or OZY."  Tr. 2277:2-7, 2627:16-17.[20]

Criminal defendants do not surrender all First Amendment rights — far from it.  But the Local Rule endeavors to strike a careful balance between those rights and the need to assure a fair and impartial jury.  The record makes clear that,

---

[20] *See* Frank Parlato, *Wealthy Judge, Familiar Faces: How the Carlos Watson Trial May Have Been Pre-Determined*, Frank Report (Sept. 29, 2024), https://frankreport.com/2024/09/29/wealthy-judge-familiar-faces-how-the-carlos-watson-trial-may-have-been-pre-determined (describing the prosecutors as "White and, if I err not, Jewish"; *id.* (referring to the "White Jewish judge" overseeing the case, and referring to the Court's "[c]onnections to Goldman Sachs," despite the undersigned's never having worked there); *see also,* Frank Parlato, *96% Market Moves, 4% Justice: Meet Wall Street's Favorite Judge*, (Nov. 27, 2024), https://frankreport.com/2024/11/27/96-market-moves-4-justice-meet-wall-streets-favorite-judge-eric-komitee (quoting an anonymous "gentleman who claims to know Komitee" as stating that he "plays the stock market like dreidel").

*as a collective*, the defense repeatedly transgressed the Rule

and its purpose — at least prior to the Court's issuance of the

special order on June 18.  *See* Gov't Ltr. on Rule 23.1 Timeline

4 (government reports that a June 26, 2024 review of the

accounts and websites at issue "showed that the accounts

associated with Sullivan and Frison generally removed offending

posts, comments, and statements, but those associated with the

defendants and their surrogates did not").  Despite that

clarity, the Court will not pursue the issue of the attorneys'

potential violations, as doing so would entail the unsavory task

of sorting out which of the offending posts were the lawyers'

(or their staff's) and which were posted by the parties (or

their supporters, paid or otherwise).

## C.    Contempt

Late in the trial, during jury deliberations, the

Court ordered one of Watson's lawyers to show cause why contempt

sanctions should not issue.  The immediate catalyst was a jury

note requesting excerpts from Watson's testimony.

Tr. 4551:25-52:7.  The parties disputed (as is common) which

testimony the jury should receive in response.  During the

ensuing colloquy, the Court concurred at one point with the

government that certain testimony should be redacted.  In

response, one member of the defense team — Janine Gilbert —

exclaimed: "unbelievable." *Id.* at 4562:11-15.   When the Court

20

asked Ms. Gilbert to confirm, she responded: "Yes.  I'm happy to say it again."  *Id.* at 4563:1-4.

This remark followed several breaches of courtroom decorum by the defense team, some of which had elicited warnings from the Court.  *See, e.g.*, Tr. 1065:3-1068:9 (warning Mr. Sullivan that shouting at the Court "should not continue"); *id.* at 3089:7-12 (similar); *id.* at 4557:5-13 (noting repeated interruptions by Ms. Gilbert).  Given the pattern, the order to show cause was necessary to crystallize the possibility of sanctions and to stem the flow of vitriol and disrespect.  *Id.* at 4564:2-4566:4.

Ms. Gilbert filed a responsive letter two days later. *See* ECF No. 258.  In the letter, she attributed her remark to "exasperation and frustration out of yet again feeling unheard by the Court," *id.* at 2, though she acknowledged that her prior instance of "feeling unheard" did not necessarily fit that pattern.  *Id.* (invoking prior example in which the Court had "seemed to be" agreeing with the government without first hearing from the defense, "although, admittedly the Court did say that [it] would hear from defense counsel in a moment"). Ms. Gilbert also stated that the word "unbelievable" was "not intended to be heard on the record, by the Court, or by any audience members."  *Id.*; *see also id.* at 3 ("As the Court is aware, throughout the trial, I have had problems with my

21

microphone and not being heard.  So naturally, I did not expect

to be heard when I made that statement.").

    In making the point that her exclamation was not

intended for the Court's consumption, Ms. Gilbert's letter omits

any discussion of the colloquy that followed:

> **THE COURT (addressing the AUSA initially):**
> Hold on a second.  Ms. Gilbert, I think you
> just said the word "unbelievable," is that
> [correct]?
>
> **MS. GILBERT:**  Yes, I did.
>
> **THE COURT:**  Okay.  I just want the record to
> be clear on that.
>
> **MS. GILBERT:**  Yes.  I'm happy to say it
> again.
>
> **THE COURT (turning back to the AUSA and the
> substantive issue):** Mr. Siegel?
>
> **MS. GILBERT:**  I'm not sure why we're
> participating.

Tr. 4562:20-63:4.

    One struggles to imagine how these *later* statements

were not intended for the Court (or the gallery), which might

explain why Ms. Gilbert's letter sidesteps them.  Nevertheless,

the Court will not impose a finding of contempt.  For better or

worse, it is not unheard of for tempers to flare in the heat of

a contested trial.  Following the order to show cause, Ms.

Gilbert engaged in no additional breaches of civility.  And

though her exclamation came late in the trial — as a proverbial

last straw — it did not rise to the level of prior conduct by at least one other defense attorney that did not result in a similar order.  Moreover, Ms. Gilbert has offered an apology (of sorts).  *See* ECF No. 258, at 1 ("If the court received my expression of frustration [as] disrespect, I sincerely apologize.").[21]  No sanctions will issue.

---

[21] Along the way to apologizing, Ms. Gilbert invokes an earlier exchange in which the Court described the defense's ostensibly inadvertent re-ordering of pages in an exhibit as "an extreme coincidence."  *See* ECF No. 258, at 4 n.ii (quoting Tr. 1803:18-04:1); *see also* Tr. 1810:5-6 (calling the same incident a "sizable coincidence").

The Court's comment, too, is relevant context here.  The background is complicated, but it will suffice here to say that the defense was trying to introduce a spreadsheet, ostensibly for impeachment, that it claimed was part of a larger slide deck.  Tr. 1789-99, 1810.  Several indications to the contrary emerged in rapid succession.  First, the government suggested that the order of pages in the slide deck had been altered, such that (as introduced) the spreadsheet appeared *after* the cover page — that is, within the slide deck.  This was not how the spreadsheet appeared in the witness's files: there, the spreadsheet appeared *prior to* the cover sheet (that is, seemingly outside the deck).  Tr. 1791:3-92:7, 1795:6-19.  Ms. Gilbert conceded that the sequence had been altered but said that the alteration was unintentional.  *See* Tr.1795:20-24.  And second, indications emerged that the spreadsheet was created on a different date than the remaining slides, and for a different purpose.  *See* Tr. 1795:6-1801:11.

This incident came on the heels of several problems with the defense's disclosure of exhibits, and after a raft of defense representations to the Court had turned out to be inaccurate, as discussed below and elsewhere.  And the change was indeed a sizeable coincidence, objectively speaking.  Moreover, in making that observation, the Court did offer a disclaimer of sorts — that it was "not drawing any conclusions whatsoever" as to the intent of defense counsel.  Tr. 1809:20-21; *see also* Tr. 1803:9-15 (Court directing parties to "sort through this").  Nevertheless, the Court's comment surely demonstrates the wisdom of Sir Francis Bacon's ancient admonishment — often repeated in this courthouse — that an "overspeaking judge is no well-tuned cymbal."  Francis Bacon, *Judicature in Essays* 162-63 (J.M. Dent & Sons ed., 1958) (1612).  The Court overspoke with this comment, and remains cognizant of it in putting this sanctions issue to rest with no findings.

**D.  Bias Allegations**

During the trial, the defense filed two letters contending that the Court exhibited bias against the defense team.  *See* First Def. Bias Ltr. 1, ECF No. 223 ("The court's entire interaction with the defense team has created an atmosphere where the defense is not perceived as equal participants in the judicial process."); Second Def. Bias Ltr. 1, ECF No. 234 ("The Court has put its thumb on the scale of justice by proving inappropriate assistance to the prosecution, undermining the credibility of Watson's defense team, and through rulings that have reflected a disturbing bias.").  These letters did not specify any relief sought.  Still, the allegation of partiality should not be left unaddressed.

1.  Context From Trial and Pretrial Proceedings

It is important to note the context in which the defense letters appeared.  As discussed in prior orders, it emerged well in advance of trial that the defense had simply declined to comply with a litany of disclosure obligations and deadlines.[22]  This pattern would ultimately lead the Court to

---

[22] *See, e.g.*, Gov't Mot. to Compel, ECF No. 59 (seeking order compelling compliance with grand jury subpoenas); Gov't Mot. in Limine, ECF No. 119 (discussing, among other things, the defense's "failure to provide reciprocal discovery"); Gov't Mot. in Limine, ECF No. 142 (describing how "[D]efendants' failure to adhere to Rule 16 and the Court's schedule ha[d] substantially prejudiced the government's ability to engage its own expert" to respond to defense expert); Gov't Mot. in Limine, ECF No. 145 (indicating that the defense turned over no exhibits by the scheduled deadline, and then declined to reply to government inquiries); Gov't Ltr. of May 17, 2024, ECF No. 151

conclude, in its order of July 17, 2024, that counsel had committed "willful violations" of their disclosure obligations. *See* ECF No. 257, at 2.[23]

These issues continued when the trial started.  On the first day, as the jury waited for opening statements to begin, a dispute emerged over whether the defense's opening slide presentation included material that the defense had not turned over in discovery or exchanged with their exhibits.  Tr. 3-6; *see also* Tr. of Apr. 26, 2024 H'ing 93:10-16, ECF No. 133 (establishing exhibit disclosure deadline of May 10, 2024).  The defense initially represented that the materials had been produced.  Tr. 7:5-24.  When the Court asked for an exhibit

---

(further describing "late and improper disclosure" of trial exhibits); Gov't Ltr. of May 23, 2024, ECF No. 157 (similar); Gov't Ltr. of May 27, 2024, ECF No. 164 (similar); Gov't Mot. in Limine, ECF No. 165 (moving to preclude admission of slide presentation "almost exclusively comprised of exhibits" Defendants had not identified to the government); Gov't Mot. in Limine, ECF No. 184 (describing defense's failure to produce any witness statements by the agreed-upon deadline, as well as the defense's continuing failures — and "gratuitously false" claims — regarding defense exhibits); Gov't Mot. in Limine, ECF No. 221 (moving to preclude testimony that was not timely disclosed to the government).

[23] In that order, the Court observed:

> The story of this case has been, in large part, a function of the current defense team's decision to treat as optional a variety of rules, deadlines, and court orders relating to discovery and witness statements — notwithstanding repeated government motions for relief, and repeated inquiries from the Court.

> As discussed in further detail below, the defense has responded to the Court's inquiries throughout with generalities and platitudes, promises to provide additional responses that never materialized, and — at times — factual representations that turned out to be false.  This has led to persistent inefficiencies in the management of this trial.

number, however, the defense team backtracked, and it turned out that the representation was incorrect. *Id.* at 10:12-22. This was not the only — or the most serious — misrepresentation the defense made in connection with the slide deck.[24]

The second morning of trial, the jury waited again while the Court sorted through a dispute over Ozy's general ledger and certain contracts. Asked whether Ozy's general ledger for 2017 was produced, defense counsel represented that he was "absolutely sure it [was]." *Id.* at 282:12-20. This representation, too, turned out to be false, as discussed in the Court's July 9 order. *See* ECF No. 245, at 28-30. As to another challenged contract, defense counsel represented (in a letter to the Court and again orally, on the record) that the document had been produced by the government to the defense. *See* Def. Ltr. of May 29, 2024, ECF No. 170; Tr. 274:11-14. The government responded that it had received an *unsigned* copy of the contract, not the executed version the defense was seeking to introduce — obviously a meaningful difference in a case about inflated contract revenues. Tr. 285:2-11. The defense made inaccurate

---

[24] The defense also asserted, in the slides, that the "prosecutors in Brooklyn" who brought this case were "friends of Ben Smith [of the *New York Times*]." This assertion was improper for two reasons: first, it conflicted with the Court's ruling *in limine* that the government's motivations for bringing the case were not a proper subject for the jury. *See* Mem. & Order 4, ECF No. 161. Second, and more importantly, the assertion was apparently false. The government reported that none of the AUSAs knew Mr. Smith, and the defense could suggest no reason to believe otherwise. Tr. 3:5-4:24.

representations of fact concerning other matters, unrelated to disclosure and discovery, as well.[25]

We will not attempt here to recite the events in this category that continued over the duration of the trial. Some later issues — but still by no means all — are detailed in the Court's July 17 Order. *See generally* ECF No. 257.

2.    Select Allegations of Bias

With that context, the Court offers the following responses to certain specific assertions contained in defense counsel's letters.

***Reference to Federal Court Procedures***. Mr. Sullivan's letter purports to quote the Court as follows: "On May 29, 2024 (the 1st day of trial), the court said to the defense team, 'I don't know where you've tried cases before . . . this is federal district court!'" *See* First Def. Bias Ltr. 6. Notwithstanding the quotation marks, this statement does not appear in the transcript. Instead, this appears to be a paraphrase of the

---

[25] On the first day of trial, for example, the gallery was frequently disruptive. *E.g.*, Tr. 11:8-9 (Court noting "laughter, somewhat inexplicably, coming from the gallery" during a colloquy about demonstratives for opening statements); *id.* at 162:12-15 (prosecutor indicates that "there continues to be laughing and comments during the witness's testimony"). When the Court referred (outside the presence of the jury) to the "woman who made a little bit of a scene this morning," *id.* at 163:2-3, one defense attorney undertook to "talk to the people who are here to support Carlos to ensure that they are not doing that." *Id.* at 162:24-63:1. Mr. Sullivan, however, was definitive: "That's not our person, for whatever it's worth. I don't know who that is." *Id.* at 163:6-7. It later emerged that the same spectator appeared on Ms. Frison's Instagram feed and was among those writing letters concerning the conduct of trial. This inaccurate statement may relate to a small matter, but it and others like it led the Court to observe the importance of candor. *See id.* at 286:22-287:4.

Court's day-one observation that "[w]e're in federal court [here,] we're going to abide by formalities."  Tr. 97:18-19. That observation came in response to a rather exceptional breach of protocol by the defense team; given the circumstances, it was actually fairly mild.[26]

Elsewhere, Mr. Sullivan asserts that the Court "signal[ed] to the jury that the defense [was] unprepared because [it] did not have multiple physical copies of exhibits." First Def. Bias Ltr. 7.  Although the letter again does not cite to the record, it appears to be referencing the Court's anodyne request that the defense "have physical copies of everything [it was] going to use in this manner or otherwise today, please." Tr. 1004:9-11.  It is hardly improper for the Court to request that a party, before showing a document to a witness, prepare copies for opposing counsel and the Court.

*The Court as "Fourth Prosecutor."*  The defense letter asserted that the Court "[c]learly" favored the prosecution "due to personal likes and affection for the individual prosecutors

---

[26] As is common, the parties had arranged before trial to send a technology person from each side to do a "walk-through" of the court's audio-visual systems to avoid technical difficulties that might result in the inefficient use of the jury's time.  The undersigned learned later that the defense elected to send Watson himself to perform this check, and that Watson had, in the process, availed himself of the opportunity to question the Court's Case Manager about the status of pending motions and other substantive matters.  *See* Tr. 97:5-21.  This deviation from protocol was of a piece with other efforts by Watson, including his false statements — on more than one occasion — to court security officers about whether he had any phones or electronic devices in his possession.

trying the case." First Def. Bias Ltr. 2. It attributes this supposedly personal affection to my having "served in the same U.S. Attorney's Office." *Id.*

In fact, the Court has no personal relationship with the prosecutors in this case. None of the assigned AUSAs overlapped with my tenure as a prosecutor, and I do not recall ever socializing with — or even interacting with — any of them outside of court business. Even *within* the context of court business, I do not recall presiding over a case with the lead AUSA prior to this one.

Mr. Sullivan's letter contains only one specific example purporting to show how the Court "assisted" the prosecution — notwithstanding that the letter came after thirteen days of trial. The letter points to a question the Court put to Samir Rao, a cooperating witness, on the third day of trial. The question at issue was just that: an actual question about something the Court had not comprehended. As should be apparent, it was not posed for rhetorical purposes:

> **THE COURT:** Can I make sure I understand what you're saying about this chart. This top line that says, The Carlos Watson Show, parenthesis YouTube, the $5,750,000 in revenue [ex-]advertising, what is the actual number of revenue excluding advertising that The Carlos Watson Show was bringing in or that had been booked for the show in 2021 at that point?

**THE WITNESS:** Zero.

**THE COURT:** Okay. Sorry.

Tr. 724:14-22.

This question can be contrasted with questions that are not really questions, but rather argument from the Court. *See, e.g.*, *United States v. Filani*, 74 F.3d 378, 385-87 (2d Cir. 1996) (trial judge's inquiries, which demonstrated disbelief in defendant's testimony and forced him to admit error before the jury, "targeted the defendant's credibility and challenged his story more in the manner of a prosecutor").

***Defense Expert Testimony***.  The defense also objected to the Court's questions to Dr. Robinson, a professor of finance and a defense witness.  *See* First Def. Bias Ltr. 6 ("Professor Robinson was effectively driven off the stand by the court in this case.").  The defense does not cite the transcript in support of this assertion, however, and the Court's questions to Dr. Robinson were for clarification and / or efficiency.  For example, the Court interceded for clarity in the following exchange:

> **THE WITNESS:** So there's — there's several studies in this area.  And I'm thinking of one, in particular, that describes — that describes this, it describes how investors evaluate the team first.  And if they — if they — they may make a decision not to invest in the team, potentially because of, you know, the fit of the team with their —

with their — I'm not making myself clear, here.

**THE COURT:** What's the study that you are describing? Is that the same survey you were talking about earlier or is it a different one?

**THE WITNESS:** No. It's not the same survey. It's a different survey.  Kaplan and Stromberg.

**THE COURT:** Okay, sorry, let's have the next question. I just want[ed] to understand what the context was.

Tr. 2713:15-14:4.  Other questions were intended to clarify whether testimony went to the subject of a prior (sustained) objection or not.  *See, e.g., id.* at 2750:16-51:10.  Along the way, the Court overruled several *government* objections to Dr. Robinson's testimony.[27]

The professor also described the Court's comment about its (relatively standard) practice of "qualifying" witnesses under Rule 702 as evidence of "disdain for the defense" — perhaps understandable for a non-lawyer, but surely not revealing of any bias.[28]

---

[27] *See, e.g.*, Tr. 2726:12-25; 2737:24-25; 2749:14-15; 2756:6-7; 2760:11-12; 2761:1-2.  The Court did rephrase (or vary) some compound or confusing questions the government put to the professor on cross-examination — again, to streamline the testimony and the trial.  *E.g., id.* at 2776:10-16. Indeed, Professor Robinson invoked this confusion, stating that he "found it impossible to understand a particular hypothetical question posed by [the] prosecution."  Ltr. to Chief Judge Margo Brodie dated July 1, 2024, ECF No. 234-2, at 1.

[28] Dr. Robinson complained to the Chief Judge that I had, among other things, declined to identify him as an expert in front of the jury.  *See* Ltr.

***Defense Counsel's Shouting.***  Mr. Sullivan complains that the Court asked him, at times, to lower his voice.  *See* First Def. Bias Ltr. 7.  These requests became necessary because Mr. Sullivan was indeed shouting with some regularity — first at prosecutors, and later at the undersigned, as exemplified in the margin.[29]  And it is of course within the Court's remit to call for civility.  Simultaneously with this call for civility, I invited defense counsel to "always feel free to ask me to

---

to Chief Judge Margo Brodie dated July 1, 2024, at 2.  He is referencing the following exchange:

> **MR. SULLIVAN:** At this point, Your Honor, we would tender Dr. Robinson as an expert in the area of entrepreneurial finance.
>
> **THE COURT:** I do not qualify witnesses as experts, but the witness may give testimony pursuant to Rule 702.

Tr. 2710:15-19.  This response was consistent with guidance from (among other sources) the Advisory Committee on the Rules of Evidence and the American Bar Association.  *See* Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendment ("The use of the term 'expert' in [Rule 702] does not, however, mean that a jury should actually be informed that a qualified witness is testifying as an 'expert.'  Indeed, there is much to be said for a practice that prohibits the use of the term 'expert' by both the parties and the court at trial."); ABA Civil Trial Standard 14 (Aug. 2007) ("The court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so.").

[29] *See* Tr. 285:12-87:22 (Trial Day 2) (shouting in response to government claim about inaccuracy of defense counsel's representations; Court asks him to lower his voice); *id.* at 1065:3-1068:11 (Trial Day 5) (The Court: "[W]e are going to maintain a level of civility and decorum during this trial that befits the setting.  I believe that I'm speaking to you in a civil tone throughout this trial and I will expect the same courtesy . . . I'm not sure who the shouting is intended for, if it's for the jury or for me or for someone else.  But regardless, it should not continue."); *id.* at 2747:16 (Trial Day 12) (Court asks Mr. Sullivan to "Please lower your voice" at sidebar, to avoid discussion being audible to jurors); *id.* at 3089:7-12 (Trial Day 14) (The Court: "The final thing I want to say [before bringing in the jury] is, Mr. Sullivan, that you had another bout yesterday of shouting at the Court.  That's not the first time that's happened in this case.  I don't want to spend my time thinking about what to do about that, but I'm just telling you right now that if that happens again there will be consequences.").

reconsider evidentiary rulings that I have made," noting that "[e]very trial judge ruling on the fly will get rulings wrong from time to time, me certainly included, and I welcome requests for reconsideration."  Tr. 1067:10-14.

      **Sua Sponte** *Objections*.  Counsel complained that the Court sustained its own objections to defense questions.  This is of course appropriate.  *See, e.g.*, *United States v. Johnson*, 529 F.3d 493, 503 n.6 (2d Cir. 2008) ("no rule" prevents a trial judge from "interceding *sua sponte*" to stop an improper examination); *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985) ("[I]f defense counsel pursues an objectionable line of questioning, he can hardly cry foul when the judge . . . excludes the testimony *sua sponte*.").  Still, some additional observations are in order.

      First, the Court sustained its own objections to the government's questions as well as the defense's.  *See, e.g.*, Tr. 322:18-20 (Court instructs government witness not to "testify to the operation of another person's mind, what they believed or didn't believe," without a contemporaneous objection from defense); *id.* at 435:24-36:13 (Court *sua sponte* revisits — and sustains — defense objection it had previously overruled, and strikes testimony); *id.* at 1584:7-8 (*sua sponte* objection to government asking its witness, regarding a disputed communication: "How did you feel when you received this

email?"); *id.* at 2778:6-9 (government asks defense expert about the mental state of actual Ozy investors); *id.* at 3638:5-7 (on cross-examination of defendant, government asks — with a hint of sarcasm — whether "California is by the Pacific Coast"); *id.* at 3736:5-8 (government asks Watson to opine on the tax concept of "gross receipts or sales"). These are examples; the Court has not made an exhaustive search of the trial transcript on this point.

Second, the Court objected to defense questions related to the dichotomy between refreshing recollection by reference to a document and substantive inquiry about a document. *E.g.*, *id.* at 1015:12-1018:22.

Third, many of the objections that the defense calls *sua sponte* actually were not. This is true, for example, of the very first objection listed in Mr. Sullivan's letter. *See* First Def. Bias Ltr. 3. He asked an Ozy witness about her knowledge of the accounting practices of a third party (Apple, Inc.). Tr. 133:18-19. The government objected, and the Court sustained the objection. *Id.* at 133:20-21. Mr. Sullivan then proceeded to ask the same exact question about Amazon instead of Apple, and the Court sustained an objection — obviously the same one the government had leveled at the prior question. *Id.*

at 133:22-34:1.[30]  Likewise, the defense's first example from

Samir Rao's testimony did not involve a *sua sponte* objection.

*See* First Def. Bias Ltr. 3.  That objection occurred as follows:

> **MR. SULLIVAN:** You have absolutely no fear, as you sit here today, that they are going to move to revoke your bail, do you?
>
> **THE WITNESS:** No, I couldn't say that I have no fear of that.
>
> **MR. SULLIVAN:** And you have no fear of that because you know that they're depending on you?
>
> ***AUSA: Objection.***
>
> **THE COURT:** Sustained.
>
> **MR. SULLIVAN:** You have no fear because you realize --
>
> **THE COURT:** Sustained.
>
> **AUSA:** Objection.

Tr. 984:19-85:3 (emphasis added).  Here, the Court was

clearly responding to the objection rendered immediately

prior (namely, that Mr. Sullivan's question

mischaracterized the witness's testimony).

>    3.    Rulings for the Defense

In response to the allegation of bias, it is also

worth noting (briefly) that a plethora of contested issues went

---

[30] The Court has not endeavored to review — let alone respond to — all defense examples here.  A brief spot-check, however, yielded the observations above.

the defense's way in this case.  A non-exhaustive list would include the following.

*First*, in response to Defendants' challenge to the U.S. Attorney's press release announcing the indictment, the Court concluded that the press release triggered the presumption of prejudice in Local Rule 23.1.  *See* Mem. & Order dated Nov. 6, 2023, at 37-41.

*Second*, when the government reported (well before trial) that Watson had violated the terms of a protective order by using sensitive documents in a separate civil litigation, and asked for his bail to be revoked, the Court declined, out of concern that pretrial detention would negatively affect Watson's ability to participate in his own defense.  *See* Status Conf. Tr. 5:13-11:20, ECF No. 106; Status Conf. Tr. 5:17-6:24, ECF No. 124.

*Third*, when the defense violated Rule 16 by failing to provide timely disclosure of its experts' conclusions, the Court permitted Dr. Robinson to testify anyway, and it overruled several of the government's substantive objections to his proposed testimony.  *See* Status Conf. Tr. 33:7-45:10, ECF No. 133.

*Fourth*, the Court expressed skepticism in response to the government's motion *in limine* to admit evidence of Watson's harsh conduct toward his employees.  *See id.* at 80:11-81:24

(noting that evidence about how Watson was "mean to his subordinates . . . could tend to provoke an emotional reaction to the evidence rather than a logical one").  The government did not seek to introduce such evidence at trial (at least in any way that provoked a renewed defense objection).

*Fifth*, when the government repeatedly asked Samir Rao to opine on whether *Watson* understood certain statements to be false, the Court sustained its own objections.  *See* Tr. 364:9-65:6.  The government pressed this issue, revisiting it the following day and citing case law.  Still, the Court declined to reconsider its ruling*.  Id.* at 528:3-31:10.

Again, these are simply examples; a comprehensive review of the transcript will indicate that other examples abound.

### 4.  Allegations of Financial Conflict

Finally, Defendants have alleged that the Court's financial holdings create the appearance of bias against the defense.  The Court has addressed these arguments at length in a separate order.  *See generally* Mem. & Order Denying Recusal, ECF No. 340.  Still, the Court pauses to comment on one point Watson raised before the Second Circuit.  The Court has not read, let alone contemplated addressing, the *totality* of Watson's appellate filings.  It has, however, observed one passage that merits a response.

In his Second Circuit filing of December 1, Watson references a statement by a defense consultant that the Court has a "direct pecuniary interest" in the underlying securities held by certain investment funds because those funds "maintain a capital account" on behalf of each investor. *See* Watson Br. in Supp. of Mot. for Stay 5, Docket No. 24-3037, ECF No. 20.1 (2d Cir. Dec. 1, 2024); *see also* Consultant Aff. ¶ 6, ECF No. 336-1. The consultant's assertion is not accurate. As the Court previously stated, the underlying securities in question are owned by the funds, not the investors in those funds. *See* Mem. & Order Denying Recusal 28 (the Court holds no "ownership interest in the underlying assets of the funds"). A capital account is simply an accounting device maintained by the fund — it does not constitute a legal interest in the fund's underlying assets. *See, e.g.*, *Solomon v. Siemens Indus., Inc.*, 8 F. Supp. 3d 261, 273 n.16 (E.D.N.Y. 2014) (quoting Black's Law Dictionary (9th ed. 2009) ("A capital account is an account on a partnership's balance sheet representing a partner's share of the partnership capital.")). Watson's assertion of a direct interest is simply false, as is his claim that the Court had not asserted otherwise. *See* Mem. & Order Denying Recusal 3 (the Court "never held" a "direct interest" in any of the alleged victims discussed in Watson's recusal motion).

## E.    Unsealing

At sentencing, the Court directed the parties to indicate whether (and why) any documents sealed in this case should remain so.  The government responded.  *See* Gov't Ltr. dated Jan. 6, 2025, ECF No. 368.  Defendants did not. Accordingly, for the reasons set out in the government's letter, ECF Nos. 10, 37, 111, 285, 306, 332, 333, 351, and 352 will remain under seal.  All other sealed documents in this case are ordered unsealed.  For the avoidance of doubt, this includes the list of interested parties at ECF No. 7, which Defendants previously moved to unseal.  *See* Def. Ltr. dated Nov. 6, 2024, ECF No. 334.

## G.    Restitution

The government seeks restitution of $36,869,153.97. Defendants argue that no restitution should be awarded.  For the reasons set out below, restitution will be awarded in the amount of $36,769,153.97.

### 1.    Applicable Law

Because Defendants committed fraud, restitution is required under the Mandatory Victims Restitution Act ("MVRA"). 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  Still, the government must prove each victim's actual loss and show that those losses were "directly and proximately caused" by the fraud.  *United States v. Calderon*, 944 F.3d 72, 94-95 (2d Cir. 2019).  This

39

means that the defendant's conduct must have been "a necessary factor in bringing about the victim's harm," and that such harm was reasonably foreseeable to the defendant. *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021).

2.  Defendants' Causation Arguments

At the Court's request, the government submitted a detailed list of victims and the corresponding restitution amounts sought, and additional detail thereafter. *See* Gov't Ltr. on Restitution & Forfeiture 6, ECF No. 373; Gov't Supp. Ltr. on Restitution & Forfeiture 2, ECF No. 377. Defendants do not dispute the calculations of each victim's actual loss, or the adequacy of their affidavits of loss. Tr. of Rest. H'ing 61:8-14, ECF No. 387. Rather, they argue that the government has not established a causal link between the victims' losses and Defendants' misrepresentations. Def. Supp. Ltr. on Restitution and Forfeiture 8, ECF No. 375.

The record robustly supports the finding that the fraud was a "necessary factor" in causing the victims' losses. The government's loss calculations begin in 2018. *See* Gov't Ltr. on Restitution and Forfeiture 5. At that point, Ozy was facing (and would continue to face) persistent cash-flow problems. *See, e.g.*, Tr. 312:21-18:6 (Ozy had "little to no cash left" by early 2018); *id*. at 569:20-23 (Ozy was in a "state of significant distress" in 2019); GX 3525 (Watson acknowledging

40

that Ozy was not profitable in 2020).  To obtain the capital the company needed to stay afloat, the evidence showed, Defendants lied to investors about Ozy's revenue and profitability, ongoing production partnerships, and the identities of other investors, among other subjects.

The government has identified trial evidence showing how each listed victim invested (at least in part) because of these misrepresentations.  *See* Gov't Ltr. on Restitution and Forfeiture 6-8.  This evidence is compelling as to causation-in-fact.[31]  *See, e.g.*, Tr. 2514:14-20:16 (employee of Antara Capital testifying that firm reviewed and relied on Ozy financial estimates before investing around $25 million); *id.* at 1328:7-56:18 (Thomas Franco testifying that Defendants' representations about Ozy's financial state influenced his decisions to invest); *id.* at 2226:22-67:19 (chairman of WTI testifying that representations about Ozy's financial state motivated firm's lending decisions).

Defendants appear to argue that the fraud did not proximately cause their victims' injuries — the indictment did.  According to the defense, Ozy was on its way to recovery in early 2023, and only foundered after this prosecution.  Def.

---

[31]  Although there is considerable record evidence that Defendants' victims acted in reliance on their fraudulent misrepresentations, an investor "may meet the causation requirement of the statutory definition of 'victim' [under the Mandatory Victims Restitution Act] without showing individual reliance."  *United States v. Marino*, 654 F.3d 310, 322 (2d Cir. 2011).

Supp. Ltr. on Restitution and Forfeiture 8-9 ("Indeed, the reality is that but for the government's atypical indictment . . . there would have been no improper loss."). On this view, the indictment was an intervening event that severed the causal link between Defendants' misrepresentations and their victims' losses.

This argument fails for at least three reasons. First, the defense identifies no evidence to support it. At oral argument, defense counsel relied solely on victim letters from non-employees and Beverly Watson (Watson's sister). Tr. of Rest. H'ing 58:9-24. When measured against the extensive trial evidence to the contrary, these letters are not credible or persuasive as to Ozy's potential for financial resurgence. Second, given Ozy's precarious financial state, it was eminently foreseeable to Defendants that victims who invested based on their misrepresentations could — even absent the indictment — lose the entirety of their investments. *See Marino*, 654 F.3d at 324; *Goodrich*, 12 F.4th at 229. And third, even if the indictment did play some role in Ozy's demise, it was reasonably foreseeable that Defendants' activities would result in an indictment. Indeed, Defendants' own CFO warned them that their conduct was "fraud," "illegal," and "a felony." *See* GX 6100. Given the verdicts, the Defendants can hardly claim that the indictment was an unforeseeable event, entirely the work of a

third party, that severed the chain of proximate causation between their misrepresentations and their victims' losses.

However, causation questions do limit the restitution owed to one victim.  Thomas Franco invested more than $3 million in Ozy, including approximately $100,000 in January 2023.  *See* Franco Aff. of Loss, ECF No. 373-7.  This was after both the period covered by the indictment and the revelations in the *New York Times* about one key episode in the fraud.  In essence, Franco made the 2023 loan after he was partially on notice of the possibility that Defendants were acting fraudulently.  So, it is questionable whether Defendants' concealment of their fraudulent activities induced Franco's 2023 loan.  Accordingly, the Court will reduce the government's requested restitution award by $100,000.

### 3.   Defendants' Arguments as to Specific Victims

In addition to their causation argument, Defendants make several victim-specific arguments, which the Court finds either inapposite or unpersuasive.

Defendants first note that several of Ozy's investors — such as Kosmas Kalliarekos and Beverly Watson — have "disavowed any interest in any financial remedy."  Def. Supp. Ltr. on Restitution and Forfeiture 8.  This assertion is irrelevant, as a sentencing court "must . . . impose orders of restitution on defendants convicted of crimes identified in the

43

MVRA even if their victims decline restitution." *United States v. Johnson*, 378 F.3d 230, 244 (2d Cir. 2004).  Still, the government has not sought restitution on behalf of these investors, and nothing in *Johnson* suggests that a court must award restitution where neither the government nor the victim seek it, and where the government offers no restitution calculation.  Accordingly, the Court will not award restitution to investors that do not appear on the government's list of victims.

Defendants then argue that one investor – WTI – suffered no loss and thus should not receive restitution.  WTI was a "venture lender": it raised money from investors (in a fund structure) and loaned to start-up companies.  Tr. 2200:5-7, 2202:11-23.  During the indictment period, WTI loaned Ozy more than $10 million.  *Id.* at 2247:6-59:7.  In September 2021, the firm "waive[d] all future interest and fees" on those loans in exchange for an immediate payoff of the outstanding principal balance.  *Id.* at 2275:12-24, 2307:20-08:5.  According to WTI Chairman Maurice Werdegar, the firm took this step to protect its own investors.  *Id.* at 2271:14-18.  Werdegar had read the *New York Times* article suggesting that Defendants had attempted to deceive Goldman Sachs, and also learned that Defendants were keeping WTI-loaned funds in a "bank that hadn't been previously

reported to [WTI]," in violation of Ozy's loan agreement. *Id.* at 2274:11-75:20.

Defendants claim that because WTI agreed to waive future interest and fees, it cannot now claim them in restitution. Def. Supp. Ltr. on Restitution and Forfeiture 9. This is incorrect. The record makes clear that WTI only forewent its right to collect interest and fees upon seeing indications of the fraud. In other words, the loss of interest and fees "flowed naturally and directly from the collapse of [Ozy's] fraud scheme." *United States v. Boccagna*, 450 F.3d 107, 120-21 (2d Cir. 2006). Because WTI could only "minimize[] its out-of-pocket loss" by accepting a partial loss, it may now recover that loss in restitution. *Id*.

4.   Amount of Restitution and Payment Schedule

The Court concludes that the appropriate amount of restitution is $36,769,153.97. Having considered the factors relevant to the schedule of payments, *see* 18 U.S.C. § 3664(f)(2), the Court orders Watson to pay restitution at $25 per quarter while incarcerated. Following his incarceration, restitution shall be paid monthly, on a marginal basis, as follows:

| Monthly Gross Income | Percentage of Gross Income to be Paid |
|---|---|
| First $5,000 | Five percent |

| $5,000 to $15,000 | Ten percent |
| $15,000 to $40,000 | Twenty percent |
| $40,000 and above | Forty percent |

With respect to Ozy, the full amount of restitution is due immediately. Defendants shall be jointly and severally liable for the full loss. *See United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004).

## H.  Forfeiture

The government seeks forfeiture of $59,590,357.37. Defendants oppose, arguing that no forfeiture should be awarded. For the reasons set out below, forfeiture will be ordered in the amount sought by the government.

### 1.  Section 981's Application to Securities and Wire Fraud

Under 18 U.S.C. § 981(a)(1)(C), the "proceeds" of specified crimes — including securities fraud and wire fraud conspiracies — are subject to forfeiture. Section 981 defines "proceeds" differently in different cases, depending on whether Defendants transacted in "illegal goods" or "lawful goods." Section 981(a)(2)(A) calls for the forfeiture of all property obtained through the sale of illegal goods, with no netting of the defendant's costs. Section 981(a)(2)(B), on the other hand, permits the direct costs "incurred in providing the goods or services" to be deducted. The parties dispute whether

46

subsection (a)(2)(A) or (a)(2)(B) applies. *See generally United States v. Percoco*, No. 16-CR-776, 2019 WL 1593882, at *2-*4 (S.D.N.Y. Apr. 15, 2019), *aff'd*, 13 F.4th 180 (2d Cir. 2021), *rev'd and remanded on other grounds,* 598 U.S. 319 (2023) ("The case law provides no clear way to delineate these two categories of conduct . . . . Those decisions that do exist have failed to set forth a clear methodology for determining whether a case falls under § 981(a)(2)(A) or (B).")

The Court will apply subsection (a)(2)(B). The "illegal transactions" at issue are the sale of stock by Ozy pursuant to various misrepresentations. The case thus involved Defendants' provision of nominally "lawful goods" — stock in a media business — to equity investors. *See United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012) ("A security is a 'lawful good' for the purposes of § 981(a)(2)(B).").[32]

A less-settled question is how to calculate the "direct costs" incurred in the illegal transactions at issue — that is, the fraudulent sales of that stock.[33] The statute provides some guidance as to what is *not* a direct cost: the

---

[32] Some courts have suggested that this will not be the case when the entity issuing the shares has no true operations at all, as would be the case in (for example) a Ponzi scheme. *See United States v. Sigillito*, 899 F. Supp. 2d 850, 864-65 (E.D. Mo. 2012). But that is not the case here, as the Court noted early on in the case. *See* Mem. & Order dated Nov. 6, 2023, at 40 (noting that the indictment described Ozy as an operating media company, and calling the press release "hyperbolic" for describing the company as a "criminal organization").

[33] The equivalent in the debt context — such as the transactions with WTI — would be the value of the note Ozy provided.

"overhead expenses of the entity" issuing that stock.  18 U.S.C. § 981(a)(2)(B).  But the most obvious reading — and the one the Court adopts here — is that the "cost" to Ozy and Watson is the fair-market value of what they gave up in those transactions. That is to say, the direct cost of the "goods" provided — the shares of stock — is the value of that stock.

The burden is on Defendants to prove the value of that stock.  *United States v. Mandell*, 752 F.3d 544, 553-54 (2d Cir. 2014); *see also United States v. Naranjo*, No. 13-CR-351, 2015 WL 2381322, at *3 (S.D.N.Y. May 13, 2015) ("Defendants bear the burden to prove not just that they incurred direct costs, but also the amount of the costs to be deducted.").  Here, Defendants have not established that the stock had any value at all.  As alluded to above, Ozy was burning cash during most of the indictment period.  *See* GX 3525 ("Are we profitable and I do not know it?"); *see also* Tr. 192:17-94:7 (Rao testifying that "investors would be resistant to investing in a company that was running out of cash").  And its underlying problems were getting worse, not better.  *E.g.*, Tr. 306:22-08:10, 312:21-14:5, 315:19-18:23, 328:16-24 (Rao testifying about increasing financial issues, that Ozy lacked the cash at one point to make payroll, and that the failure to make payroll would have led to "the company disintegrating quickly").  There was no reason to

believe the business would become profitable (or cash-flow positive) before it collapsed into insolvency.[34]

Absent some valuable assets, a company in that position is worth zero (or a negative value).  This is a basic truism of discounted cash flow analysis — if cash flows are going to be negative in perpetuity (or, more likely, until an imminent collapse) — then the company has no value, absent some residual asset value.  *See generally Thompson v. Comm'r of Internal Revenue*, 115 F.2d 661, 662 (2d Cir. 1940) ("The common stock of a corporation has no value when its assets fairly appraised are less than its liabilities except when there is a reasonable prospect of improved conditions which will bring about the reverse."); *In re Puda Coal Sec. Inc. et al. Litig.*, No. 11-CV-2598, 2017 WL 65325 (S.D.N.Y. Jan. 6, 2017), *report and recommendation adopted sub nom. In re Puda Coal Sec. Inc.,* No. 11-CV-2598, 2017 WL 511834 (S.D.N.Y. Feb. 8, 2017) ("[I]f [the company] owned nothing, had no income-producing operations and no plans to develop income-producing operations, then its stock would have no value.").  And as discussed below, Defendants have not even endeavored to establish any residual

---

[34] Indeed, the weight of the evidence at trial suggested that the capital markets were closed to Ozy on the true facts.  If Ozy could have raised the cash it needed without misrepresenting its financial picture (and subjecting its employees to felony charges), it would presumably have done so.

value in the company's shares, despite their own call for the
application of Section 981(a)(2)(B).

    2.   Watson's Arguments

        Watson apparently seeks to include *all* of Ozy's
"expenses" in the category of "direct costs" under
subsection (a)(2)(B).  *See* Def. Supp. Ltr. on Restitution and
Forfeiture 2 (Ozy's expenses totaled "way more than [] the $59M
in forfeiture which the government improperly seeks"); *id.* at 8
(arguing that "Defendants have amply met their burden of proving
that [Ozy]'s costs exceeded revenue").  Watson is joined by the
corporate defendant in these arguments.  But he cites no
authority for the proposition that every dollar Ozy spent
constitutes a "direct cost" that was "incurred in providing the
goods" at issue.  18 U.S.C. § 981(a)(2)(B).  And he makes no
effort to, for example, exclude the "overhead expenses of the
entity providing the goods," as the statute explicitly
requires.[35]  *Id.*  This argument thus falls short.

        Watson has also suggested that even now, after its
operations have been suspended, the company (and its shares)
have a positive value because of Ozy's content library.  Sent.

---

[35] This effort would be especially warranted here, given the substantial
sums Ozy expended *in the effort* to perpetrate the charged frauds.  *See, e.g.*,
Tr. 411:19-21:15, 3788:22-24 (Watson traveled to South Korea, where he met
with investors who were later provided with fraudulent revenue data); GXs
6039, 6039A (reflecting misrepresentations to investors whom Watson traveled
to the Middle East to meet).

Tr. 65:25-66:4, 67:4-12, 71:1-5.  But the burden is on him to establish that, and he has not shown any third-party interest in any of this content that supports a positive valuation.  And the trial evidence suggested the opposite conclusion — that the company's assets had no residual value.  *See, e.g.*, Tr. 330:5-23 (Rao testifying about a "significant cash crunch" in 2018, and stating that if Ozy had run out of money, the shareholders' "investment would have been worthless").

Finally, Watson has suggested that even if Ozy is subject to forfeiture, he should not be held jointly and severally liable for that forfeiture under *Honeycutt v. United States*, 581 U.S. 443 (2017).  Def. Initial Ltr. on Forfeiture 7, ECF No. 357.  This argument is mistaken.  "*Honeycutt*'s bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes."  *United States v. Tanner*, 942 F.3d 60, 67-68 (2d Cir. 2019).  And the Second Circuit has made clear that "an individual obtains proceeds indirectly through a corporation when the individual so extensively controls or dominates the corporation and its assets that money paid to the corporation was effectively under the control of the individual."  *United States v. Peters*, 732 F.3d 93, 103-04 (2d Cir. 2013).  Here, the trial record shows that Watson — the co-founder and CEO of Ozy — wielded extensive control over Ozy.  *See, e.g.*, Tr. 175:22

51

(Ozy's vice president of finance stating that "Carlos dictated terms, like in what was acceptable."); *id.* at 1559:3-5 (Ozy's CFO describing Watson's leadership style as "based much more on the ultimate manager's mission and values and discretion"); Watson PSR ¶ 62, ECF No. 332 (Watson was "only person at Ozy with the authority" to bar the company from paying Samir Rao's and Suzee Han's legal bills).  Accordingly, joint and several liability is appropriate here.

Watson's request to stay the restitution and forfeiture orders pending appeal is denied.

### III. Conclusion

The Court orders that Defendants pay restitution in the amount of $36,769,153.97.  The Court also concludes that the United States is entitled to a forfeiture money judgment in the amount of $59,590,357.37.  Defendants will be jointly and severally liable for both amounts.  An amended judgment reflecting these amounts shall issue forthwith.  Pursuant to Federal Rule of Criminal Procedure 32.2(e)(1), the Court will also amend the general orders of forfeiture entered against both Defendants to reflect the final amount of the money judgment. *See* ECF Nos. 369-1, 371-1.


SO ORDERED.

_/s/ Eric Komitee_

ERIC KOMITEE
United States District Judge

Dated:     February 16, 2025
           Brooklyn, New York